# ATTACHMENT E

COPY

1

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3

4    - - - - - - - - - - - - - -x

5    SEDERIS FIELDS                    :

6            Plaintiff,               :

7    vs.                               :   Civil Action 06-00538 (HHK)

8    MIKE JOHANNS,                     :

9    Secretary, United States         :

10   Department of Agriculture        :

11           Defendant.               :

12   - - - - - - - - - - - - - -x

13                                   Washington, D.C.

14                                   February 22, 2007

15

16   Deposition of:

17                   SEDERIS FIELDS,

18   the Deponent, called for examination by counsel for the

19   Defendant, pursuant to notice and agreement as to time and

20   place, at 501 3rd Street, N.W., Washington, D.C., before

21   Timothy J. Atkinson, a Notary Public in and for the District

22   of Columbia.

23

24

25

```
 1  APPEARANCES:

 2             On Behalf of the Defendant:

 3             JUDITH KIDWELL, ESQUIRE

 4             Assistant United States Attorney

 5             555 4th Street, N.W.

 6             Washington, D.C.

 7             202-514-7250

 8

 9             On Behalf of the Plaintiff:

10             DAVID BRANCH, ESQUIRE

11             1825 Connecticut Avenue, N.W., Suite 690

12             Washington, D.C. 20009

13             202-785-2805

14

15             On Behalf of the Agency:

16             NEHA HEWITT, ESQUIRE

17             1400 Independence Avenue, S.W., Suite 3312-5

18             Washington, D.C. 20250

19             202-690-2178

20

21

22

23

24

25
```

3

```
 1                            I N D E X

 2  WITNESS:                EXAMINATION:              PAGE:

 3  Sederis Fields        Direct - Ms. Kidwell          4

 4

 5                          E X H I B I T S

 6  EXHIBIT NO.            DESCRIPTION:               PAGE:

 7     1          Resume of Sederis Fields             97

 8     2          Application for Federal Employment   100

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    P R O C E E D I N G S
 2                                          (10:00 a.m.)
 3    (Whereupon,
 4                         SEDERIS FIELDS
 5    was called as a witness and after having been first duly
 6    sworn, was examined and testified as follows:)
 7                      DIRECT EXAMINATION
 8         BY MS. KIDWELL:
 9         Q.   Would you state your full name, please?
10         A.   Sederis W. Fields.  The W. stand for Ward, W-a-r-d.
11    But you know --
12         Q.   Ms. Fields, for the record, I'm Judith, J-u-d-i-t-h,
13    Kidwell, K-i-d-w-e-l-l.  I'm an Assistant United States
14    Attorney here in this office.  I'm going to be asking you some
15    questions today.  Before we begin though I'm going to ask you
16    some questions, and as your counsel will advise you, this is
17    just to make sure that everything is okay with respect to your
18    testimony today, and that you can proceed forward.
19              First of all, as to whether or not you've recently
20    consumed any alcohol, drugs?
21         A.   Oh, no.
22         Q.   Are you on any type of medication that would affect
23    your ability to give testimony today?
24         A.   No, no more than Nexium, I don't think that would --
25         Q.   What type of medication are you taking?
```

5

```
 1        A.    Nexium for indigestion, acid reflex (sic).

 2        Q.    And for the record, do you understand that your

 3   testimony is being recorded and that you are under oath at

 4   this time?

 5        A.    Yes.

 6        Q.    Ms. Fields, if at any time you do not understand a

 7   question that I ask you, please let me know.

 8        A.    Okay.

 9        Q.    I'll be glad to rephrase any question that you have.

10   If at any time you want to break and discuss something with

11   your counsel, please let us know that, we will go off-the-

12   record and allow to speak to Mr. Branch.

13        A.    Okay.

14        Q.    If you need a break at any time, to go to the rest

15   room or to get a drink of water or anything like that, again,

16   just let us know.

17        A.    Okay.

18        Q.    Now, have you had your deposition taken before?

19        A.    No.

20        Q.    What is your present address?

21        A.    9308 Locksey, L-o-c-k-s-e-y, Road, Fort Washington,

22   Maryland, 20744.

23        Q.    Where are you presently employed?

24        A.    I am employed with the Department of Agriculture,

25   the Deputy Administrator Office, Field Operations -- Service
```

1  Agency.

2       Q.    What is your present title?

3       A.    My present title is program coordination specialist.

4       Q.    Who is your supervisor at this time?

5       A.    At this time John Shott is my supervisor.

6       Q.    And can you generally describe your duties at this

7  time?

8       A.    Yes, I serve as personnel misconduct investigator.

9  In fact, I just did a case in October.  And I'm resolving --

10  in the process of resolving this issue for EEO mediations that

11  cover the field offices at the state, and that falls in the

12  purview of DAFO.  I handle the student program.

13       Q.    What is the student program?

14       A.    Oh, I'm sorry, the internal program such as 1890,

15  summer interns for the states.

16       Q.    When you say you handle the program, what exactly do

17  you do?

18       A.    I serve as the liaison between Washington FSA office

19  and the states offices.  DAFO, I supervise DAFO.  Supervisor

20  to the state executive directors in all 50 states, and we work

21  under him and you know, you delegate the work so that we have

22  to make sure that the states are in compliance with the

23  various stipulations about summer intern programs.  Like, for

24  example, we alligate so many slots for the summer program and

25  therefore we, you know, go out to the states and if they're

1  interested in the summer intern program, and make selections

2  and 1890 program is an intern program for historical black

3  colleges.  And the HAKU program is for the Hispanic students,

4  and this is very -- goes back to when I worked in civil

5  rights.

6      Q.    Okay.  Is there any other duties that you presently

7  perform?

8      A.    Okay, outreach.  Okay, the outreach liaison.  In

9  fact, I served at that for, for the farm programs.  What the

10 outreach program is trying to do right now is to increase the

11 number of minority farmers in the states, and we have outreach

12 staff, and I served as the liaison -- because the outreach

13 staff won't go straight to the states.  They have a liaison as

14 serves the state since the deputy is over all the SEDs, so I

15 serve as liaison working with them to try to increase the

16 minorities in the state offices, participation of all --

17     Q.    When you say SEDs, what are you referring to?

18     A.    State Executive Directors, and they are all over the

19 state offices.  What happens is we have county offices in

20 every county.  The state -- appointees and they oversee the

21 county offices.

22     Q.    One of the things we often do in the government is

23 use a lot of acronyms --

24     A.    Right.

25     Q.    -- so I'm going to ask you today, if you'll, if

1    you'll try to remember and I'll try to remind you, to spell

2    things out --

3        A.    Okay.

4        Q.    -- if you will and not to use acronyms.

5        A.    And a lot of other things come up with, you know,

6    duties as, as required for us to do.  And I serve as a liaison

7    to the civil rights staff.  Now, I work a lot with the civil

8    rights staff -- Title 6 is the program part of civil rights,

9    Title 7 is the program part.

10        Q.    Okay.  Where were you born?

11        A.    I was born in Wilson, North Carolina.

12        Q.    Did you attend high school in North Carolina?

13        A.    Yes, I did.

14        Q.    Where?

15        A.    Fike (phonetic) Senior High School.

16        Q.    And did you graduate from high school?

17        A.    Yes, I did.

18        Q.    Did you attend college anywhere?

19        A.    Yes.

20        Q.    Where did you attend college?

21        A.    I've been -- right now I'm maybe about 32 hours away

22    from my bachelors at Howard.  But I attend the University of

23    Maryland, P.G., I do have an associate degree.  And my focus,

24    I started leaning towards median (sic).  I received -- I'm a

25    certified mediator from George Mason University.

1    Q.    Okay, why don't, why don't we go one step at a time.

2  What was the first college or university that you attended

3  after you graduated from high school?

4    A.    P.G.

5    Q.    P.G. County?

6    A.    Uh-hum, Prince George County.

7    Q.    Prince George County.  Is that a community college?

8    A.    Right.

9    Q.    Okay.  And what did you study at the community

10  college?

11    A.    Business administration.

12    Q.    Okay.  And did you get a degree from that --

13    A.    Yes.

14    Q.    -- college?  And what type of degree is that?

15    A.    Business administration.  I got it here, I just --

16          MR. HEWITT.    That's okay.  Just answer the

17  question --

18          WITNESS.    Okay.

19          MR. HEWITT.    -- Ms. Fields.

20          WITNESS.    Okay.

21          BY MS. KIDWELL:

22    Q.    So from the community college you got a degree in

23  business management?

24    A.    Right.

25    Q.    And do -- is that an associate degree?

1    A.    Right, uh-hum, yeah.

2    Q.    Okay.

3          MR. HEWITT.    And just try to say yes or no instead

4    of uh-hum.

5          BY MS. KIDWELL:

6    Q.    What's the next college or university?

7    A.    University of Maryland.

8    Q.    Okay.    And do you remember what year you were at the

9    University of Maryland?

10   A.    I transferred my credits to the university from P.G.

11   Q.    Okay, so you transferred credits from the P.G.

12   Community College to the University of Maryland?

13   A.    Right.

14   Q.    Okay.    And what -- when did you go to the University

15   of Maryland?

16   A.    1993, '9 -- about 1993 or '94.

17   Q.    What did you study at the University of Maryland?

18   A.    Business, business courses, business law, several

19   business courses.

20   Q.    Okay.    Did you get a degree from the University of

21   Maryland?

22   A.    No, I did not.

23   Q.    Okay.    Now, what's the -- most of your, your classes

24   were in some type of business?

25   A.    Yes,

1    Q.    Okay.  After you went to, excuse me, after you went

2  to the University of Maryland what college or university did

3  you go to?

4    A.    Howard.

5    Q.    Howard?

6    A.    Uh-hum.  I'm sorry.

7    Q.    Do you remember when you started at Howard?

8    A.    '97, I think it was around '97, '96.

9    Q.    Okay.  What did you study at Howard University?

10   A.    Business and -- yeah, just business.  Oh, I'm

11  sorry -- yeah, because after my -- '96, '97, in that area.

12   Q.    Okay.  And you studied business what,

13  administration, or business management?

14        MR. HEWITT.   Allow her to finish, Ms. Fields,

15  before you start to answer.

16        WITNESS.   All right, yes.

17        BY MS. KIDWELL:

18   Q.    Which one?  Business administration?

19   A.    Business administration.

20   Q.    And that was at Howard University?

21   A.    Yes.

22   Q.    And did you get some type of degree from Howard

23  University?

24   A.    No, I did not.

25   Q.    Okay.  And what's the next school after that?

1    A.    I attended George Mason University.

2    Q.    George Mason.  That's in Virginia?

3    A.    Right.  Yes, it is.

4    Q.    Okay.  And do you remember when you went to George

5 Mason?

6    A.    I received my certificate for certified mediation in

7 2001 or 2000, one or the other.

8    Q.    So you got a certificate in mediation from there?

9    A.    Right, I'm a certified mediator.

10   Q.    Okay.  Did you -- after George Mason did you attend

11 any other colleges or universities?

12   A.    All the time I was taking courses, you know, at

13 Howard.

14   Q.    Okay.  Were all those courses in business

15 administration?

16   A.    Yes, it was.

17   Q.    Okay.  Are you still working on a degree --

18   A.    Yes.

19   Q.    -- at Howard University?

20        MR. HEWITT.  Allow her to finish, Ms. Fields.  You

21 have to -- okay, just relax he a little bit and allow her to

22 ask the question, please.

23        WITNESS.  Yes.

24        BY MS. KIDWELL:

25   Q.    Are you still working on a degree from Howard

1  University?

2        A.    Not at this time, no.

3        Q.    But you don't have a degree yet from Howard?

4        A.    No.

5        Q.    Prior to working at the United States Department of

6  Agriculture, can you tell me after graduating high school what

7  employment -- you may not be able to remember every little

8  summer job or anything, but major jobs that you had before you

9  began working for the Department of Agriculture?

10       A.    I started very young.  I attended secretarial school

11 here in Washington, and I -- my first job was at Treasury,

12 U.S. Department of the Treasury.  I only worked there a short

13 while, you know.

14       Q.    Do you remember what year that was?

15       A.    Probably in the '80s.

16       Q.    What did you do at the Department of Treasury?

17       A.    I worked in Employee Relations as the secretary,

18 Employee Relations, Personnel.

19       Q.    And approximately how long did you work at Treasury?

20       A.    About two, three years.

21       Q.    And after the Department of Treasury where did you

22 go to work?

23       A.    I worked at -- for a short time I worked at Naval

24 Research Lab.

25       Q.    Where is that located?

14

1       A.    In Washington, D.C.

2       Q.    And what did you do at the Navy Research Lab?

3       A.    I was a secretary.

4       Q.    And how long did you stay at the Navy Research Lab?

5       A.    Approximately two years or less.

6       Q.    Do you remember, was there a certain division at the

7  Navy Research Lab that you were a secretary for?

8       A.    Not, not right off, no.

9       Q.    Do you remember any of your supervisors' names?

10      A.    No.

11      Q.    Do you remember approximately what year that would

12  have been?

13      A.    Probably 1980.

14      Q.    And after you left the Navy Research Lab where were

15  you next employed?

16      A.    I -- for a short time I moved out of the area.

17      Q.    Okay, and where did you move to?

18      A.    North Carolina.

19      Q.    And where in North Carolina did you move?

20      A.    Wilson.

21      Q.    You moved back to Wilson?

22      A.    Uh-hum.

23      Q.    Where you were born?

24      A.    Right, uh-hum.

25      Q.    And how long did you live back in North Carolina

1    then?

2         A.    Maybe a year.

3         Q.    And you didn't -- you weren't employed during that

4    year?

5         A.    Yes, I, I worked for an attorney's office,

6    Butterfield.  He's now -- Butterfield.

7         Q.    You worked for an attorney?

8         A.    Attorney's office, uh-hum, Butterfield.

9         Q.    And his name is Butterfield?

10        A.    Butterfield, uh-hum.

11             MR. HEWITT.   Yes or no?

12             WITNESS.   Okay, yes.

13             BY MS. KIDWELL:

14        Q.    What type of work did this attorney do?

15        A.    I was secretary so --

16        Q.    Did he have a criminal practice or do civil work?

17   Do you remember?

18        A.    I don't remember.

19        Q.    But you acted as a secretary there?

20        A.    Yes.

21        Q.    Okay.  And what is your next employment?

22        A.    U.S. Department of Agriculture.

23        Q.    Okay.  And that was what year?

24        A.    I think it's 1983.

25        Q.    Did you go directly working for the attorney,

1  Butterfield, to the U.S.D.A. or was there any time period

2  between?

