# Attachment F

Sederis Fields
CONFIDENTIAL

Page 1

1                 UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3                     CIVIL DIVISION

4    - - - - - - - - - - - - - - - - - - - X     SEP 11 2007

5    SEDERIS FIELDS,                      )

6          Plaintiff,                     )     Case No.

7      vs.                                )     06-0538  (HHK)

8    MIKE JOHANNS, SECRETARY,             )

9    U.S. DEPARTMENT OF                   )

10   AGRICULTURE,                         )     Volume 2

11         Defendant.                     )     Pages 1-144

12   - - - - - - - - - - - - - - - - - - - X

13

14

15          VIDEOTAPE DEPOSITION OF SEDERIS FIELDS

16                 Wednesday, August 29, 2007

17                     Washington, D.C.

18

19

20

21   Reported by:  Sara A. Watt

22   Job No. 182397

Sederis Fields
CONFIDENTIAL

Page 2

```
 1
 2
 3
 4                   August 29, 2007
 5                   1:09 p.m.
 6
 7   Videotape deposition of SEDERIS FIELDS, held at the
 8   offices of:
 9
10      Office of the U.S. Attorney
11      501 3rd Street, Northwest
12      Fourth Floor
13      Washington, D.C. 20001
14
15   Pursuant to notice, before Sara A. Watt, Registered
16   Merit Reporter and Notary Public in and for the
17   District of Columbia.
18
19
20
21
22
```

Page 4

```
 1                 I N D E X
 2
 3   EXAMINATION OF SEDERIS FIELDS:          PAGE
 4      MR. HENAULT                  7
 5             - - -
 6
 7   CONFIDENTIAL PORTION              97-102
 8
 9             - - -
10
11            E X H I B I T S
12
13   FIELDS DEPOSITION EXHIBITS          PAGE
14   3   8/1/2003 letter to Fields from      15
15       Taylor
16   4   Complaint of employment          17
17       discrimination
18   5   Order of entering judgment      21
19   6   1/4/2006 order by EEOC denying     23
20       request for reconsideration
```

Page 3

```
 1   ON BEHALF OF THE PLAINTIFF:
 2      David A. Branch, Esquire
 3      Law Office of David A. Branch
 4      1825 Connecticut Avenue, Northwest, Suite 690
 5      Washington, D.C. 20009
 6      (202) 785-2805
 7
 8   ON BEHALF OF THE DEFENDANT:
 9      John J. Henault, Jr., Esquire
10      Office of the U.S. Attorney
11      555 4th Street, Northwest
12      Washington, D.C. 20530
13      (202) 307-1249
14
15      Neha Nagar Hewitt, Esquire
16      U.S. Department of Agriculture
17      Office of General Counsel
18      1400 Independence Avenue, Southwest, Room 3312-S
19      Washington, D.C. 20250-1400
20      (202) 690-2174
21
22   ALSO PRESENT: Steve Schaal, videographer
```

Page 5

```
 1   7   Vacancy announcement,          24
 2       administrative management
 3       specialist
 4   8   Fields' application for          25
 5       administrative management
 6       specialist
 7   9   7/11/2003 e-mail chain between     58
 8       Taylor and Chott
 9   (Exhibits retained by the reporter.)
10             - - -
11
12
13
14
15
16
17
18
19
20
21
22
```

2 (Pages 2 to 5)

Sederis Fields
CONFIDENTIAL

Page 6

1  PROCEEDINGS

2  VIDEOGRAPHER: Good afternoon. Here

3  begins videotape number one in the deposition of

4  Sederis Fields in the matter of Sederis Fields

5  versus Mike Johanns, U.S. Department of

6  Agriculture, in the United States District Court

7  for the District of Columbia, Civil Division, case

8  number which is CA 06-0537 HHK.

9  Today's date is August 29th, 2007 and the

10  time on the monitor is 1:09. The deposition is

11  being taken at 501 Third Street, Northwest,

12  Washington D.C. It was made at the request of John

13  Henault of the U.S. Attorney's Office.

14  The videographer is Steve Schaal and the

15  court reporter is Sara Watt, here on behalf of

16  Esquire Deposition Service, located at 1020 19th

17  Street, Northwest, Washington, D.C.

18  Would counsel and all present please

19  identify yourself and state whom you represent?

20  MR. BRANCH: It's your deposition.

21  MR. HENAULT: My name is John Henault on

22  behalf of Defendant, with the U.S. Attorney's

Page 7

1  Office in Washington, D.C.

2  MS. HEWITT: My name is Neha Hewitt. I'm

3  with the U.S. Department of Agriculture, Office of

4  General Counsel, to assist the Assistant

5  U.S. Attorney.

6  MR. BRANCH: Good afternoon. My name is

7  David Branch. I represent the Plaintiff,

8  Ms. Fields. And Ms. Field is present as well.

9  VIDEOGRAPHER: Will the court reporter

10  please swear in the witness?

11  Thereupon,

12  SEDERIS FIELDS

13  A witness, called for examination by counsel for

14  the Defendant, and, after having been sworn by the

15  notary, was examined and testified as follows:

16  THE WITNESS: Yes.

17  VIDEOGRAPHER: Counsel may proceed.

18  EXAMINATION BY COUNSEL FOR DEFENDANT

19  BY MR. HENAULT:

20  Q. Good afternoon, Ms. Fields. My name is

21  John Henault. And because Ms. Kidwell, who was

22  handling this case previously, is out of the office

Page 8

1  on emergency leave, I will be conducting the

2  deposition today. Okay?

3  A. Okay.

4  Q. Now, we are here today to continue your

5  deposition pursuant to an August 10, 2007, order of

6  the court; is that correct?

7  A. Right, uh-huh.

8  Q. And you have just been placed under oath?

9  A. Right.

10  Q. Is there any reason you cannot give

11  truthful and accurate testimony today, ma'am?

12  A. No.

13  MR. BRANCH: Before you start, I'd like

14  to state my objection on the record.

15  This is the second day of a deposition.

16  The first deposition was scheduled earlier this

17  year, it was not videotaped. This deposition is

18  being videotaped. We have not agreed to it and we

19  object to the deposition being videotaped. We will

20  proceed. We can raise our issues with the court.

21  I also note that Mr. Henault has not

22  entered his appearance as an attorney of record in

Page 9

1  this case and we believe it's improper for him to

2  be involved in this case without officially

3  entering his appearance. I think that's a

4  violation of the local rules and the Federal Rules

5  of Civil Procedure.

6  MR. HENAULT: Okay. Let me address your

7  last objection for a second, Mr. Branch.

8  Would you like to go off the record for a

9  minute and I will go enter my appearance and that

10  would alleviate that objection? Or would you just

11  withdraw that objection and we can continue with

12  the deposition?

13  MR. BRANCH: I don't think you can take

14  this deposition without entering your appearance.

15  MR. HENAULT: Okay. Let's go off the

16  record for five minutes, please.

17  VIDEOGRAPHER: Going off the record at

18  1:11:35.

19  (Discussion off the record at 1:11 p.m.)

20  (Deposition resumed at 1:22 p.m.)

21  VIDEOGRAPHER: Going back on the record.

22  The time is 1:22:05. Counsel may proceed.

3 (Pages 6 to 9)

Sederis Fields
CONFIDENTIAL

Page 10

1    MR. HENAULT: Prior to the break
2    Mr. Branch objected to this deposition going
3    forward on the basis that I was not -- I had not
4    yet entered may appearance in this case. That --
5    although I disagree with Mr. Branch that that was
6    necessary, we took a break and I have now entered
7    my appearance as counsel of record in this action.
8        Before we get started with questions, I
9    would like to hand to the court reporter, and I've
10   already handed to your counsel, ma'am, the exhibits
11   marked as Exhibits 1 and 2 at your February 22nd,
12   2000, deposition, and ask that they be included
13   with this transcript as Exhibits 1 and 2. And as
14   we do exhibits, I will begin with Number 3 such
15   that we can go consecutively.
16       (Exhibits 1 and 2
17       given to the reporter.)
18   BY MR. HENAULT:
19   Q.  Ms. Fields, this case involves two
20   non-selections, correct?
21   A.  A non-selection, one position.
22   Q.  There were actually two positions,

Page 11

1    correct?
2    A.  Two jobs, two jobs.
3    Q.  And the position at issue is a GS-14
4    administrative management specialist, correct?
5    A.  Right.
6    Q.  And the selectees for that position were
7    Mr. Ken Nagel and Mr. Patrick Spalding, correct?
8    A.  Yes.
9    Q.  At the time you applied for this
10   position, you were a GS-13, program coordination
11   specialist?
12   A.  Yes.
13   Q.  And you allege that you were not selected
14   for the two GS-14 administrative management
15   specialist positions on the basis of your race and
16   on your gender, correct?
17   A.  Correct.
18   Q.  And that's it?
19   A.  Yes.
20   Q.  Okay. Before we get into details about
21   the process, I'd just like to run through the
22   application and interview process to make sure

Page 12

1    we're on the same page. Okay?
2    A.  Okay.
3    Q.  You applied for the position in early
4    January, 2003, correct?
5    A.  It closed in March, 2003.
6    Q.  Okay. You timely applied --
7    A.  Yes, I did.
8    Q.  -- for that position?
9    A.  Yes.
10   Q.  You interviewed the first time for the
11   position on July 8, 2003; is that accurate?
12   A.  Yes.
13   Q.  The people conducting the July 8, 2003,
14   interview were Mr. Doug Frago?
15   A.  Frago.
16   Q.  Frago.
17       MR. BRANCH: March or July?
18       THE WITNESS: July. The job closed in
19   March.
20       MR. HENAULT: Yes.
21       MR. BRANCH: The interview was in July?
22       THE WITNESS: Uh-huh.

Page 13

1    BY MR. HENAULT:
2    Q.  The initial interview was July 8, 2003,
3    correct?
4    A.  Yes.
5    Q.  And the people conducting the interview
6    were Mr. Doug Frago?
7    A.  Yes.
8    Q.  Mr. John Chott?
9    A.  Right, yes.
10   Q.  Mr. Solomon Ramirez?
11   A.  Yes.
12   Q.  And Mr. Sean Clayton, correct?
13   A.  Yes.
14   Q.  Okay. Following the interview, Mr. Chott
15   told you that you had interviewed well, correct?
16   A.  Yes.
17   Q.  And on July 11, 2003, you were notified
18   that you had made the top five candidates and would
19   go with another interview, correct?
20   A.  Yes.
21   Q.  Who told you that?
22   A.  John Chott.

4 (Pages 10 to 13)

Sederis Fields
CONFIDENTIAL

Page 14

1    Q.  Now, the second interview was on July 21,
2  2003; is that right?
3    A.  Yes.
4    Q.  And the participants in the July 21,
5  2000, interview, were again Mr. Frago, correct?
6    A.  Yes.
7    Q.  Mr. Chott?
8    A.  Yes.
9    Q.  And a woman named Ms. Linda Treese?
10    A.  Yes.
11    Q.  Anyone else?
12        MR. BRANCH:  Objection. I believe you
13  said July, 2000. And I thought it was 2003.
14  BY MR. HENAULT:
15    Q.  July, 2003.
16    A.  Yes.
17    Q.  Let me just be -- clarify to make sure.
18        MR. BRANCH:  Just be careful to listen to
19  the question.
20  BY MR. HENAULT:
21    Q.  The second interview was conducted July
22  21, 2003, correct?

Page 15

1    A.  Yes.
2    Q.  Okay.  And the participants were the
3  people we just named?
4    A.  Yes.
5    Q.  Okay.  Now, following the interview, you
6  were told that you were not selected for the
7  position, correct?
8    A.  Yes.
9    Q.  How long after the July 21, 2003,
10  interview, were you told that you were not selected
11  for the position?
12    A.  On -- I was interviewed at 1:00 o'clock
13  on July the 21st, and in about a couple hours
14  Mr. Frago came to my office and informed me that I
15  was not selected.
16        MR. HENAULT:  Okay. Let's mark this as
17  Exhibit 3, please.
18            (Exhibit 3
19            marked for identification.)
20  BY MR. HENAULT:
21    Q.  Could you please take a look at what has
22  been marked as Exhibit 3, ma'am?

Page 16

1    A.  Yes.
2    Q.  Have you seen this before?
3    A.  Yes.
4    Q.  What has been marked as Exhibit 3 is an
5  August 1, 2003, letter from the U.S. Department of
6  Agriculture to you.
7        Is that accurate?
8    A.  Yes.
9    Q.  And it's informing you that you were
10  among those referred to the selecting official for
11  consideration, but another candidate was selected,
12  correct?
13    A.  Yes.
14    Q.  When did you receive this, do you know?
15    A.  Around that date, August the 1st,
16  probably 2nd or 3rd.
17    Q.  When did you contact an EEO counselor to
18  lodge an informal complaint of discrimination, do
19  you know?
20    A.  I can't -- I did it within 45 days. You
21  have 45 days.
22    Q.  Okay.  And the complaint was not resolved

Page 17

1  at the informal stage, correct?
2    A.  No.
3    Q.  And you received a notice informing you
4  that you then had the right to file a formal
5  complaint of discrimination, correct?
6    A.  Yes, uh-huh.
7    Q.  And that notice was issued on October
8  23rd, 2003.
9        Does that sound right?
10    A.  Approximately, yeah.
11    Q.  Okay.  And you actually received that
12  notice on November 5, 2003.
13        Does that sound right?
14    A.  That's about right.
15    Q.  Okay.  And you did in fact file a formal
16  complaint of discrimination, correct?
17    A.  Yes, I did.
18        MR. HENAULT:  Let's mark this as Exhibit
19  4, please.
20            (Exhibit 4
21            marked for identification.)
22  BY MR. HENAULT:

5 (Pages 14 to 17)

Sederis Fields
CONFIDENTIAL

Page 18

1    Q. Could you please take a look at what has
2  been marked as Exhibit 4, ma'am?
3    A. Yes.
4    Q. What has been marked as Exhibit 4 is your
5  formal complaint of discrimination, correct?
6    A. Yes.
7    Q. And you signed and dated that on November
8  14, 2003 --
9    A. Yes.
10   Q. -- is that right?
11   A. Yes.
12   Q. And it was actually filed with the
13  Department of Agriculture on January 2, 2003,
14  correct?
15   A. I took it to the office on the 14th,
16  November 14th.
17   Q. You took it to what office?
18   A. To the office of -- office of civil
19  rights, I filed it in person.
20   Q. Do you know who you gave it to?
21   A. No. I got a stamp date of it, though, of
22  11/14.

Page 19

1    Q. Okay.
2    A. It's received 11/14/03, that's on my
3  copy. I asked for a copy when it was stamped.
4    Q. And this case was not resolved at this
5  point, was it?
6    A. No.
7    Q. And it then went to the EEOC; is that
8  right?
9    A. Correct.
10   Q. And at the EEOC, the agency filed a
11  motion for summary judgment, correct?
12   A. No, they didn't.
13   Q. They did not?
14   A. No. What happened, first of all, before
15  it even -- before it went to EEOC, the agency
16  had -- number one, first I filed with EEOC because
17  they failed to meet the deadline of 180 days for
18  investigation. So I sent a letter to the
19  department and I sent one to the EEOC.
20      Then the agency proceed to have a mini
21  investigation. So they sent an investigator out
22  and she investigated in a day and a half and

Page 20

1  refused to interview any of my witnesses. And the
2  names that the agency gave her, they gave her Linda
3  Treese, Doug Frago, and John Cholt, and didn't
4  include the EEO observer or Salomon. They, you
5  know -- or right then. So when I interviewed with
6  her, she didn't know anything about first interview
7  because she only was aware of the second interview.
8      So then she dashed and somehow where she
9  happened to catch him before he traveled, but she
10  couldn't get EEO observer because he should have
11  been included in that interview. Because initially
12  the official interview panel was Salomon, Salomon,
13  John, and Frago.
14      So this second interview was unbeknown to
15  personnel, which violates the merit promotion plan.
16  This is the -- so therefore when I --
17   Q. Let me just, if I could, interrupt you
18  for one moment. We'll get into the specifics of
19  the interview --
20   A. Right, right.
21   Q. -- and of the allegations and everything.
22   A. Okay.

Page 21

1    Q. I'm just trying to run through the
2  procedural history right now, if that's okay.
3    A. I'm getting to that, how I sent a letter
4  to -- it was maybe --
5    MR. BRANCH: If you can just respond to
6  the question.
7    THE WITNESS: Okay.
8    MR. BRANCH: And that was whether there
9  was a summary judgment motion filed.
10   THE WITNESS: Yes. But the judge
11  suggested that. And we both -- the administrative
12  judge.
13   MR. HENAULT: Okay. Let's mark this as
14  the next exhibit, please. This is 5.
15      (Exhibit 5
16      marked for identification.)
17  BY MR. HENAULT:
18   Q. Ma'am, could you please take a look at
19  what has been marked as Exhibit 5, if you would?
20   A. Yes, uh-huh.
21   Q. Have you seen that before?
22   A. Yes.

6 (Pages 18 to 21)

Sederis Fields
CONFIDENTIAL

Page 22

1    Q.  And what is --
2        MR. BRANCH:  Objection to this document.
3    It's not relevant for any of the proceedings that
4    are before the court.  The court itself determines
5    the merits of the claims.
6    BY MR. HENAULT:
7    Q.  Okay.  You have seen this document
8    before, correct?
9    A.  Yes.
10   Q.  Okay.  And what this document is, is an
11   order entering judgment at the EEOC on April 18,
12   2005, correct?
13   A.  Yes.
14   Q.  And that's entering judgment in favor of
15   the agency, correct?
16   A.  Yes.
17   Q.  On summary judgment, right?
18   A.  Yes.
19   Q.  Okay.  And following the receipt of that
20   document, you or your representative on your behalf
21   filed a timely request for reconsideration, right?
22   A.  Yes.

Page 23

1        MR. HENAULT:  Okay.  Let's mark that as
2    the next document, please.
3        (Exhibit 6
4        marked for identification.)
5        MR. BRANCH:  He should give it to you.
6    BY MR. HENAULT:
7    Q.  Please take a look at Exhibit 6, ma'am.
8        Have you seen Exhibit 6 before?
9    A.  Oh, yes, uh-huh.
10   Q.  What Exhibit 6 is, is a January 4, 2006,
11   order of the EEOC denying your request for
12   reconsideration, correct?
13       MR. BRANCH:  Objection.  Same objection
14   as before.  It's not relevant to any of the
15   proceedings before the court.  The court itself
16   determines the merits of the claims.
17   BY MR. HENAULT:
18   Q.  Go ahead, ma'am, you can answer that.
19       MR. BRANCH:  You can answer the question.
20       THE WITNESS:  Yes.
21   BY MR. HENAULT:
22   Q.  Okay.  Do you know when you received this

Page 24

1    document?
2    A.  Around the date that it's dated.
3    Q.  And following your receipt of this
4    document you filed this action on March 22, 2006,
5    correct?
6    A.  Yes.
7    Q.  Okay.  Now let's go back to the -- I just
8    wanted to run through the procedural history and
9    everything.  Let's go back through the specifics of
10   the interview process.
11       MR. HENAULT:  I would like to mark this
12   as Exhibit 7.
13       (Exhibit 7
14       marked for identification.)
15   BY MR. HENAULT:
16   Q.  Ma'am, could you please take a look at
17   what has been marked as Exhibit 7?
18   A.  Yes, uh-huh.
19   Q.  What has been marked as Exhibit 7 is a
20   vacancy announcement for a GS-0301-14 position, and
21   the title of that position is administrative
22   management specialist, correct?

Page 25

1    A.  Correct, yes.
2    Q.  And this is the vacancy announcement
3    under which you applied for the positions at issue
4    in this lawsuit, correct?
5    A.  Yes.
6    Q.  Is this the accurate vacancy
7    announcement?
8    A.  Let me see.  Yes.
9        MR. HENAULT:  Okay.  Let's mark this as
10   the next exhibit, please.
11       (Exhibit 8
12       marked for identification.)
13   BY MR. HENAULT:
14   Q.  Ma'am, please take a look at Exhibit 8
15   and let me know when you're ready.
16   A.  Correct, okay.
17   Q.  Ready?
18   A.  Uh-huh.
19   Q.  What has been marked --
20       MR. BRANCH:  You have to say yes or no,
21   Ms. Fields, please.
22       THE WITNESS:  Yes.

7 (Pages 22 to 25)

Sederis  Fields
CONFIDENTIAL

Page 26

1  BY MR. HENAULT:

2      Q.  What has been marked as Exhibit 8 is your

3  application for the GS-14 administrative management

4  specialist position, correct?

5      A.  Yes.

6      Q.  Is this the complete and accurate

7  application that you submitted for that position,

8  ma'am?

9      A.  Yes.

10     Q.  Is everything in this application

11  accurate, ma'am?

12     A.  Yes.

13     Q.  Okay.  Now, as we previously discussed,

14  the first interview panel consisted of Mr. Frago,

15  Mr. Chott, Mr. Ramirez, and Mr. Clayton, right?

16     A.  Right.

17     Q.  Okay.  Let's start with Mr. Frago.  Who

18  is Mr. Frago?

19     A.  Mr. Frago at that time was my first line

20  supervisor.

21     Q.  Okay.  And ultimately was he the

22  selecting official for this position?

Page 27

1      A.  Yes.

2      Q.  Okay.  Do you allege that it was improper

3  for Mr. Frago to participate in the initial

4  interview?

5      A.  It was unusual.

6      Q.  But there's nothing improper about that,

7  correct?

8      A.  To a certain extent, because he could be

9  biased.  Usually in interviews you really would

10  like people that did not know the person to be on

11  either end of your panel, that I know personally.

12  So under most circumstances, it's very seldom that

13  a first line supervisor, which is the selecting

14  official, will be on the interview panel.

15     Q.  Okay.  But it is permissible for that to

16  happen?

17     A.  It's permissible, yes.

18     Q.  So you're aware of no personnel

19  regulations or rules prohibiting Mr. Frago from

20  participating in that initial interview, are you?

21     A.  No.

22     Q.  Okay.  Now, Mr. Chott was also a

Page 28

1  participant in the initial interview, correct?

2      A.  Right.

3      Q.  Who is Mr. Chott?

4      A.  He was my second line supervisor.

5      Q.  Do you allege that it was inappropriate

6  for Mr. Chott to participate on the initial

7  interview panel?

8      A.  No.  It was just unusual for the two of

9  them.

10     Q.  So you're aware of no personnel rules or

11  regulations that would prohibit Mr. Chott from

12  participating in the initial interview, correct?

13     A.  No.

14     Q.  Okay.

15     MR. BRANCH:  Is it "Chott" or "shot"?

16     MR. HENAULT:  C-H-O-T-T is how it is

17  spelled.

18     THE WITNESS:  He pronounces it "shot."

19  BY MR. HENAULT:

20     Q.  "Shot," okay.

21     Mr. Salomon Ramirez participated in the

22  initial interview, correct?

Page 29

1      A.  Yes.

2      Q.  Who is Mr. Ramirez?

3      A.  He at that time was employed with the

4  farm program area.

5      Q.  In what capacity, do you know?

6      A.  Assistant to the deputy administrator,

7  farm programs.

8      Q.  Do you allege that it was inappropriate

9  for any reason for Mr. Ramirez to participate in

10  the initial interview?

11     A.  No.

12     Q.  So you are not aware of any personnel

13  rules or regulations prohibiting Mr. Ramirez from

14  participating in the initial interview?

15     A.  No.

16     Q.  Now, Mr. Clayton was the final

17  participant in the initial interview, correct?

18     A.  Yes.

19     Q.  Who is Mr. Clayton?

20     A.  He was the EEO advise -- EEO observer.

21  And in our agency, whenever you convene a panel

22  interview, you would have to have a -- you know,

8 (Pages 26 to 29)

Sederis Fields
CONFIDENTIAL

Page 30

1 the regulations state you should have an EEO
2 observer.
3     Q.  Did the regulations state you should?
4     A.  No, no, must.  "Shall" is the word they
5 use, "shall."  Shall means must.  It says shall
6 have an observer in the panel that convenes.
7     Q.  So you -- do you allege that it was
8 inappropriate for Mr. Clayton to participate in the
9 initial interview?
10     A.  Yeah, he should have been there,
11 definitely.
12     Q.  No, do you allege that it was
13 inappropriate?
14     A.  No, no.
15     Q.  Okay.  So it was proper for him to be
16 there?
17     A.  It was proper, he should have been there,
18 right.
19     Q.  Now, do you allege that the interview,
20 the initial interview of the various candidates,
21 were not conducted in the same manner?
22     A.  Of course not.

Page 31

1     Q.  In what way, ma'am?
2     A.  Are you talking -- you said other --
3 okay.  Could you restate that question, please?
4     Q.  Are you alleging that the interviews of
5 the various candidates, the initial interviews,
6 were conducted in different manners?
7     A.  I can't answer that because I don't know
8 how they conducted the other interviews in it.
9     Q.  Do you allege that any applicants were
10 asked different questions than you were?
11     A.  My only question I had is that ken Nagel
12 applied for the 1144 job and the 301 position, and
13 he was interviewed, let one interview suffice for
14 both position.
15         And if it's two separate jobs, it's two
16 separate job descriptions, it should have been two
17 separate interviews.  But they used that one
18 interview and rate him highly qualified on both
19 those positions.  So that is -- I think that is in
20 violation.
21     Q.  Okay.  Do you know of any rules,
22 personnel rules or regulations, that prohibit one

Page 32

1 interview for two separate positions?
2     A.  I think I'm almost sure it's spelled out
3 in merit promotion that jobs interview should be
4 based on job specified or position specified.  And
5 these are two separate series of jobs.  One is
6 administrative and one is program.
7         So I would think that it should have been
8 two separate interviews.  Because they used that
9 one score to rate him high, you know, better
10 qualified, best qualified on the 1145 and best
11 qualified on 301.  And I can't -- you know, being
12 best qualified on both positions.  And of course he
13 was already in the 1145 series.
14     Q.  Okay.  So as you sit here today, though,
15 can you tell me any personnel rules or regulations
16 that prohibit Mr. Nagel from interviewing once for
17 the two separate positions?
18     A.  I can't specify right now, but I don't
19 close it out.
20     Q.  But as you sit here you're not aware of
21 any?
22     A.  I'm aware of it.

