# Attachment K

# WITNESS AFFIDAVIT

I, (name) __John W. Chott Jr__

am an __✓__ employee of ___ applicant to ___ former employee of ___ the:

(Agency) __Farm Service Agency USDA__

(Office) __Deputy Administrator for Field Operations__

(Division) __Office of Deputy Administrator__

(Branch) _____

Located in (city and state) __Washington DC__

In the capacity of (show both your organization title and the classification of your job, if different):

__GM-301-15 Assistant to the Dep Admin__

Grade __GM 15__ between (date) __6/90__ and (date) __present 8/04__

My telephone number during working hours is: __202 690-2807__

I HAVE BEEN ADVISED OF THE FOLLOWING:

Initials: _JC_

I am required by Federal regulations and Department of Agriculture policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Agriculture. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Department of Agriculture policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the

EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear ✓ affirm _____ the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

The following information was taken during an in-person interview in Mr. Chott's office on Wednesday, July 28, 2004.

1. Please state and spell your name for the record.
Answer: John Chott.

2. What is your current position and location?
Answer: I am Assistant to the Deputy Administrator for Field Operations, DAFO, Farm Service Agency, Washington DC.

3. Please describe your duties.
Answer: I assist in the oversight and management of our 50 state offices and 2,300 county offices.

4. What is your current grade?
Answer: GM-15.

5. How long have you worked for the Farm Service Agency?
Answer: 25 years.

6. What is your race?
Answer: White

7. What is your sex?
Answer: Male

4
87

8. What is your relationship to the complainant?

Answer: For a year during 2001-2002, I was her direct supervisor. Since that time, in the absence of Mr. Frago, I would be her second line supervisor. I give her assignments and she comes to me directly on issues, but I am not officially in her chain of command for performance evaluations.

9. The issue accepted for investigation is as follows:

*Whether the complainant was discriminated against based on her race (black) and sex (female) when she was not selected for a GS-14 Administrative Management Specialist Position on July 21, 2003. (Two individuals were selected.)* Were you involved in this selection decision? How were you involved?

Answer: Yes. I served on two interview panels for the positions. She was interviewed twice and was not selected based on the consensus of the panel.

10. How did you conduct the interviews?

Answer: For the first round interviews, we had a panel of Doug Frago, myself, and Salomon Ramirez. And we had an EEO observer, Shawn Clayton, from the EEO Office. We did not have to interview for this position, but we felt it was appropriate to interview. I felt it was important to interview people to see how they would react under stress and how they present themselves. In this position, there are a lot of phone calls, emails, and congressional contacts, so the way people interact is important.

We asked each candidate a set of the same questions. I need to review the file, but I believe during the first round interviews, we would come to a consensus after each interview on the ranking of the candidate. For the second interviews, we individually rated each candidate by ranking them with a number. Sederis made the first cut to go to the second interview. She was adequate in the first interview, but as I recall it was close whether she would make the second

interview. She did not give a real strong interview, but enough to make the cut.

For the second interviews, we interviewed five candidates. Doug Frago, Linda Treese, and I served on the panel. Linda had just been hired to supervise the area that positions (and Sederis Fields) work under. We asked human resources whether an EEO Observer was needed in the second round of interviews and they indicated we did not. We didn't need to interview the second time. We only had a few questions the second time. The questions were what I would call thoughtful questions, questions that required thought and analysis. We wanted to have one more look at the candidates. She did not do well in that interview. She was not composed, and was nervous. She commented on her own nervousness. I didn't feel she handled herself very well. Her first interview was adequate, but this is a GS-14 position and deals with a lot of difficult issues, it really requires someone who has poise and composure. I have known Sederis Fields for 20 years, and so I would have thought she would have been more comfortable with us.

11. How many individuals were interviewed for the first round of interviews?
Answer: It was a lot, around 14 employees. There were two referral candidates who were already GS-14s. She did make the cut down to the final five, but there were some bad interviews on the first round.

12. Were the same questions asked?
Answer: During both interviews, each candidate was asked the same questions. We printed the questions out and took notes regarding each candidate.

13. How did you score or rate the applicants in the second interview?
Answer: There were four or five questions and then we gave them a numerical score. The highest score was a 14. We selected the two individuals with the two highest scores. Ms. Fields' score was fourth out of the five candidates.

14. Who did you select?

Answer: Ken Nagel and Patrick Spalding.

15. Can you please describe the duties of this position?

Answer: They would be involved in budgeting, budget analysis, staffing, hiring issues, county committee issues, furniture contracting, leasing of the county offices, a lot of miscellaneous issues, political activity with the Hatch Act, some EEO activity, appeals/grievances by employees, travel issues, congressional contacts, writing regulations, and writing position papers.

16. Why did you select Ken Nagel?

Answer: I think that he was almost an ideal candidate because we deal with issues relating to county offices. Although it was not required for the position, he had previously served as a county director which would give him a lot of knowledge and experience that others would not have. For example, he had experience regarding budgeting, leasing, personnel, and he had a farming background, he also had banking experience, which was good because we do loans, he had extensive speaking experience, he had written regulations, he did a position paper for the Secretary of Agriculture on Anthrax. He's a good writer. He was composed in the interview and I thought the answers to the questions were more thoughtful. We also have 235 state committee members and he was a part of the process to bring them on board in the political appointee process.

