### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

### Civil Division

| | | |
|---|---|---|
| **SEDERIS FIELDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 06-0538 (HHK)** |
| | ) | |
| **MIKE JOHANNS, SECRETARY, U.S.** | ) | **Magistrate Judge Kay** |
| **DEPARTMENT OF AGRICULTURE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### Plaintiff's Opposition to Motion for Summary Judgment

Comes now the Plaintiff, by and through counsel, and files this opposition to Defendant's motion for summary judgment, and in support thereof, states as follows.

### Introduction

Plaintiff Sederis Fields, an African American female, and a GS-13 Series 301 Program Coordination Specialist at the U.S. Department of Agriculture, filed a complaint alleging discrimination based on race and gender under Title VII arising from the Agency's selection of two Caucasian males for two GS-14 301 Administrative Management Services (AMS) positions, even though the Caucasian males did not work in the 301 series. The Defendant has filed a motion for summary judgment arguing that it is entitled to summary judgment because Ms. Fields has not provided any evidence to demonstrate that Defendant's selections were a pretext for discriminatory reasons. The Defendant is not entitled to summary judgment because it is not disputed that the Agency violated Agency selection procedures when it excluded an EEO observer from the

1

interview panel; did not separately, interview, rank or rate one of the Caucasian selectees; made the selection before interviewing Ms. Fields; rejected Ms. Fields before one of the selectees accepted the position; and consistently selected Caucasian applicants for higher graded positions.   In a recent decision of the D.C. Circuit Court of Appeals, Salazar v. WMATA, 401 F.3d 504 (D.C. Cir. 2005), the Court made it clear that an employer must provide a "fairly administered selection process" in making hiring decisions.   Here, there was nothing fair about the selection process.   Defendant's motion for summary judgment should be denied.

**Facts**

Ms. Fields began employment with Deputy Administrator for Field Operations (DAFO), as a GS-301-13, Program Coordination Specialist in January 1999, and has more than twenty years of service with the USDA.

In 2003, the Agency advertised three GS 14 positions.  Two of the positions were in the 301 Administrative series and were GS-14 Administrative Management Services positions.  Ex. 2. The other position was a Program Management position in the 1145 series.  Ex. 3.

In addition to Ms. Fields, Ken Nagel and Pat Spalding applied for the GS-14 AMS positions in the 301 Series.  Ex. 10. Nagel also applied for the GS-14 Program Management position in the 1145 series.  At the time of their applications, Ken Nagel was a Agricultural Program Specialist, GS-1145-13 (from February 1999 – July 2003) years) (See page 3, line 17).  Prior to this he had been a full-time farmer for 26 years. Ex. 9. (See page 18), and had worked as a County Executive Director (non-federal) for three counties and a county office trainee.  Ex. 9.  Patrick Spalding had worked for 20 years at

2

USDA as follows: County Supervisor, GS-5 to GS-11 from 7/18/78 to 9/30/95; Farm

Loan Manager, GS-475-11 from 10/1/95 to 6/1/2000; Senior Loan Officer/Specialist, GS-

13 from 6/12/2002.  Ex. 11.

Ms. Fields' application indicated that she served as the liaison between

Headquarters, Deputy Administrator for Field Operations and State and county offices on

administrative issues related to Human Resources, Equal Employment Opportunity

(EEO), Civil Rights, Alternative Dispute Resolution (Mediation) and the Consent Decree

Budget.  Ex. 13. In this capacity, she coordinated and prepared semiannual and annual

budget reports, represented DAFO on several committees, coordinated Civil Rights

training for State and County FSA Committees and field office employees, served as an

Agency Resolving Official, conducted, Misconduct Personnel Investigations, served on

the Human Resources Division Recommending Panel, and developed DAFO's segment

of the agency wide Administrator's Performance Report Card and Accomplishments,

among other things. Ex. 13.

FSA Notice PM 2334, Merit Promotion Process, Section 2E, dated October 1,

2002, with disposal date October 1, 2003, states "Interview panels are not mandatory for

non-supervisory panels," however all interview panel shall include an EEO representative

or member of the CR/EEO advisory Council as an observer." Ex. 4.

On July 8, 2003, Ms. Fields interviewed with an interview panel that included

Doug Frago, her first line supervisor and selecting official, John Chott, second line

supervisor, Solomon Ramirez, Assistant Deputy Administrator for Farm Programs, and

Sean Clayton, EEO observer.  Following the interviews, Ms. Fields was told by Chott

that she did well in the interview.  On July 11, 2003, Ms. Fields was notified that there would be a second interview.

Prior to the second interview, John Chott contacted the Agency's human resources department to inquire if an EEO observer was necessary for a second panel interview.  Ms. Taylor, Human Resource Specialist, advised Mr. Chott in an e-mail message that the "EEO Representative is required only for Panel Interview process.  If you are doing a second interview, which is usually with the selecting official or representative you do not need EEO representative present".   Ex. 6.