3      A.    There was a time period.  It was just -- I was just

4  part-time, you know, doing assisting him.  So --

5      Q.    Do you remember what year you worked for the

6  attorney, Butterfield?

7      A.    Probably in 1982 or -- you know, just before --

8      Q.    Do you know if Mr. Butterfield is still practicing

9  law?

10     A.    He's a congressman now.

11     Q.    So you started at the Department of Agriculture in

12 around 1983?

13     A.    Right, yes.

14     Q.    And what was your first job at the Department of

15 Agriculture?

16     A.    I worked in the division -- the Tobacco, Peanuts

17 Division.

18     Q.    I'm sorry?

19     A.    Tobacco, Peanuts Division.

20     Q.    Tobacco --

21     A.    And Peanuts Division.  Oh, I'm sorry.  I started out

22 with a scientist, and I don't remember -- working with a

23 scientist, Cooperative Research, and what happened, they, they

24 had a RIF and I went to Tobacco and Peanuts, Tobacco and

25 Peanuts Division, because it was, you know, a short time with

 1  Cooperative Extension.

 2        Q.    So when you first went into the Department though --

 3        A.    I went to Cooperative Extension.

 4        Q.    Cooperative --

 5        A.    Cooperative Extension.

 6        Q.    Okay.  And can you generally describe what your

 7  duties were at that time?

 8        A.    I worked for a scientist and did typing because they

 9  did -- they went out and did research on whatever, they

10  brought these reports back and I typed with them, did

11  secretary duties.

12        Q.    And so you went from there to this Tobacco and

13  Peanuts Division?

14        A.    Right, uh-hum, right.

15        Q.    And what did you do in that division?

16        A.    I served as the secretary to the Deputy Director.

17        Q.    And how long were you a secretary to the Deputy

18  Director of that division?

19        A.    For approximately two years.

20        Q.    And where, where in the Department did you go next?

21        A.    To area office of -- the office -- it was called --

22  it was a different name then.  It was Deputy Administrative

23  County Office Employees -- Deputy Administrator of State and

24  County Operations.

25        Q.    And what did you do there?

1      A.    I was a secretary to the director.

2      Q.    And how long did you work there?

3      A.    About two years.  Approximately two years.

4      Q.    And you generally performed secretarial duties for

5  him?

6      A.    Yes.

7      Q.    And what was your next position?

8      A.    The EEO civil rights.

9      Q.    I'm sorry, could you repeat that please?

10      A.    Equal Employment Opportunity, and the Office of

11  Civil Rights.  Then -- that was the name then.

12      Q.    What was your title though?

13      A.    I went there first as a secretary, and then I

14  applied for a position, and I became EEO assistant.

15      Q.    Do you remember what year you became an EEO

16  assistant?

17      A.    Maybe in the '90s.  Maybe '90, around that time.

18      Q.    So you started out as a secretary, and then you

19  applied for a position as an EEO assistant?

20      A.    Right.

21      Q.    And you were hired for that position?

22      A.    Right.

23      Q.    And can you describe your duties as an EEO assistant

24  to me?

25      A.    Yes.  As an assistant I -- it was like, training to

1  do your specialist.  I assist the specialist in civil rights

2  duties such as counseling and EEO, management evaluations.

3      Q.   Did you counsel employees?

4      A.   Not actual -- I was actually in training.  As an

5  assistant, you assist them in doing, like, setting up for

6  counseling, assistant on -- I went out on state management

7  evaluations and that is to go out to the states and evaluate

8  whether or not they're in compliance with the EEO and civil

9  rights regulations.

10     Q.   And do you remember the names of any of the

11 individuals that you were assisting?

12     A.   Yes, Mary Parker.

13     Q.   Mary Parker?

14     A.   Uh-hum -- Freeman --

15     Q.   Is that P-a-r-k-e-r?

16     A.   Right, uh-hum, uh-hum.

17     Q.   And who is the next one?

18     A.   Jean Freeman.

19     Q.   Is that J-e-a-n?

20     A.   J, uh-hum.

21     Q.   And Freeman?

22     A.   Right.

23         MR. BRANCH.   You have to say yes or no.

24         WITNESS.   Yes.

25         BY MS. KIDWELL:

1      Q.    Anyone else, do you remember?

2      A.    No.

3      Q.    And how long did you serve in this assistant

4  position?

5      A.    Maybe two years.

6      Q.    Okay.  And, and then --

7      A.    I applied for a specialist position.

8      Q     So you then applied for an EEO specialist position?

9      A.    Right.

10     Q.    And can you remember approximately when that was?

11     A.    Maybe '93 or '94.

12     Q.    And did you get that position?

13     A.    Yes.

14     Q.    And can you describe for me what an EEO specialist

15  does?

16     A.    Yes, in that position I was named as the National

17  Federal Women's Program manager, and that is to give guidance

18  to the state, Federal Women's Program manger, to develop

19  programs, to outreach to new women in the agency, and I did

20  special emphasis -- special emphasis covered -- in fact, I

21  developed the special emphasis program, I was awarded for

22  that, I special emphasis club for all the, the programs

23  dealing with the Asians, the Hispanics, African-Americans,

24  disability.  So I developed the special emphasis program and

25  did Federal Women Program.  I conducted at that time -- the

1    training as I had an assistant, I was able to go out as a team

2    leader to conduct management evaluations for the states.

3        Q.    So you went out to the states and conducted

4    management --

5        A.    Evaluations.

6        Q.    Okay.  And can you describe for me what you do when

7    you go out and, and conduct a management evaluation?

8        A.    First of all, we -- conference with the state

9    executive director and we explain to them why we're in the

10   state, and we usually cover about one-third of the state.

11   It's usually maybe four -- three to four people on a team and

12   we usually cover certain areas.  But because of my experience,

13   you know, I served as a team leader on quite a few of them.

14   And we, we, we developed as a -- and I assisted in developing

15   a questionnaire and we -- at random we picked certain

16   employees and interviewed them.  We always interviewed state

17   executive director, the county office employees at random, and

18   they had this county office committees, and we usually tried

19   to interview the minority advisors just -- and then once we

20   interview we take the information back to Washington and

21   compile a report.  And once the -- we, you know, complete the

22   report we usually advise deputy administrator -- on our

23   findings of the, the -- out of compliance, it's not in

24   compliance, they're noncompliance we usually stress. And after

25   that the state would have to submit to us a corrective action

1  plan and we usually monitor that plan and approve it, you

2  know, to insure that t hey did -- they in compliance.  There's

3  a time frame for it.  And once that, that they complete their

4  correction action plan then we will send them a letter that

5  everything is okay.  And in fact, we usually conduct

6  management evaluation in 10 states a year.

7        Q.    So when you're out there interviewing the employees,

8  what types of questions are you asking to find out whether the

9  program is in compliance?

10       A.    The first question we ask them if they're aware of

11  the civil rights responsibilities to farmers.  We like to know

12  if they're -- if what they're doing to diverse the work force,

13  because of course, the farm service agents really have a

14  problem with hiring minorities, you know.  So what we're

15  trying to increase minority participation in the programs.

16       Q.    So were these managers that you were interviewing?

17       A.    Yes.  The State Executive Director and the County

18  office -- CED, County Executive Director.

19       Q.    Now, did you review any types of documents when you

20  were in those offices?

21       A.    Yes.

22       Q.    What types of documents would you review?

23       A.    First thing, we would review the minutes from the

24  county office meetings, the committee usually meet -- I

25  don't -- every so often.  So the minutes should show what they

```
 1  discussed, and how many loans they may have approved for the
 2  farmers, the ones they rejected.  We check and see if, if the
 3  rejection letters are proper, if they gave them a right to
 4  file or to appeal.  We usually check on the --
 5       Q.   Did you also look in the loan files?
 6       A.   Yes.
 7       Q.   Go ahead, I didn't mean to interrupt.
 8       A.   Certify -- most of the time it's a noncompliance
 9  visit, letters of appeals.
10       Q.   So you were checking to see if they had given
11  letters of appeal?
12       A.   Right.
13       Q.   When someone had been turned down for a loan?
14       A.   And we interview -- there's a lot of discrimination
15  based on hiring, we interview the employees.  Award situation,
16  if they were aware of the EEO civil rights.  We should check
17  with them to see if they knew the special emphasis program
18  manager, if they knew of the civil rights coordinator.  These
19  are the people they can contact, and civil rights counselors.
20  We check -- one of the main things, we check to see if -- it's
21  required posters that should be up, like sexual harassment,
22  EEO policies, and we, we check also assessment for the, the
23  facilities, the bathrooms, the parking lot, measure it to make
24  sure that it's proper for someone that's disabled to get out.
25       Q.   So you would gather all this information and take it
```

```
 1  back then to headquarters --
 2      A.    Right.
 3      Q.    -- and compile a report?
 4      A.    Uh-hum.
 5      Q.    The team would?
 6      A.    Right.  But the team leader is in charge of the
 7  report, so I have several reports that I -- the members would
 8  submit their findings to me and I would finalize the report.
 9      Q.    So you would compile all that into one report?
10      A.    Right, yes.
11      Q.    Okay.  And that would -- that report would go to
12  who?
13      A.    That report is -- would go to the state executive
14  director from the director of EEO.
15      Q.    Okay.  And that report would be telling the state
16  director what the problems were?
17      A.    Yes.
18      Q.    Okay.  Did it go to anyone in headquarters as well?
19      A.    Yes, the deputy administrator of field operations,
20  and at that point, at that time, it was going to our
21  Department of Civil Rights.  We, you know, we have a
22  Department of Civil Rights that's over all the, the agencies,
23  civil rights.  So the position now is assistant civil
24  right -- you know, assistant, assistant of civil rights --
25  anyway.  The report would go to them.  We stopped that, but
```

1  they would, you know, a copy would usually come to the had of

2  the civil rights office --

3      Q.  Okay.  And all this was performed when you were an

4  EEO specialist?

5      A.  Yes.

6      Q.  Is that correct?

7      A.  Yes, yes.

8      Q.  And how long were you in that position?

9      A.  I was doing that maybe from '93 until '99.

10      Q.  Just as a ball park, can you estimate how many of

11  these reports you may have done?

12      A.  Right off I can think of maybe seven or more.  As a

13  team leader, just as a team leader.  Now, I've been on a lot

14  of teams, but as a team leader.

15      Q.  Yes.

16      A.  Okay, seven.

17      Q.  Okay.  So as team leader you compiled at least seven

18  reports.  And you also went on some of these teams as not the

19  team leader.  Is that correct?

20      A.  Yes.

21      Q.  Do you remember when you went on a team that

22  management evaluation when you were not the team leader who

23  any of the team leaders were at that time?

24      A.  Yes, Jean Freeman.  We went to Maryland.  Mary

25  Parker.  Oh, Florida -- I can't remember who was the team

1  leader in Florida, I went to Florida, but I was not the team

2  leader.

3      Q.  Ms. Fields, do you know whether Ms. Freeman or Ms.

4  Parker still work at the Department?

5      A.  Jean, Ms. Freeman, retired.

6      Q.  What about Ms. Parker?

7      A.  She, she retired also.

8      Q.  Do you stay in touch with either one of these

9  individuals?

10     A.  Yes.

11     Q.  Do you know where they live?

12     A.  Yes.

13     Q.  Do you mind tell us where they live, just generally?

14     A.  Mary Parker lives in Temple Hills, Maryland.  And

15  Jean moved to -- outside of Maryland.  I just sent a Christmas

16  card, I can't think.  She, she -- just sent a Christmas card

17  with a change of address and I can't think of where --

18          MR. BRANCH.  Just --

19          WITNESS.  Okay.

20          MR. BRANCH.  -- answer the question because --

21          WITNESS.  No.

22          MR. BRANCH.  -- everything you say is --

23          WITNESS.  No.

24          MR. BRANCH.  -- on the record.

25          WITNESS.  Oh, okay, I'm sorry.

1        MR. BRANCH.    You're speaking your mind on the
2    record.
3        WITNESS.    Oh, okay.    No.
4        BY MS. KIDWELL:
5        Q.    Okay.  So you were an EEO specialist then from
6    approximately 1993 to 1999, did you say?
7        A.    '99, 1999.
8        Q.    Okay.  And where did you go from there?
9        A.    To Deputy Administrator Field Operations.
10        Q.    And what was your position, first position, there?
11        A.    Program coordination specialist.
12        Q.    Program --
13        A.    Coordination specialist.
14        Q.    Specialist.  And when you were an EEO specialist,
15    you were in what series?
16        A.    260.
17        Q.    260?
18        A.    Uh-hum.
19        Q.    And then you went to the program coordination
20    specialist, and what series is that?
21        A.    301.
22        Q.    So you went from a 260 series to a 301 series.    Is
23    that correct?
24        A.    Correct.
25        Q.    Did you take any additional training in order to go

```
 1 │ from the 260 series to the 301 series?
 2 │     A.    Being that it is administrative, I didn't have to.
 3 │ The personnel reviewed my application to see if I could just
 4 │ cross over to that, and since it's in the same series, I was
 5 │ just able to be reassigned as a 301.
 6 │     Q.    But it wasn't the same series.  You went from a 260
 7 │ to a 301 series.
 8 │     A.    To a 301 series.  It was all administrative.
 9 │           MR. BRANCH.  Just allow her to ask the question.
10 │           BY MS. KIDWELL:
11 │     Q.    And you went into that position in what, around 1999
12 │ or 2000?
13 │     A.    Since '99.
14 │     Q.    '99?
15 │     A.    Uh-hum.
16 │     Q.    Okay.  And presently your position is program
17 │ coordination specialist?
18 │     A.    Right, yes.
19 │     Q.    And it's in the 301 series --
20 │     A.    Yes.
21 │     Q.    -- is that correct?
22 │     A.    Yes, it is.
23 │     Q.    Ms. Fields, let me just ask you, going back in terms
24 │ of all of your employment.  Have you ever been fired to asked
25 │ to resign from a job?
```

1    A.    No.

2    Q.    Who was your first supervisor when you first became

3    a program coordination specialist?