Page 33

1     Q.  Okay.  I just can't specify --
2     A.  Right.
3     Q.  -- what specific section it is?
4     A.  Right, right.
5     Q.  And your memory of this section, now with
6 the understanding that we're going off your memory
7 of this section --
8     A.  Okay.
9     Q.  -- and the actual text will control --
10     A.  Right.
11     Q.  -- but it's your understanding of this
12 section that it expressly precludes conducting one
13 interview for -- of a candidate for two separate
14 positions?
15     A.  No, it's not spelled out that way.  But
16 I'm saying that these were two separate different
17 positions, and according to regulation it states
18 that the interview should relate to that specific
19 job.
20         So, okay, if they had separate questions
21 for Ken during this interview, then all the
22 candidates supposed to be asked the same questions.

9 (Pages 30 to 33)

Sederis Fields
CONFIDENTIAL

Page 34

1  So if they interviewed him with two jobs, then he
2  couldn't have been asked the same questions.
3      Q.  Okay.  Do you know how Mr. Nagel's
4  interview was conducted?
5      A.  No, I do not.
6      Q.  Okay.  So you don't know how -- which
7  questions they asked him?
8      A.  I think I did see in the ROI, they did
9  have some additional questions.
10     Q.  Okay.
11     A.  Right.
12     Q.  Anything else about his interview that
13  you believe was different?
14     A.  Like I said, he was interviewed for both
15  positions.
16     Q.  Okay.  Now, let's talk about
17  Mr. Spalding's interview for a second.
18     A.  Okay.
19     Q.  Do you allege that Mr. Spalding was asked
20  any different questions than you?
21     A.  No.
22     Q.  So you -- do you allege that

Page 35

1  Mr. Spalding's interview was conducted in a manner
2  that was different than yours?
3      A.  No.
4      MR. BRANCH:  Now, you're inquiring about
5  the first interview?
6  BY MR. HENAULT:
7      Q.  That's correct.  I'm just talking about
8  the initial interview right now.
9      A.  Okay, yes, okay.
10     Q.  And I'm sorry, I should have clarified
11  that.  Until I expressly say we're talking about
12  the second one, these interviews I'm talking about
13  right now are just the initial interview.
14     Fair enough?
15     A.  Okay.
16     Q.  Okay.  Now, following your initial
17  interview, when did Mr. Chott tell you that you
18  interviewed well?
19     A.  The same day.
20     Q.  The same day.  And was that as you walked
21  out of the interview or did he come up to you later
22  or how did that transpire?

Page 36

1      A.  He came -- he came to my office and asked
2  me to do an investigation.  First he said you did
3  very -- you did good on the interview.  Then he
4  said I have an investigation for you, Georgia.  You
5  know, he said I'll bring you the specifics.
6      Q.  Okay.  Now, we've already said about
7  this, but just because I'm going through the
8  process now in order, on July 11, 2003, you were
9  notified that you had made the top five candidates
10  and would go through another interview, correct?
11     A.  Yes.
12     Q.  Okay.  And who told you that?
13     A.  John Chott.
14     Q.  And how was that expressed to you?
15     A.  He called me to his office.
16     Q.  And to the best of your recollection,
17  exactly what did Mr. Chott say?
18     A.  He said we're going to have a second
19  interview of the top five, and that, you know,
20  you'll be interviewed.  And possibly after you come
21  back off your trip he said.
22     And one thing, this sticks with me, he

Page 37

1  said, you know, the second interview, don't mention
2  too much about the 301 series.
3      Q.  What's the 301 series?
4      A.  Jobs, if you're familiar with OPM, jobs
5  are categorized by series.  And the 301 series is
6  administrative series.  And that is the series that
7  that administrative specialist job was announced.
8      Ken Nagel was an agriculture program
9  specialist with specifics in farm background.  My
10  background is administrative.  I was a 301, Ken was
11  1145.  So, you know, like I said, it's unusual for
12  1145 to qualify, be promoted to a 301 series unless
13  there was a 301 at a 13 level for a year.  That's
14  OPM procedures.
15     Now, John mentioned to me, don't mention
16  about the 301, because I mentioned it in the first
17  interview.
18     Q.  And what did you mention about the 301 in
19  the first interview?
20     A.  When they asked me a question about my
21  administrative experience and I mentioned that I've
22  been in -- how long I've been in the 301 series.

10 (Pages 34 to 37)

Sederis Fields
CONFIDENTIAL

Page 38

1 Prior to that I was an administrative, I was in
2 civil rights. And all that ties into the same
3 series.
4         See, jobs are qualified by series in the
5 federal government. You can't go from a 318 to a
6 301, you know. It's assigned by series.
7         And so being that Ken was 1145 and 301
8 and applied for both jobs, he just asked me not to
9 mention it when I had my second interview.
10    Q.  Why, do you know?
11    A.  I -- I don't know.
12    Q.  Okay.
13    A.  Maybe because of the job.
14    Q.  Maybe because what?
15    A.  For one thing, I don't think Mr. Frago
16 understands the personnel procedure, that normally
17 a person usually is not promoted from 1145 series
18 to a 301 series because of the job-specific
19 position descriptions.
20    Q.  Now, let me ask you a question about the
21 process -- the promotion process in general. And
22 I'm going to describe to you my understanding of

Page 39

1 how the promotion process works. And I would like
2 you to tell me if that is accurate. And if it's
3 inaccurate, I would like you to tell me why.
4         Okay?
5    A.  Okay.
6    Q.  A vacancy announcement comes out,
7 correct?
8    A.  Yes.
9    Q.  And interested personnel submit their
10 applications?
11    A.  Right.
12    Q.  And the HR or personnel function of an
13 agency reviews all the applications and sends those
14 that are deemed qualified forward, correct?
15    A.  Yes.
16    Q.  Okay. And then there is the interview
17 panel, the rating and ranking panel receives the
18 applications that HR or the personnel function has
19 deemed qualified and meeting the minimum
20 requirements for the position, correct?
21    A.  Yes.
22    Q.  So when the interview panel in this case

Page 40

1 received the applications, including the
2 applications of Mr. Nagel and Mr. Spalding, they
3 could presume that those people were qualified for
4 promotion, the promotion at issue, correct?
5    A.  Yes.
6    Q.  Okay.
7         MR. BRANCH:  Objection to the extent that
8 calls for speculation.
9         MR. HENAULT:  Okay.
10         MR. BRANCH:  Or presumption.
11 BY MR. HENAULT:
12    Q.  So do you allege that Mr. Nagel was
13 ineligible to compete for this position?
14    A.  One thing I noticed in the report of
15 investigation, that John Chott and Doug Frago rated
16 him as a 301. And in fact if you looked at his 52,
17 he was a 1145. So they ranked him as a 11 --
18 GS-301-13. And that's on his performance rating.
19    Q.  Okay. And the SF 52 is the document in
20 the application package that shows your current
21 position, correct?
22    A.  Right, uh-huh, series.

Page 41

1    Q.  And that was for Mr. Nagel you said?
2    A.  Yes, uh-huh.
3    Q.  Now, do you know if the SF 52 in
4 Mr. Nagel's application package had his accurate
5 job series?
6    A.  Yes, it did.
7    Q.  So that would have been presented to the
8 personnel department first to review that, and they
9 make a determination that he is eligible to compete
10 for this position, correct?
11    A.  Yes.
12    Q.  Okay.
13         MR. BRANCH:  Objection to the extent that
14 it calls for speculation.
15 BY MR. HENAULT:
16    Q.  So do you allege that Mr. Nagel should
17 have been ineligible to compete for this GS-14
18 position?
19    A.  Yes.
20    Q.  Why?
21    A.  Because according to -- Mr. Nagel, and I
22 think this is a part of the ROI, I was hired as

11 (Pages 38 to 41)

Sederis Fields
CONFIDENTIAL

Page 42

1  a -- he was in -- he was a county executive
2  director, which is a nonfederal employee in
3  Nebraska. He came to the agency in 1999 as an
4  agricultural program specialist.
5       And to qualify for that position you have
6  to have farm background specifics, not
7  administrative. Because the county executive
8  director administrative positions are different
9  from. In fact, a notice came out in 1999
10 qualifying county employees to be qualified, to
11 qualify for federal positions.
12      So Mr. Nagel came to the agency in 1999.
13 He had been a farmer for 20 years, and he worked as
14 a CED in Nebraska.
15      Q.  Now, what's a CED? I'm sorry to
16 interrupt.
17      A.  County executive director.
18      Q.  Okay. And I apologize for interrupting,
19 but just so the record's clear, I want to make sure
20 that we're not using acronyms.
21      A.  So he came to the position and he worked
22 in his series. And I have notice -- AO notices

Page 43

1  went out to the nationwide --
2       Q.  A what notice?
3       A.  AO, administrative notice describing our
4  positions. And Mr. Nagel's position was dealing
5  with the farm program. Of course mine was
6  identified as dealing with administrative, the same
7  programs that, you know, identified on the job
8  description.
9       Okay. So Mr. Nagel worked in that area
10 until John Chott became acting deputy administrator
11 of field operation. When Mr. Chott became acting
12 deputy administrator, field operations, we had
13 about five GS-15s on that staff. Mr. Chott
14 reassigned every 15 on that staff and a 14, which
15 is Chuck. Chuck, he worked -- Ken worked with
16 Chuck. Chuck was a 301 GS-14. So he reassigned
17 Chuck. He said Chuck was undermining him. But he
18 reassigned Chuck and gave Ken Chuck's duties. In
19 other words, he targeted him for position for
20 promotion.
21      So he gave him accretion of duties. You
22 know, it was like a training. And he was of course

Page 44

1  still in the 1145 series. And we had another black
2  female 301 series there in which he had Ken acting
3  over her all the time. He showed favoritism. All
4  the specialists complained about him showing
5  favoritism to Ken Nagel, because he is -- in fact,
6  the GS-15 went to the administrator because he had
7  Ken acting over the 15s and he was a 13.
8       Q.  Let me ask you a question. What was this
9  position or what duties are you saying that Ken,
10 Mr. Nagel --
11      A.  Right.
12      Q.  -- was given?
13      A.  Chuck Berge, Chuck Berge was the GS-14,
14 GS-301-14.
15      Q.  So you're saying that in Mr. Nagel's
16 prior position, he performed the duties of a 301
17 series?
18      A.  It was he worked as 1145 until John came.
19 And for a short time, not a year, he start
20 filtering all of Chuck Berge's responsibilities.
21      Q.  And those were administrative
22 responsibilities?

Page 45

1       A.  Yes.
2       Q.  Okay. So at that time Mr. Nagel would
3  have received experience in doing administrative
4  duties, correct?
5       A.  Yes.
6       Q.  Okay. And duties that had previously
7  been performed by a GS-14 or 15?
8       A.  A 14.
9       Q.  So in Mr. Nagel's prior position, he was
10 performing duties -- he was GS-13, correct?
11      A.  Right, yes.
12      Q.  So he was performing duties of a GS-14
13 administrative employee, correct?
14      A.  Yes, which is another violation,
15 accretion of duties.
16      Q.  Were any of the duties given to Mr. Nagel
17 at this -- at the time you were just talking about,
18 taken away from you?
19      A.  Taken away? Possibly, because the way
20 John works. Okay. One thing is --
21      Q.  Go ahead.
22      A.  I was the resolving official. He had Ken

12 (Pages 42 to 45)

Sederis Fields
CONFIDENTIAL

Page 46

1  trained as a resolving official and, you know,
2  start sending him out.
3      Q.  Are those administrative duties or --
4      A.  Administrative duties.
5      Q.  Okay.  So that's additional
6  administrative duties that Mr. Nagel would have
7  been performing, correct?
8      A.  Yes, uh-huh.
9      Q.  Okay.
10     A.  And usually the 301 series are
11 administrative series, because you really need a
12 background in personnel and EEO for resolving
13 official in the area.
14         And before I get there, at that time when
15 John Chott became acting deputy administrator,
16 field operations, we had five 15s that he named Ken
17 acting over them when he was out.  And eventually
18 he had all of those reassigned and left only one
19 14, which is a black female, and then he had Ken
20 acting over her.  He was a GS-13, 1145.
21         So Mr. Frago came on board, of course
22 this was a political position, and Mr. Frago came

Page 47

1  on board.  Now let me back up and tell you why this
2  happens, supposedly.
3         John Chott was a part of the staff, but
4  John Chott only did -- and the notices will show
5  that out, he only performed appeal hearings.
6  Springer was the deputy administrator of field
7  operation and Springer was a Democrat.  So when
8  that party left, John Chott came in as an interim
9  because of his party affiliation.  And he came in
10 as a Republican and he acted until, you know, the
11 position -- he acted in the position.
12         And that's one of the reasons why they --
13 I can't say.  It was alleged he reassigned those
14 people because they -- because of political
15 affiliation.  That's why Chuck filed a complaint on
16 that.  But of course, you know, EEOC does not
17 accept political affiliation.
18         So --
19     Q.  So let me stop you for a second.  You're
20 talking about this action that Mr. Chott had taken
21 previously in reassigning Mr. Nagel over others and
22 then reassigning others out of the division.

Page 48

1         That was because of political
2  affiliation?
3      A.  My understanding.
4      Q.  Okay.  Fair enough.  Go ahead, please.
5      A.  That's my understanding.  And so what I'm
6  saying is that he gave Ken the unfair advantage
7  over me and all the other employees by giving him
8  accretion of duties so he could qualify for this
9  position.
10     Q.  Okay.  Now, my original question that we
11 just went off on that tangent was, was Mr. Nagel --
12 do you allege that Mr. Nagel was ineligible for
13 promotion to this GS-14 position at issue in this
14 lawsuit?  Is that --
15     A.  Okay.  Now --
16     Q.  Yes or no, do you allege that he was
17 ineligible for some reason to be promoted to this
18 GS-14 position?
19     A.  Yes.
20     Q.  Okay.  And is that the reason you just
21 gave me, because he was a 1145, not a 301?
22     A.  No.  He had not -- okay.  In order to

Page 49

1  qualify for 301 GS-14, you have to work as a 301-13
2  for one year, specialized experience.  And you can
3  look at that --
4      Q.  Go ahead, I'm listening.
5      A.  Okay, the requirement for specialized
6  experience.  Now, like I said, Mr. Chott did
7  reassign him those duties, but it was still less
8  than a year that he was performing those duties.
9      Q.  Okay.
10     A.  And he had to work -- my -- he had to
11 work outside his job position description in order
12 to qualify for that position, which gave an unfair
13 advantage, I mean.
14     Q.  Okay.  Ma'am, could you please look back
15 at Exhibit 7?
16         Now, what was marked as Exhibit 7 is the
17 vacancy announcement.  And this has in it the
18 minimum requirements and the eligibility
19 requirements for being promoted to this GS-14
20 position, correct?
21     A.  Right, yes.
22     Q.  Can you tell me where it says you must

13 (Pages 46 to 49)

Sederis Fields
CONFIDENTIAL

Page 50

1  have served one year in a 301 category?
2      A.  Yes, okay.  Page -- page 3.
3      Q.  Page 3, okay.
4      A.  Okay.  "To be creditable, specialized
5  experience must have been equivalent to at least
6  one year in the next lower grade level."
7      Q.  Okay.  Now, grade level, ma'am, that is
8  your GS level, not the series, correct?
9      A.  Yes.
10     Q.  Okay.  So basically what this is saying
11 is to be creditable, specialized experience must
12 have been at least one year at the GS-13 level,
13 correct?
14     A.  Right.  Read further.
15     Q.  No, tell me -- okay.  Go ahead.
16     A.  "Experience that demonstrated knowledge
17 of administrative management policies and
18 procedures and knowledge in planning, coordinating
19 and administering agricultural program regulations
20 and practices."
21     Q.  So what this says now is you must have
22 experience demonstrating your knowledge of these

Page 51

1  areas, correct?
2      A.  Right, correct.
3      Q.  This doesn't say that you have to have
4  served one year in a 301 category at the GS-13
5  level, does it?
6      A.  Let me explain to you about the 1145
7  series.
8      Q.  Okay.  Hold on, ma'am.  My question is,
9  this vacancy announcement does not expressly
10 require a candidate to have served one year as a
11 GS-13 in the 301 series, does it?
12     A.  I'm not going to answer that.
13     Q.  You have to answer that question, ma'am.
14     MR. BRANCH:  Objection.  The document
15 speaks for itself.
16 BY MR. HENAULT:
17     Q.  Go ahead, ma'am.  Would you like me to
18 repeat the question?
19     A.  I am -- yes, I think it is.  In my
20 interpretation, I put it that way.
21     Q.  Okay.  Your interpretation, but that's
22 not expressly what the document says, is it?

Page 52

1      A.  That's my interpretation.
2      Q.  Okay.  Thank you.
3      Now, let's talk about Mr. -- I'm sorry,
4  the other selectee's name was Mr. Spalding.  Okay.
5      Do you allege that Mr. Spalding for any
6  reason was ineligible to be promoted to this GS-14
7  position?
8      A.  Yes.
9      Q.  Why?
10     A.  Mr. Spalding was a GS-1165, which is a
11 loan specialist.  And his specifically, I can't see
12 where at the -- if you look at his job description,
13 where his experience at the 13 level was
14 administrative one year, because he performed farm
15 loan duties.  And this required -- he was -- I
16 think he was a GS-11 in 1997.
17     Q.  He was a GS-13 at the time of the
18 promotion, correct?
19     A.  Right.  Okay, 2001, 2001 he was a GS-11
20 program, I mean he was GS-11.  And he moved to
21 Washington I think 2002 as a loan specialist.  And
22 according to a loan specialist position, according

Page 53

1  to the OPM regulations and 1165 and 1145, it's
2  specific to farm background.
3      Now, Mr. Spalding's background was
4  specifically loan.  Now he did have experience when
5  he was GS-11 as administrative, an administrative
6  series, but he was not at the next lower level as a
7  13.  So that experience, you know, he did not.
8      Q.  Prior to the selection, ma'am, do you
9  know if Mr. Spalding had been a GS-13 for one year?
10     A.  According to his application, he had
11 been.
12     Q.  Okay.  So according to the one provision
13 that you pointed out in Exhibit 7, he would have
14 been eligible because he was a GS-13, correct?
15     A.  Correct.
16     Q.  Okay.  Other than the fact that -- other
17 than what you just said, do you allege any other
18 reasons why Mr. Spalding was ineligible for
19 promotion?
20     A.  His job series.
21     Q.  Okay.
22     A.  Unless he worked outside his job series.

14 (Pages 50 to 53)

Sederis Fields
CONFIDENTIAL

Page 54

1    Q. And as we've already discussed, the
2  determination of whether he was eligible or not was
3  made by the personnel function prior to Mr. Frago,
4  Frago, Mr. Chott, Mr. Ramirez, and Mr. Clayton
5  receiving the applications, correct?
6    A. Yes.
7    Q. Okay. So that wasn't Mr. Frago's
8  determination to make. Personnel makes the minimum
9  eligibility determination, right?
10   A. Right.
11   Q. Okay. Now, I believe we've already said
12 you participated in the second interview on July
13 21, 2003, correct?
14   A. Yes.
15   Q. Do you know how many candidates were
16 brought back for a second interview?
17   A. Five.
18   Q. Okay. Do you know who they were?
19   A. I know according to the records, for the
20 301 second interview, Ken name did not show up. It
21 was four names on that, on the tally sheet. And I
22 think it was four names for the 1145 on the tally

Page 55

1  sheet.
2    It was -- I can't give the names for
3  sure, but I know Spalding, my name and Spalding's
4  name is on there.
5    Q. Okay. So you know that you were
6  interviewed a second time?
7    A. Right, uh-huh.
8    Q. You know Mr. Spalding was interviewed a
9  second time?
10   A. Right.
11   Q. You know Mr. Nagel was actually
12 interviewed a second time, correct?
13   A. It didn't show it on the tally sheet for
14 the 301. It showed his name on the 1145.
15   Q. Okay. But do you know if he was
16 interviewed a second time for this position?
17   A. No.
18   Q. You don't know?
19   A. No, I don't know.
20   Q. Okay. The participants in the July 21,
21 2003, interview were Mr. Frago again?
22   A. Yes.

Page 56

1    Q. Correct? Mr. Chott?
2    A. Yes.
3    Q. And Ms. Treese, right?
4    A. Yes.
5    Q. Who is Ms. Treese?
6    A. She was just selected as a GS-15
7  supervisory position that they created to supervise
8  all the specialists.
9    Q. Do you allege that Ms. Treese's
10 participation in the interview panel was somehow
11 improper?
12   A. Yes.
13   Q. Why?
14   A. Because it's -- it's improper for the
15 first line supervisor, second line supervisor, and
16 since she was coming on board, she wasn't on board,
17 she was going to be my new supervisor, the three of
18 them to sit on a panel.
19   Q. Okay. Now, let me ask you this way. Do
20 you know of any personnel rules or regulations that
21 would prohibit Ms. Treese from participating in
22 that panel?

Page 57

1    A. No.
2    Q. Okay. So although you may believe it's
3  improper, you know of no regulation stating it's
4  improper?
5    A. No, I don't know of it.
6    Q. Okay. Now, this second interview panel,
7  do you allege that for any reason Mr. Frago should
8  have been ineligible to participate in it? Let me
9  rephrase that. I take that question back.
10   Do you know of any personnel rules,
11 regulations, guidance, or anything that would state
12 or that would hold Mr. Frago's participation in
13 this second panel improper?
14   A. No.
15   Q. Same question for Mr. Chott. Do you know
16 of any personnel rules, regulation, guidance, that
17 would hold his participation, Mr. Chott's
18 participation in this second panel improper?
19   A. No.
20   Q. Okay. And you've already answered no to
21 Ms. Treese, correct?
22   A. Yes.

15 (Pages 54 to 57)

Sederis Fields
CONFIDENTIAL

Page 58

1    Q.  Okay.  Now, do you allege that conducting
2  a second interview was somehow against rules and
3  regulation?
4    A.  Yes.  According to the merit promotion,
5  number one, they did not notify personnel.  They
6  sent an e-mail and asked them if they had a second
7  interview would they need an EEO observer, and she
8  stated to them all panels must have an EEO
9  observer.  However, if the selection official or
10  representative interview, they would not need one.
11  But if they convene a panel, they would have to
12  have an EEO observer.
13    MR. HENAULT:  Okay.  Let's stop for a
14  second.  Let's mark this as the next exhibit if we
15  could.
16    (Exhibit 9
17    marked for identification.)
18    MR. HENAULT:  And this is number what,
19  ma'am?
20    THE REPORTER:  9.
21    MR. HENAULT:  9, thank you.
22    Mr. Branch, here you are.

Page 59

1  BY MR. HENAULT:
2    Q.  Ma'am, please take a look at Exhibit 9
3  and tell me when you're ready.
4    A.  I'm ready.
5    Q.  What -- Exhibit 9 is what appears to be
6  an e-mail chain between someone named Carolyn
7  Taylor and John Chott.  All e-mails are dated July
8  11, 2003; is that right?
9    A.  Yes.
10    Q.  And who is Ms. Taylor?
11    A.  She was a personnel specialist handling
12  this position.
13    Q.  Okay.  So this is the personnel --
14  Ms. Taylor is the personnel specialist on which
15  Mr. Chott and Mr. Frago relied for guidance in
16  doing this process, correct?
17    A.  Yes.
18    Q.  Now, if you look, and I'm going to point
19  out to you the second e-mail down, it appears to be
20  an e-mail from Mr. Chott to Ms. Taylor dated July
21  11, 2003, at 11:30 a.m.
22    Do you see what I'm talking about?

Page 60

1    A.  Yes.
2    Q.  And according to this at least, Mr. Chott
3  appears to be asking Ms. Taylor if they -- if they
4  conduct an interview, a short final interview with
5  all the high-ranking people, do they need an EEO
6  person.
7    Is that accurate?
8    A.  Right.
9    Q.  And Ms. Taylor responds back that you do
10  not need EEO present, correct?
11    MR. BRANCH:  Objection.
12  Mischaracterizes --
13    THE WITNESS:  No, I can read it to you.
14    MR. BRANCH:  Wait one second.  Objection.
15  Mischaracterizes what's stated in the e-mail.
16  BY MR. HENAULT:
17    Q.  Okay.  What Ms. -- thank you for that.
18  What Ms. Taylor says, "If you are doing a second
19  interview, which is usually with the selecting
20  official or representative, you do not need EEO
21  present."  Correct?
22    MR. BRANCH:  Objection.  That still

Page 61

1  mischaracterizes.
2    THE WITNESS:  Read the first line.
3    MR. BRANCH:  That's only half of this
4  response.
5  BY MR. HENAULT:
6    Q.  Is that what that sentence says?
7    MR. BRANCH:  You can answer that
8  question.
9    THE WITNESS:  Yes.
10  BY MR. HENAULT:
11    Q.  Okay.  Now, this second interview, was
12  that with the selecting official or representative?
13    A.  Or representative.  It's not -- it's one
14  person.  So it's three people.  So it's a panel.
15    Q.  Okay.  Was the selecting -- was the
16  second interview that you participated with, with
17  the selecting official?
18    A.  Yes, and two other people.
19    Q.  Okay.  Do you allege that Mr. Frago knew
20  that he was required to have an EEO person present
21  at that second interview?
22    A.  I don't know.