17. Please compare Mr. Nagel's qualifications to the complainant's.

Answer: Sederis spent most of her career as a secretary. She then went in to EEO and Civil Rights, Federal Women's Program. She has done some mediations. She is good at that. She never asked to go beyond that area. I let her take courses, but they were also narrow in the EEO and field. Although she is good at what she does, her experience is very narrow. She said she had experience with budgeting, but it was really just copying numbers, not analyzing budgets. She didn't have the experience in contracting, writing regulations. The bread of her experience was not what Nagel had. Her interview was not composed. We asked her what a significant

7
90

accomplishment was and she said she helped with the Christmas party. I thought she would have mentioned something involving her handling of the Federal Women's Program, I was surprised at her response. Mr. Nagel said he went to Puerto Rico and led a team looking at the illegalities of the loan program to Puerto Rico.

*[handwritten annotations: "Administrates'", "in our field office"]*

18. Why did you select Mr. Spalding?

Answer: Mr. Spalding used to be an Assistant Administrative Officer. In other words, he had held the position that we deal with all the time. He had a great deal of experience in leasing, contracting, and consolidating offices. He was involved in consolidating the Massachusetts and Rhode Island offices. Again, although this was not required for the position, he had the background that was ideal for the job. He had experience in personnel, in hiring people, in handling grievances, and employee discipline. Also, he was very composed during the interview. During the interview, he mentioned he had handled *[strikethrough: been involved in a]* very sensitive loan case, there was a foreclosure, there were threats of violence, and he dealt with the OIG and the U.S. Attorney, it was a high profile case.

We asked what makes a good team leader. Ms. Fields said not missing meetings. Nagel mentioned you have to make people feel that they are members of the team and show them that you are interested in them and lay out the guidelines for the team.

Another significant accomplishment Ms. Fields' mentioned that comes to mind was that she put together a list of awardees for Mr. Frago at the last minute. I did not find that to be a significant accomplishment.

19. The complainant feels that Mr. Nagel was pre-selected for the position. She believes that Mr. Nagel, you, and Mr. Frago are buddy-buddy and that this position was targeted for him, or that you had him in mind the whole time. Can you respond to that claim?

Answer: We are not "buddy-buddy." I do not socialize with anyone from work. I know little of what people do outside the office. I was acting DAFO for a year before Mr. Frago came and Mr. Nagel was involved in things such as appointing state committees and working on county

8
91

committee issues. He was also involved in consent decree activities. We had to coordinate bringing in hundreds of people here to work on a project and he was involved in that. It was my understanding that project was given to him because Ms. Fields could not handle it, but that was before I arrived in this position.

I deny he was pre-selected. There were issues that came up that I had to use his talents. Given his background and education, he was used for special projects. For example, he wrote the paper on Anthrax for the Secretary because he knew about Anthrax since it occurs on farms.

Ms. Fields was not responsible for budgeting for the consent decree. She merely gathered the amount of money states spent and put it on a list. She did not prepare budgets at all. Whereas Mr. Nagel had been very involved in the budget process under the prior administration and now.

20. She also states that the reason she believes Mr. Nagel was pre-selected is because he was given an accretion of duties when Chuck Berge left. The complainant believes this was the only way Mr. Nagel qualified for the position by providing him with administrative duties. Was Mr. Nagel given some of Chuck Berge's duties? When did this occur?

Answer: The list that was sent from personnel of qualified people connotes that all individuals have the basic qualifications. It is the job of the selecting official to determine who is the best qualified for the job. Ms. Fields and Mr. Nagel were both basically qualified. Ms. Fields never asked for added duties.

Mr. Nagel and Mr. Berge worked closely together. It was logical for Mr. Nagel to do duties that they were already working on with another individual when Berge left. These extra duties did not make him more qualified for the position. His background was what really set him apart. The duties he was doing when Berge left were the same he was doing before, he just did more of them when Berge left. That was my understanding.

21. Did you make a recommendation to the selecting official? Who did you recommend?
Answer: We took the top two scores. The scoring was done without consensus. We did not discuss our scores. Linda Treese created a chart of our scores. It was very clear that Ken Nagel

9
9a

Initials

was the highest and Ms. Fields was number four. Mr. Spalding had the second highest score.

22. The complainant alleges that she did not receive this position because she is black. Please respond.

Answer: I deny that.

23. The complainant also alleges that she did not receive this position because she is female. Can you please respond?

Answer: I deny that.

24. Do you have anything further you would like to add regarding this complaint?

Answer: No. I will provide you with the interview file.

I have reviewed this statement, which consists of __11__ pages, and hereby solemnly swear __✓__ affirm ____ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____  8/9/04
(Signature of Affiant)              (Date)

Signed before me at (Street and City): 1400 Independence Ave, SW Washington, D.C. 20250
on this 9th day of August, 2004

10
93

(Initials)

_____ received 8/10/04
(Signature of Investigator/Witness)

11
94

Initials