The second interview panel included Doug Frago, Caucasian male and deciding official,  and Linda Treese, Caucasian female and John Chott, Caucasian male.

Interviews were scheduled between July 15, 2003 and July 21, 2003.  Ex. 18.  On July 18, 2003, Linda Cornin was selected for the Program Specialist position even though Ken Nagel received the highest score by the panel for the Program Specialist position. Ex. 19 and 21.

On July 21, 2003, Ms. Fields interviewed with the second interview panel, which included Doug Frago, John Chott and Linda Treese, but excluded an EEO observer.  Ms. Fields was not selected for the AMS positions.  The Agency selected Ken Nagel and Pat Spalding.

According to the deciding official, Doug Frago, three GS-14 positions were created, two AMS positions, and one program specialist. Ex.1:14:3-6.  Frago states that he was the deciding official, id. at  14:14-17, and he selected who was going to be on the interviewing panel.  Id. at 15:21-22-16:1.

Frago acknowledges that there was an EEO observer for the first interview panel, id. at 16:2-10, but there was a second interviewing panel. 20:19-20, and he was told by John Chott that after consulting with personnel, and Chott decided an EEO observer was not necessary for the second panel.  Id. at 21:17-22.

According to Frago, the second panel discussed who would be selected after the panel conducted interviews for both the administrative assistant position and program manager position. Id. at 25-27.  Frago recalls that a grid was made after interviewing all 9 to 10 applicants for all three positions.  Id. at 28:8-10. Thus,  the selection was improper, because Cronin was offered the program manager position before Ms. Fields was interviewed.

Frago states that Nagel came out as the top applicant on both the program manager and the administrative management specialist positions, and Ms. Cronin was second for the program manager position.  Id. 29:4-19.

Frago recalled that he made all three selections at the same time, and said he was positive of that, and he selected Nagel and Spalding for the AMS positions and Cronin for the program manager position.  Id. at 33:11-17.

Frago testified that after all of the interviews,  Nagel was asked whether he wanted the AMS or the program, and Cronin was selected for the program manager position because Nagel selected the AMS position and Cronin she was next in line for the program manager position.  Id. at 33::22, 34-37.  Frago specifically recalls that the panel discussed that because Nagel ended up being the top applicant for both positions, he would be given the option to choose.  35:13-17 ("I don't recall talking to Mr. Nagel.  I know that was the discussion between Treese and Chott and I when Nagel ended up

being top on both that he would be given that option to choose."). Thus, the Agency did not fairly consider Ms. Fields because Cronin was offered job before Ms. Fields was interviewed, so Nagal had to have been offered job before Ms. Fields was interviewed.

Frago admitted that Nagel did not have separate interviews for the program manager position and administrative services position. Id. at 45:9-16.

According to Nagel, he was not told which position he was interviewing for when he appeared for his single interview. Id. at 40-41.

The Agency's non-selection of Ms. Fields is consistent with the Agency's discriminatory hiring practices. In 2003, DAFO announced six vacant professional positions (GS-13, 14 and 15). Despite several minorities applying for the positions, all of the positions were filled by Caucasian applicants. Ex. 26. Frago was the selecting official for four of the positions, and Linda Treese was the selecting official for the other two positions. Id.

## Defendant's Statement of Material Facts to Which it contends there is no Genuine Dispute

Plaintiff submits that Defendant's Statement of Material Facts which it contends are not in dispute omits many relevant facts in the record, and there are disputed facts which remain for trial. Only the disputed facts are listed below.

1.      No Dispute.

2.      No Dispute.

3.      No Dispute.

4.      Dispute. Defendant alleges that it advertised two positions. Douglas W.

Frago stated in his deposition of March 12, 2007 (Ex. 1:14, 15 and 16) that the Agency

advertised three positions (Exhibit No.1, Doug W. Frago, Deposition of March 12, 2007);

two Administrative Management Specialist positions, GS-301-14 (Exhibit No. 2,

Vacancy Announcement number UF168394CT) and one Agricultural Program Specialist,

GS-1145 (Exhibit  No. 3, Vacancy Announcement number UF168394CT).  Mr. Frago

stated that he made the decision for all three positions at the same time (Exhibit No.1,

Doug W. Frago, Deposition), page 33, lines 6-22). In fact, he used the same interview for

both the Administrative and the Program positions (page19).  He further stated that he

selected Ken Nagel, Patrick Spalding and Linda Cronin (page 33, line 10) at the same

time.  Mr. Frago also stated that Mr. Nagel was asked whether he wanted to take the

Program position or the Administrative position (page 33, line 20).


5.      Dispute.  In addition, specialized experience which is necessary to qualify for the

positions.  According to the Vacancy Announcement UF168394CT, specialized

experience is required to qualify for this position. Specialized Experience is defined as

(Exhibit No.2, Vacancy Announcement number UF168394CT) "Experience that

equipped the applicant with the particular knowledge, skills and abilities to perform

successfully the duties of the position to be filled.  To be creditable, specialized

experience must have been equivalent to at least one year in the next lower grade level.