4    A.    Robert Springer.

5    Q.    Is Mr. Springer still with the Department as far as

6    you know?

7    A.    No, he's not.  He was an appointed with the

8    Democratic administration, so when the administration changed

9    he --

10    Q.    Do you stay in touch with Mr. Springer?

11    A.    No.

12    Q.    Who was your next supervisor?

13    A.    I think Carter -- Tim Carter, he was another

14    appointee, Tim Carter.

15    Q.    And how long did you work for Mr. Carter?

16    A.    Not very long, maybe a year.

17    Q.    Approximately a year you worked for Tim Carter?

18    A.    Right.

19    Q.    And how long did you work for Mr. Springer?

20    A.    Maybe two years.

21    Q.    Approximately two years?

22    A.    Two years, uh-hum.  And the only reason --

23    Q.    Let's start with Mr. Springer, can you describe for

24    me what your duties were with him for those two years, or

25    approximately two years?

1    A.    Yes, I did -- I conducted OIG investigator --

2 investigations.  I certify misconduct personnel investigation

3 (sic) and -- and he required me to investigate -- conduct some

4 investigations from OIG complaints coming from the states.  He

5 used --

6    Q.    Let me stop you right there.  So what would happen

7 is the Office of the Inspector General, I think is what you're

8 referring to --

9    A.    Right.

10    Q.    -- when you say OIG -- is that correct?

11    A    Right, yes.

12    Q.    So the Office of the Inspector General would refer

13 things over to Mr. Springer's office?

14    A.    Yes.

15    Q.    And these would be allegations regarding the states?

16    A.    Yes.

17    Q.    Is that correct?

18    A.    Yes.

19    Q.    And you were assigned the task of doing what with

20 respect to those referrals?

21    A.    Investigating and reporting back to him my findings.

22    Q.    And when you conducted these investigations, what

23 exactly did you do?

24    A.    I would have to go out to that particular place and

25 interview the person that is alleged discriminating official

```
 1  whatever, and the person need to -- the allegation, you know.
 2  And, and the employees that knew about it.
 3      Q.   So you would conduct interviews?
 4      A.   Right, yes, I -- yes.
 5      Q.   And were these referrals generally allegations
 6  involving some type of discrimination?
 7      A.   Yes.
 8      Q.   Were they ever investigations of criminal conduct?
 9      A.   No.
10      Q.   What other types of allegations would be --
11      A.   That particular -- this was with state or deputy --
12  state executive director making a decision -- making an
13  improper decision about an employee.
14      Q.   So it could have also been, like, an employee
15  grievance?
16      A.   Yes.  They filed an OIG, you know, OIG.
17      Q.   So generally what you were investigating were either
18  some type of employee allegations involving either grievances
19  that they had been treated improperly by management -- is that
20  correct?
21      A.   And farmers that came into the office.
22      Q.   So sometimes you were investigating allegations by
23  farmers?
24      A.   Right.  And that, that allegation was mismanagement
25  of funds.
```

```
 1        Q.    So you, so you investigated and conducted interviews

 2   with respect to grievances by employees, discrimination

 3   allegations concerning employees, but also outsiders such as

 4   farmers who had made complaints to the Office of the Inspector

 5   General.  Is --

 6        A.    Yes.

 7        Q.    -- that correct?

 8        A.    Yes.  It's not always the Office of Inspector

 9   General.  I went on sexual harassment investigation.  One

10   involving an official threatening a farmer.  One I was

11   involved with an outsider making a racial statement to one of

12   our customers.  So it's different -- I have, you know --

13        Q.    Are you indicating that the referrals didn't always

14   come --

15        A.    No --

16        Q.    -- from the Office of --

17              MR. BRANCH.   Allow her to finish, Ms. Fields,

18   please.

19              BY MS. KIDWELL:

20        Q.    Are you indicating that the referrals did not always

21   come from the Office of the Inspector General?

22        A.    Yes.

23        Q.    And where -- what other places might the referrals

24   have come from?

25        A.    John Shott, as my supervisor, would, you know, send
```

1  me an e-mail and ask me if I'm available to do an

2  investigation.  And, you know, you know, when I meet with him,

3  he'd give me the information and ask me to go out on an

4  investigation.

5     Q.   So is it correct to say that you sometimes didn't

6  know where the referrals had come from?

7     A.   Right.

8     Q.   But they'd come in to Mr. Shott and then Mr. Shott

9  would ask you to go out and --

10    A.   Yes.

11    Q.   -- and conduct these investigations?

12    A.   Yes.

13         COURT REPORTER.   Excuse me, Counselor.

14         (Off the record.)

15         (On the record.)

16         COURT REPORTER.   We're back on.

17         BY MS. KIDWELL:

18    Q.   Do you still conduct these type of investigations

19  presently?

20    A.   Yes.

21    Q.   Do you remember when the last one that you

22  conducted --

23    A.   October, October 2006 actually.

24    Q.   And can you describe for me what type of

25  investigation you conducted in October of 2006?

1      A.    Yes, a county executive director made some racial

2   remarks to one of our customers in Pennsylvania, and she in

3   turn called our office -- the state office and -- her

4   supervisor called the state office and they were quiet upset

5   about the statement that this county executive director made.

6   So in turn I was sent down to North Carolina to conduct an

7   investigation.   I had interviewed those employees in New

8   Jersey.   I did it over the phone.   But I had to go to North

9   Carolina to take the sworn -- I take sworn statements, take

10  the statement.   And then I write the report of my findings.

11     Q.    And did you write a report in this case?

12     A.    Yes, I did.

13     Q.    And who would you have given that report to?

14     A.    John Shott.

15     Q.    Anyone else get a copy of that report?

16     A.    Employee Relations.

17     Q.    And prior to October of '06 do you remember any of

18  the other investigations that you've conducted prior to

19  October of '06?

20     A.    Yes.

21     Q.    And can you -- do you remember if there were any

22  in -- any other investigations that you conducted in 2006?

23     A.    That's the only one in 2006.

24     Q.    What about 2005?

25     A.    No, I didn't do one in 2005.

1    Q.   What about 2004?

2    A.   I think that Georgia one -- I went to Georgia.

3  That's the official threat on a farmer in Georgia.  And I

4  conducted that in Georgia, 2004, 2005, one of those -- 2004 or

5  2003.

6    Q.   So you think in the year 2003 or 2004 you conducted

7  one investigation?

8    A.   Right, in Georgia.

9    Q.   In Georgia.

10    A.   2003 I also went to Arkansas.  I believe it was

11  January I went to Arkansas and that, that was a sexual

12  harassment.

13    Q.   With respect to these other investigations, let's go

14  with the one in Georgia.  Who gave you that assignment?

15    A.   John Shott.

16    Q.   And the one in Arkansas in January, who gave you

17  that assignment?

18    A.   John Shott.

19    Q.   And you actually traveled to Arkansas to conduct

20  that investigation?

21    A.   Yes.

22    Q.   And did you travel to Georgia to conduct that

23  investigation?

24    A.   Yes.

25    Q.   And who would have approved your travel?

1    A.    John Shott.

2    Q.    Is it correct to say then that you would have

3  written a report and provided that to Mr. Shott?

4    A.    Yes.

5    Q.    After you submitted your reports to Mr. Shott did

6  you all ever sit down and have discussions about what was in

7  your report?

8    A.    Yes.  Usually, as soon as I return, I brief him or

9  brief -- and then --

10   Q.    As soon as you returned from your travels?

11   A.    Right.

12   Q.    Is that correct?

13   A.    Yes.

14   Q.    Was anyone else present at these briefings or was it

15  just you and Mr. Shott?

16   A.    Just the two --

17   Q.    Just the two of you?

18   A.    Yes.

19   Q.    And then you would compile a written report with

20  respect to your investigation?

21   A.    Yes.

22   Q.    What would, what would that report consist of?

23   A.    Statements and my summary.

24   Q.    So you would write up a summary of your

25  investigation.  Is that correct?

1      A.   Correct.

2      Q.   And then would there be attachments to that

3  summary --

4      A.   Yes.

5      Q.   -- statements?

6      A.   Right.

7      Q.   And those statements were taken under oath --

8      A.   Yes.

9      Q.   -- is that correct?

10     A.   Yes.

11     Q.   And let's say, I guess, between 1999 and 2003, are

12  there any other investigations that you remember that you

13  conducted?

14     A.   Yes, the OIG one was from Mr. Springer.  The rest of

15  those four or so was -- John gave me, John Shott gave me the

16  assignment.

17     Q.   So you remember approximately four that Mr. Shott

18  gave you.  Is that right?

19     A.   Let me make sure.  I'm almost sure it was four.

20     Q.   When you went on these investigations did anyone go

21  with you?

22     A.   No.

23     Q.   So you were permitted to go out and given the

24  responsibility of handling these investigations on your own?

25  Is that correct?

38

1    A.    Correct.

2    Q.    And Mr. Shott's the one that assigned as least four

3 of these referrals to you, these assignments to you.  Is --

4    A.    Yes.

5    Q.    -- that correct?

6    A.    Yes.

7    Q.    Why don't you tell me about some of the other duties

8 that you've had as a program coordination specialist.

9    A.    I served as a resolving official.

10    Q.    Resolving official?

11    A.    Resolving official under mediation when someone in

12 the state or county filed an EEO complaint and they like to go

13 through the ADR program --

14    Q.    Again, ADR is what?

15    A.    A deterrent to dispute resolution (sic).

16    Q.    So somebody files a complaint and they want to try

17 to handle it through an alternative dispute resolution

18 program?

19    A.    Right.

20    Q.    Is that correct?

21    A.    Right.

22    Q.    And what do you do in that instance?

23    A.    I usually sit in on the mediation and I make the

24 final decision.

25    Q.    Are you the mediator?

1    A.    No, I usually served as a resolving official.

2    Q.    Why don't you describe for me then --

3    A.    Resolving.

4    Q.    -- what takes place?  Like, who's there and what you

5    do?

6    A.    The person that filed the complaint, the mediator,

7    usually the attorney --

8    Q.    The attorney for who?

9    A.    For the person that filed the complaint.

10   Q.    Okay.

11   A.    And an responding official.  Maybe a state executive

12   director or DV or --

13   Q.    Somebody from the Agency --

14   A.    Right.

15   Q.    -- would that be correct?

16   A.    Right.

17   Q.    Okay.  So you would have somebody from the Agency --

18   A.    Right.

19   Q.    -- you would have the person who made the complaint,

20   you would have an attorney for the person who made the

21   complaint --

22   A.    Yes.

23   Q.    -- you would have a mediator --

24   A.    Yes.

25   Q.    -- and then you would be there?

40

1    A.   Yes.

2    Q.   As --

3    A.   Making the final decision on whether or not we can

4 resolve the complaint.

5    Q.   Okay.  So there would be at least five people at

6 these meetings.  Is that correct?

7    A.   Mostly -- sometimes four.  The last one was five.

8    Q.   So mechanically speaking, would you just sit there

9 and listen to what went on?  Is that correct?

10    A.   Correct.  Usually before I go out, they'll send me

11 the file for me to review it and I review it and, you know,

12 just to see, you know, the allegations or whatever, and once

13 we go out the mediation, mediator tries to resolve it.  And it

14 may -- for example, the attorney may ask for $10,000 and the

15 employees want back pay, but actually I can make the decision

16 whether or not the Agency could give them the $10,000 and give

17 him back pay.  But I have to call back to Personnel to make

18 sure if we could, you know, be in compliance with the

19 regulations.

20    Q.   Did you, did you in effect work hand-in-hand with

21 the Agency personnel that was there, whoever was representing

22 the Agency?

23    A.   I, I supposed to been a neutral party listening and

24 making the final decision on whether or not we can resolve

25 this complaint.

41

1      Q.    So you were considered a neutral party?

2      A.    Yes.

3      Q.    Okay.  What was the purpose of the person who was

4    there then representing the Agency?

5      A.    The person representing the Agency couldn't make the

6    final decision.  That's how our mediation was set up.

7      Q.    Okay.  During these mediations then would the person

8    who made the complaint talk about what their complaints were?

9      A.    Yes.

10     Q.    Okay.  And would the Agency person respond to those

11   complaints?

12     A.    Yes.

13     Q.    Okay.  And then would the mediator, like, give his

14   view or discuss what had been said?

15     A.    Yes.

16     Q.    And did you involve yourself in those discussions in

17   any way?

18     A.    Yes.

19     Q.    Okay.  So you were part of this process then?

20     A.    Yes.

21     Q.    And then you would listen to what the, the

22   complainant was saying and then you would have to contact

23   somebody at headquarters in Personnel to find out if you could

24   actually do that on behalf of the Agency, either pay the

25   person or resolve the complaint?  Is that correct?

1      A.    Correct.

2      Q.    And how many of, of these type of mediation sessions

3   have you sat in, just generally?

4      A.    Five.

5      Q.    Five?

6      A.    Right, recently.

7      Q.    Recently?

8      A.    Uh-hum.

9      Q.    Okay.

10     A.    From '99 until, until now.  I just went --

11     Q.    From '99 until 200', what, '7, you --

12     A.    Yes.

13     Q.    -- you have sat in on at least five of these?

14     A.    Yes.

15     Q.    And who assigns you this duty?

16     A.    John Shott.  Springer, also Springer.  Spring is the

17   one that named me as the resolving official.

18     Q.    Okay.  So Mr. Springer is the one that had named you

19   previously as --

20     A.    Right.

21     Q.    -- resolving official?

22     A.    Right.  And then John came aboard and he named me

23   because it's three, you know, on the -- certain amount --

24     Q.    So Mr. Shott also named you as the resolving

25   official?

1    A.    Correct.

2    Q.    Okay.  So Mr. Shott, in effect, assigned you to, to

3 this position, to attend these mediations as part of your

4 duties?

5    A.    Yes.

6    Q.    Would you agree that that's a pretty responsible

7 position?

8    A.    Very much so.

9    Q.    With respect to these investigations that you were

10 sent on by Mr. Shott, would you agree that those were pretty

11 responsible positions?

12    A.    Very much so.

13    Q.    Would you agree that it suggests that Mr. Shott has

14 confidence in you?

15    A.    Yes, I have e-mails showing -- yes, yes.

16        MS. KIDWELL.    I think it's now 11 o'clock.  We've

17 been going about an hour.  Would you like to take a five

18 minute break, let your client go to the rest room?