16 (Pages 58 to 61)

Sederis  Fields
CONFIDENTIAL

Page 62

1    Q.  Do you -- same question, do you allege
2  that Mr. Chott knew that he was required to have an
3  EEO person present at that second?
4    A.  Yes, because this e-mail states it. "The
5  EEO representative is required only for 'panel
6  interview' process." It's required. And they had
7  it the first time. Why not be consistent?
8    Q.  Okay.  What about Ms. -- her name was
9  Ms. Treese, correct?
10    A.  Correct.
11    Q.  Do you allege that she knew that an EEO
12  person was required for this second interview?
13    A.  She just -- I mean of course they just
14  hired her, she's going to go along with anything
15  they say, even if she knew.
16    Q.  That's not my question, ma'am. My
17  question is --
18    MR. BRANCH: Objection.
19  BY MR. HENAULT:
20    Q.  -- do you allege that Ms. Treese knew
21  that an EEO person was required for this second
22  interview?

Page 63

1    MR. BRANCH: Objection. It calls for
2  speculation.
3    You can answer.
4    THE WITNESS: I don't know.
5  BY MR. HENAULT:
6    Q.  Okay. So you're not alleging that? I'm
7  not asking about you specifically about what
8  Ms. Treese knew or did know. I'm asking about your
9  allegations --
10    A.  Yes.
11    Q.  --- regarding Ms. Treese now.
12    A.  I think she knew, because she was a
13  manager, she interviewed people, so she knew.
14    Q.  Okay. On what basis do you allege that
15  she knew?
16    A.  Her position. She possibly --
17    Q.  Okay. Do you have any specific evidence
18  to point to, that you can point to where she said
19  she knew or --
20    A.  No.
21    Q.  -- she was made aware?
22    A.  No.

Page 64

1    MR. BRANCH: Just allow him to finish the
2  question before you respond, please.
3    THE WITNESS: Okay.
4  BY MR. HENAULT:
5    Q.  So your allegation is just based solely
6  on your understanding of her prior position?
7    A.  Yes.
8    Q.  Okay. Other than not having an EEO
9  person present at this second interview, do you
10  allege that there was anything improper about the
11  conduct of the second interviews of the applicants?
12    A.  Yes.
13    Q.  What?
14    A.  Because I would -- okay. Of course, I
15  was on travel so I was the last one interviewed.
16  So at 1:00 o'clock, it was a rush. It was, you
17  know, they had the interview at 1:00 o'clock. And
18  it was just unusual, it was a quick interview, then
19  in a couple hours they came and told me I didn't
20  get the position.
21    Q.  Okay. So what was improper about the
22  conduct of the interviews, though?

Page 65

1    A.  The conduct, okay.
2    Q.  You were the last one interviewed?
3    A.  Right.
4    Q.  Okay. Was there anything improper about
5  you being the last one interviewed?
6    A.  Well, the improper thing was they did not
7  have an EEO observer.
8    Q.  I understand that. And my question
9  was -- I appreciate that. Because maybe my
10  question wasn't clear.
11    A.  Okay.
12    Q.  But the question I thought I asked was
13  other than not having an EEO observer, so let's set
14  that aside, was there anything about the conduct of
15  the interviews that was improper?
16    A.  No.
17    Q.  Do you allege that the applicants were
18  asked different questions?
19    A.  I don't know that.
20    Q.  Okay. So you have no evidence one way or
21  the other?
22    A.  No.

17 (Pages 62 to 65)

Sederis Fields
CONFIDENTIAL

Page 66

1    Q.  Okay.  Do you allege that there were --
2    A.  Well --
3    Q.  Go ahead, ma'am.
4    A.  Okay.  Let me -- looking at the question
5    that was asked in the second interview, I think Ken
6    was asked some different questions, some different
7    questions for the 1145.  It was all in that one
8    interview.  So he was asked different questions.
9    Q.  Okay.  And again, you say that that's
10   improper, correct?
11   A.  Yes.
12   Q.  Okay.  Do you allege that the interview
13   of Mr. Spalding was conducted in any way that you
14   deem improper?
15   A.  I don't know.
16   Q.  Okay.  Now, as we discussed previously,
17   it was Mr. Nagel and Mr. Spalding that were
18   selected for the positions, correct?
19   A.  Correct.
20        MR. HENAULT:  Okay.  We've been going for
21   just about an hour.  Does anyone need a quick break
22   or anything?

Page 67

1        MR. BRANCH:  No, I don't.
2        MR. HENAULT:  Ma'am, do you?
3        THE WITNESS:  I don't.
4    BY MR. HENAULT:
5    Q.  Okay.  Now, I believe --
6        MR. BRANCH:  I'm sorry, you, Madam
7    Reporter?
8        THE REPORTER:  I'm fine.
9    BY MR. HENAULT:
10   Q.  We've already talked about this, I just
11   want to make sure we're clear.
12        Prior to receiving the administrative
13   management specialist position what grade level was
14   Mr. Nagel?
15   A.  GS-13, 1145 series, program, agriculture
16   program specialist.
17   Q.  Do you know what jobs he had held
18   previously?
19   A.  Yes.  He was a county executive director.
20   And before then he was a farmer.
21   Q.  Okay.  Do you know the breadth of the
22   experience he had in his positions?

Page 68

1    A.  I'm familiar with what a county executive
2    director was.
3    Q.  He was an agricultural coordination
4    specialist, correct?
5    A.  No, he was a -- if you look at his 50, he
6    was an agricultural program specialist.
7    Q.  Program specialist, okay.  Have you ever
8    held that position?
9    A.  No.
10   Q.  So you don't know exactly what duties
11   Mr. Nagel performed, do you?
12   A.  Yes, I do.
13   Q.  How?
14   A.  Because DAFO, the area we work in --
15   Q.  What's DAFO now?
16   A.  Deputy administrative, field operation.
17   Q.  Okay.
18   A.  Prior to him coming on board, we separate
19   in two groups.  It's administrative series, 301
20   that handle the administrative requirements.  Then
21   we had the program area whereas people coming from
22   the field with that farm background, they had to

Page 69

1    have the farm background to qualify for the
2    position.  So they specifically worked the program
3    area and the 301 worked the administrative area.
4    Q.  Okay.  But you've already said that in
5    Mr. Nagel's prior position, prior to getting the
6    promotion, he was actually performing
7    administrative duties that had previously been
8    performed by a GS-14, correct?
9    A.  I said that John gave him some of Chuck
10   Berge's duties after he reassigned him.
11   Q.  And so he did those duties?
12   A.  Yes.
13   Q.  Okay.  Do you know exactly what duties he
14   was performing?
15   A.  Yes.  He's the -- personnel and the
16   budget.  Chuck was responsible for the budget.  And
17   he did personnel, budget, work loads, dealing with
18   the states, the state executive directors.  Just
19   those duties that Chuck kind of helped.  You can
20   see that in his application.
21   Q.  Okay.  And how long had he actually
22   been -- how long had Mr. Nagel actually been

18 (Pages 66 to 69)

Sederis Fields
CONFIDENTIAL

Page 70

1  performing those duties that had been previously
2  performed by a GS-14 administrative person?
3      A.  Approximately a few months.  Just the
4  time that John Chott became acting deputy
5  administrator, field operations.
6      Q.  And how long was that?
7      A.  I can't -- I haven't any idea.  But I
8  know it was less than a year.
9      Q.  Okay.  And do you know for a fact whether
10  prior to performing those duties Mr. Nagel had ever
11  performed any administrative duties before?
12     A.  He may have, but at the lower level.
13     Q.  Okay.
14     A.  Not at the 13 level.
15     Q.  He may have.  You said he may have but
16  not at the GS-13 level.
17     A.  Specialized experience at 13 level.
18     Q.  Now, I want to direct your attention to
19  Exhibit 7 again, page 3, and something that you had
20  pointed out to me.
21         Now, to be creditable for -- and I assume
22  that means to be creditable for, to be credited

Page 71

1  towards meeting the requirements for this position,
2  correct?
3      A.  Uh-huh.
4      Q.  Is that accurate?
5      A.  Yes.  But you have to read the first page
6  to just --
7      Q.  We're talking about the specialized
8  experience necessary.  Okay?
9      A.  Uh-huh, right.
10     Q.  And it says "specialized experience must
11  have been equivalent to at least one year at the
12  next lower grade level," right?
13     A.  But then they're talking about the
14  specific duties, they're talking about experience
15  equivalent.  The job that's been announced.
16     Q.  Right.
17     A.  So okay.
18     Q.  And to be eligible --
19     A.  Right.
20     Q.  -- you must demonstrate that you have
21  performed the equivalent duties --
22     A.  At that.

Page 72

1      Q.  -- of one year at a GS-13 level?
2      A.  That's right.
3      Q.  Okay.
4      A.  And he had not.
5      Q.  But you don't know exactly what other
6  duties he had -- administrative duties he had
7  performed, correct?
8      A.  Well --
9      Q.  "He" being Mr. Nagel.
10     A.  Okay.  Well, at the 13 level, I was there
11  the entire time he was there and I know what he was
12  doing, because of course from staff meetings, from
13  our duties.  He was performing the farm, the
14  program area duties.
15     Q.  Now, you said you were there and you knew
16  what he was doing.
17         You didn't supervise Mr. Nagel, did you?
18     A.  No, no.
19     Q.  So you actually weren't seeing what he
20  was doing on a daily basis, were you?
21     A.  No, no.
22     Q.  Okay.  Now, let's talk about Mr. Spalding

Page 73

1  for a second.
2         You've already said that Mr. Spalding had
3  been a GS -- he was a GS-13 at the time of the
4  promotion, correct?
5      A.  Correct.
6      Q.  Okay.  His position was an administrative
7  management specialist, correct?
8      A.  No.
9      Q.  What was his position?
10     A.  Agricultural -- he was farm, it was farm
11  loan.
12     Q.  You know, I apologize, you're right.  He
13  was an agricultural program specialist, right?
14     A.  Farm -- he was -- okay, agricultural
15  program specialist.
16     Q.  Okay.  And as we've just said, you've
17  never held that position, correct?
18     A.  No, no.
19     Q.  And so you've never performed the duties
20  that an agricultural program specialist does?
21     A.  Well, let me just clarify that.  I
22  wouldn't qualify, I don't have a farm background, I

19 (Pages 70 to 73)

Sederis Fields
CONFIDENTIAL

Page 74

1 don't have the agriculture background. So and
2 that's only FSA series. OPM granted that to us
3 because of the farmers and the farm loan
4 background. It's only a series only works in Farm
5 Service Agency. So I wouldn't qualify and I
6 wouldn't apply for it because I couldn't go
7 anywhere else with it.
8      That's why most of those people in that
9 series try to get out of it, because only -- it's
10 only -- it's only a Farm Service Agency series.
11 You can only work in the agency with that series.
12     Q.  Okay. So the answer to my question that
13 you have never held this position --
14     A.  No.
15     Q.  -- is no, correct?
16     A.  No, right.
17     Q.  And you don't know exactly the duties
18 that Mr. Spalding performed as an agriculture
19 program specialist, do you?
20     A.  Looking at his job application.
21     Q.  Okay. Did you ever supervise
22 Mr. Spalding?

Page 75

1     A.  No, I didn't.
2     Q.  So you don't know whether he actually did
3 perform any administrative duties or not, do you?
4     A.  No.
5     Q.  Now, your complaint appears to
6 distinguish or it does -- your complaint and your
7 discussion today distinguishes between program
8 duties and administrative duties.
9      Could you please explain to me the
10 difference? Let's start with program experience or
11 program duties. What are those, in your opinion?
12     A.  Program duties are duties that's related
13 to farm programs. And we have a lot of farm
14 programs, like CRP, disaster program, conservation.
15 And these people are expert at this program area
16 because they're farm programs.
17      The administrative duties are
18 administrative, like dealing with personnel, civil
19 rights, budget, just the administrative. And I can
20 define that and OPM defines the difference between
21 the job.
22      301 is a nonprofessional position. And

Page 76

1 it's a two-interview position. And it's a wide
2 range, but it's not specific to farm, to like I
3 said the agriculture program specialist is dealing
4 strictly from the farm program.
5     Q.  Okay. In a farm program, do you know
6 would someone working in that area perhaps prepare
7 budgets for those programs?
8     A.  Well, actually, no, not in farm, no.
9     Q.  They never would?
10     A.  No, we have a division that would handle
11 that.
12     Q.  Okay. Do you know if any of the
13 people -- any people actually working in that area
14 would ever perform any of those duties?
15     A.  I don't know.
16     Q.  Do you know if they would perhaps deal
17 with personnel?
18     A.  That wouldn't be in their job
19 description.
20     Q.  But do you know if it would be duties
21 they would perform?
22     A.  I don't know.

Page 77

1     Q.  So you could potentially be in a farm
2 program position and perform administrative jobs as
3 part of your duties?
4     A.  You would be working outside --
5      MR. BRANCH: Objection. Calls for
6 speculation.
7 BY MR. HENAULT:
8     Q.  Go ahead and answer.
9     A.  You will work outside your job
10 description.
11     Q.  Okay. But you still could perform those
12 kind of duties, correct?
13     A.  Unlikely. You would have no knowledge.
14 You need specialized or -- you need specialized
15 experience or practical experience.
16     Q.  But you could do that, right?
17     A.  I don't know if a person could do that.
18 I can't answer for anybody else.
19     Q.  Okay. So it's your testimony that you
20 don't know whether someone working in a farm
21 program position could do administrative type
22 duties?

20 (Pages 74 to 77)

Sederis Fields
CONFIDENTIAL

Page 78

1  A.  If you're talking about discrimination or
2  civil rights, whatever, it would be unfair to --
3  Q.  I'm not talking about discrimination or
4  civil rights. I'm talking about them performing
5  those duties, ma'am.
6  A.  I don't know.
7  Q.  Okay.  So it's your testimony that you
8  don't know whether they would perform those duties
9  or not, correct?
10  A.  My testimony is they shouldn't.
11  Q.  But you don't know whether they actually
12  could and did perform those, correct?
13  A.  No, I do not.
14  Q.  Okay.  Now, in your response to
15  interrogatory 1 you allege that any administrative
16  experience that either Mr. Nagel or Mr. Spalding
17  received was outside of their job duties.
18       How do you know that?
19  A.  Because I had a copy of their job
20  position description.  I reviewed it.
21  Q.  And do position descriptions typically
22  say "other duties as assigned"?

Page 79

1  A.  None that was taken out -- for all of the
2  union, we're all under the contract.  And job
3  description, those other job description was taken
4  out of our job descriptions a few years ago.
5  Q.  Okay.  Do you allege that it would have
6  been improper for the interviewing officials to
7  consider experience that they had performed outside
8  of their job description?
9  A.  Yes.
10  Q.  Why?
11  A.  Because it's not fair to the other
12  candidates.
13  Q.  But when you interview, you want to -- as
14  a candidate, you want to explain to the interview
15  panel everything you have done relevant to the
16  position you're applying for, correct?
17  A.  Yes.
18  Q.  And if these gentlemen had actually
19  performed administrative duties, it was proper for
20  them to explain that to the interview panel,
21  correct?
22  A.  I guess, yeah.

Page 80

1  Q.  And the interview panel should be trying
2  to get the person best qualified for the duties
3  required to be done, right?
4       MR. BRANCH:  Objection.  Calls for
5  speculation.
6  BY MR. HENAULT:
7  Q.  Go ahead and answer, ma'am.
8  A.  Now, repeat that question.
9  Q.  The interviewing panel presumably would
10  want the best person qualified for the duties of
11  the new position, correct?
12  A.  No, they want -- they wanted a specific
13  person.
14  Q.  Okay.  Why would it be improper for the
15  interview panel to consider the duties that an
16  interviewing candidate explains to them they have
17  performed previously?
18  A.  Why?  Because it's unfair to the other
19  applicants if they are -- if their job description
20  did not call for those duties.
21  Q.  In what way is that unfair, ma'am?
22  A.  Because it's people that actually did

Page 81

1  administrative duties that's more qualified.
2  Q.  But you -- it's your testimony that
3  Mr. Nagel actually did perform administrative
4  duties.
5  A.  I said at the GS-11 level, and that was
6  not quite a year.
7  Q.  But he had performed.  In fact, it was
8  your testimony that Mr. Nagel was performing
9  administrative duties that a GS-14 administrative
10  person handled previously.
11       Remember that?
12  A.  Yes, I do.
13  Q.  Okay.  So why would it be unfair for the
14  interviewing panel to consider those?
15  A.  Because they gave him those duties which
16  was unfair advantage.
17  Q.  Okay.  Do you know of any personnel rules
18  or regulations stating that it is improper for the
19  interview panel to consider the materials presented
20  by the candidate in the interview?
21  A.  No.
22  Q.  Do you know of any personnel rules or

21 (Pages 78 to 81)

Sederis Fields
CONFIDENTIAL

Page 82

1 regulations stating that it is improper for an
2 interview panel to consider any duties that a
3 candidate tells them they performed that may be
4 outside of their job description?
5     A. Merit promotion 3-PM states that
6 accretion of duties is unacceptable. So if they
7 get -- if he was performing due to because of
8 accretion of duties, that was a violation of merit
9 promotion.
10     Q. Okay. "Accretion of duties is
11 unacceptable." Explain to me what you mean by
12 that, ma'am, please.
13     A. Okay. What John did to --
14     Q. I'm not talking about Mr. Nagel specific
15 or Mr. Chott.
16     A. Okay. When you target a person for a
17 specific job, now merit promotion being a
18 competitive position, that means you go into there
19 and you go into in a fair way to compete. Now, if
20 you give a person the upper hand, you're violating
21 the merit promotion plan.
22     He was -- like I said, he was given

Page 83

1 unfair advantage. They gave him accretion of
2 duties which violates the merit promotion. I do
3 know where you can find that.
4     Q. Okay. Where?
5     A. In 3-PM, if you have that handbook and
6 you look under merit promotion and you have
7 exceptions, it's under exceptions, I'm almost sure.
8 But it's in there.
9     Q. Okay. So under merit promotion, it's
10 improper to give someone those duties to target
11 them for promotion?
12     A. Yes.
13     Q. Does it state that an interview panel
14 presented with someone telling them that they've
15 performed these duties, that it's improper for them
16 to consider that?
17     A. But this specific one because a person
18 gave them accretion of duties.
19     Q. That wasn't my question, ma'am. My
20 question is --
21     A. Yes, it is.
22     Q. -- it is improper for the interview panel

Page 84

1 to consider the materials presented to them in the
2 interview?
3     A. Yes, when they know better.
4     Q. Okay. So this is just I guess a
5 clarifying question.
6     Do you allege that it is improper for the
7 interview panel to base a selection on a
8 determination that the selectees express themselves
9 and their experience in the interviews better than
10 others?
11     A. Yes.
12     Q. Okay. The alleged -- the material that
13 you allege it was improper for the panel to
14 consider related to Mr. Nagel, correct?
15     Do you allege that they considered any
16 improper material, "they" being the second
17 interview panel, do you allege that the second
18 interview panel considered any material that was
19 improper relating to Mr. Spalding?
20     A. Yes.
21     Q. What?
22     A. He did not have that administrative

Page 85

1 experience at the 13 level for one year,
2 specialized.
3     Q. And that was a determination that -- the
4 determination that he did meet the minimum
5 requirements was initially made by the personnel
6 function, correct?
7     A. Yes.
8     Q. Okay. And you've already said that the
9 interviewing panel could presume that he met the
10 minimum requirements when they received the
11 application from personnel, correct?
12     A. Yes.
13     Q. Okay. So do you allege that someone in
14 the personnel function discriminated against you
15 when they determined that Mr. Nagel and
16 Mr. Spalding met the minimum qualifications?
17     A. Yes.
18     Q. Okay. Who do you allege discriminated
19 against you?
20     A. Carolyn.
21     Q. Who?
22     A. Probably Carolyn, the personnel person.

22 (Pages 82 to 85)

Sederis Fields
CONFIDENTIAL

Page 86

1    Q.  Carolyn, and that was Ms. --
2    A.  Taylor.
3    Q.  -- Taylor?
4    A.  Uh-huh.
5    Q.  In what way was Ms. Taylor -- first of
6  all, do you know if Ms. Taylor is the one that made
7  the initial determination that Mr. Nagel and
8  Mr. Spalding were minimally qualified?
9    A.  Yes.
10    Q.  She is the person?
11    A.  Most likely.
12    Q.  Most likely or she is, ma'am?  Because
13  there's a big difference.
14    A.  She is, she is.
15    Q.  How do you know she is the person that
16  made that determination?
17    A.  Because she is the person -- the person
18  that personnel designated for this job and she's --
19  her responsibility is to determine qualifications.
20    Q.  Okay.  And she determined that these two
21  gentlemen were qualified?
22    A.  Yes.

Page 87

1    Q.  But you don't think they were?
2    A.  Yes.
3    Q.  How was her determination regarding them
4  discriminatory towards you?
5    A.  Well, personnel has a way of satisfying
6  the managers.  So if the manager said he wants
7  certain people, they get the person, whether they
8  are the best qualified or not.
9    Q.  Okay.  Prior to Ms. Taylor, if she is the
10  one that made this determination, prior to her
11  making the determination that Mr. Nagel and
12  Mr. Spalding were minimally qualified, do you know
13  whether Mr. Chott or Mr. Frago or anyone else
14  involved in the selection went to Ms. Taylor and
15  told her that they wanted Mr. Nagel and
16  Mr. Spalding for these positions?
17    A.  No.
18    Q.  So when you say that she would satisfy
19  the managers, how do you know that she knew how she
20  was supposed to satisfy the managers, ma'am?
21    A.  Well, I can almost give you an example of
22  something that --

Page 88

1    Q.  I don't want an example, ma'am.  I want
2  specifics as to this case.
3    Do you have any evidence --
4    A.  No.
5    Q.  -- that Ms. Taylor knew that she should
6  ensure that either Mr. Nagel or Ms. Spalding -- or
7  Mr. Spalding were minimally qualified?
8    A.  No.
9    Q.  So your statement that she would of
10  course want to satisfy the managers really isn't
11  supported by any evidence in this case with regard
12  to Mr. Nagel and Mr. Spalding, is it?
13    A.  Yes, I probably can come -- yes.
14    Q.  Okay.  What evidence do you have that
15  Ms. Taylor knew that the managers wanted
16  Mr. Tail -- Mr. Spalding and Mr. Nagel for this
17  position?
18    A.  In reviewing her testimony in the ROI, it
19  sounds as if she was just satisfying them.  That's
20  my proof.
21    Q.  Okay.  It sounds as if she was satisfying
22  them.  In what way, ma'am?

Page 89

1    A.  In her statement regarding, she was
2  saying the same thing they were saying, that they
3  did experience, they -- the program experience
4  which is -- she was not looking at the
5  administrative experience but she was talking about
6  their program area, which was not even dealing with
7  the job description in her statement.
8    Q.  Okay.  But you have no evidence that she
9  knew that these two were allegedly targeted for
10  this promotion, do you?
11    A.  No.
12    Q.  Okay.  Ms. Taylor determined that
13  Mr. Nagel and Mr. Spalding were minimally qualified
14  you said, correct?
15    A.  Correct.
16    Q.  She also determined that you were
17  minimally qualified, correct?
18    A.  Yes.
19    Q.  So how is determining that all three of
20  you are minimally qualified discriminatory against
21  you on the basis of your race, ma'am?
22    A.  Okay.  I've sat on a lot of panels.  And

23 (Pages 86 to 89)

Sederis Fields
CONFIDENTIAL

Page 90

1  like I'm going back to the series things. And a
2  personnelist who first of all separated series --
3  the job was announced as a 301. And what they
4  would do, the administrative applicants, they put
5  them in one pile; and the 1145, which is not in
6  that series, because it would take more for them to
7  qualify for a 301. And they usually distinguish
8  with their position that they're already in series
9  whether or not they will qualify for a 301
10  promotion.
11      Q.  Okay. But after Ms. Taylor made her
12  determination, you, Mr. Nagel, and Mr. Spalding
13  were all on equal footing, correct?
14      A.  Correct.
15      Q.  So there was nothing about Ms. Taylor's
16  determination that was discriminatory towards you,
17  was there?
18      A.  No, because I was already in 301 series.
19      Q.  Okay.
20      A.  I was the only one.
21      Q.  Because all of you were determined to be
22  minimally qualified?