Experience that demonstrated knowledge of administrative management policies and

procedures and knowledge in planning, coordinating and administering agricultural

program regulations and practices. "

6.      No Dispute.

7.      Dispute. Mr. Frago was selecting official for three positions, two AMS positions and one Programs Specialist.  The second interview panel of July 21, 2003, included more individuals that Frago, and thus, required an EEO observer.  Ms. Carolyn Taylor, Human Resource Specialist, advised Mr. Chott in an e-mail message dated July 11, 2003, that the "EEO Representative is required only for the Panel Interview process.  If you are doing a second interview, which is usually with the selecting official or representative, you do not need an EEO representative present." Exhibit No. 6, Email Message from HRD.  The Agency did not comply with the Merit Promotion Process, FSA Notice PM-2334, Section 2E, dated October 10, 2002, ( disposal date of October 1, 2003) which states that "Interview panels shall include an EEO observer for all interview panels"(Exhibit No. 7 Notice PM-2334).

8.      No Dispute.

9.      No Dispute.

10.      Dispute.  Ms. Fields was also among the thirteen applicants referred to the selecting official, after Ms. Fields received a score of 100.  Exhibit No. 8, ROI Pages 157-159.

11.      Dispute. At his deposition, Nagel stated his experience as follows: Agricultural Program Specialist, GS-1145-13 – from February 1999 – July 2003 (4 years) (Ex. 9:3, line 17); full-time farmer - total of 26 years. Id. at 18; County Executive Director (non-federal) for three counties; County Office Trainee; Agricultural loan banking experience; and full-time student and full-time farmer. Id. at 10.  Exhibit No. 9, Nagel's deposition of March 12, 2007.

12.    Dispute. Defendant has not produced any document authenticating that he has a Bachelor of Science degree from the University of Nebraska.

13.    Dispute. Patrick Spalding's 20 years of experience working for USDA are as follows: County Supervisor, GS-5 to GS-11 from 7/18/78 to 9/30/95; Farm Loan Manager, GS-475-11 from 10/1/95 to 6/1/2000; Senior Loan Officer/Specialist, GS-13 from 6/12/2002; Evidence of Record reveals that Spalding made application for Administrative Management Specialist, Vacancy Announcement No.  UF168394 CT, without the requisite time in grade to apply for same.  Exhibit 11 Spalding Application, See ROI 221,

14.    Dispute  Defendant has not produced any document authenticating that he has a Bachelor of Science degree from Purdue University.

15.    Dispute.  A review of the Job Announcement did not require a farm or agricultural background.  Plaintiff never indicated that she had farming experience. Exhibit 12, Fields application.

16.    Dispute. A  review of the Ms. Fields application substantiates that Ms. Fields did not state that she had a BS degree, in a particular year, Exhibit 13, Fields Application Ms. Fields Training profile from FSA Human Resource's Training Division is which substantiates her application, Exhibit 14, Fields Training Profile.  According to the Job Announcement for the "Administrative Management Specialist 301-14," position it did not require a college degree.   The qualification was for Specialized Experience and practical experience. (See Job Announcement Exhibit 2).  Ms. Fields met the required qualification for any positions she was selected for in the Federal Government, Exhibit 15, OPM Qualification Standards for General Schedule Position.

9

Ms. Fields did not include a degree date on her application was because she was working with colleges to convert her work experience into college credits. With the combination of her experience along with her college credits she has more college credits than is needed for a Bachelor's degree.

16.    No Dispute.

17.    No Dispute.

18.    Omitted.

19.    Dispute. There are no records of the average score for the first panel. No records to reveal how the panel determines High, Medium and Low.

20.    Dispute. Only four individuals appear on the AMS GS14-301 Interview Score Sheet. Exhibit 19.

21.    Dispute. Only four individuals appear on the AMS GS14-301 Interview Score Sheet and Ken Nagel was not one of those individuals. Exhibit 19.

22.    No Dispute.

23.    No Dispute.

24.    Dispute. Before conducting the second panel interview, John Chott contacted HR representative Carolyn Taylor and asked "Do we need an EEO person" for the second interview panel. Taylor responded that an EEO Representative is required for panel interviews, and an EEO Representative is not needed if the second interview is with the selecting official. Exhibit 26. Because the second interview was with a panel, an EEO observer was required. FSA Notice 2334, Merit Promotion Process, Section 2 E, dated October 1, 2002, with disposal date of October 1, 2003, states "Interview panels are not mandatory for non-supervisory panels," however, all interview panels **shall** include an

EEO representative or member of the CR/EEO Advisory Council as an observer.
Carolyn Taylor, Human Resource Specialist, stated in her sworn statement that she did
not recall giving facts about the interview process or if they had a second interview, pg.
69.  The guidance she gave them was based on the Personnel Operations Manual,
Amendment 8, dated May of 2003 a review of her instructions to the panel reveal there
was no mention of Amendment 8.  In fact, Amendment 8 was only mentioned after Ms.
Fields filed an EEO complaint.  Additionally, Amendment 8 was not in effect until
October, 2003.  The interviews took place on July 8 and 21, 2003.  The Personnel
Operations 3-PM (Revision 3) Amendment 8 is an amendment to a handbook published
May 7, 2003.  Amendment 8 was transmitted to Merit Promotion Process Notice PM-
2388 with an effective date of November 14, 2003.