19        MR. BRANCH.    That's fine.

20        MS. KIDWELL.    Okay.

21        COURT REPORTER.    We're off the record.

22        (Off the record.)

23        (On the record.)

24        COURT REPORTER.    Back on the record.

25        BY MS. KIDWELL:

1    Q.   Ms. Fields, we were discussing your, your duties as

2   a program coordination specialist.  Can you tell me about any

3   other duties that you have in that position?

4    A.   I serve as the outreach coordinator and in the past

5   two years with that position various things like National

6   Association of Colored People, that's NAACP, usually conduct a

7   convention, and our agency usually provide a booth there.  And

8   what I have to do is go -- state to participate in the booth,

9   you know, recruiting booth and outreach to farmers.  For the

10  past five -- since '99 I've been working with outreach staff

11  on conferences such as NAACP, and that is providing them with

12  state assistance.  And any state we have an outreach

13  coordinator and that outreach coordinator is responsible for

14  getting the information out to the minority farmers.  We try

15  to increase the participation on minority farmers.  So as

16  being in the state office I serve as the liaison between the

17  outreach staff and our state employees.

18    Q.   The outreach staff --

19    A.   Uh-hum.

20    Q.   -- and the outreach employees you serve as a

21  liaison?

22    A.   Uh-hum, outreach coordinators in each state, there's

23  one in each state.  And I, you know, I go out and -- state

24  executive director to name the coordinator for the state.  So

25  you know, I composed a memo and it went out the state and they

1  sent the names in for each coordinator, so I work closely with

2  them in various projects.   They -- at a certain stage they may

3  have a booth.   Like NAACP, just one example, but they had

4  another farm where outreach to black farmers.   I also worked

5  on one of my main akonishment (sic) is Mr. Springer assigned

6  me to work on a consent decree for black farmers who filed a

7  complaint against the Agency.   And with that we had to go out

8  to the states to assist us for them to come in and help us

9  with those case -- case load.   And I was the point person for

10  the administrative part of that consent degree (sic) in 1999.

11  And I worked very closely with them until John Shott came

12  aboard.   He kind of switched the duty of to Ken, but I worked

13  very -- the initial letter that went to the states, I wrote

14  that letter to advise them that -- about the consent decree.

15  State executive directors.   And --

16      Q.   Were there other individuals that worked on this

17  consent decree?

18      A.   David Nix.

19      Q.   I just asked you whether there were.   You don't have

20  to --

21      A.   Oh --

22      Q.   -- name them.

23      A.   -- oh, quite a few.   It was, it was a task force.

24      Q.   So you were a member of a task force?

25      A.   I was a member of the task force.

1      Q.    You indicated that you had written a letter.    What

2  other duties did you perform as a member of that task force?

3      A.    Each month I had to go out to each state for budget

4  report, and request -- I developed a form so they could report

5  to me how much they spent on travel, the employees, the

6  supervisor, the assistant to farm -- program and getting

7  information from the state.    The states had sent in all these

8  files, case files, and so what we had to do, the

9  administrative part, is to make sure the states send the files

10  in, and we had to track them.    So one of my duties -- you

11  know, ask me to do this, keep it with the budget, how much is

12  saved -- spent.    I guess it was quarter -- I don't know how --

13  I did the report quarterly, but I went out with a member to

14  the state and requested them to provide information on a form

15  and once I disseminate the form I -- information that I gather

16  I would come up with one report to submit to Mr. Springer and

17  the head of the task force of how much they were spending in

18  the state regarding employees working on the consent decree

19  task force.

20      Q.    Are there other duties as a program coordination

21  specialist that you have?

22      A.    Yes.    The -- before John became -- the 1890 Program

23  and the HACU Program I have -- this is experience that came

24  from my civil rights experience.

25      Q.    Okay.    Now, I think we need to, for the record --

1      A.    Right.

2      Q.    -- describe these programs, 1890 and this other one

3   that you've mentioned.

4      A.    It's the Historical Black University -- there's 17

5   agricultural universities, and we signed an agreement, a memo

6   of understanding, to employ so many students from these black

7   colleges.

8      Q.    Is that the 1890 Program?

9      A.    Yes, uh-hum.  And --

10     Q.    And what is the other program that you mentioned?

11     A.    HACU, Hispanic, Hispanic program to change the

12  change the Hispanic -- that's the HACU, which is a Hispanic

13  organization -- Hispanic Association -- I'm not quite sure.

14  In this program I hired five -- you know, each year we had a

15  certain amount of people you can employ.  And I did hire five

16  1890 students when I was in civil rights.  So therefore, when

17  I came to Mr. Springer shop, he wanted me to handle the

18  program for the state, the 1890 and the HACU Program and the

19  summer interns.  And so what we, we went out the states and

20  let them know how many slots we had, if they're interested in

21  HACU students, that we could provide them for (sic) -- for

22  that student, and we allotted them so many slots for HACU

23  students and 1890 students.

24     Q.    Okay.  So you worked with these programs under --

25  when you were --

1      A.    Civil rights.

2      Q.    -- with Mr. Springer?

3      A.    Yes, uh-hum, as a 13, yes.  Now, monitoring the

4  states.  For example, it was limited amount of time and we had

5  five in our request for the states if they are interested in

6  that or not, 1890, because once they finish college they're

7  kind of obligated to hire them if they have a full-time slot.

8  So a lot of times if they, you know -- interested in, but

9  we'll transfer it to another state so I was charged with that

10 duty.

11     Q.    Any other duties you had program coordination

12 specialist?

13     A.    Personnel various requests.  And I constantly get

14 states -- since I been -- since I was well-known in all the

15 states because of all the years of experience in going out to

16 the states, and I get quite a bit of calls from state and

17 county offices requesting information.  So I work constantly,

18 you know, with them because --

19     Q.    So you provide information to the counties and the

20 states?

21     A.    Uh-hum, per request.  And another thing on this

22 duty, civil rights still provides those management

23 evaluations, so I'm the coordinator.  I set up meetings with

24 civil rights and deputy administrator of field operations for

25 them to discuss the findings in these states, and it's my duty

1   to monitor, to assure that the states are in compliance with

2   the written -- plan in time.  So I, you know, I monitor

3   whether or not the state is in compliance.  So I'm still doing

4   somewhat what I did in civil rights.  And each year they do

5   five to 10 states and send me the list, and we send it to the

6   states, and then I monitor each review.

7       Q.    Anything else you think of that is part of your

8   duties that you want to --

9       A.    I was assigned the liaison for the disability

10  program and what -- in that position you try to work with the

11  states to hire more disabled employees.  And one -- a couple

12  states did sign an MOU with certain disability, you know,

13  companies, whatever, to hire disabled employees --

14      Q.    Did you work on that MOU?  I assume that's a

15  Memorandum of Understanding --

16      A.    Right.

17      Q.    -- to --

18      A.    Civil rights, civil rights did provide us that, but

19  we did work with the states, try to get someone, you know, at

20  the state to buy into hiring disabled employees.  And I

21  assisted in -- recently, I assist in the training for civil

22  rights coordinators and liaison.  In fact, I wrote the memo, I

23  wrote the memo for, for, for my deputy administrator giving

24  them information, the training for this civil rights

25  coordinator.  I also John sent me to the training to assist

50

1  the civil rights director and provide the training to all the

2  civil rights coordinators.

3      Q.  Is that John Shott who sent you to the training?

4      A.  Yes, uh-hum, uh-hum.  To assist the director -- I

5  provide -- one of my specialties, I provide briefing books.

6  For example, like the consent decree, I put together briefing

7  books for the consent decree.  I also put a briefing took

8  together for our assistant administrator, that had some

9  questions on issues in a state regarding the OIG report of

10 noncompliance.

11     Q.  Okay.  And what was that one now?

12     A.  We -- back in 1997 we had an artist from the Office

13 of Investigation -- farm service agency had a lot of problem

14 with discrimination, so they wrote up a report --

15     Q.  They being --

16     A.  OIG.

17     Q.  Office of Inspector General --

18     A.  Right.  And I try to keep up with that kind of

19 stuff.  And we was in a meeting and he had a lot of questions

20 so --

21     Q.  Who?

22     A.  The assistant administrator which is over John

23 Shott.

24     Q.  And what was his name?

25     A.  He's -- Veril Lanier (phonetic).  Veril Lanier.

1    Q.   So Mr. Lanier had questions about what the OIG had

2  reported in one of its reports?

3    A.   Uh-hum, on civil rights.

4    Q.   On civil rights.

5    A.   Right.  So with my institutional knowledge and

6  historic, you know, knowing what happened back in '97, I did a

7  briefing book showing him what the findings and whether we was

8  in compliance, and of today they're still trying to come into

9  compliance with that 1997 report.  And that also -- report

10  which is another big report that the whole agency went through

11  with civil rights problems.

12    Q.   When you do these reports, describe to me exactly

13  what you do.  Do you just compile information that's given to

14  you and, and then put it together into some type of format, or

15  do you actually write parts of the reports?

16    A.   Yes, I write the report to explain to them the

17  history, what happened before.

18    Q.   And with these briefing books, do you actually write

19  the information in the briefing books or just compile the

20  information?

21    A.   Compile it and then summarize.

22    Q.   Okay.  So you summarize it and then -- there is some

23  type of summary that's written by you for these briefing

24  books.  Is that correct?

25    A.   Right, showing the facts.  Show the facts.

1      Q.   And does it also consist though of information that

2  you've compiled?

3      A.   Yes.

4      Q.   And can you give me, like, a time line in terms of

5  when these briefing books or this other information report was

6  written?

7      A.   One -- oh, when it happened, when I did that report?

8      Q.   Uh-hum.

9      A.   That was in 2002.

10     Q.   2002.  And who would have received copies of that

11  report?

12     A.   The deputy report (sic) went to Veril Lanier.

13     Q.   Mr. Lanier?

14     A.   Right.

15     Q.   Do you have a copy of that report?

16     A.   I can provide it for you because he -- you know, the

17  book that I gave him, he gave -- he hired a new civil rights

18  director and I saw him in the hallway and he introduced me.

19  He said, this is the lady that provided the information that I

20  gave you on this briefing -- on that civil rights briefing.

21  And so when he left I went to try to get my book back from his

22  secretary and she didn't have it.

23     Q.   Okay.

24     A.   Uh-hum.  But I do have -- I probably do have a

25  summary.

1    Q.    And with respect to these summaries on these

2    briefing books and other reports that you put together, do

3    those -- do these documents go directly to the person who has

4    requested them or are they edited by anyone?

5    A.    That -- no, they're not edited because it's like,

6    you know, the historical knowledge of, of you know, what

7    happened.  No, not usually.  That one was edited.

8    Q.    With respect to your, your duties either as an EEO

9    specialist or a program coordination specialist, have you ever

10   actually prepared a budget?

11   A.    Yes.  I had to prepare a budget for 1890 Program and

12   a budget for the HACU Program.  I had to get it approved.

13   Q.    Okay.  Why don't you tell me about these budgets

14   that you prepared.

15   A.    Well, actually, like, the HACU student really works

16   so many weeks.  And so the budget -- we are allocated so much

17   money for the student employer program.  So they're paid a

18   little bit different, not under the civil service program,

19   unlike the 1890.  But we pay their housing, and a certain

20   amount for transportation, and in fact we try to provide

21   housing for them.  So I have to break it down on how much we

22   spent for housing, how much we'll pay for their employment,

23   and for their travel.  A lot of times they're not from this

24   area and the 1890 is a bigger -- it's a larger report.  It's a

25   very large report because these students are still in school,

1  and they work for us, like, holidays and during the summer,

2  and we assist them with housing.  So all this come into play.

3  This is how they went about, when I was in civil rights, to

4  determine how many students we would, you know, hire each year

5  on a full-time budget.

6      Q.   So when you prepared these budgets you were an EEO

7  specialist?

8      A.   Yes.

9      Q.   Have you prepared any budgets as a program

10 coordination specialist?

11     A.   Just the budget that I, I -- the consent decree

12 budget for the state employees and that was under Springer.

13     Q.   Did you actually prepare a budget in that case or

14 did you just compile information as to how much they had spent

15 into a report?

16     A.   I compiled information how much they had spent.

17 They wanted to know the final amount, how much the states were

18 spending on this consent degree.  So I had to figure out a way

19 to get that information.  That was a project -- an assignment

20 I was given and I had to figure out how I can get this from

21 the states.

22     Q.   Have you ever worked on any regulations, either

23 writing regulations or the approval of regulations for the

24 Agency?

25     A.   Yes.

55

1    Q.    Can you tell us about that?

2    A.    The 19PM which is the employee -- Equal Employment

3  Opportunity Handbook, and the 18AO which is the Civil Rights

4  Handbook.

5    Q.    I'm sorry, are these handbooks or regulations --

6  actual regulations?

7    A.    These are regulations.   The handbooks are

8  regulations.

9    Q.    Okay.   And they're published in the Federal

10  Register?

11    A.    No, I don't -- it's, it's -- it gives guidance to

12  all the farm service agency employees.   This is the guidance

13  and the regulations that stipulates the EEO responsibilities.

14    Q.    Okay.   So you assisted on these handbooks then?

15    A.    As a team in civil rights.   A team of five people

16  had to -- we had to rewrite 18AO and 19 PM.

17    Q.    Okay.   So you worked on a team with other

18  individuals rewriting these handbooks?

19    A.    Yes.

20    Q.    That was an EEO specialist, you did that?

21    A.    Yes.

22    Q.    Have you ever worked on regulations that were

23  published in the Federal Register?

24    A.    Trying to think -- no, I can't think of right off

25  because if I, if I was the lead person, I would, you know --

1   sometimes I'm asked to give information and I'm not aware

2   whether it went to -- I can't think right now.  I don't think

3   so.  I can't -- I'm quite sure there are many things I

4   provided, a lot of information I provided, something probably

5   was part of it, but I just can't remember.

6        Q.   Do you have any management experience?

7        A.   No more than the course of secretaries I had, you

8   know, secretaries to fall under me in civil rights.

9             MR. BRANCH.  Just wait -- objection.  What do you

10  mean by management?  What are you asking?

11            MS. KIDWELL.   Has she ever been a manager of an

12  office or managed anyone under her?