Page 91

1      A.  Right, right.
2      Q.  So there was actually no discrimination
3  by Ms. Taylor, was there?
4      A.  Not that I can point out.
5      Q.  Okay. Have you ever heard Mr. Frago make
6  any racial comments to you or to anyone else?
7      A.  Someone told me, so it's hearsay, so I'm
8  not going to repeat it.
9      Q.  Okay. Who told you?
10      A.  No, I strike that.
11      Q.  No, ma'am. Who told you Mr. Frago made a
12  racial comment?
13      A.  It's confidential.
14      Q.  No, ma'am, it is not. You must tell me.
15      A.  No.
16      MR. HENAULT:  Counsel, you want to talk
17  to your client or do you want to get the court on
18  the phone?
19      MR. BRANCH:  You should go ahead and
20  answer that. In this portion, just go ahead and
21  answer the question.
22      THE WITNESS:  Well, a person -- they just

Page 92

1  said that they think he's a racist. I just don't
2  know.
3  BY MR. HENAULT:
4      Q.  Okay, ma'am. Who said that?
5      A.  Two or three people, but I'm --
6      Q.  Okay, ma'am. Let's start with the first
7  one. Who was it? I want their name.
8      A.  I can't give it to you.
9      MR. HENAULT:  Counsel, you want to talk
10  to your client?
11      MR. BRANCH:  No, she said she can't give
12  it to you.
13      MR. HENAULT:  Well, let's get the judge
14  on the phone and we'll get an order from the court
15  if that's okay with you. Or would you like to talk
16  to your client outside?
17      MR. BRANCH:  No, that's her
18  determination. She's saying she can't give it to
19  you.
20      THE WITNESS:  Okay. Nobody told me.
21  Okay. Nobody told me.
22  BY MR. HENAULT:

Page 93

1      Q.  Now, we can go one of two ways, ma'am.
2  If you are going to -- do you want to withdraw your
3  allegation in this case that Mr. Frago is a racist?
4      A.  Yes.
5      Q.  You do?
6      A.  Yes.
7      Q.  Okay. And Mr. Frago was the selecting
8  official in this case, correct?
9      A.  Yes.
10      Q.  So you now want to withdraw your
11  allegation in this case that Mr. Frago treated
12  people, anyone differently on the basis of their
13  race?
14      MR. BRANCH:  Objection, objection. What
15  she testified to was somebody told her that
16  Mr. Frago was a racist.
17      MR. HENAULT:  I understand that. And I'm
18  asking a new question, Counsel.
19  BY MR. HENAULT:
20      Q.  Go ahead and answer, ma'am.
21      A.  What is the question again?
22      MR. HENAULT:  Can you please repeat the

24 (Pages 90 to 93)

Sederis Fields
CONFIDENTIAL

Page 94

1    question?
2         (The reporter read back as requested.)
3         THE WITNESS: No, I don't want to
4    withdraw that, because he treated Ken differently.
5    He favored Ken.
6    BY MR. HENAULT:
7         Q.  Okay.  Do you want to withdraw your
8    allegation that Mr. Frago treated any
9    African-Americans differently based on their race?
10        A.  Yes.
11        Q.  Your allegation in this action, ma'am, is
12   that Mr. Frago discriminated against you on the
13   basis of your race, correct?
14        A.  Yes.
15        Q.  Are you withdrawing that allegation?
16        A.  No.
17        Q.  Okay.  Ma'am, you previously testified
18   under oath that two or three people told you that
19   Mr. Frago was --
20        A.  They think.  It's their opinion.
21        Q.  Okay.  You previously testified under
22   oath under penalty of perjury that two or three

Page 95

1    people told you that they think that Mr. Frago is a
2    racist.
3         A.  Didn't I withdraw that?
4         Q.  Ma'am, you testified under oath under
5    penalty of perjury that two or three people told
6    you --
7         A.  That they think.  And that's just
8    hearsay.
9         Q.  Correct, that they think that Mr. Frago
10   is a racist, correct?
11        A.  Yes.
12        Q.  Okay.  Who is the first person, ma'am?
13        A.  I withdrew that.
14        Q.  No, ma'am.  I am asking you --
15        MR. BRANCH:  Okay.  She's --
16   BY MR. HENAULT:
17        Q.  -- under penalty of perjury --
18        A.  Didn't I withdraw it?  I withdrew it.
19        Q.  You withdrew what, ma'am?
20        A.  I withdrew the thing.  It was hallway
21   talk, someone said that.  I shouldn't have even
22   been listening to it.

Page 96

1         Q.  Okay.  So what you're saying is you heard
2    someone make that comment?
3         A.  Right, uh-huh.
4         Q.  Okay.  Who did you hear make that
5    comment, ma'am?
6         A.  I don't know the name.  I don't know the
7    people.
8         Q.  Ma'am, you do understand that you are
9    under oath under penalty of perjury, correct?
10        A.  Yes.  And I can't -- yes.  I mean I
11   withdrew the fact that somebody said.  I withdraw
12   it.
13        Q.  Okay, ma'am.  Were you not telling the
14   truth under penalty of perjury when you stated that
15   you -- someone told you that they think Mr. Frago's
16   a racist?
17        A.  I thought I said I heard it.
18        Q.  Were you not telling the truth when you
19   said under penalty of perjury that you heard
20   someone say they think Mr. Frago's a racist?
21        A.  I withdraw it.
22        Q.  No, ma'am.  Were you telling the truth

Page 97

1    under penalty of perjury, yes or no?
2         A.  I'm not going to answer that.
3         MR. HENAULT:  We're going to get the
4    court on the phone here.  Let me -- let's go off
5    the record for a moment.  I want to go get the
6    phone number.
7         THE WITNESS:  Going off the record at
8    2:43:17.
9         (Recess taken at 2:43 p.m.)
10        (Deposition resumed at 2:46 p.m.)
11        VIDEOGRAPHER:  Going back on the record
12   at 2:46:22.  Counsel may proceed.
13   BY MR. HENAULT:
14        Q.  Okay.  We're back on the record?
15        And prior to us taking a break I had
16   asked you, ma'am, that you had previously testified
17   that two or three people had told you -- or you
18   heard two or three people say that they believed
19   Mr. Frago was a racist.
20        A.  Okay.
21        Q.  Is that correct, did you testify to that?
22        A.  One person said it and the other people

25 (Pages 94 to 97)

Sederis Fields
CONFIDENTIAL

Page 98

1    standing by. Yes, okay, yes.
2        Q. Okay. Who did you hear say that
3    Mr. Frago was a racist?
4        A. Cliff --
5        MR. BRANCH: Objection. That they think
6    that Mr. Frago is a racist.
7        THE WITNESS: Right, they think. Cliff
8    Herring.
9    BY MR. HENAULT:
10       Q. Cliff?
11       A. Herring.
12       Q. Herring? How do you spell his last name?
13       A. H-E-R-R-I-N-G.
14       Q. Okay. And who else was there at the
15    time?
16       A. Joyce Bishop, B-I-S-H-O-P.
17       Q. Okay. And who else?
18       A. It was the three of us.
19       Q. Okay. And what did you hear Mr. Herring
20    say?
21       A. When he -- okay. When Frago came on
22    board, he was Mr. Herring's supervisor also, and

Page 99

1    Mr. Herring was a 15. So we were talking. And of
2    course, you know, he felt like John Chott was a
3    racist. He said Mr. Frago's a racist, too.
4        I just said I haven't been around, I
5    can't -- I don't know about that. So he said -- so
6    he just said, you know, he just said he just -- you
7    know, he just said he's a racist.
8        MR. BRANCH: And let me just state an
9    objection. I want to designate this portion of the
10    transcript as confidential pursuant to the
11    protective order in this case.
12       MR. HENAULT: I would ask what provision
13    of the protective order that you feel appropriate
14    to designate this portion as confidential?
15       MR. BRANCH: It's included in the
16    protective order. Anything that we determine
17    that's appropriate for confidence to be maintained
18    as confidential can be designated as such.
19       MR. HENAULT: Well, I think before the
20    end of the deposition I'll go get the protective
21    order and we can look through it.
22       MR. BRANCH: So be it.

Page 100

1    BY MR. HENAULT:
2        Q. Okay. Other than the offhanded remark
3    by -- did Mr. Herring provide any support, did you
4    hear him provide any support for his conclusion
5    that he thinks Mr. Frago may be a racist?
6        A. No.
7        Q. Okay. Other than Mr. Herring's comment
8    have you heard anyone else accuse Mr. Frago of
9    racism?
10       A. No.
11       Q. Have you ever heard yourself or heard
12    from other people that Mr. Frago made any
13    race-based remarks or jokes?
14       A. No.
15       Q. Have you ever heard yourself or from
16    anyone else about Mr. Frago making gender-based
17    comments or derogatory remarks?
18       A. No.
19       Q. Have you ever heard yourself or heard
20    others tell you of Mr. Chott making any
21    racially-based comments, remarks, or jokes?
22       A. Yes.

Page 101

1        Q. Okay. Did you hear yourself?
2        A. No.
3        Q. So someone told you that Mr. Chott made
4    race-based remark, jokes, or comments?
5        A. Yes.
6        Q. Who told you?
7        A. Cliff Herring.
8        Q. What did Mr. Herring tell you about
9    Mr. Chott?
10       A. He just asked me had I heard about an
11    incident when Mr. Chott was in employee relations
12    and he called an African-American woman a big, fat,
13    black, dumb bitch. And he was suspended for it.
14    And she filed a complaint and they settled her
15    complaint and he -- you know, that's what I heard.
16       Q. But you have no firsthand knowledge of
17    that incident yourself?
18       A. No.
19       Q. Okay. Have you ever heard anyone else
20    tell you -- or have you ever heard of any other
21    racially-based comments by Mr. Chott?
22       A. No.

26 (Pages 98 to 101)

Sederis Fields
CONFIDENTIAL

Page 102

1    Q.   Has anyone else ever told you that
2  Mr. Chott has made racially-based comments?
3    A.   Cliff.  He was saying it was in a meeting
4  and he made some remarks about Native Americans.
5    Q.   What were those remarks?
6    A.   What was he saying?  Something about
7  Native Americans.  He said he shouldn't be -- I
8  can't remember.
9    Q.   Do you have any firsthand knowledge of
10  that?
11    A.   No.
12    Q.   You weren't at that meeting?
13    A.   No.
14    Q.   Okay.  Other than the two comments now,
15  one -- other than the two comments Mr. Herring
16  related to you, one about an incident with an
17  African-American woman, one about comments about
18  Native Americans, have you ever heard any other
19  of -- heard of Mr. Chott making any other
20  racially-based remarks?
21    A.   No.
22    Q.   Have you ever heard of Mr. Chott making

Page 103

1  any gender-based remarks?
2    A.   Just I sat on a panel and we selected
3  some secretaries, and I think he was selection
4  official because we talked with him about who we
5  came up with.  He said all these -- all these
6  people are old.  He was just talking about age of
7  the women, you know, just said these are --
8    Q.   So that was an age-based comment, not --
9    A.   No, no.
10    Q.   Not a gender-based?
11    A.   No.
12    Q.   Is that correct or not, that was
13  age-based, not gender?
14    A.   Age, it was age.
15    Q.   Okay.  My question is have you ever heard
16  of Mr. Chott making any gender-based --
17    A.   No.
18    Q.   -- discriminatory comments or derogatory
19  comments?
20    A.   No.
21    Q.   And I think I asked this question but let
22  me make sure.  I think I just asked, have you ever

Page 104

1  heard him making any.
2    Have you ever heard of him making any
3  other gender-based remarks?
4    A.   No.
5    Q.   Have you ever heard Mr. Ramirez or heard
6  of Mr. Ramirez making any racially-based comments
7  or remarks?
8    A.   No.
9    Q.   Have you ever heard yourself or heard of
10  Mr. Ramirez making any gender-based remarks?
11    A.   No.
12    Q.   Have you ever heard Mr. Clayton or heard
13  of Mr. Clayton making any racially-based comments?
14    A.   No.
15    Q.   Have you ever heard yourself or heard of
16  Mr. Clayton making any gender-based remarks?
17    A.   No.
18    Q.   Have you ever heard yourself or heard of
19  Ms. Treese making any racially-based remarks or
20  comments?
21    A.   No.
22    Q.   Have you ever heard of or heard yourself

Page 105

1  Ms. Treese making any gender-based comments or
2  remarks?
3    A.   No.
4    Q.   So correct me if I'm wrong, but your
5  allegations that you were discriminated against on
6  the basis of your race are based on the fact that
7  you -- it's your testimony that you were better
8  qualified for the GS-14 position than Mr. Nagel and
9  Mr. Spalding, correct?
10    A.   Yes.
11    Q.   Okay.  Other than your testimony that you
12  were better qualified, what other evidence do you
13  have to support your allegation that they were
14  selected over you based on your race?
15    A.   If you look at the pattern, the last 11
16  people they hired have all been white, either male
17  or female.
18    Q.   Okay.  The last 11 people that they
19  hired.
20    A.   Right.
21    Q.   Who are "they"?
22    A.   Well, Mr. Frago, Mr. Frago, John.

27 (Pages 102 to 105)

Sederis Fields
CONFIDENTIAL

Page 106

1   Q.  Okay.  Wait a minute.  Mr. Frago?
2   A.  Frago.
3   Q.  Let's start with Mr. Frago.  How many
4   people out of the 11 were the last that he hired?
5   A.  He hired --
6   Q.  I guess I want to know, you're lumping a
7   lot of people in together.
8   A.  Yes, okay, okay.  Let me just --
9   Mr. Frago hired Linda Treese.  Then he reassigned
10  Jim Madigan from budget, he claimed to do a small
11  project.  Then he reassigned him in a 14 position,
12  which is a white male.  Linda Treese is a white
13  female.  He promoted Ken, which is a white male.
14  He promoted Spalding, which is a white male.
15      He promoted Deb.  Deb -- I sat on the
16  panel.  Deb was a GS-7 secretary.  And about three
17  or four years ago --
18  Q.  Deb who?
19  A.  Deb Johnson.  He promoted her to a GS-13.
20  She came in as a 7 and within three or four years
21  she was a 13.
22  Q.  And you were on the interview panel for

Page 107

1   her for the 13 position?
2   A.  No, for the -- she was a 7.
3   Q.  Okay.  You were on the interview panel
4   for her to come in as a 7?
5   A.  Uh-huh, right, come in.  As a 9, she got
6   promoted to a 9.
7   Q.  Okay, thank you.
8   A.  She was a 7, Deb Johnson.
9   Rick, Rick, Rick was probably -- worked
10  for, what's her last name, Arlene.  And Rick -- I
11  listed their names in there.
12  Q.  Okay.  That's --
13  A.  They're all listed.
14  Q.  And those were for Mr. Frago?
15  A.  Yes.
16  Q.  Okay.  Who else are you lumping in this
17  "they"?  Because it was your testimony that the
18  last 11 people that they promoted.
19  A.  Okay.  How many was that?  One, two,
20  three, four, five, six, seven, eight.  And I think
21  I probably -- they considered some that John had
22  hired.

Page 108

1   Q.  John?
2   A.  Chott, before Frago came on board.
3   Q.  Do you, know for these 11 people about
4   which you're discussing, about you said look at
5   their record, the last 11 they hired were white,
6   were there any EEO complaints filed about those
7   positions --
8   A.  I don't know.
9   Q.  -- those selections?
10  A.  I don't know.
11  Q.  So you actually don't know --
12  A.  Let me correct you.  I think it's eight.
13  I can't -- I don't remember.  I know might be
14  eleven now, but maybe during that time, during the
15  time that Frago was supervising may have been about
16  eight.  I can't remember right offhand, but maybe
17  approximately eight, not eleven, that Frago, during
18  Frago was there.
19  Q.  Have you engaged any economist or
20  statistician to analyze the selection about these
21  last eight or eleven people?
22  A.  No.  It's just a pattern.

Page 109

1   Q.  Okay.  So you're basing it solely on the
2   conclusion that it was a white person selected for
3   the position?
4   A.  Yes, uh-huh.
5   Q.  But you don't know who that white person
6   was competing against?
7   A.  Yes, I do know that.
8   Q.  And have you -- you haven't engaged an
9   expert to do an analysis of the qualifications of
10  any of those people, have you?
11  A.  No.
12  Q.  Okay, okay.  So we have right now your
13  testimony about the pattern and your testimony
14  about your belief that you were more qualified than
15  Mr. Nagel and Spalding.
16  A.  Right.
17  Q.  That's all the evidence that supports
18  your allegations that you were discriminated
19  against on the basis of your race, correct?
20  A.  No, that's not all.
21  Q.  All right.  What else?
22  A.  I have some witnesses.

28 (Pages 106 to 109)

Page 110

1    Q.   Okay.  What witnesses?

2    A.   The witnesses, are we talking witnesses

3    now?

4    Q.   What witnesses, ma'am?

5    MR. BRANCH:  You have to answer the

6    question.

7    THE WITNESS:  Now, they'll testify that

8    these people were hired or that they discriminate?

9    What was the question again?  I'm sorry.

10   BY MR. HENAULT:

11   Q.   I am asking for all evidence you have --

12   A.   All the evidence.

13   Q.   -- that supports your allegations that

14   the selection of Mr. Nagel and Mr. Spalding over

15   you for the GS-14 position was discriminatory

16   against you on the basis of your race.

17   A.   Yes, that's all the evidence that I could

18   think of at this point.

19   Q.   And that includes -- by evidence, I'm

20   saying any other witnesses you know that are going

21   to testify to certain things.

22   A.   Oh, okay.

Page 111

1    Q.   Any evidence that you are going to

2    present in support of your allegations, ma'am.

3    A.   I don't know at this point.

4    Q.   Do you know of anyone that will testify

5    or that could testify to support these allegations?

6    A.   I have to talk to them first.

7    Q.   Have any of these people -- who are these

8    people that you might want to talk to?

9    A.   Well, some people applied for the job,

10   didn't get it.  Jorge Comas applied for the job.

11   Q.   So these are other applicants for this

12   position, for this GS-14?

13   A.   Uh-huh, for the position.

14   Q.   Do you know if anyone else filed an EEO

15   complaint over it?

16   A.   I don't know.

17   Q.   Okay.

18   A.   I really don't know.  I do know I think

19   it's two complaints in my office, but not for this

20   position.

21   Q.   So not for this position?

22   A.   Right.

Page 112

1    Q.   Okay, all right.  So I interrupted you

2    and I apologize for that.  You're telling me what

3    other evidence you have other than the pattern that

4    you talked about and your belief that you were,

5    your testimony, that you were better qualified for

6    the position than Mr. Nagel and Mr. Spalding.  What

7    else?

8    A.   That's it for right now.

9    Q.   Well, ma'am, this is an evidence-based

10   inquiry, and where you need to disclose and I'm

11   entitled to your testimony on the evidence that's

12   out there.

13   A.   Okay.  Yes, that's it.

14   Q.   That's it, okay.

15   Now, your allegation that you were

16   discriminated against based on your gender.  Okay,

17   the last question was about race, this one I want

18   to focus on your gender.

19   Your evidence that the selection of

20   Mr. Nagel and Mr. Spalding for the GS-14 position

21   was discriminatory against you based on your gender

22   is the fact that you believe and you testified that

Page 113

1    you're better qualified for the position, correct?

2    A.   Yes.

3    Q.   Anything else?

4    A.   They have a pattern of discriminating

5    against blacks.

6    Q.   Okay.  Ma'am, I'm talking about gender

7    right now.

8    A.   Oh, gender.

9    Q.   Let me rephrase my question.  Let me

10   reask the question, just so we're clear, okay,

11   because my last question focussed on your race.

12   Correct me if I'm wrong.

13   Your allegations in this lawsuit are that

14   the selection of Mr. Nagel and Mr. Spalding was

15   discriminatory against you based on, one, your

16   race, the fact that you're black; and two, your

17   gender, the fact that you're a female?

18   A.   Right.

19   Q.   Is that accurate?

20   A.   Yes.

21   Q.   Okay.  We just discussed your allegation

22   of racial discrimination.  Now I want to discuss

Sederis Fields
CONFIDENTIAL

Page 114

1  your allegation of gender discrimination.
2      A.  Okay.
3      Q.  Okay.  So your allegation that the
4  selection of Mr. Spalding and Mr. Nagel for the
5  GS-14 position was discriminatory against you based
6  on your gender, the fact that you're a female, is
7  supported by, my understanding, one, the fact that
8  you testified that you're better qualified for the
9  position, correct?
10     A.  Right.
11     Q.  Anything else?
12     A.  The agency's known for the good old boy
13  network.  They tend to promote white males over
14  qualified applicants.
15     Q.  Okay.  And have you engaged any expert
16  statistician --
17     A.  No.
18     Q.  -- or economist to look at the agency's
19  pattern of selecting males over females?
20     A.  No.
21     Q.  Okay.  So what else supports your
22  allegation?

Page 115

1      A.  That's it.
2      Q.  Do you know of any witnesses that will
3  offer testimony in support of that?
4      A.  No.
5      Q.  So it's just your own testimony?
6      A.  Well, yeah, I do know one.  Edith Stoval.
7      Q.  Edith Stoval?
8      A.  Uh-huh, Edith Stoval.
9      Q.  Is that E-D-I-T-H, S-T-O-V-A-L?
10     A.  Yes, uh-huh.
11     Q.  Okay.  Who is Ms. Stoval?
12     A.  She is a supervise -- she's an EEO
13  director, EEO manager -- EEO chief in Farm Service
14  Agency.
15     Q.  Okay.
16     A.  She does a lot of statistics and
17  whatever.
18     Q.  Okay.  But you have not asked Ms. Stoval
19  to conduct an analysis --
20     A.  No.
21         MR. BRANCH:  Allow him to finish the
22  question, Ms. Fields.

Page 116

1  BY MR. HENAULT:
2      Q.  -- of whatever pattern you're saying has
3  occurred in the past, have you?
4      A.  No.
5      Q.  Okay.  Anyone else?
6      A.  No.
7      Q.  Now, in response to interrogatory 10,
8  which asked you to identify all health care
9  providers from whom you have received treatment
10  with respect to the harm alleged in your complaint,
11  you responded "none," correct?
12     A.  Right.
13     Q.  Okay.  So in this case you are not
14  alleging any medical repercussions or medical
15  damages arising from the alleged discrimination,
16  are you?
17     A.  No.
18     Q.  So you will not seek any compensatory
19  damages based on any health issues?
20     A.  No, just mental.
21     Q.  Mental?
22     A.  Emotional.

Page 117

1      Q.  Did you have to -- or have you seen any
2  mental health care providers?
3      A.  Well, I'll put it like this.  This is
4  emotional and it's -- I have ulcers, I mean I have
5  a stomach condition where when I get upset or
6  stress, you know, I get to a point where I can't
7  eat.  And I've been going through that quite a bit
8  for the past two or three years.
9      Q.  Okay.  But you're not seeking damages
10  based on that, are you, in this case?
11     A.  I have records.  If I have to I can
12  produce them.
13     Q.  Okay.  Now, in response to the
14  interrogatory that asked you to identify --
15     A.  Oh, okay.
16     Q.  -- any health care providers, you
17  responded "none."
18     A.  Okay, all right.
19     Q.  So are you seeking any damages in this
20  action based on that medical condition?
21     A.  Could I change that now or just --
22     Q.  I'm asking -- I'm asking you to tell me,

30 (Pages 114 to 117)

Sederis Fields
CONFIDENTIAL

Page 118

1   ma'am.
2       A.  I just didn't -- I just didn't think
3   about that then, because I didn't relate it.  But
4   usually I get stressed out, I just, you know.  He
5   just told me the other week because I had -- my
6   ulcer had flared up and he gave me some new
7   medication.
8       Q.  So are you seeking damages in this action
9   for that condition?
10      A.  Yes, yes.
11      Q.  Okay.  Prior to disclosing this right
12  now, have you ever disclosed that condition as a
13  result of the alleged discrimination in this case?
14      A.  No.
15      Q.  So other than the ulcer condition are you
16  seeking any damages based on any other medical
17  conditions?
18      A.  No.
19      Q.  No?
20      A.  No.
21      Q.  Now, you referred to mental anguish,
22  correct --

Page 119

1       A.  Yes.
2       Q.  -- a minute ago.  Have you ever had to
3   see a mental health care provider?
4       A.  No, no.
5       Q.  So you're not seeking damages in this
6   case based on any diagnosis of any mental health
7   problems arising from the alleged discrimination?
8       A.  No.  It's more emotional and I'm a
9   spiritual person so I rely on spiritual.
10      Q.  Okay.  So what's the answer to my
11  question then?
12      A.  No.
13      Q.  The answer is no?
14      A.  Right, no.
15      Q.  What mental anguish or mental health
16  problems have you suffered from the alleged
17  discrimination in this case?
18      A.  Depression, rejection.  And one of the
19  mental things, before I filed this complaint I was
20  an excellent employee.  And the office, the
21  supervisors -- I guess it's reprisal, subtle
22  reprisal, everything changed.  I was a great

Page 120

1   employee, outstanding performance appraisals,
2   awards, and depended on my expertise.  And after I
3   filed my complaint, I felt like because of the
4   abuse of power I was rejected because of their
5   abuse of power and extremely depressed.
6       Q.  Okay.  Has any medical professional ever
7   diagnosed you with depression?
8       A.  No.
9       Q.  Has any medical professional opined to
10  you that any depressive condition you may have or
11  feel you have is related to the alleged
12  discrimination?
13      A.  No.
14      Q.  Have you ever been diagnosed with any
15  mental health condition involving rejection?
16      A.  No.
17      Q.  Has any medical professional or counselor
18  or anything like that ever opined to you that you
19  have any mental condition, rejection condition, or
20  anything due to the alleged discrimination in this
21  case?
22      A.  No.  Just my ulcers will flare up.

Page 121

1       Q.  Okay.  Has a medical professional opined
2   to you that your ulcer flaring up is a result of
3   the alleged discrimination?
4       A.  No, stress.
5       Q.  Just stress?
6       A.  Yeah.
7       Q.  Since July 30 -- July 31, 2003, are you
8   currently married, ma'am?
9       A.  Yes.
10      Q.  Were you married in July of 2003?
11      A.  Yes.
12      Q.  Same spouse as today?
13      A.  Yes.
14      Q.  Okay.  Since the beginning of 2003 until
15  today have you and your spouse had any marital
16  problems?
17      A.  Only with my depression.
18      Q.  What about your depression?
19      A.  I feel a lot of times I'm rejected, not
20  doing -- I'm a very organized person.  I keep
21  things going in the house and all.  And when I'm
22  depressed I'm rejected and I don't do anything.  I

31 (Pages 118 to 121)

Sederis Fields
CONFIDENTIAL

Page 122

1  don't feel like going places or our social life
2  changed.
3      Q.  In what way?
4      A.  Because I just felt depressed and didn't
5  feel like, you know, doing anything.
6      Q.  Okay.  Give me some concrete specifics
7  about how your social life changed between July
8  31st, 2003, and today.
9      A.  Well, we have a lot of friends and we do
10  a lot of going on vacations and going to weekend
11  vacations, Atlantic City, and Florida at times, Las
12  Vegas.  There are various things, you know, friends
13  that we usually just do little things with.  I just
14  haven't felt like doing some of the pattern, the
15  things we normally do.
16      Q.  Okay.  In 2002, how many times did you go
17  to Atlantic City?
18      A.  Maybe -- well, 2002, we went on just
19  about four or five vacations, maybe different
20  places, not always there.  Just one example of
21  that.
22      Q.  In 2002, how many times did you go to

Page 123

1  Atlantic City?
2      A.  Twice.
3      Q.  You know of two times or you're just
4  guessing it was twice?
5      A.  I'm sure because I went -- I'm just
6  thinking of two people, two separate couples we
7  went with.
8          I don't know.  I can't remember the
9  specific year, I don't know.  I'm not going to say,
10  I don't know.
11      Q.  Okay.  What about Florida in 2002?
12      A.  We went to Miami once.
13      Q.  One trip to Florida in 2002.
14          What about Las Vegas?
15      A.  We went last year.
16      Q.  I'm asking about 2002.
17      A.  I don't remember.
18      Q.  Do you recall going to Las Vegas in 2002,
19  though?
20      A.  I can't remember what I did in 2002.
21      Q.  What about let's go to 2003, how many
22  times did you go to Atlantic City?