25.     No Dispute.

26, 27, 28, 29. Dispute. According to the FSA Merit Promotion Process, this interview
was invalid.   Ex. 4. USDA Merit promotion Plan (Par. 89) states that the scale of High,
Medium and Low shall be used to rate the candidates, Exhibit 4, Merit Promotion ROI
490.

Since the second interview panel failed to include an EEO observer, it was incomplete
and unofficial, thus incapable of ranking applicants.

        Failure to follow the rules and regulations in the second interview violated the
Merit Promotion Plan (Handbook 3-PM, Part 3) and Merit Promotion Notice 2334. The
procedure mandates the following:

        Paragraph 92 B of Handbook 3-PM, Outlines the composition of the FSA
interview panel.   This procedure mandates the interview panel to include an EEO

observer or a member of the CR/EEO Advisory Council as an observer only and not to rate or rank applicants.

Paragraph 94 C states the role of the civil rights observer is to ensure that the evaluation and any conversation about the process are not discriminatory in nature.

Paragraph 92 B of Handbook 3-PM that states "Interview panels shall be diverse."

USDA Merit promotion Plan (Par. 89) Section B, assessing candidates states that candidates shall be rated on their response to each question. At the conclusion of each interview, the panel shall discuss the candidates using the scale of High, Medium and Low. ROI 490.

At his deposition, Doug Frago, Ex.1 27:26 states "Now, I do know a grid was made. I didn't make the grid. I have seen a copy of it but I don't know their handwriting." A copy of said grid was used in evaluation. ROI pg. 486. Consequently, the ranking was void, as the interview was non-official. Mr. Frago stated in his deposition that Mr. Nagel was asked whether he wanted to take the program position or the AMS position. Mr. Nagel accepted the AMS position. Mr. Frago stated that Mr. Nagel was the highest rated person for the program specialist position which is an 1145 position, but was selected for the AMS position.

Mr. Fargo testified that he made the decision for all three positions at the same time Exhibit 1: 33:6-22. Mr. Frago stated that no decision was made on the selections until Ms. Fields was interviewed. Id. at 63:5-10. Linda Cronin was selected for the program position before Mrs. Fields was interviewed. Id. at 65:1-22. An email was sent out dated

July 18, 2003 stating "Doug Frago has chosen Linda Cronin for the program position." Exhibit 21.   Mrs. Fields was interviewed on July 21, 2003.

On July 21, 2007, Ms. Fields was interviewed at 1:00 p.m.  Mr. Frago informed her around 3:30 p.m. that she was not selected. Mr. Spalding stated that that Mr. Frago called him at his home between 5:00 and 6:00 p.m. one evening but he was not sure of the date; however, he accepted the position the next day. Exhibit 12:42 and 43.  The Selection Certificate was dated July 21, 2003, Exhibit 20; however, Mr. Spalding did not agree to accept the position until July 22, 2003. (Violation of Merit Promotion).  Mr. Chott made the announcement by email on July 22, 2003, that Mr. Spalding and Mr. Nagel (two white males) were selected for the positions.  Exhibit 22.

Nagel was not rated against other AMS applicants on the GS 301 scoring sheet. Exhibit 19.


30.    Disputed.  The panel members did not indicate that Ms. Fields did not interview well, appeared nervous, lacked composure or gave substandard responses until Ms. Fields filed a complaint, and the panel lacked the required independent EEO observer.

31.    Disputed.  Ms. Fields' application confirmed that she met all of the qualifications for the positions and had experience in the position performing all of the duties at a lower grade. Ex. 13.

32.    Omitted.

33.    No Dispute.

**ARGUMENT**

**I.        Employment Discrimination–Disparate Treatment**

Ms. Fields' claim is that she was individually discriminated against by the Defendant on the basis of her race and gender.  Her claim is one of disparate treatment.1

A disparate treatment claim is analyzed under the three-stage framework set forth in McDonnell-Douglas Corp. v. Green.2  "Under the McDonnell-Douglas framework, the complainant must first establish a prima facie case of prohibited discrimination.  Once he has done so, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decisions.  Should the employer succeed in presenting such reasons, the burden then shifts back to the complainant, who then has an opportunity to discredit the employer's explanation."3

_____

1Most claims of racial discrimination may be classified as either claims of disparate treatment (i.e., a claim that a person was treated adversely because of his membership in a protected class) or disparate impact (i.e., a claim that an employer's use of a race-neutral rule has a disproportionately negative impact on members of a protected class).  The legal standard and burdens of proof for a disparate treatment claim under Title VII are articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, S.Ct. 1817, 36 L.Ed.2d 668 (1973).  For a disparate treatment claim, see Griggs v. Duke Power Co., 401 U.S. 424 (1971).