13            WITNESS.   Yes.  I managed all the federal women's

14  program manger in the field.  I managed all the -- program in

15  the -- managers in the field.

16            BY MS. KIDWELL:

17       Q.   Okay, let me define this.  Have you ever had a

18  position where you had employees under you reporting to you?

19       A.   No.  But as far as 18 --

20       Q.   Have you ever had to do performance appraisals for

21  any employee in USDA, which is the Department of Agriculture?

22       A.   No.

23       Q.   Have you ever --

24       A.   Could I correct that?  I had, I had input for

25  secretaries' performance.

```
 1      Q.    You provided input for --
 2      A.    For the secretaries.
 3      Q.    -- for the secretaries?
 4      A.    In civil rights, uh-hum.
 5      Q.    But someone else actually signed the performance
 6 appraisal though, is that correct?
 7      A.    Director of EEO.
 8      Q.    What about speaking engagement?  Let's go back --
 9 let's just focus right now on the time as a program
10 coordination specialist.  Have you had any speaking
11 engagements on behalf of the Department?
12      A.    Yes.
13      Q.    Okay.  Can you tell us about those?
14      A.    A and T had a small farm convention and --
15      Q.    A and T?
16      A.    University of Agriculture and Technical University
17 (sic) in North Carolina.  And Springer sent me there the first
18 year.  They had a panel to answer questions to those black
19 farmers, they had black farmers there.  So I went representing
20 the Agency and sat on the panel and provided information to
21 black farmers.  So the following year -- they request me every
22 year so I didn't go last year, but I been going every year.
23 One year I had asked me to be the speaker to the women's
24 group.
25      Q.    Do you remember what year that was?
```

1     A.    Maybe 2002, 2002 or 2003.  I have the letter -- I

2  mean, I went the first time, and every year they send a letter

3  requesting that I -- and one year they asked me to be the

4  speaker for the women's group.  The last year I went was 2006,

5  I think, you know, to participate in.

6     Q.    Any other speaking engagements that you've been

7  assigned?

8     A.    Well, actually, when I represent DAFO in all these

9  meetings I have to always --

10    Q.    And DAFO is what?

11    A.    Deputy Administrator Farm Operations.  I'm

12  constantly talking about their positions on various things.

13    Q.    I'm sorry --

14    A.    Their position on, like the EEO position, or their

15  outreach position, or you know --

16    Q.    You have discussions with this person?

17    A.    Right, with a group.

18    Q.    With a group, okay.  So you attend meetings.  Is

19  that correct?

20    A.    Correct.  And also, speaking engagement,

21  affirmative, affirmative employment, and maybe that's --

22  that's been awhile back but I used to always -- I was called a

23  lot to -- a wealth of experience on affirmative employment and

24  I was called to talk about -- oh, I was speaker at, at

25  Wisconsin on a sexual harassment -- I had to do sexual

1  harassment training in Wisconsin.

2      Q.   And who assigned you that position?

3      A.   That's when I was in civil rights.

4      Q.   That was when you were in civil rights?

5      A.   Civil rights, uh-hum.

6      Q.   Again, I want to focus on --

7      A.   Okay.

8      Q.   Am I correct then, you've been in the program

9  coordination specialist position for, let's see, what, six and

10 a half now, something like that?  Is that correct?

11     A.   Yes, since '99, January of '99.

12          MR. BRANCH.   So it's more than six.

13          MS. KIDWELL.   It's more than six.

14          WITNESS.   Uh-hum.

15          BY MS. KIDWELL:

16     Q.   With respect to the position you applied for, and I

17 believe that position was a vacancy for a GS-14 administrative

18 management specialist, am I correct on that --

19     A.   Yes.

20     Q.   -- and that was in -- you applied for that position

21 in July, 2003?  Am I correct on that?

22     A.   Yes.

23     Q.   So at that time you had about four and a half years,

24 if my math is right, as a program coordination specialist?

25     A.   Correct.

1     Q.   Is that correct?

2     A.   Yeah.

3         MS. KIDWELL.  Okay.

4         COURT REPORTER.  One second.

5         (Off the record.)

6         (On the record.)

7         COURT REPORTER.  Yes.

8         BY MS. KIDWELL:

9     Q.   Ms. Fields, have you ever received any type of

10 awards or quality step increases while you were working for

11 Mr. Shott or Mr. Frago (phonetic)?

12    A.   Yes.

13    Q.   And who recommended you for those awards?

14    A.   John Shott.

15    Q.   So Mr. Shott has recommended you for awards before?

16    A.   Yes.

17    Q.   More than one time?

18    A.   I think he only had one opportunity because ever

19 since, ever since I been in that position, since '99, I have

20 received two quality step increase, and every year I receive

21 outstanding performance rating and an award.

22    Q.   Okay.

23    A.   And two quality step increases.

24    Q.   Do you remember who recommended the quality step

25 increases for you?

1      A.    Springer and John Shott.

2      Q.    Mr. Shott?

3      A.    Uh-hum.

4      Q.    Mr. Springer --

5      A.    Right.  And Mr. Shott was 2002.

6      Q.    I'm going to direct you now to the complaint that

7  you filed.  And I have a copy of it here and if you feel the

8  need to look at it any time, feel free to do so.

9      A.    Okay.

10         MR. BRANCH.   Do you have another copy?

11         MS. KIDWELL.   I don't.

12         MR. BRANCH.   Can you get another copy if you're

13  going to question her about it?

14         MS. KIDWELL.   Certainly, we'll get another copy.

15         BY MS. KIDWELL:

16      Q.    My first question is, have you ever seen this

17  complaint before?

18      A.    Of course.

19      Q.    And does it appear to be the complaint that you

20  filed in this case?

21         MR. BRANCH.   Before we start ask -- answering

22  questions about the complaint, let's get another copy of the

23  complaint.  If we can just take a break and can you get

24  another copy?

25         MS. KIDWELL.   We'll get it later.  It's my

62

1    deposition, we'll conduct it the way I --

2            MR. BRANCH.    Yeah, I understand.    But I'm not going

3    to allow her to answer questions about a complaint unless you

4    give me a copy of what -- you show her a copy and give me a

5    copy of what you're asking her about.

6            MS. KIDWELL.    All I've asked her if this is the

7    complaint.    That's as far as we've gotten so far, David.

8            MR. BRANCH.    I understand that.    But I thought you

9    were asking her to look through the document.

10           MS. KIDWELL.    I asked her if it looked like the

11   complaint she had filed.

12           MR. BRANCH.    That's all you're asking?

13           MS. KIDWELL.    That's all I'm asking.

14           BY MS. KIDWELL:

15   Q.    Now, you're aware that we made what would be termed

16   as our discovery request where we ask you questions.    They're

17   called interrogatories in this case.    Is that -- are you aware

18   of that?

19   A.    Uh-hum.

20   Q.    And in one of your answers to the interrogatories am

21   I correct that you've indicated that you've never been a party

22   to any type of lawsuit?

23   A.    Correct.

24   Q.    So in other words, this would have been the first

25   complaint that you would have ever filed?

1    A.   Yes.

2    Q.   But have you ever filed any other type of claim of

3 discrimination with any agency or private employer?

4    A.   Discrimination, no.

5    Q.   Have you ever filed any type of just a claim with

6 any agency or private employer?

7    A.   No.

8    Q.   Have you ever filed any actions with the Merit

9 System Personnel Board?

10   A.   No.

11        MR. BRANCH.   Merit System Protection Board?

12        MS. KIDWELL.   I'm sorry, Protection Board, I

13 apologize.

14        BY MS. KIDWELL:

15   Q.   So you've never filed anything with them?

16   A.   Uh-uh.

17        MR. BRANCH.   And by complaint are you asking her

18 about before this complaint or anything --

19        MS. KIDWELL.   Yes.

20        MR. BRANCH.   -- after this complaint?

21        MS. KIDWELL.   Yes, before.   I've indicated already

22 we're aware of this, and has she filed --

23        BY MS. KIDWELL:

24   Q.   Well, have you filed anything prior to this

25 complaint with Merit Systems?

1    A.    No.

2          MR. BRANCH.    I just want to be clear, are you --

3    when you ask her about whether she's filed any complaint, do

4    you mean before or after this complaint either with MSPB or

5    with anyone?

6          MS. KIDWELL.    With anyone.

7          WITNESS.    Before or after?

8          MR. BRANCH.    Which are you asking, before or are

9    you asking --

10         MS. KIDWELL.    I'm asking prior.

11         WITNESS.    Okay.

12         MR. BRANCH.    Okay.

13         BY MS. KIDWELL:

14   Q.    And your answer is no, I believe --

15   A.    Right.

16   Q.    -- am I correct on that?

17   A.    Correct.

18   Q.    With respect to the complaint that you've made

19   against the Department of Agriculture and the Secretary, this

20   is an individual complaint.  Am I correct?  It's not a class

21   action?

22   A.    You're correct.

23   Q.    It is an individual.  That is correct?

24   A.    Yes.

25   Q.    And I'd like to direct now to the vacancy that's at

1  issue in this case which was, as I understand it, a GS-14

2  administrative management specialist position.  Is that

3  correct?

4      A.    Correct.

5      Q.    And for this position the Agency did not have to

6  conduct any interviews.  Is that correct?

7      A.    Correct.

8      Q.    And for this position the Agency did not have to

9  conduct a second round of interviews for this position.  Is

10  that correct?

11      A.    Correct.

12      Q.    Now, do you remember who was conducting the

13  interviews in the first set of interviews?

14      A.    Yes.

15      Q.    And can you for the record please name those

16  individuals?

17      A.    Doug Frago.

18      Q.    Doug Frago?

19      A.    Right, selection official.  He was my first-line

20  supervisor.  John Shott, he was my second-line supervisor and

21  my previous supervisor; and Linda -- no, no, no.  Solomon,

22  Solomon -- what is his name, Solomon -- last name.

23      Q.    Would that have been --

24      A.    Ramirez.

25      Q.    -- Solomon Ramirez?

1    A.    Right, correct.

2    Q.    So those three individuals conducted the first

3  interview?

4    A.    Yes.

5    Q.    And with respect to the second set of interviews do

6  you remember who conducted those interviews?

7    A.    Yes.  Doug Frago, selection official; and my

8  immediate supervisor, John Shott, my previous supervisor; and

9  Linda Treese who would have been my future supervisor.

10    Q.    And when you indicate the future and the prior,

11  you're talking about at that time of the interview.

12    A.    At the time.

13    Q.    Am I correct?

14    A.    Correct.

15          MR. BRANCH.    Allow her to finish the question

16  before you respond.

17          BY MS. KIDWELL:

18    Q.    Now, as part of your action, are you contending that

19  any of these individuals ever made either racial or sexual

20  remarks to you or in your presence?

21    A.    No.

22    Q.    And let's go through in terms of your action.

23  Please name the individual or the individuals that you are

24  alleging discriminated against you with respect to the

25  nonselection of this GS-14 position.

1    A.    Doug Frago, John Shott, Linda Treese.

2    Q.    Are you alleging that Mr. Ramirez discriminated

3    against you?

4    A.    No.

5    Q.    Are you alleging that Carolyn Taylor discriminated

6    against you?

7    A.    Yes.

8    Q.    Okay, let's talk about Carolyn Taylor.  Do you know

9    whether or not Ms. Taylor is still at the Agency?

10    A.    She, she retired after 40 years.

11    Q.    Prior to her retirement did you know Ms. Taylor?

12    A.    I had worked with her since I conducted some

13    interviews, panel interviews.

14    Q.    And how well did you know her?

15    A.    On a work base -- professional base.

16    Q.    So you had a working relationship.  Is that correct?

17    A.    I knew her from giving me instructions on

18    interview -- about the interview panels.  I conducted some

19    interviews for our secretary and some specialists and I got

20    assistance from her, instructions from her just like she

21    gave --

22    Q.    Did you have a personal relationship with Ms.

23    Taylor?

24    A.    No.

25    Q.    Ever go to lunch with Ms. Taylor?

68

1    A.   No.

2    Q.   Did you ever have an argument with Ms. Taylor?

3    A.   No.

4    Q.   Do you know of any reason that Ms. Taylor would
5  discriminate against you?

6    A.   Yes, I think -- at our Agency, Farm Service Agency,
7  this is what I call institutionalized racism.  That is where
8  as the personnel go along with wrongdoings just to satisfy
9  management.

10    Q.   And in this case who do you think she went along
11  with?

12    A.   John Shott and Doug Frago.

13    Q.   Are, are you alleging that they actually conspired
14  against you?  And what I mean by that is that they actually
15  had discussions about discriminating against you?

16    A.   I can't answer that.

17         MR. BRANCH.    Objection.  Calls for her to
18  speculate.

19         BY MS. KIDWELL:

20    Q.   Did you ever hear of any --

21    A.   I --

22    Q.   -- conversations that they had with regard to
23  discriminating against you?

24    A.   Hearsay, I don't know.

25    Q.   Did Carolyn Taylor, did she ever say anything to you

69

1   directly that would suggest that she was discriminating

2   against you?

3        A.    I didn't talk with her.

4        Q.    Do you have any evidence that Ms. Taylor spoke to

5   Mr. Shott or Mr. Frago about discriminating against you?

6        A.    Do I have any --

7        Q.    Evidence of that.

8        A.    No.  Circumstantial --

9        Q.    Can you tell me why you believe you were not

10  selected for this position on the basis of your gender or sex?

11       A.    Yes, because that position I was, I was -- I have a

12  GS-13, and I'm doing almost the same things as required as a

13  GS-14.  I'm working in that area and I was the only minority

14  and only 301 that applied for that position.

15       Q.    Ms. Fields, I'll ask you again.  I'm, I'm talking --

16            MR. BRANCH.    Allow her to finish her answer.  I

17  mean, if you've asked her a question, allow her to finish the

18  answer.

19            WITNESS.    So you know, if you review the

20  applications and the questions, it was not that much

21  different.  Also I rated the same as two white males and at

22  that point an affirmative decision should have been made.

23            BY MS. KIDWELL:

24       Q.    I'm sorry, I don't understand that.  Under

25  affirmative decision --

1    A.    Uh-hum, you know, in the affirmative decision if a

2   minority is just as qualified and there are two positions

3   there, there's two white males, and I was already in the

4   position doing similar work, yet they decide to have a second

5   interview so they can disqualify me.

6    Q.    So you think that, that you should have gotten the

7   position because you're female?