Page 124

1      A.  I didn't do anything in 2003.
2      Q.  You didn't even go to Atlantic City
3  before July of 2003?
4      A.  I went maybe 2002, but 2003, I don't
5  remember doing.  That's when I just stopped social,
6  much social life.  I don't remember.
7      Q.  Okay.  Your four or five vacations that
8  you took in 2002, were those spread throughout the
9  year or at a certain time every year or at a
10  certain time that year?
11      A.  Spread throughout the year.
12      Q.  Okay.  Let's talk about before July,
13  2003.  What vacations did you take?
14      A.  We did California.  Let's see.  I
15  don't -- I don't remember.  I don't remember.
16      Q.  You don't remember any vacations that you
17  took in the early part of 2003?
18      A.  We go to North Carolina quite a bit and
19  Richmond quite a bit.  My husband's from Richmond,
20  I'm from North Carolina.  So -- oh, and
21  Philadelphia, we go there quite often.  I know in
22  2002, probably to Philadelphia, the area, you know,

Page 125

1  the Philadelphia area, maybe five times.  That's
2  one place I know.
3      Q.  Let's talk about 2003 now.
4      A.  Okay.  I can't -- maybe we went maybe
5  once, 2003.  I didn't do very much in the year
6  2003, I know that.
7      Q.  Why?
8      A.  Because I felt so depressed and I just
9  didn't feel like doing things.
10      Q.  What about -- what about before July,
11  2003?  You weren't discriminated against before
12  that, were you?
13      A.  No.
14      Q.  So what did you do prior to that?
15      A.  Like I said, we just frequent -- a lot of
16  trips, you know, New York --
17      Q.  Do you know for a fact that you went to
18  New York between January and July, 2003?
19      A.  We went there for Christmas.
20      Q.  Christmas what year, ma'am?
21      A.  We do it almost every year, but I --
22      Q.  So that would have been 2002?

32 (Pages 122 to 125)

Sederis Fields
CONFIDENTIAL

Page 126

1    A. Possibly, yes.
2    Q. Ma'am, I'm asking about January, 2003, to
3  July, 2003.
4    A. January, 2003, I can't remember.
5    Q. Okay. So what about from July, 2003, to
6  December, 2003, did you take any vacations at all?
7    A. No, I didn't take one that year. I can't
8  remember taking, going anywhere then.
9    Q. Didn't go to Atlantic City at all?
10    A. I don't remember.
11    Q. You don't remember --
12    A. I know that's the time --
13    Q. -- or you didn't go?
14    A. That's the time when a lot of things came
15  up when I didn't feel like going to. It's not
16  always a specific place, but we're always -- we're
17  always invited to various things and different
18  things. And that particular time I know that was
19  move of a withdrawal time, it was more of a --
20  because I never filed a complaint before, so I was
21  really --
22    Q. Okay.

Page 127

1    A. -- depressed.
2    Q. So is your testimony that you definitely
3  did not go to Atlantic City between July, 2003, and
4  December, 2003, or you're not sure?
5    A. I'm not sure.
6    Q. Okay. What about Las Vegas? Do you --
7    A. I'm not sure.
8    Q. Okay. Do you -- so you could have --
9    A. I just know my pattern changed from
10  wanting to do. I don't -- my pattern changed from
11  wanting to travel and go to these places that we
12  usually go to. Those are places we usually go all
13  the time.
14    Q. What about 2004, what vacations did you
15  take? Did you go to Atlantic City in 2004?
16    A. No, I don't think so.
17    Q. Definitely not or you're not sure?
18    A. No, no, I definitely didn't go 2004.
19    Q. Okay. What about Las Vegas?
20    A. I know I went there last year.
21    Q. Okay. So 2006, Las Vegas, okay.
22    But you didn't go in 2004?

Page 128

1    A. Not that I can remember.
2    Q. Did you go to Florida in 2004?
3    A. I went to Florida, but I went -- I had
4  to -- okay. I did -- I had to go to Florida on an
5  investigation or something.
6    Q. I'm talking about vacations.
7    A. Oh, vacation, okay.
8    Q. What I'm looking for is you told me that
9  your vacation pattern changed.
10    A. Yes, uh-huh.
11    Q. Okay. I'm asking for concrete examples
12  of how that changed.
13    A. Oh, it changed, the fact I didn't feel
14  like -- to me, I was so depressed, I didn't feel
15  like -- I just didn't feel like going anywhere,
16  doing anything.
17    Q. But did you?
18    A. Not as much as I did before 2003.
19    Q. Okay. I understand that's your
20  testimony. But I'm asking for concrete examples of
21  places and how many times you went prior to the
22  alleged discrimination --

Page 129

1    A. Oh.
2    Q. -- and how that changed afterwards,
3  ma'am.
4    A. Oh, okay. I'd say 2002, we went to New
5  York twice, Philadelphia about four or five times,
6  North Carolina at least four times.
7    Q. And how long are these trips? Weekend
8  trips or are we talking a week at a time or what?
9    A. At least -- well, four to five days.
10    Q. Okay.
11    A. Uh-huh, four to five days.
12    Q. And in 2002, you went where?
13    A. We went to --
14    Q. Let's start with Philly.
15    A. Philadelphia, at least about five times.
16    Q. Five times. So four or five days, so
17  you're talking between 20 and 25 days in Philly?
18    A. Maybe.
19    Q. Okay. North Carolina?
20    A. At least, let's see, about four or five
21  times.
22    Q. So you're talking another 20 to 25 days

DC 1-800-441-3376                    ESQUIRE DEPOSITION SERVICES                    VA 1-800752-8979
                                          MD 1-800-539-6398

Sederis Fields
CONFIDENTIAL

Page 130

1  in North Carolina?
2      A.  Yes.
3      Q.  Okay.  What about -- where else did you
4  say you go, Richmond?
5      A.  Oh, Richmond, Richmond, like once a
6  month.
7      Q.  Once a month, how many days?
8      A.  We have a house there, so weekends, a lot
9  of weekends.
10     Q.  So it's just you go down there for the
11 weekend, those wouldn't be --
12     A.  Yes.
13     Q.  -- like a four or five-day trip --
14     A.  Right, no.
15     Q.  -- where you have to take leave from
16 work?
17     A.  Right, weekends, uh-huh.
18     Q.  Okay.  All right.  Atlantic City?
19     A.  Atlantic City, in 2002?  Okay.
20     Q.  Go ahead and answer.
21     A.  Maybe twice.
22     Q.  Okay.  For how long would your trips to

Page 131

1  Atlantic City be?
2      A.  From Wednesday, we usually come back on
3  Saturday.  Most of the time we'll go on Wednesday,
4  come back on Saturday.
5      Q.  Wednesday would you miss work?
6      A.  Yes, uh-huh.
7      Q.  Okay.  So Wednesday, Thursday, Friday, so
8  you'd have five days gone, three days missing work?
9      A.  I did it once, but the next -- the other
10 time, I have every other Friday off, and we had
11 this package deal, so I went on Friday, it was
12 Friday, Saturday, Sunday.  Okay, so I did that
13 twice that year.
14     MR. HENAULT:  Okay.  Let's take a break
15 real quick because I believe the tape needs to be
16 changed.
17     VIDEOGRAPHER:  Going off the record at
18 3:19:34.  End of tape one.
19     (Recess taken at 3:19 p.m.)
20     (Deposition resumed at 3:22 p.m.)
21     VIDEOGRAPHER:  We're going back on the
22 record.  The time is 3:22:57.  This marks the

Page 132

1  beginning of video tape number two of the
2  deposition of Sederis Fields, being taken at 501
3  Third Street, Northwest, Washington, D.C.
4      The videographer is Steve Schaal here on
5  behalf of Esquire Deposition Service, located at
6  1020 19th Street, Northwest, Washington, D.C..
7      Counsel may proceed.
8  BY MR. HENAULT:
9      Q.  Okay.  Ma'am, have you had anyone do a
10 determination of if you were successful in this
11 action up to now how much back pay you're entitled
12 to?
13     A.  No.
14     Q.  Have you had anyone do a determination of
15 how much front pay you would be entitled to?
16     A.  No.
17     Q.  Are you seeking back pay in this action?
18     A.  Yes.
19     Q.  Okay.  What about front pay?
20     A.  Yes.
21     Q.  Do you have -- now, you said that you
22 have one medical professional that has opined that

Page 133

1  your ulcer condition is made worse by stress,
2  correct?
3      A.  Yes.
4      Q.  Let's talk about your ulcer condition for
5  a second.
6      When did your ulcer condition start?
7      A.  Probably in 2004.
8      Q.  You never had a problem prior to that?
9      A.  No.
10     Q.  Okay.
11     A.  Now, I had my gall bladder removed in --
12 that was earlier.
13     Q.  Right.  That has nothing to do with this.
14     A.  Okay, okay.
15     Q.  Other than your ulcer condition do you
16 have any other medical conditions that you allege
17 are caused or worsened by the alleged
18 discrimination in this case?
19     A.  No, just depression.
20     Q.  Okay.  Just depression.  And we've
21 already talked about you have no medical
22 professionals --

34 (Pages 130 to 133)

Sederis Fields
CONFIDENTIAL

Page 134

1    A. Right.
2    Q. -- that have opined that any depression
3  is the result of the alleged discrimination,
4  correct?
5    A. Correct, yes.
6    Q. How much to date have you expended in
7  attorney's fees, ma'am?
8      MR. BRANCH: Objection.
9  BY MR. HENAULT:
10    Q. Go ahead and answer.
11      MR. BRANCH: We're not getting into that.
12  No, we're not discussing what she's expended in
13  attorney's fees.
14      MR. HENAULT: May I ask, sir, under what
15  privilege you are instructing this witness not to
16  answer?
17      MR. BRANCH: Attorney/client privilege.
18      MR. HENAULT: So it is your position that
19  how much Plaintiff has expended in attorney's fees
20  to date is covered by the attorney/client
21  privilege?
22      MR. BRANCH: It's my position that it's

Page 135

1  privileged and we're not going to discuss what she
2  has paid in legal fees.
3      MR. HENAULT: All right. I think we can
4  go off the record for a minute.
5      VIDEOGRAPHER: Going off the record at
6  3:25:40.
7      (Recess taken at 3:25 p.m.)
8      (Deposition resumed at 3:28 p.m.)
9      VIDEOGRAPHER: Going back on the record
10  at 3:28:37.
11      Counsel may proceed.
12  BY MR. HENAULT:
13    Q. Okay. Ma'am, prior to the break I asked
14  you how much you have expended to date in
15  attorney's fees. And your counsel objected on the
16  basis of privilege.
17      Are you going to answer that question?
18      MR. BRANCH: I'm objecting to the amount
19  that you've paid to my office --
20      THE WITNESS: Okay.
21      MR. BRANCH: -- on fees.
22      THE WITNESS: I paid several -- before

Page 136

1  Mr. Branch I --
2      MR. BRANCH: And wait, let me just say
3  that I am going to object to that because I don't
4  want you to waive that privilege. And we need to
5  get some type of ruling from the court.
6      THE WITNESS: Okay.
7      MR. BRANCH: We are going to -- if you
8  prevail in this matter, I'll state it on the
9  record, we'll make a claim under the lodestar
10  attorney's fees provisions, and that will be
11  determined by the court. I don't think it's
12  appropriate for you to tell or discuss what you
13  paid in legal fees.
14      THE WITNESS: Oh.
15  BY MR. HENAULT:
16    Q. Okay. Ma'am, I asked you how much you
17  expended to date in attorney fees relating to this
18  action.
19      Are you going to answer that question?
20    A. Yes.
21    Q. Okay. To date, how much have you paid in
22  attorney's fees?

Page 137

1      MR. BRANCH: And just -- I don't want you
2  to waive your right.
3      MR. HENAULT: Sir, you've made your
4  objection and your client has answered, yes, she
5  will answer the question.
6      MR. BRANCH: And I'm objecting as an
7  attorney. Let's find out -- we need to get a
8  decision from the judge on that.
9      MR. HENAULT: Sir, if you are going to
10  instruct your client not to answer, then by all
11  means go ahead.
12      MR. BRANCH: Okay.
13      MR. HENAULT: But your objection is made.
14      MR. BRANCH: I don't believe you have to
15  answer that and I would like to get clarity from
16  the court on that.
17      MR. HENAULT: Okay. Are you instructing
18  your client --
19      MR. BRANCH: Yes, yes.
20      MR. HENAULT: -- not to answer that
21  question?
22      MR. BRANCH: Yes.

35 (Pages 134 to 137)

Sederis Fields
CONFIDENTIAL

Page 138

1  BY MR. HENAULT:
2      Q.  Ma'am, are you going to follow your
3  counsel's advice?
4      A.  Yes.
5      MR. HENAULT:  Okay.  Under the Federal
6  Rules of Civil Procedure, if you instruct your
7  client not to answer, then it is your requirement
8  to move for a protective order within -- the rules
9  set a specific limitation of days.
10     I presume that you will file a motion for
11 protective order, correct?
12     MR. BRANCH:  I will check the rules.  If
13 that's what it requires then I will do that.
14     MR. HENAULT:  Okay.  So but you -- I want
15 to be clear, you have instructed your client not to
16 answer how much she has paid in attorney's fees to
17 date on the basis of what privilege?
18     MR. BRANCH:  It's privileged,
19 attorney/client privilege.  That's my position.
20 BY MR. HENAULT:
21     Q.  Okay.  Other than the back pay has the
22 alleged discrimination, the discrimination that you

Page 139

1  allege in this case, caused you any other financial
2  hardships?
3      A.  Financial hardships?
4      Q.  Any financial damages, financial loss,
5  any financial repercussions.
6      A.  Like, for example -- no, not -- no, I
7  can't, no.
8      Q.  Okay.  So other than back pay you're not
9  seeking any other financial damages, with the --
10 other than of course under law you're allowed to
11 recover attorney's fees?
12     A.  I think I mentioned compensatory damages.
13     Q.  Okay.  What sorts of compensatory damages
14 are you seeking, ma'am?  The basis and the amount.
15     A.  The basis for the depression, the
16 rejection, the discrimination I'm still dealing
17 with.  But, you know, to be honest, I just am
18 not --
19     THE REPORTER:  I'm sorry, I didn't hear.
20     THE WITNESS:  I said to be honest, that's
21 what I can see.
22 BY MR. HENAULT:

Page 140

1      Q.  Okay.  That's what you can see or that's
2  it?
3      A.  Yes, that's it.
4      Q.  That's it?
5      A.  Yes, sir, uh-huh.
6      MR. HENAULT:  Okay.  I think at this time
7  I have no further questions, with the caveat that
8  if your counsel -- or, excuse me, when your counsel
9  moves for a protective order on the issue of
10 attorney's fees, that if the court rules against
11 you, then I would expect to potentially reopen this
12 deposition for an answer to that question.  Other
13 than that, I have no questions at this time.
14     Mr. Branch?
15     MR. BRANCH:  I think we'll read and sign.
16 Thank you.
17     MR. HENAULT:  That's it.
18     VIDEOGRAPHER:  That's it?  Sorry.  We're
19 going off the record at 3:33:30.  This ends --
20 excuse me.  This ends the deposition of Sederis
21 Fields.  The total number of videotapes is two.
22     (Deposition concluded at 3:33 p.m.)

Page 141

1      ACKNOWLEDGMENT OF DEPONENT
2      I, SEDERIS FIELDS, do hereby acknowledge that I
3  have read and examined the foregoing one hundred
4  forty (140) pages of testimony, and the same is a
5  true, correct and complete transcription of the
6  testimony given by me, and any changes and/or
7  corrections appear on the attached errata sheet
8  signed by me.
9
10
11
12
13    (Date)          SEDERIS FIELDS
14
15
16
17
18
19
20
21
22

36 (Pages 138 to 141)

Sederis Fields
CONFIDENTIAL

Page 142

1  **ESQUIRE DEPOSITION SERVICES**
2  1020 19th Street, Northwest
3  Suite 620
4  Washington, D.C. 20036
5
6        **ERRATA SHEET**
7  Case Name: Fields v. Johanns
8  Witness Name: SEDERIS FIELDS
9  Deposition Date: August 29, 2007
10  Job No.: 182397
11  PAGE  LINE      CORRECTION
12
13
14
15
16
17
18
19
20
21
22    Signature            Date

Page 144

1  SEDERIS FIELDS
   c/o David A. Branch, Esquire
2  Law Office of David A. Branch
   1825 Connecticut Avenue, Northwest
3  Suite 690
   Washington, D.C. 20009
4
      In Re: Fields v. Johanns
5
   As requested at the time of deposition, your
6  deposition transcript in the above-captioned matter
   is being held for thirty (30) days for review and
7  signature.
8  This task may be accomplished in one of two ways;
   either the deponent may appear at our office to
9  read and sign the deposition transcript, for which
   the deponent should make an appointment at (202)
10  429-0014, or counsel may provide the witness with a
   copy of the transcript, from which the deponent
11  shall make an errata sheet.
12  If the latter method is chosen and the witness is
   provided with a copy of the deposition transcript
13  for review, the deponent should keep in mind that
   the purpose of review is only to ensure accuracy
14  and not to revise in an editorial manner. If any
   changes and/or corrections are necessary, the
15  deponent should list them on an errata sheet,
   listing the page, line number and correction; i.e.,
16  page 15, line 8, change "he said" to "she said."
   When the errata sheet is completed, it should be
17  signed and dated by the deponent and returned to
   our office. The signed errata sheet will
18  subsequently be attached to the original transcript
   and be filed with the Court.
19
   The original transcript will be held until Friday,
20  October 12, 2007, at which time if the deponent has
   not followed either of the above two steps for
21  reading his deposition transcript, it will be
   assumed that reviewing and signing are no longer
22  desired, and the deposition will be filed.

Page 143

1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC
2
3  I, Sara A. Watt, Registered Professional Reporter,
4  the office before whom the foregoing deposition was
5  taken, do hereby certify that the witness named
6  herein was duly sworn by me; that the foregoing
7  transcript is a true, correct, and complete record
8  of the testimony given; that said testimony was
9  taken by me stenographically and thereafter reduced
10  to typewriting by me; and that I am neither counsel
11  for, related to, nor employed by any of the parties
12  to this litigation and have no interest, financial
13  or otherwise, in its outcome.
14        IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal.
16
17
18        Sara A. Watt, Notary Public in
19        and for the District of Columbia
20  My Commission expires June 30, 2008.
21
22

37 (Pages 142 to 144)

Sederis Fields
CONFIDENTIAL

Page 145

| A | | | | |
|---|---|---|---|---|
| **above-captio...** 144:6 | 26:3 32:6 37:6,7,10,21 38:1 42:7,8 43:3,6 44:21 45:3,13 46:3 46:4,6,11 50:17 52:14 53:5,5 67:12 68:16,19,20 69:3,7 70:2 70:11 72:6 73:6 75:3,8 75:17,18,19 77:2,21 78:15 79:19 81:1,3 81:9,9 84:22 89:5 90:4 | 114:12,18 **age-based** 103:8,13 **ago** 79:4 106:17 119:2 **agreed** 8:18 **agricultural** 42:4 50:19 68:3,6 73:10 73:13,14,20 **agriculture** 1:10 3:16 6:6 7:3 16:6 18:13 37:8 67:15 74:1,18 76:3 **ahead** 23:18 | 57:7 58:1 61:19 62:1,11 62:20 63:14 64:10 65:17 66:1,12 78:15 79:5 84:6,13 84:15,17 85:13,18 133:16 139:1 **alleged** 47:13 84:12 116:10 116:15 118:13 119:7 119:16 120:11,20 121:3 128:22 133:17 134:3 138:22 | 23:19 31:7 51:12,13 61:7 63:3 74:12 77:8,18 80:7 91:20,21 93:20 97:2 110:5 119:10 119:13 130:20 134:10,16 135:17 136:19 137:5 137:10,15,20 138:7,16 140:12 |
| **abuse** 120:4,5 **accept** 47:17 **accomplished** 144:8 **accretion** 43:21 45:15 48:8 82:6,8 82:10 83:1,18 **accuracy** 144:13 **accurate** 8:11 12:11 16:7 25:6 26:6,11 39:2 41:4 60:7 71:4 113:19 **accuse** 100:8 | | | | **answered** 57:20 137:4 **anybody** 77:18 **AO** 42:22 43:3 **apologize** 42:18 73:12 112:2 |
| **acknowledge** 141:2 **ACKNOWLE...** 141:1 **acronyms** 42:20 **acted** 47:10,11 **acting** 43:10,11 44:2,7 46:15 46:17,20 70:4 **action** 10:7 24:4 47:20 94:11 117:20 118:8 132:11 132:17 136:18 **actual** 33:9 **additional** 34:9 46:5 **address** 9:6 **administering** 50:19 **administrative** 5:2,5 11:4,14 21:11 24:21 | **administrator** 29:6 43:10,12 44:6 46:15 47:6 70:5 **advantage** 48:6 49:13 81:16 83:1 **advice** 138:3 **advise** 29:20 **affiliation** 47:9 47:15,17 48:2 **affixed** 143:15 **African-Ame...** 101:12 102:17 **African-Ame...** 94:9 **afternoon** 6:2 7:6,20 **age** 103:6,14 103:14 **agency** 19:10 19:15,20 20:2 22:15 29:21 39:13 42:3,12 74:5,10,11 115:14 **agency's** | 45:21 48:4 49:4 50:15 51:17 66:3 77:8 80:7 91:19,20 93:20 130:20 134:10 137:11 **allegation** 64:5 93:3,11 94:8 94:11,15 105:13 112:15 113:21 114:1 114:3,22 **allegations** 20:21 63:9 105:5 109:18 110:13 111:2 111:5 113:13 **allege** 11:13 27:2 28:5 29:8 30:7,12 30:19 31:9 34:19,22 40:12 41:16 48:12,16 52:5 53:17 56:9 | **allegedly** 89:9 **alleging** 31:4 63:6 116:14 **alleviate** 9:10 **allow** 64:1 115:21 **allowed** 139:10 **Americans** 102:4,7,18 **amount** 135:18 139:14 **analysis** 109:9 115:19 **analyze** 108:20 **and/or** 141:6 144:14 **anguish** 118:21 119:15 **announced** 37:7 71:15 90:3 **announceme...** 5:1 24:20 25:2,7 39:6 49:17 51:9 **answer** 23:18 | **appeal** 47:5 **appear** 141:7 144:8 **appearance** 8:22 9:3,9,14 10:4,7 **appears** 59:5 59:19 60:3 75:5 **applicants** 31:9 64:11 65:17 80:19 90:4 111:11 114:14 **application** 5:4 11:22 26:3,7 26:10 40:20 41:4 53:10 69:20 74:20 85:11 **applications** 39:10,13,18 40:1,2 54:5 |

Sederis  Fields
CONFIDENTIAL

Page 146

| | | | | |
|---|---|---|---|---|
| **applied** 11:9 | 95:14 110:11 | 32:22 63:21 | 132:5 | 28:15 35:4 |
| 12:3,6 25:3 | 117:22,22 | **a.m** 59:21 | **belief** 109:14 | 40:7,10 41:13 |
| 31:12 38:8 | 123:16 126:2 | | 112:4 | 51:14 58:22 |
| 111:9,10 | 128:11,20 | **B** | **believe** 9:1 | 60:11,14,22 |
| **apply** 74:6 | **assigned** 38:6 | **B** 4:11 | 14:12 34:13 | 61:3,7 62:18 |
| **applying** 79:16 | 78:22 | **back** 9:21 24:7 | 54:11 57:2 | 63:1 64:1 |
| **appointment** | **assist** 7:4 | 24:9 36:21 | 67:5 112:22 | 67:1,6 77:5 |
| 144:9 | **Assistant** 7:4 | 47:1 49:14 | 131:15 | 80:4 91:19 |
| **appraisals** | 29:6 | 54:16 57:9 | 137:14 | 92:11,17 |
| 120:1 | **assume** 70:21 | 60:9 90:1 | **believed** 97:18 | 93:14 95:15 |
| **appreciate** | **assumed** | 94:2 97:11,14 | **Berge** 44:13,13 | 98:5 99:8,15 |
| 65:9 | 144:21 | 131:2,4,21 | **Berge's** 44:20 | 99:22 110:5 |
| **appropriate** | **Atlantic** 122:11 | 132:11,17 | 69:10 | 115:21 134:8 |
| 99:13,17 | 122:17 123:1 | 135:9 138:21 | **best** 32:10,10 | 134:11,17,22 |
| 136:12 | 123:22 124:2 | 139:8 | 32:12 36:16 | 135:18,21 |
| **approximately** | 126:9 127:3 | **background** | 80:2,10 87:8 | 136:1,2,7 |
| 17:10 70:3 | 127:15 | 37:9,10 42:6 | **better** 32:9 | 137:1,6,12,14 |
| 108:17 | 130:18,19 | 46:12 53:2,3 | 84:3,9 105:7 | 137:19,22 |
| **April** 22:11 | 131:1 | 68:22 69:1 | 105:12 112:5 | 138:12,18 |
| **area** 29:4 43:9 | **attached** 141:7 | 73:22 74:1,4 | 113:1 114:8 | 140:14,15 |
| 46:13 68:14 | 144:18 | **base** 84:7 | **biased** 27:9 | 144:1,2 |
| 68:21 69:3,3 | **attention** 70:18 | **based** 32:4 | **big** 86:13 | **breadth** 67:21 |
| 72:14 75:15 | **attorney** 2:10 | 64:5 94:9 | 101:12 | **break** 10:1,6 |
| 76:6,13 89:6 | 3:10 7:5 8:22 | 105:6,14 | **Bishop** 98:16 | 66:21 97:15 |
| 124:22 125:1 | 136:17 137:7 | 112:16,21 | **bit** 117:7 | 131:14 |
| **areas** 51:1 | **attorney's** 6:13 | 113:15 114:5 | 124:18,19 | 135:13 |
| **arising** 116:15 | 6:22 134:7,13 | 116:19 | **bitch** 101:13 | **bring** 36:5 |
| 119:7 | 134:19 | 117:10,20 | **black** 44:1 | **brought** 54:16 |
| **Arlene** 107:10 | 135:15 | 118:16 119:6 | 46:19 101:13 | **budget** 69:16 |
| **aside** 65:14 | 136:10,22 | **basically** 50:10 | 113:16 | 69:16,17 |
| **asked** 19:3 | 138:16 | **basing** 109:1 | **blacks** 113:5 | 75:19 106:10 |
| 31:10 33:22 | 139:11 | **basis** 10:3 | **bladder** 133:11 | **budgets** 76:7 |
| 34:2,7,19 | 140:10 | 11:15 63:14 | **board** 46:21 | **B-I-S-H-O-P** |
| 36:1 37:20 | **attorney/client** | 72:20 89:21 | 47:1 56:16,16 | 98:16 |
| 38:8 58:6 | 134:17,20 | 93:12 94:13 | 68:18 98:22 | |
| 65:12,18 66:5 | 138:19 | 105:6 109:19 | 108:2 | **C** |
| 66:6,8 97:16 | **August** 1:16 | 110:16 | **boy** 114:12 | **C** 6:1 |
| 101:10 | 2:4 6:9 8:5 | 135:16 | **Branch** 3:2,3 | **CA** 6:8 |
| 103:21,22 | 16:5,15 142:9 | 138:17 | 6:20 7:6,7 | **California** |
| 115:18 116:8 | **Avenue** 3:4,18 | 139:14,15 | 8:13 9:7,13 | 124:14 |
| 117:14 | 144:2 | **beginning** | 10:2,5 12:17 | **call** 80:20 |
| 135:13 | **awards** 120:2 | 121:14 132:1 | 12:21 14:12 | **called** 7:13 |
| 136:16 | **aware** 20:7 | **begins** 6:3 | 14:18 21:5,8 | 36:15 101:12 |
| **asking** 60:3 | 27:18 28:10 | **behalf** 3:1,8 | 22:2 23:5,13 | **calls** 40:8 |
| 63:7,8 93:18 | 29:12 32:20 | 6:15,22 22:20 | 23:19 25:20 | 41:14 63:1 |