2411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

3Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288 (D.C.Cir. 1998) (internal citations omitted).  The rationale for this three-part back-and-forth analysis is that once the plaintiff establishes a prima facie case of discrimination, the presumption arises that the defendant's adverse employment actions against the plaintiff were caused by illegal discrimination, which "compels the employer to 'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  If the defendant does articulate such a legitimate, nondiscriminatory reason for the adverse employment actions, "'the presumption [of discrimination] raised by the prima facie case is rebutted' and 'drops from the case.'"  Id. at 1289, quoting St. Mary's Honor Center v.

Throughout this analysis, the burden of proof never shifts to the employer, but always remains with the employee.4

Thus, in this matter, Ms. Fields has the initial burden to make out a prima facie case that the Defendant discriminated against her on the basis of her race and gender. Once she has done so, the burden of production–but not of persuasion–shifts to the Defendant, and the Defendant must articulate a legitimate, nondiscriminatory reason for the adverse actions it took against Ms. Fields.  If the Defendant does so, Ms. Fields must then make a showing that the reasons articulate by the Defendant are not the true reasons, but are rather a pretext.

The Supreme Court has held that the plaintiff may make a prima facie case of non-promotion by showing:   (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position

---

Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

After the defendant-employer has articulated legitimate, nondiscriminatory reasons for its adverse employment actions, "the plaintiff has 'the full and fair opportunity to demonstrate, through presentation of his own case and through cross-examination of the defendant's witnesses, that the proffered reason was not the true reason for the employment decision, and that race [or some other discriminatory basis] was."  Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998), quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), quoting Texas Department of Community Afairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

4Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288-89 (D.C.Cir. 1998) (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 102 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green,411 U.S. 792*, 802, 93 S.Ct. 817, 1824, 36 L.Ed.2d 668 (1973). These criteria are "flexible," and must be adjusted to the facts of the case at hand. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. "The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected *under circumstances which give rise to an inference of discrimination.*" *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094 (emphasis added). This standard is "not onerous"; it serves only to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection," thus justifying a requirement that the employer come forward with an explanation. *Id.* at 253-54, 101 S.Ct. at 1093-94. Thus, in an ordinary discrimination case, in which the plaintiff is a member of a minority group, an "inference of discrimination" arises when the employer simply passes over the plaintiff for a promotion to a position for which he is qualified. *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824.

The standard for reviewing a motion for summary judgment requires the court to view the evidence in the light most favorable to the non-moving party. To decide a motion for summary judgment in an employment discrimination case, "assuming ... that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus ... will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation of its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary

16

evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."5

## II.     Ms. Fields has raised an Inference of Discrimination based on Her Vastly Superior Qualifications and the Irregularities in the Selections.

The Agency concedes that Ms. Fields established a prima facie case of discrimination, but argues that there is no evidence that the selection decision was based on race or gender discrimination because the selectees were better qualified for the positions.  Ms. Fields has established that the Agency discriminated against her based on her race and gender.

   a.     Ms. Fields was Vastly Better Qualified for the AMS Positions than the Selectees.

Ms. Fields was employed as a GS-13-301 Program Coordination Specialist Administrative Specialist at the time of the selection.  The AMS position was a 301 administrative series position.  Her application indicated that she served as the liaison between Headquarters, Deputy Administrator for Field Operations and State and county offices on administrative issues related to Human Resources, Equal Employment Opportunity (EEO), Civil Rights, Alternative Dispute Resolution (Mediation) and the Consent Decree Budget.  Ex. 13.  In this capacity, she coordinated and prepared semiannual and annual budget reports, represented DAFO on several committees, coordinated Civil Rights training for State and County FSA Committees and field office

---

5Aka v. Washington Hosp. Center, 156 F.3d 1284, 1289 (D.C.Cir. 1998).

employees, served as an Agency Resolving Official, conducted, Misconduct Personnel Investigations, served on the Human Resources Division Recommending Panel, and developed DAFO's segment of the agency wide Administrator's Performance Report Card and Accomplishments, among other things. Id.