8    A.    Not -- no, because I was better qualified than the

9   other two, that's why I think I should get the position.

10    Q.    Being better qualified isn't the same as an

11   affirmative decision, so I'm a little confused.

12            MR. BRANCH.    Objection.    What is the question?

13            MS. KIDWELL.    I'm not understanding her answer.

14            MR. BRANCH.    What aspect of her answer do you not

15   understand?

16            MS. KIDWELL.    She appears to be saying that, that

17   given the fact that she was female and that they were two

18   white males, and she was already there, that she automatically

19   should have gotten the position as the only female.    And I'm

20   not --

21            MR. BRANCH.    Objection, that mischaracterizes her

22   testimony.    I mean, what is your question.    What are you

23   asking?

24            MS. KIDWELL.    I again said, appears to be saying.

25            BY MS. KIDWELL:

1     Q.   My question was, can you tell me why you believe you

2  were not selected on the basis of your sex or gender?

3     A.   Number one, if you look at the pattern, the pattern

4  is that whenever a selection is made it's always Caucasian

5  even though minority is on, on the cert.

6     Q.   Ms. Fields, my question, again, is can you tell me

7  why you believe you were not selected on the basis of your

8  gender, that's being a female I believe in this case?  Gender.

9  That's the only question I'm asking you at this time.

10     A.   Because they hired two white males.

11     Q.   So is it your position that because they hired two

12  white males there was automatically discrimination?

13     A.   If you look at the qualifications, if you really

14  review -- if you compare their qualifications with mine.  And

15  experience with mine.

16     Q.   In this case Carolyn Taylor is female.  Am I

17  correct?

18     A.   You're correct.

19     Q.   And Ms. Treese is female --

20     A.   You're correct.

21     Q.   -- am I correct on that?

22     A.   Yes.

23     Q.   And is it your position that these two females

24  discriminated against you on the basis of your gender?

25     A.   Those two -- I didn't say that, did I?  I said John

72

1    Shott and Frago discriminated against me.  I didn't say

2    Carolyn.  My, my thing with Carolyn is that I served on a

3    panel -- secretary, hiring three secretaries in DAPO and

4    Carolyn Taylor told me if I used a panel that I have to have

5    an EEO observer.  So I contacted EEO, the civil rights office,

6    and they provided me with an observer, and this is at the 7

7    level, and at the 8 level, and then we hired some analysts at

8    the 9 level.  So each time she told me that I had to have the

9    EEO observer if I had a panel.

10        Q.    Ms. Fields, my question to you now --

11        A.    Uh-hum.

12        Q.    -- is whether or not you are alleging that Carolyn

13   Taylor discriminated against you on the basis of your gender?

14        A.    No.

15        Q.    Do you allege that Carol -- Carolyn Taylor

16   discriminated against you on the basis of your race?

17        A.    Yes.

18        Q.    Do you allege that Ms. Treese discriminated against

19   you on the basis of your gender?

20        A.    No.

21        Q.    Do you allege that Ms. Treese discriminated against

22   you on the basis of your race?

23        A.    Yes.

24        Q.    Do you allege that Mr. Shott discriminated against

25   you on the basis of your gender?

73

1    A.    Yes.

2    Q.    And do you allege that Mr. Shott discriminated

3  against you on the basis of your race?

4    A.    Yes.

5    Q.    Do you allege that Mr. Frago discriminated against

6  you on the basis of your gender?

7    A.    Yes.

8    Q.    And do you allege that Mr. Frago discriminated

9  against you on the basis of your race?

10    A.    Yes.

11    Q.    Now, are you alleging that anyone else at the Agency

12  with respect to this action discriminated against you either

13  on the basis of your race or your gender other than the

14  individuals that we've just named?

15    A.    No.

16    Q.    Getting to this EEO observer that you've mentioned,

17  I'm correct that there was an EEO observer during the first

18  interviews.  Is that correct?

19    A.    Correct.

20    Q.    Did you know the person that was the EEO observer?

21    A.    Yes.

22    Q.    How well did you know them?

23    A.    On a professional basis.

24    Q.    Just let me know how --

25    A.    Oh, he worked in civil rights, so me serving as the

74

1    liaison to civil rights I worked with him on certain, you

2    know, various projects.

3        Q.    So you had known him about how long?

4        A.    He, he stayed there a short time.  Maybe two years.

5        Q.    And there was an EEO observer during the first set

6    of interviews.  Isn't that correct?

7        A.    Correct.

8            MR. BRANCH.    Objection.  Asked and answered.

9            BY MS. KIDWELL:

10        Q.    Did you observe this EEO observer during the

11    interviews?

12        A.    Yes.

13        Q.    Do you know whether the EEO observer took notes?

14        A.    I know where you're going there but could I talk to

15    him --

16            MR. BRANCH.    No, just answer the question.

17            WITNESS.    Okay.

18            MR. BRANCH.    Do you know if he took notes?

19            WITNESS.    Yes, yes, he took notes.

20            BY MS. KIDWELL:

21        Q.    Did you later object to the fact that he took notes?

22        A.    No.

23        Q.    Did you have any discussions with Mr. Frago or Mr.

24    Shott regarding the EEO observer having taken notes during the

25    interview progress?

```
 1        A.    With Mr. Shott.  And this is how it came about --
 2              MR. BRANCH.   Just wait.   Just answer the question.
 3              WITNESS.    Okay, yes.
 4              BY MS. KIDWELL:
 5        Q.    You had a discussion with Mr. Shott?
 6        A.    Yes.
 7        Q.    Did you have any discussion with Mr. Frago?
 8        A.    No.
 9        Q.    And can you tell me about the discussion you had
10  with Mr. Shott?
11        A.    Mr. Shott called me in his office because he wanted
12  me to go on an investigation.  And then he said, Shawn, I
13  don't know -- gosh -- anyway, he said, what you think of
14  Shawn?  He seemed, you know -- I said, oh, I don't know.  I
15  said, I did notice he was writing a lot.  And he said, well,
16  we got -- we better watch that because we got people from EEO
17  that's coming in on the interview.  He could be writing down
18  the questions.  That's the discussion that we had.  But I
19  didn't think that.  But he just asked me what I thought
20  because he didn't care for him.  And so I said, well, only
21  thing I noticed, he was doing, you know, a lot of -- I serve
22  as EEO observer on a lot of panels.  And so I mean, I just --
23  out of -- it was no big deal but he made the statement then,
24  he said that, oh, well, I better watch that because people on
25  his staff was coming in on interviews and he could be writing
```

1    the questions down and that was the extent of our, our

2    conversation.

3        Q.    So you did not complain to Mr. Shott --

4        A.    No.

5        Q.    -- regarding --

6              MR. BRANCH.    Allow her to finish, Ms. Fields.

7              WITNESS.    No.

8              BY MS. KIDWELL:

9        Q.    Ms. Fields, do you contend that working at the

10   Agency made you more qualified than Mr. Nagel for the vacant

11   position?  I'll repeat this question.  Do you contend that

12   working at the Agency made you more qualified than Mr. Nagel

13   for the vacant GS-14 position?

14       A.    The Agency?

15       Q.    The Department.  The Department of Agriculture.

16       A.    It was more than that.

17       Q.    Do you contend that working for more than 20 years

18   at the Department of Agriculture made you more qualified than

19   either Mr. Nagel or Mr. Spalding?

20             MR. BRANCH.    Objection, the question is vague.  The

21   prior question was vague as well.  You can answer if you

22   understand what she's asking you.

23             WITNESS.    Okay.  No, I'm not going to answer that.

24             MR. BRANCH.    No, I mean, you can answer it if you

25   understand.

1              WITNESS.   I don't understand the question.  Ms.

2   Morgan, the DAP -- I just wouldn't single out that.

3              BY MS. KIDWELL:

4       Q.   Do you contend that -- strike that.

5              You have alleged that there was a personal

6   relationship between Mr. Shott and Mr. Nagel.  Am I correct?

7       A.   You're correct.

8       Q.   Can you define for me what you mean by personal

9   relationship?

10      A.   Mr. Nagel spends most of his time -- most -- he's

11  always in John's office or John is in his office.  John give

12  him preferential treatment over everybody.  It's just so

13  obvious that, that he was singled out as being closer to John

14  Shott than anybody else.

15      Q.   Did you ever see Mr. Shott and Mr. Nagel together

16  outside of the office?

17      A.   No.

18      Q.   Did you ever hear either one of them talk about any

19  events that they had attended together?

20      A.   No.

21      Q.   Did you ever hear either one of them talk about

22  going to each other's homes?

23      A.   No.

24      Q.   Did you ever see them after work hours in a

25  restaurant?

78

```
 1      A.   No.

 2      Q.   Are you contending that Mr. Nagel was preselected

 3 for the position?

 4      A.   Yes.

 5      Q.   Then do you contend that preselection alone

 6 evidences discrimination?

 7           MR. BRANCH.   Objection.   That calls for a legal

 8 conclusion.   Are you -- what was your question again?

 9           MS. KIDWELL.   My question is whether or not she's

10 indicating that preselection by itself, if it's true in this

11 case, means that she was discriminated against?

12           MR. BRANCH.   Objection.   It does call for legal

13 conclusion.   You can answer the question if you understand,

14 but she's not offering a legal opinion as those words are not

15 commonly known.

16           WITNESS.   Mr. Nagel was given preferential

17 treatment which led to preselection.

18           BY MS. KIDWELL:

19      Q.   And does that mean then that --

20      A.   I don't know --

21      Q.   -- you were discriminated --

22      A.   Not alone.

23      Q.   -- against?   Not alone?

24      A.   Not alone, not alone, not by -- not alone.

25 Preselection, not alone.   It's more than that.
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

```
 1        Q.    Is it part of the --
 2        A.    Part of.
 3        Q.    -- discrimination against you?
 4        A.    Part of.
 5        Q.    You are alleging that?
 6        A.    Uh-hum, part of.
 7        Q.    Okay.  And was it part of the discrimination against
 8   you on the basis of race, or gender, or both?
 9        A.    Both.
10        Q.    In your complaint you're claiming compensatory
11   damages.  Can you tell me what you're claiming compensation
12   for as far as damages are concerning?
13        A.    I been suffering emotional distress since 2003.  I
14   been extremely depressed, almost divorced.  I, I can't -- I
15   been on -- I can't hold -- I lost quite a bit of weight.  I'm
16   on Nexium.  I don't know, when I eat, I get sick quite a bit.
17   This is -- the doctor be telling me stress.  I suffer a lot of
18   headaches right after that.   And it's just that I don't want
19   to, to do the things that I used to do.  I'm just consumed
20   with this, this complaint because it's starting into
21   retaliation now.  And this is really, this is really a mental
22   distress.  At times I have been sicker than, you know, I've
23   ever been.  It's just the things that's going on, just to
24   think that -- how this cover-up and -- I can see why the
25   Agency has so many problems with discrimination, because
```

1   they're protected -- their wrongdoing and they continue on,

2   and then they give them the leeway to retaliate and do

3   anything, misuse their authority and their power to hurt

4   people.  And I worked in civil rights so I know what this

5   stuff is all about.  I seen it happen to so many people, but

6   now it's happening to me.  And I know what the system is all

7   about.  And, and all these investigations, GAO, OIG, all this

8   discrimination that's going on in Farm Service Agency, the

9   worse agency, and it's covered up.  And, and if I was a white

10  employee, I seen it just like this.  But when you're black you

11  have to go all the way and fight for years.  So much

12  discrimination.   And yes, I am, I am, I am mentally stressed

13  because I know the situation.  I have firsthand information

14  that's happening to so many blacks.  We have so many class

15  action complaints because of these kind of people, and these

16  kind of people use their power to fix people and destroy

17  people lives.  And the system allow them to do that.  I talk

18  to John Shott when this first happened, and I told him, I

19  said, I don't want any money, just promote me under a section

20  12 of MD110 and that incumbent promotion only.  If I leave the

21  position it would still be a 13.  You can do that any time.

22  They have done that.  I, I did not seek money then.  I said,

23  just -- and no, we don't do that.  I know they do that.  I

24  worked in civil rights.  I've seen the settle -- John Shott,

25  white people complain every single day.  When it come to a

81

```
 1  minority, they have to go all the way.  No whites go to EEO,
 2  see, because they -- their complaint.  I have documentation.
 3  But yet they put me through this.  Yes, I am -- I have been
 4  harmed.  I haven't had a regular life in the past three (sic)
 5  since this happen.  And John Shott is a known racist.  He has
 6  a history of it.  They're just going to show this black girl
 7  that, look, you, you not going to -- we're not going to give
 8  you nothing.  Just didn't have to go this far.  I've been
 9  through these -- you know, I've -- a complaint.  I know what
10  they can do.  I had the authority to do it.
11       Q.   Ms. Fields, let me just ask one question because you
12  had mentioned retaliation.  Are you alleging retaliation as
13  part of this complaint?
14       A.   No.
15            MR. BRANCH.   Just answer the question.
16            WITNESS.   Could I include it at this point?
17            MS. KIDWELL.   I think you'd better discuss that --
18            WITNESS.   Okay.
19            MS. KIDWELL.   -- with your counsel.
20            WITNESS.   Okay.
21            MR. BRANCH.   I don't want you asking questions.
22  Just answer the question.
23            WITNESS.   Okay, all right, okay.
24            BY MS. KIDWELL:
25       Q.   Ms. Fields, you've indicated in your answer to our
```

1   interrogatory number 10 that you had not received any

2   treatment with respect to any harm alleged in your complaint.

3   Now, with respect to what you've just indicated, the emotional

4   distress, the depression, loss of weight, have you seen any

5   healthcare professionals?

6        A.    Nothing but the doctor.  Just my medical doctor.

7        Q.    And what is your doctor's name?

8        A.    Bone, Paul Bone.  Dr. Paul Bone, B-o-n-e.  He's run

9   all kinds of tests about this gastritis of the --

10       Q.    Would you be willing to sign a medical authorization

11  so that we can see your medical records relating to this?

12       A.    I don't know if the records -- I don't know if the

13  records are related to this but it shouldn't be a problem.

14  I'll sign it.

15       Q.    Prior to 2003 had you ever had any treatment for any

16  physical ailment, or impairment, or diseases or problems of

17  any kind?

18       A.    I, I was on a trip in Dallas, Texas and I had a

19  pancreatitis attack, and I had to have my gallbladder removed.

20  That's the only medical --

21       Q.    Have you ever had treatment for any psychological

22  problems --

23       A.    No.

24       Q.    -- prior to 2003?

25       A.    Psychological, no.  Of course not -- go to the Lord.

1      Q.   Are you alleging that your earning capacity has been

2  impaired because of the actions that you allege in your

3  complaint?

4           MR. BRANCH.   Objection, what do you mean by earning

5  capacity?

6           MS. KIDWELL.   Her ability to earn money.

7           MR. BRANCH.   You can answer it if you understand

8  what's being asked.

9           WITNESS.   I don't understand.

10           BY MS. KIDWELL:

11      Q.   Ms. Fields, you just indicated that you've been

12  depressed, lost weight, emotional distress and this has been

13  going on.  And what I'm asking you is, if that's been going on

14  does that affect your ability to earn money?

15           MR. BRANCH.   Objection, once again, I'm not trying

16  to be difficult.  I don't understand what you're asking.  Are

17  you asking her if her medical condition affects her ability to

18  earn money outside of her current job or has she suffered a

19  loss of pay or --

20           WITNESS.   Oh, okay, yes, yes.

21           MR. BRANCH.   Hold on a second.  Let's get the

22  question so that we're clear on this.

23           MS. KIDWELL.   If she doesn't understand the

24  question I think she has the right to say I don't understand

25  the question.