Sederis  Fields
CONFIDENTIAL

77:5 80:4
**candidate**
  16:11 33:13
  51:10 79:14
  80:16 81:20
  82:3
**candidates**
  13:18 30:20
  31:5 33:22
  36:9 54:15
  79:12
**capacity** 29:5
**care** 116:8
  117:2,16
  119:3
**careful** 14:18
**Carolina**
  124:18,20
  129:6,19
  130:1
**Carolyn** 59:6
  85:20,22 86:1
**case** 1:6 6:7
  7:22 9:1,2
  10:4,19 19:4
  39:22 88:2,11
  93:3,8,11
  99:11 116:13
  117:10
  118:13 119:6
  119:17
  120:21
  133:18 139:1
  142:7
**catch** 20:9
**categorized**
  37:5
**category** 50:1
  51:4
**caused** 133:17
  139:1
**caveat** 140:7
**CED** 42:14,15
**certain** 27:8
  87:7 110:21

124:9,10
**CERTIFICATE**
  143:1
**certify** 143:5
**chain** 5:7 59:6
**change** 117:21
  144:16
**changed**
  119:22 122:2
  122:7 127:9
  127:10 128:9
  128:12,13
  129:2 131:16
**changes** 141:6
  144:14
**check** 138:12
**chief** 115:13
**chosen** 144:12
**Chott** 5:8 13:8
  13:14,22 14:7
  20:3 26:15
  27:22 28:3,6
  28:11,15
  35:17 36:13
  36:17 40:15
  43:10,11,13
  46:15 47:3,4
  47:8,20 49:6
  54:4 56:1
  57:15 59:7,15
  59:20 60:2
  62:2 70:4
  82:15 87:13
  99:2 100:20
  101:3,9,11,21
  102:2,19,22
  103:16 108:2
**Chott's** 57:17
**Christmas**
  125:19,20
**Chuck** 43:15
  43:15,16,16
  43:17,17,18
  44:13,13,20
  47:15 69:9,16

69:19
**Chuck's** 43:18
**circumstances**
  27:12
**City** 122:11,17
  123:1,22
  124:2 126:9
  127:3,15
  130:18,19
  131:1
**civil** 1:3 6:7 9:5
  18:18 38:2
  75:18 78:2,4
  138:6
**claim** 136:9
**claimed** 106:10
**claims** 22:5
  23:16
**clarified** 35:10
**clarify** 14:17
  73:21
**clarifying** 84:5
**clarity** 137:15
**Clayton** 13:12
  26:15 29:16
  29:19 30:8
  54:4 104:12
  104:13,16
**clear** 42:17
  65:10 67:11
  113:10
  138:15
**client** 91:17
  92:10,16
  137:4,10,18
  138:7,15
**Cliff** 98:4,7,10
  101:7 102:3
**close** 32:19
**closed** 12:5,18
**Columbia** 1:2
  2:17 6:7
  143:19
**Comas** 111:10
**come** 35:21

36:20 88:13
  107:4,5 131:2
  131:4
**comes** 39:6
**coming** 56:16
  68:18,21
**comment**
  91:2 96:2,5
  100:7 103:8
**comments**
  91:6 100:17
  100:21 101:4
  101:21 102:2
  102:14,15,17
  103:18,19
  104:6,13,20
  105:1
**Commission**
  143:20
**compensatory**
  116:18
  139:12,13
**compete** 40:13
  41:9,17 82:19
**competing**
  109:6
**competitive**
  82:18
**complained**
  44:4
**complaint** 4:16
  16:18,22 17:5
  17:16 18:5
  47:15 75:5,6
  101:14,15
  111:15
  116:10
  119:19 120:3
  126:20
**complaints**
  108:6 111:19
**complete** 26:6
  141:5 143:7
**completed**
  144:16

**concluded**
  140:22
**conclusion**
  100:4 109:2
**concrete** 122:6
  128:11,20
**condition**
  117:5,20
  118:9,12,15
  120:10,15,19
  120:19 133:1
  133:4,6,15
**conditions**
  118:17
  133:16
**conduct** 60:4
  64:11,22 65:1
  65:14 115:19
**conducted**
  14:21 30:21
  31:6,8 34:4
  35:1 66:13
**conducting** 8:1
  12:13 13:5
  33:12 58:1
**confidence**
  99:17
**confidential**
  4:7 91:13
  99:10,14,18
**Connecticut**
  3:4 144:2
**consecutively**
  10:15
**conservation**
  75:14
**consider** 79:7
  80:15 81:14
  81:19 82:2
  83:16 84:1,14
**consideration**
  16:11
**considered**
  84:15,18
  107:21

Sederis  Fields
**CONFIDENTIAL**

Page 148

| | | | | |
|---|---|---|---|---|
| **consisted** 26:14 | 32:12 43:5,22 46:21 47:16 | 138:17 141:13 142:9 | 50:22 **denying** 4:19 | **describing** 43:3 |
| **consistent** 62:7 | 62:13 64:14 72:12 88:10 | 142:22 **dated** 18:7 24:2 | 23:11 **department** 1:9 | **description** 43:8 49:11 |
| **contact** 16:17 | 99:2 139:10 | 59:7,20 | 3:16 6:5 7:3 | 52:12 76:19 |
| **continue** 8:4 | **court** 1:1 6:6 | 144:17 | 16:5 18:13 | 77:10 78:20 |
| 9:11 | 6:15 7:9 8:6 | **David** 3:2,3 7:7 | 19:19 41:8 | 79:3,3,8 |
| **contract** 79:2 | 8:20 10:9 | 144:1,2 | **depended** | 80:19 82:4 |
| **control** 33:9 | 22:4,4 23:15 | **day** 8:15 19:22 | 120:2 | 89:7 |
| **convene** 29:21 | 23:15 91:17 | 35:19,20 | **deponent** | **descriptions** |
| 58:11 | 92:14 97:4 | **days** 16:20,21 | 141:1 144:8,9 | 31:16 38:19 |
| **convenes** 30:6 | 136:5,11 | 19:17 129:9 | 144:10,13,15 | 78:21 79:4 |
| **coordinating** | 137:16 | 129:11,16,17 | 144:17,20 | **designate** 99:9 |
| 50:18 | 140:10 | 129:22 130:7 | **deposition** | 99:14 |
| **coordination** | 144:18 | 131:8,8 138:9 | 1:15 2:7 4:13 | **designated** |
| 11:10 68:3 | **covered** | 144:6 | 6:3,10,16,20 | 86:18 99:18 |
| **copy** 19:3,3 | 134:20 | **deadline** 19:17 | 8:2,5,15,16 | **desired** 144:22 |
| 78:19 144:10 | **created** 56:7 | **deal** 76:16 | 8:17,19 9:12 | **details** 11:20 |
| 144:12 | **creditable** 50:4 | 131:11 | 9:14,20 10:2 | **determination** |
| **correction** | 50:11 70:21 | **dealing** 43:4,6 | 10:12 97:10 | 41:9 54:2,8,9 |
| 142:11 | 70:22 | 69:17 75:18 | 99:20 131:20 | 84:8 85:3,4 |
| 144:15 | **credited** 70:22 | 76:3 89:6 | 132:2,5 135:8 | 86:7,16 87:3 |
| **corrections** | **CRP** 75:14 | 139:16 | 140:12,20,22 | 87:10,11 |
| 141:7 144:14 | **current** 40:20 | **Deb** 106:15,15 | 142:1,9 143:4 | 90:12,16 |
| **counsel** 3:17 | **currently** 121:8 | 106:16,18,19 | 144:5,6,9,12 | 92:18 132:10 |
| 6:18 7:4,13 | **C-H-O-T-T** | 107:8 | 144:21,22 | 132:14 |
| 7:17,18 9:22 | 28:16 | **December** | **depressed** | **determine** |
| 10:7,10 91:16 | **c/o** 144:1 | 126:6 127:4 | 120:5 121:22 | 86:19 99:16 |
| 92:9 93:18 | | **decision** 137:8 | 122:4 125:8 | **determined** |
| 97:12 132:7 | **D** | **deem** 66:14 | 127:1 128:14 | 85:15 86:20 |
| 135:11,15 | **D** 4:1 6:1 | **deemed** 39:14 | **depression** | 89:12,16 |
| 140:8,8 | **DAFO** 68:14,15 | 39:19 | 119:18 120:7 | 90:21 136:11 |
| 143:10 | **daily** 72:20 | **Defendant** 1:11 | 121:17,18 | **determines** |
| 144:10 | **damages** | 3:8 6:22 7:14 | 133:19,20 | 22:4 23:16 |
| **counselor** | 116:15,19 | 7:18 | 134:2 139:15 | **determining** |
| 16:17 120:17 | 117:9,19 | **define** 75:20 | **depressive** | 89:19 |
| **counsel's** | 118:8,16 | **defines** 75:20 | 120:10 | **diagnosed** |
| 138:3 | 119:5 139:4,9 | **definitely** 30:11 | **deputy** 29:6 | 120:7,14 |
| **county** 42:1,7 | 139:12,13 | 127:2,17,18 | 43:10,12 | **diagnosis** |
| 42:10,17 | **dashed** 20:8 | **Democrat** 47:7 | 46:15 47:6 | 119:6 |
| 67:19 68:1 | **date** 6:9 16:15 | **demonstrate** | 68:16 70:4 | **difference** |
| **couple** 15:13 | 18:21 24:2 | 71:20 | **derogatory** | 75:10,20 |
| 64:19 | 134:6,20 | **demonstrated** | 100:17 | 86:13 |
| **couples** 123:6 | 135:14 | 50:16 | 103:18 | **different** 31:6 |
| **course** 30:22 | 136:17,21 | **demonstrating** | **describe** 38:22 | 31:10 33:16 |

Sederis Fields
CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 34:13,20 35:2 42:8 65:18 66:6,6,8 122:19 126:17 **differently** 93:12 94:4,9 **direct** 70:18 **director** 42:2,8 42:17 67:19 68:2 115:13 **directors** 69:18 **disagree** 10:5 **disaster** 75:14 **disclose** 112:10 **disclosed** 118:12 **disclosing** 118:11 **discriminate** 110:8 **discriminated** 85:14,18 94:12 105:5 109:18 112:16 125:11 **discriminating** 113:4 **discrimination** 4:17 16:18 17:5,16 18:5 78:1,3 91:2 113:22 114:1 116:15 118:13 119:7 119:17 120:12,20 121:3 128:22 133:18 134:3 138:22,22 139:16 **discriminatory** 87:4 89:20 | 90:16 103:18 110:15 112:21 113:15 114:5 **discuss** 113:22 135:1 136:12 **discussed** 26:13 54:1 66:16 113:21 **discussing** 108:4 134:12 **discussion** 9:19 75:7 **distinguish** 75:6 90:7 **distinguishes** 75:7 **District** 1:1,2 2:17 6:6,7 143:19 **division** 1:3 6:7 47:22 76:10 **document** 22:2 22:7,10,20 23:2 24:1,4 40:19 51:14 51:22 **doing** 45:3 59:16 60:18 72:12,16,20 121:20 122:5 122:14 124:5 125:9 128:16 **Doug** 12:14 13:6 20:3 40:15 **due** 82:7 120:20 **duly** 143:6 **dumb** 101:13 **duties** 43:18,21 44:9,16 45:4 45:6,10,12,15 45:16 46:3,4 46:6 48:8 | 49:7,8 52:15 68:10 69:7,10 69:11,13,19 70:1,10,11 71:14,21 72:6 72:6,13,14 73:19 74:17 75:3,8,8,11 75:12,12,17 76:14,20 77:3 77:12,22 78:5 78:8,17,22 79:19 80:2,10 80:15,20 81:1 81:4,9,15 82:2,6,8,10 83:2,10,15,18 **D.C** 1:17 2:13 3:5,12,19 6:12,17 7:1 132:3,6 142:4 144:3 ——————— **E** E 4:1,11 6:1,1 **earlier** 8:16 133:12 **early** 12:3 124:17 **eat** 117:7 **economist** 108:19 114:18 **Edith** 115:6,7,8 **editorial** 144:14 **EEO** 16:17 20:4 20:10 29:20 29:20 30:1 46:12 58:7,8 58:12 60:5,10 60:20 61:20 62:3,5,11,21 64:8 65:7,13 108:6 111:14 | 115:12,13,13 **EEOC** 4:19 19:7,10,15,16 19:19 22:11 23:11 47:16 **eight** 107:20 108:12,16,17 108:21 **either** 27:11 78:16 88:6 105:16 144:8 144:20 **eleven** 108:14 108:17,21 **eligibility** 49:18 54:9 **eligible** 41:9 53:14 54:2 71:18 **emergency** 8:1 **emotional** 116:22 117:4 119:8 **employed** 29:3 143:11 **employee** 42:2 45:13 101:11 119:20 120:1 **employees** 42:10 48:7 **employment** 4:16 **ends** 140:19,20 **engaged** 108:19 109:8 114:15 **ensure** 88:6 144:13 **enter** 9:9 **entered** 8:22 10:4,6 **entering** 4:18 9:3,14 22:11 22:14 **entire** 72:11 | **entitled** 112:11 132:11,15 **equal** 90:13 **equivalent** 50:5 71:11,15,21 **errata** 141:7 142:6 144:11 144:15,16,17 **Esquire** 3:2,9 3:15 6:16 132:5 142:1 144:1 **eventually** 46:17 **evidence** 63:17 65:20 88:3,11 88:14 89:8 105:12 109:17 110:11,12,17 110:19 111:1 112:3,11,19 **evidence-ba...** 112:9 **exactly** 36:17 68:10 69:13 72:5 74:17 **examination** 4:3 7:13,18 **examined** 7:15 141:3 **example** 87:21 88:1 122:20 139:6 **examples** 128:11,20 **excellent** 119:20 **exceptions** 83:7,7 **excuse** 140:8 140:20 **executive** 42:1 42:7,17 67:19 68:1 69:18 |

Sederis  Fields
CONFIDENTIAL

Page 150

**exhibit** 15:17
  15:18,22 16:4
  17:18,20 18:2
  18:4 21:14,15
  21:19 23:3,7
  23:8,10 24:12
  24:13,17,19
  25:10,11,14
  26:2 49:15,16
  53:13 58:14
  58:16 59:2,5
  70:19
**exhibits** 4:13
  5:9 10:10,11
  10:13,14,16
**expect** 140:11
**expended**
  134:6,12,19
  135:14
  136:17
**experience**
  37:21 45:3
  49:2,6 50:5
  50:11,16,22
  52:13 53:4,7
  67:22 70:17
  71:8,10,14
  75:10 77:15
  77:15 78:16
  79:7 84:9
  85:1 89:3,3,5
**expert** 75:15
  109:9 114:15
**expertise**
  120:2
**expires** 143:20
**explain** 51:6
  75:9 79:14,20
  82:11
**explains** 80:16
**express** 84:8
**expressed**
  36:14
**expressly**
  33:12 35:11

  51:9,22
**extent** 27:8
  40:7 41:13
**extremely**
  120:5
**E-D-I-T-H** 115:9
**e-mail** 5:7 58:6
  59:6,19,20
  60:15 62:4
**e-mails** 59:7

———— **F** ————
**fact** 17:15
  40:16 42:9
  44:5 53:16
  70:9 81:7
  96:11 105:6
  112:22
  113:16,17
  114:6,7
  125:17
  128:13
**failed** 19:17
**fair** 35:14 48:4
  79:11 82:19
**familiar** 37:4
  68:1
**farm** 29:4,7
  37:9 42:6
  43:5 52:14
  53:2 68:22
  69:1 72:13
  73:10,10,14
  73:22 74:3,4
  74:10 75:13
  75:13,16 76:2
  76:4,5,8 77:1
  77:20 115:13
**farmer** 42:13
  67:20
**farmers** 74:3
**fat** 101:12
**favor** 22:14
**favored** 94:5
**favoritism** 44:3

  44:5
**February** 10:11
**federal** 9:4
  38:5 42:11
  138:5
**feel** 99:13
  120:11
  121:19 122:1
  122:5 125:9
  126:15
  128:13,14,15
**fees** 134:7,13
  134:19 135:2
  135:15,21
  136:10,13,17
  136:22
  138:16
  139:11
  140:10
**felt** 99:2 120:3
  122:4,14
  125:8
**female** 44:2
  46:19 105:17
  106:13
  113:17 114:6
**females** 114:19
**field** 7:8 43:11
  43:12 46:16
  47:6 68:16,22
  70:5
**Fields** 1:5,15
  2:7 4:3,13,14
  5:4 6:4,4 7:8
  7:12,20 10:19
  25:21 115:22
  132:2 140:21
  141:2,13
  142:7,8 144:1
  144:4
**file** 17:4,15
  138:10
**filed** 18:12,19
  19:10,16 21:9
  22:21 24:4

  47:15 101:14
  108:6 111:14
  119:19 120:3
  126:20
  144:18,22
**filtering** 44:20
**final** 29:16 60:4
**financial** 139:1
  139:3,4,4,5,9
  143:12
**find** 83:3 137:7
**fine** 67:8
**finish** 64:1
  115:21
**first** 8:16 12:10
  19:14,16 20:6
  26:14,19
  27:13 35:5
  36:2 37:16,19
  41:8 56:15
  61:2 62:7
  71:5 86:5
  90:2 92:6
  95:12 111:6
**firsthand**
  101:16 102:9
**five** 9:16 13:18
  36:9,19 43:13
  46:16 54:17
  107:20
  122:19 124:7
  125:1 129:5,9
  129:11,15,16
  129:16,20
  131:8
**five-day** 130:13
**flare** 120:22
**flared** 118:6
**flaring** 121:2
**Floor** 2:12
**Florida** 122:11
  123:11,13
  128:2,3,4
**focus** 112:18
**focussed**

  113:11
**follow** 138:2
**followed**
  144:20
**following**
  13:14 15:5
  22:19 24:3
  35:16
**follows** 7:15
**footing** 90:13
**foregoing**
  141:3 143:4,6
**formal** 17:4,15
  18:5
**forty** 141:4
**forward** 10:3
  39:14
**four** 54:21,22
  106:17,20
  107:20
  122:19 124:7
  129:5,6,9,11
  129:16,20
  130:13
**Fourth** 2:12
**Frago** 12:14,15
  12:16 13:6
  14:5 15:14
  20:3,13 26:14
  26:17,18,19
  27:3,19 38:15
  40:15 46:21
  46:22 54:3,4
  55:21 57:7
  59:15 61:19
  87:13 91:5,11
  93:3,7,11,16
  94:8,12,19
  95:1,9 97:19
  98:3,6,21
  100:5,8,12,16
  105:22,22
  106:1,2,3,9
  107:14 108:2
  108:15,17,18

Sederis Fields
CONFIDENTIAL

**Frago's** 54:7
57:12 96:15
96:20 99:3
**frequent**
125:15
**Friday** 131:7,10
131:11,12
144:19
**friends** 122:9
122:12
**front** 132:15,19
**FSA** 74:2
**function** 39:12
39:18 54:3
85:6,14
**further** 50:14
140:7

— **G** —
**G** 6:1
**gall** 133:11
**gender** 11:16
103:13
112:16,18,21
113:6,8,17
114:1,6
**gender-based**
100:16 103:1
103:10,16
104:3,10,16
105:1
**general** 3:17
7:4 38:21
**gentlemen**
79:18 86:21
**Georgia** 36:4
**getting** 21:3
69:5 134:11
**give** 8:10 23:5
55:2 82:20
83:10 87:21
92:8,11,18
122:6
**given** 10:17
44:12 45:16

82:22 141:6
143:8
**giving** 48:7
**go** 9:8,9,15
10:15 13:19
23:18 24:7,9
36:10 38:5
45:21 48:4
49:4 50:15
51:17 62:14
66:3 74:6
77:8 80:7
82:18,19
91:19,20 93:1
93:20 97:4,5
99:20 122:16
122:22
123:21,22
124:2,18,21
126:9,13
127:3,11,12
127:12,15,18
127:22 128:2
128:4 130:4
130:10,20
131:3 134:10
135:4 137:11
**going** 9:17,21
10:2 33:6
36:7,18 38:22
51:12 56:17
59:18 62:14
66:20 90:1
91:8 93:2
97:2,3,7,11
110:20 111:1
117:7 121:21
122:1,10,10
123:9,18
126:8,15
128:15
131:17,21
135:1,5,9,17
136:3,7,19
137:9 138:2

140:19
**good** 6:2 7:6
7:20 36:3
114:12
**government**
38:5
**grade** 50:6,7
67:13 71:12
**granted** 74:2
**great** 119:22
**groups** 68:19
**GS** 50:8 73:3
**GS-0301-14**
24:20
**GS-11** 52:16,19
52:20 53:5
81:5
**GS-1165** 52:10
**GS-13** 11:10
45:10 46:20
50:12 51:4,11
52:17 53:9,14
67:15 70:16
72:1 73:3
106:19
**GS-14** 11:3,14
26:3 41:17
43:16 44:13
45:7,12 48:13
48:18 49:1,19
52:6 69:8
70:2 81:9
105:8 110:15
111:12
112:20 114:5
**GS-15** 44:6
56:6
**GS-15s** 43:13
**GS-301-13**
40:18
**GS-301-14**
44:14
**GS-7** 106:16
**guess** 79:22
84:4 106:6

119:21
**guessing**
123:4
**guidance**
57:11,16
59:15

— **H** —
**H** 4:11
**half** 19:22 61:3
**hallway** 95:20
**hand** 10:9
82:20 143:15
**handbook** 83:5
**handed** 10:10
**handle** 68:20
76:10
**handled** 81:10
**handling** 7:22
59:11
**happen** 27:16
**happened**
19:14 20:9
**happens** 47:2
**hardships**
139:2,3
**harm** 116:10
**health** 116:8,19
117:2,16
119:3,6,15
120:15
**hear** 96:4 98:2
98:19 100:4
101:1 139:19
**heard** 91:5
96:1,17,19
97:18 100:8
100:11,11,15
100:19,19
101:10,15,19
101:20
102:18,19,22
103:15 104:1
104:2,5,5,9,9
104:12,12,15

104:15,18,18
104:22,22
**hearings** 47:5
**hearsay** 91:7
95:8
**held** 2:7 67:17
68:8 73:17
74:13 144:6
144:19
**helped** 69:19
**Henault** 3:9 4:4
6:13,21,21
7:19,21 8:21
9:6,15 10:1
10:18 12:20
13:1 14:14,20
15:16,20
17:18,22
21:13,17 22:6
23:1,6,17,21
24:11,15 25:9
25:13 26:1
28:16,19 35:5
40:9,11 41:15
51:16 58:13
58:18,21 59:1
60:16 61:5,10
62:19 63:5
64:4 66:20
67:2,4,9 77:7
80:6 91:16
92:3,9,13,22
93:17,19,22
94:6 95:16
97:3,13 98:9
99:12,19
100:1 110:10
116:1 131:14
132:8 134:9
134:14,18
135:3,12
136:15 137:3
137:9,13,17
137:20 138:1
138:5,14,20

139:22 140:6 140:17
**hereunto** 143:14
**Herring** 98:8 98:11,12,19 99:1 100:3 101:7,8 102:15
**Herring's** 98:22 100:7
**Hewitt** 3:15 7:2 7:2
**HHK** 1:7 6:8
**high** 32:9
**highly** 31:18
**high-ranking** 60:5
**hired** 41:22 62:14 105:16 105:19 106:4 106:5,9 107:22 108:5 110:8
**history** 21:2 24:8
**hold** 51:8 57:12 57:17
**honest** 139:17 139:20
**hour** 66:21
**hours** 15:13 64:19
**house** 121:21 130:8
**HR** 39:12,18
**hundred** 141:3
**husband's** 124:19
**H-E-R-R-I-N-G** 98:13