By contrast, Nagel and Spalding were not employed in the 301 series at the time of their selections to GS-14 301 series positions, and had limited administrative experience.  At the time of the selection, Mr. Nagel was a GS-13-1145 Agricultural Program Specialist, and Mr. Spalding was a GS-13-1165 Loan Specialist. Ex. 10 and 11. Their applications reveal that Ken Nagel served as Agricultural Program Specialist, GS-1145-13 – from February 1999 – July 2003 (4 years) (Ex. 9:3, line 17), had served as a County Executive Director (non-federal) for three counties and a County Office Trainee. and before that position, he was a full-time Farmer - (1966-1971) - total of 26 years. (See id. at 18). Patrick Spalding's 20 years of experience working for USDA are as follows: County Supervisor, GS-5 to GS-11 from 7/18/78 to 9/30/95; Farm Loan Manager, GS-475-11 from 10/1/95 to 6/1/2000; and Senior Loan Officer/Specialist, GS-13 from 6/12/2002.  Ex. 11.

The Agency argues that the AMS duties included "budgeting, budget analysis, staffing, hiring issues, county committee issues, furniture contracting, leasing of the county offices, a lost of miscellaneous issues, political activity with the Hatch Act, some EEO activity, appeals/grievances by employees, travel issues, congressional contacts, writing regulations, and writing positions papers." Mem at 5.  The position description for the AMS positions, does not support this claim.  The position description lists the major duties as "provid[ing] oversight and guidance to State and county offices of the

Farm Services Agency (FSA) in order to improve program delivery and customer service. The incumbent represents DAFO by providing instruction and policy guidance to State and county FSA officers related to administrative and management issues including those related to budget, workload analysis and reporting, personnel, fiscal management, and administrative services.  The incumbent also participates fully in the development, implementation, and evaluation of nationwide policies and programs pertaining to all aspects of the operation and management of State and county FSA offices and represents DAFO in meetings with top Agency and Departmental officials on matters related to State and county office management, operating policies and overall program delivery." Ex. 2.

As reflected in the position description, these positions were intended to provide guidance to state and county FSA offices related to administrative and management issues.  This mischaracterization of the duties by the Agency is an attempt to minimize the administrative component of the position because the selectees had little to no experience in this area and Ms. Fields had far more experience in the key administrative area.

The Agency claims that Nagel had experience in procurement, leasing, personnel, farm loans, farming, banking, public speaking and writing and had worked as a county director, and had a good interview.  The Agency claims that Spalding had experience in leasing , contracting and consolidating offices, and experience in personnel, such as hiring people, handling grievances, and employee discipline, and a good interview.

The Agency claims that Ms. Fields experience was limited and focused on EEO and Civil Rights areas, and she did not have administrative, or farming or agricultural experience, and her interview was poor.

First, the fact that Nagel and Spalding had experience in procurement, leasing, loans, farming, banking, and contracting is not relevant because these were not qualifications for the position in the job description.  The positions were created to provide guidance to State and County offices on  administrative and management issues. As noted earlier and reflected on her application, Ms. Fields experience was not limited to EEO and Civil Rights, and she did have vast administrative experience, and  there was no requirement for farming or agricultural experience.  In addition, there is nothing in the record before Ms. Fields filed an EEO complaint which states that her interview was poor.  This is a post litigation justification.

Moreover, the Agency has misstated Spalding's experience.  Spalding testified that his work on personnel issues was limited to a period of ten months  as an administrative officer trainee and administrative officer, in Little Rock, Arkansas and Amhurst, Massachusetts from May 1991 until March 1992.  Ex.12:34.  This was approximately eleven years before the selection in this matter. By contrast, Ms. Fields was working on personnel issues at the time of the selection.

Here, Ms. Fields has shown that she had qualifications "clearly superior" to those of the individuals selected and more closely suited to the position in question.  The Agency acknowledges that superior qualifications may be probative of pretext if "a reasonable employer would have found plaintiff to be significantly better qualified for the job.  See Ash v. Tyson Foods, Inc., 163 L.Ed. 2d 1053, 1058 (2006).  The Agency's

claim that Ms. Fields did not have administrative experience is false, and there is a disputed fact concerning whether she had superior qualifications for these positions when compared to the selectees.

   b. <u>The Agency Violated Agency Selection Procedures by Conducting Interviews without an EEO Observer.</u>

   An inference of discrimination is raised when an employer violates its own personnel regulations in making employment decisions. It is generally recognized that an employer's failure for follow personnel regulations is evidence of pretext. See <u>Kolstad v. American Dental Association</u>, 108 F.3d 1431 (D.C. Cir. 1997), rev'd on other ground, 139 F.3d 958 (D.C. Cir. 1998); <u>Vitarelli v. Seaton</u>, 359 U.S. 535, 539-40 (1959); <u>Watson v. National Linen Service</u>, 686 F.2d 877 (11th Cir. 1962).