```
 1              MR. BRANCH.  And I have the right to object if I
 2  don't understand the question.
 3              MS. KIDWELL.   That's --
 4              MR. BRANCH.   I'm asking you to give, give her a
 5  clear question.
 6              MS. KIDWELL.   I think that's a clear question.
 7              MR. BRANCH.   And what is the question?
 8              MS. KIDWELL.   The question was whether or not her
 9  earning capacity has in her opinion been impaired because of
10  the alleged allegations in this complaint?  Yes.  I think it's
11  a clear question.  Never had a problem with it either.
12              BY MS. KIDWELL:
13        Q.   What is your approximately salary at this time?
14        A.   We just got a raise -- I don't know what the
15  raise -- 90,000.
16        Q.   Now, as part of your damages you're also alleging
17  that you're entitled to back pay.  Is that correct?
18        A.   Correct.
19        Q.   You're also alleging that you're entitled to front
20  pay.  Is that correct?
21        A.   Yes.
22        Q.   Can you, can you just generally describe to me what
23  the basis of the front pay would be?
24              MR. BRANCH.   Objection to the extent that you're
25  asking her to define a legal term.
```

1          MS. KIDWELL.   It's not a legal term.  I just want

2    to know why -- she's asked for damages from the Agency.  She

3    said she's been harmed.  I'm trying to decide, or figure out,

4    what harm it is that we're talking about that she's talking

5    about that she would get damages for.  She's asked for front

6    pay.  So what's the basis of her asking for front pay?

7          MR. BRANCH.   The front pay is in the complaint.  If

8    she -- you haven't established, established that she

9    understands what front pay is.  I mean, to the extent that she

10   understands it, she can answer it.  She didn't prepare the

11   complaint.  Obviously she has counsel to prepare the

12   complaint.

13         BY MS. KIDWELL:

14     Q.    Then I'll ask you the question, Ms. Fields.  Is

15   there -- are there items in this complaint that you do not

16   know what they mean?

17     A.    I know what they mean.

18     Q.    Do you know what front pay means?

19         MR. BRANCH.   You can answer if you understand it.

20         WITNESS.   Yes.

21         BY MS. KIDWELL:

22     Q.    Can you tell me what front pay means?

23     A.    I would think front pay is the damages.

24     Q.    And how, how -- what amount --

25     A.    Front --

1      Q.    -- what amount of money --

2      A.    Oh.

3      Q.    -- would you indicate would be appropriate for front

4  pay?

5            WITNESS.   Can we caucus?

6            MR. BRANCH.   No, just answer the question, if you

7  can answer the question and if you understand.

8            WITNESS.   Okay.  I don't know no dollar amount.

9            MR. BRANCH.   That's not an amount that's determined

10  by the plaintiff, it will be determined by the judge in any

11  event.

12            MS. KIDWELL.   I have to have some basis --

13            (Off the record.)

14            (On the record.)

15            BY MS. KIDWELL:

16      Q.    Have you received, other than your salary, any other

17  income or monies from any other source since July of 2003?

18      A.    No.

19      Q.    Getting back to the interviews that were conducted

20  with respect to this position.  Did you during one of the

21  interviews indicate to the people who were interviewing you,

22  that you were nervous?

23      A.    No.

24      Q.    During the interviews when asked about

25  accomplishments did you mention a Christmas party during one

1  of the interviews?

2      A.    Yes, I did, but it's minute compared to what I

3  answered.  It was one of the smallest things.  I have 10

4  things I named and that's the one they picked.  Just --

5      Q.    During the interviews do you remember mentioning

6  putting together a list of awards for Mr. Frago?

7      A.    No, I sure don't.  But I, I worked on the Awards

8  Committee and sometimes he'll call and say, who, who was --

9  who from the state has been nominated, and I just type him up

10 something and give it to him.  It's nothing -- it's informal,

11 just --

12     Q.    My question to you is, do you remember mentioning

13 that during --

14     A.    I don't remember --

15     Q.    -- either one of the interviews?

16     A.    No, I do not.  I do not.  I do not remember

17 mentioning that.

18     Q.    Do you remember what you did tell the people that

19 were interviewing you were your significant accomplishments?

20         MR. BRANCH.    Objection.  Which interview are you

21 talking about?

22         MS. KIDWELL.    Either one of the interviews.

23         BY MS. KIDWELL:

24     Q.    Do you remember telling any of the interviewees --

25 interviewers, something about --

1    A.    Yeah --

2    Q.    -- significant accomplishments?

3    A.    -- uh-hum.  I told them about some of my

4 accomplishment (sic).  I really felt good about was the hiring

5 of the 1890 students because they all coming back to me,

6 they're working full-time, and they're very appreciative of

7 the program.  I talked about my accomplishment with the women

8 program.  I mean, I'm known nationwide.  I constantly

9 compliment on --

10          MR. BRANCH.   Wait, are you asking her to name the

11 accomplishments that --

12          MS. KIDWELL.   No, I'm asking her what --

13          MR. BRANCH.    I don't think that was the question,

14 but if that's what you're --

15          MS. KIDWELL.   I'm trying not to interrupt her when

16 she's going on.  So we need to get the ground rules here.   I'm

17 asking a question that I think sometimes is a yes or no, but I

18 don't want to interrupt her when she starts answering.  So I'm

19 not sure what to do here.

20          MR. BRANCH.    The question was whether she named her

21 accomplishments?

22          MS. KIDWELL.   Yes.  And she indicated in her

23 previous answer that the Christmas party was just one of 10

24 that she mentioned.  So I'm asking about the others that she's

25 mentioned.

1          MR. BRANCH.   You asked about the others, but if

2    that's --

3          WITNESS.   Right, okay.

4          MR. BRANCH.   -- that's what you're asking, then

5    please continue.

6          WITNESS.   Okay.  And I also mentioned that one of

7    my accomplishment with -- when I had to go out on

8    investigation, they needed it right away, how I did it in two

9    days, and that was an accomplishment.  Also accomplishment in

10   my -- I think the Georgia review, how fast I, I did these

11   things, he accomplishment.  It usually take weeks.  In fact,

12   when I was a field rep they gave us a couple of weeks.  But in

13   this area, you know, I'm very fast to get it done.  I, I

14   mentioned my accomplishment with the working with the

15   providing information to the black farmers when I spoke on

16   behalf of A and T.  In fact, that was one of them.  And the

17   HACU Program, I mentioned all the things that I really felt

18   made a difference in my career.  Right off I can't tell you,

19   but I know I mentioned -- I just went through and -- that

20   particular question, they asked me how well you work with

21   people or call at the last minute.  And I just used that for

22   an example.  I said, for example, the administrator, which is

23   the highest person in our agency, was having a party and they

24   needed some assistance at the last minute and they asked me,

25   even though I was busy.  I was just saying that.  I thought

1   what I was doing was assisting with that Christmas party.  And

2   I also mentioned how Personnel called me a lot to sit on

3   panels.  And the reason why -- I asked them why they called me

4   so much.  And they said, you never said no.  So my basic

5   answer was that, I have accomplished so much because any kind

6   of opportunity that I have to do something I will do it

7   because I never say no.  It was to that extent.  And that was

8   another question, I just said something about the Christmas

9   party.  It was, it was something about working with people, or

10  last minute -- something, I can't remember.  But it didn't

11  fall into the purview that you put it -- they put it.

12          BY MS. KIDWELL:

13      Q.   Ms. Fields, with respect to Interrogatory No. 2

14  where we requested information --

15      A.   Uh-hum.

16      Q.   -- it reads, "Identify and describe in detail all

17  communications including but not limited to memoranda,

18  correspondence and e-mails between plaintiff --" -- which is

19  you, Ms. Fields --  "-- and any other U.S.D.A. employee

20  regarding the claims that were asserted in his lawsuit.

21  You've provided some information here which we view as

22  nonresponsive.  So I'd like to ask you that question again and

23  I'll, I'll try to rephrase it so that you understand it.

24          Have there been any type of communications, either

25  through mail or just oral discussions, writing notes back and

1  forth --

2      A.   Uh-hum.

3      Q.   -- between you and the U.S.D.A. employees  --

4      A.   Yes.

5      Q.   -- regarding the claims in your lawsuit?

6      A.   Yes.

7      Q.   And can you -- and is one of those employees a

8  Michael Hill that you mentioned in your answers?  Have you had

9  discussions with Mike Hill?

10      A.   Yes.

11      Q.   And Edith Stovall?

12      A.   Yes.

13      Q.   And Ronald Hollings?

14      A.   Yes.

15      Q.   Okay, and starting with Mike Hill, can you tell me,

16  like, who he is and where he is in the Agency?

17      A.   Mike Hill is director of outreach, and at one time

18  the outreach fell under John Shott -- and Mike Hill was very

19  upset with the fact that John sent out an e-mail stating that

20  Ken will be action -- Ken was a 13 at that time and Mike was a

21  15.  So we discussed that.

22      Q.   Is that -- you just discussed that issue with

23  respect to Mr. Nagel being put in --

24      A.   The position, right.  Right, uh-hum.

25      Q.   And Ronald Hollings?