**I**

**idea** 70:7
**identification** 15:19 17:21 21:16 23:4 24:14 25:12 58:17
**identified** 43:6 43:7
**identify** 6:19 116:8 117:14
**improper** 9:1 27:2,6 56:11 56:14 57:3,4 57:13,18 64:10,21 65:4 65:6,15 66:10 66:14 79:6 80:14 81:18 82:1 83:10,15 83:22 84:6,13 84:16,19
**inaccurate** 39:3
**inappropriate** 28:5 29:8 30:8,13
**incident** 101:11,17 102:16
**include** 20:4
**included** 10:12 20:11 99:15
**includes** 110:19
**including** 40:1
**Independence** 3:18
**ineligible** 40:13 41:17 48:12 48:17 52:6 53:18 57:8
**informal** 16:18 17:1
**informed** 15:14
**informing** 16:9 17:3
**initial** 13:2 27:3 27:20 28:1,6 28:12,22 29:10,14,17 30:9,20 31:5 35:8,13,16 86:7
**initially** 20:11 85:5
**inquiring** 35:4
**inquiry** 112:10
**instruct** 137:10 138:6
**instructed** 138:15
**instructing** 134:15 137:17
**interest** 143:12
**interested** 39:9
**interim** 47:8
**interpretation** 51:20,21 52:1
**interrogatory** 78:15 116:7 117:14
**interrupt** 20:17 42:16
**interrupted** 112:1
**interrupting** 42:18
**interview** 11:22 12:14,21 13:2 13:5,14,19 14:1,5,21 15:5,10 20:1 20:6,7,11,12 20:14,19 24:10 26:14 27:4,14,20 28:1,7,12,22 29:10,14,17 29:22 30:9,19 30:20 31:13 31:18 32:1,3 33:13,18,21 34:4,12,17 35:1,5,8,13 35:17,21 36:3 36:10,19 37:1 37:17,19 38:9 39:16,22 54:12,16,20 55:21 56:10 57:6 58:2,7 58:10 60:4,4 60:19 61:11 61:16,21 62:6 62:12,22 64:9 64:17,18 66:5 66:8,12 79:13 79:14,20 80:1 80:15 81:19 81:20 82:2 83:13,22 84:2 84:7,17,18 106:22 107:3
**interviewed** 12:10 13:15 15:12 20:5 31:13 34:1,14 35:18 36:20 55:6,8,12,16 63:13 64:15 65:2,5
**interviewing** 32:16 79:6 80:9,16 81:14 85:9
**interviews** 27:9 31:4,5,8,17 32:8 35:12 64:11,22 65:15 84:9
**investigated** 19:22
**investigation** 19:18,21 36:2 36:4 40:15 128:5
**investigator** 19:21
**invited** 126:17
**involved** 9:2 87:14
**involves** 10:19
**involving** 120:15
**issue** 11:3 25:3 40:4 48:13 140:9
**issued** 17:7
**issues** 8:20 116:19
**i.e** 144:15

**J**

**J** 3:9
**January** 12:4 18:13 23:10 125:18 126:2 126:4
**Jim** 106:10
**job** 1:22 12:18 31:12,16 32:4 33:19 37:7 38:13 41:5 43:7 49:11 52:12 53:20 53:22 71:15 74:20 75:21 76:18 77:9 78:17,19 79:2 79:3,4,8 80:19 82:4,17 86:18 89:7 90:3 111:9,10 142:10
**jobs** 11:2,2 31:15 32:3,5 34:1 37:4,4 38:4,8 67:17 77:2
**job-specific** 38:18

Sederis Fields
**CONFIDENTIAL**

**Johanns** 1:8
6:5 142:7
144:4
**John** 3:9 6:12
6:21 7:21
13:8,22 20:3
20:13 36:13
37:15 40:15
43:10 44:18
45:20 46:15
47:3,4,8 59:7
69:9 70:4
82:13 99:2
105:22
107:21 108:1
**Johnson**
106:19 107:8
**jokes** 100:13
100:21 101:4
**Jorge** 111:10
**Joyce** 98:16
**Jr** 3:9
**judge** 21:10,12
92:13 137:8
**judgment** 4:18
19:11 21:9
22:11,14,17
**July** 12:11,13
12:17,18,21
13:2,17 14:1
14:4,13,15,21
15:9,13 36:8
54:12 55:20
59:7,20 121:7
121:7,10
122:7 124:3
124:12
125:10,18
126:3,5 127:3
**June** 143:20

**K**

**keep** 121:20
144:13
**ken** 11:7 31:11

33:21 37:8,10
38:7 43:15,18
44:2,5,7,9
45:22 46:16
46:19 48:6
54:20 66:5
94:4,5 106:13
**Kidwell** 7:21
**kind** 69:19
77:12
**knew** 61:19
62:2,11,15,20
63:8,12,13,15
63:19 72:15
87:19 88:5,15
89:9
**knowledge**
50:16,18,22
77:13 101:16
102:9
**known** 114:12

**L**

**Las** 122:11
123:14,18
127:6,19,21
**law** 3:3 139:10
144:2
**lawsuit** 25:4
48:14 113:13
**leave** 8:1
130:15
**left** 46:18 47:8
**legal** 135:2
136:13
**letter** 4:14 16:5
19:18 21:3
**let's** 9:15 15:16
17:18 21:13
23:1 24:7,9
25:9 26:17
34:16 52:3
58:13,14
65:13 72:22
75:10 92:6,13

97:4 106:3
123:21
124:12,14
125:3 129:14
129:20
131:14 133:4
137:7
**level** 37:13
50:6,7,8,12
51:5 52:13
53:6 67:13
70:12,14,16
70:17 71:12
72:1,10 81:5
85:1
**life** 122:1,7
124:6
**limitation**
138:9
**Linda** 14:9 20:2
106:9,12
**line** 26:19
27:13 28:4
56:15,15 61:2
142:11
144:15,16
**list** 144:15
**listed** 107:11
107:13
**listen** 14:18
**listening** 49:4
95:22
**listing** 144:15
**litigation**
143:12
**little** 122:13
**loads** 69:17
**loan** 52:11,15
52:21,22 53:4
73:11 74:3
**local** 9:4
**located** 6:16
132:5
**lodestar** 136:9
**lodge** 16:18

**long** 15:9 37:22
69:21,22 70:6
129:7 130:22
**longer** 144:21
**look** 15:21 18:1
21:18 23:7
24:16 25:14
49:3,14 52:12
59:2,18 68:5
83:6 99:21
105:15 108:4
114:18
**looked** 40:16
**looking** 66:4
74:20 89:4
128:8
**loss** 139:4
**lot** 75:13 89:22
106:7 115:16
121:19 122:9
122:10
125:15
126:14 130:8
**lower** 50:6 53:6
70:12 71:12
**lumping** 106:6
107:16

**M**

**Madam** 67:6
**Madigan**
106:10
**maintained**
99:17
**making** 87:11
100:16,20
102:19,22
103:16 104:1
104:2,6,10,13
104:16,19
105:1
**male** 105:16
106:12,13,14
**males** 114:13
114:19

**management**
5:2,5 11:4,14
24:22 26:3
50:17 67:13
73:7
**manager** 63:13
87:6 115:13
**managers** 87:6
87:19,20
88:10,15
**manner** 30:21
35:1 144:14
**manners** 31:6
**March** 12:5,17
12:19 24:4
**marital** 121:15
**mark** 15:16
17:18 21:13
23:1 24:11
25:9 58:14
**marked** 10:11
15:19,22 16:4
17:21 18:2,4
21:16,19 23:4
24:14,17,19
25:12,19 26:2
49:16 58:17
**marks** 131:22
**married** 121:8
121:10
**material** 84:12
84:16,18
**materials**
81:19 84:1
**matter** 6:4
136:8 144:6
**ma'am** 8:11
10:10 15:22
18:2 21:18
23:7,18 24:16
25:14 26:8,11
31:1 49:14
50:7 51:8,13
51:17 53:8
58:19 59:2

Sederis Fields
**CONFIDENTIAL**

Page 154

| | | | | |
|---|---|---|---|---|
| 62:16 66:3 | 118:21 119:3 | **move** 126:19 | 54:21,22 55:2 | notarial 143:15 |
| 67:2 78:5 | 119:6,15,15 | 138:8 | 107:11 | notary 2:16 |
| 80:7,21 82:12 | 119:19 | **moved** 52:20 | nationwide | 7:15 143:1,18 |
| 83:19 86:12 | 120:15,19 | **moves** 140:9 | 43:1 | note 8:21 |
| 87:20 88:1,22 | mention 37:1 | ——— | Native 102:4,7 | notice 2:15 |
| 89:21 91:11 | 37:15,18 38:9 | **N** | 102:18 | 17:3,7,12 |
| 91:14 92:4,6 | mentioned | N 4:1 6:1 | Nebraska 42:3 | 42:9,22 43:2 |
| 93:1,20 94:11 | 37:15,16,21 | Nagar 3:15 | 42:14 | 43:3 |
| 94:17 95:4,12 | 139:12 | Nagel 11:7 | necessary 10:6 | noticed 40:14 |
| 95:14,19 96:5 | merit 2:16 | 31:11 32:16 | 71:8 144:14 | notices 42:22 |
| 96:8,13,22 | 20:15 32:3 | 37:8 40:2,12 | need 46:11 | 47:4 |
| 97:16 110:4 | 58:4 82:5,8 | 41:1,16,21 | 58:7,10 60:5 | notified 13:17 |
| 111:2 112:9 | 82:17,21 83:2 | 42:12 43:9 | 60:10,20 | 36:9 |
| 113:6 118:1 | 83:6,9 | 44:5,10 45:2 | 66:21 77:14 | notify 58:5 |
| 121:8 125:20 | merits 22:5 | 45:16 46:6 | 77:14 112:10 | November |
| 126:2 129:3 | 23:16 | 47:21 48:11 | 136:4 137:7 | 17:12 18:7,16 |
| 132:9 134:7 | met 85:9,16 | 48:12 55:11 | needs 131:15 | number 6:3,8 |
| 135:13 | method 144:12 | 66:17 67:14 | Neha 3:15 7:2 | 10:14 19:16 |
| 136:16 138:2 | Miami 123:12 | 68:11 69:22 | neither 143:10 | 58:5,18 97:6 |
| 139:14 | Mike 1:8 6:5 | 70:10 72:9,17 | network | 132:1 140:21 |
| mean 49:13 | mind 144:13 | 78:16 81:3,8 | 114:13 | 144:15 |
| 52:20 62:13 | mine 43:5 | 82:14 84:14 | never 73:17,19 | ——— |
| 82:11 96:10 | mini 19:20 | 85:15 86:7 | 74:13 76:9 | **O** |
| 117:4 | minimally 86:8 | 87:11,15 88:6 | 126:20 133:8 | O 6:1 |
| means 30:5 | 87:12 88:7 | 88:12,16 | new 56:17 | oath 8:8 94:18 |
| 70:22 82:18 | 89:13,17,20 | 89:13 90:12 | 80:11 93:18 | 94:22 95:4 |
| 137:11 | 90:22 | 105:8 109:15 | 118:6 125:16 | 96:9 |
| medical 116:14 | minimum | 110:14 112:6 | 125:18 129:4 | object 8:19 |
| 116:14 | 39:19 49:18 | 112:20 | nonfederal | 136:3 |
| 117:20 | 54:8 85:4,10 | 113:14 114:4 | 42:2 | objected 10:2 |
| 118:16 120:6 | 85:16 | Nagel's 34:3 | nonprofessi... | 135:15 |
| 120:9,17 | minute 9:9 | 41:4 43:4 | 75:22 | objecting |
| 121:1 132:22 | 106:1 119:2 | 44:15 45:9 | non-selection | 135:18 137:6 |
| 133:16,21 | 135:4 | 69:5 | 10:21 | objection 8:14 |
| medication | minutes 9:16 | name 6:21 7:2 | non-selections | 9:7,10,11 |
| 118:7 | mischaracte... | 7:6,20 52:4 | 10:20 | 14:12 22:2 |
| meet 19:17 | 60:12,15 61:1 | 54:20 55:3,4 | normally 38:16 | 23:13,13 40:7 |
| 85:4 | missing 131:8 | 55:14 62:8 | 122:15 | 41:13 51:14 |
| meeting 39:19 | moment 20:18 | 92:7 96:6 | North 124:18 | 60:11,14,22 |
| 71:1 102:3,12 | 97:5 | 98:12 107:10 | 124:20 129:6 | 62:18 63:1 |
| meetings | monitor 6:10 | 142:7,8 | 129:19 130:1 | 77:5 80:4 |
| 72:12 | month 130:6,7 | named 14:9 | Northwest 2:11 | 93:14,14 98:5 |
| memory 33:5,6 | months 70:3 | 15:3 46:16 | 3:4,11 6:11 | 99:9 134:8 |
| mental 116:20 | motion 19:11 | 59:6 143:5 | 6:17 132:3,6 | 137:4,13 |
| 116:21 117:2 | 21:9 138:10 | names 20:2 | 142:2 144:2 | observer 20:4 |

20:10 29:20
30:2,6 58:7,9
58:12 65:7,13
**occurred** 116:3
**October** 17:7
144:20
**offer** 115:3
**offhand** 108:16
**offhanded**
100:2
**office** 2:10 3:3
3:10,17 6:13
7:1,3,22
15:14 18:15
18:17,18,18
36:1,15
111:19
119:20
135:19 143:4
144:2,8,17
**offices** 2:8
**official** 16:10
20:12 26:22
27:14 45:22
46:1,13 58:9
60:20 61:12
61:17 93:8
103:4
**officially** 9:2
**officials** 79:6
**oh** 23:9 110:22
113:8 117:15
124:20 128:7
128:13 129:1
129:4 130:5
136:14
**old** 103:6
114:12
**once** 32:16
123:12 125:5
130:5,7 131:9
**operation**
43:11 47:7
68:16
**operations**

43:12 46:16
70:5
**opined** 120:9
120:18 121:1
132:22 134:2
**opinion** 75:11
94:20
**OPM** 37:4,14
53:1 74:2
75:20
**order** 4:18,19
8:5 22:11
23:11 36:8
48:22 49:11
92:14 99:11
99:13,16,21
138:8,11
140:9
**organized**
121:20
**original** 48:10
144:18,19
**outcome**
143:13
**outside** 49:11
53:22 77:4,9
78:17 79:7
82:4 92:16
**outstanding**
120:1
**o'clock** 15:12
64:16,17

——— **P** ———
**P** 6:1
**package** 40:20
41:4 131:11
**page** 4:3,13
12:1 50:2,2,3
70:19 71:5
142:11
144:15,16
**pages** 1:11
141:4
**paid** 135:2,19

135:22
136:13,21
138:16
**panel** 20:12
26:14 27:11
27:14 28:7
29:21 30:6
39:17,17,22
56:10,18,22
57:6,13,18
58:11 61:14
62:5 79:15,20
80:1,9,15
81:14,19 82:2
83:13,22 84:7
84:13,17,18
85:9 103:2
106:16,22
107:3
**panels** 58:8
89:22
**part** 41:22 47:3
77:3 124:17
**participant**
28:1 29:17
**participants**
14:4 15:2
55:20
**participate**
27:3 28:6
29:9 30:8
57:8
**participated**
28:21 54:12
61:16
**participating**
27:20 28:12
29:14 56:21
**participation**
56:10 57:12
57:17,18
**particular**
126:18
**parties** 143:11
**party** 47:8,9

**Patrick** 11:7
**pattern** 105:15
108:22
109:13 112:3
113:4 114:19
116:2 122:14
127:9,10
128:9
**pay** 132:11,15
132:17,19
138:21 139:8
**penalty** 94:22
95:5,17 96:9
96:14,19 97:1
**people** 12:13
13:5 15:3
27:10 40:3
47:14 60:5
61:14,18
63:13 68:21
74:8 75:15
76:13,13
80:22 87:7
92:5 93:12
94:18 95:1,5
96:7 97:17,18
97:22 100:12
103:6 105:16
105:18 106:4
106:7 107:18
108:3,21
109:10 110:8
111:7,8,9
123:6
**perform** 75:3
76:14,21 77:2
77:11 78:8,12
81:3
**performance**
40:18 120:1
**performed**
44:16 45:7
47:5 52:14
68:11 69:8
70:2,11 71:21

72:7 73:19
74:18 79:7,19
80:17 81:7
82:3 83:15
**performing**
45:10,12 46:7
49:8 69:6,14
70:1,10 72:13
78:4 81:8
82:7
**perjury** 94:22
95:5,17 96:9
96:14,19 97:1
**permissible**
27:15,17
**person** 18:19
27:10 38:17
60:6 61:14,20
62:3,12,21
64:9 70:2
77:17 80:2,10
80:13 81:10
82:16,20
83:17 85:22
86:10,15,17
86:17 87:7
91:22 95:12
97:22 109:2,5
119:9 121:20
**personally**
27:11
**personnel**
20:15 27:18
28:10 29:12
31:22 32:15
38:16 39:9,12
39:18 41:8
46:12 54:3,8
56:20 57:10
57:16 58:5
59:11,13,14
69:15,17
75:18 76:17
81:17,22 85:5
85:11,14,22

Sederis Fields
CONFIDENTIAL

Page 156

| | | | | |
|---|---|---|---|---|
| 86:18 87:5 | **portion** 4:7 | 67:22 87:16 | 128:21 133:8 | 52:20 67:15 |
| **personnellist** | 91:20 99:9,14 | 108:7 | 135:13 | 67:16 68:6,7 |
| 90:2 | **position** 10:21 | **possibly** 36:20 | **privilege** | 68:21 69:2 |
| **Philadelphia** | 11:3,6,10 | 45:19 63:16 | 134:15,17,21 | 72:14 73:13 |
| 124:21,22 | 12:3,8,11 | 126:1 | 135:16 136:4 | 73:15,20 |
| 125:1 129:5 | 15:7,11 24:20 | **potentially** | 138:17,19 | 74:19 75:7,10 |
| 129:15 | 24:21 26:4,7 | 77:1 140:11 | **privileged** | 75:11,12,14 |
| **Philly** 129:14 | 26:22 31:12 | **power** 120:4,5 | 135:1 138:18 | 75:15 76:3,4 |
| 129:17 | 31:14 32:4 | **practical** 77:15 | **probably** 16:16 | 76:5 77:2,21 |
| **phone** 91:18 | 38:19 39:20 | **practices** | 85:22 88:13 | 89:3,6 |
| 92:14 97:4,6 | 40:13,21 | 50:20 | 107:9,21 | **programs** 29:7 |
| **pile** 90:5 | 41:10,18 42:5 | **precludes** | 124:22 133:7 | 43:7 75:13,14 |
| **place** 125:2 | 42:21 43:4,19 | 33:12 | **problem** 133:8 | 75:16 76:7 |
| 126:16 | 44:9,16 45:9 | **prepare** 76:6 | **problems** | **prohibit** 28:11 |
| **placed** 8:8 | 46:22 47:11 | **present** 3:22 | 119:7,16 | 31:22 32:16 |
| **places** 122:1 | 47:11 48:9,13 | 6:18 7:8 | 121:16 | 56:21 |
| 122:20 | 48:18 49:11 | 60:10,21 | **procedural** | **prohibiting** |
| 127:11,12 | 49:12,20 52:7 | 61:20 62:3 | 21:2 24:8 | 27:19 29:13 |
| 128:21 | 52:22 55:16 | 64:9 111:2 | **procedure** 9:5 | **project** 106:11 |
| **Plaintiff** 1:6 3:1 | 56:7 59:12 | **presented** 41:7 | 38:16 138:6 | **promote** |
| 7:7 134:19 | 63:16 64:6,20 | 81:19 83:14 | **procedures** | 114:13 |
| **plan** 20:15 | 67:13 68:8 | 84:1 | 37:14 50:18 | **promoted** |
| 82:21 | 69:2,5 71:1 | **presumably** | **proceed** 7:17 | 37:12 38:17 |
| **planning** 50:18 | 73:6,9,17 | 80:9 | 8:20 9:22 | 48:17 49:19 |
| **please** 6:18 | 74:13 75:22 | **presume** 40:3 | 19:20 97:12 | 52:6 106:13 |
| 7:10 9:16 | 76:1 77:2,21 | 85:9 138:10 | 132:7 135:11 | 106:14,15,19 |
| 15:17,21 | 78:20,21 | **presumption** | **proceedings** | 107:6,18 |
| 17:19 18:1 | 79:16 80:11 | 40:10 | 22:3 23:15 | **promotion** |
| 21:14,18 23:2 | 82:18 88:17 | **prevail** 136:8 | **process** 11:21 | 20:15 32:3 |
| 23:7 24:16 | 90:8 105:8 | **previously** | 11:22 24:10 | 38:21 39:1 |
| 25:10,14,21 | 106:11 107:1 | 7:22 26:13 | 36:8 38:21,21 | 40:4,4 43:20 |
| 31:3 48:4 | 109:3 110:15 | 45:6 47:21 | 39:1 59:16 | 48:13 52:18 |
| 49:14 59:2 | 111:12,13,20 | 66:16 67:18 | 62:6 | 53:19 58:4 |
| 64:2 75:9 | 111:21 112:6 | 69:7 70:1 | **produce** | 69:6 73:4 |
| 82:12 93:22 | 112:20 113:1 | 80:17 81:10 | 117:12 | 82:5,9,17,21 |
| **point** 19:5 | 114:5,9 | 94:17,21 | **professional** | 83:2,6,9,11 |
| 59:18 63:18 | 134:18,22 | 97:16 | 120:6,9,17 | 89:10 90:10 |
| 63:18 91:4 | 138:19 | **prior** 10:1 38:1 | 121:1 132:22 | **pronounces** |
| 110:18 111:3 | **positions** | 44:16 45:9 | 143:3 | 28:18 |
| 117:6 | 10:22 11:15 | 53:8 54:3 | **professionals** | **proof** 88:20 |
| **pointed** 53:13 | 25:3 31:19 | 64:6 67:12 | 133:22 | **proper** 30:15 |
| 70:20 | 32:1,12,17 | 68:18 69:5,5 | **program** 11:10 | 30:17 79:19 |
| **policies** 50:17 | 33:14,17 | 70:10 87:9,10 | 29:4 32:6 | **protective** |
| **political** 46:22 | 34:15 42:8,11 | 97:15 118:11 | 37:8 42:4 | 99:11,13,16 |
| 47:14,17 48:1 | 43:4 66:18 | 125:14 | 43:5 50:19 | 99:20 138:8 |

Sederis  Fields
CONFIDENTIAL

138:11 140:9
provide 100:3
  100:4 144:10
provided
  144:12
provider 119:3
providers
  116:9 117:2
  117:16
provision
  53:12 99:12
provisions
  136:10
Public 2:16
  143:1,18
purpose
  144:13
pursuant 2:15
  8:5 99:10
put 51:20 90:4
  117:3
p.m 2:5 9:19,20
  97:9,10
  131:19,20
  135:7,8
  140:22

_____
      Q
_____
qualifications
  85:16 86:19
  109:9
qualified 31:18
  32:10,10,11
  32:12 38:4
  39:14,19 40:3
  42:10 80:2,10
  81:1 86:8,21
  87:8,12 88:7
  89:13,17,20
  90:22 105:8
  105:12
  109:14 112:5
  113:1 114:8
  114:14
qualify 37:12

42:5,11 48:8
49:1,12 69:1
73:22 74:5
90:7,9
qualifying
  42:10
question 14:19
  21:6 23:19
  31:3,11 37:20
  38:20 44:8
  48:10 51:8,13
  51:18 57:9,15
  61:8 62:1,16
  62:17 64:2
  65:8,10,12
  66:4 74:12
  80:8 83:19,20
  84:5 91:21
  93:18,21 94:1
  103:15,21
  110:6,9
  112:17 113:9
  113:10,11
  115:22
  119:11
  135:17
  136:19 137:5
  137:21
  140:12
questions 10:8
  31:10 33:20
  33:22 34:2,7
  34:9,20 65:18
  66:6,7,8
  140:7,13
quick 64:18
  66:21 131:15
quite 81:6
  117:7 124:18
  124:19,21

_____
      R
_____
R 6:1
race 11:15
  89:21 93:13

94:9,13 105:6
105:14
109:19
110:16
112:17
113:11,16
race-based
  100:13 101:4
racial 91:6,12
  113:22
racially-based
  100:21
  101:21 102:2
  102:20 104:6
  104:13,19
racism 100:9
racist 92:1 93:3
  93:16 95:2,10
  96:16,20
  97:19 98:3,6
  99:3,7
  100:5
raise 8:20
Ramirez 13:10
  26:15 28:21
  29:2,9,13
  54:4 104:5,6
  104:10
range 76:2
ranked 40:17
ranking 39:17
rate 31:18 32:9
rated 40:15
rating 39:17
  40:18
read 50:14
  60:13 61:2
  71:5 94:2
  140:15 141:3
  144:9
reading 144:21
ready 25:15,17
  59:3,4
real 131:15
really 27:9

46:11 88:10
111:18
126:21
reask 113:10
reason 8:10
  29:9 48:17,20
  52:6 57:7
reasons 47:12
  53:18
reassign 49:7
reassigned
  43:14,16,18
  46:18 47:13
  69:10 106:9
  106:11
reassigning
  47:21,22
recall 123:18
receipt 22:19
  24:3
receive 16:14
received 17:3
  17:11 19:2
  23:22 40:1
  45:3 78:17
  85:10 116:9
receives 39:17
receiving 54:5
  67:12
Recess 97:9
  131:19 135:7
recollection
  36:16
reconsiderat...
  4:20 22:21
  23:12
record 8:14,22
  9:8,16,17,19
  9:21 10:7
  97:5,7,11,14
  108:5 131:17
  131:22 135:4
  135:5,9 136:9
  140:19 143:7
records 54:19