   The Agency violated Agency selection procedures by conducting interviews without an EEO observer. Before conducting the second panel interview, John Chott contacted HR representative Carolyn Taylor and asked "Do we need an EEO person" for the second interview panel.  Ex. 6.Taylor responded that an EEO Representative is required for panel interviews, and an EEO Representative is not needed if the second interview is with the selecting official. Exhibit 23.   The Agency proceeded with a second interview with a panel, and not the selecting official alone, and did not have an EEO representative present.  This was a violation of the Agency's merit procedures and raises an inference of discrimination.

   c. <u>The Agency did not Separately Interview and Rate One of the Caucasian Selectees or Rank One of the Selectees Against the Other Applicants.</u>

The Agency selected one Caucasian applicant, Ken Nagel, who was not rated, or ranked against the other applicants, nor separately interviewed for the position   The Agency produced a scoring grid for the GS-14-301 Administrative Management Specialist position.  At the top of the document, are three initials, J, D and L, which are the initials for the first names of interview panel, John Chott, Doug Frago, and Linda Treese.  Ex. 25. Along the left margin of the  grid is a list of the applicants, including Pat (Spalding) (one of the selectees), Jean, Bruce and Sederis (Fields).  Pat Spalding and Ken Nagel were selected for the administrative management specialist positions. Ken Nagel was never rated or ranked for this position and did not separately interview for this position.   There is no way for the court to determine how Nagel was scored by the interview panel for the 301 series AMS position against the other applicants because his application and interview was not scored separately by the panel for the 301 series AMS position.

To the extent the Agency attempts to argue that even if Nagel was not selected, Ms. Fields would not have been selected because she had a lower score than other applicants, the Court of Appeals has rejected this line of argument in  Salazar v. Wash. Metro. Area Transit Auth., 401 F.3d 504, 509 (D.C. Cir. 2005) (appeal after remand, motion granted, Salazar v. Wash. Metro. Area Transit Auth., 2006 U.S. Appl LEXIS 14792 (D.C. Cir., June 13, 2006)), and noted that an agency must provide a fairly administered selection process even if the non-selected employee receives a lower score on a panel interview than other applicants.

d. The Agency made the Selection for the Administrative Management Specialist Position before the Panel Interviewed Ms. Fields.

The record before the court support's Ms. Fields claim that the Agency made the selection for the Administrative Management Specialist position before the panel interviewed Ms. Fields. According to the testimony of the selecting official, Doug Frago, the panel interviewed individuals for the 301 series AMS position and the 1145 series program analyst position. Frago recalls that after conducting the interviews, the panel concluded that Ken Nagel came out on top for both positions, and the panel discussed the fact that Nagel would be given a choice of which position he would select. Frago testified that Ms. Cronin was given the 1145 program specialist position because Nagel declined that position, and Cronin was second in line. The problem for the Agency is that Cronin was offered the program specialist position on Friday, July 18, 2003. The record contains an email dated July 18, 2003 at 4:56 p.m., from John Chott, Assistant to the Deputy Administrator for Field Operations to the office staff announcing that: "This is to inform you that Doug has chosen Linda Cronin for the Program Specialist position." **Ms. Fields was not interviewed until Monday, July 21, 2003.** According to Frago's testimony, Cronin was not offered the program specialist position until that position was offered to Nagel and he declined it. So Nagel had to have been given the choice of the AMS position or the program specialist position on or before July 18, 2003, because Cronin was offered the position on July 18, 2003. Since Nagel received the highest score for the program specialist position, it would be highly unlikely that the Agency would not select him for the position within his 1145 series, unless one of two conditions occurred: 1) Nagel was offered the program specialist position and he declined it; or 2) Nagel was offered the AMS position at the same time. Common sense suggests that Nagel would not apply for both positions and then decline the program specialist position, unless he

had some assurance that he would receive the AMS position.   Ms. Fields, however, was not interviewed until Monday, July 21, 2003.

      e.    <u>The Agency Rejected Ms. Fields for the AMS Position before Spalding Accepted the Position.</u>

      The Agency had no intention of considering Ms. Fields for either of the AMS positions because it rejected Ms. Fields for the position given to Patrick Spalding before Spalding accepted the position.  Ms. Fields interviewed for the position at approximately 1:00 pm on Monday, July 21, 2003.  Frago forwarded a selection certificate to the human resources on July 21, 2003, identifying Ken Nagel and Patrick Spalding as the selectees. According to Ms. Fields, at approximately 3:30 p.m. John Chott came to her office and told her she would not be selected for the position.  Spalding does not recall the date, but he testified that he received a telephone call at 5:00 p.m. from John Chott, and Spalding had already left the office for the day.  He returned Chott's call and was told Doug Frago wanted to talk to him but Frago was on a telephone call and would call him later.  Frago later called Spalding at home and offered him the position.  Spalding however, indicated he needed to discuss it with his wife.  He did not accept the position until the following day.  On July 22, 2003, Chott sent out an email to staff announcing that Frago selected Ken Nagel and Pat Spalding for the two AMS positions.   Thus, Ms. Fields was rejected for the position on July 21, 2003 and Spalding did not accept the position until July 22, 2003.

      f.    <u>The Agency's Version of Events is Contradictory, Manufactured and Not Credible.</u>