```
 1        A.    Ron Hollings, Ron Hollings told me that he
 2   thought -- he's very much aware of discrimination and he's a
 3   GS-15 also, assistant to the administrator.  He just recently
 4   retired.  But he, he said that he used to do various things
 5   with John, and all of a sudden John -- Ken.  So he thought Ken
 6   was more than a 13 because of the things that John was letting
 7   him do that he supposed to been doing.  And he also told me
 8   that he even wrote the 2003 worker paper trying to get the --
 9   hire more minority and stop the discrimination which they
10   rejected.  And he just observed how Ken was giving
11   preferential treatment over the other 13s, which was five 13
12   on that staff.
13        Q.    Okay.  And what about Edith Stovall?
14        A.    Edith Stovall is the EEO chief in Kansas City, and
15   she's very familiar with the notice because she -- on the
16   notice, the notice -- instructions on interviewing.  In fact,
17   she, she staff and she told me that her staff was out all the
18   time under the interview panel, no matter what grade, and
19   usually she would sit on at that time because it's very
20   important because the past discrimination.  The way this panel
21   thing came about is that it was so much discrimination on
22   hiring in FSA, so they started this EEO observer having to be
23   on a panel.  So try to cut down on the complaints, you know,
24   when there's a panel interview.  So it came about because of
25   past discrimination in FSA.  So that's a requisite now that
```

1  any time it's more than one person that you have to have an

2  EEO observer.

3      Q.    So you had discussions about -- with Ms. Stovall

4  about when an EEO observer is required --

5      A.    Right.

6      Q.    -- during interviews?

7      A.    Yes, correct.  I don't know, but I also talked to

8  Chuck Bergee (phonetic).

9      Q.    Who?

10     A.    Chuck Bergee.  He's a person that John reassign out

11  of there.  He's a GS-14-301.  I don't know if he's mentioned

12  in there.

13     Q.    You talked to Mr. Bergee about when an EEO

14  observer --

15     A.    No, I talked to --

16     Q.    -- is required?

17     A.    -- no, I talked to him about -- John stated that Ken

18  worked closely with Chuck Bergee, which was a 301-14.  So when

19  Chuck left the position, but John actually reassign him, left

20  the position, he let Ken take on his duties because he worked

21  closely with him.  So I asked Bergee that question and Bergee

22  said, the only thing that Ken worked closely with him was

23  program, not administrative.  He said Ken was 1145 program

24  person, and he gave him program assignments, but he did not do

25  administrative work with him.  He's willing to, to give a

94

1    statement of whatever you need on that.  He said, if anybody

2    assume his duties, was John.  John took his personnel duties,

3    whatever.  But Ken did not have experience in that area.  He

4    only did program work dealing with --

5         Q.    Let me ask you some questions on that because that

6    does seem to be a theme in your answers in terms of a program

7    versus administrative.  The title of your position is program

8    coordination specialist.  Am I correct?

9         A.    Correct.  It's not the title so much as the

10   description, the job description.

11        Q.    So tell me what you mean when you say that Ken Nagel

12   was not doing -- or that Chuck told you that Ken Nagel was not

13   doing administrative work, he was only doing program work.

14        A.    I think I show -- I had some exhibits showing how

15   Ken was hired and DAFO -- it's -- they have an administrative

16   area which is the 301 series, and then the 1145 which, which

17   is a program area only for Farm Service Agency.  You can not

18   go as 1145 to another agency because OPM, you know, approved

19   that title for FSA because of farm background and to make

20   people from the farm area to qualify to come in, you know, the

21   federal government.  Okay, so what we usually do, they recruit

22   administrative people to handle administrative stuff like

23   personnel and you know, you know, the hiring, you know,

24   misconduct investigations, all that.  Then Chuck was the

25   resolving official at a 14.  In fact, most of the resolving

1  officials are 14.  You know, because of my background, you

2  know, they named me one.  But anyway, you normally -- that,

3  that person to quality from the county would have to have a

4  farm background to come here in Washington as an 1145, so

5  prior to that they had no federal experience, they knew

6  nothing about the federal system and personnel, the budgeting

7  or nothing.  So when he came here, he was hired and I have an

8  exhibit showing, he was hired as a program person whose duties

9  are specified in his job description and in the notice that

10  went to all the SEDs stating what we all, you know, perform.

11  Mine was administrative, Chuck was administrative, Ken was

12  program, dealing with the farm program area.

13      Q.    Now, when you say yours was administrative --

14      A.    Administrative.

15      Q.    -- was that because you're in the 301 series?

16      A.    Right, and I perform the 301 administrative duties

17  according to my job description.

18      Q.    Okay.

19      A.    I provide --

20      Q.    But you can go from some series to other series --

21      A.    You can --

22            MR. BRANCH.    Allow her to finish the question.

23            WITNESS.    Okay.

24            BY MS. KIDWELL:

25      Q.    You can go from some series to other series, can't

1   you?

2       A.    You're correct.  In fact, the 260, lateraled over

3   because of the administrative duty.

4       Q.    Okay.  How well did you know Mr. Nagel?

5       A.    Very well.  We all very good, we on good terms.

6       Q.    Are you very familiar with his background?

7       A.    Yes, I'm -- yeah, I'm familiar enough, yes, uh-hum.

8       Q.    Do you know all the positions that he's held and all

9   the duties he's had over the years?

10      A.    According to the job, of course, I looked in the --

11  I have a copy of the report of investigation and according to

12  his resume.

13      Q.    And do you -- did you also look at Mr. Spalding's?

14      A.    Yes.

15      Q.    In looking at all that and looking at your

16  experience, is it at least your position that they were not as

17  qualified as you were for the GS-14 position?  Is that

18  correct?

19      A.    Correct.

20      Q.    Am I correct though that when you looked at all

21  their qualifications and everything, and the ROI, you had

22  already filed your complaint at that time, hadn't you?

23      A.    Yes.

24            MS. KIDWELL.   Do you want to take a break?

25            MR. BRANCH.   Not necessarily.

97

1        MS. KIDWELL.    Okay, I just asked.  I'm fine.  If

2   anyone else -- do you need a --

3        Could this be marked as Government's Exhibit 1?

4   (Whereupon, Deposition Exhibit No. 1 was marked

5   for identification.)

6        MS. KIDWELL.    Let the record reflect I'm handing a

7   copy of Government Exhibit 1 to Ms. Fields' counsel.

8        MR. BRANCH.    He's going to give you a copy, Ms.

9   Fields.

10        WITNESS.    Oh.

11        BY MS. KIDWELL:

12   Q.    Ms. Fields, I'm going to ask you to look at

13   Government Exhibit 1.  It consists of several pages.

14   A.    Uh-hum.

15   Q.    After you've had adequate time to look at it, I'll

16   ask you if you could, for the record, tell us what it is?

17   A.    This is my resume I submitted for the position.

18   Q.    This is the resume that you submitted for the GS --

19   A.    Fourteen.

20   Q.    -- 14 vacancy, administrative management specialist

21   position.  Is that correct?

22   A.    Yes.

23   Q.    I'd like to direct your attention to page 3 of this

24   document, towards the bottom.

25   A.    Uh-hum.

1      Q.    Under the Education Section.

2      A.    Uh-hum.

3      Q.    Am I correct that it indicates under the Education

4  Section that you received a BS in business management from

5  Howard University?

6      A.    I did not put the date here because I was lacking

7  some hours.   That's why I didn't put the date.   If you note,

8  the date is not there.   On the old 171 you can specify, as

9  long as you didn't put the number, you know.   And so I did not

10  specify that -- the date.

11      Q.    A BS would be a bachelor of science.   Am I correct?

12      A.    Right, uh-hum, in business management.

13      Q.    And are you -- is it your position that this does

14  not indicate that you have a bachelor of science in --

15      A.    Right.

16      Q.    -- business administration?

17      A.    Correct.

18      Q.    I also noticed you had given us some earlier schools

19  that you listed George Mason University on here which you had

20  given us, that's correct.

21      A.    Uh-hum --

22      Q.    But you do not list the P.G. Community --

23      A.    That's because --

24            MR. BRANCH.   Wait, allow her to ask the question.

25            BY MS. KIDWELL:

1    Q.    You do not list the P.G. Community College degree on

2    this resume.  Is that correct?

3    A.    Correct.

4    Q.    And you do not list the University of Maryland on

5    this resume --

6    A.    Correct.

7    Q.    -- is that correct?

8    A.    Uh-hum.

9         MR. BRANCH.    Just answer the question.

10        WITNESS.    Fine.

11        BY MS. KIDWELL:

12   Q.    And can you tell me then why you don't have these

13   other educational things listed on the resume?

14   A.    Because I was attaching, you know, I was going to

15   school and stopping and it was such a patch.  So maybe it was

16   my mistake that I didn't do that, but I didn't think it was of

17   any importance since I didn't put a date.

18        MS. KIDWELL.    I need to go off the record for one

19   second to get some additional copies made of some things -

20        MR. BRANCH.    That's fine.  Where are you -- let's

21   go off the record.

22        COURT REPORTER.    We're off the record.

23        (Off the record.)

24        (On the record.)

25        COURT REPORTER.    Okay, we're back on the record.

100

1          MS. KIDWELL.  And I'll ask that this be marked as

2   Government Exhibit 2.  Let the record reflect that I am

3   handing a copy of this to Ms. Fields' counsel.

4   (Whereupon, Deposition Exhibit No. 2 was marked

5   for identification.)

6          BY MS. KIDWELL:

7     Q.  Ms. Fields, I'll ask you to take a look at

8   Government's Exhibit 2 and review it.  It consists of several

9   pages.

10         MR. BRANCH.  Have you reviewed it?

11         WITNESS.  Uh-hum.

12         BY MS. KIDWELL:

13    Q.  And for the record, can you tell us what it is?

14    A.  This is a job I applied for -- specialist -- is

15  that --

16    Q.  Is it an Application for Federal Employment, also

17  known as SF-171?

18    A.  Yes, uh-hum.

19    Q.  And can I direct your attention to the very last

20  page --

21    A.  Uh-hum.

22    Q.  -- of this document?

23    A.  Yes.

24    Q.  And is this your signature in block number 48?

25    A.  Yes, it is.

101

1    Q.   Is the date appears to the right of that in block

2    number 49, 12-8-97?

3    A.   12-8 --

4         MR. BRANCH.   The last page, Ms. Fields.   Just

5    follow her, the last page --

6         WITNESS.   Yes, uh-hum, yes.

7         BY MS. KIDWELL:

8    Q.   Okay, Ms. Fields, I'll ask you now to look at the

9    next to the last page --

10   A.   Yes.

11   Q.   -- of this document.

12   A.   Uh-hum.

13   Q.   And this page actually has a numerical page three in

14   the bottom left-hand corner.   Is that correct?

15   A.   Correct, uh-hum.

16   Q.   And I ask you to direct your attention to the top of

17   the page, the blocks number 28 and 29.   Do you see those on

18   the page?

19   A.   Yes, I do.

20   Q.   Number 28 --

21   A.   Yes, I --

22        MR. BRANCH.   Just allow her to ask the question.

23        WITNESS.   Okay.

24        BY MS. KIDWELL:

25   Q.   Number 28 states, name and location of college or

102

1   university.  And the first one listed there is the University

2   of Maryland, University of College, College Park, Maryland.

3        A.    Uh-hum.

4        Q.    It has the zip-code, 9-92 to 2-97, 89 semester

5   hours.  And it says, type of degree, B.S. --

6        A.    Uh-hum.

7        Q.    -- 12-98.

8        A.    Uh-hum.

9        Q.    Does that B.S. stand for bachelor of science?

10       A.    Right.  And what happened --

11             MR. BRANCH.    Wait.

12             WITNESS.    Oh.

13             MR. BRANCH.    Allow her to ask the question.

14             WITNESS.    Uh-hum.

15             MR. BRANCH.    All I want you to do is allow her to

16   ask the question.

17             WITNESS.    Okay, all right.

18             BY MS. KIDWELL:

19       Q.    And number two indicates, Howard University,

20   Saturday College, Washington, D.C., has the zip-code, from 9-

21   90 to 5-93, and indicates 64 credit hours.  Type of degree,

22   A.A. which I assume is an associates degree, 5-93.    Does A.A.

23   stand for associates degree?

24       A.    Yes, uh-hum.

25       Q.    And the last thing listed on there is the Prince

1  George's Community College which indicates you attended from

2  9-88 to 5-93.  It does not list any credits or any degrees.

3          Number 29 it lists, chief undergraduates, subjects,

4  and it just has one, business management.  Am I correct?

5      A.  Uh-hum.

6          MR. BRANCH.  Is that a yes?

7          WITNESS.  Yes.

8          BY MS. KIDWELL:

9      Q.  On this 171, Ms. Fields, am I correct that you

10  indicated that you either had or would have a bachelor of

11  science degree from the University of Maryland?

12      A.  Yes.  I, I asked the director, director of civil

13  rights, I said, I'm working on it.  Should I put the date that

14  I expect to get it?  And he said, yes.  That's the only reason

15  I put that there.

16      Q.  And does this SF-171 also indicate that you had

17  obtained an associates degree from Howard University in 5-93?

18      A.  Yes, I have a copy of that.  I'm, I'm --

19          MR. BRANCH.  Just --

20          WITNESS.  Okay.

21          MR. BRANCH.  -- just answer the question.

22          WITNESS.  Oh, okay, okay.

23          BY MS. KIDWELL:

24      Q.  Is it correct though that you did not obtain a

25  bachelor of science degree from the University of Maryland?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1    A.    No, I did not.

2    Q.    And is it correct that you don't have a bachelor of

3  science degree from Howard University?

4    A.    That's correct.

5    Q.    Is it correct to say that you don't have any college

6  degrees?

7    A.    Yeah, I do, I do.  I have associate.

8    Q.    And when did you obtain that associate degree?

9    A.    19 -- it was '93.

10         MR. BRANCH.    Objection.  I think that's been asked

11  and answered earlier in the deposition.

12         MS. KIDWELL.    I don't agree that it has been.

13         Ms. Fields, I have a Release of Academic Records.

14  You may want to discuss this with your attorney, but I'm

15  wondering if you're willing to authorize the U.S. Attorney's

16  Office to receive your academic records from Howard University

17  and the University of Maryland?  And I'll hand this to your

18  counsel.

19         MR. BRANCH.    If you're -- you're going to have to

20  send that, the proper way of doing that -- that's not how

21  you --

22         MS. KIDWELL.    David, I'm not going to take

23  directions from you anymore in terms of taking a deposition.

24         MR. BRANCH.    Well --

25         MS. KIDWELL.    This is done all the time and we

 1  can --

 2          MR. BRANCH.   And I'm, I'm telling you, I'm telling

 3  you --

 4          MS. KIDWELL.   If it's not the way that --

 5          MR. BRANCH.    -- to do it properly.  You just don't

 6  do her something at the deposition and say, discuss it with

 7  your counsel.  If you have a discovery request, you have to do

 8  it through the proper means.

 9          MS. KIDWELL.   I'm asking her whether or not she

10  would be willing to sign an authorization for her academic

11  records, and I was handing it to you so you could see what I

12  was talking about.

13          MR. BRANCH.   I understand exactly what you were

14  doing.

15          MS. KIDWELL.   It was a courtesy I was extending and

16  I will not do so in the future.

17          MR. BRANCH.   I don't want you answering -- just --

18  if there is a question, you will answer it.

19          BY MS. KIDWELL:

20     Q.   Ms. Fields, have you ever told anyone that you have

21  a bachelor of science degree?

22     A.   No.

23     Q.   Have you put on other resumes or applications the

24  initials, B.S. and listed Howard University without putting a

25  date behind them?

1      A.   Maybe put a date that I expect to get it.  Or use
2  the, you know --
3      Q.   Do you know whether or not Mr. Ken Nagel has any
4  college degrees?
5      A.   I don't know.
6      Q.   Do you know whether or not Ken Spalding has a
7  college degree?
8      A.   I do not know.
9           MS. KIDWELL.   David, I think we'll stop the
10  deposition at this time in order to review the records that I
11  received yesterday in response to our discovery request.
12          MR. BRANCH.   And let me just say the records were
13  delivered to your office on Monday -- well, actually Monday
14  was a holiday so I believe it was Tuesday.  And I understand
15  you were out of the office yesterday, but they were couriered
16  over to your office on Tuesday.
17          MS. KIDWELL.   Let the record reflect that my
18  position is that I was here until 2 o'clock yesterday, checked
19  with our receptionist several times and had not received those
20  records --
21          MR. BRANCH.   Well --
22          MS. KIDWELL.   -- so I can only --
23          MR. BRANCH.   -- I can't -- I don't have any control
24  over your internal processes.
25          MS. KIDWELL.   Well, David, they were way overdue

1  anyway, and so I think I should be extended the courtesy of

2  reviewing the records, and if we have additional questions of

3  Ms. Fields, asking her to come back.

4          MR. BRANCH.   I've made it clear that I don't have

5  an issue with that.  Wait, we're not --

6          WITNESS.   Okay.

7          MR. BRANCH.   -- answering any questions.

8          WITNESS.   Okay.

9          COURT REPORTER.   Off the record.

10         MR. BRANCH.   She's going to read and sign.

11         (Reading and signature not waived.)

12         (Whereupon, at 1:00 p.m. on Thursday, February 22,

13  2007, the deposition was adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

108

CERTIFICATE

1
2    I, Timothy J. Atkinson, a Shorthand Reporter and a Notary
3    Public, do hereby certify that the foregoing witness,
4    SEDERIS FIELDS, was duly sworn on the date indicated, and that
5    the foregoing is a true and accurate transcription of my
6    stenographic notes and is a true record of the testimony given
7    by the foregoing witness.
8    I further certify that I am not employed by or related to
9    any party to this action by blood or marriage and that I am in
10   no way interested in the outcome of this matter.
11   In witness whereof, I have hereunto set my hand this
12   14th day of March, 2007.
13
14
15   _____ /S/
16   Timothy J. Atkinson
17   Notary Public in and for the
18   District of Columbia
19
20   My commission expires:
21   February 28, 2011
22
23
24
25

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947