117:11
record's 42:19
recover 139:11
reduced 143:9
referred 16:10
  118:21
refused 20:1
regard 88:11
regarding
  63:11 87:3
  89:1
Registered
  2:15 143:3
regulation
  33:17 57:3,16
  58:3
regulations
  27:19 28:11
  29:13 30:1,3
  31:22 32:15
  50:19 53:1
  56:20 57:11
  81:18 82:1
rejected 120:4
  121:19,22
rejection
  119:18
  120:15,19
  139:16
relate 33:18
  118:3
related 75:12
  84:14 102:16
  120:11
  143:11
relating 84:19
  136:17
relations
  101:11
relevant 22:3
  23:14 79:15
relied 59:15
rely 119:9
remark 100:2
  101:4


Sederis Fields
**CONFIDENTIAL**

Page 158

remarks
100:13,17,21
102:4,5,20
103:1 104:3,7
104:10,16,19
105:2
remember
81:11 102:8
108:13,16
123:8,17,20
124:5,6,15,15
124:16 126:4
126:8,10,11
128:1
removed
133:11
reopen 140:11
repeat 51:18
80:8 91:8
93:22
repercussions
116:14 139:5
rephrase 57:9
113:9
report 40:14
Reported 1:21
reporter 2:16
5:9 6:15 7:7
10:9,17 58:20
67:7,8 94:2
139:19 143:1
143:3
represent 6:19
7:7
representative
22:20 58:10
60:20 61:12
61:13 62:5
reprisal 119:21
119:22
Republican
47:10
request 4:20
6:12 22:21
23:11

requested 94:2
144:5
require 51:10
required 52:15
61:20 62:2,5
62:6,12,21
80:3
requirement
49:5 138:7
requirements
39:20 49:18
49:19 68:20
71:1 85:5,10
requires
138:13
resolved 16:22
19:4
resolving
45:22 46:1,12
respect 116:10
respond 21:5
64:2
responded
116:11
117:17
responds 60:9
response 61:4
78:14 116:7
117:13
responsibiliti...
44:20,22
responsibility
86:19
responsible
69:16
restate 31:3
result 118:13
121:2 134:3
resumed 9:20
97:10 131:20
135:8
retained 5:9
returned
144:17
review 41:8

144:6,13,13
reviewed 78:20
reviewing
88:18 144:21
reviews 39:13
revise 144:14
Richmond
124:19,19
130:4,5,5
Rick 107:9,9,9
107:10
right 8:7,9 11:5
13:9 14:2
17:4,9,13,14
18:10 19:8
20:5,20,21
21:2 22:17,21
26:15,16 28:2
30:18 32:18
33:2,4,4,10
34:11 35:8,13
39:11 40:22
44:11 45:11
49:21 50:14
51:2 52:19
54:9,10 55:7
55:10 56:3
59:8 60:3
65:3 71:9,12
71:16,19 72:2
73:12,13
74:16 77:16
80:3 91:1,1
96:3 98:7
105:20 107:5
108:16
109:12,16,21
111:22 112:1
112:8 113:7
113:18
114:10
116:12
117:18
118:11
119:14

130:14,17,18
133:13 134:1
135:3 137:2
rights 18:19
38:2 75:19
78:2,4
ROI 34:8 41:22
88:18
Room 3:18
rules 9:4,4
27:19 28:10
29:13 31:21
31:22 32:15
56:20 57:10
57:16 58:2
81:17,22
138:6,8,12
140:10
ruling 136:5
run 11:21 21:1
24:8
rush 64:16

———— S ————
S 4:11 6:1
Salomon 20:4
20:12,12
28:21
Sara 1:21 2:15
6:15 143:3,18
sat 89:22 103:2
106:15
satisfy 87:18
87:20 88:10
satisfying 87:5
88:19,21
Saturday 131:3
131:4,12
saying 33:16
44:9,15 48:6
50:10 89:2,2
92:18 96:1
102:3,6
110:20 116:2
says 30:5

49:22 50:21
51:22 60:18
61:6 71:10
Schaal 3:22
6:14 132:2
scheduled
8:16
score 32:9
seal 143:15
Sean 13:12
second 8:15
9:7 14:1,21
20:7,14 28:4
34:17 35:12
36:18 37:1
38:9 47:19
54:12,16,20
55:6,9,12,16
56:15 57:6,13
57:18 58:2,6
58:14 59:19
60:14,18
61:11,16,21
62:3,12,21
64:9,11 66:5
73:1 84:16,17
133:5
secretaries
103:3
secretary 1:8
106:16
section 33:3,5
33:7,12
Sederis 1:5,15
2:7 4:3 6:4,4
7:12 132:2
140:20 141:2
141:13 142:8
144:1
see 25:8 34:8
38:4 52:11
59:22 69:20
119:3 124:14
129:20
139:21 140:1

Sederis Fields
CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| seeing 72:19 | series 32:5,13 | 141:8 144:17 | 34:17 35:1 | spiritual 119:9 |
| seek 116:18 | 37:2,3,5,5,6,6 | 144:17 | 53:3 55:3 | 119:9 |
| seeking 117:9 | 37:12,22 38:3 | signing 144:21 | speaks 51:15 | spouse 121:12 |
| 117:19 118:8 | 38:4,6,17,18 | sir 134:14 | specialist 5:3,6 | 121:15 |
| 118:16 119:5 | 40:22 41:5 | 137:3,9 140:5 | 11:4,11,15 | spread 124:8 |
| 132:17 139:9 | 42:22 44:1,2 | sit 32:14,20 | 24:22 26:4 | 124:11 |
| 139:14 | 44:17 46:10 | 56:18 | 37:7,9 42:4 | Springer 47:6 |
| seen 16:2 | 46:11 50:8 | six 107:20 | 52:11,21,22 | 47:7 |
| 21:21 22:7 | 51:7,11 53:6 | small 106:10 | 59:11,14 | staff 43:13,14 |
| 23:8 117:1 | 53:20,22 | social 122:1,7 | 67:13,16 68:4 | 47:3 72:12 |
| seldom 27:12 | 67:15 68:19 | 124:5,6 | 68:6,7 73:7 | stage 17:1 |
| selected 11:13 | 74:2,4,9,10 | solely 64:5 | 73:13,15,20 | stamp 18:21 |
| 15:6,10,15 | 74:11 90:1,2 | 109:1 | 74:19 76:3 | stamped 19:3 |
| 16:11 56:6 | 90:6,8,18 | Solomon 13:10 | specialists | standing 98:1 |
| 66:18 103:2 | served 50:1 | somebody | 44:4 56:8 | start 8:13 |
| 105:14 109:2 | 51:4,10 | 93:15 96:11 | specialized | 26:17 44:19 |
| selectees 11:6 | Service 6:16 | sorry 35:10 | 49:2,5 50:4 | 46:2 75:10 |
| 84:8 | 74:5,10 | 42:15 52:3 | 50:11 70:17 | 92:6 106:3 |
| selectee's 52:4 | 115:13 132:5 | 67:6 110:9 | 71:7,10 77:14 | 129:14 133:6 |
| selecting 16:10 | SERVICES | 139:19 | 77:14 85:2 | started 10:8 |
| 26:22 27:13 | 142:1 | 140:18 | specific 33:3 | state 6:19 8:14 |
| 60:19 61:12 | set 65:13 138:9 | sorts 139:13 | 33:18 53:2 | 30:1,3 57:11 |
| 61:15,17 93:7 | 143:14 | sound 17:9,13 | 63:17 71:14 | 69:18 83:13 |
| 114:19 | settled 101:14 | sounds 88:19 | 76:2 80:12 | 99:8 136:8 |
| selection 53:8 | seven 107:20 | 88:21 | 82:14,17 | stated 58:8 |
| 58:9 84:7 | SF 40:19 41:3 | Southwest | 83:17 123:9 | 60:15 96:14 |
| 87:14 103:3 | sheet 54:21 | 3:18 | 126:16 138:9 | statement 88:9 |
| 108:20 | 55:1,13 141:7 | Spalding 11:7 | specifically | 89:1,7 |
| 110:14 | 142:6 144:11 | 34:19 40:2 | 52:11 53:4 | states 1:1 6:6 |
| 112:19 | 144:15,16,17 | 52:4,5,10 | 63:7 69:2 | 33:17 62:4 |
| 113:14 114:4 | short 44:19 | 53:9,18 55:3 | specifics 20:18 | 69:18 82:5 |
| selections | 60:4 | 55:8 66:13,17 | 24:9 36:5 | stating 57:3 |
| 108:9 | shot 28:15,18 | 72:22 73:2 | 37:9 42:6 | 81:18 82:1 |
| sending 46:2 | 28:20 | 74:18,22 | 88:2 122:6 | statistician |
| sends 39:13 | show 47:4 | 78:16 84:19 | specified 32:4 | 108:20 |
| sent 19:18,19 | 54:20 55:13 | 85:16 86:8 | 32:4 | 114:16 |
| 19:21 21:3 | showed 44:3 | 87:12,16 88:6 | specify 32:18 | statistics |
| 58:6 | 55:14 | 88:7,12,16 | 33:1 | 115:16 |
| sentence 61:6 | showing 44:4 | 89:13 90:12 | speculation | stenographi... |
| separate 31:15 | shows 40:20 | 105:9 106:14 | 40:8 41:14 | 143:9 |
| 31:16,17 32:1 | sign 140:15 | 109:15 | 63:7 77:6 | STENOTYPE |
| 32:5,8,17 | 144:9 | 110:14 112:6 | 80:5 | 143:1 |
| 33:13,16,20 | signature | 112:20 | spell 98:12 | steps 144:20 |
| 68:18 123:6 | 142:22 144:7 | 113:14 114:4 | spelled 28:17 | Steve 3:22 6:14 |
| separated 90:2 | signed 18:7 | Spalding's | 32:2 33:15 | 132:4 |

Sederis Fields
CONFIDENTIAL

Page 160

sticks 36:22
stomach 117:5
stop 47:19
  58:13
stopped 124:5
Stoval 115:6,7
  115:8,11,18
Street 2:11
  3:11 6:11,17
  132:3,6 142:2
stress 117:6
  121:4,5 133:1
stressed 118:4
strictly 76:4
strike 91:10
submit 39:9
submitted 26:7
subsequently
  144:18
subtle 119:21
successful
  132:10
suffered
  119:16
suffice 31:13
suggested
  21:11
Suite 3:4 142:3
  144:3
summary
  19:11 21:9
  22:17
Sunday 131:12
supervise 56:7
  72:17 74:21
  115:12
supervising
  108:15
supervisor
  26:20 27:13
  28:4 56:15,15
  56:17 98:22
supervisors
  119:21
supervisory

56:7
support 100:3
  100:4 105:13
  111:2,5 115:3
supported
  88:11 114:7
supports
  109:17
  110:13
  114:21
supposed
  33:22 87:20
supposedly
  47:2
sure 11:22
  14:17 32:2
  42:19 55:3
  67:11 83:7
  103:22 123:5
  127:4,5,7,17
suspended
  101:13
swear 7:10
sworn 7:14
  143:6
S-T-O-V-A-L
  115:9

— T —

T 4:11
Tail 88:16
take 9:13 15:21
  18:1 21:18
  23:7 24:16
  25:14 57:9
  59:2 90:6
  124:13 126:6
  126:7 127:15
  130:15
  131:14
taken 6:11
  45:18,19
  47:20 79:1,3
  97:9 131:19
  132:2 135:7

143:5,9
talk 34:16 52:3
  72:22 91:16
  92:9,15 95:21
  111:6,8
  124:12 125:3
  133:4
talked 67:10
  103:4 112:4
  133:21
talking 31:2
  35:7,11,12
  45:17 47:20
  59:22 71:7,13
  71:14 78:1,3
  78:4 82:14
  89:5 99:1
  103:6 110:2
  113:6 128:6
  129:8,17,22
tally 54:21,22
  55:13
tangent 48:11
tape 131:15,18
  132:1
target 82:16
  83:10
targeted 43:19
  89:9
task 144:8
Taylor 4:15 5:8
  59:7,10,14,20
  60:3,9,18
  86:2,3,5,6
  87:9,14 88:5
  88:15 89:12
  90:11 91:3
Taylor's 90:15
tell 32:15 35:17
  39:2,3 47:11
  49:22 50:15
  59:3 91:14
  100:20 101:8
  101:20
  117:22

136:12
telling 83:14
  96:13,18,22
  112:2
tells 82:3
tend 114:13
testified 7:15
  93:15 94:17
  94:21 95:4
  97:16 112:22
  114:8
testify 97:21
  110:7,21
  111:4,5
testimony 8:11
  77:19 78:7,10
  81:2,8 88:18
  105:7,11
  107:17
  109:13,13
  112:5,11
  115:3,5 127:2
  128:20 141:4
  141:6 143:8,8
text 33:9
thank 52:2
  58:21 60:17
  107:7 140:16
thing 36:22
  38:15 40:14
  45:20 65:6
  89:2 95:20
things 90:1
  110:21
  119:19
  121:21
  122:12,13,15
  125:9 126:14
  126:17,18
think 9:3,13
  31:19 32:2,7
  34:8 38:15
  41:22 51:19
  52:16,21
  54:22 63:12

66:5 87:1
  92:1 94:20
  95:1,7,9
  96:15,20 98:5
  98:7 99:19
  103:3,21,22
  107:20
  108:12
  110:18
  111:18 118:2
  127:16 135:3
  136:11
  139:12 140:6
  140:15
thinking 123:6
thinks 100:5
Third 6:11
  132:3
thirty 144:6
thought 14:13
  65:12 96:17
three 56:17
  61:14 89:19
  92:5 94:18,22
  95:5 97:17,18
  98:18 106:16
  106:20
  107:20 117:8
  131:8
Thursday
  131:7
ties 38:2
time 6:10 9:22
  11:9 12:10
  26:19 29:3
  44:3,19 45:2
  45:17 46:14
  52:17 55:6,9
  55:12,16 62:7
  70:4 72:11
  73:3 98:15
  108:14,15
  124:9,10
  126:12,14,18
  126:19

Sederis Fields
CONFIDENTIAL

127:13 129:8
131:3,10,22
140:6,13
144:5,20
**timely** 12:6
22:21
**times** 121:19
122:11,16,22
123:3,22
125:1 128:21
129:5,6,15,16
129:21
**title** 24:21
**today** 8:2,4,11
32:14 75:7
121:12,15
122:8
**Today's** 6:9
**told** 13:15,21
15:6,10 36:12
64:19 87:15
91:7,9,11
92:20,21
93:15 94:18
95:1,5 96:15
97:17 101:3,6
102:1 118:5
128:8
**top** 13:18 36:9
36:19
**total** 140:21
**trained** 46:1
**training** 43:22
**transcript**
10:13 99:10
143:7 144:6,9
144:10,12,18
144:19,21
**transcription**
141:5
**transpire** 35:22
**travel** 64:15
127:11
**traveled** 20:9
**treated** 93:11

94:4,8
**treatment**
116:9
**Treese** 14:9
20:3 56:3,5
56:21 57:21
62:9,20 63:8
63:11 104:19
105:1 106:9
106:12
**Treese's** 56:9
**trip** 36:21
123:13
130:13
**trips** 125:16
129:7,8
130:22
**true** 141:5
143:7
**truth** 96:14,18
96:22
**truthful** 8:11
**try** 74:9
**trying** 21:1
80:1
**twice** 123:2,4
129:5 130:21
131:13
**two** 10:19,22
11:2,2,14
28:8 31:15,15
31:16 32:1,5
32:8,17 33:13
33:16 34:1
61:18 68:19
86:20 89:9
92:5 93:1
94:18,22 95:5
97:17,18
102:14,15
107:19
111:19
113:16 117:8
123:3,6,6
132:1 140:21

144:8,20
**two-interview**
76:1
**type** 77:21
136:5
**typewriting**
143:10
**typically** 78:21

_____ **U** _____
**uh-huh** 8:7
12:22 17:6
21:20 23:9
24:18 25:18
40:22 41:2
46:8 55:7
71:3,9 86:4
96:3 107:5
109:4 111:13
115:8,10
128:10
129:11
130:17 131:6
140:5
**ulcer** 118:6,15
121:2 133:1,4
133:6,15
**ulcers** 117:4
120:22
**ultimately**
26:21
**unacceptable**
82:6,11
**unbeknown**
20:14
**undermining**
43:17
**understand**
65:8 93:17
96:8 128:19
**understanding**
33:6,11 38:22
48:3,5 64:6
114:7
**understands**

38:16
**unfair** 48:6
49:12 78:2
80:18,21
81:13,16 83:1
**union** 79:2
**United** 1:1 6:6
**unusual** 27:5
28:8 37:11
64:18
**upper** 82:20
**upset** 117:5
**use** 30:5
**usually** 27:9
38:17 46:10
60:19 90:7
118:4 122:13
127:12,12
131:2
**U.S** 1:9 2:10
3:10,16 6:5
6:13,22 7:3,5
16:5

_____ **V** _____
**v** 142:7 144:4
**vacancy** 5:1
24:20 25:2,6
39:6 49:17
51:9
**vacation** 128:7
128:9
**vacations**
122:10,11,19
124:7,13,16
126:6 127:14
128:6
**various** 30:20
31:5 122:12
126:17
**Vegas** 122:12
123:14,18
127:6,19,21
**versus** 6:5
**video** 132:1

**videographer**
3:22 6:2,14
7:9,17 9:17
9:21 97:11
131:17,21
132:4 135:5,9
140:18
**videotape** 1:15
2:7 6:3
**videotaped**
8:17,18,19
**videotapes**
140:21
**violates** 20:15
83:2
**violating** 82:20
**violation** 9:4
31:20 45:14
82:8
**Volume** 1:10
**vs** 1:7

_____ **W** _____
**wait** 60:14
106:1 136:2
**waive** 136:4
137:2
**walked** 35:20
**want** 42:19
67:11 70:18
79:13,14
80:10,12 88:1
88:1,10 91:16
91:17 92:7,9
93:2,10 94:3
94:7 97:5
99:9 106:6
111:8 112:17
113:22 136:4
137:1 138:14
**wanted** 24:8
80:12 87:15
88:15
**wanting** 127:10
127:11

Sederis Fields
CONFIDENTIAL

Page 162

wants 87:6
Washington
  1:17 2:13 3:5
  3:12,19 6:12
  6:17 7:1
  52:21 132:3,6
  142:4 144:3
wasn't 54:7
  56:16 65:10
  83:19
Watt 1:21 2:15
  6:15 143:3,18
way 31:1 33:15
  45:19 51:20
  56:19 65:20
  66:13 80:21
  82:19 86:5
  87:5 88:22
  122:3
ways 93:1
  144:8
Wednesday
  1:16 131:2,3
  131:5,7
week 118:5
  129:8
weekend
  122:10 129:7
  130:11
weekends
  130:8,9,17
went 19:7,15
  43:1 44:6
  48:11 87:14
  122:18 123:5
  123:7,12,15
  124:4 125:4
  125:17,19
  127:20 128:3
  128:3,21
  129:4,12,13
  131:11
weren't 72:19
  102:12
  125:11

we'll 20:18
  92:14 131:3
  136:9 140:15
we're 12:1 33:6
  35:11 36:18
  42:20 67:11
  71:7 79:2
  97:3,14
  113:10
  126:16,16
  131:21
  134:11,12
  135:1 140:18
we've 36:6 54:1
  54:11 66:20
  67:10 73:16
  133:20
WHEREOF
  143:14
white 105:16
  106:12,12,13
  106:14 108:5
  109:2,5
  114:13
wide 76:1
withdraw 9:11
  93:2,10 94:4
  94:7 95:3,18
  96:11,21
withdrawal
  126:19
withdrawing
  94:15
withdrew 95:13
  95:18,19,20
  96:11
witness 7:10
  7:13,16 12:18
  12:22 21:7,10
  23:20 25:22
  28:18 60:13
  61:2,9 63:4
  64:3 67:3
  91:22 92:20
  94:3 97:7

98:7 110:7
  134:15
  135:20,22
  136:6,14
  139:20 142:8
  143:5,14
  144:10,12
witnesses 20:1
  109:22 110:1
  110:2,2,4,20
  115:2
woman 14:9
  101:12
  102:17
women 103:7
word 30:4
words 43:19
work 49:1,10
  49:11 68:14
  69:17 74:11
  77:9 130:16
  131:5,8
worked 42:13
  42:21 43:9,15
  43:15 44:18
  53:22 69:2,3
  107:9
working 76:6
  76:13 77:4,20
works 39:1
  45:20 74:4
worse 133:1
worsened
  133:17
wouldn't 73:22
  74:5,6 76:18
  130:11
wrong 105:4
  113:12

------ X ------
X 1:4,12 4:1,11

------ Y ------
yeah 17:10

30:10 79:22
  115:6 121:6
year 8:17 37:13
  44:19 49:2,8
  50:1,6,12
  51:4,10 52:14
  53:9 70:8
  71:11 72:1
  81:6 85:1
  123:9,15
  124:9,9,10,11
  125:5,20,21
  126:7 127:20
  131:13
years 42:13
  79:4 106:17
  106:20 117:8
York 125:16,18
  129:5

------ 0 ------
06-0537 6:8
06-0538 1:7

------ 1 ------
1 10:11,13,16
  16:5 78:15
1st 16:15
1-144 1:11
1/4/2006 4:19
1:00 15:12
  64:16,17
1:09 2:5 6:10
1:11 9:19
1:11:35 9:18
1:22 9:20
1:22:05 9:22
10 8:5 116:7
1020 6:16
  132:6 142:2
11 13:17 36:8
  40:17 59:8,21
  105:15,18
  106:4 107:18
  108:3,5

11/14 18:22
11/14/03 19:2
11:30 59:21
1144 31:12
1145 32:10,13
  37:11,12 38:7
  38:17 40:17
  44:1,18 46:20
  48:21 51:6
  53:1 54:22
  55:14 66:7
  67:15 90:5
1165 53:1
12 144:20
13 37:13 44:7
  52:13 53:7
  70:14,17
  72:10 85:1
  106:21 107:1
14 18:8 43:14
  45:8 46:19
  106:11
14th 18:15,16
140 141:4
1400 3:18
15 4:14 43:14
  45:7 99:1
  144:16
15s 44:7 46:16
17 4:16
18 22:11
180 19:17
182397 1:22
  142:10
1825 3:4 144:2
19th 6:16 132:6
  142:2
1997 52:16
1999 42:3,9,12

------ 2 ------
2 1:10 10:11,13
  10:16 18:13
2nd 16:16
2:43 97:9

Sederis Fields
CONFIDENTIAL

**2:43:17** 97:8
**2:46** 97:10
**2:46:22** 97:12
**20** 42:13
  129:17,22
**2000** 10:12
  14:5,13
**20001** 2:13
**20009** 3:5
  144:3
**2001** 52:19,19
**2002** 52:21
  122:16,18,22
  123:11,13,16
  123:18,20
  124:4,8,22
  125:22 129:4
  129:12
  130:19
**2003** 12:4,5,11
  12:13 13:2,17
  14:2,13,15,22
  15:9 16:5
  17:8,12 18:8
  18:13 36:8
  54:13 55:21
  59:8,21 121:7
  121:10,14
  122:8 123:21
  124:1,3,4,13
  124:17 125:3
  125:5,6,11,18
  126:2,3,4,5,6
  127:3,4
  128:18
**20036** 142:4
**2004** 127:14,15
  127:18,22
  128:2 133:7
**2005** 22:12
**2006** 23:10
  24:4 127:21
**2007** 1:16 2:4
  6:9 8:5 142:9
  144:20

**2008** 143:20
**202** 3:6,13,20
  144:9
**20250-1400**
  3:19
**20530** 3:12
**21** 4:18 14:1,4
  14:22 15:9
  54:13 55:20
**21st** 15:13
**22** 24:4
**22nd** 10:11
**23** 4:19
**23rd** 17:8
**24** 5:1
**25** 5:4 129:17
  129:22
**29** 1:16 2:4
  142:9
**29th** 6:9

—— **3** ——
**3** 4:14 10:14
  15:17,18,22
  16:4 50:2,3
  70:19
**3rd** 2:11 16:16
**3-PM** 82:5 83:5
**3:19** 131:19
**3:19:34** 131:18
**3:22** 131:20
**3:22:57** 131:22
**3:25** 135:7
**3:25:40** 135:6
**3:28** 135:8
**3:28:37** 135:10
**3:33** 140:22
**3:33:30** 140:19
**30** 121:7
  143:20 144:6
**301** 31:12
  32:11 37:2,3
  37:5,10,12,13
  37:16,18,22
  38:6,7,18

40:16 43:16
44:2,16 46:10
48:21 49:1
50:1 51:4,11
54:20 55:14
68:19 69:3
75:22 90:3,7
90:9,18
**301-13** 49:1
**307-1249** 3:13
**31** 121:7
**31st** 122:8
**318** 38:5
**3312-S** 3:18

—— **4** ——
**4** 4:16 17:19,20
  18:2,4 23:10
**4th** 3:11
**429-0014**
  144:10
**45** 16:20,21

—— **5** ——
**5** 4:18 17:12
  21:14,15,19
**50** 68:5
**501** 2:11 6:11
  132:2
**52** 40:16,19
  41:3
**555** 3:11
**58** 5:7

—— **6** ——
**6** 4:19 23:3,7,8
  23:10
**620** 142:3
**690** 3:4 144:3
**690-2174** 3:20

—— **7** ——
**7** 4:4 5:1 24:12
  24:13,17,19
  49:15,16
  53:13 70:19

106:20 107:2
107:4,8
**7/11/2003** 5:7
**785-2805** 3:6

—— **8** ——
**8** 5:4 12:11,13
  13:2 25:11,14
  26:2 144:16
**8/1/2003** 4:14

—— **9** ——
**9** 5:7 58:16,20
  58:21 59:2,5
  107:5,6
**97-102** 4:7