The Agency's version of events in this selection is simply not believable. According to the interview scoring sheet from the panel interview, Ms. Fields interviewed for the position at approximately 1:00 p.m. on Monday, July 21, 2003. According to Ms. Fields, at approximately 3:30 p.m. John Chott came to her office and informed her that she had not been selected. To accept the Agency version of events, the court and jury would have to believe that the panel completed its interview of Ms. Fields at approximately 1:30 p.m. on March 21, 2003, and then discussed all of the candidates from the prior week of interviews and gave each of them a score; the scores were placed on a grid; Frago made his selections; Ms. Fields was notified that she was not selected; and all of this occurred in two hours. This cannot be possible for a number of reasons. First, according to Doug Frago, after all of the interviews, he took time and looked at the resumes of the applicants. "Well, after the interviews were complete I remember sitting around the table with – at that point with their – the resumes and we then – we looked at the resumes. I remember that was the first time that I looked at the resumes." 25:3-8. Further, the decision for the 1145 program specialist position was made on July 18, 2003 and Ken Nagel was not selected for that job even though he had the highest score on that application. Frago also testified that the panel discussed that because Nagel received the highest score for both positions, Nagel would be given the option of which position he would prefer. This type of discussion could not have taken place until the final interview of Ms. Fields at 1:30 on Monday, July 21, 2003. It would be impossible for all of these activities to take place in the span of two hours. The sequence of events as described by Ms. Fields supports her claim that the selections were made before she was interviewed.

g.    Other Evidence of Discrimination

Finally, the Agency has a long history of discriminating against minorities, both minority farmers and employees. This practice of consistently selecting Caucasian applicants was acknowledged by Mr. Frago at his deposition. Ms. Fields documented at least eight instances where Caucasian employees were selected for positions over qualified African American employees during the relevant period.

Under <u>Aka,</u> to survive summary judgment in an employment discrimination claim, the court must consider (1) the plaintiff's <u>prima facie</u> case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation of its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)."[6] Here, Ms. Fields has demonstrated that the reasons offered by the Agency are false, and presented additional evidence of discrimination, sufficient to survive summary judgment.

Given this evidence, it certainly cannot be held, as a matter of law, that no reasonable jury could find that the Defendant's action against Ms. Fields was not a pretext for discrimination. The Defendant has not established that no reasonable fact finder could find that its proffered, legitimate, non-discriminatory reasons for the actions against Ms. Fields are a pretext for discrimination. The fact that the Defendant did not follow the normal process when it "normally" would have done so—and thus did not follow its own usual, "normal" procedures in selecting her for an administrative position-

---

[6]<u>Aka v. Washington Hosp. Center</u>, 156 F.3d 1284, 1289 (D.C.Cir. 1998).

-is itself evidence that can also support an inference that the legitimate, non-discriminatory reasons articulated by the Defendant are pretext or are unworthy of belief, especially if the decision was made or influenced  by a discriminating official.[7]

_____

[7]See, e.g., Salazar v. Wash. Metro. Area Transit Auth., 401 F.3d 504, 509 (D.C. Cir. 2005) (appeal after remand, motion granted, Salazar v. Wash. Metro. Area Transit Auth., 2006 U.S. Appl LEXIS 14792 (D.C. Cir., June 13, 2006)), citing Latham v. Snow, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that a jury could infer discrimination when the agency departed from its normal procedures without justification); Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting that an employer's failure to follow its normal procedures, standing alone, may not be sufficient to support a finding of discrimination, but an employer's failure to follow its procedures "is a factor that the trier of fact may deem probative ... in determining the true motivation behind the hiring decision of the prospective employer").

In sum, Ms. Fields has established that the selection process was rigged to prevent her from being selected, and raised an inference of discrimination.  See Salazar v. Wash. Metro. Area Transit Auth., 401 F.3d  at 511 (" . . .we must consider whether a jury which found that WMATA rigged the process to keep Salazaar from getting the job could further conclude that WMATA did so because of Salazar's national origin. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court held that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," particularly since "the employer is in the best position to put forth the actual reason for its decision." *Id.* at 147, 120 S.Ct. 2097; *see also Aka,* 156 F.3d at 1293 (noting that "[t]he jury can conclude that an employer who fabricates a false explanation has something to hide; that `something' may well be discriminatory intent")).

## Conclusion

For these reasons, the motion for summary judgment should be denied.

Respectfully submitted,

By:     _____/s/_____
        David A. Branch #438764
        Law Offices of David A. Branch, P.C.
        1825 Connecticut Avenue, NW #690
        Washington, D.C.  20009
        (202) 785-2805
        Attorney for Plaintiff

**<u>Certificate of Service</u>**

I hereby certify this 17th day of April 2008, that a copy of the foregoing opposition to Defendant's motion for summary judgment was sent electronically to counsel for Defendant, Blanche Bruce, AUSA, 555 4th Street, NW, Washington, DC 20530.


_____/s/_____
David A. Branch