# Exhibit No. 1

**Douglas Frago**

Page 1

1

2                 UNITED STATES DISTRICT COURT FOR THE

3                      DISTRICT OF COLUMBIA

4                        CIVIL DIVISION

5    SEDERIS FIELDS                )

6        Plaintiff                 )

7            vs.                   ) Civil Action No.

8    MIKE JOHANNS, SECRETARY,  ) 06-0538(HHK)

9    U.S. DEPARTMENT OF           )

10   AGRICULTURE                  )

11       Defendant                 )

12

13                                   **COPY**

14

15              Deposition of Douglas W. Frago

16                   Washington, D.C.

17                   March 12, 2007

18

19

20

21   Reported by:  Bonnie L. Russo

22   JOB NO. 179873C

Douglas Frago

Page 2

1

2

3

4

5                    March 12, 2007

6                      2:05 p.m.

7

8

9   Deposition of Douglas W. Frago held at:

10

11          Law Offices of David A. Branch

12          1825 Connecticut Avenue, N.W.

13          Suite 690

14          Washington, D.C. 20009

15

16

17

18

19

20

21   Pursuant to notice, before Bonnie L. Russo,

22   Notary Public

Douglas Frago

Page 3

```
 1   APPEARANCES:

 2   For the Plaintiff

 3           DAVID A. BRANCH, Esq.

 4           LAW OFFICES OF DAVID A. BRANCH

 5           1825 Connecticut Avenue, N.W.

 6           Suite 690

 7           Washington, D.C. 20009

 8           202-785-2805

 9   For the Defendant

10           JUDITH KIDWELL, Esq.

11           UNITED STATES ATTORNEY'S OFFICE

12           555 4th Street, N.W.

13           Civil Division

14           Room E4905

15           Washington, D.C. 20530

16           202-514-7250

17

18   Also Present:

19   Nena Hewitt, Esq.

20   UNITED STATES DEPARTMENT OF AGRICULTURE

21   Sederis Fields

22
```

Douglas Frago

```
 1                C O N T E N T S

 2    EXAMINATION OF DOUGLAS W. FRAGO          PAGE

 3    BY MR. BRANCH                            5

 4

 5

 6

 7    EXHIBITS

 8    1        Final Interview Schedule

 9    2        Score Sheets

10    3        Merit Promotion Competitive

11             Certificate

12    4        E-Mail dated 7-18-03

13    5        E-Mail dated 7-22-03

14    6        E-Mail dated 7-11-03

15    7        Notification of Personnel Action

16    8        Frago Interview Notes

17

18

19

20

21

22
```

Douglas Frago

Page 5

1

2

3    (Exhibits included with transcript.)

4

5

6

7                    P-R-O-C-E-E-D-I-N-G-S

8                    DOUGLAS W. FRAGO,

9    being first duly sworn, to tell the truth, the

10          whole truth and nothing but the truth,

11                testified as follows:

12    EXAMINATION BY COUNSEL FOR PLAINTIFF

13          BY MR. BRANCH:

14    Q.    Please state your name.

15    A.    Douglas William Frago.

16    Q.    Good afternoon, Mr. Frago.  My name

17    is David Branch.  My office represents Sederis

18    Fields.  We are here today to take your

19    deposition.  I have some questions for you.

20    It's going to take us some time to get through

21    the questions here so I want to proceed as

22    quickly as possible, though.

Douglas Frago

Page 6

1           If you need to take a break at any

2     point, let me know.  I will be happy to

3     accommodate that request.  If you're not sure

4     what's being asked of you, just let me know and

5     I'll repeat or rephrase the question.

6           Are you taking any medication or

7     receiving any treatment which would impair your

8     ability to testify truthfully here today?

9     A.    No.

10    Q.    It's important that you provide a

11    verbal response to each question asked.  It's

12    not appropriate to nod your head or to respond

13    in a nonverbal manner.

14          Please allow me to finish the

15    question before you start your answer.

16          Okay.  Are you currently employed?

17    A.    No.

18    Q.    Are you retired?

19    A.    Retired.

20    Q.    Okay.  And who did you last work

21    for?

22    A.    Department of Agriculture.

Douglas Frago

1      Q.    And when did you retire?

2      A.    December of '05.

3      Q.    What was your last position at

4  Agriculture?

5      A.    Deputy administrator for field

6  operations.

7      Q.    And what was your grade?

8      A.    SES 2 or 3.  They switched to a

9  nongraded level, but it was SES.

10     Q.    How long did you work at the

11 Department of Agriculture?

12     A.    Three and a half years this time

13 around.

14     Q.    Had you worked there previously?

15     A.    Yes.

16     Q.    So December of '05 is when you

17 retired from Agriculture?

18     A.    Yes.

19     Q.    So three and a half years since mid

20 2001?

21     A.    2002.  April of 2002.

22     Q.    April of 2002 until December, 2005;

Douglas Frago

1    is that correct?

2         A.    Time goes by.  Yes.

3         Q.    Okay.  So when did you previously

4    work at Agriculture?

5         A.    1990 to 1993.

6         Q.    Any other service at the Department

7    of Agriculture?

8         A.    No.  As an employee, no.

9         Q.    How many years in federal service?

10        A.    I think I had 17, 18.

11        Q.    What's your address?

12        A.    1743 North Lake Shore Drive, Louisa,

13   Virginia.

14        Q.    L-O-U-I-S-A?

15        A.    Correct.  23093.

16              MS. KIDWELL:  For the record, that

17   information is covered under our stipulation

18   and protective order.

19              BY MR. BRANCH:

20        Q.    Your last position at Agriculture,

21   what were your duties?

22        A.    I was deputy administrator for field

Douglas Frago

Page 9

```
 1    operations overseeing the activity of 51 states

 2    and state directors to possibly 2500 county

 3    offices --

 4         Q.     And in the --

 5         A.     -- state committee members and state

 6    offices.

 7         Q.     What were your duties as it relates

 8    to supervising employees in the D.C. office?

 9         A.     I supervised the immediate office of

10    deputy administrator, and, Mr. Branch, it

11    fluctuated whether it was 17 to 22.

12         Q.     17 to 22?

13         A.     People.  And I was a direct

14    supervisor of 51 state directors.

15         Q.     How far have you gone in school?

16         A.     I have a bachelor's degree.

17         Q.     From what university or school?

18         A.     University of -- California State

19    University in San Luis Obispo.

20         Q.     California State University --

21         A.     San Luis Obispo.

22         Q.     How do you spell that?
```

Douglas Frago

Page 10

1      A.     San, S-A-N L-u-i-s.

2      Q.     L-U?

3      A.     L-U-I-S.

4      Q.     Okay.

5      A.     Obispo, O-B-I-S-P-O.

6      Q.     Okay.  What year did you get your

7   degree there?

8      A.     '63.  1963.

9      Q.     Were you involved in the selection

10   of a GS-14 administrative management specialist

11   position in 2003?

12      A.     Yes.

13      Q.     What was your involvement from start

14   to finish from the vacancy announcement until

15   the positions were filled?

16      A.     I and Mr. Chott in my office.

17      Q.     When you say, "Mr. Chott," who are

18   you referring to?

19      A.     John Chott was special assistant.

20      Q.     He was your special assistant?

21      A.     Yes.

22      Q.     What was his title?

Douglas Frago

1      A.    Special.  I believe it was special

2  assistant to deputy administrator for field

3  operations.

4      Q.    Now, was your position a -- was it a

5  political appointment?

6      A.    Political appointment.

7      Q.    Okay.  So you were appointed by

8  President Bush for this position?

9      A.    No.  Technically, I think you're

10  appointed by the administrator which would have

11  been Mr. Little, but you would be cleared

12  through the political process.

13      Q.    Okay.  So Mr. Chott was your

14  specialist assistant?

15      A.    Yes.

16      Q.    When did he become your special

17  assistant?

18      A.    He was there when I was -- he was

19  there when I arrived.

20      Q.    Okay.  And your involvement in this

21  selection for this position?

22      A.    Okay.  When it was determined that

Douglas Frago

1    we were going to upgrade the positions of

2    program positions and administrative positions,

3    plus we were given authority to hire an

4    additional 15 that was going to be in charge of

5    field operations which included the

6    administrative and the program positions.

7        Q.    When you say you were given

8    authority to upgrade the positions, what does

9    that mean?

10       A.    To hire for the position.  Hire the

11   positions.

12       Q.    And so by upgrade you don't mean

13   take an existing position, and raise the level

14   to --

15       A.    No.  Absolutely not.

16       Q.    Okay.  You have to allow me to

17   finish.  You may know where I'm going, but let

18   me get there first.

19            You were not talking about taking an

20   existing position and raising the grade?

21       A.    No.

22       Q.    What's your response?

Douglas Frago

1    A.    No, we were not.

2    Q.    What did you mean by upgrade?

3    A.    Meaning that the levels of

4  responsibilities for two new positions in the

5  administrative area -- actually, three because

6  Mrs. Treese was the assistant in that area or

7  she later -- she became the assistant.

8        We were upgrading the

9  responsibilities of the program people that we

10  had.  We didn't have administrative -- we had

11  program 13s.  But we didn't have the -- any

12  administrative positions that handle the

13  administrative side of the agencies.  It was

14  just kind of fluttered around to everybody.

15    Q.    Okay.  So that determination was

16  made.  What was the next step in the process?

17    A.    Getting approval to hire the three

18  new positions.  Getting the approval to

19  backfill, if it was necessary.  Getting the

20  approval of the agency to hire the 15.

21    Q.    And was that accomplished?

22    A.    Yes.  We were given approval to hire

Douglas Frago

Page 15

1      A.    And one assistant to the deputy

2   administrators position.

3      Q.    And that was at the 15 level,

4   correct?

5      A.    That was the 15.

6      Q.    Okay.  So for the 14 positions there

7   were three positions?

8      A.    That's correct.

9      Q.    All right.  So the last thing you

10  told me was that the -- I think the secretary

11  set up interviews?

12     A.    Yes.  She would have been the person

13  to schedule them.

14     Q.    Okay.

15     A.    Once a cert came from personnel.

16     Q.    All right.  So what was the next

17  thing that happened after the cert came from

18  personnel?

19     A.    Set up the interviews and selected

20  who was going to be on the interview panel.

21     Q.    Who selected who would be on the

22  interviewing panel?

Douglas Frago

1      A.    I did.

2      Q.    Who did you select for the

3   interviewing panel?

4      A.    Soloman Ramirez, Mr. Chott, myself.

5   Both Mr. Chott and I was in -- we were in

6   communication with the personnel folks because

7   we also wanted to have an EEO advisor there,

8   which we did.  And I don't remember his name.

9   I want to say it was Shawn.  But I think that's

10  all I know.

11     Q.    Okay.  So for the first interview

12  the panel included yourself, Chott and Mr.

13  Ramirez?

14     A.    Yes.

15     Q.    Is that correct?

16     A.    Correct.

17     Q.    What positions were you interviewing

18  for?

19     A.    Two administrative positions and one

20  program position.

21     Q.    So you were interviewing for three

22  different positions?

Douglas Frago

Page 14

1    the 15s, the additional 15 and to create three

2    positions.

3        Q.    What were the three positions

4    created?

5        A.    Administrative Specialist II and one

6    program specialist.

7        Q.    What was the next step in the

8    process of filling these positions?

9        A.    Personnel put out the

10   advertisements, the notices.  They compiled the

11   best qualified.  They sent a list, a certain

12   list with a list of qualified candidates.  The

13   secretary then scheduled the interviews.

14       Q.    And what role were you playing in

15   this?

16       A.    I was going to be the deciding

17   official, naturally, because everybody -- at

18   that point, everybody reported to me and I

19   opted to interview the program specialist.

20       Q.    All right.  So you say there were

21   three positions:  Two administrative management

22   positions and one program specialist position?

Douglas Frago

Page 17

1       A.      Three different positions.

2       Q.      Okay.  And what happened next?  Did

3    you conduct these interviews?

4       A.      Conducted the interviews.  After

5    the -- and I -- again, I can't remember whether

6    it was 14 or 15 people that were interviewed.

7    We had three pages of questions.  They were

8    rather generic.  There were a couple of

9    questions that were just strictly program

10   related.  The vast majority of the others were

11   more generic and if they -- a person was

12   applying for the program position, they

13   responded to all the generic questions plus the

14   program.  And the same way with the

15   administrative.  That if they were applying for

16   the administrative, then they did not respond

17   to the program questions.

18      Q.      So did you have some applicants

19   applying for both positions?

20      A.      Yes.

21      Q.      How many applicants applied for both

22   positions?

Douglas Frago

1    A.    I absolutely don't recall.

2    Q.    Okay.  So explain to me what

3    happened as part of this interviewing process,

4    this first interviewing process?

5    A.    Held the interview, individual

6    interviews.  After it was complete when we

7    interviewed everyone, we sat around the table,

8    Ramirez, Chott and myself.  We kept rough

9    notes.  I kept my own notes strictly for my own

10    memory.  And the first interview the decision

11    was mutually made by all three of us that we

12    would only rank people -- what was the term

13    that we used?  I think personnel normally puts

14    terms like high medium and low and we opted

15    just high and medium.  My personal view was if

16    we were sent a cert by personnel that everybody

17    met the minimum standard for that cert.

18    Q.    Okay.  So what was the result of

19    your first interview, first series of

20    interviews?

21    A.    Again, being there were so many

22    folks that had applied and we interviewed, Mrs.

Douglas Frago

1    Treese was selected almost simultaneous by a

2    panel of -- actually, I think there were a

3    couple SES people, and she was selected and I

4    opted at that point to hold a second round of

5    interviews with a top folks on both -- for both

6    positions.  And when I say, "both positions," I

7    mean administrative positions that were the

8    two, and the program position.

9         Q.    Okay.  So there was one round of

10   interviews with all the applicants for both

11   positions; is that correct?

12        A.    That is correct.

13        Q.    Then you decided that there would be

14   a second round of interviews for the top

15   applicants or candidates for both positions?

16        A.    That is correct.

17        Q.    And how many people were interviewed

18   for the program positions?

19        A.    Four or five.

20        Q.    And how many people were -- got to

21   the second interview for the administrative

22   position?

Douglas Frago

Page 20

1      A.    Same thing.  Five, I believe.  That

2   one I was sure there was five.  On the other

3   one I was -- it was -- it just seems it was

4   four or five.

5      Q.    And why did you hold the second

6   round of interviews?

7      A.    Because at that point Mrs. Treese

8   that had been selected for the 15 was going to

9   be the supervisor of these people, whoever was

10  selected, she was going to be the supervisor.

11  I was no longer the supervisor and I thought

12  that she should be a part of the interview

13  process.

14     Q.    Did Mrs. Treese replace someone on

15  the interviewing panel?

16     A.    No.  It was a new interviewing

17  panel.  It was a -- as far as I was concerned,

18  a new panel.

19     Q.    Who was on the second panel?

20     A.    Mrs. Treese, Mr. Chott and myself.

21     Q.    And those -- you and Mr. Chott were

22  on the first panel, right?

Douglas Frago

Page 21

1    A.    That is correct.

2    Q.    But Mr. Ramirez was also on the

3   first panel?

4    A.    He was on the first panel.

5    Q.    Why was he not on the second panel?

6    A.    Because I think then at that point

7   my thought was we were now getting down to

8   really the best of the best.

9    Q.    And so why was he not on the second

10   panel?

11    A.    No reason, other than Mrs. Treese

12   was going to be supervising so I added Mrs.

13   Treese.

14    Q.    You also said you had an EEO

15   observer for the first panel?

16    A.    Uh-huh.

17    Q.    Did you have an EEO observer for the

18   second round of interviews?

19    A.    No.

20    Q.    And why not?

21    A.    Again, with consultation with

22   personnel, they said that wasn't necessary.

Douglas Frago

1      Q.     Well, did personnel tell you that if

2  there was a second interview with the deciding

3  official that you didn't need an EEO observer

4  or if there was a second interviewing panel you

5  didn't need an EEO observer?

6      A.     My recollection is that we didn't

7  need an EEO adviser there.

8      Q.     Okay.  All right.  So what happened

9  after it was decided that you would have a

10  second round of interviews?

11      A.     They were scheduled.

12      Q.     Okay.  And who conducted the --

13  well, strike that.

14           All right.  So they were -- when you

15  say, "they were scheduled," do you mean for

16  both positions?

17      A.     Yes.

18      Q.     Interviews were scheduled for both

19  positions?

20      A.     Yes.  My recollection is yes.

21      Q.     All right.  And so what happened

22  after the interviews were scheduled for both

Douglas Frago

Page 23

1  positions?

2      A.    As we interviewed or -- and again,

3  as I interviewed, we rank each question one to

4  five.

5      Q.    You rank the response to each

6  question or each question?

7      A.    The response from each question from

8  one to five.

9      Q.    All right.  Did you discuss with

10  Mrs. Treese or Chott the fact that you all

11  would rank the responses to questions after

12  each interview?

13      A.    It was -- at some point, Mr. Branch,

14  I have to assume that it was discussed because

15  we did it.

16      Q.    I don't want you to make

17  assumptions.

18      A.    Okay.

19      Q.    I mean, do you recall discussing

20  with Treese and Chott that they were to rank

21  each applicant after the interview?

22      A.    Each applicant was to be ranked,

Douglas Frago

Page 24

1    whether during the interview or after the

2    interview.  Each applicant was to be ranked.

3        Q.    And the question is:  Did you have

4    that discussion with Chott and Treese before

5    you started the interviews?

6        A.    Yes.

7        Q.    Okay.

8        A.    Because as I look back on my notes,

9    I had done that.

10        Q.    Do you know if the other panel

11    members --

12        A.    I had never seen --

13        Q.    -- did that?

14        A.    I've never seen their notes.

15        Q.    So you recall a discussion -- you

16    believe that there was a discussion with

17    yourself and Chott and Treese where there was

18    an agreement that the applicants would be

19    ranked either before or -- well, during or

20    after their interviews?

21        A.    During or after.  Yes, that is

22    correct.

Douglas Frago

Page 25

1     Q.    What was the next step in the

2  process?

3     A.    Well, after the interviews were

4  complete I remember sitting around the table

5  with -- at that point with their -- the resumes

6  and we then -- we looked at the resumes.  I

7  remember that was the first time that I looked

8  at the resumes.

9     Q.    So after all the interviews were

10  done?

11     A.    Yes.

12     Q.    For both positions?

13     A.    Yes.

14     Q.    Okay.  I just want to be sure I

15  understand that.

16     A.    Uh-huh.

17     Q.    Understand this.

18         When you scheduled the interviews

19  did you schedule the -- all of the interviews

20  at the same time or over a period of days?

21     A.    Okay.  It would be over a period of

22  days the interviews took place.  They weren't

Douglas Frago

Page 26

1    at the same time because everybody wasn't in

2    one given room.

3        Q.    Okay.  Well, thank you for

4    clarifying that for me.  I didn't mean to

5    suggest that everybody did it at the same time,

6    but -- so for -- was that true for both

7    positions that you schedule all the interviews

8    over a period of days?

9        A.    Uh-huh.

10       Q.    Is that yes?

11       A.    Yes.

12       Q.    At what point in the selection

13   process was there this discussion between

14   yourself and Treese and Chott?

15       A.    After the interview process.  After

16   we finished interviewing all the candidates.

17       Q.    After the last candidate was

18   interviewed for both positions?

19       A.    Yes.  I do not recall having

20   specific interviews after each candidate.

21       Q.    And you believe that there were five

22   applicants for the administrative series

Douglas  Frago

1    position and four to five applicants for the

2    program position?

3        A.    Yes.

4        Q.    And is it your testimony that after

5    nine to ten interviews, that's when you had

6    this discussion of who would be selected?

7        A.    That is correct.

8        Q.    Okay.

9        A.    That is my recollection.

10       Q.    All right.  And so tell me what

11   happened at the -- during this discussion phase

12   after everyone was selected?

13       A.    Discussion phase, I know we

14   discussed our feelings of what were the strong

15   points on the different responses to the

16   questions, and as I said, that is the first

17   that -- that's the first time I remember

18   looking at the resumes.  I then looked at the

19   resumes again later when I finally made the

20   decision on who was going to be offered the

21   position.

22             Now, I do know a grid was made.  I

Douglas Frago

Page 28

1    didn't make the grid, but at that point I can

2    remember saying, you know, for question number

3    one it was Fields had or whatever the

4    questions -- these were her numbers per the

5    four questions and the same thing with the

6    other candidates.  And then it was added up and

7    I believe then divided.

8        Q.    And did that occur for all nine

9    applicants, nine to ten applicants?

10       A.    As I remember, yes.

11       Q.    When was the grid made?  Was it

12   during this discussion after the candidates?

13       A.    It just seems to me it was made

14   during the discussion when we were ready to

15   give our ratings.

16       Q.    Who made the grid?

17       A.    I am not sure if it was Mr. Chott or

18   Mrs. Treese.  I have seen a copy of it but I

19   don't know their handwriting.  I just don't

20   know.  I know I didn't.

21       Q.    You did not?

22       A.    I know I didn't.

Douglas Frago

1      Q.    Okay.

2      A.    I mean, I can't even read my own

3   handwriting.

4      Q.    And so what happened after a --

5   after you had this discussion?

6      A.    Well, then there was a discussion on

7   who came out on top and in my recollection

8   Nagel came out on top on both program and

9   administrative.  And it just seemed to me the

10  next was Ms. Cronin on the program side.  On

11  the administrative side it was Nagel, Spalding,

12  Peters or Peterson.  Peters, I think.  And

13  there is some discussion on the next two

14  between Freeman and Fields.

15          On my notes I had Freeman ahead of

16  Fields.  On the composite, I think -- I thought

17  it was the other way around.  But they were

18  all -- you know, they were relatively close on

19  the bottom side.

20     Q.    Okay.  So was a decision made after

21  this grid was prepared?

22     A.    No.  No.  Because I still sat --

Douglas Frago

1    after they left I had all the recommendations

2    and I still sat and went through the resumes

3    several more times.  And I would -- I cannot

4    tell you -- I cannot recall whether the

5    decision was made at the end of the day that

6    day of the last interview or whether it was the

7    following day.  Personnel may be able to tell

8    you that because whenever the cert was sent to

9    personnel.  Or the selection.  I don't --

10   excuse me with terminology.  Whatever the --

11   the register was sent back.

12       Q.    Was a decision made before the

13   certificate was sent to personnel?

14       A.    Well, of course.  It would have to

15   be made before because you have to inform

16   personnel on who was selected.

17       Q.    So after the last interview, how

18   long did it take you before a decision was

19   made?

20       A.    Mr. Branch, I cannot sit here in

21   good conscience tell you that it was two hours

22   or it was the end of the day or the next day.

Douglas Frago

1    I just absolutely do not recall.

2        Q.    Okay.  So you don't recall how long

3    it took to make it?

4        A.    I do not recall whether it was a day

5    of two, but it wasn't many days.  I mean, it

6    wouldn't have been a long period.  It could

7    have been that same day or the next day.

8        Q.    And do you recall how long this

9    discussion took place between yourself and

10   Chott and Treese?

11       A.    A couple of hours.

12       Q.    At least a couple of hours?

13       A.    At least a couple of hours.  Nothing

14   happened faster than that.

15       Q.    And you said after you had this

16   discussion, then you looked at the resumes

17   again?

18       A.    Uh-huh.

19       Q.    Okay.  And how long after you had

20   this discussion with Chott and Treese was it

21   that you made a decision?

22       A.    I just don't know the timing again.

Douglas Frago

1    In the meantime -- in between of having all

2    these interviews, you know, the operation of

3    the department went on in the agency so that's

4    why I don't want to say it was at the end of

5    that day or the next day.  But it was in a

6    short period of time.

7         Q.    Okay.

8         A.    By short period I mean in a matter

9    of days.  I just can't -- I cannot tell you.  I

10   cannot remember whether it was on the 8th,

11   10th, 12th, 15th.  I can't remember that.

12        Q.    All right.  What was the next step

13   in the process?

14        A.    The information was sent to

15   personnel.

16        Q.    No, before the information being

17   sent to personnel you said that there was a

18   discussion with yourself and the other panel

19   members.

20        A.    Uh-huh.

21        Q.    And then you looked at the resumes

22   once again?

Douglas Frago

```
 1        A.      And then --
 2        Q.      And then what was the next step in
 3    the process after that?
 4        A.      I made that decision and circled the
 5    name of who was offered the position.
 6        Q.      Okay.  So you made a decision on who
 7    would be selected?
 8        A.      Uh-huh.
 9        Q.      For which positions?
10        A.      All three positions.
11        Q.      Did you make that decision at the
12    same time?  You decided at the same time that
13    all three positions -- who would be selected
14    for all three positions?
15        A.      That, I am almost positive that's
16    what I would have done.  I would not have let
17    them sit.
18        Q.      Okay.  Who did you select for these
19    different positions?
20        A.      Administrative was Nagel and
21    Spalding, and program was Cronin.
22        Q.      Why did you select Cronin for the
```

Douglas Frago

Page 34

1    program position?

2        A.    Because she was next in line.  Now,

3    what I absolutely -- again, I am hoping that if

4    you have already talked to Mr. Chott, I am

5    hoping he will recall, but I can't recall on --

6    at what point -- this is what I can't recall.

7    At what point Mr. Nagel was asked whether he

8    wanted to take the program position or the

9    administrative position.  But I recall that

10   that was given an option because he was top on

11   both.  He was far superior on both program and

12   administrative positions.

13       Q.    So you believe Nagel was given the

14   option of taking either the program or the

15   administrative job?

16       A.    Ultimately, which that he wanted to

17   be considered for and which he took.  That's

18   just -- that's in my mind.  I tend to believe

19   that that's what happened.  Because I know he

20   was -- he came out on top on both.  He applied

21   for and was certified for both and came out on

22   top on both in the scoring of both.

Douglas Frago

Page 35

1      Q.    And I think you testified previously

2  you hope that Chott would be able to answer

3  that?

4      A.    What I am saying is if Mr. Chott is

5  going to be interviewed I will hope that he

6  would remember exactly how that process

7  occurred.  I just don't recall exactly how that

8  occurred.

9      Q.    Well, let me ask you this:  Did you

10  talk to Nagel and tell him he could select

11  either the program or the administrative

12  position?

13      A.    I don't recall talking to Mr. Nagel.

14  I know that was the discussion between Treese

15  and Chott and I when Nagel ended up being top

16  on both that he would be given that option to

17  choose.  Because he was the top of both.

18      Q.    So there was a discussion between

19  yourself and Treese and Chott --

20      A.    Yes.

21      Q.    -- that because Nagel was at the top

22  of both for both positions he would be given

Douglas Frago

Page 36

1    the option; is that correct?

2         A.    That's what I recall.

3         Q.    Okay.  Can you explain to me what

4    was said in that discussion, as much of it as

5    you can recall?

6         A.    No.  Just that that's -- that we

7    were in a dilemma that he happened to be the

8    top on both positions.

9         Q.    Now, did this discussion between

10   yourself and Chott and Treese, did it happen

11   before all of the applicants were interviewed

12   or after all of --

13        A.    Of course not.

14        Q.    Allow me to finish.

15              Or after all the applicants were

16   interviewed?

17        A.    It was after everyone was

18   interviewed, after everyone was scored and then

19   the realization that the same person came out

20   on top on both cases.

21              And I apologize, Mr. Branch, if I --

22   I interrupt.

Douglas Frago

Page 37

1    Q.    No.  That's -- we're fine there.

2    A.    Just everything is here.

3    Q.    All right.  So Nagel was given the

4    option of taking the administrative position or

5    the program position?

6    A.    That's what I recall.

7    Q.    Were you informed which position he

8    accepted or he decided to accept?

9    A.    The administrative, yes.

10    Q.    And who told you that?

11    A.    I believe it was one or the other

12    two told me that.  By the other two I mean Mrs.

13    Treese or Mr. Chott.

14    Q.    So at some point you had this

15    discussion of the applicants and a ranking or

16    rating of the applicants and it was determined

17    that Nagel came out on top?

18    A.    In both positions.

19    Q.    Did you stop this discussion process

20    and someone went and called Nagel or what

21    happened after that that you learned that Nagel

22    was going to accept the administrative

Douglas Frago

Page 38

1    position?

2        A.    I am just not sure what the process

3    was, whether it came back to me before -- and

4    again, I don't even know if it was in writing

5    or verbal, but that came back to me that he

6    wanted to be considered for the administrative.

7    And then I made the decision.

8        Q.    So it was only after Nagel indicated

9    that he wanted to be considered for the

10   administrative position that you made the

11   selection of Nagel?

12       A.    Uh-huh.

13       Q.    Is that yes?

14       A.    That's yes.

15       Q.    Okay.

16       A.    And he scored the highest in the

17   administrative interviews of all the

18   candidates.

19       Q.    All right.  So Nagel was selected

20   for the administrative position and Cronin was

21   selected for the program position.

22       A.    Program position.

Douglas Frago

Page 39

1      Q.    And who was selected for the other

2   administrative position?

3      A.    Pat Spalding.

4      Q.    Okay.  Were you involved in the

5   selection of Spalding for this second

6   administrative position?

7      A.    Yes.

8      Q.    Okay.  Can you tell me what

9   happened?

10      A.    I made that selection based on the

11   scoring, the interviews and the resumes, the

12   back up.

13      Q.    So you made the selection on your

14   own?

15      A.    I made all the selections on my own.

16      Q.    Was it based on the score that he

17   received?

18      A.    Uh-huh.  The score that he received,

19   and as I said, that I also reviewed all the

20   resumes even after they were reviewed with

21   the --

22      Q.    And for all -- for the other folks

Douglas Frago

1    who were selected for these three positions,

2    for all the people that were selected, is it

3    your contention that you selected the

4    individuals who had the highest scores?

5         A.    Uh-huh.

6         Q.    Is that yes?

7         A.    Yes.

8               And I will say that they definitely

9    had the highest scores on my sheets.

10        Q.    What about for the overall panel?

11        A.    They were the highest scores, as I

12   remember also, on the overall panel.

13        Q.    At what point in the process did

14   Patrick -- did Pat Spalding accept the

15   position?

16        A.    Mr. Branch, I believe -- and I am

17   not a personnel person -- but I believe that

18   once the deciding official makes a selection

19   that went to personnel, then personnel does the

20   official informing.  And I think at that point

21   they can still reject -- they can accept it or

22   reject it.

Douglas Frago

Page 41

1     Q.     Did you speak to Mr. Spalding?

2     A.     Only during the interview process.

3     Q.     Only during the interviewing

4  process?

5     A.     Yes.

6     Q.     Did you speak to him after the

7  interviewing process?

8     A.     No.

9     Q.     Did you actually call Mr. Spalding

10  and ask him if he would accept a position?

11     A.     I don't recall if I did.  I don't

12  believe I called anyone.

13     Q.     Did you ask John Chott to call Mr.

14  Spalding to see if he would accept a position?

15     A.     I may have asked John Chott to call

16  the candidates but -- because I want to say

17  that I think it was John Chott that went and

18  talked to Mrs. Fields.  And that was -- we had

19  several people in our office that had applied

20  for these positions and we felt -- and I

21  would -- I agreed with it.  We felt for the

22  continuity within the office.

Douglas Frago

Page 42

1      Q.      Why did you have John Chott

2  contacting people who were not selected or the

3  people who were selected when you were the

4  deciding official?

5      A.      I delegated that down to him.   There

6  was --

7      Q.      Okay.

8      A.      We worked closely together.

9      Q.      So if Mr. Spalding's memory is that

10  you actually called him and offered the job to

11  him would you dispute that?

12      A.      No, I wouldn't dispute that at all

13  because -- again, let me -- Mr. Branch, let me

14  think here.

15              I don't remember.   What I don't

16  remember is whether the search went over first

17  to personnel and they did the notification and

18  then I called the candidates, the successful

19  candidates.   I tend to think that that's how I

20  would have done it, is -- that's how I did it

21  with the state directors.   I didn't select them

22  but I was the person to notify the state

Douglas Frago

Page 43

1    directors that they had been selected.

2           So at some point a conversation did

3    occur with Linda Cronin, with Linda Treese,

4    with Mr. Spalding and Mr. Nagel, at some point.

5    It wouldn't have been until after the search

6    had been sent to personnel.

7       Q.    Did you speak to Mrs. Fields to tell

8    her she had not been selected?

9       A.    No.  I think Mr. Chott is the one

10   that talked to Mrs. Fields and -- because I had

11   talked to Rodge Singh that was also a

12   candidate.  And they were the two that were in

13   our office.

14      Q.    You talked to -- what's the other

15   person's niece name?

16      A.    Rodge Singh.

17      Q.    How do you spell the last name?

18      A.    S-I-N-G-H, I believe.

19           Anyone qualified in our office

20   applied for the positions.  They all didn't

21   make the interviews.

22      Q.    So after you considered the

Douglas Frago

1    applications and you made the final decisions,

2    did you do anything else in the selection

3    process?

4        A.    Other than have the secretary send

5    it to personnel.

6        Q.    And what did the secretary send to

7    personnel?

8        A.    I believe it's called the selection

9    cert.  Again, I don't know the terminology.  I

10   only -- my times there I only had -- this is

11   the only time I hired anybody.

12       Q.    Mr. Frago, were you aware of the

13   positions held by Spalding and Nagel before

14   their selection for this administrative

15   position?

16       A.    I knew the position that Nagel held

17   because he was in our office.  Spalding, he

18   worked for the deputy administrator for farm

19   programs.

20       Q.    And this administrative series

21   position, it was in the 301 series; is that

22   correct?

Douglas Frago

Page 45

1        A.      That's what I told them.

2        Q.      Is it true that neither Spalding nor

3    Nagel actually held a 301 series position at

4    the time they were selected for this job?

5        A.      I have no idea.  I mean, that's one

6    thing I don't remember focusing in.  If they

7    were on the cert, then personnel certified them

8    to be interviewed for that position.

9        Q.      Now, was Mr. Nagel interviewed for

10   both the administrative and program positions?

11       A.      Yes.

12       Q.      Did he have separate interviews for

13   both of those positions?

14       A.      No, he did not.  As I recall, he had

15   one interview on the first round.  One

16   interview like everyone.

17       Q.      One interview, I'm sorry, on the

18   first round?

19       A.      Then on the second, the same thing.

20       Q.      One interview on the second round?

21       A.      Same thing.

22       Q.      And so why was he not interviewed

Douglas Frago

1    twice --

2        A.    The way the questions were --

3        Q.    Allow me to finish.

4            Why was he not interviewed twice for

5    the second position?

6        A.    The way the questions were set up,

7    the three pages, it included generic questions

8    and then it had questions that were

9    specifically program related.   To the program

10   related questions, the administrative person

11   did not have to respond to those or the vice

12   versa.

13       Q.    And what about the second interview?

14       A.    The second interview it was the same

15   four questions for everybody.

16       Q.    Okay.   And why was Mr. Nagel not

17   interviewed separately for the second

18   interview?

19       A.    Because they were the same

20   questions.

21       Q.    Were any of the questions position

22   specific?

Douglas Frago

1      A.      On the second interview it didn't

2    appear to me to be.

3              Can I look?

4      Q.      Certainly.  That's what I'm going to

5    show you.

6              Do you have it there with you?

7      A.      I have my copies.  The first four

8    questions, yes.  First one is interest of your

9    strength as an employee.

10             MS. KIDWELL:  Objection.

11             BY MR. BRANCH:

12     Q.      Can you read the first question?

13             MS. KIDWELL:  Mr. Branch, can we

14   identify this for the record?

15             BY MR. BRANCH:

16     Q.      What are you reading from, sir?

17     A.      I'm reading the interview questions

18   for the GS0114 specialist farm programs, farm

19   loan and administrative functions.

20     Q.      Okay.  Are you reading from your

21   notes?

22     A.      I'm reading the questions.

Douglas Frago

Page 48

1      Q.    The questions from your notes?

2      A.    Yes.

3      Q.    Can you turn to your notes for Ken

4    Nagel?

5      A.    Okay.

6      Q.    Are you there?

7      A.    I am there.

8      Q.    Can you read the first question?

9      A.    "We are interested in your strength

10   as an employee.  What do you bring to this

11   position, knowledge, skills and ability?"

12     Q.    What position was that question

13   referring to?

14     A.    Both.  Because on my notes you can

15   see on the left-hand side I have administrative

16   and on the right-hand side I have program.

17     Q.    Well, the question doesn't say,

18   "What do you bring to these positions," does

19   it?

20     A.    No.

21     Q.    It says "this position."  It

22   identifies a singular position, correct?

Douglas Frago

Page 49

1      A.     That's what -- when you read the

2   question that's what it would imply, but it was

3   for both.

4      Q.     Well, why did you --

5      A.     The intent was for both.

6      Q.     When you say, "the intent was for

7   both," what's the basis for your belief that

8   the intent was for both?

9      A.     Because in my notes I have

10  administrative on one side, I have program on

11  the other.  And in this case, Mr. Nagel's

12  responses he talks about --

13     Q.     We'll get to his responses in a

14  minute.

15     A.     Sure.

16     Q.     But was there a discussion with the

17  panel members that they would rate Mr. Nagel on

18  both the administrative and the program

19  position on this single interview sheet?

20     A.     I would have to -- I don't want to

21  assume.  I would say yes because that's what I

22  did.

Douglas Frago

Page 50

1      Q.    Do you know if the other folks --
2  allow me to finish -- do you know if the folks
3  who -- other folks who were on the interviewing
4  panel rated or ranked Mr. Nagel for both
5  positions on this single interview sheet?

6      A.    I don't know if they did.  I have to
7  assume they did.  That's what I did.

8      Q.    Was there any discussion with the
9  other panel members that they would rate Mr.
10 Nagel on both positions on this single
11 interview sheet?

12     A.    I believe there was.

13     Q.    When did that discussion take place?

14     A.    Before Mr. Nagel or anyone that was
15 being interviewed for two positions when Mr.
16 Nagel came in.

17     Q.    Okay.  So you believe before Mr.
18 Nagel or for anyone who interviewed for two
19 positions came in, there was a discussion that
20 those individuals were to be rated on both the
21 program and the administrative position?

22     A.    That is -- yes, that's what I

Douglas Frago

Page 51

1    believe.

2        Q.    Was Mr. Nagel told at the time of

3    his interview that he was interviewing for both

4    the administrative and the program specialist

5    positions?

6        A.    I believe he was.

7        Q.    Who told him that?

8        A.    He would have been told the period

9    he walked in.  It called have been me.  I would

10   assume it would be me.  It could have been Mrs.

11   Treese or it could have been Mr. Chott.

12       Q.    Do you recall?

13       A.    No, I do not recall.

14       Q.    Let me show you --

15           (Deposition Exhibit No. 1 was marked

16   for identification.)

17           BY MR. BRANCH:

18       Q.    Do you recall when folks were

19   actually interviewed?  Do you recall when folks

20   were actually interviewed for the position?

21       A.    How specific do you -- do I recall

22   what day?

Douglas Frago

Page 52

1       Q.    Yes.

2       A.    No, I don't recall what day.

3       Q.    I'm showing you what's been marked

4  as something taken from the report of

5  investigation.  It says, "Final Interview

6  Schedule."  It has July -- well, first, it

7  says, "Final Interview Schedule 3092 S," what

8  does that mean?

9       A.    That's the office number.

10       Q.    Is that a room?

11       A.    Yes.

12       Q.    Okay.  Is that where the interviews

13  took place?

14       A.    If that was the -- if that's my

15  office number, then yes.

16            Yeah, that would be our office

17  number.  But it could be the secretary outer

18  office.  It could be my office.

19       Q.    And there is a schedule that starts

20  with Wednesday, July 16?

21       A.    Yes.

22       Q.    Are you referring to some other

Douglas Frago

Page 53

1    document?

2        A.    No.  I was trying to see that this

3    is an old book from when I was working and I

4    have an old card there and I can probably tell

5    you what my office number was.

6        Q.    Oh, okay.

7        A.    3094.  My office is 3094.  3092 is

8    the secretary's reception room.

9        Q.    Okay.  So there's -- on this

10   schedule there is Wednesday, July 16; Thursday,

11   July 17; Monday, July 21?

12       A.    Uh-huh.

13       Q.    Do you see that?

14       A.    Yep.

15       Q.    Ad there is -- there are times to

16   the left and then on the right there is

17   handwritten note of unknown Applicant F,

18   Selectee Applicant H?

19       A.    Yes.

20       Q.    Okay.  Do you know what these names

21   refer to?

22       A.    People that were being interviewed.

Douglas Frago

Page 54

1    Q.    Were these folks being interviewed

2    for both positions or just for the

3    administrative?

4            MS. KIDWELL:  Mr. Branch, I'm going

5    to object.  I don't see any names on Exhibit 1

6    that I have a copy of.

7            MR. BRANCH:  He said these -- the

8    unknowns selectee applicant refers to folks who

9    were being interviewed.

10           THE WITNESS:  That's -- I would

11   assume that's what they mean.

12           BY MR. BRANCH:

13   Q.    Does this refresh your memory on

14   when people were interviewed for these

15   positions?

16   A.    What it does -- tells me on

17   Wednesday, 16th, that there was probably four

18   interviews.  And on Thursday, July 17th, there

19   were three interviews, and Monday, July 21st,

20   there was one interview.  So I assume this is

21   when they were interviewed.

22   Q.    Okay.  On July 21st, that interview

Douglas Frago

Page 55

1    was for the complainant, and that would be Mrs.

2    Fields?

3         A.    Yes.

4              (Deposition Exhibit No. 2 was marked

5    for identification.)

6              BY MR. BRANCH:

7         Q.    I am showing what's been marked as

8    your Deposition Exhibit No. 2.

9              Can you identify this, please?

10        A.    This looks like a grid that either

11   Mr. Chott or Mrs. Treese made and lists the

12   numbers that we gave people.

13        Q.    Okay.  And on the second page of

14   this document there are four columns across the

15   top, one, two, three, and four.  Do you see

16   those?

17        A.    Uh-huh.

18        Q.    Underneath those there are initials.

19   Do you know who those initials refer to?

20        A.    John, Doug and Linda.

21        Q.    Okay.  And along the left side there

22   are four names.  Can you read those names?

Douglas Frago

Page 56

1    A.    Pat, Gene, Bruce and Sedaris.

2    Q.    And who are those folks?

3    A.    They were interviewed.

4    Q.    Were they applicants for the

5    administrative series position?

6    A.    Yes, they were applicants for the

7    administrative position.

8    Q.    Were they also applicants for the

9    program position?

10    A.    No.

11    Q.    Let's turn to the second page.  The

12    names along the left-hand column?

13    A.    Uh-huh.

14    Q.    Can you read those names?

15    A.    Linda, Jan, Ken and Chuck.

16    Q.    And who are those folks?

17    A.    They were interviewed also.

18    Q.    And they were applicants for which

19    position?

20    A.    Linda, Jan and Chuck were for the

21    program, and Nagel was for both.

22    Q.    Linda, Jan and Chuck, they were for

Douglas Frago

Page 57

1    the program position.  And you're saying Ken

2    was for both positions?

3         A.    Uh-huh.

4         Q.    Why isn't Ken's name on the first

5    page?

6         A.    I have no idea.

7         Q.    And the initials across the top for

8    four columns, looks like J, D and L?

9         A.    That's correct.

10        Q.    What do they represent?

11        A.    John, Doug and Linda.

12        Q.    Now, were these grids prepared at

13   the same time?

14        A.    I don't -- I did not prepare the

15   grids.  The grids were prepared when we were

16   sitting at the table.  I remember the --

17        Q.    That was after everyone was

18   interviewed?

19        A.    Yes.

20        Q.    Okay.  So it appears that from

21   Exhibit No. 1 that Mrs. Fields was interviewed

22   on Monday, July 21?

Douglas Frago

Page 58

1      A.      Uh-huh.

2      Q.      Is that correct?

3      A.      Correct.

4              (Deposition Exhibit No. 3 was marked

5      for identification.)

6              BY MR. BRANCH:

7      Q.      Can you identify this document?

8      A.      This is the certificate that I

9      believe goes back to the personnel.  Let me

10     read it.

11             Yes.  Okay.

12     Q.      And it's a two-page document?

13     A.      Correct.

14     Q.      And what is the second page of this

15     document?

16     A.      Well, it looks like this document is

17     a promotion noncompetitive certification.

18     Q.      The second page of the document?

19     A.      That's what the title is.

20     Q.      Okay.  And is that your signature at

21     the bottom of the second page?

22     A.      That's my signature.

Douglas Frago

Page 59

1    Q.    And what's the date of this

2    document?

3    A.    Issue date is 28th and the sign date

4    is July 21st.

5    Q.    So did you sign this on July 21st,

6    2003?

7    A.    Boy, is that my -- are those my

8    numbers?

9         Mr. Branch, I signed it.  That's my

10   signature.

11   Q.    And what about the numbers there,

12   the date, the numbers with the date?

13   A.    It looks like they are my numbers,

14   too.

15   Q.    Okay.  And can you explain to me

16   what this first page is?

17   A.    I have to read it.  I have only --

18   I've seen is this once when I signed it.

19   Q.    Is that your signature at the

20   bottom?

21   A.    That's my signature.

22   Q.    It's cut off, but is that your

Douglas Frago

Page 60

1    signature?

2         A.      That's my signature.  And the NS and

3    Ss are mine.  All this other -- the material

4    written on the right-hand side is not mine and

5    the selection on the left-hand side is not

6    added, but the NS, and the Ss are mine.

7         Q.      And what about the Y --

8         A.      Yes.

9         Q.      -- and the no?

10        A.      Those are mine, also.

11        Q.      Okay.  So did you complete this

12   form?

13        A.      I completed those interview yes and

14   no and action SD or NS.

15        Q.      Okay.  This is --

16        A.      This would be -- excuse me -- under

17   the advisement because I would have never seen

18   one of these forms in my life before this

19   interview process.

20        Q.      Okay.  So I believe you told me

21   previously that you interviewed five people for

22   the two administrative management specialist

Douglas Frago

1    positions?

2        A.    I don't know how many of the 14 were

3    the administrative.  I don't recall that.  I

4    mean, do you have that there?

5        Q.    No.  I'm just asking you for -- did

6    you interview five people for the

7    administrative or at least a second interview

8    for the administrative position?

9        A.    Second interview there were five,

10   yes.

11       Q.    Okay.  What does this reflect?  Is

12   this all the interviews for the administrative

13   position?

14       A.    That would be my assumption.  Let me

15   read it.

16            God, I hate to make assumptions.

17   This is the form that was sent back to

18   personnel.  And it looks like to me that

19   everybody is on that list.

20            Is there 13 there or 14?

21       Q.    You'll have to tell me.

22       A.    13.  We didn't interview 13 for each

Douglas Frago

Page 62

1    one.  So I -- my assumption is that is the

2    total number of people interviewed.

3        Q.    And I believe your prior testimony

4    was that you believe that after all the

5    interviews and you had this discussion with

6    Treese and Chott, that the selections were made

7    for all three positions?

8        A.    After all the interviews, after the

9    discussion, yes.

10       Q.    Okay.  And the final -- Mrs. -- was

11   Mrs. Fields the last person to be interviewed?

12       A.    It would appear on this one, yes.

13       Q.    Do you recall if she was the last

14   person to be interviewed or not?

15       A.    I recall because what sticks in my

16   mind -- and as I am thinking it -- before

17   coming here today, there just seemed to me that

18   there was a difficulty that Mrs. Fields was not

19   available for the Wednesday and Thursday.  That

20   just sticks in my mind.  I won't swear on a

21   Bible.  Excuse me.  I won't swear on a Bible on

22   that, but it sticks in my mind that there was

Douglas Frago

Page 63

1    difficulty with the secretary scheduling Mrs.

2    Fields.

3        Q.    Was it because she was on travel?

4        A.    There was some reason.

5        Q.    And is it your testimony that no

6    decisions were made on the selections until

7    Mrs. Fields was selected?

8        A.    Until she was interviewed.

9        Q.    Until she was interviewed?

10       A.    Absolutely.

11       Q.    Okay.

12       A.    And I know that we are writing all

13   this down, but Mrs. Fields did react there.

14   Did I remember correctly?

15       Q.    Wait.  Well, now, hold on.  I'm just

16   asking you questions, sir.

17       A.    Okay.  Sorry.

18       Q.    If you can just answer.

19            (Deposition Exhibit No. 4 was marked

20   for identification.)

21            BY MR. BRANCH:

22       Q.    I am showing you what is marked as

Douglas Frago

Page 64

1    Deposition Exhibit No. 4.

2              Have you seen that document prior to

3    today's date?  There is an e-mail address there

4    that says Doug Frago USDA?

5         A.    Yes.

6         Q.    Is that your e-mail address?

7         A.    Yes.

8         Q.    Okay.

9         A.    Why am I hesitant?  The assumption

10   is, of course, it is.

11        Q.    Okay.

12        A.    It's there and it went through and

13   it didn't bounce back.

14        Q.    All right.  And what's the date of

15   this e-mail?

16        A.    July 18th.

17        Q.    Of what year?

18        A.    '03.

19        Q.    And was that before or after Mrs.

20   Fields was interviewed for the position?

21        A.    Well, she wasn't interviewed for

22   this position.

Douglas Frago

Page 65

1      Q.      Was that before or after.  Was July

2      18th before or after Mrs. Fields was

3      interviewed?

4      A.      July 18th is the Friday.  It is

5      before Mrs. Fields is interviewed.

6      Q.      And what is this -- what is the

7      subject of this letter or subject of this

8      e-mail?

9      A.      That Doug has chosen Linda Cronin

10     for -- subject, his selection.

11     Q.      Okay.  And what is the contents, if

12     you can read the contents of this e-mail?

13     A.      That "Doug has chosen Linda Cronin

14     for the program specialist position."

15     Q.      So this e-mail seems to suggest that

16     Doug -- and that would be you, correct?

17     A.      Uh-huh.

18     Q.      Doug Frago has chosen Linda Cronin

19     for the program specialist position and it's

20     dated July 18th, 2003?

21     A.      That's what it says there.

22     Q.      Okay.  And I believe your prior

Douglas  Frago

Page 66

1    testimony was that Linda Cronin was not

2    selected until Mrs. Fields was interviewed?

3         A.    That's what I recalled.  But this

4    would tell me that Mr. Chott sent this out

5    before we finished the administrative

6    interviews.

7         Q.    Before you --

8         A.    So I stand corrected.

9         Q.    Okay.  So Mr. Chott sent this e-mail

10   out -- July 18th, 2003 e-mail out before the

11   interviews were completed?

12        A.    Before the administrative interviews

13   were completed.

14        Q.    Okay.  Now, I believe you testified

15   previously that after all the interviews since

16   Ken Nagel ranked the highest in both the

17   administrative and the program interviews, that

18   he was given the option of selecting the

19   program position or the administrative

20   position?

21        A.    That's what I recall.  The timing

22   may be off, but that's what I recall.

Douglas Frago

1      Q.     Okay.

2      A.     My timing may not be on, but that's

3   what I recall.

4      Q.     So how can it be that Nagel was

5   given the option of accepting the

6   administrative or the program position and that

7   position was announced that it had been filled

8   on July 18th and Mrs. Fields was not even

9   interviewed until July 21?

10      A.     Then it would tell me that the

11   interviews of all the program applicants had

12   already been completed and it tells me that

13   maybe what it was is that Ken opted to only be

14   considered for the administrative.  And

15   therefore that relieved the selection -- the

16   timing I'm just -- Mr. Branch, I can't remember

17   the timing if I can't remember the timing.

18           I just know that what I have told

19   you as far as Ken was the top on both, and you

20   know, if John sent this out on the 18th, on the

21   Friday after, it would then tell me that the

22   decision for the program position had been made

Douglas Frago

Page 68

1    before the administrative position.

2        Q.    All right.  So now let's get this

3    clear.  When did you make a decision on the

4    program position?

5        A.    Looking at that would tell me it

6    would have been on Thursday or Friday.  The

7    timing there is 4:56 p.m..

8        Q.    So you believe you made a decision

9    on the program position before --

10       A.    I believe I --

11       Q.    -- before Friday at 4:56 p.m.?

12       A.    What I told you is I believe that I

13   made the decision after all people were

14   interviewed.

15       Q.    Okay.  And which --

16       A.    I evidently recalled incorrectly.

17       Q.    So now you're changing your

18   testimony?

19       A.    Am I to assume that this is a fact?

20       Q.    Well, I can't answer the question

21   for you.

22       A.    And I can't either.  So I can't

Douglas Frago

Page 69

1    answer that.  That, I can't -- I can't answer

2    that question because if that went out, that

3    would tell me -- if this is, in fact, an e-mail

4    that went out, then Mr. Chott is informing the

5    staff that Ms. Cronin has been selected as the

6    program specialist.  And that is on the -- July

7    18th.  Which is the day after the Thursday.

8        Q.    So is it your belief that Nagel

9    declined the position of program specialist

10   before the final -- before the interview

11   process was even completed for the

12   administrative position?

13       A.    That would appear to me that that

14   would tell us.

15       Q.    Did John Chott tell you that Nagel

16   had declined the position before the

17   interviewing process was completed for the

18   administrative position?

19       A.    That, I don't recall.  I recall that

20   Mr. Nagel came out top on all of them.  That, I

21   just recall.  Because that's what my notes

22   have.

Douglas Frago

Page 70

1      Q.    Was Mr. Nagel a preselection for

2   this administrative position?

3      A.    Absolutely not.

4      Q.    Well, that's what it seems like from

5   these documents?

6            MS. KIDWELL:  Objection.

7   Argumentative.

8            THE WITNESS:  Absolutely not.

9            BY MR. BRANCH:

10     Q.    It appears that a decision had

11  already been made to select Mr. Nagel.

12  Wouldn't that be an explanation for this?

13           MS. KIDWELL:  Objection.

14  Argumentative, improper foundation.

15           THE WITNESS:  No, Mr. Branch.  No,

16  it would not be.  There was no preselection.

17  The best candidates were selected after the

18  interview process.

19           BY MR. BRANCH:

20     Q.    But as I understand your prior

21  testimony, Mr. Nagel declined the position of

22  program specialist?

Douglas Frago

1      A.    No, I did not say he declined.

2      Q.    He was given the option of -- allow

3   me to finish.

4      A.    I believe he was given the option,

5   yes.

6      Q.    Okay.  He was -- your testimony, I

7   believe, was that he was given the option of

8   accepting the program or the administrative

9   position and he decided to accept the

10   administrative position?

11      A.    And again, this is recalling four

12   years later is giving the option or wanting to

13   be considered for -- I don't know the

14   correct -- I don't know what terminology was

15   used.  It's four years ago.

16          MR. BRANCH:  Let's take a short

17   break here.

18          (A short recess was taken.)

19          BY MR. BRANCH:

20      Q.    Mr. Frago, for the individuals who

21   were recommended for selection for the two

22   administrative positions, did they agree to

Douglas Frago

Page 72

1    accept the positions before you sent the

2    certificate to personnel?

3        A.    Not that I recall.

4        Q.    So can you explain to me why you

5    would send a certificate to personnel before

6    the positions were accepted?

7        A.    My understanding -- personnel -- as

8    far as I understand, personnel is the one that

9    makes the offer.  Personnel is the one that

10   does that.

11       Q.    So what did you understand your role

12   when you completed this?

13       A.    That as selecting official telling

14   personnel who the choice was for the position.

15       Q.    Okay.  For the second page of -- I

16   think this is Exhibit No. 3, I guess it's the

17   first page of Exhibit NO. 3.  The second page

18   may be a continuation of that first page.

19       A.    I have come to the same conclusion.

20       Q.    So there are two names, two items

21   listed here with selecting one and selecting

22   two.

Douglas Frago

Page 73

1          Do you see those two items?

2     A.     Uh-huh.

3     Q.     Is that a yes?

4     A.     Yes.

5     Q.     And this page -- this document is

6     dated July 21st, 2003?

7     A.     Yes.

8     Q.     Had Mr. Spalding or Mr. Nagel

9     accepted the position when you sent this merit

10    promotion competitive certificate to personnel?

11    A.     I don't recall.

12    Q.     Had you spoken with either one of

13    them to offer the position to them?

14    A.     I don't believe I had.

15    Q.     Did you speak to either Mr. Nagel or

16    Mr. Spalding after you completed this to offer

17    the position to them?

18    A.     At the point that personnel would

19    have said I can do that that's what I would

20    have done.

21    Q.     Do you recall how long it was after

22    you sent this to personnel before personnel

Douglas Frago

1    said to you, you can offer these folks a job?

2         A.    No, I do not.

3         Q.    Was it within --

4         A.    I think this must be Carol Taylor's

5    signature.

6         Q.    Was it within a week or a month?

7         A.    Do not know.  No.  It would have

8    been soon after.

9         Q.    What do you mean by soon after?

10   Less than a week, less then a month?

11        A.    I would assume a couple -- here I

12   go.  In a couple of days.

13        Q.    And so --

14        A.    If not that day.

15        Q.    Okay.  And --

16        A.    I don't recall.

17        Q.    Okay.  And after personnel told you

18   it was okay to offer the position to them what

19   did you do?  Did you contact these folks?

20        A.    At some point I talked with Nagel,

21   Cronin and Spalding as I talked with Linda

22   Treese.

Douglas Frago

Page 75

1    Q.    And what did you tell these --

2    Nagel, Spalding and Cronin?

3    A.    That they were my selection for the

4    position.

5    Q.    And you don't know if that was

6    before or after you spoke to personnel?

7    A.    I wouldn't have spoke directly to

8    personnel.  This would have gone over and they

9    would have communicated back.

10    Q.    Okay.  Or after someone spoke --

11    someone from personnel spoke to you and

12    communicated back to you?

13    A.    That that was a process.

14    Q.    Do you know when that -- when it

15    occurred that you talked to these?

16    A.    No, I do not.

17    Q.    Cronin, Nagel or Spalding?

18    A.    No, I do not.

19    Q.    Did you talk to those three

20    individuals on the same day?

21    A.    I do not recall.

22          (Deposition Exhibit No. 5 was marked

Douglas Frago

Page 76

1    for identification.)

2              BY MR. BRANCH:

3        Q.    Showing you what has been marked as

4    Deposition Exhibit No. 5.

5              Can you identify this document?

6        A.    The document is an e-mail from John

7    Chott, July 22nd, '03.  Subject was selection.

8    It says, "Doug has asked that all of you be

9    notified that he is has selected Ken Nagel and

10   Pat Spalding of FLP for the two administrative

11   positions."

12             MS. KIDWELL:  Mr. Branch, just for

13   the record, agency counsel -- neither agency

14   counsel or I have seen Exhibits 4 and 5 prior

15   to this deposition.

16             MR. BRANCH:  Mrs. Fields, you can

17   see that there is a date here at the bottom.

18   I'm not sure the source of the date, but we

19   just received these documents today.  So the

20   first time I have seen them is today.

21             I think they probably would have

22   been responsive to the discovery request that

Douglas Frago

Page 77

1  we -- when we asked for all the documents

2  related to the filling of these positions.  So

3  I'm concerned that the agency hasn't adequately

4  checked the electronic mails to produce these

5  documents, or produce these e-mails.

6          MS. KIDWELL:  Mr. Branch, for the

7  record, I think that these documents are

8  also -- should have been responsive to the

9  discovery which we propounded to the plaintiff.

10          MR. BRANCH:  And what I'm telling

11  you I just received it today so you're getting

12  it the same day that I'm receiving it.  But the

13  agency should have checked its records, it

14  should have produced these documents

15  previously?

16          MS. KIDWELL:  If the documents were

17  available.  We're talking over four years ago.

18          BY MR. BRANCH:

19      Q.    Did you authorize John Chott to

20  advise the staff that Ken Nagel and Pat

21  Spalding have been selected for the two

22  administrative positions?

Douglas Frago

1      A.     He did.  I assume I did.

2      Q.     I understand that Mrs. Fields was

3  interviewed on the afternoon of the 21st, of

4  July 21st, and then there was some discussion

5  with the panel members.  There was a ranking or

6  rating of the candidates and then this e-mail

7  which is dated the following day indicates that

8  Ken Nagel and Pat Spalding were selected for

9  the administrative positions.  Is that your

10  memory of how things happened?

11     A.     Yes.

12     Q.     Do you recall talking to Ken Nagel

13  on the evening of July 21st at 6:00 and Mr.

14  Nagel -- I'm sorry.

15         Do you recall talking to Pat

16  Spalding on the evening of July 21st at 6:00

17  p.m. and Mr. Spalding telling you that he could

18  not accept the position until he spoke with his

19  wife?

20     A.     I don't recall that.

21     Q.     And on July 21st you submitted to

22  your personnel department this merit promotion

Douglas Frago

Page 79

1    competitive certificate where you indicated

2    that the selectee was -- that two individuals

3    have been selected from the applicants?

4        A.    Correct.  Yes, I see that.

5        Q.    Okay.  How could it be that the

6    selections were made for these two individuals

7    when Mr. Spalding didn't agree to accept the

8    position until the 22nd of July?

9              MS. KIDWELL:  Objection.  Improper

10   foundation.

11             THE WITNESS:  My understanding --

12   not my understanding.  The selection process is

13   once people are selected it goes -- it's sent

14   to personnel.  Whether a person accepts the

15   position or doesn't accept the position is

16   irrelevant.

17             BY MR. BRANCH:

18       Q.    Mr. Frago, do you know what the

19   difference is between a -- between the 301

20   administrative position at the 14 level and the

21   program specialist position 1145 at the 14

22   level?

Douglas Frago

Page 80

1      A.    I am not a expert on different

2   classifications, program is one.  Personnel is

3   the other.  I mean --

4      Q.    I understand Mr. Nagel was the

5   highest rated person for the program specialist

6   position which was -- which is an 1145

7   position?

8      A.    Okay.

9      Q.    But he was not selected for the

10  program specialist position at the 14 level

11  even though he was already in the 1145 series.

12  Do you know why that occurred?

13     A.    Repeat it again.

14     Q.    Mr. Nagel was in the 1145 series at

15  a grade 13 level.  He applied for a grade 14

16  position in the 1145 series but he was not

17  selected for that position.  And I am asking

18  you, do you have an explanation of why, if he

19  was already in the 1145 series at the 13 level,

20  he was not selected for the grade 14 position

21  in the 1145 series?

22     A.    According to my notes, he was -- he

Douglas Frago

Page 81

1    scored the highest in the administrative

2    position.

3         Q.    Okay.  But why was -- if he was

4    already in the 1145 series, why wasn't he

5    selected for the 1145 series at the grade 14

6    level?

7         A.    I don't know if it would make any

8    difference.

9         Q.    What do you mean it wouldn't make

10   any difference?

11        A.    Because he qualified for either one

12   of the two.

13        Q.    Well, it would mean that someone

14   other than Mr. Nagel would have to be selected

15   for the administrative series position,

16   wouldn't it?

17        A.    That, I don't know.  It would assume

18   to me, then, Mr. Peters -- taking your line of

19   thought, then Mr. Peters would be the next

20   selectee.

21        Q.    And who is Mr. Peters?

22        A.    He was number three in the

Douglas Frago

Page 82

1    administrative.

2        Q.    Was Mr. Peters already in the 301

3    series?

4        A.    I have no idea.  I have no idea.  I

5    have no idea what series they were in.

6              (Deposition Exhibit No. 6 was marked

7    for identification.)

8        Q.    I believe your prior testimony was

9    that you believe that it was HR approved the

10   process of not having an EEO observer on the

11   second interview panel?

12       A.    Repeat that again.  I don't think

13   that's what I said.

14       Q.    Why did you not have an EEO observer

15   on the second panel?

16       A.    What did you just say?  I'm sorry.

17       Q.    Well, let me just rephrase the

18   question.

19             Why did you not have an EEO observer

20   on the second panel?

21       A.    We just didn't, but we asked Carolyn

22   Taylor if we had to and she indicated no, that

Douglas Frago

Page 83

1    it was not necessary.

2        Q.    Okay.  Can you read this first

3    sentence of this e-mail?

4        A.    "The EEO representatives are

5    required only for panel interview process.  If

6    you're doing a second interview which is

7    usually with a selecting official or

8    representative, you do not need an EEO

9    present."

10       Q.    Was the second interview a panel

11   interview?  Was the second interview for the

12   administrative specialist position a second --

13   a panel interview?

14       A.    The second interview was Mr. Chott

15   and I and Mrs. Treese because she had just been

16   selected and was going to serve.

17       Q.    Was that a panel?

18       A.    I don't think it was -- I don't

19   remember referring to it as a panel.

20       Q.    Well, what's your under --

21       A.    The first one was a panel.

22       Q.    Why -- how did the first one differ

Douglas Frago

Page 84

1    from the second?

2        A.    I wanted Mrs. Treese to have some

3    input because she was going to be the

4    supervisor of the these positions.

5        Q.    Okay.  Then you misunderstood my

6    question.

7            Why was the first interview that

8    included three people consist -- considered a

9    panel and the second interview that included

10   three interviewers not considered a panel?

11           MS. KIDWELL:  Objection.  Improper

12   foundation.

13           THE WITNESS:  It just wasn't

14   referred to as a panel.

15           BY MR. BRANCH:

16       Q.    What was it referred to as?

17       A.    We were having a second interview

18   and I wanted Mrs. Treese to be present.

19       Q.    And the second part of this first

20   sentence says that if you're doing a second

21   interview, which is usually with the selecting

22   official or representative, you do not need EEO

Douglas Frago

Page 85

1    present.

2              Was the second interview with the

3    selecting official alone?

4         A.    No.

5         Q.    Was the second interview with the

6    selecting official or the selecting official's

7    representative alone?

8         A.    No.

9         Q.    Have you seen this e-mail prior to

10   today's date?

11        A.    No.

12        Q.    What's your understanding of this

13   first sentence, the first two sentences here?

14        A.    That in the initial panel we need

15   you to have an EEO representative and the

16   second one we did not.  The second --

17        Q.    The second what?

18        A.    Interview we did not.

19        Q.    Well, doesn't this seem to say that

20   if you're doing a second interview, which is

21   usually with the selecting official or

22   representative, you do not need EEO present?

Douglas Frago

Page 86

1          MS. KIDWELL:  Objection.  Asked and

2     answered.

3          THE WITNESS:  I think I already

4     answered that.

5          BY MR. BRANCH:

6     Q.    And the EEO representative is

7     required only for panel interview process?

8     A.    That's what it says.

9     Q.    Okay.  Do you know if there was any

10    follow-up to seek clarity on whether the three

11    individuals who conducted the second interviews

12    were considered a panel?

13    A.    I have no idea.  Mr. Chott sent this

14    one.

15    Q.    Mr. Frago, are you aware of any

16    occasion where John Chott has made racist

17    comments?

18    A.    No.

19    Q.    Has he made any racist comments in

20    your presence?

21    A.    No.

22    Q.    Have you been told that he made

Douglas Frago

Page 87

1    racist comments at any occasion?

2        A.    No.

3        Q.    Wasn't it true that John Chott

4    referred to an African-American employee as a

5    fat afro black lady or something along those

6    lines?

7        A.    Never heard that.

8        Q.    Are you aware of any EEO complaints

9    being filed against Chott?

10       A.    No.

11       Q.    Have you sat on any other panels

12   other than the panels that you sat on for this

13   position?

14       A.    No.

15       Q.    Were there other EEO complaints

16   filed against your agency or you department

17   while you were the supervisor?

18            MS. KIDWELL:  Objection.  Improper

19   foundation.

20            THE WITNESS:  My department, no.

21            (Deposition Exhibit No. 7 was marked

22   for identification.)

Douglas Frago

Page 88

```
 1                 BY MR. BRANCH:

 2        Q.     I am showing you what has been

 3   marked as Deposition Exhibit No. 7.

 4               Can you identify this, please?

 5               You may not be able to identify it

 6   from the first page since the name is redacted.

 7        A.     I don't.

 8        Q.     If you will look at the last --

 9        A.     Personnel action?

10        Q.     Yeah.  If you will look at the last

11   page, do you see your name on this document?

12        A.     Uh-huh.

13        Q.     And you're listed as the rating

14   official?

15        A.     Uh-huh.

16        Q.     I'm going to represent to you that

17   this is the evaluation for Mr. Nagel for the

18   period ending September 30th, 2002.

19        A.     Uh-huh.

20        Q.     If you will turn to the second page

21   of this document, second page, Page 2.

22        A.     This is Page 2.
```

Douglas Frago

Page 89

1      Q.      Okay.   The second page of the

2   document under title, series and grade program

3   coordination specialist GS 301 13/04?

4      A.      Uh-huh.

5      Q.      Do you see that?

6      A.      Yes.

7      Q.      Was Mr. Nagel in a 301 series

8   position for the year ending 2002?

9      A.      I have no idea.

10      Q.      Okay.   But you signed this document?

11      A.      I signed the rating.   I didn't --

12   yes, I signed the rating, yes.

13      Q.      Do you know why his performance plan

14   agreement and appraisal would indicate that he

15   was in a 301 series position?

16      A.      I have no idea.

17           MS. KIDWELL:   For the record, Mr.

18   Nagel's name does not appear anywhere on

19   Exhibit 7.

20           MR. BRANCH:   Yeah.   The names have

21   been -- the name has been redacted.

22           BY MR. BRANCH:

Douglas Frago

Page 90

```
1       Q.      Turn, if you will, to --
2               (Deposition Exhibit No. 8 was marked
3       for identification.)
4               BY MR. BRANCH:
5       Q.      Can you identify these?
6       A.      These are my notes.
7       Q.      If you will turn to the first page,
8       these are your interview notes?
9       A.      Yes.
10      Q.      Okay.  And do you see Mrs. -- the
11      first individual interview, do you have
12      Sederis?
13      A.      Yes.
14      Q.      Is that Mrs. Fields?
15      A.      That is correct.
16      Q.      There is no date on this document,
17      correct?
18      A.      That is correct.
19      Q.      And why isn't there a date on the
20      document?
21      A.      Because these were my working notes
22      to help me recall.  They were -- that's what
```

Douglas Frago

1    they were.

2        Q.    And there is a number to the left of

3    each of the four questions?

4        A.    Correct.

5        Q.    Did you make those numbers?

6        A.    That is correct.

7        Q.    Was there a discussion between you

8    and the other panel members on what scores or

9    what answers would receive particular scores in

10   response to these questions?

11       A.    No.

12       Q.    So how did the panel members know

13   what was a good score or what was a good

14   answer?

15       A.    Each individual has that subjective.

16       Q.    Can you read Mrs. -- read your notes

17   in response to question number one for Mrs.

18   Field?

19       A.    Sure.

20             My notes.

21       Q.    Yes.  Read them, please.

22       A.    "20 years experience, identifies

Douglas Frago

1    problems, extensive work" -- "extensive working

2    with the counties, research mediation," I'm not

3    sure what my next word is there.   "Good

4    listener."  And I put "narrow" on the side.

5        Q.    What does narrow mean?

6        A.    As I remember, it was related to the

7    20 years experience because I felt the comments

8    were very narrowly focused on her expertise as

9    civil rights EEO.

10       Q.    And did you originally give her 2

11   and cross it out and change it to the a 3?

12       A.    Yes, I did.

13       Q.    Did you give her -- originally give

14   her 2s for all of her scores?

15       A.    I don't recall whether I crossed a 2

16   out.  If I rated 2 and then scratched it out

17   and put the 3 and then went on to question

18   number 2.

19       Q.    Now, did you make your decision on

20   the selection of Spalding and Nagel based only

21   on their interviews?

22       A.    No.  No.  I said that we went

Douglas Frago

1    through this second process and then looked at

2    the resumes.

3        Q.    Were the applicants given any credit

4    for the information contained in the resumes?

5        A.    Oh, sure, yes.

6        Q.    Where was that?

7        A.    That was when I was making the final

8    decision.

9        Q.    Did you give them any numerical

10   score for the information contained in the

11   resumes?

12       A.    No.

13       Q.    Can you read the notes that you made

14   in response to question 2 for Mrs. Fields?  Can

15   you read your handwriting?

16       A.    Yeah, I will get to it.  I'm reading

17   the question first.

18           Mrs. Sederis's first comment was so

19   many.  She indicated there were so many

20   accomplishments.  I am not sure the amount of

21   harassment investigations.

22       Q.    Is that sexual harassment?

Douglas Frago

Page 94

1        A.      Could be.

2        Q.      Okay.  What else?

3        A.      Deals with civil rights.  SCS.  She

4    was certified as a mediator.

5        Q.      Where are you reading?

6        A.      Number 2.

7        Q.      Okay.  What's the second line, the

8    first sentence on the second line?

9        A.      "Misunderstanding of program."

10       Q.      What does that mean?

11       A.      I believe in the response to the

12   question there must have been something that

13   Sederis had said that indicated that I wrote

14   misunderstanding of program.

15       Q.      Who are you referring to?

16       A.      Sederis.

17       Q.      That she had a misunderstanding of

18   some program?

19       A.      Uh-huh.

20       Q.      What program?

21       A.      I don't recall.

22       Q.      Okay.  What's your -- can you read

Douglas Frago

Page 95

1    anything else from that response?

2        A.    No.

3        Q.    Can you read your notes from the

4    third -- her third -- response to the third

5    question?

6        A.    "Describe yourself in terms of your

7    ability to work as a member of the team and

8    what do you believe makes successful chain,

9    respect others opinion.  Dependable, panel

10   participant, never says no or never say no,

11   likes various committees."

12       Q.    And what was -- can you read your

13   notes for question 4?

14       A.    It was "Tell me about a major

15   problem you recently handled.  What issues were

16   presented?  Were you successful in resolving

17   it?  Please be specific as possible."

18            And the response was a short notice

19   on award that she was asked to do some logistic

20   responsibilities, make reservation, hotel, work

21   at hotel, time, et cetera, many problems.  She

22   worked on the Christmas party at the last

Douglas Frago

Page 96

1   moment. She did the investigation in Georgia.

2   I am not sure why I have a question mark on

3   that computer hard line drive. I didn't know

4   what -- didn't come out clear to me. I have no

5   idea what that refers to. And then she puts

6   likes to follow through.

7       Q.    What is this comment "can't chew"?

8   What's that?

9       A.    It's related to the hard drive on

10  the computer. Went down. And I'm not sure.

11  That's not can't. I don't know what that

12  means.

13      Q.    And what's the last thing?

14      A.    Christmas party. I wrote that twice

15  in the middle because I remember Sederis -- one

16  of the accomplishments -- well, one of her

17  successful resolution of a major problem and I

18  rated her low because there were so many other

19  things that seemed to be more important than

20  Christmas parties or award ceremonies.

21      Q.    Okay. And let's look at your notes

22  for Pat Spalding. Under question number 1 it

Douglas Frago

Page 97

1    looks like the word "John" is written to the

2    left.  What is that?

3         A.    Yeah.  He asked that question.  John

4    asked that question.  Linda asked the second

5    question.  Doug asked the third question.

6         Q.    Oh, okay.

7         A.    We all asked the same question.

8         Q.    All right.  Can you read your notes

9    there?

10        A.    Sure.  First one?

11        Q.    Yes.

12        A.    "Knowledge of FSA and FMHA, positive

13   attitude."  I put good body language,

14   communication, administrative background and

15   contracting.  I'm not sure what that word is,

16   but he worked between MSD which is management

17   service department and the field.

18        Q.    It looks like disconnect?

19        A.    Could be.  Disconnect between MSD

20   and the field.  Budgeting, funding, some

21   personnel and the work with OPM.

22        Q.    Now, this position was an

Douglas Frago

1    administrative management position, correct?

2        A.    Uh-huh.

3        Q.    And most of the work would be

4    personnel; is that correct?

5        A.    No.

6        Q.    Most of the work would be in what

7    area?

8        A.    Contracting, budgeting, funding,

9    office consolidations.

10       Q.    Okay.  What's your -- can you read

11   your notes for the second question?

12       A.    "In your accomplishments describe in

13   detail two or three accomplishments.

14   Reorganization of office closures, employment

15   movement," employees had to be moved from one

16   office to another.  Many reorganization or

17   organization of a state office.  And the horse

18   breeding regulation was a major issue in the

19   farm home -- farm loan program with Mrs.

20   Cooksey and he indicated that he wrote the

21   regulations and worked on the regulations for

22   the Horse Breeders Association regulations.

Douglas Frago

1    Q.    Okay.  And what was his response to

2    the third question?

3    A.    "Describe yourself in terms of your

4    ability to work as a member of a team.  What do

5    you believe makes a successful team?  He's a

6    team player.  Personalize, must lead well or be

7    a leader, communications, goals being" -- "set

8    goals."

9    Q.    And what was his response to

10   question 4?

11   A.    "Tell me about your major problem

12   you recently handled.  What issues were

13   present?  Were you successful in resolving it?

14   Please be specific."  MT stands for Montana.

15   Walton stands for a major issue of an eviction

16   in Montana of some landowners and he was --

17   worked closely on the Walton program and the

18   ultimate -- that the Waltons complied with the

19   eviction.  The other was office ceilings.  That

20   he worked on office ceilings in the farm loan

21   program sections.

22   Q.    Turn, if you will, to section -- to

Douglas Frago

1    the next page, Ken Nagel.

2         A.    Uh-huh.

3         Q.    You dated this document, correct?

4         A.    Uh-huh.

5         Q.    Is that a yes?

6         A.    Yes.

7         Q.    Can you read your notes under

8    question 1?

9         A.    "Strong FSA background.  CD

10   management of people, CECD account executive

11   director, management of people.  Worked with

12   the state White House.  Liaison" -- but I can't

13   remember what the other heading was.  For the

14   state committees.  He worked with FAC, F-A-C,

15   which is -- what does FAC stand for?  The

16   National FAC.  It's the organization between

17   FSA.

18        Q.    If you can just read what you wrote,

19   that would be fine?

20        A.    Okay.  "Speaking engagements and the

21   farm loan liaison for the field operations."

22        Q.    And his answer was in response to

Douglas Frago

Page 101

1    his application for which position?

2        A.    Both.   Because you can see that he

3    is referring to the CED program positions and

4    working in the county and state office and the

5    administrative side would be the management of

6    people, the White House contacts and the

7    National FAC.

8        Q.    Now, on this page you included on

9    the left side it looks like ADM, is that

10   administrative?

11       A.    Administrative.

12       Q.    And on the right is program?

13       A.    Program.

14       Q.    Do you know why the other panel

15   members did not score Mr. Nagel for the

16   administrative and program separately?

17       A.    I think I already mentioned that,

18   that I don't know what they did.   I didn't see

19   their papers.

20       Q.    Okay.   What's your -- what was the

21   response to question 2 indicated in your notes?

22       A.    Okay.   "We're interested in your

Douglas Frago

Page 102

1  accomplishments, which you enjoy doing and

2  doing well.  Worked with state committees.  235

3  appointments, successful task when the

4  administrative change occurred all state

5  committees had to be replaced.  Working with

6  state SEDs the consent decree which was part of

7  farm loan consent decree," and the last refers

8  to working in Puerto Rico after the hurricane.

9  And the clearing of -- there were thousands of

10  cases.

11     Q.    Okay.  What was your -- what do your

12  notes indicate in response to question 3?

13     A.    Well, I'm sure what I am writing is

14  ability as a team player, more than one person

15  on a team, and work together.

16     Q.    What do your notes indicate in

17  response to question 4?

18     A.    Major accomplishments, but he said

19  he took over the county committee systems and

20  the regulation writing, the denominations and

21  balloting for county committees.

22     Q.    Are you able to read the rest?

Douglas Frago

Page 103

1        A.      Information known as -- he also

2    worked on notices.  Regulations.  Agency

3    department regulations.

4        Q.      Now -- okay.  Thank you.

5            Mr. Frago, I understand that during

6    the period when you were the supervisor in the

7    office that a number of positions were filled.

8    There was a position supervisor field

9    operations filled by Linda Treese; is that

10   correct?

11       A.      Correct.

12       Q.      She's a Caucasian female?

13       A.      Correct.

14       Q.      There's an administrative management

15   specialist position filled by Ken Nagel, he was

16   a Caucasian male?

17       A.      That is correct.

18       Q.      There was an administrative

19   management specialist position filled by Pat

20   Spalding and he is a white male; is that

21   correct?

22       A.      Correct.

Douglas Frago

Page 104

1    Q.    There is an agriculture program
2    specialist position at the 14 level filled by
3    Linda Cronin.  She's Caucasian; is that
4    correct?
5    A.    That's correct.
6    Q.    And there is an agricultural
7    specialist -- program specialist position at
8    the 13 level filled by Rick Pinkston; is that
9    correct?
10   A.    That's correct.
11   Q.    And he's a white male, Caucasian
12   male?
13   A.    Correct.
14   Q.    There is an agricultural program
15   specialist position at the 13 level filled by
16   Arlene Moncollier.  She's a Caucasian female?
17   A.    That's correct.
18   Q.    Is that correct?
19         There was a GS-14 filled by Jay
20   Mettinger.  He was reassigned?
21   A.    He was reassigned.
22   Q.    Okay.  He's a Caucasian male?

Douglas  Frago

Page 105

1      A.      Correct.

2      Q.      All right.  And all of this occurred

3   during the period when you were the -- in your

4   position?

5      A.      That's correct.

6      Q.      And there was a GS-12 position

7   filled by Deborah Johnson, a Caucasian female;

8   is that correct?

9      A.      She and Zena were there before I was

10   there.

11      Q.      Is that correct?

12      A.      What's the dates?  What I am saying

13   is --

14      Q.      October 2005.

15      A.      Okay.

16      Q.      Is that correct?

17      A.      Yes.

18      Q.      All right.  So it appears that there

19   were at least eight positions, fairly high

20   level at the 13 level or above that were filled

21   with Caucasians while you were the supervisor

22   of the office?

Douglas Frago

Page 106

1          A.      Why isn't Zena Riley on there?

2          Q.      I'm just asking you about these

3    eight positions.

4          A.      Yes.

5          Q.      Okay.  All right.

6                  MR. BRANCH:  No additional questions

7    at this time.

8                  BY MS. KIDWELL:

9          Q.      Mr. Frago, I just have a couple

10   questions.  With respect to the list that Mr.

11   Branch just read off to you, did you conduct

12   interviews for every one of those positions and

13   select every one of those individuals?

14         A.      No.

15         Q.      I'm sorry?

16         A.      No, I was not the selecting

17   official.

18         Q.      And are you married, Mr. Frago?

19         A.      Yes, I am.

20         Q.      Do you have any children?

21         A.      Four.

22         Q.      What are the -- what is the gender

Douglas Frago

1    of your children?

2         A.    Two males and two females.

3         Q.    And what is the race or color of

4    your children?

5              MR. BRANCH:  Objection.  Relevance.

6              THE WITNESS:  Male African-American

7    son, male Hispanic-American son, and two girls,

8    one northern European and the other girl

9    combination of a lot of things.

10             BY MS. KIDWELL:

11        Q.    Mr. Frago, in response to one of Mr.

12   Branches's questions concerning EEO's

13   complaints against the department, were you

14   referring to the department -- United States

15   Department of Agriculture or were you referring

16   to your individual section or department?

17        A.    If I -- if we're referring to the

18   question that Mr. Branch asked has there been a

19   complaint against my department, I took it

20   meaning the deputy administrator for field

21   operations, my department.  No, there was not.

22             MS. KIDWELL:  I think that's all the

Douglas Frago

Page 108

1    questions I have, Mr. Branch.

2              MR. BRANCH:  Okay.  Thank you for

3    your time here today, Mr. Frago.  The court

4    reporter is going to prepare a transcript of

5    your proceedings here today if you want to

6    review the copy before it comes -- becomes

7    final, you need to indicate that on the record.

8              MS. KIDWELL:  Yes, we do.

9              THE WITNESS:  Yes, I do.

10             MR. BRANCH:  Okay.  Thank you for

11   your time.

12             (Whereupon, the proceeding was

13   concluded at 4:12 p.m.)

14

15

16

17

18

19

20

21

22

**Douglas Frago**

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2    I, DOUGLAS W. FRAGO, do hereby acknowledge I

 3    have read and examined the foregoing pages of

 4    testimony, and the same is a true, correct and

 5    complete transcription of the testimony given

 6    by me, and any changes or corrections, if any,

 7    appear in the attached errata sheet signed by

 8    me.

 9    _____      _____

10    Date            DOUGLAS W. FRAGO

11

12

13

14

15

16

17

18

19

20

21

22
```

Douglas Frago

Page 110

1          CERTIFICATE OF NOTARY PUBLIC

2          I, Bonnie L. Russo, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10   record of the testimony given by said witness;

11   that I am neither counsel for, related to, nor

12   employed by any of the parties to the action in

13   which this deposition was taken; and further,

14   that I am not a relative or employee of any

15   attorney or counsel employed by the parties

16   hereto, nor financially or otherwise interested

17   in the outcome of the action.

18          _____Bonnie L. Russo_____

19               Notary Public in and for

20               the District of Columbia

21   My Commission expires:  May 14, 2010

22

Page 111

```
1    Ms. Judith Kidwell
     US Attorneys Office
2    555 4th Street, NW
     Civil Division
3    Room E4905
     Washington, DC 20530

4

5

6

     IN RE:  Fields vs. Johanns
7

8

     Dear Ms. Kidwell:
9

     Enclosed please find your copy of the
10   deposition of DOUGLAS W. FRAGO along with the
     original signature page.  As agreed, you will
11   be responsible for contacting the witness
     regarding reading and signing the transcript.

12

     Within 30 days of receipt, please forward
13   errata sheet and original signature page signed
     to opposing counsel.

14

     If you would like to change this procedure or
15   if you have any questions, please do not
     hesitate to call.

16

     Thank you.

17

     Yours,

18

19

20   Bonnie L. Russo
     Reporter/Notary

21

22
```

# Exhibit No. 2



Use back on your browser to return to the Job Record

# Vacancy Announcement

USAJOBS Control No. XA5977&nbspFM

www.USAJOBS.opm.gov, the U. S. Government's official source of job information, provides this information to the public at no cost.

UNITED STATES DEPARTMENT OF AGRICULTURE
FARM AND FOREIGN AGRICULTURAL SERVICES

FARM SERVICE AGENCY

VACANCY ANNOUNCEMENT

THIS IS A CAREER-CAREER CONDITIONAL POSITION

VACANCY IDENTIFICATION NUMBER:  UF168394 CT

OPENING DATE:  Feb 24, 2003

CLOSING DATE:  Mar 17, 2003

POSITION TITLE, SERIES AND GRADE:  ADMINISTRATIVE MANAGEMENT SPECIALIST ,
GS - 0301 -14 /14  (Two Positions)

PROMOTION POTENTIAL:  GS -14

SALARY:  $80,690.00 - $104,900.00 (includes locality pay)

LOCATION OF POSITION:
Farm Service Agency
Deputy Administrator for Field Operations
Field Operations Staff
WASHINGTON METRO AREA, DC - 1 vacancy

CONTACT:  Any questions should be directed to ADRIANE O'MEARA ,
(202)418-8998            , TDD (202) 418-9116

WEB SITES:  HTTP://DC.FFASINTRA
NET.USDA.GOV/HRD/EMPLOYMEA.HTM
(For FFAS Employees Only)

All other applicants use:HTTP://WWW.USAJOBS.OPM.GOV/

AREA OF CONSIDERATION:  FSA Nationwide - Status Candidates Only

                              Status candidates must be in the area of
consideration reflected above.

**FARM SERVICE AGENCY (FSA) COUNTY EMPLOYEES:** Permanent County Employees without prior Federal tenure may apply for this position under Pub. L. 105-277. County employees who are selected will be given a career-conditional appointment and must serve a 1-year probationary period. After 3 years of service, employees will be eligible for conversion to career status.

**VETERANS:** Under Pub. L. 106-117, veterans who are preference eligibles or who have been separated from the Armed Forces under honorable conditions after substantially completing 3 years of continuous active service may apply under competitive procedures.

**Other Hiring Authorities:**                    Candidates who submit evidence of their eligibility may be considered under other hiring authorities:

              Individuals with Disabilities  VRA Eligibles  30% Disabled Veterans * Former Peace Corps, Vista, or Action Coopeative Volunteers

        To be considered for this position, all application materials (for competitive and Non-competitive candidates) must be received by the closing date of this announcement.

**MALE APPLICANTS:** To be eligible for Federal employment, male applicants born after December 31, 1959, must certify at the time of appointment that they have registered with the Selective Service System, or are exempt from having to do so under Selective Service Law.

**BASIS OF RATING:** Ratings will be based on responses to the occupational questions in this document. Please follow all the instructions carefully. Errors or omissions may affect your score.

If a determination is made that you have rated yourself higher than is supported by your description of experience and/or education OR that your application is incomplete, the following will take place: After a review of all the experience and training, a final score will be assigned for your total experience including education and training.

**ALL APPLICATION MATERIALS MUST BE RECEIVED BY THE CLOSE OF BUSINESS (**Midnight Eastern Time**) ON THE CLOSING DATE OF THIS ANNOUNCEMENT. YOU WILL LOSE CONSIDERATION IF YOUR APPLICATION PACKAGE DOES NOT PROVIDE ALL THE INFORMATION REQUESTED IN THIS ANNOUNCEMENT. DO NOT ATTACH POSITION DESCRIPTIONS, AWARDS, MANUSCRIPTS, PERSONAL ENDORSEMENT OR OTHER UNSOLICITED MATERIAL. YOUR APPLICATION MATERIALS WILL NOT BE RETURNED. DO NOT SUBMIT ORIGINAL DOCUMENTS THAT YOU MAY NEED IN THE FUTURE.**

**MAJOR DUTIES:** This position is located on the Field Operations Staff of the Deputy Administrator for Field Operations (DAFO) which was established to provide oversight and guidance to State and county offices of the Farm Service Agency ( FSA) in order to imporve program delivery and customer service. The incumbent represents DAFO by providing instruction and policy guidance to State and county FSA offices related to administrative and management issues including those related to budget, workload analysis and reporting, personnel, fiscal management, and administrative services. The incumbent also participates fully in the development, implementation and evaluation of nationwide policies and programs pertaining to all aspects of the operation and management of State and county FSA offices and represents DAFO in meetings with top Agency and Departmental officials on matters related to State and county office management, operating policies and overall program delivery.

**BASIC ELIGIBILITY:** You must be a United States citizen to apply. Status applicants must meet time-in-grade restrictions by the closing date of this announcement.

**TIME-IN-GRADE REQUIREMENTS:** To meet time-in-grade requirements, status applicants must have served at no lower than the next lower grade of this vacancy during the preceding  year under any type of appointment, or have met the requirements at some time previously.

**SPECIALIZED EXPERIENCE:** Experience that equipped the applicant with the particular knowledge, skills and abilities to perform successfully the duties of this position, and that is typically in or related to the work of the position to be filled.  To be creditable, specialized experience must have been equivalent to at least one year in the next lower grade level. Experience that demonstrated knowledge of administrative management policies and procedures and knowledge in planning, coordinating and administering agricultual progam regulations and practices.

**IMPORTANT INFORMATION FOR SURPLUS OR DISPLACED FEDERAL EMPLOYEES (CAREER TRANSITIION ASSISTANCE PLAN - CTAP, INTERAGENCY CAREER TRANSITION ASSISTANCE PLAN - ICTAP):** Individuals who have special priority selection rights under the Agency Career Transition Assistance Program (CTAP) or Interagency Career Transition Assistance Program (ICTAP) must be well-qualified for the position to receive consideration for special priority selection. CTAP or ICTAP eligibles will be considered well qualified if achieving a rating of 70 or above.

Federal employees seeking eligibility must submit proof that they meet the requirements of 5 CFR 330.605(a) for CTAP and 5 CFR 330.704 for ICTAP. Please annotate your application to reflect that you are applying as a CTAP or ICTAP eligible.

**PRIORITY PLACEMENT ELIGIBILITY:** Priority placement services apply to employees:
a. in tenure Group I and/or II (career and career-conditional);
b. in the competitive service;
c. who have a current, or last performance appraisal/rating of at least fully successful or equivalent.
d. who are displaced or have been identified as surplus in a USDA Agency and who apply for a USDA vacancy in their current/former position's local commuting area;
e. who are displaced within another covered Federal Agency and who apply for vacancies in their former position's local commuting area;
f. who apply for a vacancy that is at or below the grade level from which the employee may be or is being separated;
g. who submits a complete application package for a specific vacancy announcement within the time frames described in the announcement.

**HOW TO APPLY:** Your application package will consist of three separate components. The first component consists of the Qualifications and Availability C FORM (OPM Form 1203-FX) that you must complete. The second component is your resume. The final component of your application consists of "other" application materials. Examples of these other materials include your college transcript(s) (if required), documentation of veteran status (if applicable), Notification of Personnel Action (SF-50), or performance appraisal. Instructions on completing and submitting these items follow.

Please be sure to read carefully and follow the directions for each step. If you are submitting on-line, we recommend that you print the vacancy announcement and preview your responses before inputting them.

**STEP ONE - Complete and Submit the Occupational Questionnaire, C
FORM:To submit your answers on-line, you may start by clicking on the
following link.**<u>Online
Application</u>

You may also follow the instructions below to get to the on-line
questionnaire directly from the home page of the USAJOBS web site.

1. Connect to the USAJOBS web site at
   **http://www.usajobs.opm.gov**  (OR
   **https://staffing.opm.gov/vacancies/SecureApplyOnline.asp**   and go
   to step 3.)

2. Click on Enter> under the *On-line    Application/Questionnaire*
   section   located at the lower right hand corner of the USAJOBS home page.

3. Scroll down the on-line application screen until the "Vacancy
   Identification Number" box appears under the "Create a New Application For
   This Job"  on the left side of the screen.

4. Enter Vacancy Identification Number UF168394

We highly encourage you to complete the C FORM using the on-line
method since it is the most efficient way for us to process your responses. If
you are unable to submit your responses on-line, refer to the alternatives
described under Alternative Methods for Completing C FORM.

**Instructions for answering the occupational questions in the C FORM:**
Please use the following step-by-step instructions as a guide to
completing the required occupational questions. You may omit any optional
information; however, you must provide responses to all required questions. Be
sure to double check your application before submission. If you are submitting
on-line, you may wish to print the vacancy announcement and preview your
responses before entering the responses on-line.

You must submit your on-line C FORM by close of business (Midnight Eastern
Time), on the closing date of the announcement.

**C FORM, OCCUPATIONAL QUESTIONNAIRE**

 **VACANCY IDENTIFICATION  NUMBER:UF168394**

**Social Security Number**

 Required.  Enter your Social Security Number in the space indicated.

**Vacancy Identification Number**

The Vacancy Identification Number is UF168394
This field does not appear on the on-line application.  You would only need to
enter it if using an alternative application method.  See Item 2 under
Alternative Methods for Completing C FORM.

**1. Title of Job**

This field does not appear on the on-line application.  You would only need to
enter it if using an alternative application method.  See Item 2 under
Alternative Methods for Completing C FORM.

**2. Biographic Data**

All biographic information is required, except for your telephone number and
the contact time.

**3. E-Mail Address**

Your e-mail address is optional.  You may enter it or leave the e-mail address
space blank.

**4. Work Information**

The Online Application will not ask you this question.  On the C FORM, you
will leave this section blank.

**5. Employment Availability**

Read the following questions and mark yes to those **applicable** to you.

Question 1. Are you a current permanent (non-temporary) **competitive**
service Federal employee of the FARM SERVICE AGENCY?

Are you a permanent FSA county employee of the FARM SERVICE AGENCY?

Are you a permanent (non-temporary) **competitive** service Federal
employee of another Federal agency?

If your response to any one of the above questions is YES, then answer "Yes"
to this question. If your response is yes, you must submit the Notification of
Personnel Action, SF-50, that reflects permanent status.


Question 2. Are you a former Federal employee with competitive/reinstatement
eligibility? (Have you worked for the Federal government in your past under a
permanent competitive appointment?)

If your response is YES, then answer "Yes" to this question. If your response
is yes, you must submit your Notification of Personnel Action, SF-50, from
your previous permanent appointment.

Question 3. Are you eligible and applying under special hiring authorities
such as: Individuals with Disabilities, former Peace Corps, Vista, and Action
Cooperative volunteers, Veterans Readjustment Appointment (VRA), or 30%
Disabled Veterans?

If your response is YES, then answer "Yes" to this question. If your response
is yes, you must submit proof of your eligibility with your application (i.e.,
DD-214).

    Question 4. Are you eligible and applying under Pub L. 106-117 Veterans
Employment Opportunity Act (VEOA)?

If your response is YES, then answer "Yes" to this question. If your response
is yes, you must submit proof of your eligibility with your application (i.e.,
DD-214).

Question 5. Are you a CURRENT Federal employee serving in a permanent position
(non-temporary) at the GS-14  grade level or above or with promotion potential
to the GS-14  grade level or above?

Are you a FORMER Federal employee who served in a permanent position
(non-temporary) at the GS-14 grade level or above or had promotion potential
to the GS-14  grade level or above?

If your response to either of the above questions is YES, answer "Yes" to this question. If your response is yes, you must submit your Notification of Personnel Action, SF-50, or other official documentation to support your response.

**6. Citizenship**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**7. Background Information**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**8. Other Information**

Optional.  You may leave this field blank.

**9. Languages**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**10. Lowest Grade**

Required.  Enter the lowest grade level you will accept.  For example:  14

**11. Miscellaneous Information**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**12. Special Knowledge**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**13. Test Location**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**14. Veteran Preference Claim**

Required. Enter your claim for Veteran's Preference.

For items 15, 16, 17 and 18, enter date information in this format: MM/DD/YYYY.

**15. Dates of Active Duty - Military Service**

A response to this question is required if you have claimed Veteran's Preference.

**16. Availability Date**

You may omit the availability date if you can begin work immediately. Otherwise, you must provide the date that you will be available for employment.

**17. Service Computation Date**

Optional. You may leave this field blank.

**18. Other Date Information**

Optional. You may leave this field blank.

**19. Job Preference**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**20. Occupational Specialties**

Required. Enter at least one occupational specialty.

**Enter 001 to apply as a merit promotion candidate.** Merit promotion refers to announcements open to current and former permanent Federal employees or FSA county employees, and certain other candidates eligible for placement under special hiring authorities such as disability, veterans, Postal Service employees, etc

001 MERIT

**21. Geographic Availability**

Required. Enter at least one geographic availability location code. The location code(s) for this position is:

0675 WASHINGTON METRO AREA, DC

**22. Transition Assistance Plan**

In this section indicate if you are surplus or displaced Federal employee requesting special priority consideration under the Career Transition Assistance Plan (CTAP). Otherwise, leave Section 22 blank.

To receive consideration for CTAP, you must submit the necessary supporting documentation. Refer to the vacancy announcement for additional information and instructions.

**23. Job Related Experience**

Optional. You may leave this field blank.

**24. Personal Background Information**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**25. Occupational Questions**

Respond to the following questions. Mark only one response for each question. Any experience claimed in response to the following questions MUST be supported by information in your written application (resume, OF-612, or SF-171). This information must be SPECIFIC, (i.e.; duties, responsibilities, and accomplishments). Failure to provide this supporting documentation may result in receipt of a lower or ineligible rating.

1. From the descriptions below, select the letter that corresponds to the highest level of experience that you fully possess and that demonstrates your ability to perform the duties of this position. (Note: One year of specialized experience is based on a 40-hour workweek. If you have worked less that 40 hours per week, you must prorate your experience.) SELECT ONLY ONE LETTER.

A. I possess at least one full year (12-months) of specialized work experience equivalent in difficulty and responsibility to the GS-13 level in the Federal service that equipped me with the particular knowledge, skills and abilities to perform successfully the duties of this position, and that is typically in or related to the work of the position to be filled. Specialized experience includes expert knowledge of administrative management policies and procedures and skill in planning, coordinating and administering agricultural program regulations and practices.

B. I do not possess the required specialized experience to qualify for this position.

For each task in the following tasks, choose the statement from the list below that best describes your experience and/or training. Please select only one letter for each item.LEVEL DESCRIPTIONS:

A- I have not had education, training or experience in performing this task.

B- I have had education or training in performing this task, but have not yet performed it on the job.

C- I have performed this task on the job. My work on this task was monitored closely by a supervisor or senior employee to ensure compliance with proper procedures.

D- I have performed this task as a regular part of a job. I have performed it independently and normally without review by a supervisor or senior employee.

E- I am considered an expert in performing this task. I have supervised performance of this task or am normally the person who is consulted by other workers to assist them in doing this task because of my expertise.

2. Participates with Agency program officials in the development, implementation and review of program policies, procedures and regulations.

3. Recommends new or revised procedures related to administrative management programs and functions.

4. Provides authoritative advice and directin on program and administrative management policies and procedures.

5. Provides instruction and policy guidance to State and county FSA offices in area related to budget, workload analysis and reporting.

6. Serves as liaison between FSA State and county offices and representatives of other agencies providing advice and guidance in interrelated program areas.

7. Knowledge of Human Resources Management functions to include staffing, position management and classification, employee development and training, and employee benefits.

8. Keeps abreast of administraive procedures and program policy based on the Code of Federal Regulations, Office of Personnel Management regulations, GAO decisions, EEOC decisions, etc.

9. Knowledge of position management and staffing plans.

10. Develops and coordinates training activities.

11. Evaluates the efficiency or effectiveness of organizational programs, projects or operations.

12. Reviews and analyzes forms, applications, documents.

13. Implements operational, program or project plans to meet objectives.

14. Analyzes or interprets data or other information.

15. Develops and directs the full range of administrative programs, including budget, personnel, procurement and IT.

16. Serves as a primary point of contact for a specific subject area.

17. Negotiates with individuals or organizations to resolve conflicts, disputes or grievances.

18. Notifies individuals or offices orally of decisions, problems, or further actions needed.

19. Serves on panels, committees, or taskforces as a representative for the organization on technical or professional issues.

20. Instructs classes or conducts training sessions or workshops.

21. Gives presentations or briefings.

22. Provides guidance on laws, regulations, policies and procedures.

23. Develops materials for briefings, meetings or conferences.

24. Composes complex correspondence or other written work (for example, manuals, handbooks, technical reports, etc.).

25. Develops methods or materials to obtain information.

26. Composes routine correspondence or other written work (for example, memoranda, form letters, notces, etc.)

27. Creates tables, charts, graphs, or diagrams to organize or show information.

28. Processes forms, records, documents, or other materials.

29. Writes decisions in administrative appeal cases.

**After you submit your on-line Occupational Questionnaire you will receive a "Thank You" message stating that your application for the vacancy UF168394 has been received. You should now proceed to Steps Two and Three of the vacancy announcement to find out how to submit your resume and other application materials.**


**Alternative Methods for Completing C FORM**1. Submit your answers via telephone (long distance charges may apply):
a. Dial **1-478-757-3135**
b. Listen and follow the instructions
c. Enter Vacancy ID Number 54168394 (Note: number appears different than elsewhere in this vacancy announcement to enable telephone application system to process your application)
d. Enter your Social Security Number
e. Some questions require a yes or no answer. Enter 1 for Yes; 2 for No
f. Follow the instructions under "Instructions for answering the occupational questions in the C FORM" for the rest of the items. To record your responses to the occupational questions, you must use the numbers on the telephone keypad by selecting 1 for A; 2 for B; 3 for C; 4 for D; 5 for E, etc. When you have finished entering your responses to the occupational questions, you will be given a chance to review and correct your responses.

**OR**

2. Submit your answers via paper application C FORM (OPM Form 1203-FX). Paper application forms are available to those who are unable to complete the on-line application or telephone application process. Please apply on-line or by telephone, if possible. Using paper application forms may delay the processing of your application.

To obtain the C FORM on the web, you can print the form from http://www.opm.gov/forms/pdfimage/opm1203fx.pdf.

You can also obtain this form from the Office of Personnel Management (OPM) main web page. The OPM main web page is located at www.opm.gov. Click on these links: Site Index; Forms; Office of Personnel Management (OPM) Forms; and finally OPM 1203 FX.

OR

To obtain the form by phone via USAJOBS, follow these steps:

1. Call USAJOBS by Phone at (478) 757-3000
2. After the introductory message, press 1 to begin
3. At the main menu, select 3 to request forms and then 1 to begin recording
4. At the prompt, enter your zip code
5. At the next prompt, ask for C FORM (OPM Form 1203-FX)
6. At the next prompt, record your name, address and telephone number
7. The system will allow you to review and change your request, address and telephone. When you are ready, press 3 to save your request. The form will be mailed to you.

To complete the paper C FORM, follow the instructions under "Instructions for Answering the Occupational Questions in the C FORM." Be sure to enter your Social Security Number and the Vacancy Identification Number UF168394 at the top of each of the six pages of the form.

Mail the completed C FORM to: USOPM Technology, ATTN: Vacancy UF168394, 4685 Log Cabin Drive, Macon, GA 31204-6317.


**STEP TWO** - Submit a resume, Optional Application for Federal Employment (OF-612), or other written application format of your choice. You may submit your resume on-line, or you may e-mail it to HRD-FSA-RMA-APPL@WDC.USDA.GOV . Be sure you provide all of the information requested below:

**Job Information:**
- Vacancy Identification Number, title and grade(s) for which you are applying.
**Personal Information:**
-Full name, mailing address (with zip code) and day/evening telephone numbers (with area code).
- Social Security Number. Giving your Social Security Number is voluntary. However, we cannot process your application without it.
- Country of Citizenship.
- If ever employed by the Federal Government, please show the highest Federal civilian grade held, job series, and dates of employment in grade.
**Education:**
- High School name, city, state and zip code, date of diploma or GED.
- Colleges and/or Universities attended, city, state and zip code.
- Major field(s) of study.
- Type and year of degree(s) received. If no degree received, show total credit hours received and identified as semester or quarter hours.
**Work Experience for each paid or non-paid position held related to the job for which you are applying (do not provide copies of job descriptions):**

- Job title.
- Duties and accomplishments. (i.e., If you describe more than one type of work, write the approximate percentage of time you spent doing each).
- Number of hours per week.
- Employer's name and address.
- Supervisor's name and phone number.
- Starting and ending dates of employment (month, day and year).
- Salary.
- Indicate if your current supervisor may be contacted


**Other Qualifications:**
- Job-related training courses (title and year).
- Job-related skills (e.g., other languages, computer software/hardware, tools, machinery, typing speed, etc.)
- Job-related certificates and licenses.
- Job-related honors, awards, and special accomplishments. (e.g., publications, memberships in professional or honor societies, leadership activities, public speaking, performance awards, etc.) Do not send copies of documents unless specifically requested.


**ON-LINE RESUME OPTION:** You may submit your resume for this vacancy announcement on-line. To do so, connect to the USAJOBS web site at www.usajobs.opm.gov , enter the Current Job Openings area and conduct an alphabetic job search to locate this vacancy (UF168394 ); scroll down the vacancy announcement to the Submit Resume On-line page. Click on the Submit Resume On-line link and it will take you to our on-line Resume Builder. You can then click on Register to use the Resume Builder to create a resume on the system. Or, click on Edit if you wish to edit and submit a resume that you already have on file in the Resume Builder. Click on the submit button to send your resume.

After you complete and submit the on-line application, you should receive a "Thank You" message stating that your on-line application has been successfully submitted. If you do not receive this message, please submit again as this indicates that your resume has not been received.

Electronic resumes must be received by the close of business (Midnight Eastern Time) on the closing date of the announcement.

**NOTE:** Submission of a resume electronically from the Resume Builder may not be a complete application. Many positions require the completion of additional forms and/or the submission of supplemental materials. Please carefully review the complete vacancy announcement for full "How to Apply" instructions. **FAILURE TO PROVIDE THE REQUIRED INFORMATION AND/OR MATERIALS MAY RESULT IN YOUR NOT BEING CONSIDERED FOR EMPLOYMENT.**


**STEP THREE** - Submit other application materials, as necessary.

- You must submit a copy of your college transcript to verify successful completion of degree, college course work and/or grade point average when:  a) this announcement has a basic education requirement and/or;  b) you are substituting education for specialized experience. **FAILURE TO SUBMIT A COPY OF YOUR COLLEGE TRANSCRIPT(S) WILL RESULT IN AN INELIGIBLE RATING. (FOR ALL NEW FEDERAL GOVERNMENT EMPLOYEES,  AN OFFICIAL COLLEGE TRANSCRIPT(S) WILL BE REQUIRED BEFORE YOU CAN REPORT TO DUTY)**
- Annotate your application and include the required documentation if you are eligible and applying under special hiring authorities such as: Individuals with Disabilities, former Peace Corps, Vista, Action Cooperative volunteers, Veterans Readjustment Appointment (VRA), or 30% Disabled Veterans.
- If you are applying for Veterans' Preference, submit evidence of eligibility, such as: DD-214, Certificate of Release or Discharge from Active

Duty, or Standard Form 15, Application for 10-point Veteran Preference and the proof requested on the form.
- If you are or have been a Federal employee or permanent FSA County employee, please submit proof of competitive status (SF-50, latest Notification of Personnel Action, showing competitive/excepted service, career/career-conditional tenure, series/grade, permanent highest grade held).
- In addition, **current** Federal or permanent FSA County employees must submit their most recent or last performance appraisal or a statement advising why the performance appraisal is unavailable.

Submitting Resume and Other Application Materials: Please indicate on your resume whether you answered the C FORM on the USAJOBS web site, by phone, or via the paper application C FORM. Please indicate the vacancy announcement number on all application material. When you have completed your resume as requested in Step Two, and assembled the materials requested in Step Three, you may choose one of the following options.

Faxed resumes/applications for employment will be accepted if received by 12:00 Midnight Eastern Time on the closing date at following designated fax numbers. Applications for positions in the Farm Service Agency (FSA) and Risk Management Agency (RMA) should be faxed to 202-418-9148. Applications for positions in the Foreign Agricultural Service (FAS) should be faxed to 202-418-9149. If a fax does not go through properly, please use the other number as an alternate. If you choose to fax your material, it is not necessary for you to send the originals in the mail.

**OR**

Mail through the U.S. Postal Service or any commercial or private carrier (i.e., Federal Express, United Parcel Service) to:

FSA-HRD-PMB 349
ATTN: VACANCY # UF168394 CT
2117 L STREET NW
WASHINGTON DC 20037-1524

**OR**

**PERSONALLY DELIVER** (hand carry) to the above address, or to either of the following locations:

2101 L STREET, NW, WASHINGTON, DC -
Application Box in Room 5000

**OR**

1400 INDEPENDENCE AVENUE, SW, WASHINGTON, DC -
Mail Slot in Room 0082-South Building.

FFAS employees located at the Park Office Center, Portals Building, and the Reporters Building may use the interoffice mail system to transmit employment applications.

IN ACCORDANCE WITH 39 U.S.C. SECTION 415, USE OF POSTAGE-PAID GOVERNMENT AGENCY ENVELOPES TO FILE JOB APPLICATIONS IS A VIOLATION OF FEDERAL LAWS AND REGULATIONS. APPLICATIONS SUBMITTED IN POSTAGE-PAID GOVERNMENT ENVELOPES **WILL NOT BE ACCEPTED.**

**ADDITIONAL INFORMATION:**

Applications are not screened for all required forms before determining minimum qualifications. Therefore, it is the applicant's responsibility to ensure that all required material is received in the office BY THE CLOSE OF BUSINESS (Midnight Eastern Time) ON THE CLOSING DATE OF THIS ANNOUNCEMENT.

This Agency provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application process or hiring process, please contact USDA's Target Center at 202-720-2600, voice and TDD. The decision on granting reasonable accommodation will be on a case-by-case basis.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs,                sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means of communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

ALL APPLICANTS ARE CONSIDERED WITHOUT REGARD TO RACE, RELIGION, COLOR, NATIONAL ORIGIN, SEX, POLITICAL AFFILIATION, AGE (WITH AUTHORIZED EXCEPTIONS) OR ANY OTHER NONMERIT FACTOR.

___



To submit an online résumé for this announcement, select the link to our on line Résumé Builder. You can use the Builder to create a résumé on the system or to edit and submit a résumé that you already have on file. Please be sure to follow all instructions in How to Apply to assure that you will be considered for this employment opportunity.

Download PDF file of Special Form

Employer Services • Site Survey • Contact Us • Privacy Policy

This is a United States Office of Personnel Management web site. USAJOBS is the Federal Government's official one-stop source for Federal jobs and employment information.

# Exhibit No. 3

**" Working for America "**

Job Search • USAJOBS by Email • FAQs • Forms

Use back on your browser to return to the Job Record

# Vacancy Announcement

USAJOBS Control No. XA5963&nbspFM

www.USAJOBS.opm.gov, the U. S. Government's official source of job information, provides this information to the public at no cost.

UNITED STATES DEPARTMENT OF AGRICULTURE
FARM AND FOREIGN AGRICULTURAL SERVICES

FARM SERVICE AGENCY

VACANCY ANNOUNCEMENT

THIS IS A CAREER-CAREER CONDITIONAL POSITION

VACANCY IDENTIFICATION NUMBER:  UF168243 CT

OPENING DATE:  Feb 24, 2003

CLOSING DATE:  Mar 17, 2003

POSITION TITLE, SERIES AND GRADE:  AGRICULTURAL PROGRAM SPECIALIST ,
 GS - 1145 -14 /14

PROMOTION POTENTIAL:  GS -14

SALARY:  $80,690.00 - $104,900.00 (includes locality pay)

LOCATION OF POSITION:
Farm Service Agency
Deputy Administrator for Field Operations
Field Operations Staff
WASHINGTON METRO AREA, DC - 1 vacancy

CONTACT:  Any questions should be directed to ADRIANE O'MEARA ,
(202)418-8998          , TDD (202) 418-9116

WEB SITES:  HTTP://DC.FFASINTRA
NET.USDA.GOV/HRD/EMPLOYMEA.HTM
(For FFAS Employees Only)

All other applicants use:HTTP://WWW.USAJOBS.OPM.GOV/

AREA OF CONSIDERATION:  FSA Nationwide - Status Candidates Only

                          Status candidates must be in the area of
consideration reflected above.

**FARM SERVICE AGENCY (FSA) COUNTY EMPLOYEES:** Permanent County Employees without prior Federal tenure may apply for this position under Pub. L. 105-277. County employees who are selected will be given a career-conditional appointment and must serve a 1-year probationary period. After 3 years of service, employees will be eligible for conversion to career status.

**VETERANS:** Under Pub. L. 106-117, veterans who are preference eligibles or who have been separated from the Armed Forces under honorable conditions after substantially completing 3 years of continuous active service may apply under competitive procedures.

**Other Hiring Authorities:** Candidates who submit evidence of their eligibility may be considered under other hiring authorities:

* Individuals with Disabilities * VRA Eligibles * 30% Disabled Veterans * Former Peace Corps, Vista, or Action Cooperative Volunteers

To be considered for this position, all application materials (for competitive and Non-competitive candidates) must be received by the closing dae of this announcement.

**MALE APPLICANTS:** To be eligible for Federal employment, male applicants born after December 31, 1959, must certify at the time of appointment that they have registered with the Selective Service System, or are exempt from having to do so under Selective Service Law.

**BASIS OF RATING:** Ratings will be based on responses to the occupational questions in this document. Please follow all the instructions carefully. Errors or omissions may affect your score.

If a determination is made that you have rated yourself higher than is supported by your description of experience and/or education OR that your application is incomplete, the following will take place: After a review of all the experience and training, a final score will be assigned for your total experience including education and training.

**ALL APPLICATION MATERIALS MUST BE RECEIVED BY THE CLOSE OF BUSINESS (**Midnight Eastern Time**) ON THE CLOSING DATE OF THIS ANNOUNCEMENT. YOU WILL LOSE CONSIDERATION IF YOUR APPLICATION PACKAGE DOES NOT PROVIDE ALL THE INFORMATION REQUESTED IN THIS ANNOUNCEMENT. DO NOT ATTACH POSITION DESCRIPTIONS, AWARDS, MANUSCRIPTS, PERSONAL ENDORSEMENT OR OTHER UNSOLICITED MATERIAL. YOUR APPLICATION MATERIALS WILL NOT BE RETURNED. DO NOT SUBMIT ORIGINAL DOCUMENTS THAT YOU MAY NEED IN THE FUTURE.**

**MAJOR DUTIES:** This position is located on the Field Operatons Staff of the Deputy Administrator for Field Operations (DAFO) which provides oversight and guidance to State and county offices of the Farm Service Agency (FSA) in order to improve program delivery and customer service. The incumbent represents DAFO by providing instruction and policy guidance to State and county FSA offices and represents DAFO in meetings with top Agency and Departmental officials on matters related to State and county office management, operating policies and overall program delivery.

**BASIC ELIGIBILITY:** You must be a United States citizen to apply. Status applicants must meet time-in-grade restrictions by the closing date of this announcement.

**TIME-IN-GRADE REQUIREMENTS:** To meet time-in-grade requirements, status applicants must have served at no lower than the next lower grade of this vacancy during the preceding  year under any type of appointment, or have met the requirements at some time previously.

**SPECIALIZED EXPERIENCE:** Experience that equipped the applicant with

the paticular knowledge, skills and abilities to perform successfully the
duties of this position, and that is typically in or related to the work of
the position to be filled. To be creditable, specialized experience must have
been equivalent to at least one year in the next lower grade level.
Experience that demonstrated knowledge of the laws and regulations governing
agriculural stabilization and conservation programs and of the particular
application of national policies and objectives at the State level; an
understanding of farming practices and customs in the United States, and of
the economic needs of farm communities at the State level; knowledge of
current State  and Federal agricultual trends; and ability to establish and
maintain effective relationships with representatives of public and private
organizations, farmers' associations and others; and to interpret regulations,
programs, and plicies affecting them.


**IMPORTANT INFORMATION FOR SURPLUS OR DISPLACED FEDERAL EMPLOYEES (CAREER
TRANSITIION ASSISTANCE PLAN - CTAP, INTERAGENCY CAREER TRANSITION ASSISTANCE
PLAN - ICTAP):** Individuals who have special priority selection rights
under the Agency Career Transition Assistance Program (CTAP) or Interagency
Career Transition Assistance Program (ICTAP) must be well-qualified for the
position to receive consideration for special priority selection. CTAP or
ICTAP eligibles will be considered well qualified if achieving a rating of 70
or above.

Federal employees seeking eligibility must submit proof that they meet the
requirements of 5 CFR 330.605(a) for CTAP and 5 CFR 330.704 for ICTAP. Please
annotate your application to reflect that you are applying as a CTAP or ICTAP
eligible.


**PRIORITY PLACEMENT ELIGIBILITY:** Priority placement services apply to
employees:
a. in tenure Group I and/or II (career and career-conditional);
b. in the competitive service;
c. who have a current, or last performance appraisal/rating of at least fully
successful or equivalent.
d. who are displaced or have been identified as surplus in a USDA Agency and
who apply for a USDA vacancy in their current/former position's local
commuting area;
e. who are displaced within another covered Federal Agency and who apply for
vacancies in their former position's local commuting area;
f. who apply for a vacancy that is at or below the grade level from which the
employee may be or is being separated;
g. who submits a complete application package for a specific vacancy
announcement within the time frames described in the announcement.


**HOW TO APPLY:** Your application package will consist of three separate
components. The first component consists of the Qualifications and
Availability C FORM (OPM Form 1203-FX) that you must complete. The second
component is your resume. The final component of your application consists of
"other" application materials. Examples of these other materials include your
college transcript(s) (if required), documentation of veteran status (if
applicable), Notification of Personnel Action (SF-50), or performance
appraisal. Instructions on completing and submitting these items follow.

Please be sure to read carefully and follow the directions for each step. If
you are submitting on-line, we recommend that you print the vacancy
announcement and preview your responses before inputting them.

**STEP ONE – Complete and Submit the Occupational Questionnaire, C FORM:** To submit your answers on-line, you may start by clicking on the following link. Online Application

You may also follow the instructions below to get to the on-line questionnaire directly from the home page of the USAJOBS web site.

1. Connect to the USAJOBS web site at **http://www.usajobs.opm.gov** (OR **https://staffing.opm.gov/vacancies/SecureApplyOnline.asp** and go to step 3.)

2. Click on Enter> under the *On-line Application/Questionnaire* section located at the lower right hand corner of the USAJOBS home page.

3. Scroll down the on-line application screen until the "Vacancy Identification Number" box appears under the "Create a New Application For This Job" on the left side of the screen.

4. Enter Vacancy Identification Number UF168243

We highly encourage you to complete the C FORM using the on-line method since it is the most efficient way for us to process your responses. If you are unable to submit your responses on-line, refer to the alternatives described under Alternative Methods for Completing C FORM.

**Instructions for answering the occupational questions in the C FORM:**
Please use the following step-by-step instructions as a guide to completing the required occupational questions. You may omit any optional information; however, you must provide responses to all required questions. Be sure to double check your application before submission. If you are submitting on-line, you may wish to print the vacancy announcement and preview your responses before entering the responses on-line.

You must submit your on-line C FORM by close of business (Midnight Eastern Time), on the closing date of the announcement.

**C FORM, OCCUPATIONAL QUESTIONNAIRE**

  **VACANCY IDENTIFICATION  NUMBER:** UF168243

**Social Security Number**

 Required.  Enter your Social Security Number in the space indicated.

**Vacancy Identification Number**

The Vacancy Identification Number is UF168243
This field does not appear on the on-line application.  You would only need to enter it if using an alternative application method.  See Item 2 under Alternative Methods for Completing C FORM.

**1. Title of Job**

This field does not appear on the on-line application.  You would only need to

enter it if using an alternative application method.  See Item 2 under
Alternative Methods for Completing C FORM.

**2. Biographic Data**

All biographic information is required, except for your telephone number and
the contact time.

**3. E-Mail Address**

Your e-mail address is optional.  You may enter it or leave the e-mail address
space blank.

**4. Work Information**

The Online Application will not ask you this question.  On the C FORM, you
will leave this section blank.

**5. Employment Availability**

Read the following questions and mark yes to those **applicable** to you.

Question 1. Are you a current permanent (non-temporary) **competitive**
service Federal employee of the FARM SERVICE AGENCY?

Are you a permanent FSA county employee of the FARM SERVICE AGENCY?

Are you a permanent (non-temporary) **competitive** service Federal
employee of another Federal agency?

If your response to any one of the above questions is YES, then answer "Yes"
to this question. If your response is yes, you must submit the Notification of
Personnel Action, SF-50, that reflects permanent status.


Question 2. Are you a former Federal employee with competitive/reinstatement
eligibility? (Have you worked for the Federal government in your past under a
permanent competitive appointment?)

If your response is YES, then answer "Yes" to this question. If your response
is yes, you must submit your Notification of Personnel Action, SF-50, from
your previous permanent appointment.

Question 3. Are you eligible and applying under special hiring authorities
such as: Individuals with Disabilities, former Peace Corps, Vista, and Action
Cooperative volunteers, Veterans Readjustment Appointment (VRA), or 30%
Disabled Veterans?

If your response is YES, then answer "Yes" to this question. If your response
is yes, you must submit proof of your eligibility with your application (i.e.,
DD-214).

    Question 4. Are you eligible and applying under Pub L. 106-117 Veterans
Employment Opportunity Act (VEOA)?

If your response is YES, then answer "Yes" to this question. If your response
is yes, you must submit proof of your eligibility with your application (i.e.,
DD-214).

Question 5. Are you a CURRENT Federal employee serving in a permanent position
(non-temporary) at the GS-14  grade level or above or with promotion potential
to the GS-14  grade level or above?

Are you a FORMER Federal employee who served in a permanent position

(non-temporary) at the GS-14 grade level or above or had promotion potential to the GS-14 grade level or above?

If your response to either of the above questions is YES, answer "Yes" to this question. If your response is yes, you must submit your Notification of Personnel Action, SF-50, or other official documentation to support your response.

## 6. Citizenship

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

## 7. Background Information

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

## 8. Other Information

Optional.  You may leave this field blank.

## 9. Languages

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

## 10. Lowest Grade

Required.  Enter the lowest grade level you will accept.  For example:  14

## 11. Miscellaneous Information

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

## 12. Special Knowledge

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

## 13. Test Location

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

## 14. Veteran Preference Claim

Required. Enter your claim for Veteran's Preference.

For items 15, 16, 17 and 18, enter date information in this format: MM/DD/YYYY.

## 15. Dates of Active Duty - Military Service

A response to this question is required if you have claimed Veteran's Preference.

## 16. Availability Date

You may omit the availability date if you can begin work immediately. Otherwise, you must provide the date that you will be available for employment.

**17. Service Computation Date**

Optional. You may leave this field blank.

**18. Other Date Information**

Optional.  You may leave this field blank.

**19. Job Preference**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**20. Occupational Specialties**

Required.  Enter at least one occupational specialty.

**Enter 001 to apply as a merit promotion candidate.** Merit promotion refers to announcements open to current and former permanent Federal employees or FSA county employees, and certain other candidates eligible for placement under special hiring authorities such as disability, veterans, Postal Service employees, etc

001 MERIT

**21. Geographic Availability**

Required. Enter at least one geographic availability location code. The location code(s) for this position is:

0675 WASHINGTON METRO AREA, DC

**22. Transition Assistance Plan**

In this section indicate if you are surplus or displaced Federal employee requesting special priority consideration under the Career Transition Assistance Plan (CTAP). Otherwise, leave Section 22 blank.

To receive consideration for CTAP, you must submit the necessary supporting documentation. Refer to the vacancy announcement for additional information and instructions.

**23. Job Related Experience**

Optional.  You may leave this field blank.

**24. Personal Background Information**

The Online Application will not ask you this question. On the C Form, you will leave this section blank.

**25. Occupational Questions**

Respond to the following questions. Mark only one response for each question. Any experience claimed in response to the following questions MUST be supported by information in your written application (resume, OF-612, or SF-171).  This information must be SPECIFIC, (i.e., duties, responsibilities, and accomplishments).   Failure to provide this supporting documentation may result in receipt of a lower or ineligible rating.

1. From the descriptions below, select the letter that corresponds to the highest level of experience that you fully possess and that demonstrates your ability to perform the duties of this position.  Select only one letter. (Note: One year of specialized experience is based on a 40-hour workweek.  If

you have worked less that 40 hours per week, you must prorate your experience.)

A. I have at least one full-time year (12-months) of specialized work experience equivalent in difficulty and responsibility to the GS-13 level in the Federal service, that equipped me with the particular knowledge, skills and abilities to perform successfully the duties of this position, and that is typically in or related to the work of the position to be filled.  Knowledge of the laws and regulations governing agricultural stabilization and conservation programs; understanding of farming practices and customs in the United States, and of the economic needs of farm communities at the state level; knowledge of current state and federal agricultural trends; and ability to establish and mciantain effective relationships with representatives of public and private organizations, farmers' associations, and others, and to interpret regulations, programs, and policies affecting them.

B. I do not possess the required experience to qualify for this position.

For each task in the following group, choose the statement form the list below that best describes your experience and/or training.  Darken the oval corresponding to that statement in Section 25, Occupational Questions on the Form C.  Please select only one letter for each item.LEVEL DESCRIPTIONS:

A- I have not had education, training or experience in performing this task.

B- I have had education or training in performing this task, but have not yet performed it on the job.

C- I have performed this task on the job.  My work on this task was monitored closely by a supervisor or senior employee to ensure compliance with proper procedures.

D- I have performed this task as a regular part of a job.  I have performed it independently and normally without review by a supervisor or senior employee.

E- I am considered an expert in performing this task. I have supervised performance of this task or am normally the person who is consulted by other workers to assist them in doing this task because of my expertise.

2. Interprets, develops, and implements nationwide Farm Loan Programs.

3. Interprets, develops, and implements nationwide Price Support Programs.

4. Interprets, develops, and implements nationwide Conservation Programs.

5. Interprets, develops, and implements nationwide Production Adjustment Programs.

6. Develop, implement, or maintain Farm Pograms.

7. Develop regulations, policies, and procedures for multiple programs.

8. Develop, implement, or maintain Farm Loan Programs.

9. Serves as a technical subject-matter expert in interpreting program policies and procedures.

10. Represents the Agency in working with others on related programs.

11. Drafts program regulations, policies, procedures, and correspondence.

12. Serves as the point of contact for responding to internal and external calls and correspondence.

13. Analyzes and develops polices.

14. Develops and recommends efficient and effective changes in programs consistent with Administration policy.

15. Responsible for clear and precise regulations and procedures to implement legislative and policy initiatives.

16. Conducts special studies and prepared preliminary analysis for use by others.

17. Analyzes recommendations for program changes and evaluated justifications or equivalent.

18. Researches and interprets technical or program policies or procedures.

19. Serves as a member of a team responsible for analyzing and developing regulations and procedures.

20. Analyzes a segment of a policy and procedures and recommended program changes.

21. Drafts regulations and procedures to implement legislative and policy initiatives.

22. Serves as technical expert on a program area.

23. Interprets policy for field employees or personnel outside the Agency: or equivalent.

24. Assists in researching and interpreting technical or program policies or procedures.

25. Develops and recommends changes in Agency program operating procedures.

26. Assists in the management of a program and/or policy.

27. Participates in developing policies.

28. Researches and interprets program policies or procedures.

29. Recommends changes in Agency program operating procedures.

30. Conveys information to a diverse group such as team members of staff.

31. Conducts presentations or briefings to a diverse group and the results were measurable.

32. Communicates or presents agency programs or persuasive arguments to groups both within and outside the Agency.

33. Conducts briefings on a wide variety of issues.

34. Deals with managers and officials by discussing technical, sensitive issues.

35. Writes regulations or policies relative to agency objectives.

36. Writes a segment of operating policies and procedures for handbooks.

37. Edits policy and procedural guidelines (handbooks, notices, etc.).

38. Write analytical reports and/or correspondence on controversial/complex issues.

39. Responds to Congressional inquiries.

40. Reviews and edits new, changed, or proposed legislation affecting programs.

41. Drafts proposed legislation for approval.

42. Responds to technical inquires.

43. Compiles and summarizes information for reports or position papers.

44. Writes informational materials covering program areas, policy, briefing papers, etc.

45. Prepares complex internal program related material, briefing materials, or routine correspondence.

46. Drafts answers to general inquiries.

47. Writes reports or statistical data.

48. Provides written comments on procedure, decision memoranda, etc.

**After you submit your on-line Occupational Questionnaire you will receive a "Thank You" message stating that your application for the vacancy UF168243 has been received. You should now proceed to Steps Two and Three of the vacancy announcement to find out how to submit your resume and other application materials.**


**Alternative Methods for Completing C FORM**1. Submit your answers via telephone (long distance charges may apply):
a. Dial **1-478-757-3135**
b. Listen and follow the instructions
c. Enter Vacancy ID Number 54168243 (Note: number appears different than elsewhere in this vacancy announcement to enable telephone application system to process your application)
d. Enter your Social Security Number
e. Some questions require a yes or no answer. Enter 1 for Yes; 2 for No
f. Follow the instructions under "Instructions for answering the occupational questions in the C FORM" for the rest of the items. To record your responses to the occupational questions, you must use the numbers on the telephone keypad by selecting 1 for A; 2 for B; 3 for C; 4 for D; 5 for E, etc. When you have finished entering your responses to the occupational questions, you will be given a chance to review and correct your responses.

OR

**2. Submit your answers via paper application C FORM (OPM Form 1203-FX). Paper application forms are available to those who are unable to complete the on-line application or telephone application process. Please apply on-line or by telephone, if possible. Using paper application forms may delay the processing of your application.**

**To obtain the C FORM on the web, you can print the form from http://www.opm.gov/forms/pdfimage/opm1203fx.pdf.**

**You can also obtain this form from the Office of Personnel Management (OPM) main web page. The OPM main web page is located at www.opm.gov. Click on these links: Site Index; Forms; Office of Personnel Management (OPM) Forms; and finally OPM 1203 FX.**

OR

To obtain the form by phone via USAJOBS, follow these steps:

1. Call USAJOBS by Phone at (478) 757-3000
2. After the introductory message, press 1 to begin
3. At the main menu, select 3 to request forms and then 1 to begin recording
4. At the prompt, enter your zip code
5. At the next prompt, ask for C FORM (OPM Form 1203-FX)
6. At the next prompt, record your name, address and telephone number
7. The system will allow you to review and change your request, address and telephone. When you are ready, press 3 to save your request. The form will be mailed to you.

To complete the paper C FORM, follow the instructions under "Instructions for Answering the Occupational Questions in the C FORM." Be sure to enter your Social Security Number and the Vacancy Identification Number UF168243 at the top of each of the six pages of the form.

Mail the completed C FORM to: USOPM Technology, ATTN: Vacancy UF168243, 4685 Log Cabin Drive, Macon, GA 31204-6317.


**STEP TWO** - Submit a resume, Optional Application for Federal Employment (OF-612), or other written application format of your choice. You may submit your resume on-line, or you may e-mail it to HRD-FSA-RMA-APPL@WDC.USDA.GOV . Be sure you provide all of the information requested below:

**Job Information:**
- Vacancy Identification Number, title and grade(s) for which you are applying.
**Personal Information:**
-Full name, mailing address (with zip code) and day/evening telephone numbers (with area code).
- Social Security Number. Giving your Social Security Number is voluntary. However, we cannot process your application without it.
- Country of Citizenship.
- If ever employed by the Federal Government, please show the highest Federal civilian grade held, job series, and dates of employment in grade.
**Education:**
- High School name, city, state and zip code, date of diploma or GED.
- Colleges and/or Universities attended, city, state and zip code.
- Major field(s) of study.
- Type and year of degree(s) received. If no degree received, show total credit hours received and identified as semester or quarter hours.
**Work Experience for each paid or non-paid position held related to the job for which you are applying (do not provide copies of job descriptions):**
- Job title.
- Duties and accomplishments. (i.e., If you describe more than one type of work, write the approximate percentage of time you spent doing each).
- Number of hours per week.
- Employer's name and address.
- Supervisor's name and phone number.
- Starting and ending dates of employment (month, day and year).
- Salary.
- Indicate if your current supervisor may be contacted


**Other Qualifications:**
- Job-related training courses (title and year).
- Job-related skills (e.g., other languages, computer software/hardware, tools, machinery, typing speed, etc.)
- Job-related certificates and licenses.
- Job-related honors, awards, and special accomplishments. (e.g.,

publications, memberships in professional or honor societies, leadership activities, public speaking, performance awards, etc.) Do not send copies of documents unless specifically requested.

**ON-LINE RESUME OPTION:** You may submit your resume for this vacancy announcement on-line. To do so, connect to the USAJOBS web site at www.usajobs.opm.gov , enter the Current Job Openings area and conduct an alphabetic job search to locate this vacancy (UF168243 ); scroll down the vacancy announcement to the Submit Resume On-line page. Click on the Submit Resume On-line link and it will take you to our on-line Resume Builder. You can then click on Register to use the Resume Builder to create a resume on the system. Or, click on Edit if you wish to edit and submit a resume that you already have on file in the Resume Builder. Click on the submit button to send your resume.

After you complete and submit the on-line application, you should receive a "Thank You" message stating that your on-line application has been successfully submitted. If you do not receive this message, please submit again as this indicates that your resume has not been received.

Electronic resumes must be received by the close of business (Midnight Eastern Time) on the closing date of the announcement.

**NOTE:** Submission of a resume electronically from the Resume Builder may not be a complete application. Many positions require the completion of additional forms and/or the submission of supplemental materials. Please carefully review the complete vacancy announcement for full "How to Apply" instructions. **FAILURE TO PROVIDE THE REQUIRED INFORMATION AND/OR MATERIALS MAY RESULT IN YOUR NOT BEING CONSIDERED FOR EMPLOYMENT.**


**STEP THREE** - Submit other application materials, as necessary.

- You must submit a copy of your college transcript to verify successful completion of degree, college course work and/or grade point average when:  a) this announcement has a basic education requirement and/or;  b) you are substituting education for specialized experience. **FAILURE TO SUBMIT A COPY OF YOUR COLLEGE TRANSCRIPT(S) WILL RESULT IN AN INELIGIBLE RATING. (FOR ALL NEW FEDERAL GOVERNMENT EMPLOYEES,  AN OFFICIAL COLLEGE TRANSCRIPT(S) WILL BE REQUIRED BEFORE YOU CAN REPORT TO DUTY)**
- Annotate your application and include the required documentation if you are eligible and applying under special hiring authorities such as: Individuals with Disabilities, former Peace Corps, Vista, Action Cooperative volunteers, Veterans Readjustment Appointment (VRA), or 30% Disabled Veterans.
- If you are applying for Veterans' Preference, submit evidence of eligibility, such as: DD-214, Certificate of Release or Discharge from Active Duty, or Standard Form 15, Application for 10-point Veteran Preference and the proof requested on the form.
- If you are or have been a Federal employee or permanent FSA County employee, please submit proof of competitive status (SF-50, latest Notification of Personnel Action, showing competitive/excepted service, career/career-conditional tenure, series/grade, permanent highest grade held).
- In addition, **current** Federal or permanent FSA County employees must submit their most recent or last performance appraisal or a statement advising why the performance appraisal is unavailable.


Submitting Resume and Other Application Materials: Please indicate on your resume whether you answered the C FORM on the USAJOBS web site, by phone, or

via the paper application C FORM. Please indicate the vacancy announcement number on all application material. When you have completed your resume as requested in Step Two, and assembled the materials requested in Step Three, you may choose one of the following options.

Faxed resumes/applications for employment will be accepted if received by 12:00 Midnight Eastern Time on the closing date at following designated fax numbers. Applications for positions in the Farm Service Agency (FSA) and Risk Management Agency (RMA) should be faxed to 202-418-9148. Applications for positions in the Foreign Agricultural Service (FAS) should be faxed to 202-418-9149. If a fax does not go through properly, please use the other number as an alternate. If you choose to fax your material, it is not necessary for you to send the originals in the mail.

**OR**

Mail through the U.S. Postal Service or any commercial or private carrier (i.e., Federal Express, United Parcel Service) to:

FSA-HRD-PMB 349
ATTN: VACANCY # UF168243 CT
2117 L STREET NW
WASHINGTON DC 20037-1524

**OR**

**PERSONALLY DELIVER** (hand carry) to the above address, or to either of the following locations:

2101 L STREET, NW, WASHINGTON, DC -
Application Box in Room 5000

**OR**

1400 INDEPENDENCE AVENUE, SW, WASHINGTON, DC -
Mail Slot in Room 0082-South Building.

FFAS employees located at the Park Office Center, Portals Building, and the Reporters Building may use the interoffice mail system to transmit employment applications.

IN ACCORDANCE WITH 39 U.S.C. SECTION 415, USE OF POSTAGE-PAID GOVERNMENT AGENCY ENVELOPES TO FILE JOB APPLICATIONS IS A VIOLATION OF FEDERAL LAWS AND REGULATIONS. APPLICATIONS SUBMITTED IN POSTAGE-PAID GOVERNMENT ENVELOPES **WILL NOT BE ACCEPTED.**

**ADDITIONAL INFORMATION:**

Applications are not screened for all required forms before determining minimum qualifications. Therefore, it is the applicant's responsibility to ensure that all required material is received in the office BY THE CLOSE OF BUSINESS (Midnight Eastern Time) ON THE CLOSING DATE OF THIS ANNOUNCEMENT.

This Agency provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application process or hiring process, please contact USDA's Target Center at 202-720-2600, voice and TDD. The decision on granting reasonable accommodation will be on a case-by-case basis.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs,                       sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.)  Persons with

disabilities who require alternative means of communication of program
information (Braille, large print, audiotape, etc.) should contact USDA's
TARGET Center at (202) 720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil
Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW,
Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an
equal opportunity provider and employer.

ALL APPLICANTS ARE CONSIDERED WITHOUT REGARD TO RACE, RELIGION, COLOR,
NATIONAL ORIGIN, SEX, POLITICAL AFFILIATION, AGE (WITH AUTHORIZED EXCEPTIONS)
OR ANY OTHER NONMERIT FACTOR.



To submit an online résumé for this announcement, select the link to
our on line Résumé Builder. You can use the Builder to create a
résumé on the system or to edit and submit a résumé that you already
have on file. Please be sure to follow all instructions in How to Apply
to assure that you will be considered for this employment opportunity.

Download PDF file of Special Form

Employer Services • Site Survey • Contact Us • Privacy Policy

This is a United States Office of Personnel Management web site. USAJOBS is the Federal
Government's official one-stop source for Federal jobs and employment information.

**Exhibit No. 4**

Exhibit 8
(Par. 80)

Merit Promotion Plan

\*_

# United States Department of Agriculture

## National Offices, Services Centers, and Field Offices



Farm Service Agency                    Risk Management Agency

Foreign Agricultural Service            Rural Development

_\*

Continued on the next page

7-15-02                    3-PM (Rev. 3) Amend. 6                    **Page 1**

490

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

## TABLE OF CONTENTS

### MERIT PROMOTION PLAN

**Paragraph**

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
Methods for Filling Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
Priority Placement Programs . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
Initiating the Vacancy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
Procedures When Vacancy Is Announced . . . . . . . . . . . . . . . . . . .   9
Submitting Applications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
Evaluation to Determine Eligibility, Basic Qualifications, and
        Notification to Candidates  . . . . . . . . . . . . . . . . . . . . . . . . .  11
Rating and Ranking Procedures . . . . . . . . . . . . . . . . . . . . . . . . .  12
Alternative Evaluation Method  . . . . . . . . . . . . . . . . . . . . . . . . .  13
Selection Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
Promotion Records and Information  . . . . . . . . . . . . . . . . . . . . . .  15
Program Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Attachment:

Employee, Supervisor, and Human Resources Responsibilities

Continued on the next page

491

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

1. BACKGROUND

This establishes the procedures for merit promotion and placement actions for positions in the National Offices, Service Centers, and other Field Offices of RBS, RHS, RUS, * * * RMA, FAS, and FSA * * *. This document is according to 5 CFR 335 and provides supplemental information to comply with these requirements.

*—Where exclusive representation exists, appropriate bargaining may take place. Where contract language addresses these policies and procedures for bargaining unit employees, contract language prevails.—*

2. POLICY

A. To promote fair and equitable treatment for all employees, this plan defines how consideration will be given to all interested applicants.

B. This supplement does not guarantee promotion, nor does it require a vacancy be filled by promotion.

C. Actions under this Merit Promotion Plan—whether in identification, qualification, evaluation, or selection of candidates, or any other phase of the promotion process--shall be made without discrimination for any nonmerit reason.

D. This plan covers promotions in the competitive service through GS-15 and similar pay schedules, and to or from any prevailing rate schedule position.

E. Any exception to this merit promotion policy must be approved by the head of the national *—Human Resources Office or designee.—*

3. OBJECTIVES

A. The objectives of this plan are to:

(1) narrow the number of candidates to a reasonable number and ensure that selections are made from among the best qualified applicants

(2) give employees an opportunity to receive fair, equitable, and appropriate consideration for higher level jobs

(3) provide an incentive for employees to improve their performance and develop their KSA's

(4) provide career opportunities for employees

(5) bring the best qualified candidates to the attention of the selecting official

(6) enhance and support diversity in the workforce.

Continued on the next page

492

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

4.  COVERAGE

The following types of personnel actions are covered:

A.  Competitive promotion.

B.  Reassignment or demotion to a position with more promotion potential than the highest actual grade held by an employee on a permanent basis under a career or career-conditional appointment.

C.  Transfers to a higher-graded position or a position with higher promotion potential than the highest actual grade previously held by an employee on a permanent basis under a career or career-conditional appointment.

D.  Reinstatement to a higher-graded position or a position with higher promotion potential than the highest actual grade held by an employee on a permanent basis under a career or career-conditional appointment.

E.  Selections for details for more than 120 calendar days to a higher-graded position or to a position with known promotion potential.

F.  Selection for training that is any 1 of the following:

    (1)  part of an authorized training agreement

    (2)  part of a promotion program, although the promotion may not immediately follow the training

    (3)  required before an employee is qualified for reassignment to a different occupational series

    (4)  part of a Career Enhancement Program

    (5)  designed primarily to prepare employees for advancement or to fulfill specific qualification requirements for a position with known promotion potential.

G.  Time-limited promotion for more than 120 calendar days to a higher-graded position or a position with higher promotion potential, unless the selectee has held the grade previously on a permanent basis.

Continued on the next page

493

Exhibit 8
(Par. 80)

**Merit Promotion Plan (Continued)**

5. EXCEPTIONS

The following types of personnel actions are not covered:

A.  Competitive selection from an OPM certificate or a certificate issued by an Agency with delegated examining authority.

B.  Promotions resulting from an employee's position being reclassified at a higher grade because of accretion of duties and responsibilities.

C.  Promotions resulting from upgrading a position, without significant changes in the duties or responsibilities, because of either the issuance of a new classification standard or the correction of an initial classification error.

D.  Career-ladder promotions when an employee was previously selected for an assignment intended to prepare him or her for the position being filled. Sources of selection may be 1 of the following:

   (1)   an OPM certificate

   (2)   a list of employees issued under delegated examining authority

   (3)   selection under competitive promotion procedures

   (4)   Special Placement Programs

   (5)   any other direct hire authority.

E.  Promotion, reassignment, demotion, transfer, reinstatement, or detail to a position having promotion potential no greater than the potential of a position an employee currently holds or previously held on a permanent basis in the competitive service, provided the employee was not demoted or separated from that grade because of deficiencies in performance or "for cause" reasons.

F.  Details, not longer than 120 calendar days, to a higher-graded position or to a position with no known promotion potential.

G.  Details at the same or lower grade.

H.  Actions taken as a remedy for failure to receive proper consideration in a competitive promotion action.

Continued on the next page

494

Exhibit 8
(Par. 80)

**Merit Promotion Plan (Continued)**

5. EXCEPTIONS (Continued)

   I.  Promoting an employee upon exercise of reemployment rights if the employee's former position was reclassified during his or her absence.

   J.  Selection of a candidate from RPL for a position up to the highest grade previously held in the competitive service.

   K.  Position changes permitted by RIF regulations.

   L.  Repromotion to a grade or position from which an employee was demoted as a result of RIF.

   M.  Selection by reassignment to a position with the same or less promotion potential than a position previously held under a career or career-conditional appointment.

   N.  A temporary promotion for 120 calendar days or less to a higher-graded position or to a position with known promotion potential.

   O.  Permanent promotion to a position held under temporary promotion when:

      (1)  the assignment was originally made under competitive procedures

      (2)  it was made known under competitive procedures to all competitors at the time that it might lead to a permanent promotion.

   P.  Voluntary change to a lower grade with the same or less promotion potential than previously held under a career or career-conditional appointment.

   Q.  A position change from a position having known promotion potential to a position at the same grade having no higher potential.

   R.  Selection of an eligible CTAP or ICTAP candidate.

6. METHODS FOR FILLING VACANCIES

Vacancies may be filled by any appropriate method including special placement programs, new appointment, reassignment, transfer, reinstatement or promotion, etc.

Continued on the next page

495

**Exhibit 8**
**(Par. 80)**

Merit Promotion Plan (Continued)

7.  PRIORITY PLACEMENT PROGRAMS

A.  When a position is announced with an area of consideration limited to all or some portion of the USDA workforce, the order of consideration for priority and other candidates is as follows:

    (1)   Agency CTAP eligibles

    (2)   USDA CTAP eligibles

    (3)   Agency/USDA repromotion eligibles

    (4)   Agency priority consideration eligibles

    (5)   all other applicants within the area of consideration

    (6)   RPL registrants at the option of the selecting official.

B.  When a position is announced with an area of consideration which exceeds the current USDA workforce, such as Governmentwide or all sources, the order of consideration for priority and other candidates is as follows:

    (1)   Agency CTAP eligibles

    (2)   USDA CTAP eligibles

    (3)   USDA RPL registrants

    (4)   USDA ICTAP applicants

    (5)   Agency/USDA repromotion eligibles

    (6)   Agency priority consideration eligibles

    (7)   ICTAP eligibles (other than those displaced from USDA)

    (8)   all other applicants.

Continued on the next page

496

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

7. PRIORITY PLACEMENT PROGRAMS (Continued)

   C. USDA Repromotion Placement Plan

     Employees downgraded through no fault of their own are entitled to priority consideration for a period of 2 years from the effective date of the employee's downgrade.

   D. Priority Consideration

     Employees are entitled to priority consideration whenever reconstruction of a promotion action shows that, except for some error (such as wrong qualification determination, failure to consider, improper rating, failure to follow competitive procedures, etc.), the employee would have appeared on a promotion certificate. The employee shall be entitled to 1 bonafide consideration for the type (same series, grade, up to the same promotion potential, and geographic area) of position previously applied for under competitive procedures. A priority consideration certificate will be forwarded to the selecting official before issuing a competitive certificate. If no priority consideration candidate is selected, the selecting official must provide job-related justification for the nonselection.

8. INITIATING THE VACANCY

   A. The supervisor of the vacancy will submit SF-52 through appropriate channels. With SF-52, the supervisor will attach a Position Description Cover Sheet and a current position description that accurately describes the position to be filled.

   B. No action will be taken to staff the vacant position until the position is classified.

   C. The selecting official will determine, in consultation with the Personnel Specialist, the best way to fill the vacancy (OPM register, transfer, reinstatement, merit promotion procedures, Special Placement Programs, etc.).

Continued on the next page

497

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

9.  PROCEDURES WHEN VACANCY IS ANNOUNCED

The following procedure will be followed for all merit promotion vacancies:

A.  Identification of Selection Criteria

*–Agencies have the option of using either KSA's or job-related statements to determine best qualified candidates.

Before posting the vacancy announcement, the Personnel Specialist determines that KSA's or job-related statements are:

(1)  established for the position. The Personnel Specialist will discuss and review with the selecting official the existing KSA's or job-related statements to determine whether they are still appropriate

(2)  **not** established for the position. The Personnel Specialist will contact the selecting official to establish KSA's or job-related statements.–*

B.  Minimum Area of Consideration

The following is designated as the minimum area of consideration:

(1)  any single Agency, Service, or Bureau, National/Headquarters Offices - commuting area

(2)  any single Agency, Service, or Bureau, State/Field Offices - commuting area.

A wider area of consideration may be initially established to obtain more qualified candidates if it is anticipated that sufficient candidates will not be available.

C.  Preparation and Posting Vacancy Announcements

(1)  Vacancy announcements will normally be posted for a minimum of 10 workdays. Announcements with the area of consideration limited to CTAP/ICTAP candidates may be open for 5 calendar days.

(2)  Nationwide/Governmentwide will be posted for a minimum of 21 calendar days.

(3)  Close of business in Field Offices will be determined by the appropriate official in each office.

(4)  Vacancies will be posted on the automated bulletin board systems prescribed by OPM. Offices will ensure announcements are posted to provide for adequate publicity to employees.

Continued on the next page

498

**Exhibit 8**
**(Par. 80)**

Merit Promotion Plan (Continued)

10.  SUBMITTING APPLICATIONS

A.  To be considered for posted vacancies, the following procedures must be followed:

(1)  Applicants must submit the following:

a.  SF-171, OF-612, or resume

b.  supplemental statement that addresses each of the KSA's separately or other *—information included in the announcement, such as job-related statements—*

c.  current performance appraisal/rating, or a statement advising the performance appraisal/rating is unavailable

Note:    This applies **only** to current Federal employees.

d.  any other information as specified in the vacancy announcement.

(2)  Noncompetitive referral candidates are not required to submit KSA supplemental statements although they are encouraged to do so.

Notes:

(1)  Failure on the part of the applicant to submit the requested material will result in not being considered for the advertised position.

*—(2)  KSA supplemental statements, if used, may not be more than 2 single-spaced pages per—* KSA unless otherwise stated on the vacancy announcement.

(3)  Additional materials, such as copies of position descriptions, publications, and award certificates, will not be considered in the ranking process.

B.  Applications must be received at the specified location by the close of business on the closing date of the vacancy announcement unless otherwise stated on the vacancy announcement. Exceptions to this requirement may be made by the servicing Human Resources Office for reasons such as extended power outages, severe weather, etc.

C.  Applications submitted by FAX or other electronic means as specified in the announcement will be accepted.

Continued on the next page

499

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

10.  SUBMITTING APPLICATIONS (Continued)

D.  Employees who are on extended leave are responsible for notifying their supervisor if they want to be considered for promotional opportunities while they are on travel or leave. Employees shall leave a telephone number, e-mail address, and/or FAX number with their supervisor. The supervisor is responsible for contacting the employee to provide vacancy information.

E.  Voluntary applications within the Agency will not be accepted unless so stated on the vacancy announcement. The vacancy announcement will outline the method of considering candidates when applications are accepted.

*—F.  Applications will normally be accepted from candidates under special hiring authorities, that is, VRA, 30 Percent Disabled Veteran, Persons with Disabilities, etc. Qualified candidates will be placed on the promotion certificate as noncompetitive referrals. The vacancy announcement will indicate if candidates under special hiring authorities will not be considered.—*

G.  Pub. L. 105-277, Section 765, states that permanent employees of FSA COC's employed on or after October 1, 1998, shall be considered as having Federal Civil Service status for the purpose of applying for USDA Civil Service vacancies. Applications will be accepted from permanent FSA COC employees who were employed on or after October 1, 1998, when the area of consideration includes FSA employees. FSA COC employees do not receive any priority consideration for Civil Service vacancies.

11.  EVALUATION TO DETERMINE ELIGIBILITY, BASIC QUALIFICATIONS, AND NOTIFICATION TO CANDIDATES

A.  Qualifications of the applicants will be determined from the application package submitted and the applicant notified of the results.

B.  Minimum qualification standards used for placements are standards approved by OPM and may be found in OPM Handbook, Qualification Standards for General Schedule Positions and the X-118C, Internal Qualifications Guide for Trade and Labor Jobs. The Personnel Specialist will assure that all of the following requirements are met:

(1)  time-in-grade restrictions

(2)  Qualification Standards for General Schedule Positions or the X-118C standards

(3)  90 calendar days after competitive appointment restriction

(4)  any other requirements such as selective placement factors, such as ability to communicate in a foreign language

(5)  summary performance rating of fully successful or results achieved.

C.  Applicants must meet all of the above requirements by the closing date of the announcement.

D.  Submission of additional information after the closing date will not be accepted.

Continued on the next page

500

Exhibit 8
(Par. 80)

**Merit Promotion Plan (Continued)**

12. RATING AND RANKING PROCEDURES

\*–Either a Merit Promotion Panel, Personnel Specialist/Subject Matter Expert, or automated rating of responses to job-related statements may be used to rate and rank candidates.–\*

A panel may be used for any vacancy regardless of the number of competitive candidates.

A Personnel Specialist/Subject Matter Expert may be used if there are 10 or less competitive candidates for any particular advertised grade level.

The same method will be used for any position(s) advertised at multiple grade levels.

A. Merit Promotion Panel Method

  (1) Merit Promotion Panel Composition

    a. The Personnel Specialist will assemble a Merit Promotion panel consisting of at least 2 members who occupy positions at a grade level not lower than the full performance level of the position being filled. The selecting official may recommend members to serve on the panel subject to the approval of the Personnel Specialist.

    b. The Personnel Specialist will serve as a facilitator with responsibility for ensuring the requirements of merit promotion procedures are followed and to assist in expediting the process.

    c. Neither the supervisor, the selecting official, nor the approving official of the vacancy may be a member of the panel. They may, however, be asked to appear before the panel to answer any questions regarding the vacancy or the crediting plan.

    d. Merit Promotion Panels should include minority group members and/or women.

    e. Members of the panel will protect the confidentiality of all information received or reviewed during the committee process.

    f. There may be an EEO observer present during this process.

  (2) Merit Promotion Panel Delegated Responsibility

The Merit Promotion Panel has the final responsibility for determining best qualified candidates based on valid, job-related criteria and employee's application package. They are accountable for defending their final decision to any regulatory or investigative agency.

Continued on the next page

501

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

12.  RATING AND RANKING PROCEDURES  (Continued)

    A.  Merit Promotion Panel Method (Continued)

        (3)  Merit Promotion Panel's Rating of the Candidates

            a.  The Merit Promotion Panel will use the following rating instruments to determine a candidate's possession of each identified KSA and the level of proficiency attained.

                Rating Instruments:   Application, KSA's, performance appraisal, related awards, training and self-development.

            Note:   These factors may be considered in the evaluation process only to the extent that they are clearly related to 1 or more of the skills and knowledges important to successful performance in the job to be filled.

            b.  A rating scale will be developed for each KSA against which an applicant's possession of that KSA will be measured.  The point range is 5 - 0.

| Superior | - | 5 points will be assigned |
| Satisfactory | - | 3 points will be assigned |
| Minimally acceptable | - | 1 point will be assigned |
| No evidence | - | 0 point will be assigned |

    B.  Personnel Specialist/Subject Matter Expert Ranking Method

        (1)  If there are 10 or fewer qualified competitive applicants at each particular grade level for a vacancy, a Personnel Specialist may be used to determine the best qualified.

        (2)  The Personnel Specialist or Subject Matter Expert will apply the same rating criteria used by a merit promotion panel as described above in paragraph 12 A (3).

    *—C.  Automated Rating of Job-Related Statements

    An automated rating of responses to job-related statements may be used to rate candidates.—*

    D.  Determining the Best Qualified

        (1)  Each basically qualified competitive candidate is evaluated against criteria developed from the job analysis process which was developed before rating.  Each candidate is given a score based on their experience, education, related awards, training, and self-development.  These scores are then combined and recorded on the master score sheet.

Continued on the next page

502

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

12.  RATING AND RANKING PROCEDURES  (Continued)

D.  Determining the Best Qualified (Continued)

(2)  Up to 10 candidates may be certified for each grade level if meaningful distinctions cannot be made among a smaller number.

(3)  Where distinctions simply cannot be made if a tie occurs for the 10th position, all names with that score will be referred.

(4)  If more than 1 position is to be filled, 3 additional names may be certified for each additional vacancy.

(5)  If insufficient candidates (3 or less) are best qualified, the selecting official may make a selection or request that the area of consideration be extended.

(6)  There is no provision allowing the selecting official to request and make a selection from candidates who have not been rated best qualified.

13.  ALTERNATIVE EVALUATION METHOD

A.  This is an alternate approach for determining well qualified candidates when 10 or fewer applications are received from basically qualified candidates who must compete.

B.  The Personnel Specialist reviews application materials to determine that an applicant meets basic qualifications and any selective factors identified for the position.  A further review is conducted to distinguish well qualified candidates from those who only meet minimum requirements.

C.  If a Personnel Specialist is not familiar with the requirements of the position to determine whether experience, education, or training relates to the evaluation criteria, then a subject matter expert may perform the evaluation or his or her technical advice may be obtained.

D.  Applicants who meet all these requirements are referred to the selecting official as well qualified candidates for consideration by the selecting official.

E.  Any basically qualified candidates for lateral reassignment and those eligible for consideration under special hiring authorities or for reinstatement will be referred to the selecting official without being evaluated by any of these methods.

Continued on the next page

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

14. SELECTION PROCESS

A. The names of the best qualified candidates will be listed on the promotion certificate by grade level in alphabetical order.

B. The selecting official may be provided with all best qualified candidates' KSA supplemental statements, applications, and any other related material.

C. The selecting official has the option to either interview or not to interview the best qualified candidates on a promotion certificate. If one best qualified candidate is interviewed, then all best qualified candidates must be interviewed. Noncompetitive referrals need not be interviewed, nor must the selecting official interview all noncompetitive referrals if they interview one.

D. The selecting official is entitled to make a selection from any of the candidates listed on a promotion certificate based on his or her judgment of how well the candidate will perform in the particular job being filled.

E. The selecting official will make his or her selection and forward it through appropriate approving officials. Each candidate will be notified of the selection.

F. The promotion certificate should be returned within 30 calendar days. If the selecting official is unable to make the selection, extensions may be granted up to 90 calendar days from the date the certificate was originally issued. In the event a like (same Agency, official title, series, grade, and geographic location) vacancy occurs within the original area of consideration during the 90-calendar-day period, the same certificate may be used to fill the subsequent vacancy(s) without re-advertising.

G. The selecting official is not required to make a selection from the promotion certificate but may select from any other appropriate source.

H. A selected candidate will normally be released to enter on duty in the new position no later than 1 full pay period after selection. Extensions beyond the normal 1 pay period will be negotiated between the supervisors involved by the Personnel Specialist.

Continued on the next page

564

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

15. PROMOTION RECORDS AND INFORMATION

    A. The Human Resources office will establish and maintain an official promotion case file for 2 years.

    B. The following information will be provided to any employee upon request:

        (1) explanations and supporting regulations concerning the Merit Promotion Plan

        (2) the qualifications required for a position

        (3) if the employee was considered and basically qualified

        (4) whether the employee was among the best qualified and how the employee was evaluated by the Merit Promotion Panel or Personnel Specialist

        (5) cut-off score for best qualified

        (6) scores of other candidates, not identified by name

        (7) number of qualified candidates

        (8) number of candidates certified as best qualified

        (9) sho was selected.

    C. Employee Complaints:  An employee has the right to file a grievance or complaint if he or she feels:

        (1) There has been an improper application of governing rules and regulations.

        (2) The Merit Promotion Plan procedures were not followed.

        Individual judgments used in merit promotion process or non-selection from a group of properly ranked or certified candidates are not subject to the formal administrative grievance process.

    D. All employees are encouraged to discuss plans and opportunities for advancement with their supervisor and request information and/or assistance from the servicing office on specifics of the Merit Promotion Plan,  qualification standards, etc.

Continued on the next page

505

Exhibit 8
(Par. 80)

**Merit Promotion Plan (Continued)**

16. PROGRAM REVIEW

This plan will be reviewed and reported on periodically in conjunction with managers, supervisors and employees to ensure that:

A. the plan is effective and useful to employees and management

B. promotion actions and employee complaints are handled promptly and properly

C. promotions are used to encourage competent employees to investigate new careers and to make the best use of their knowledge and skills

D. employees, supervisors and managers have a full understanding of the merit promotion process.

506

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

## Attachment 1

### Employee, Supervisor, and Human Resources Responsibilities

**Employee Responsibility**

1.  Review announcements under the Merit Promotion Program.

2.  Review announcements and, if they feel they meet specific experience and training requirements for the position, properly complete and forward all required application material by the closing date for each position for which they wish to be considered, keeping in mind that the promotion certificate can be used for another like (same Agency, official title, series, grade, and geographic location) vacancy that occurs within 90 calendar days.

3.  Keep supervisors informed of career interests. Before departure on temporary duty, scheduled leave, and other absences, provide supervisor with a telephone number, e-mail address and/or FAX number at which they may be contacted.

4.  Take advantage of self-development and training opportunities, both on and off the job.

5.  Demonstrate competence and readiness for advancement by diligent and effective performance in current assignment.

6.  When requested, participate in applying OPM regulations to establish reasonable job-related
    *--evaluation criteria (KSA's) or job-related statements, and participate on promotion panels for--*
    determining best qualified candidates.

7.  Assure that official personnel records reflect all experience, education, and training.

8.  Keep informed of the provisions of this plan.

**Supervisor Responsibility**

1.  Maintain a current copy of this plan, make it available to their employees, and exert every effort to ensure that employees fully understand the plan.

2.  Inform new employees where position vacancy announcements are posted.

Continued on the next page

507

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

3. Periodically inform employees, either orally or in writing, that questions about the plan or specific promotion actions should be referred to the servicing Human Resources Office for informal handling and that formal means for resolving promotion complaints are available through Agency Grievance Procedures.

4. Anticipate personnel vacancies and initiate action in a timely manner so that sufficient qualified applicants can be found to facilitate the best selection.

5. Participate in applying OPM regulations to establish reasonable job-related evaluation criteria *—(KSA's or job-related statements).—*

6. Participate in or make employees available for rating panels.

7. Give fair, equitable, and full consideration to all candidates referred and make a final selection from the list without discrimination for any nonmerit reason and without favoritism based on personal relationship or patronage.

8. Under the provisions of this plan, release a selected employee for assignment to his or her new job.

9. On a fair and equitable basis, guide and assist employees in developing skills and abilities through cross-training, special assignments, and formal education, as needed. Encourage and advise employees regarding self-development needs and opportunities, and on areas where improvement should be made to increase chances for future promotion.

Human Resources Responsibility

1. Develop and administer the Merit Promotion Plan.

2. Ensure the quality and effectiveness of the merit promotion program and management/employee understanding and acceptance.

3. Through job-analysis, develop and administer selective placement factors for basic eligibility and identification of job-related criteria.

4. Determine and/or develop appropriate evaluation methods and instruments to be included in *—crediting plans or automated staffing systems.—*

5. Provide technical advice and assistance to panel members responsible for rating candidates.

Continued on the next page

508

Exhibit 8
(Par. 80)

Merit Promotion Plan (Continued)

6.  Publicize the program to keep management and employees well informed.

7.  Furnish advice and assistance to employees interested in advancing or transferring to new career fields.

8.  Evaluate program effectiveness to include initiation of improvements or necessary changes.

9.  Maintain records according to OPM and USDA requirements.

10. Give new employees general information on the program as a part of employee orientation.

11. Advise of methods and procedures for filling all vacancies.

12. Advise candidates who apply for promotion whether they meet basic eligibility requirements and inform them of action taken on their applications.

13. Ensure that position vacancy announcements are published.

**UNITED STATES DEPARTMENT OF AGRICULTURE**
Farm Service Agency
Washington, DC 20250

| Personnel Operations<br>3-PM (Revision 3) | Amendment 8 |
| --- | --- |

**Approved by:** Deputy Administrator, Management

*[signature]*

---

**Amendment Transmittal**

**A  Reason for Amendment**

Paragraphs 87 through 89 and Exhibits 9 through 11 have been added about the panel interview process using the Behavioral Event Interview (BEI).

| Page Control Chart | | |
| --- | --- | --- |
| **TC** | **Text** | **Exhibit** |
| 1-4 | 3-1<br>3-2 (add)<br>3-3, 3-4 (add) | 9, page 1 (add)<br>10, page 1 (add)<br>11, page 1 (add) |

# Table of Contents

Page No.

**Part 1     Basic Provisions and Delegations of Authority**

1     Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-1
2-8     (Reserved)
9     Delegations of Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-21
10     OPM Recruitment and Examining Authority . . . . . . . . . . . . . . . . . . . . .     1-23
11     OPM-Delegated Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-25
12     Servicing Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-28
13     Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-29
14     Adverse Action Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-30
15     KCMO Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1-31
16-29     (Reserved)

**Part 2     Employment Policies**

**Section 1     Basic Policies**

30     Nondiscrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-1
31     Internal Advancement Opportunities . . . . . . . . . . . . . . . . . . . . . . . . . .     2-1
32     Requests for Personnel Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-2
33     Modification of OPM Qualification Standards . . . . . . . . . . . . . . . . . . . .     2-3
34     Nepotism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-3
35     State Office Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-4
36-45     (Reserved)

**Section 2     Personnel Actions**

46     Appointments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-25
47     Details and Temporary Promotions . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-26
48     Resignations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-27
49     AD-139 and AD-1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-28
50     Processing Separations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2-31
51-60     (Reserved)

**Table of Contents (Continued)**

Page No.

**Part 2    Employment Policies (Continued)**

**Section 3    Probatory Periods for New Supervisors and Managers**

| | | |
|---|---|---|
| 61 | Overview | 2-55 |
| 62 | Coverage | 2-55 |
| 63 | Documentation | 2-56 |
| 64 | Removal From Supervisory or Managerial Position | 2-56 |
| 65-79 | (Reserved) | |

**Part 3    Merit Promotion Plan**

| | | |
|---|---|---|
| 80 | Overview | 3-1 |
| 81-86 | (Withdrawn--Amend. 3) | |
| 87 | Panel Interview Process | 3-2 |
| 88 | Process Responsibilities | 3-3 |
| 89 | Panel Interviews Questions and Assessments | 3-4 |
| 90-99 | (Reserved) | |

**Part 4    Career Transition Assistance Programs**

| | | |
|---|---|---|
| 100 | Overview | 4-1 |
| 101 | Responsibilities | 4-2 |
| 102 | Transition Services | 4-4 |
| 103 | Retraining Affected Employees | 4-8 |
| 104 | Priority Placement Services | 4-8 |
| 105 | Personnel Actions | 4-12 |
| 106 | Order of Priority | 4-15 |
| 107 | Supplements for Field Offices | 4-16 |
| 108 | Expected or RIF Separation Procedures | 4-16 |
| 109-120 | (Reserved) | |

**Table of Contents (Continued)**

Page No.

**Part 5      Conflict of Interest**

121    Principles of Ethical Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-1
122    OGE Standards of Ethical Conduct for Employees of the Executive Branch . . . . . .    5-3
123    Employee Responsibilities and Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-6
124    Designated Ethics Officials and Advisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-7
125    Permitted Political Activities Under the Hatch Act Reform Amendment of 1993 . .    5-7
126    Prohibited Political Activities Under the Hatch Act Reform Amendment of 1993 . .    5-15
127    Political Activities for Career SES Members and SFS Officers . . . . . . . . . . . . . . . .    5-19
128    OGE-450, Confidential Financial Disclosure Report . . . . . . . . . . . . . . . . . . . . . . .    5-21
129    OGE-450 Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-33
130    Conflict of Interest Situations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-37
131    Outside Employment or Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-38
132    Processing and Servicing FSA Assistance Under FLP . . . . . . . . . . . . . . . . . . . . . .    5-39
133-137  (Reserved)
138    Ethics Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-51
139    AD-815, Post-Employment Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-55
140    Initial and Annual Disclosure of Applicant and Borrower Relationships . . . . . . . . .    5-60
141    FLP Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-62
142    Information Used in Determining if There Is a Conflict of Interest Regarding the
         Impartiality of Official Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5-67
143-150  (Reserved)

**Part 6      Student Educational Employment Program (SEEP)**

151    General Program Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-1
152    STEP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-3
153    SCEP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6-7
154-159  (Reserved)

**Part 7      FOIA and Privacy Act**

160    Handbook References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-1
161    Employee Information Available for Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-1
162    Employee Information Not Available for Disclosure . . . . . . . . . . . . . . . . . . . . . . . .    7-2
163    Supervisor's Personal Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-3
164    Promotion Files . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-3
165    OPF's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7-4
166-179  (Reserved)

**Part 8      National Associations**

180    NACS, NASE, NADD, and NASCOE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8-1

513

**Table of Contents (Continued)**

**Exhibits**

| | |
|---|---|
| 1 | Reports, Forms, Abbreviations, and Redelegations of Authority |
| 2 | Definitions of Terms Used in This Handbook |
| 3-7 | (Reserved) |
| 8 | Merit Promotion Plan |
| 9 | Instructions to the Panel |
| 10 | Instructions to the Candidate |
| 11 | Evaluation Matrix |
| 12 | 5 CFR Part 735, Employee Responsibilities and Conduct |
| 13 | Copy of Personnel Bulletin No. 735-1 |
| 14, 15 | (Reserved) |
| 16 | Designated Municipalities and Political Subdivisions |
| 17-19 | (Reserved) |
| 20 | Definition of Confidential Filer |
| 21-29 | (Reserved) |
| 30 | SEEP Academic Institutions |
| 31-34 | (Reserved) |
| 35 | Consultative Agreement Between Farm Service Agency (FSA) and the National Association of Credit Specialists (NACS) |
| 36 | Consultative Agreement Between Farm Service Agency (FSA) and the National Association of Support Employees (NASE) |
| 37 | Consultative Agreement Between Farm Service Agency (FSA) and the National Association of District Directors (NADD) |

**Part 3    Merit Promotion Plan**

**80  Overview**

**A**
**Background**

The FFAS Merit Promotion Plan has been revised to adopt the common Merit Promotion Plan developed by FSA, NRCS, and RD.  See Exhibit 8.

This plan does not cover bargaining unit positions covered by negotiated agreements.

**81-86  (Withdrawn--Amend. 3)**

**\*—87    Panel Interview Process**

**A**
**Purpose**

In the absence of guidance, paragraphs 87 through 89 standardize the panel interview process.

The panel interview process is a collective capacity to provide a balanced and comprehensive assessment of a candidate's ability.  It was devised for conducting interviews to select key management positions but may be used for filling any vacancy.

**B**
**Obtaining the**
**Information**

Panel interviews provide information on how a candidate will perform in the target position through understanding how the candidate has performed in past positions.  Information is obtained by having each candidate describe, in detail, past and/or current experiences that they believe demonstrate their ability to perform in the position for which they have applied.

The panel interview process gives the selecting official a better picture of the relative strengths and weaknesses of the candidates, and addresses the question of relative "job fit".

**B**
**Weighing the**
**Information**

This process is **not** designed or intended to rerate, rerank, or pare the candidates on the best qualified list.  The information provided to the selecting official may have the effect of eliminating some candidates from further consideration, but this is a result of the selecting official weighing the information provided, rather than a direct result of the process itself.—\*

**\*--88  Process Responsibilities**

| | |
|---|---|
| **A**<br>**Manager and/or**<br>**Selecting Official**<br>**Responsibility** | Management determines whether the panel interview will be used to conduct interviews for supervisory and/or non-supervisory positions and at what grade level. See current agency requirements for position to be filled. The selecting official is responsible for:<br><br>• ensuring that panel interviews are conducted according to this procedure<br>• maintaining official records for 2 years after the panel interview. |
| **B**<br>**Planning**<br>**Interviews** | The selecting official chooses the panel members and makes every effort to ensure that the panel is diverse. Each panel member will be notified of the date, time, and location of the interviews with a brief description of the interview process. See Exhibit 9. In addition, candidates shall be informed of the date, time, and location of the interview with a brief description of the interview process. See Exhibit 10 for sample instructions.<br><br>If the selecting official is **not** present, a panel member will lead the interviews by introducing the candidate and panel members, giving an overview of the position and selection process, and answering any questions from the panel or the candidate. A human resources specialist will be consulted if needed. |
| **C**<br>**Civil Rights**<br>**Observer**<br>**Responsibility** | A civil rights observer may be present at panel interviews. A member of the Office of Civil Rights or the Civil Rights Council, the State Civil Rights Coordinator or Special Emphasis Program Manager may serve as observer.<br><br>The role of the civil rights observer is to ensure that the evaluations and any conversation about the process is **not** discriminatory in nature. The observer will **not** take part in the interview or attempt to influence the panel discussion. If any irregularity is observed, it should be brought to the attention of the selecting official.--\* |

**\*--89   Panel Interview Question and Assessments**

**A**
**Developing**
**Questions**

Questions used in the interview must be developed before the interview with the criteria for evaluating the responses to each question. All candidates will respond to the same questions. The questions should **not** be a restatement of KSA's or KSA-based statements listed in the vacancy announcement or the position description. They must be job-related and should be structured so that the panel is able to determine to what extent the candidate possesses the knowledge, skill, or ability. Normally 5 to 7 questions are sufficient, however, the number is **not** as important as the content of the question. Avoid using acronyms that may confuse outside candidates. The questions may or may not be given to all candidates before the interview.

**B**
**Assessing**
**Candidates**

Candidates shall be rated on their response to each question. At the conclusion of each interview, the panel shall assess the candidate using the scale of **High, Medium, and Low.** See Exhibit 11.

If the selecting official was **not** part of the panel, they shall receive an oral briefing by the panel. In this way, they can hear the panel members full range of opinions and perspectives and their rationale for the final assessment of each candidate.

**C**
**Documentation**

All documents generated in this panel interview process will become part of the official file maintained by the selecting official. Those documents are:

- instructions to the candidate
- instructions to the panel member
- interview questions and the criteria for evaluating the responses
- the panel's assessment of the candidates (a signed copy of Exhibit 11).--\*

**90-99 (Reserved)**

Exhibit 9
(Par. 88)

*--Instructions to the Panel

The basis for the panel interview process is to provide information on how a candidate will perform in the target position through understanding how the candidate has performed in past positions.   Information is obtained by having each candidate describe in detail, past and/or current experiences that they believe demonstrate their ability to perform in the position.

The interview panel member's responsibility is to obtain information about each candidate relative to their strengths and weaknesses, using a standard set of questions and criteria developed for this purpose.

The panel usually consists of 3 to 5 members.  Questions and the criteria may have been given to the panel at the beginning of the interviews.  The interview normally lasts 45 minutes and the panel will take notes during the interviews.  The panel may ask follow-up or clarifying questions as needed.

Each candidate will be evaluated on their responses using a scale of **High, Medium, or Low.**  The interviews with the application will form the basis on which the decision for a selection will be made.

A civil rights observer may also be present.  The role of the civil rights observer is to ensure that the evaluations and any conversation about the process is **not** discriminatory in nature.  The observer will **not** take part in the interviews or attempt to influence the panel discussion.

Your evaluation of each candidate will become part of the official file maintained by the selecting official.--*

**Exhibit 10**
**(Par. 88)**

*--Instructions to the Candidate

The basis for the panel interview process is to provide information about how a candidate will perform in the target position through understanding how the candidate has performed in past positions. Information is obtained by having each candidate describe in detail, past and/or current experiences that they believe demonstrate their ability to perform in the position.

A civil rights observer may be present. The role of the civil rights observer is to ensure that the evaluations and any conversation about the process is **not** discriminatory in nature. The observer will **not** participate in the interviews or attempt to influence the panel discussion.

Candidates will be participating in a panel interview setting that will include 3 to 5 panel members and a civil rights observer. The interview will consist of approximately 5 to 7 questions, and will take approximately 45 minutes. Panel members may ask the questions, or you may be given the questions at the time of the interview. Panel members will be taking notes.

Panel members will be interested in hearing how past and/or current experiences have equipped the candidate to perform successfully in this position. It will be helpful if responses and/or examples demonstrate or substantiate skills and abilities and how the candidate applies them if selected for the position.

Panel members will be taking notes during the candidate's responses and may ask follow-up or clarifying questions. The candidates will be evaluated on their responses.--*

Exhibit 11
(Par. 89)

**\*--Evaluation Matrix**

| Position and Title | | Series and Grade | Duty Station Office | Vacancy No. |
|---|---|---|---|---|
| | | | | |

The following table must be used to evaluate each candidate's response.

| Applicant's Name | High | Medium | Low |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Signature of Panel Members | Date |
|---|---|
| | |
| | |
| | |
| | |
| Selecting Official's Signature | |
| | |

Remarks:

**UNITED STATES DEPARTMENT OF AGRICULTURE**
Farm Service Agency
Washington, DC 20250

> **Notice PM-2334**

**For:** FSA Employees

### Merit Promotion Process

**Approved by:** Administrator

*James R. Little*

---

## 1 Overview

**A**
**Purpose**

This notice informs FSA employees of merit promotion procedures in the following areas:

- areas of consideration
- KSA statements
- rating panels
- interviews and interview panels.

**B**
**FSA Policy**

Supervisors and managers shall provide fair, equitable, and full consideration to all candidates without discrimination or favoritism.

**C**
**Noncompetitive Actions**

Selecting officials have the option of filling positions noncompetitively through programs such as the Student Career Experience Program and Workforce Recruitment Program.

**D**
**Labor Management Obligations**

Where exclusive representation exists, bargaining may be requested to the extent allowed by applicable statutes. Where contract language already addresses these policies and procedures for bargaining unit employees, contract language prevails.

Continued on the next page

| Disposal Date | Distribution |
|---|---|
| October 1, 2003 | All FSA employees; State Offices relay to County Offices |

522

Notice PM-2334

## 1    Overview (Continued)

**E**
**Additional**
**Information**

If additional information is needed, contact the following.

| Office | Contact |
|--------|---------|
| National Office | Servicing Employment Specialist in HRD |
| Kansas City Offices APFO State Offices | Servicing Employment Specialist in KCAO, HR |
| County Offices | State Office |

## 2    Merit Promotion Consideration Procedures

**A**
**Areas of**
**Consideration**

A broad area of consideration:

* increases the applicant pool
* diversifies the applicant pool
* allows employee mobility.

FSA requires that 2-grade interval vacancies be announced nationwide. Nationwide announcements are required to be posted for a minimum of 21 calendar days.  The following vacancies are exempted from the nationwide requirement:

* 1-grade interval positions
* vacancies in States that do not have the ceiling for an outside hire
* Career Enhancement vacancies
* Career Transition Assistance Program (CTAP) vacancies.

EDSO or DAM may also grant an exception to the nationwide requirement on a case-by-case basis.

Continued on the next page

Notice PM-2334

## 2  Merit Promotion Consideration Procedures (Continued)

**A
Areas of
Consideration
(Continued)**

Determine the minimum area of consideration for 2-grade interval vacancies and for exempted vacancies according to the following.

| Type of Vacancy | Minimum Area of Consideration |
| --- | --- |
| 2-grade vacancies | FSA nationwide |
| 1-grade vacancies | FSA local commuting area |
| vacancies in States with no ceiling for outside hires | FSA Statewide |
| Career Enhancement | FSA local commuting area |
| CTAP | CTAP eligibles - local commuting area |

**B
Knowledge,
Skills, and
Abilities (KSA's)**

KSA's consisting of narrative statements or job-related questions must be identified for each position.

Both narrative statements and job-related questions are based on an analysis of the KSA's and competencies needed to perform the position.

Agencies have the option of using either narrative KSA statements or job-related KSA questions to rank applicants.

KSA's will be:

- standardized for similar positions, except when positions require specific KSA's that are not typical of other positions of that series, or when positions are interdisciplinary in nature because of added functions assigned to the job

- reflected in the official position descriptions

- generic rather than specific, whenever possible.

Job-related KSA questions are designed to reduce the burden on applicants when applying for vacancies or promotions by requiring responses to questions instead of narrative KSA statements.

Continued on the next page

Notice PM-2334

## 2  Merit Promotion Consideration Procedures (Continued)

**C**
**Rating Panels**

When using narrative KSA statements, either a Merit Promotion rating panel or a HR specialist/subject matter expert may be used to rate and rank applicants.

When using job-related KSA questions, an automated ranking of responses is used to rate applicants.

If an automated ranking of responses to job-related questions is not used to rate and rank candidates, rating panels:

- are mandatory when there are more than 10 competitive candidates for a particular grade level

- may be used if there are 10 or less competitive candidates

- rate and rank qualified applicants to determine which applicants are best qualified and referred to the selecting official.

HRD and KCAO, HR shall:

- ensure that rating panels include subject matter experts and are diverse

- ensure that rating panel members are at a grade level not lower than the full performance level of the position being filled

- consult with managers and supervisors for suggested panel members

- make final panel member determinations.

Union representatives may suggest panel members.

An EEO observer shall be requested to serve as an observer during rating panel deliberations.  EEO observers serve as observers only and do not rate and rank applicants.

Continued on the next page

10-30-02

Page 4

**Notice PM-2334**

## 2   Merit Promotion Consideration Procedures (Continued)

**D**
**Selection Process for Nonsupervisory Positions**

For nonsupervisory positions, selecting officials may select an applicant either from the:

- competitive certificate, that is, from among applicants seeking promotion

- noncompetitive certificate, that is, from among applicants already at that grade, formerly at that grade, or who hold or held a position with potential to that grade.

Selecting officials shall interview all candidates on the particular merit promotion certificate used for selection. This does not apply to certificates issued by OPM or Kansas City Delegated Examining Unit.

If no selection is made, the selecting official shall provide justification to the next higher level official for approval of nonselection before returning the certificate to HRD or KCAO, HR.

**E**
**Interview Panels for Supervisory Positions**

Until further notice, interview panels are mandatory for:

- all supervisory grades GS-14 and above in the National Office
- all supervisory grades GS-13 and above in Field Offices.

   **Note:** Administrative Officers and Farm Loan Managers are considered supervisory/managerial positions.

Interview panels are **not** mandatory for nonsupervisory positions.

Interview panels shall:

- be determined by management

- consist of at least 3 persons at or above the grade level of the position being filled who have knowledge of the position

Continued on the next page

Notice PM-2334

## 2   Merit Promotion Consideration Procedures (Continued)

**E**
**Interview Panels**
**for Supervisory**
**Positions**
**(Continued)**

- include an EEO representative or a member of the CR/EEO Advisory Council as an observer for all interview panels

  Note:  The State Civil Rights Coordinator or Special Emphasis Program Manager may serve as the EEO representative in the field.

- be diverse

- interview all applicants on the particular merit promotion selection certificate used for selection

  Note:  This does not apply to certificates issued by OPM or Kansas City Delegated Examining Unit.

- use standardized questions, based on the position description, and reflecting management and technical areas

- rate applicants high, medium, or low based on their response to the panel questions.

Selecting officials are encouraged to select from the highly ranked applicants, as rated by the interview panel.

- If a selection is not made from the highly ranked applicants, written justification shall be provided to the next higher level official for approval before final decision.

- If no selection is made, the selecting official shall provide justification to the next higher level official for approval of nonselection.

Selecting officials are responsible for maintaining records of interview panel records and scores for 2 years after the panel interview.

527

# Exhibit No. 5

The following information was taken during an in-person interview taken on Wednesday, July 28, 2004, in Mr. Frago's office.

1. Please state and spell your name for the record.
Answer: Douglas W. Frago.

2. What is your current position and location?
Answer: My current position is the Deputy Administrator for Field Operations for the Farm Service Agency. I have been in this position for two years and four months.

3. Can you please describe your duties?
Answer: I oversee the field operations for FSA, and its 51 state offices, 2400 county offices, 13,400 employees. I am the direct supervisor of 51 state directors and my local staff at headquarters, plus 230 state committee members that are politically appointed.

4. How long have you worked for the Farm Service Agency?
Answer: I have been in my current position for two years and one month. I used to work for the Agriculture Stabilization and Conservation Agency from 1990 to January of 1993. I was the area director for the northwest.

5. What is your race?
Answer: White. I am of Portuguese descent.

6. What is your sex?
Answer: Male.

7. What is your position in relation to the complainant?
Answer: I am now her second line supervisor. When the positions were filled, I was her first line supervisor.


Initials

8. The issue accepted for investigation is as follows:

*Whether the complainant was discriminated against based on her race (black) and sex (female)*
*when she was not selected for a GS-14 Administrative Management Specialist Position on July 21,*
*2003. (Two individuals were selected.)*

Were you involved in this selection process? How were you involved?

Answer: Yes, I was involved in this selection process. I participated in the interview panels
and I was ultimately the deciding official.

9. What was your decision making process with regard to this selection?

Answer: During a period of one week, we interviewed for four positions. One of the positions
was for the Assistant to the Deputy Administrator, which was a GS-15. We chose a panel for that
interview process. I did not directly participate in that interview. At the same time, we were
interviewing for two administrative positions (the two at issue here) and one program area
position. Human Resources collected the applications and sent forward approximately fourteen
applicants. I don't remember how many of those were for the program position and how many
were for the administrative position. Some applicants had applied and qualified for both positions.
We requested clearance from Human Resources that we would interview all of the referred
candidates. John Chott, Salomon Ramirez, and I made up the interview panel. Shawn, an EEO
Advisor, served as an observer during the first round of interviews.

We ranked the applicants according to how the three of us felt that they interviewed from high
to medium rankings. I opted to hold a second interview with the five top candidates for both the
administrative positions. In that interview, it was John Chott, Linda Treese, and myself. Linda
had just been selected for the Assistant to the Deputy Administrator position and she would be in
charge of the field operations staff. Since these positions would report to her, we had her sit in on
the interviews. There were about three pages of questions for the first round of interviews, but the
second interview only had four questions. We made a selection by taking the highest rated two
candidates from this process. We started out on a level playing field for the interviews because

4
98



Initials

Human Resources had found them all qualified.

10. Who decided what the selection process would entail?

Answer: The interview panel decided together what the appropriate process would be, in consultation with Human Resources.

11. Why did you decide to sit on the interview panel?

Answer: I never thought not to do it. I am not aware that it is unusual for the deciding official to sit on the interview panel. The state directors often sit on their panels. I thought that was a part of the process for me to sit in on the interviews. Those were the first individuals I had hired in my two and half years here.

12. The complainant alleges that this is improper, that the deciding official should not sit on the interview panel. Did you receive advice from human resources on how to conduct the panel? Do you recall who in human resources advised you?

Answer: Yes. All along the selection process we consulted with human resources, Carolyn Taylor.

13. Why did you have a second round of interviews?

Answer: I think because we started off with so many candidates. Also, since Linda had just received her position, I wanted her input.

14. Why did the interview panel change?

Answer: Because Linda was new and she was going to supervise these individuals.

15. The complainant also believes that it was improper to have the interview panel change in the middle of a selection process. Can you please respond?

Answer: Recommendations from HR said that it was totally proper.

99

16.  The complainant also alleges that the first interview panel had an EEO advisor sit in, but the second interview panel did not.  Again, she believes this was improper.  Can you please respond?

Answer:  HR also said that was proper.  When Sederis had her first interview, I believe that she called Mr. Chott and thought it was improper that the EEO advisor was taking notes.  We consulted HR on that matter and they said it was o.k. for him to take notes, but we went ahead and asked him to destroy his notes.

17.  What materials did you review in making your decision?

Answer:  Resumes and interview notes.  We discussed the candidates and we ranked their responses to the questions.  We went into detail in reviewing their resumes on the final five candidates to make a decision.

18.  Did you take any recommendations from anyone?  Who?  What did they tell you?

Answer:  No.  Everyone who was in the final cut worked in headquarters.  Some candidates worked here in Field Operations and some worked in Farm Programs and Farm Loans.  I did not call anyone's supervisor for a recommendation.

19.  What does the position at issue entail?

Answer:  It has daily contact to state administrative offices, state directors, responding to any inquiries regarding personnel, budget, workload issues, the monitoring and development with the budget.  They are also involved in regulation writing.  Mr. Chott handles most of the personnel issues, but they do handle some.  And they handle some EEO issues.

20.  What qualities were you looking for in a candidate?

Answer:  I was looking for someone who had broad experience in administrative areas.  I needed someone who had good communication skills, could work under pressure, and was a quick



Initials

decision maker. With 2400 offices, you don't have a lot of time to think. I needed someone who can analyze data of budgets and positions. I needed someone who could advise the state offices on property management and leasing. The states call us on these issues all the time. All candidates had some of these qualities.

21. Why did you select Ken Nagel?

Answer: Ken came out as the highest scorer. He had applied for both positions. He came out on top on both interviews from everyone. He has a wide range of experience. He has banking background, farming experience, he was a manager at a state office, he has administrative experience, and since he has been here, he has picked up many of the responsibilities of our office. He had done leasing, he had experience in personnel management, and he had performed budgeting responsibilities. Although something such as farming was not a requirement for the position, it gave him a broader base of experience. He was ranked the highest of any of the fourteen candidates interviewed.

During the interview, he was articulate, calm, responded well to the questions, and he was quick to articulate his accomplishments. I recall he told us about going to Puerto Rico to lead a group of farm loan people, and how he organized and trained folks to do the job. That assignment was before my time here, but I was impressed that he volunteered to do such a thing.

22. Please compare Mr. Nagel's qualifications to the complainant's.

Answer: Ms. Fields is very competent in what she does. I knew her the last time I worked here as well. She was a secretary in one of the offices. During her interview, and after reviewing her resume, her background is very focused in civil rights. Therefore, she has a limited background. This job was not dealing strictly with EEO or Civil Rights, because it was an administrative job. I feel like she does her job well, it is just narrowly focused. During the first interview, she did very well. She made it to the second interview. She was very nervous and emotional during the second interview. Her response to our question of what do you feel is your major accomplishment was that she helped to organize the Administrator's Christmas party. And she stated that on a short notice, she got letters out for the awards ceremony. These were not the types of accomplishments that I was looking for in a GS-14 position.

Initials

23. The complainant feels that Mr. Nagel was pre-selected for the position. She believes that Mr. Nagel, Mr. Chott and you are buddy-buddy and that this position was targeted for him, or that you had him in mind the whole time. Can you respond to that claim?

Answer: That's not true. I do not socialize with Mr. Nagel. Mr. Nagel spends no more time in my office than any other folks that work here. Mr. Nagel is often chosen by other people outside our agency to perform tasks. He also often volunteers to perform tasks. He was not pre-selected. The position was not advertised for Mr. Nagel.

24. She also states that the reason she believes Mr. Nagel was pre-selected is because he was often allowed to act when you were and Mr. Chott were out of the office. And that he would act over individuals who were higher graded than he is.

Answer: If John Chott is here when I am gone, I would make him acting. If John were out, I rotate the acting among all of the staff. I have given everyone an opportunity to act. I was really looking at Mr. Nagel's overall resume and not duties he had performed in the office in an acting capacity. I also looked at courses people had taken to give them a broad background.

25. Why did you select Mr. Spalding?

Answer: He had experience in the farm loan programs. He was an administrative officer in several states. He also was one that had done many different things that came out in the interview and on his resume. When he was asked what his accomplishments were, he mentioned a consolidation of administrative offices. He was in charge of consolidating and closing offices, which is a major issue for us right now. Two agencies were combined back in 1996, Farm Loans and Farm Programs, the fact that he comes from the Farm Loan area, is helpful.

26. Please compare Mr. Spalding's qualifications to the complainant's qualifications.

Answer: Mr. Spalding has a broader range of experiences.

8

102



Initials

27. The complainant also alleges that it would be harder to train someone outside of the office such as Pat Spalding, the other selectee. Can you respond?

Answer: That doesn't make any sense. Where a person originated from was not an issue. It is what experience and aptitudes they have.

28. The complainant alleges that she did not receive this position because she is black. Please respond.

Answer: That is absolutely not true. I have been told by my counterparts that I am color blind, and I consider that a compliment. I have spent the better part of my life working in Africa, Asia, and South America with the underprivileged with the Peace Corp. In fact, I encouraged Ms. Fields to go to Ghana when she was fearful. I helped her to see there are positive things in these countries. In addition, my family is a multi-racial family. If I wanted to surround myself with people that are like me, I would not have my children. I have a black child and I have a Hispanic child that I adopted.

29. The complainant also alleges that she did not receive this position because she is female. Can you please respond?

Answer: I would not discriminate against females because I have two daughters and a wife that I would not want treated that way. My staff is made up of more females than males and I have no problem working with females. And females do not have a problem working for me.

30. Do you have any further information to add?

Answer: I respect Sederis Fields and what she does. I have worked well with her and continue to work well with her today. I simply chose the most qualified candidates for these positions.

Initials

I have reviewed this statement, which consists of ___9___ pages, and hereby solemnly swear ___⌐___ affirm _____ that it is true and complete to the best of my knowledge and belief.  I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          _8-7-04_____
        (Signature of Affiant)                              (Date)


Signed before me at (Street and City):

_____

on this _____ day of _____, 2004

_____ received 8/10/04
        (Signature of Investigator/Witness)

10

104

# Exhibit No. 6

## John Chott - Re: Second selection from GS-14 Ag Program Cert

**From:**    Carolyn Taylor
**To:**      John Chott
**Date:**    7/11/03 11:41 AM
**Subject:** Re: Second selection from GS-14 Ag Program Cert

The EEO representative is required only for "panel interview" process. If you are doing a second interview, which is usually with the selecting official or representative, you do not need EEO present.

>>> John Chott 07/11/03 11:30AM >>>
We interviewed for the non-supervisory 14s even though we did not have to; however, we did reduce the numbers to HIGH and MEDIUM. We would like a short final inteview with the HIGHS. Do we need an EEO person. I though not since you do not need one for interviewing the highs after you get the list from the panel.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 11:18AM >>>
You can FAX me the certificate once you have acceptance and send everything back by mail.    You can send me a copy of the interview panel sheet but the selecting official should keep a copy with any other documents you have in the selection process which are your files.

>>> John Chott 07/11/03 10:24AM >>>
Thanks, we are not sure yet. By the way, we have offered the 15 to someone who will let us know this afternoon. The cert deadline is tomorrow. May I fax the certs to you this afternoon or will sending them by internal mail be ok. They are dated before the 12th. Also do you want the panel rating sheet?

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 10:16AM >>>
That's fine, you will need to submit another SF-52 for your second selection for Agrl Prog Speclst.

>>> John Chott 07/11/03 09:42AM >>>
The Admini Specialist --we already are selecting two.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 08:39AM >>>

     Yes, if the announcement does not state two or more positions, and the Agrl Prog Speclst announcement did not,  then you are to notify the Union of
          the circumstances and that you would like to make two selections.    This is not changing your selections (2) for the Agrl Mgmt
               Speclst announcement?

                                                                    >>> John Chott 07/10/03 06:19PM >>>
We may want to select a second person from the cert, but, unlike the Admin Specialist, we did advertise for two. If I recall, we must ask the union. Is that correct?

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

# Exhibit No. 7

**UNITED STATES DEPARTMENT OF AGRICULTURE**
Farm Service Agency
Washington, DC 20250

| Notice PM-2334 |
| --- |

For: FSA Employees

## Merit Promotion Process

Approved by: Administrator

*James R. Little*

---

**1  Overview**

---

**A**
**Purpose**

This notice informs FSA employees of merit promotion procedures in the following areas:

- areas of consideration
- KSA statements
- rating panels
- interviews and interview panels.

---

**B**
**FSA Policy**

Supervisors and managers shall provide fair, equitable, and full consideration to all candidates without discrimination or favoritism.

---

**C**
**Noncompetitive Actions**

Selecting officials have the option of filling positions noncompetitively through programs such as the Student Career Experience Program and Workforce Recruitment Program.

---

**D**
**Labor Management Obligations**

Where exclusive representation exists, bargaining may be requested to the extent allowed by applicable statutes. Where contract language already addresses these policies and procedures for bargaining unit employees, contract language prevails.

Continued on the next page

---

| Disposal Date | Distribution |
| --- | --- |
| October 1, 2003 | All FSA employees; State Offices relay to County Offices |

26

Notice PM-2334

## 1  Overview (Continued)

**E**
**Additional**
**Information**

If additional information is needed, contact the following.

| Office | Contact |
|---|---|
| National Office | Servicing Employment Specialist in HRD |
| Kansas City Offices APFO State Offices | Servicing Employment Specialist in KCAO, HR |
| County Offices | State Office |

## 2  Merit Promotion Consideration Procedures

**A**
**Areas of**
**Consideration**

A broad area of consideration:

* increases the applicant pool
* diversifies the applicant pool
* allows employee mobility.

FSA requires that 2-grade interval vacancies be announced nationwide.
Nationwide announcements are required to be posted for a minimum of 21
calendar days.  The following vacancies are exempted from the nationwide
requirement:

* 1-grade interval positions
* vacancies in States that do not have the ceiling for an outside hire
* Career Enhancement vacancies
* Career Transition Assistance Program (CTAP) vacancies.

EDSO or DAM may also grant an exception to the nationwide requirement on a
case-by-case basis.

Continued on the next page

**Notice PM-2334**

2   **Merit Promotion Consideration Procedures (Continued)**

**A**
**Areas of**
**Consideration**
**(Continued)**

Determine the minimum area of consideration for 2-grade interval vacancies and
for exempted vacancies according to the following.

| Type of Vacancy | Minimum Area of Consideration |
|---|---|
| 2-grade vacancies | FSA nationwide |
| 1-grade vacancies | FSA local commuting area |
| vacancies in States with no ceiling for outside hires | FSA Statewide |
| Career Enhancement | FSA local commuting area |
| CTAP | CTAP eligibles - local commuting area |

**B**
**Knowledge,**
**Skills, and**
**Abilities (KSA's)**

KSA's consisting of narrative statements or job-related questions must be
identified for each position.

Both narrative statements and job-related questions are based on an analysis of the
KSA's and competencies needed to perform the position.

Agencies have the option of using either narrative KSA statements or job-related
KSA questions to rank applicants.

KSA's will be:

- standardized for similar positions, except when positions require specific
  KSA's that are not typical of other positions of that series, or when positions
  are interdisciplinary in nature because of added functions assigned to the job

- reflected in the official position descriptions

- generic rather than specific, whenever possible.

Job-related KSA questions are designed to reduce the burden on applicants when
applying for vacancies or promotions by requiring responses to questions instead
of narrative KSA statements.

Continued on the next page

**Notice PM-2334**

## 2   Merit Promotion Consideration Procedures (Continued)

**C
Rating Panels**

When using narrative KSA statements, either a Merit Promotion rating panel or a HR specialist/subject matter expert may be used to rate and rank applicants.

When using job-related KSA questions, an automated ranking of responses is used to rate applicants.

If an automated ranking of responses to job-related questions is not used to rate and rank candidates, rating panels:

- are mandatory when there are more than 10 competitive candidates for a particular grade level

- may be used if there are 10 or less competitive candidates

- rate and rank qualified applicants to determine which applicants are best qualified and referred to the selecting official.

HRD and KCAO, HR shall:

- ensure that rating panels include subject matter experts and are diverse

- ensure that rating panel members are at a grade level not lower than the full performance level of the position being filled

- consult with managers and supervisors for suggested panel members

- make final panel member determinations.

Union representatives may suggest panel members.

An EEO observer shall be requested to serve as an observer during rating panel deliberations.  EEO observers serve as observers only and do not rate and rank applicants.

Continued on the next page

**Notice PM-2334**

## 2  Merit Promotion Consideration Procedures (Continued)

**D**
**Selection Process for Nonsupervisory Positions**

For nonsupervisory positions, selecting officials may select an applicant either from the:

- competitive certificate, that is, from among applicants seeking promotion

- noncompetitive certificate, that is, from among applicants already at that grade, formerly at that grade, or who hold or held a position with potential to that grade.

Selecting officials shall interview all candidates on the particular merit promotion certificate used for selection. This does not apply to certificates issued by OPM or Kansas City Delegated Examining Unit.

If no selection is made, the selecting official shall provide justification to the next higher level official for approval of nonselection before returning the certificate to HRD or KCAO, HR.

**E**
**Interview Panels for Supervisory Positions**

Until further notice, interview panels are mandatory for:

- all supervisory grades GS-14 and above in the National Office
- all supervisory grades GS-13 and above in Field Offices.

  **Note:** Administrative Officers and Farm Loan Managers are considered supervisory/managerial positions.

Interview panels are **not** mandatory for nonsupervisory positions.

Interview panels shall:

- be determined by management

- consist of at least 3 persons at or above the grade level of the position being filled who have knowledge of the position

Continued on the next page

**Notice PM-2334**

**2   Merit Promotion <u>Consideration Procedures (Continued)</u>**

**E**
**Interview Panels**
**for Supervisory**
**Positions**
**(Continued)**

- include an EEO representative or a member of the CR/EEO Advisory Council as an observer for all interview panels

  **Note:**   The State Civil Rights Coordinator or Special Emphasis Program Manager may serve as the EEO representative in the field.

- be diverse

- interview all applicants on the particular merit promotion selection certificate used for selection

  **Note:**   This does not apply to certificates issued by OPM or Kansas City Delegated Examining Unit.

- use standardized questions, based on the position description, and reflecting management and technical areas

- rate applicants high, medium, or low based on their response to the panel questions.

Selecting officials are encouraged to select from the highly ranked applicants, as rated by the interview panel.

- If a selection is not made from the highly ranked applicants, written justification shall be provided to the next higher level official for approval before final decision.

- If no selection is made, the selecting official shall provide justification to the next higher level official for approval of nonselection.

Selecting officials are responsible for maintaining records of interview panel records and scores for 2 years after the panel interview.

**Notice PM-2334**

## 3   Roles and Responsibilities

**A**
**Supervisor/**
**Manager**
**Responsibilities**

Supervisors and managers shall:

- work closely with HRD or KCAO, HR in the recruitment process
- interview applicants
- arrange interview panels, as required
- review and use workforce profiles before making selections
- support cultural diversity training for all employees
- guide and assist employees in developing skills and abilities.

**B**
**Union Role**

Union representatives may:

- assist HRD and KCAO, HR in developing training modules
- encourage members to understand the Merit Promotion Plan and process
- evaluate and provide input about the merit promotion process.

## 4   Information

**A**
**Information on**
**CD**

A CD titled "Climb the Ladder of SUCCESS with FFAS" is in production and will be made available to FFAS offices.  This CD explains:

- what Merit Promotion is
- how Federal positions are advertised
- how to apply for Federal positions
- the automated, on-line USA Staffing application process
- types of appointments
- student programs
- veterans programs
- interviewing tips.

# Attachment Q

**UNITED STATES DEPARTMENT OF AGRICULTURE**
Farm Service Agency
Washington, DC 20250

| Notice PM-2334 |

**For: FSA Employees**

### Merit Promotion Process

**Approved by:** Administrator

*James R. Little*

---

## 1 Overview

**A**
**Purpose**

This notice informs FSA employees of merit promotion procedures in the following areas:

- areas of consideration
- KSA statements
- rating panels
- interviews and interview panels.

---

**B**
**FSA Policy**

Supervisors and managers shall provide fair, equitable, and full consideration to all candidates without discrimination or favoritism.

---

**C**
**Noncompetitive Actions**

Selecting officials have the option of filling positions noncompetitively through programs such as the Student Career Experience Program and Workforce Recruitment Program.

---

**D**
**Labor Management Obligations**

Where exclusive representation exists, bargaining may be requested to the extent allowed by applicable statutes. Where contract language already addresses these policies and procedures for bargaining unit employees, contract language prevails.

Continued on the next page

---

| Disposal Date | Distribution |
|---|---|
| October 1, 2003 | All FSA employees; State Offices relay to County Offices |

10-30-02                                                                                    **Page 1**

26

Notice PM-2334

## 1  Overview (Continued)

**E**
**Additional**
**Information**

If additional information is needed, contact the following.

| Office | Contact |
|---|---|
| National Office | Servicing Employment Specialist in HRD |
| Kansas City Offices<br>APFO<br>State Offices | Servicing Employment Specialist in KCAO, HR |
| County Offices | State Office |

## 2  Merit Promotion Consideration Procedures

**A**
**Areas of**
**Consideration**

A broad area of consideration:

* increases the applicant pool
* diversifies the applicant pool
* allows employee mobility.

FSA requires that 2-grade interval vacancies be announced nationwide. Nationwide announcements are required to be posted for a minimum of 21 calendar days.  The following vacancies are exempted from the nationwide requirement:

* 1-grade interval positions
* vacancies in States that do not have the ceiling for an outside hire
* Career Enhancement vacancies
* Career Transition Assistance Program (CTAP) vacancies.

EDSO or DAM may also grant an exception to the nationwide requirement on a case-by-case basis.

Continued on the next page

**Notice PM-2334**

2  **Merit Promotion Consideration Procedures (Continued)**

**A
Areas of
Consideration
(Continued)**

Determine the minimum area of consideration for 2-grade interval vacancies and for exempted vacancies according to the following.

| Type of Vacancy | Minimum Area of Consideration |
|---|---|
| 2-grade vacancies | FSA nationwide |
| 1-grade vacancies | FSA local commuting area |
| vacancies in States with no ceiling for outside hires | FSA Statewide |
| Career Enhancement | FSA local commuting area |
| CTAP | CTAP eligibles - local commuting area |

**B
Knowledge,
Skills, and
Abilities (KSA's)**

KSA's consisting of narrative statements or job-related questions must be identified for each position.

Both narrative statements and job-related questions are based on an analysis of the KSA's and competencies needed to perform the position.

Agencies have the option of using either narrative KSA statements or job-related KSA questions to rank applicants.

KSA's will be:

- standardized for similar positions, except when positions require specific KSA's that are not typical of other positions of that series, or when positions are interdisciplinary in nature because of added functions assigned to the job

- reflected in the official position descriptions

- generic rather than specific, whenever possible.

Job-related KSA questions are designed to reduce the burden on applicants when applying for vacancies or promotions by requiring responses to questions instead of narrative KSA statements.

Continued on the next page

**Notice PM-2334**

## 2   Merit Promotion Consideration Procedures (Continued)

**C**
**Rating Panels**

When using narrative KSA statements, either a Merit Promotion rating panel or a HR specialist/subject matter expert may be used to rate and rank applicants.

When using job-related KSA questions, an automated ranking of responses is used to rate applicants.

If an automated ranking of responses to job-related questions is not used to rate and rank candidates, rating panels:

- are mandatory when there are more than 10 competitive candidates for a particular grade level

- may be used if there are 10 or less competitive candidates

- rate and rank qualified applicants to determine which applicants are best qualified and referred to the selecting official.

HRD and KCAO, HR shall:

- ensure that rating panels include subject matter experts and are diverse

- ensure that rating panel members are at a grade level not lower than the full performance level of the position being filled

- consult with managers and supervisors for suggested panel members

- make final panel member determinations.

Union representatives may suggest panel members.

An EEO observer shall be requested to serve as an observer during rating panel deliberations.  EEO observers serve as observers only and do not rate and rank applicants.

Continued on the next page

**Notice PM-2334**

## 2   Merit Promotion Consideration Procedures (Continued)

| | |
|---|---|
| **D**<br>**Selection Process**<br>**for**<br>**Nonsupervisory**<br>**Positions** | For nonsupervisory positions, selecting officials may select an applicant either from the: |

- competitive certificate, that is, from among applicants seeking promotion

- noncompetitive certificate, that is, from among applicants already at that grade, formerly at that grade, or who hold or held a position with potential to that grade.

Selecting officials shall interview all candidates on the particular merit promotion certificate used for selection. This does not apply to certificates issued by OPM or Kansas City Delegated Examining Unit.

If no selection is made, the selecting official shall provide justification to the next higher level official for approval of nonselection before returning the certificate to HRD or KCAO, HR.

| | |
|---|---|
| **E**<br>**Interview Panels**<br>**for Supervisory**<br>**Positions** | Until further notice, interview panels are mandatory for: |

- all supervisory grades GS-14 and above in the National Office
- all supervisory grades GS-13 and above in Field Offices.

   **Note:** Administrative Officers and Farm Loan Managers are considered supervisory/managerial positions.

Interview panels are **not** mandatory for nonsupervisory positions.

Interview panels shall:

- be determined by management

- consist of at least 3 persons at or above the grade level of the position being filled who have knowledge of the position

Continued on the next page

**Notice PM-2334**

## 2   Merit Promotion Consideration Procedures (Continued)

**E**
**Interview Panels**
**for Supervisory**
**Positions**
**(Continued)**

- include an EEO representative or a member of the CR/EEO Advisory Council as an observer for all interview panels

    **Note:** The State Civil Rights Coordinator or Special Emphasis Program Manager may serve as the EEO representative in the field.

- be diverse

- interview all applicants on the particular merit promotion selection certificate used for selection

    **Note:** This does not apply to certificates issued by OPM or Kansas City Delegated Examining Unit.

- use standardized questions, based on the position description, and reflecting management and technical areas

- rate applicants high, medium, or low based on their response to the panel questions.

Selecting officials are encouraged to select from the highly ranked applicants, as rated by the interview panel.

- If a selection is not made from the highly ranked applicants, written justification shall be provided to the next higher level official for approval before final decision.

- If no selection is made, the selecting official shall provide justification to the next higher level official for approval of nonselection.

Selecting officials are responsible for maintaining records of interview panel records and scores for 2 years after the panel interview.

**Notice PM-2334**

## 3   Roles and Responsibilities

**A**
**Supervisor/**
**Manager**
**Responsibilities**

Supervisors and managers shall:

- work closely with HRD or KCAO, HR in the recruitment process
- interview applicants
- arrange interview panels, as required
- review and use workforce profiles before making selections
- support cultural diversity training for all employees
- guide and assist employees in developing skills and abilities.

**B**
**Union Role**

Union representatives may:

- assist HRD and KCAO, HR in developing training modules
- encourage members to understand the Merit Promotion Plan and process
- evaluate and provide input about the merit promotion process.

## 4   Information

**A**
**Information on**
**CD**

A CD titled "Climb the Ladder of SUCCESS with FFAS" is in production and will be made available to FFAS offices.  This CD explains:

- what Merit Promotion is
- how Federal positions are advertised
- how to apply for Federal positions
- the automated, on-line USA Staffing application process
- types of appointments
- student programs
- veterans programs
- interviewing tips.

# Exhibit No. 8

5/1/2003

HUMAN RESOURCES DIV., WASHINGTON, DC
1400 INDEPENDENCE AV, SW
WASHINGTON, DC 20250

SEDERIS W. FIELDS
9308 LOCKSLEY ROAD
FORT WASHINGTON, MD 20744
UNITED STATES OF AMERICA

Dear SEDERIS W. FIELDS,

This refers to the application you recently submitted to this office for the position shown below:

|  |  |
|---|---|
| Position: | ADMINISTRATIVE MANAGEMENT SPECIALIST |
| Series / Grade: | 0301-14 |
| Vacancy ID: | 168394 |
| Vacancy Announcement | UF168394CT |
| Agency: | DEP ADMR FOR FIELD OPERATIONS |
| Duty Location: | WASHINGTON METRO AREA, DC |

This refers to the recent application you submitted under the above Vacancy Announcement for consideration under merit promotion procedures. The paragraph checked below provides information concerning the status of your application. If you applied to the open competitive process you will receive notification from the Kansas City Delegated Examining Unit.

( ✓ ) For the GS- 14 position you have been rated best qualified and have been certified to the selecting official.

( ) For the GS-_____ position, although you meet the minimum qualification requirements, your name was not referred to the selecting official for consideration because you were not among the best qualified candidates.

( ) For the GS-_____ position, you are a non-competitive eligible candidate and have been referred to the selecting official.

Note: It can take 60 to 90 days to complete the recruitment process. You will be notified once a decision has been made.

Sincerely,

Human Resources Division

Thank you for your interest in Federal employment.

157

**APPLICANT WORKSHEET**   -   **Announcement #**   __UF168394_____

NAME: _Fields Sederis_____   Applied for:  001 Merit   002 Comp (for DEU)

Appl. Package rec'd by Closing Date      YES / NO - Number Rec'd  _____

Area of Cons. __FSA-Natioinwide_____   YES - NO - N/A

Competitive/Non-Competitive Applicant   COMP - NON COMP

Eligible for Spec. Emp. Progs.      ICTAP/CTAP - VEOA - VRA - DISABILITY -
                                    OTHER - NONE

US Citizen                          YES - NO

Basically Qualified                 YES - NO - GRADE(S) _14_

Reinstatement Eligible              YES - NO - N/A

Copy of SF-50                       YES - NO - N/A

Competitive Service                 YES - NO - N/A

Type of Appt.    FED. - FSA COUNTY -   PERM - TEMP - N/A

Evaluation Criteria                 FORM C - KSA's - MISSING - N/A

Performance Appraisal    PASS - FAIL -   YES - NO - N/A

Time-In-Grade                       YES - NO - N/A

GS/GM _13____ from _____ to _____

Typing Speed on Application          YES - NO - N/A

College Transcript(s)                YES - NO - N/A

Comments: _____C-14_____

_____

_____

Report Date: 3/24/2003

## Complete Applicant Record Printout (CARP)

## Vacancy ID Number:  168394

:: FIELDS, SEDERIS W                                              SSN:
_ne Address                                                      Work Address
9308 LOCKSLEY ROAD
FORT WASHINGTON, MD  20744-0744
(202) 720-7552

Record Status Code:     AA - Eligible for Cert
Veterans Preference:    NV- Non Veteran                     Adj Vet Preference:

CTAP:    Claimed     Qualified:  Not Reviewed        ICTAP:    Claimed      Qualified:  Not Reviewed
Employment Information:          Full Time   Y    Part Time  N   N   N    Temporary    N   N   N    Travel    Y   N   N
Eligiblity Begin Date:    March/2003                        Eligibility End Date:         June/2003
Searchable Date Field(s):
Applicant Dates:       3/17/03      Added                  3/17/03      Receipt
                       3/17/03      Available              3/17/03      Processed
                       3/17/03      Application Rated
Geographic Location(s):      WASHINGTON METRO AREA, DC

| Osp-Grade-Rate | Osp-Grade-Rate | Osp-Grade-Rate | Osp-Grade-Rate | Osp-Grade-Rate |
|---|---|---|---|---|
| 001 - 14 - 100.0 | | | | |

Certificate History

Number of Career Certs:                          Number of Temporary Certs:

| Question Number | Response | | |
|---|---|---|---|
| 1 | A | 28 | E |
| 2 | E | 29 | D |
| 3 | E | | |
| 4 | E | | |
| 5 | E | | |
| 6 | E | | |
| 7 | E | | |
| 8 | E | | |
| 9 | E | | |
| 10 | E | | |
| 11 | E | | |
| 12 | E | | |
| 13 | E | | |
| 14 | E | | |
| 15 | D | | |
| 16 | E | | |
| 17 | E | | |
| 18 | E | | |
| 19 | E | | |
| 20 | E | | |
| 21 | E | | |
| 22 | E | | |
| 23 | E | | |
| 24 | E | | |
| 25 | E | | |
| 26 | E | | |
| 27 | E | | |

# Exhibit No. 9

1

2              UNITED STATES DISTRICT COURT FOR THE

3                     DISTRICT OF COLUMBIA

4                        CIVIL DIVISION

5   SEDERIS FIELDS                 )

6       Plaintiff                  )

7           vs.                    ) Civil Action No.

8   MIKE JOHANNS, SECRETARY,   ) 06-0538(HHK)

9   U.S. DEPARTMENT OF             )

10  AGRICULTURE                    )

11      Defendant                  )

12

13

14

15              Deposition of Kenneth Nagel

16                   Washington, D.C.

17                   March 12, 2007

18

19

20

21   Reported by:  Bonnie L. Russo

22   JOB NO. 179873A

Kenneth Nagel

Page 6

1  question and you don't know the answer and
2  later on during the deposition you recall,
3  remember the answer, just let me know and I
4  will allow you to answer to provide a full
5  response.
6          The purpose here is to get a full
7  response, full and complete responses to the
8  questions.
9          If you need to take a break at any
10 point, let me know and I will accommodate that
11 request.  My only request will be that if there
12 is a question pending that you answer the
13 question before we take a break.
14         Are you taking any medication or
15 receiving treatment, any type of medical
16 treatment which would impair your ability to
17 testify truthfully here today?
18     A.   No.
19     Q.   Are you currently employed?
20     A.   Yes.
21     Q.   Who is your employer?
22     A.   U.S. Department of Agriculture, Farm

Page 7

1  Service Agency.
2      Q.   What is your grade, title and
3  position?
4      A.   My grade is a GS-14.  We work -- the
5  official title is Administrative Management
6  Specialist and working title of Field
7  Operations Manager.
8      Q.   What is a series for your position?
9      A.   It's a 301.
10     Q.   How long have you been in this
11 position?
12     A.   301 position?
13     Q.   Yes.  Your current position.
14     A.   Since July of 2003.
15     Q.   How long have you worked for USDA?
16     A.   I worked -- 16 years.
17     Q.   Prior to July 2003 had you worked in
18 a 301 series position?
19     A.   No.
20     Q.   What was your position before July
21 2003?
22     A.   It was an Agriculture Management

Page 8

1  Specialist.  Agriculture Management Specialist
2  is the title.  It was an 1145 series.
3      Q.   What is the difference between the
4  1145 series and the 301 series?
5      A.   I am not totally sure.
6      Q.   Is a 301 an administrative series?
7      A.   That's my understanding.
8      Q.   Is 1145 a program series?
9      A.   That's my understanding.
10     Q.   You will have to allow me to finish
11 the question.
12         So before July 2003 you were in a
13 program series position?
14     A.   Yes.
15     Q.   How long were you in the 1145 series
16 before July 2003?
17     A.   I started that position the end of
18 February 1999.
19     Q.   The position that you started in
20 February 1999 was what?
21     A.   The Agriculture Program Specialist.
22     Q.   I think you said you started at the

Page 9

1  USDA 16 years ago?
2      A.   Yes, sir.
3      Q.   What was your first position with
4  USDA?
5      A.   My very first position was as a
6  county office management trainee.
7      Q.   And where was that located?
8      A.   In Nebraska.  Through the state
9  office in Lincoln, Nebraska.
10     Q.   What was your grade in that
11 position?
12     A.   Very beginning grade was a 5.  A CO
13 5.
14     Q.   Is that county office?
15     A.   Yes.
16     Q.   Were you reared in Nebraska?
17     A.   Yes.
18     Q.   What type of work did you do before
19 coming to the USDA?
20     A.   I managed a farming operation and I
21 worked for two area banks preparing loan
22 documents and meeting with producers and

3 (Pages 6 to 9)

Kenneth Nagel

Page 14

1    A.    Yes.
2    Q.    When did you farm?
3    A.    In the afternoons and evenings.
4    Q.    Who else worked the farm?  Was it
5   just you and your father or were there other
6   folks?
7    A.    No.  My father and I.
8    Q.    Any employees on the farm?
9    A.    Not at that period of time, no.
10   Q.    For the entire period that you
11  attended the University of Nebraska did you
12  live at home?
13   A.    Yes.
14   Q.    You said you received a bachelor's
15  degree?
16   A.    Yes.
17   Q.    What is -- what is the area of
18  concentration?
19   A.    Agriculture -- economics and
20  agronomy.  It was a dual major.
21   Q.    How many credit hours did you have
22  to achieve to obtain your degrees?

Page 15

1    A.    It was a minimum of 128 credit
2   hours.
3    Q.    So after you completed this training
4   program you worked -- you were assigned to a
5   director -- county director position?
6    A.    County executive director position,
7   yes.
8    Q.    That would have been in what?  Was
9   that '91 or '92?
10   A.    That was September 1991.
11   Q.    How far is Johnson County from
12  Lancaster County?
13   A.    It is contiguous.  It touches the
14  Lancaster County.  It's one of the counties
15  contiguous to Lancaster.
16   Q.    How long were you a county director?
17   A.    I was a county director for nine
18  years.  Executive director.  I'm sorry. ,
19   Q.    What work did you do after you were
20  county executive director?
21   A.    I came to the national office.  I
22  had two other offices besides the Johnson

Page 16

1   County office.
2    Q.    So you started out as a CO 5.  What
3   was the next grade that you obtained?
4    A.    We went to a 7.  Program calls for
5   the next 7 and then it progresses to a GS-12.
6    Q.    So 5, 7.  What was the next level?
7    A.    It would have been a 9.
8    Q.    And after that?
9    A.    Then 11 and then 12.
10   Q.    All of these grades were on the CO
11  scale?
12   A.    Yes.  My CO 12 was attained in Grant
13  County.  I'm sorry.  Perkins County, Nebraska.
14   Q.    What year did you become a CO 12?
15   A.    Let's see.  That would have been
16  approximately 1995.  I don't know exactly
17  without looking at my records.
18   Q.    You said at some point you moved to
19  Washington?
20   A.    Yes.
21   Q.    What position did you take in
22  Washington?

Page 17

1    A.    The Agriculture Program Specialist.
2    Q.    What was the grade for that?
3    A.    GS-13.
4    Q.    That was in 1999?
5    A.    Yes.
6    Q.    What were your duties in that
7   position or what were your major duties in that
8   position?
9    A.    I worked with a broad range of
10  duties, specifically with administrative issues
11  and program issues.
12   Q.    When you say administrative issues
13  what do you mean?
14   A.    Well, my supervisor, Mr. Springer at
15  that time, had me administer large jump teams
16  for disaster programs and activities in Texas.
17  148 people I managed and administered.  There
18  he had me working in Puerto Rico with a team of
19  28 people.  He had me working with an
20  investigation in the North Carolina state
21  office.  He had me working with staffing and
22  workload.

5 (Pages 14 to 17)

Kenneth Nagel

1  were in the GS-13 program specialist position?
2     A.   It started with Mr. Robert Springer.
3     Q.   What period of time was Robert
4  Springer your supervisor?
5     A.   He was the main -- Charles Berge was
6  also a supervisor.  He was my first line
7  supervisor.  Mr. Springer, he was the executive
8  director for state operations, the man that
9  hired me.  It was from the time I started in
10 1999, February of '99 until the change of
11 administration in approximately January of
12 2001.
13    Q.   So Springer was the executive
14 director from January -- February '99 until
15 January 2001?
16    A.   He was before that.  He was
17 executive director when I came on board in
18 Washington.
19    Q.   And how long was Berge your
20 supervisor?
21    A.   From the beginning also.  It was Mr.
22 Springer was the selecting official and Mr.

1  Berge was my immediate supervisor.
2     Q.   So Berge was your immediate
3  supervisor?
4     A.   Yes.
5     Q.   Who became your immediate supervisor
6  after January 2001?
7     A.   Then Mr. Tim Denley, the acting
8  executive director for state operations.  I'm
9  sorry.  Mr. Berge was still there also at that
10 time.  Mr. Berge remained my direct supervisor.
11    Q.   When did Berge last serve as your
12 direct supervisor?
13    A.   I can't answer that exactly.
14 Sometime in 2001.  Probably mid 2001.
15    Q.   Who became your immediate supervisor
16 in mid 2001?
17    A.   That was Mr. John Chott.
18    Q.   What was Chott's position?
19    A.   He was the acting executive director
20 for state operations.
21    Q.   Who did he report to?
22    A.   He would have reported to the

1  administrator.  Actually maybe the associate
2  administrator.  To the administrator.
3     Q.   Did your duties change after Chott
4  became your immediate supervisor?
5     A.   No.
6     Q.   Did your responsibilities change
7  after Chott became your immediate supervisor?
8     A.   No.
9     Q.   Prior to Chott becoming your
10 immediate supervisor had you served as the
11 acting assistant executive director in the
12 absence of the executive director?
13    A.   On one or two occasions, yes.
14    Q.   And how did that come to happen?
15    A.   I was asked to do so in the absence
16 of superiors.
17    Q.   Which superiors were absent and you
18 were asked to stand in as the acting executive
19 director?
20    A.   Well, it would be the executive
21 director or my immediate supervisor who was a
22 deputy director for program coordination.  I

1  believe it was -- I can't remember his title.
2  Mr. Berge's title.
3     Q.   So there were occasions when Mr.
4  Berge was your supervisor when you were the
5  acting executive director?
6     A.   Yes.
7     Q.   And you believe that happened on one
8  or two occasions?
9     A.   Yes.  Perhaps more.  It was an
10 as-need basis.
11    Q.   After Chott became your supervisor
12 how often were you called upon to serve as the
13 acting executive director?
14    A.   I don't have a count but it was on
15 various occasions as well.
16    Q.   More than one or two?
17    A.   Yes.  More than one or two.
18    Q.   So from mid 2001, let's just say,
19 mid 2001, until your current position that you
20 obtained in July of 2003 on how many occasions
21 were you asked to serve as the acting executive
22 director?

7 (Pages 22 to 25)

Kenneth Nagel

Page 30

1    A.    Mr. Frago.
2    Q.    Was there an interview panel for the
3    first interview for both positions?
4    A.    Yes, sir.
5    Q.    Who was on the interview panel?
6    A.    It was Mr. Frago, Mr. Chott and Mr.
7    Soloman Ramirez.
8    Q.    So you had one interview for the
9    administrative position and the program
10   position and that interview was with Frago,
11   Chott and Mr. Ramirez?
12   A.    That's the way I understand it or
13   remember it, yes.
14   Q.    You say Frago told you that your
15   interview for this first interview was for both
16   positions.  When did Frago tell you this?
17   A.    I don't remember when that was.
18   Q.    Was it before the interview or after
19   the interview started?
20   A.    I don't recall.
21   Q.    What questions were asked of you in
22   this first interview for both positions?

Page 31

1    A.    I don't remember the questions.
2    Q.    Was there an EEO observer present
3    during this first interview for both positions?
4    A.    I don't remember.  There were other
5    people in the room.
6    Q.    When did this first interview for
7    both positions take place?
8    A.    I don't know the exact date.  It was
9    sometime after the application period closed.
10   Q.    So you submitted your application or
11   applications for both positions?
12   A.    Yes.
13   Q.    And what was the next thing that
14   happened in this process?
15   A.    The interviews.  The panel.
16   Q.    Did someone contact you and say we
17   are going to interview you for both positions?
18   A.    I don't recall when I was notified
19   of that.
20   Q.    I am asking you did that occur?  Did
21   someone contact you and say we are going to
22   interview you for both positions?

Page 32

1    A.    I don't recall that beforehand.
2    Q.    So you had -- do you recall anything
3    else from this first interview or do you recall
4    anything from this first interview -- and I
5    think you said there was just one interview for
6    two positions, correct?
7    A.    That's the way I understand it, yes.
8    Q.    Do you recall anything from this one
9    interview for two positions with the panel with
10   Frago, Chott and Ramirez?
11   A.    Can you repeat that again.
12   Q.    Do you recall anything that happened
13   at that one interview for two positions with
14   Frago, Chott and Ramirez?
15   A.    I remember being asked questions.  I
16   don't remember the questions.
17   Q.    Were you asked specifically about
18   your administrative experience?
19   A.    I don't know that I was asked
20   specifically.
21   Q.    Were you asked specifically about
22   your program experience?

Page 33

1    A.    I don't remember the questions.
2    Q.    How long did this first interview
3    last?
4    A.    I believe interviews were limited to
5    30 minutes.
6    Q.    What were the panel members doing
7    when you were interviewing?
8    A.    They were asking questions and if I
9    remember correctly taking notes.
10   Q.    They were taking notes?
11   A.    I think they were, yes.
12        MR. BRANCH:  Ms. Kidwell, we have
13   not seen copies of notes from this first
14   interview.  I take that back.  I think I have
15   seen the notes from the first interview.  Okay.
16        BY MR. BRANCH:
17   Q.    So they were taking -- all three
18   panel members were taking notes?
19   A.    To the best of my knowledge, yes.
20   Q.    So after this first interview what
21   was the next step in this process?
22   A.    Then I was called to a second

9 (Pages 30 to 33)

Kenneth Nagel

Page 38

1    Q.    Did you ever follow up to see why
2  you were not selected for the program
3  specialist position?
4    A.    No.
5    Q.    And why not?
6    A.    It is the selecting official's
7  decision so I wasn't questioning her decisions.
8    Q.    So you applied for a position but
9  you never followed up to see why you didn't get
10  it?
11    A.    I don't remember asking any
12  questions about it.
13    Q.    Who was the selecting official?
14    A.    It would have been Mr. Frago.
15    Q.    How long was the interview the for
16  administrative position?
17    A.    You mean the actual interview?
18    Q.    Yes.  How long was the actual
19  interview?
20    A.    If I remember correctly it was 30
21  minutes they allotted for interviews.
22    Q.    Was there a second interview for the

Page 39

1  program specialist position?
2    A.    I don't know that.
3    MR. BRANCH:  Let's take a short
4  break here.
5    (A short recess was taken.)
6    BY MR. BRANCH:
7    Q.    Mr. Nagel, how did you learn about
8  your selection for this administrative series
9  position?
10    A.    I believe it was Mr. Frago announced
11  it to me.
12    Q.    Prior to Frago announcing to you
13  that you would be selected for this
14  administrative series position did you have any
15  discussions with John Chott concerning his
16  desire to place you in the administrative
17  series position?
18    A.    No.
19    Q.    Have you socialized with Mr. Chott
20  or Frago outside of the workplace?
21    A.    No.
22    Q.    Have you ever been out for drinks

Page 40

1  with either one of them or to dinner?
2    A.    You mean on a social basis?
3    Q.    Yes.
4    A.    No.  Just business meetings.
5    Q.    Have you been to either one of Mr.
6  Frago or Chott's homes?
7    A.    No.
8    Q.    Have they been to your home?
9    A.    No.
10    Q.    Just so that I'm clear here, I
11  believe your testimony was that you applied for
12  two positions, the program position and the
13  administrative position?
14    A.    Yes.
15    Q.    You had one interview for both
16  positions initially?
17    A.    That's the way I remember and
18  understand it.
19    Q.    And then you had a second interview
20  for just the administrative position?
21    A.    I am not totally sure it was just
22  the administrative position I guess because I

Page 41

1  was offered that that is -- I thought that is
2  what it was.
3    Q.    What do you mean when you say you
4  are not sure if it was just the administrative
5  position?
6    A.    I don't know if they were looking at
7  one or both positions at the time.
8    Q.    So are you saying now that you may
9  have had a second interview for both positions?
10    A.    I am -- I have been trying to think
11  back on your questioning and trying to think if
12  it was one or two or both.  I had one second
13  interview so whether it was both or one I
14  assume -- because I was offered the 301
15  position I thought that was what it was for but
16  I can't honestly accurately respond to that.
17    Q.    Were there any specific positions,
18  specific questions related to the position?
19    A.    I don't remember the questions.
20    Q.    I'm going to show you a document
21  that was introduced during Linda Treese's
22  deposition last week and it's an interview

11 (Pages 38 to 41)

Kenneth Nagel

Page 46

1      MR. NAGEL: Yes. I just said those
2   are all the questions I have.
3      EXAMINATION BY COUNSEL FOR DEFENDANT
4      BY MS. KIDWELL:
5      Q.   Mr. Nagel, did you write a paper for
6   the secretary on anthrax?
7      A.   Yes, I did.
8      Q.   Did you also work on a consent
9   degree that I believe had to do with the
10  African-American farmers?
11     A.   Yes.
12     Q.   That was involving some type of
13  discrimination complaint. Am I correct on
14  that?
15     A.   Yes.
16     Q.   And have you ever socialized with
17  Linda Treese outside the office?
18     A.   No.
19     Q.   Has Ms. Treese ever been to your
20  home?
21     A.   No.
22     Q.   Have you ever been to Ms. Treese's

Page 47

1   home?
2      A.   No.
3      MS. KIDWELL: I have no more
4   questions.
5      MR. NAGEL: The court reporter is
6   going to prepare a transcript of the
7   proceedings here. You will need to state on
8   the record if you want to review the transcript
9   before it becomes final.
10     MS. KIDWELL: Yes. We are not
11  waiving signature.
12     (Whereupon, the deposition was
13  concluded at 11:14 a.m.)
14
15
16
17
18                        ,
19
20
21
22

Page 48

1      ACKNOWLEDGMENT OF DEPONENT
2   I, KENNETH NAGEL, do hereby acknowledge I have
3   read and examined the foregoing pages of
4   testimony, and the same is a true, correct and
5   complete transcription of the testimony given
6   by me, and any changes or corrections, if any,
7   appear in the attached errata sheet signed by
8   me.
9   _____  _____
10  Date        KENNETH NAGEL
11
12
13
14
15
16
17
18
19
20
21
22

Page 49

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly
6   sworn by me; that the testimony of said witness
7   was taken by me in shorthand and thereafter
8   reduced to computerized transcription under my
9   direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18  _____
19      Notary Public in and for
20      the District of Columbia
21  My Commission expires:  May 14, 2010
22

13 (Pages 46 to 49)

Kenneth Nagel

Page 52

## A

abilities 42:9
ability 6:16
able 21:15
absence 24:12
  24:15
absent 24:17
access 43:21
accommodate
  6:10
accurately
  41:16
achieve 14:22
acknowledge
  48:2
ACKNOWLE...
  48:1
acres 10:19,20
  11:4,6,6
acting 19:5
  23:7,19 24:11
  24:18 25:5,13
  25:21 26:3,21
  27:8,13 28:5
action 1:7
  49:12,17
activities 17:16
  18:5 45:6
activity 21:16
actual 38:17,18
adjustment
  19:11
administer
  17:15
administered
  17:17
administration
  12:9 22:11
administrative
  7:5 8:6 17:10
  17:12 19:19
  19:22 20:1,16
  20:19 21:10
  21:14,17 30:9
  32:18 34:19
  36:2,13 37:20

38:16 39:8,14
  39:16 40:13
  40:20,22 41:4
  43:1 44:7
administrator
  19:6 24:1,2,2
advised 35:1
advising 37:5
advisory 19:21
African-Ame...
  46:10
afternoons
  14:3
agency 7:1
  43:14 44:22
ago 9:1 28:16
  28:17 36:18
  44:5
agreed 50:10
Agriculture
  1:10 3:20
  6:22 7:22 8:1
  8:21 14:19
  17:1 18:2
  20:17 43:13
agronomy
  14:20
allotted 38:21
allow 6:4 8:10
AMTA 19:12
announced
  39:10
announcing
  39:12
answer 5:21
  6:1,3,4,12
  21:6 23:13
  37:4
answered
  21:11
anthrax 46:6
appear 48:7
APPEARANC...
  3:1
appears 49:5
application

28:11,21 31:9
  31:10 36:19
  37:2,2
applications
  31:11 36:22
applied 28:19
  38:8 40:11
apply 37:8
appropriate
  51:6
approximately
  16:16 22:11
area 9:21 14:17
areas 20:11
  37:10
asked 5:17,22
  24:15,18
  25:21 30:21
  32:15,17,19
  32:21 36:6,10
  42:10,19 45:1
  45:5
asking 31:20
  33:8 38:11
  44:9
assigned 15:4
  20:9
assignments
  4:9 18:18
  19:1,3,4
assistance
  19:8
assistant 24:11
assisted 20:8
associate 24:1
assume 27:5
  41:14
as-need 25:10
attach 51:6
attached 48:7
attained 16:12
attend 12:16
attended 14:11
attorney 49:15
Attorney's 3:11
  50:1

authorize 51:6
Avenue 2:12
  3:5
a.m 2:6 47:13

## B

bachelor's
  12:7,11 14:14
back 33:14
  41:11 43:5
background
  26:5
banks 9:21
basis 25:10
  40:2
becoming 24:9
began 12:8
beginning 9:12
  22:21
believe 25:1,7
  33:4 34:14
  39:10 40:11
  46:9
Berge 22:5,19
  23:1,2,9,10
  23:11 25:4
Berge's 25:2
best 28:11
  33:19
board 22:17
Bonnie 1:21
  2:21 49:2
  50:20
Branch 2:11
  3:3,4 4:3 5:7
  5:11 18:11
  33:12,16 39:3
  39:6 42:21
  43:10 45:9,14
  45:19
break 6:9,13
  39:4
bring 42:8,14
broad 17:9
  18:4 26:5
bullets 19:7

business 12:8
  40:4

## C

C 4:1
call 50:15
called 25:12
  27:10,12
  33:22 34:2
calls 16:4
campus 13:19
candidate 37:6
candidates
  34:10
CAPTION 51:1
captioned 51:3
Carolina 17:20
CASE 51:1
Certificate 49:1
  51:6
certify 49:4
change 22:10
  24:3,6 50:14
  51:7
changes 48:6
  51:4
Charles 22:5
Chott 23:17
  24:3,7,9
  25:11 30:6,11
  32:10,14
  34:13 36:2
  39:15,19 44:9
Chott's 23:18
  40:6
circumstances
  44:12
Civil 1:4,7 3:13
  50:2
clear 40:10
closed 31:9
Columbia 1:3
  49:20
come 24:14
  28:8
coming 9:19

32:18,22
**expires** 49:21
**E4905** 3:14
50:3

**F**
**facets** 21:13
**facilitated** 20:14
**fall** 28:10
**family** 13:2,4
**far** 12:6 13:6 15:11
**farm** 6:22 10:6 10:9,19 13:2 13:3,5,7,12 14:2,4,8 19:6 19:16 43:13 44:21
**farmed** 13:4
**farmer** 10:3,9 10:17
**farmers** 19:17 46:10
**farming** 9:20 10:2,5 11:1 12:22
**father** 13:4 14:5,7
**February** 8:18 8:20 22:10,14
**Field** 7:6
**Fields** 1:5 3:21 5:12 50:6 51:1
**filled** 28:10
**final** 47:9
**financially** 49:16
**find** 50:9
**finish** 8:10
**first** 5:3 9:3,5 11:9 19:3,6 22:6 29:13,16 29:19,21 30:3 30:15,22 31:3 31:6 32:3,4

33:2,13,15,20 36:12 42:4,5
**folks** 14:6 26:16 27:7 28:3
**follow** 18:6 29:11,14 38:1
**followed** 38:9
**following** 29:17 51:4
**follows** 5:5
**foregoing** 48:3 49:3,5
**forward** 50:12
**foundation** 42:17
**four** 27:18,19 36:18
**Frago** 29:8 30:1,6,10,14 30:16 32:10 32:14 34:13 36:2 38:14 39:10,12,20 40:6
**FSA** 21:13
**full** 6:4,6,7
**full-time** 10:21 12:19,21,22
**further** 49:13

**G**
**gain** 43:21
**gender** 45:8,13
**give** 5:13
**given** 48:5 49:10
**going** 26:7 31:17,21 41:20 47:6
**Good** 5:10
**gotten** 45:15 45:18
**grade** 4:10 7:2 7:4 9:10,12 16:3 17:2 26:14 28:16

37:11 43:12
**grades** 16:10 27:1
**graduated** 10:11
**grain** 10:6
**Grant** 16:12
**ground** 5:13
**group** 18:7
**GS** 42:1
**GS-12** 16:5
**GS-13** 17:3 20:16 21:9 22:1 28:4
**GS-14** 7:4 21:10
**guess** 40:22

**H**
**happen** 24:14 26:2
**happened** 25:7 31:14 32:12 36:5
**happy** 5:19
**headquarters** 44:22
**held** 2:9
**hereto** 49:16
**hesitate** 50:15
**Hewitt** 3:19
**high** 10:10
**higher** 27:1
**hired** 22:9
**home** 13:20,21 14:12 40:8 46:20 47:1
**homes** 40:6
**hometown** 13:12
**honestly** 5:22 41:16
**hours** 14:21 15:2 27:17
**House** 26:9

**I**

**identification** 18:10 43:9
**identify** 18:15 43:11
**immediate** 23:1,2,5,15 24:4,7,10,21
**impair** 6:16
**Improper** 42:16
**include** 45:16
**included** 4:21
**includes** 45:7
**increase** 37:11
**indicated** 51:5
**indicates** 42:2
**individual** 42:2
**information** 43:22 45:8,16
**initially** 40:16
**interest** 37:10
**interested** 42:6 49:16
**interview** 28:14 29:10,11,13 29:16,19,21 30:2,3,5,8,10 30:15,15,18 30:19,22 31:3 31:6,17,22 32:3,4,5,9,13 33:2,14,15,20 34:1,3,12,17 34:20 35:2,10 36:1,5,8,12 36:13 38:15 38:17,19,22 40:15,19 41:9 41:13,22 42:20
**interviewed** 28:10,12 29:2 29:4,6 42:2
**interviewing** 33:7 34:4,7 34:16 37:19
**interviews** 29:9

31:15 33:4 38:21
**introduced** 41:21
**investigation** 17:20
**involved** 21:5
**involving** 46:12
**issues** 17:10 17:11,12 19:10,14 21:5 21:6,12,14,21

**J**
**January** 22:11 22:14,15 23:6
**job** 1:22 10:21 11:9,15 18:1 45:3
**Johanns** 1:8 50:6 51:1
**John** 23:17 39:15 44:9
**Johnson** 12:4 15:11,22
**Judith** 3:10 50:1
**July** 7:14,17,20 8:12,16 25:20 42:3
**jump** 17:15

**K**
**Kenneth** 1:15 2:9 4:2 5:2,9 42:2 43:16 48:2,10 50:10 51:2,19
**Kidwell** 3:10 4:4 33:12 42:16 45:9,21 46:4 47:3,10 50:1,8
**kind** 21:16
**know** 5:18 6:1 6:3,10 16:16 27:9 31:8

Kenneth Nagel

**physical** 37:2
**place** 31:7
  39:16
**placed** 11:17
  11:21 28:8
**Plaintiff** 1:6 3:2
  5:6
**plaintiff's**
  18:13
**please** 5:8 50:9
  50:12,15
**point** 5:17 6:10
  16:18 28:2
**position** 7:3,8
  7:11,12,13,18
  7:20 8:13,17
  8:19 9:3,5,11
  11:18,21 15:5
  15:6 16:21
  17:7,8 20:15
  20:17,18,20
  20:22 21:3,3
  21:10,11 22:1
  23:18 25:19
  27:8,18,20
  28:9,12,15,18
  29:15 30:9,10
  34:21 35:3,5
  35:6,11,16,21
  36:3,14,20
  37:3,14,20
  38:3,8,16
  39:1,9,14,17
  40:12,13,20
  40:22 41:5,15
  41:18 42:1,8
  42:15,20 43:1
  43:2 44:7
**positions**
  28:19,22 29:3
  29:5,7,12,14
  29:17,20,22
  30:3,16,22
  31:3,7,11,17
  31:22 32:6,9
  32:13 34:16

36:12 37:9
  40:12,16 41:7
  41:9,17
**possible** 37:12
  44:11
**prepare** 43:17
  44:10,18 45:4
  47:6
**prepared** 43:15
  43:16,19
  44:14,16
**preparing** 9:21
  10:1 44:2
**present** 3:18
  31:2
**pretty** 18:5
  42:18
**previously**
  26:12
**Prior** 7:17 24:9
  39:12
**probably** 20:12
  23:14 27:16
**procedure**
  50:14
**proceedings**
  47:7
**process** 31:14
  33:21
**producers** 9:22
**production**
  19:11
**Profile** 4:10
  43:12
**program** 4:9
  8:8,13,21
  11:21 12:9
  15:4 16:4
  17:1,11 18:2
  18:6,18 20:11
  20:17,21 21:1
  21:2,5,6,9,12
  22:1 24:22
  28:16,17 30:9
  32:22 35:2,6
  35:10,15,20

36:20 37:13
  38:2 39:1
  40:12 43:2
**programs**
  17:16 19:6,17
  34:21
**progresses**
  16:5
**provide** 6:4
  19:8
**Public** 2:22
  49:1,19
**Puerto** 17:18
**purpose** 6:6
  44:13
**Pursuant** 2:21
**put** 12:5 28:11
  36:17
**P-R-O-C-E-E-...**
  5:1

---

**Q**

**qualified** 28:12
**question** 5:19
  5:21 6:1,12
  6:13 8:11
  42:5,5,11,13
  42:19 45:10
**questioning**
  38:7 41:11
**questions** 5:15
  6:8 20:4,9
  30:21 31:1
  32:15,16 33:1
  33:8 36:6,10
  38:12 41:18
  41:19 45:20
  45:22 46:2
  47:4 50:15

---

**R**

**race** 45:7,12
**Ramirez** 30:7
  30:11 32:10
  32:14 34:15
**ranchers** 19:17
**range** 17:9

18:4
**read** 42:5 48:3
  51:3,4
**reading** 50:11
**realm** 19:22
**reared** 9:16
**REASON** 51:7
**reasons** 39:5
**recall** 6:2 19:13
  30:20 31:18
  32:1,2,3,8,12
  34:22 36:15
  37:16 42:10
  44:1,2,4,9,12
  45:1
**receipt** 50:12
**receive** 37:5
**received** 14:14
**receiving** 6:15
**recess** 39:5
**record** 47:8
  49:10 51:5
**records** 16:17
**reduced** 49:8
**referencing**
  42:14,22 43:1
  43:4
**regarding**
  50:11
**related** 41:18
  49:11
**relative** 49:14
**remained**
  23:10
**remember** 6:3
  25:1 26:19
  28:17 30:13
  30:17 31:1,4
  32:15,16 33:1
  33:9 34:13,15
  36:18 37:7,22
  38:11,20
  40:17 41:19
  43:18 45:18
**rented** 11:7
**repeat** 5:19

32:11 35:17
**rephrase** 5:19
**report** 23:21
  45:16
**reported** 1:21
  23:22
**reporter** 47:5
**Reporter/Not...**
  50:21
**represents**
  5:11
**request** 6:11
  6:11 51:4
**requested**
  44:17
**required** 18:5,8
**respond** 41:16
**response** 6:5,7
**responses** 6:7
**responsibiliti...**
  24:6
**responsibility**
  26:22 27:6
**responsible**
  50:11
**review** 29:11
  47:8
**Rico** 17:18
**Robert** 22:2,3
**room** 3:14 31:5
  50:3
**rules** 5:13
**Russo** 1:21
  2:21 49:2
  50:20

---

**S**

**S** 4:1
**sat** 36:9
**saying** 41:8
**says** 18:22
  42:6,14 43:16
  43:19
**scale** 16:11
**school** 10:10
  12:6

Kenneth Nagel

Page 58

**understanding**
8:7,9 34:6,18
**United** 1:2 3:11
3:20 50:1
**University**
12:13,17 13:6
13:19 14:11
**USDA** 7:15 9:1
9:4,19 10:12
11:9
**U.S** 1:9 6:22

**V**
**Varied** 10:20
**variety** 45:6
**various** 19:16
20:11,11
21:20 25:15
**vs** 1:7 50:6
51:1

**W**
**waiving** 47:11
**want** 47:8
**Washington**
1:16 2:14 3:7
3:15 16:19,22
22:18 50:3
**wasn't** 38:7
**way** 12:5 29:14
30:12 32:7
40:17
**week** 27:14
36:16 41:22
**weeks** 27:15
**went** 13:18
16:4
**White** 26:9
**wide** 45:6
**witness** 42:18
45:12 49:4,6
49:10 50:11
**work** 7:4 9:18
15:19 20:3,11
21:20 46:8
**worked** 7:15,16
7:17 9:21

14:4 15:4
17:9 26:11
**working** 7:6
17:18,19,21
26:5,8,10
**workload**
17:22
**workplace**
39:20
**write** 46:5

**Y**
**year** 12:14
16:14
**years** 7:16 9:1
10:14 12:16
15:18 36:18

**0**
**06-0538(HHK)**
1:8

**1**
**1** 4:9 18:9,14
**10:05** 2:6
**11** 16:9
**11:14** 47:13
**1145** 8:2,4,8,15
**12** 1:17 2:5
16:9,12,14
**1200** 10:20
11:5
**128** 15:1
**13** 26:14 51:2
**14** 26:17 27:7
28:3,16 42:1
49:21
**148** 17:17
**15** 26:17 27:7
28:4
**16** 7:16 9:1
42:3
**179873A** 1:22
**18** 4:9
**1825** 2:12 3:5
**1965** 10:11,13
10:16

**1966** 12:18
**1971** 12:15,18
**1991** 10:12,13
10:16 11:1,10
15:10
**1995** 16:16
**1999** 8:18,20
17:4 22:10

**2**
**2** 4:10 43:7,8
**20009** 2:14 3:7
**2001** 22:12,15
23:6,14,14,16
25:18,19
**2003** 7:14,17
7:21 8:12,16
25:20 42:3
44:6,17,19
**2007** 1:17 2:5
51:2
**2010** 49:21
**202-514-7250**
3:16
**202-785-2805**
3:8
**20530** 3:15
50:3
**26** 10:14
**28** 17:19
**297** 11:4

**3**
**30** 33:5 38:20
50:12
**301** 7:9,12,18
8:4,6 29:15
41:14 42:1

**4**
**4th** 3:12 50:2
**43** 4:10
**46** 4:4

**5**
**5** 4:3 9:12,13
16:2,6

**55** 18:19
**555** 3:12 50:2

**6**
**690** 2:13 3:6

**7**
**7** 16:4,5,6

**9**
**9** 16:7
**9-11** 27:18,21
**91** 15:9
**92** 15:9
**99** 22:10,14

# Exhibit No. 10

**Kenneth L. Nagel**
2723 Baronhurst Drive
Vienna, VA  22181-6158
(703) 242-5740
klnagel@msn.com



March 15, 2003


FSA-HRD-PMB 349
ATTN: Vacancy # UF168394 CT
2117 L Street NW
Washington, DC 20037-1524


Dear Sir or Madam:

Please accept the attached documents as part of my application for the position of
<u>Administrative Management Specialist</u>, announcement number: UF168394 CT.  The
Qualifications and Availability C FORM was submitted on-line.  My resume has also
been submitted by e-mail to HRD-FSA-RMA-APPL@WDC.USDA.GOV.

Your consideration of my qualifications for the position of <u>Administrative Management
Specialist</u> is greatly appreciated.  I am sure you will find me to be an excellent candidate
for the position.

Sincerely,

Kenneth L. Nagel


Enclosure

ANNOUNCEMENT NUMBER:    **UF168394 CT**
TITLE:    **ADMINISTRATIVE MANAGEMENT SPECIALIST**
GRADE:    **GS-301-14**
C FORM ANSWERED:    **USAJOBS WEBSITE**

# KENNETH L. NAGEL

2723 Baronhurst Drive
Vienna, Virginia 22181-6158

SSN: 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
Citizenship: United States

Home Phone (703)-242-5470
Office Phone (202)-720-7890

## WORK EXPERIENCE

2/99 - Present **Agricultural Program Specialist**, GS-1145-13

United States Department of Agriculture, Farm Service Agency,
Office of the Deputy Administrator for Field Operations
1400 Independence Ave. SW, Stop 0539, Washington, DC, 20250
Hours per week: 40 hours – Salary: $75,112
Supervisor:    Douglas W. Frago, Deputy Administrator for Field Operations
Phone number: (202) 690-2807

- Serve as the principal point of contact and liaison for the Deputy Administrator for Field Operations (DAFO) for administrative questions and personnel concerns and provide advice and directions on personnel, budget, staffing, hiring, claims, ethics, travel, reimbursable agreements and other administrative functions (work regularly with the Budget, Fiscal Management, Human Resources, and Management Services Divisions and KCAO)
- Approve overtime, travel, and equipment requests from State Offices
- Serve as contact and liaison with the Deputy Administrator for Farm Loan Programs (DAFLP) for DAFO and FSA State Offices on policy and procedural matters related with the FSA Farm Loan Programs division
- Serve as acting Deputy Administrator for Field Operations in the absence of the Deputy Administrator and Assistant to the Deputy Administrator
- Served as acting Executive Director for State Operations (EDSO, now DAFO) on and during the four days following the September 11, 2001 terrorist attacks
- Attend Administrator's staff meetings and Under Secretary staff meetings to present DAFO reports in the absence of the DAFO and Assistant to the DAFO
- Served as contact and liaison with the Deputy Administrator for Farm Programs (DAFP) for EDSO from 02/1999 to 12/1999
- Serve as a backup contact and liaison for the FSA Farm Programs Division
- Serve as the coordinator of the FSA State Committee appointment process and interact with the White House Liaison to appoint and reappoint FSA State Committee members in a smooth and efficient manner
- Serve as DAFO speaking representative at FSA employee State and Area conventions (IA, IL, NE, OH, OR, and SE Area Rally to date) and to the National Association of Farmer Elected Committeemen legislative conference in DC

Kenneth L. Nagel
Administrative Management Specialist                              UF168394 CT

- Serve as an Agency Resolving Official for EEO complaints and write decisions and settlement agreements to resolve cases (trained in 2002)
- Serve as a hearing officer for the DAFO in employee administrative appeals around the country and write the decision and recommended DAFO response for each appeal
- Serve as a contact and advisor to State Offices when county office sit-ins or takeovers occur in the absence of the DAFO and assist when he is present
- Serve on the headquarter Continuity of Operations Plan team to be relocated to an alternate site to maintain national operations for FSA in the event the National Office is inoperative
- Serve on a task force with other divisions and agencies for DAFO to develop guidelines for security in State and county offices to prepare them for and how to react to terrorist events
- Participate with Agency program officials in reviewing existing and proposed legislation, program policies, procedural requirements and Federal regulations affecting assigned areas to assess their adequacy and effectiveness in meeting the needs of program participants as well as those of State and county offices
- Develop and write Federal regulations pertaining to county committees and State and county office administration processes
- Interact with the National Office's FOIA officer to respond to FOIA requests
- Developed processes for DAFO for States' Federal and non-Federal staff ceilings, funding and personnel issues for the last three years
- Served on a task force with SEDs, Budget staff, FLP staff, FP staff, and DAFO to develop new methods to distribute staff ceilings using actual employee costs and workload figures
- Serve as DAFO contact and liaison with the Budget Division (BUD) to determine State allotments for county office equipment, overtime guidelines and travel allotments
- Reviewed and developed procedures with BUD, MSD, and ITSD for Federal equipment allotments with subsequent notice preparation to disseminate funds
- Work with the Budget Division on budget and workload reporting and analysis and assist State offices with questions on budget and workload
- Analyze workload figures and reports to use in determining staff ceilings for the States and serve as the DAFO contact person for States on workload and ceilings
- Work with the classification staff on county office employee positions and CED grades
- Serve as the DAFO representative for the Pigford vs. Veneman lawsuit, Consent Decree operations connected with all the States and all FSA staff since 1999
- Serve as the major contact persons for FSA and the Department of Justice (DOJ) representative under Shaller vs. US involving the plaintiffs' interpretation of the Fair Labor Standards Act as applied to exempt employees on the Consent Decree
- Write responses to plaintiffs' requests for discovery and write responses to plaintiffs' interrogatories in concert with the Office of General Counsel and DOJ
- Serve as the primary contact person for the last three years and gather, consolidate, and provide information to OIG special investigators on one of the largest potential fraud cases in history involving FSA loans and programs in Puerto Rico
- Performed on-site investigation and subsequently wrote a full report and recommendations for the EDSO regarding allegations of disparate treatment of employees in the North Carolina State Office under the previous administration
- Write responses to Congressional inquiries, work with USDA and FSA Congressional affairs staff and served as the EDSO representative to Congressional Ag committees
- Work with the Secretary's staff on questions, decision memos, and attend Department level meetings with the Secretary, Under Secretary for FFAS and others
- Served on a task force with USDA Congressional affairs staff representing the former EDSO on county committee and civil rights issues
- Serve as a DAFO meeting representative to the Office of Civil Rights

2

Kenneth L. Nagel
Administrative Management Specialist                              UF168394 CT

- Develop briefing memos for the DAFO, Administrator and Secretary
- Wrote briefing memorandum for the new Assistant Undersecretary for Civil Rights on the county committee system and met with him to describe the process
- Traveled to Texas and organized action teams into Texas involving 148 detailees from across the nation to assist the Texas State Office with the 1998 Crop Loss Disaster Assistance Program
- Organized, developed the plan of action and supervised 9 action teams in Puerto Rico involving 28 detailees, 9 county offices, and the State Office for six weeks to complete applications for the 1999 Crop Disaster Program and the Livestock Indemnity Program
- Led the detailing of over 400 FSA employees from around the nation to serve on the Consent Decree Action Team over the last three and one-half years
- Organized, developed, and supervised six FSA employees to conduct a four day training for FSA processes and programs in Puerto Rico
- Participated in, developed script and appeared in a live, national satellite training broadcast and video tape for Farm Loan Officer trainers
- Assisted in developing and coordinating a State Executive Director (SED) and State Committee (STC) training conference and assisted with two previous SED/STC conferences
- Served as Chairperson for an interagency work group consisting of headquarter APHIS, CSREES, RD, NRCS, and FS staff members at the National Office for the National Food and Agriculture Council to develop guidelines for the Secretary in the event of Foot and Mouth Disease outbreaks in the States at the request of the Secretary
- Prepared an in depth briefing memorandum and report for the Secretary about anthrax after an anthrax outbreak in the northern Midwest
- Served as the FSA coordinator for a special project involving energy resource information gathering from all 50 states and prepared a report for the USDA Chief Economist, Department of Energy, and FSA-Economic and Policy Analysis Staff, plus being involved in interagency and inter-department meetings
- Served on a National Business Needs assessment work group made up of a cross section of employees from Headquarters, Kansas City AO, State Offices, and county offices to develop recommendations for more efficient Agency processes to present to the Administrator
- Co-chaired a 21 member national task force to totally revise handbooks 15-AO and 16-AO and subsequently worked with the directives branch and HRD
- Totally revised and provided to OGC and the Office of Civil Rights, 7 CFR, Part 7, Sections 1-26 for the previous administration
- Serve as a DAFO contact person for workplace violence and interact with the National workplace violence coordinator
- Serve as a contact person for the national workplace violence coordinator to handle individuals barred from county FSA offices and to take calls from irate and unhappy producers to assist them with their concerns
- Serve as the contact person for State and county travel questions
- Serve as coordinator of the county committee election reform legislation and collect data required to provide to the Secretary per the Farm Security and Rural Investment Act of 2002
- Coordinate the development of new county committee nomination forms, new ballots, and recommendations to the Secretary for election reform to ensure socially disadvantaged participants are represented on county committees
- Review, edit, and assist in preparing notices, handbook amendments and memorandums for Financial Management, Personnel Management, Budget, Administrative Operations, Administrative Services, Farm Loan Programs, and all other areas as necessary
- Develop spreadsheets, charts, tables, and data bases for staff ceilings, judicial requests, detailing Consent Decree employees, staff analysis, and other needed data base information

3

Kenneth L. Nagel
Administrative Management Specialist                                    UF168394 CT

- Gather information and evidence for assigned Hotline Complaints and subsequently write the reports and responses to OIG
- Work with the Office of Reviews and Audits Staff on assignments provided DAFO
- Work with and advise the Appeals and Litigation Staff with requests on appeals that have involved the Sugar PIK program in Puerto Rico and Florida plus other appeals
- Work with Budget Division, Human Resources Division, Financial Management Division to recommend, review and implement administrative management, processes, and functions as they are needed
- Provide advice, guidance and direction to State Offices for the management of State and County offices and personnel management and adverse determinations
- Served on interview panels to select the Puerto Rico Farm Loan and Programs Chief, District Directors for Texas and North Carolina, DAFO program analysts and DAFO secretaries


1/97 - 2/99:   **County Executive Director**, CO-12

Lancaster County FSA, 6030 S. 58th, Suite A, Lincoln, NE, 68516-3641
Hours per week: 40 hours  - Salary:  $50881
Supervisor:    Leonard Ringland, County Committee Chairperson
                     Phone number:  (402) 423-3993

- Managed a Grade 12 county office that consistently ranked among the top 10 counties in the nation in workload with eight permanent Program Technicians, two temporary Program Technicians, and three Field Assistants with a three person Farm Loan Team
- Coordinated Aerial Compliance activities as Headquarters County
- Served as the Aerial Compliance State Office consultant and a district trainer
- Responsible for Production Flexibility Contracts; Price Support, including Marketing Assistance Loans and Loan Deficiency Payments; Conservation Reserve Program; Common Provisions; Compliance; and other programs as required
- Processed over 3000 1999 LDP applications for wheat, feed grains, and silage
- Responsible for 673 Conservation Reserve Program contracts involving 31,415 acres and 2417 Production Flexibility Contracts
- Responsible for the largest workload county in Nebraska and 7th largest in the U.S. with over 2400 farms of 331,161 cropland acres and 3500 producers
- Developed and presented Power Point informational meetings to farmers, businessmen, and land owners
- Served as the Service Center facilitator for civil rights and EEO training at two sessions
- Served as lead agency coordinator for the FSA, Natural Resources Conservation Service, and Rural Development in the Lincoln Service Center
- Worked closely with the Nebraska State FSA Office located in Lincoln on pilot projects, routine program and automation matters, and GIS fact finder at GIS seminars
- Served on the State FSA Grievance Board as the CED Representative
- Coordinated efforts with a Farm Loan Manager and Farm Loan Officer headquartered in the office (Completed the one year CED Farm Loan Program training December 2, 1998)
- Regularly interviewed by the farm reporter for the Lincoln newspaper on FSA and other agriculture issues

Kenneth L. Nagel
Administrative Management Specialist                              UF168394 CT

**7/93 - 1/97:   County Executive Director**, CO-12

Perkins County FSA, PO Box 100, Grant, NE, 69140-0100
Hours per week: 40 hours  - Salary:  $46569
Supervisor:    Duane McClintock, County Committee Chairperson
               Phone number:  (308) 352-4129

- Managed the largest Grade 12 workload county office in western Nebraska with up to eight permanent Program Assistants and one Field Assistant
- Responsible for over $7million in commodity loans for wheat, feed grains, and oilseeds. Performed all commodity loan inspections
- Responsible for enrolling 100% of eligible contract acreage consisting of 312,779 acres on 930 farms with over 128,000 acres of irrigated corn land into the AMTA program.  The county was the second largest wheat producing and largest sunflower seed-producing county in Nebraska.
- Responsible for 297 CRP contracts covering 42,505 acres
- Coordinated the largest flying operation ever conducted in Nebraska involving 49 counties, 3 aircraft, and 10 Aerial Compliance Assistants
- Promoted the then FSA Wetland Reserve Program and had the only applications in western Nebraska approved
- Composed a bi-weekly column for the Grant-Tribune Sentinel newspaper
- Wrote script and spoke about FSA issues on the nation's largest farm radio station KRVN, Lexington, Nebraska
- Conducted numerous informational meetings to inform producers of farm programs
- Conducted the annual county convention to elect county committeepersons

**11/91 - 7/93:   County Executive Director**, CO-12

Johnson County ASCS, PO Box 567, Tecumseh, NE, 68450-0567
Hours per week: 40 hours  - Salary:  $27789
Supervisor:    Harold Jeffries, County Committee Chairperson (deceased)
               Kevin Nabor, District Director
               Phone number:  (402) 223-3125

- Managed a Grade 12 county office with seven permanent Program Assistants and two Field Assistants, with occasional temporary Program Assistants
- Administered a large workload of commodity loans for wheat, feed grains, and oilseeds
- Responsible for a large CRP program with 498 contracts
- Responsible to administer the annual farm program on 75% of the cropland that was enrolled in the program
- Administered 932 farms and 1600 producers.  The Agricultural Conservation Program was a major program managed in the county
- Worked with the SCS in planning a new USDA Service Center for the county
- Wrote informational articles for the local newspaper

5

Kenneth L. Nagel
Administrative Management Specialist                                    UF168394 CT

**3/91 - 11/91:  County Office Trainee**, CO-5 to C0-7

Nebraska State ASCS, 7131 A, Lincoln, NE, 68505-7975
Hours per week: 40 hours  - Salary:  $21023
Supervisor:    John Neuberger, State Executive Director
               Phone number:  (402) 437-5581

- Trained in all ASCS program areas for preparation to manage an ASCS county office
- Trained in six counties across Nebraska.  Required overnight travel from home during the week in five of the six counties
- Was tested by State specialists after completing each of the five sessions and passed each program area without the need to repeat any part
- Read all ASCS handbook procedure pertaining to Administration, Production Adjustment/Common Programs, Compliance, Price Support, and Conservation.
- Read and studied all notices, State memos, tele-mails, and any other information required for the position
- Attended first session of CED Management Training at San Diego, CA under CED Management Training pilot program


**2/88 -3/91:    Agricultural Assistant**

Farmer's State Bank, PO Box 89, Panama, NE, 68419-0089
Hours per week: Part time  - Wages:  $12.50 per hour
Supervisor:    Lee Anderberry, Vice president
               Phone number:  (402) 782-3500

- Met with Ag borrowers to develop computerized annual cash-flow projections
- Prepared and updated financial statements and security agreements to establish borrowers' annual lines of credit for operating loans
- Assisted in the preparation of FmHA guaranteed loan applications and provided updated documentation for FmHA guaranteed loans
- Reviewed Ag borrowers' files to ensure that all filings and reports were current, complete, and correct
- Revised and developed Lotus 123 computer templates and spreadsheets for office use
- Assisted with review of current note balances and payments


**2/87 - 3/91:    Agricultural Representative**

Lancaster County Bank, 10841 N 142nd, Waverly, NE, 68462-0447
Hours per week: Part time  - Wages:  $12.50 per hour
Supervisor:    Mort Novak (retired), President
               Janet Latimer, President
               Phone number:  (402) 786-2555

- Developed a farm inspection program and reporting procedure for Lancaster County Bank
- Conducted annual on-site farm inspections with Ag borrowers to ensure FDIC requirements were met and to provide the loan committee with an objective report on bank customers' farm operations, inventories, equipment, and land

6

Kenneth L. Nagel
Administrative Management Specialist                                    UF168394 CT

- Provided current values of borrower real estate and chattels
- Reviewed all Ag cash-flow projections and financial statements for accuracy and feasibility
- Prepared computerized trend analysis from each Ag borrower's financial data
- Recommended actions borrowers could apply to their farm operations to improve profitability and improve cash flow
- Reviewed and updated all lien filings for both agricultural and commercial borrowers and annually reviewed each customer's loan documentation
- Reviewed all commercial loan files for completeness and feasibility
- Developed trend analysis for commercial loans


5/71 - 3/91:    **Self-employed Farm Owner and Operator**

Nagel Farms, RR 2, Ceresco, NE, 68017
Hours per week: Full-time  - Salary:  $35,000

- Successfully operated and managed more than 1,000 acres of owned and leased dryland and irrigated land
- Managed crop and livestock enterprises
- Received numerous State and local awards with spouse for achievements in various aspects of agricultural production and leadership
- Produced a State Convention attended by over 500 people as the State President for the Nebraska Young Farmers' and Ranchers' Educational Association
- Breeder of registered championship Quarter Horses
- Still own and manage 297 acres of farmland under share lease in Nebraska


## EDUCATION

9/61 - 5/65    Waverly High School, Waverly, NE, 68462
               High School Diploma - 1965

2/66 - 6/71    University of Nebraska, College of Agriculture, Lincoln, NE, 68588
               Bachelor of Science with dual major of Ag Economics and Agronomy - 1971

9/83 - 11/83   Nebraska School of Real Estate, Lincoln, NE, 68500
               Real Estate Sales License -1983

9/89 - 12/89   Southeast Community College, Lincoln, NE, 68520
               Instructor Certificate - Nebraska Farm and Ranch Business Management Program

1/88 - 12/90   University of Nebraska, Graduate College of Business Adm., Lincoln, NE, 68588
               Graduate credit - 7 hours -- Undergraduate credit - 6 hours

7

Kenneth L. Nagel
Administrative Management Specialist                                  UF168394 CT

## ACTIVITIES

| | |
|---|---|
| 2001 - 2003 | Nebraska Farm Bureau Federation, Member |
| 1997 - 1999 | Kiwanis Club of Lincoln, Agriculture and Environment Committee |
| 1997 - 1999 | Advisory Defense Council, Lincoln-Lancaster, Mayoral Appointment |
| 1996 - 1997 | Grant City Planning Commission, Steering Committee Member |
| 1993 - 1997 | Grant Rotary Club, Member |
| 1990 - 1991 | Nebraska Coalition for Agriculture Financial Management Education, Steering Committee Member |
| 1989 - 1991 | UN-L Cooperative Extension of Lancaster County, Board vice-president |
| 1986 - 1991 | Farmer's Co-op Association of Ceresco, Board Secretary |
| 1980 - 1982 | Farmer's Co-op Elevator of Agnew/Davey, Board Secretary |
| 1975 - 1976 | Raymond Central School Agricultural Advisory Committee, Chairperson |
| 1971 - 1972 | Nebraska Young Farmer and Rancher Education Association, State President |
| 1965 - 1966 | Nebraska Future Farmers of America, State Secretary |

## AWARDS AND OTHER QUALIFICATIONS

| | |
|---|---|
| 2002 | Agency Resolving Official Training |
| 2002 | Cash award for leading State Committee appointments |
| 2001 | Farm Loan Officer Training Orientation |
| 2001 | Brio Training (KC) |
| 2001 | Excel Spreadsheet Training |
| 2000 | Civil Rights and EEO Training |
| 2000 | Quality Step Increase for Outstanding Work |
| 1999 | Travel Management Training |
| 1999 | Certificate of Appreciation by Administrator |

Use Brio, HRD-Employee Information System, I*CAMS, and OIP software
Proficient in MS Word, MS Excel, MS PowerPoint, Corel WordPerfect

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supn. 296-33, Subch. 4

*Vacancy Identification Number*

Exception to SF 50-B
approved by GSA/IRMS 2-87

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| NAGEL, KENNETH L | 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 | 11/11/47 | 01/12/03 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| | PAY ADJ | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| QWM | REG 531.205 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| ZLM | E O 13282 | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | AGRL PROG SPECLST |
| | 00030801    114530 |

| 8. Pay Plan | 9. Occ Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 72,851.00 | PA | GS | 1145 | 13 | 04 | 75,112.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 65,349.00 | 7,502.00 | 72,851.00 | .00 | 67,377.00 | 7,735.00 | 75,112.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FARM SERVICE AGENCY |
| | DEP ADM FOR FIELD OPERS |
| | FIELD OPERS STAFF |
| | AG FA0502000000000000    PP 01 2003 |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1  1-None  3-10 Point/Disability  5-10 Point/Other  2-5 Point.  4-10 Point/Compensable  6-10 Point/Compensable/30% | 1  0-None  2-Conditional  1-Permanent  3-Indefinite | | YES  X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| BO  WAIVED | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| FERS AND FICA | 03/10/91 | F  FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1  1-Competitive Service  3-SES General  2-Excepted Service  4-SES Career Reserved | E  E-Exempt  N-Nonexempt | | 0395 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON    DIST OF COLUMBIA    DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

FEDERAL PAY INCREASE DUE TO E.O. 13282 SIGNED 12/31/02.
SALARY INCLUDES A GENERAL INCREASE OF 3.1% ROUNDED AND A LOCALITY
PAYMENT (OR OTHER GEOGRAPHIC ADJUSTMENT) APPLICABLE IN THIS AREA.

| 47. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF AGRICULTURE | *Donna D. Beecher* |
| 47. Agency Code  48. Personnel Office ID  49. Approval Date | DONNA D. BEECHER |
| AG FA    4881    12/31/02 | DIRECTOR, OF HUMAN RESOURCES MGMT |

TURN OVER FOR IMPORTANT INFORMATION
3-Part    50-315

1 — Employee Copy - Keep for Future Reference

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

*Vacancy Identification Number 4F168394 CT*

EPRODUCE LOCALLY. *Include form number and date on all reproductions.*

**AD-2000**
(9-27-00)

**United States Department of Agriculture**

## Performance Plan Agreement and Appraisal

*Privacy Act Notice: Submission of information is mandatory. Failure to provide information will prohibit data collection required by the Office of Personnel Management.*

| 1. EMPLOYEE'S NAME | 2. RATING PERIOD |
|---|---|
| Nagel, Kenneth | FROM: 10/01/01    TO:    09/30/02 |

| 3. TITLE/SERIES/GRADE | 4. AGENCY/DIVISION | 5. SOCIAL SECURITY NUMBER |
|---|---|---|
| Program Coordination Specialist GS-301-13/04 | FSA/EDSO | 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 |

### PART I - PERFORMANCE PLAN

6. CRITICAL RESULTS *(Check (✔) a minimum of 2/ maximum of 5 applicable elements.)*

Note:    The narrative statements describe the "Results Achieved" level of performance. Where applicable, quantity, quality, and timeliness are derived directly from appropriate agency regulations, policies, instructions, work plans or other guidelines. If no guidelines exist, further clarification will be provided by the rating official. These elements are to be used by employees and supervisors to develop performance plans. They may be used as is, with further clarification, or up to three new elements may be developed, as appropriate. All employees must have at least one job specific element (see two-level performance appraisal system policy part 10 A (2) (e) (v)).

| Elements | Results Achieved | Results Not Achieved |
|---|---|---|
| [✔] **Element #1  Execution of Duties:** Completed work assignments are performed in a timely manner, assuring a quality of work that meets the needs of the organization. Appropriate work methods are selected for the development of work products. Work products do not require substantive revisions. Assignments are completed in accordance with applicable agency guidelines, including time-frames. **Further clarification, as needed:** | ✔ | |
| [X] **Element #2  Communications:** Oral and written communications are clear, correct, timely, and presented in an understandable manner. Supervisor and coworkers are informed of issues and problems when necessary. Information and guidance provided is timely and correct. **Further clarification, as needed:** | ✔ | |
| [ ] **Element #3  Supervision:**  Work is assigned in a fair and effective manner. Technical guidance to subordinate staff is given in a timely manner. Performance management is implemented in accordance with procedure. Issues, concerns, or problems are handled promptly and fairly. To the extent possible, staff is properly trained and complies with occupational health and safety programs. Management decisions are supported and implemented within appropriate time-frames. **Further clarification, as needed:** | | |
| [ ] **Element #4 - Team Leadership:** Routinely leads individuals and team members toward specific goals and accomplishments. Provides encouragement, guidance, and direction as needed. Adjusts style to fit situation. Delegates appropriate authority in an effective manner. Coordinates functions of the team members. Demonstrates a sincere interest in employees' activities, abilities, etc **Further clarification, as needed.** | | |

**AD-2000** (09-27-00)

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

D-2000 (09-27-00)

| Elements | Results Achieved | Results Not Achieved |
|---|---|---|
| ☐ **Element #5  Program Management**:  Manages program(s), resolving issues and problems within the employee's control.  Monitors all aspects of program(s) for quality, effectiveness, and consistency. Program plans and guidance are responsive to objectives and requirements of the Agency. Policy instructions are appropriately issued and are accurate. Evaluates effectiveness of work and adjusts plans accordingly. **Further clarification, as needed**: | | |
| ☐ **Element #6  Special Projects**:  Special projects are regularly completed on time in a competent, accurate, and thorough manner. Completed projects comply with regulations and procedures. Special projects are completed independently, or reflect research and collaboration with others as required.  **Further clarification, as needed**: | | |
| ☐ **Element #7  Research and Analysis**:  Thoroughly and accurately researches issues in a timely manner, using available reference sources (e.g., USDA manuals, or applicable law or regulations. Makes reasonable recommendations or decisions based on available guidance.  **Further clarification, as needed**: | | |
| ☒ **Element #8  Customer Service**:  Routinely displays courteous and tactful behavior.  Projects a positive and professional image of USDA. Provides advice that is timely, responsive and accurate. Maintains appropriate rapport with internal and external customers. Develops and establishes working relationships with external organizations as required. Keeps supervisor and/or team leader informed of difficult and/or controversial issues and unique problems. Takes action to effectively solve problems before they have adverse impact on the organization or other employees.  **Further clarification as needed**: | ✓ | |
| ☐ **Element #9  Equal  Opportunity & Civil Rights**: (Mandatory for all supervisors and managers).  Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and  responsibilities of Agency and Departmental goals of working to employ and develop a diverse, yet unified workforce.  **Further  clarification, as needed**. | ✓✓ | |
| ☒ **Element #10  Equal  Opportunity & Civil Rights**: (Mandatory for all  non-supervisory employees).  Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of valuing a diverse, yet unified workforce.  **Further clarification, as needed**: | ✓ | |
| ☐ **Element #11  Resource Management**:  Monitors allocated funds and maintains complete and accurate records of expenditures. Routinely utilizes resources in an efficient and effective manner. Ensures that funds, property and other resources are guarded against waste, loss, unauthorized use, and misappropriation.  **Further clarification, as needed**: | | |

**AD-2000** (09-27-00)

| Elements | Results Achieved | Results Not Achieved |
|---|---|---|
| ☒ **Element #12  Individual Contributions to the Team**:  Ordinarily displays dependability and reliability. Promotes open communication. Contributes creative ideas and actively participates in team meetings resulting in added value to the team's products d services. When problems arise, explores causes and assists in resolving them. Works with team members to appropriately .plement decisions.  Is usually open-minded to new ideas and approaches in implementing the team's goals.  Willing accepts and .acts on constructive criticism.  **Further clarification, as needed:** | ✓ | • |
| ☐  Element #13 - | | |
| ☐  Element #14 - | | |
| ☐  Element #15 - | | |

## PART II - PROGRESS REVIEWS

Note:  Regular and open communication between supervisors and employees is vitally important in any performance management system, and particularly in a two-tier system where all elements rated are critical elements.  **Progress reviews should be held quarterly, but no less than semi-annually, and such reviews will be ocumented in writing.**    Date of reviews, initials of employee and rating official and comments must be provided for each review.  *(Provide any additional omments as an attachment).*

## DISCUSSION TOPICS FOR USE IN PLANNING PERFORMANCE AND CONDUCTING PROGRESS REVIEWS

- Employee's performance on primary responsibilities/priorities in the past year.
  - ▸ revise performance work plan for the coming year, as necessary
  - ▸ relationship to overall work unit objectives

- Employee's strengths and areas for growth

- Barriers to effective work performance and job satisfaction

- Employee's development *(over the past year; future needs for current job; long-term career goals and developmental needs to  achieve them)*

- Possible work process improvements

- Whether employee continues to grow to meet future needs and demands of the changing environment

- Employee's feedback/constructive suggestions for supervisor

- Anything else the employee or supervisor would like to address

D-2000 (09-27-00)                                                                    Page 5 of 5

. RATING OFFICIAL'S COMMENTS

| | |
|---|---|
| ˢᵗ Quarter | |
| 2ⁿᵈ Quarter | |
| 3ʳᵈ Quarter | |
| 4ᵗʰ Quarter | |

8. EMPLOYEE'S COMMENTS

| | |
|---|---|
| 1ˢᵗ Quarter | |
| 2ⁿᵈ Quarter | |
| 3ʳᵈ Quarter | |
| 4ᵗʰ Quarter | |

| | 1ˢᵗ Quarter | 2ⁿᵈ Quarter | 3ʳᵈ Quarter | 4ᵗʰ Quarter |
|---|---|---|---|---|
| Meeting Date | | | | |
| Employee's Initials | | | | |
| Rating Official's Initials | | | | |

## PART III - SUMMARY RATING

☐ RESULTS ACHIEVED                     ☐ RESULTS NOT ACHIEVED *

*A "Results not Achieved" rating requires explanation. Provide additional comments as an attachment.*

## PART IV - CERTIFICATION

Note: Employee's signature certifies review and discussion with the Rating Official. It does not necessarily mean that the employee concurs with the information on this form.

| 9. PERFORMANCE PLAN (Sign when plan is established) | 10. SUMMARY RATING (Sign when rating is completed) |
|---|---|
| Employee's Signature                Date  10/22/01 | Employee's Signature                Date  11/1/02 |
| Print Name of Rating Official        JOHN W. CHTOTT, JR | Print Name of Rating Official        Douglas W Frago |
| Signature of Rating Official          Date  10/24/01 | Signature of Rating Official          Date  11/1/02 |
| reviewed the standards of conduct and have had any questions answered by faction. (Employee initial appropriate block below.)   ☐ YES   ☐ NO | Name of Reviewing Official (required for summary rating of "Results Not Achieved")                Date |

# Exhibit No. 11

Monday, March 17, 2003



USDA, Farm Service Agency
FSA-HRD-PMB 349
2101 L Street Northwest
Attn: Vacancy Identification Number UF168394 CT
Washington, DC  20037-1524

In response to Vacancy Identification Number UF168394 CT, Administrative
Management Specialist GS-301-14 please find the attached OF-612, my most recent
performance appraisal and  my most recent SF-50.  The Occupational Questionnaire was
completed online on the USDAJOB website.

This material is for the merit promotion announcement.

Should you have any questions, please feel free to contact me at work (202) 690-0595 or
at home at (540) 710-5649.  I can also be reached by email at
Patrick.Spalding@usda.gov.

Sincerely,

Patrick J. Spalding

11911 Kingswood Boulevard
Fredericksburg, VA  22408

Form Approved
OMB No. 3206-0219

# OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT - OF 612

You may apply for most jobs with a resume, this form, or other written format. If your resume or application does not provide all the information requested on this form and in the job vacancy announcement, you may lose consideration for a job.

| Job title in announcement | | 2 Grade(s) applying for | 3 Announcement number |
|---|---|---|---|
| Administrative Management Specialist | | GS-0301-14 | UF168394 CT |

| 4 Last name | First and middle names | 5 Social Security Number |
|---|---|---|
| Spalding | Patrick  J. | 308 - 74 - 5978 |

**6** Mailing address

11911 Kingswood Boulevard

| City | State | ZIP Code |
|---|---|---|
| Fredericksburg | VA | 22408 - |

**7** Phone numbers (include area code)

Daytime     (202) 690  0595

Evening     (540) 710  5649

## WORK EXPERIENCE

**8** Describe your paid and nonpaid work experience related to the job for which you are applying. Do **not** attach job descriptions.

Job title (if Federal, include series and grade)

**1)** Loan Specialist (Agriculture), GS-1165-13

| From (MM/YY) | To (MM/YY) | Salary | per | Hours per week |
|---|---|---|---|---|
| 04/01/2000 | 03 2003 | $75,112 | Year | 40 |

Employer's name and address
USDA, Farm Service Agency (FSA)
1400 UIndependence Avenue SW, Washington, DC  20250-0522
Describe your duties and accomplishments

Supervisor's name and phone number
Michael R. Hinton
(202) 720  1764

As a senior loan specialist I perform a full range of functions including developing and recommending operating policies and plans, conducting loan program evaluations, developing and analyzing legislative proposals, training field personnel, reviewing and responding to complex loan making applications and inquiries.

I have prepared numerous written responses to applicant, congressional and general public inquiries. Inquiries were of complex nature dealing with legislative issues as well as loan eligibility and farm loan program requirements. Responses were prepared for the Division Director and Deputy Administrator's signatures. In addition, I routinely answer telephone inquiries dealing with complex and sensitive issues from the field offices, borrowers, applicants, and congressional staff.

I have drafted regulations to be published in the Federal Register concerning real estate appraisal requirements and Horse Breeder loans. During the drafting process I coordinated and conducted meetings with various groups, i.e., the Office of General Counsel (OGC), employees from other divisions and branches, and the general public to determine the best method to implement regulation changes and new legislation. I analyzed paperwork burden requirements and made other relevant determinations.

I have played a pivotal role in notifying the field staff of policy and legislative changes through the issuance of procedural notices, handbook changes and training. Some of these topics include changes in the Uniform Commercial Code, Revised Article 9, and procurement and non-procurement activities for farm loan programs. In addition, I have served as the expert for loan cost items for the Apple loan program. I have worked extensively with the Financial Management Division, Kansas City and St. Louis accounting and automation staffs to develop new software for the Apple loan program. I am currently serving as the Agency representative for the Department of Agriculture's reinvention of the National Finance Center (NFC) PRCH system used by farm loan programs and Rural Development to make procurement and non-procurement payments.

I review FSA State instructions and directives dealing with loan making issues for conformance with applicable laws, regulations and national procedures and recommend changes when necessary. I work with the OGC and the Deputy Administrators office in reviewing operating policies and procedures. I have independently developed and presented procurement and non-procurement training at two national farm loan conferences while in this position.

In addition to my duties as a senior loan specialist, and with my extensive administrative knowledge and experience, I routinely spend five percent of my time providing advice and counsel to the Division Director and Branch Chief on human resources, procurement and travel issues. During the last year the division offices were relocated and I provided advice on space layout and procedures in connection with the move to the division director and branch chief. In addition, I spend ten percent of my time providing procurement advice to State Office Contract Specialists. FSA's Management Service Division, Acquisition Management Branch routinely refers field office calls to me for procurement policy and advice.

Item 8 *WORK EXPERIENCE (continued)*

| Job title in announcement | Grade(s) applying for | Announcement number |
|---|---|---|
| Administrative Management Specialist | GS-14 | UF168394 CT |

| Last name | First and middle names | Social Security Number |
|---|---|---|
| Spalding | Patrick  J. | 308 - 74 - 5978 |

Job title (if Federal, include series and grade)
Contract Specialist, GS1102-11

| From (MM/YY) | To (MM/YY) | Salary | Per | Hours per week |
|---|---|---|---|---|
| 10/01/1995 | 03/31/2000 | $52,952 | Year | 40 |

| Employer's name and address | Supervisor's name and phone number |
|---|---|
| USDA, Farm Service Agency (FSA), Minnesota State Office | Linda Hennen, Admininstrative Officer |
| 375 Jackson Street, Suite 400, St. Paul, Minnesota  55101-1852 | (651) 602  7700 |

Describe your duties and accomplishments

In October of 1995 I was reassigned to FSA as a result of the transfer of function between Rural Development (RD) and FSA. The position's duties and responsibilities remained virtually the same as they were with RD.

In addition, I provided performance plan training to state office staff and District Directors when the Agency changed form the 5 tier rating system to the pass/fail rating system.

I provided procurement training to county office, federal and non-federal employees.

After the transfer of function I was responsible for the State Office renovation project which included remodeling general office and storage space.  This project also included the preparation of the space to be used by a high speed Kodak printer.  In the entire project included approximately 12,000 square feet at cost of $125,000.  I was responsible for negotiations and meeting with the General Service Administration (GSA) and the landlord.  In addition, I was responsible for the project budget and ensured the project was completed within the budget constraints.

During the installation of the Local Area Network/Wide Area Network (LAN/WAN) for the FSA State Office, RD and Natural Resources Conservation Service (NRCS), I represented FSA as the subject matter expert.  I played a significant role in the planning and installation of new wiring, a T1 and a new telephone system which was used to support the Common Computing Environment (CCE).  In addition, I worked closely with the Information Technology (IT) staffs from all three agencies to implement the LAN/WAN and CCE initiatives in the county office throughout Minnesota.

I planned, organized and contracted for basic Windows and MS Word training for all federal and non-federal FSA employees in the State of Minnesota.

I maintained office space records for the county offices and provided technical guidance on leasing issues.

I independently maintained the farm loan programs, program loan cost expense accounts and made quarterly reports on expenditures and projections for the remainder of the fiscal year.

Shortly after the transfer of function, I assisted the Administrative Officer and Kansas City personnel office in reclassifying all Farm Loan program technicians in the State of Minnesota.

With my extensive administrative knowledge and experience I was able to assist the Administrative Officer in many administrative areas other than procurement.

**Item 8 WORK EXPERIENCE (continued)**

| Job title in announcement | | Grade(s) applying for | Announcement number |
|---|---|---|---|
| Administrative Management Specialist | | GS-14 | UF168394 CT |
| Last name | First and middle names | | Social Security Number |
| Spalding | Patrick J. | | 308 - 74 - 5978 |

3)

Job title (if Federal, include series and grade)
Contract Specialist, GS-1102-11

| From (MM/YY) | To (MM/YY) | Salary | per | Hours per week |
|---|---|---|---|---|
| 03/22/1992 | 09/30/1995 | $46,249 | year | 40 |

| Employer's name and address | Supervisor's name and phone number |
|---|---|
| USDA, Rural Economic & Community Development (Formerly Farmers Home Administration) 375 Jackson Street, Suite 410, St. Paul, Minnesota 55101-1851 | Janice Daley, State Director (651) 602  7800 |

As Contract Program Manger, I managed and planned the overall procurement program (i.e. small purchases - equipment, supplies, service and construction contracts, and real property leasing) for Farmers Home Administration in the State of Minnesota. I also acted as a liaison between the program officials and the National Finance Center, and independently provided technical guidance. I managed all Contract Program Funds and Loan Cost Item Accounts. I reviewed all procurement requests and resolved errors or problems prior to initiating contractual actions.

I determined methods of procurement based on program needs and established procurement procedures. This includes formal contracting through negotiated procedures and sealed bidding. I also used a variety of small purchase procedures such as informal oral and written solicitations, purchase orders, and Blanket Purchase Agreements (BPAs). I prepared solicitations and clarified specifications to insure compliance with the appropriate laws and regulations. I made appropriate use of small businesses through small purchase set-a-sides, labor surplus set-a-sides, economically disadvantaged, and women-owned businesses.

I conducted formal solicitations, bid openings and analyzed offers received, and awarded based on low price. I made responsibility determinations and qualifications of bidders and/or offerers to make contract or purchase awards.

I negotiated contracts and ensured that technical evaluation factors and basis for award were clearly stated in requests for proposals. I lead technical review boards and determined competitive ranges, negotiated with contractors, and made analyses leading to award.

I administered contracts and supervised the administration of various contracts through the Contracting Officer's Representatives. I settled disputes and claims, monitored payments and ensured the appropriate application of the Prompt Payment Act. I investigated problems, protests and disputes and took steps to resolve matters expediently. I made final decisions on purchase order cancellations and contract terminations.

I performed in-depth management analysis of procurement functions and determined the appropriate means for efficient and effective delivery of contract services. I assisted the National Office Procurement Staff in determining the proper assignments of warrant levels for all warranted individuals in the state.

I was responsible for all Procurement Integrity issues throughout the state. I developed written guidance in the form of state procedures and Administrative Notices involving procurement topics. These Administrative Notices clarified and implemented procurement laws and regulations.

I conducted field reviews and identified strengths, weaknesses and recommended corrective action when needed. I monitored compliance action items to ensure the integrity of the procurement program was maintained.

I conducted training of contract administrators and procurement personnel. I prioritized training needs, designed training materials and conducted training to improve and maintain the quality of procurement practices.

I supervised a staff of two Procurement clerks and one contract specialist.

Item 8 *WORK EXPERIENCE (continued)*

| Job title in announcement | Grade(s) applying for | Announcement number |
|---|---|---|
| Administrative Management Specialist | GS-14 | UF168394 CT |
| Last name | First and middle names | Social Security Number |
| Spalding | Patrick   J. | 308 - 74 - 5978 |

Job title (if Federal, include series and grade)
＊) Administrative Officer, GS341 -12

| From (MM/YY) | To (MM/YY) | Salary | per | Hours per week |
|---|---|---|---|---|
| 05/05/1991 | 03/22/1992 | $40,156 | year | 40 |

| Employer's name and address | Supervisor's name and phone number |
|---|---|
| USDA, Farmers Home Administration | Theodore Fusaro, State Director |
| 451 West Street, Amherst, Massachusettes  01002 | (413) 253  3471 |

As an Administrative Officer for the tri-state (Massachusetts, Connecticut and Rhode Island) jurisdiction of the Farmers Home Administration (FmHA), I was an integral member of the management team. I provided substantial technical administrative guidance and support on decisions effecting the State Office's mission to provide credit for community and rural development projects and relieved the State Director of various administrative issues.

I participated as a key member in the development of the tri-states State Resource Management Plan (SRMP). I provided advice and monitored the tri-state wide implementation of SRMP and projected the most effective utilization of human and financial resources. I provided policy and direction on a variety of administrative areas. The following are examples of administrative disciplines for which I performed and the amount of time spent in each: personnel - 20%, budget - 15%, procurement - 15%, property utilization - 10%, travel - 10%, information management - 15%, and staff supervision - 15%. I managed administrative support services for 20 field offices and 115 personnel. I supervised a Personnel Staff of 2, an Information Staff of 2, a Contracting/Procurement Staff of 2, and 1 administrative clerk.

I conducted comprehensive studies of staff resources based on workload. I then recommended appropriate utilization of resources that were allocated to the jurisdiction. I informed and discussed administrative changes, with program managers and the administrative staff. I assisted the State Director in identifying and defining administrative issues that needed attention. I explored alternatives and prepared explanatory materials necessary to document final decisions by the State Director. I independently composed letters, Administrative Notices and other related correspondence on all phases of administrative management.

I assisted the State Director with public relations and used contacts with representatives of other Federal Agencies, colleges, civic groups and the general public to explain FmHA programs and to give or secure information on administrative matters. I played an active role in carrying out an effective public relations program designed to better explain the purpose and mission of the agency programs. During my tenure in Massachusetts, I implemented a reorganization plan through consolidation (closure and combination) of county offices which I had developed prior to my entering the position. In summary, this plan of reorganization closed four field offices and implemented three specialized positions. On November 30, 1991, three field offices had been closed and work functions moved to new locations. In addition, one new position was filled through special hiring authorities and the other two were filled through agency merit promotion procedures. With my exceptional knowledge of Administrative Management, I was able to close offices and reassign employees with minimal impact. During this period I coordinated activities with the State Director and District Managers.

In addition, I worked with the procurement staff in FmHA's St. Louis Office, National Office and the Soil Conservation Service (SCS) to purchase new telephone equipment, which was compatible with state-of-the-art telecommunications, equipment and initiatives. This complex and time-consuming initiative took approximately 4 months to accomplish. As an Administrative Officer I dealt with a variety of personnel issues which included hiring, time and attendance, a Merit System Protection Board settlement, unacceptable performance issues and conduct issues. I also provided daily supervision to the Automated Information Staff in development of training topics, equipment utilization and general information management.

Along with managing the Administrative Staff, I provided advice and counsel to the State Director on a wide variety of issues and policies. These issues involved human resources, staffing, awards, promotions, travel, special projects, fiscal budgets, and overall management of the Tri-state jurisdiction. During periodic absences of the State Director, approximately five weeks, the State Director would designate me as Acting State Director. During these periods he would delegate to me all his authorities and responsibilities to perform during his absences.

**Item 8** *WORK EXPERIENCE (continued)*

| Job title in announcement | Grade(s) applying for | Announcement number |
|---|---|---|
| Administrative Management Specialist | GS-14 | UF168394 CT |
| Last name | First and middle names | Social Security Number |
| Spalding | Patrick J. | 308 - 74 - 5978 |

5)

Job title (if Federal, include series and grade)
Administrative Officer Trainee, GS-341-11

| From (MM/YY) | To (MM/YY) | Salary | per | Hours per week |
|---|---|---|---|---|
| 09 1988 | 04 1991 | $34,227 | year | 40 |

| Employer's name and address | Supervisor's name and phone number |
|---|---|
| USDA, Farmers Home Administration, Deputy Administrator for Management | Russ P. Harvell, Administrative Officer |
| 1400 Independence Avenue, SW, Washington, DC 20250 | (501) 301 3216 |

As an Administrative Officer Trainee I received a variety of formal training and worked on developmental assignments directly related to the area of administrative management. As a member of the Farmers Home Administration (FmHA) staff for the state of Arkansas, I participated in the planning, deployment and direction of the financial and administrative expense portion of the State Resource Management Plan (SRMP). I conducted preliminary analyses of the states needs, which included the various program functions, and I recommended options for effective use of staffing and other related resources. I assisted in the managing and controlling of personnel, fiscal, and general services for the State Office and 83 field locations.

I spent eleven months assisting the Personnel Management Specialist. I completed work assignments in employee relations, classification, staffing, employee development, bargaining unit negotiations, performance evaluations, incentive awards, retirements, and personnel record keeping. I also assisted the Administrative Officer and the State Director with immediate or potentially controversial personnel matters. In addition, I assisted in keeping field personnel informed of rules, regulation changes, policies and procedures.

I spent seven months assisting the Contract Specialist in the administration of business services. This included the procurement of supplies and equipment for the field and state offices. I also assisted in the utilization and disposal of government property. While assisting in field office leasing activities, I independently conducted lease market surveys for office space. In addition, I assisted the Contract Specialist in the solicitation, evaluation, award, and administration of service contracts. I also assisted in the utilization and procurement of telephone equipment and services.

During the training program, I cross-trained in the area of budget formulation, utilization, and control. I gathered data and developed budget requests for personnel ceilings, equipment, supplies, leasing, travel, awards, overtime and other related areas. I made recommendations and supplied appropriate documentation to support funding requests.

I also trained in the area of automation information management and developed informal databases and spreadsheets used in the administrative areas.

I assisted the Administrative Officer and the State Director in an active and effective public relations program. I made contacts with other agency representatives, colleges and the public to give and secure information on administrative matters.

In April and May of 1990 I was detailed to the position of Administrative Officer in Massachusetts. During the six-week detail I performed the full range of duties and responsibilities of the Administrative Officer position GS-341-12. In addition, during November and December of 1990 and February of 1991 I was detailed to the New Jersey State Office for eight weeks and performed the duties and responsibilities of the position of Administrative Officer GS-341-12. During these details I performed a full range of Administrative Officer duties and actively supervised the administrative staffs in the state office. During these details I advised the State Directors on all administrative issues.

**Item 8 WORK EXPERIENCE (continued)**

| Job title in announcement | Grade(s) applying for | Announcement number |
|---|---|---|
| Administrative Management Specialist | GS-14 | UF168394 CT |

| Last name | First and middle names | Social Security Number |
|---|---|---|
| Spalding | Patrick  J. | 308 - 74 - 5978 |

Job title (if Federal, include series and grade)
Agricultural Management Specialist, GS-475-11

| From (MM/YY) | To (MM/YY) | Salary | per | Hours per week |
|---|---|---|---|---|
| 03  1986 | 08  1988 | $29,564 | year | 40 |

| Employer's name and address | Supervisor's name and phone number |
|---|---|
| USDA, Farmers Home Administration<br>5975 Lakeside Boulevard, Indianapolis, Indiana  46278 | Earl Clark, District Director<br>Unavailable |

In March of 1986 and after completing approximately 3 years as an Assistant County Supervisor I was reassigned to the position of Agricultural Management Specialist, County Supervisor GS-475-9 in the Logansport, Indiana County Office.  As a County Supervisor, I processed farm loan program applications for operating and real estate loans.  I gathered information, and analyzed production records to assist farms in developing feasible plans in accordance with the appropriate Farmers Home Administration (FmHA) procedures.  I then used these plans to render credit decisions on farm loan applications.  In addition, I was able to use my analytical abilities to processes rural housing applications and determine loan eligibility and assist creditworthy applicants who possessed the ability to repay a loan.

As a County Supervisor, I was able to maintain and dispose of farm loan program and rural housing inventory properties.  I used my experience, knowledge and authorities to rehabilitate and sell suitable homes.  I was able to successfully sell farm loan inventory property.  Therefore, reducing the cost to the Government in maintaining farm loan properties.

When I was promoted to County Supervisor, I received a $5,000.00 Contracting warrant and I used this authority in accordance with FmHA procedures.

As County Supervisor, I was able to maintain county office operations and supervise 4 staff.  Along with managing the county office, I made certain that reports were completed timely as required, and that the public was served in their best interest.

One of my most important responsibilities was that of public relations and dealing with a wide variety of people on a daily basis.  I feel I had an excellent rapport with borrowers, applicants, Realtors, and other lenders.  I related information about FmHA and my decisions in terms that the public and fellow employees could understand.

Patrick J. Spalding 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

Announcement Number UF168394 CT

**9**   May we contact your current supervisor?

      **YES** ☒   **NO** ☐ ➡   If we need to contact your current supervisor before making an offer, we will contact you first.

## EDUCATION

**)**   Mark highest level completed.   **Some HS** ☐   **HS/GED** ☐   **Associate** ☐   **Bachelor** ☒   **Master** ☐   **Doctoral** ☐

**11**   Last high school (HS) or GED school.  Give the school's name, city, State, ZIP Code (if known), and year diploma or GED received.

    Columbus North High School, Columbus, Indiana  47201 - Diploma 1978

**12**   Colleges and universities attended.  Do **not** attach a copy of your transcript unless requested.

| | | | Total Credits Earned | | Major(s) | Degree | - | Year |
|---|---|---|---|---|---|---|---|---|
| **1)** Name | | | Semester | Quarter | | (if any) | | Received |
| Purdue University | | | | | | | | |
| City | State | ZIP Code | | | | | | |
| West Lafayette | IN | 46497 - | | | Animal Science | BS | | 1982 |

**2)**

**3)**

## OTHER QUALIFICATIONS

**13**   **Job-related** training courses (give title and year).  **Job-related** skills (other languages, computer software/hardware, tools, machinery, typing speed, etc.  **Job-related** certificates and licenses (current only).  **Job-related** honors, awards, and special accomplishments (publications, memberships in professional/honor societies, leadership activities, public speaking, and performance awards.)  Give dates, but do **not** send documents unless requested.

USDA, Farmers Home Administration, Administrative Officer Training Program, Certificate of Completion 10/1990
Certificate of Accomplishment  09/1995
Outstanding Performance Award 03/1998
Superior Accomplishment Award 09/1999
Cash Award (Performeance) 05/2002

See attachment for job related training.

## GENERAL

**14**   Are you a U.S. citizen?   **YES** ☒   **NO** ☐   Give the country of your citizenship.

**15**   Do you claim veterans' preference?   **NO** ☒   **YES** ☐   Mark your claim of 5 or 10 points below.

    **5 points** ☐   Attach your DD 214 or other proof.   **10 points** ☐   Attach an *Application for 10-Point Veterans' Preference* (SF 15) and proof required.

**16**   Were you ever a Federal civilian employee?

| | | | | Series | Grade | From (MM/YY) | To (MM/YY) |
|---|---|---|---|---|---|---|---|
| **NO** ☐ | **YES** ☒ | For highest civilian grade give: | | 1165 | 13 | 04 2001 | 08 2002 |

**17**   Are you eligible for reinstatement based on career or career-conditional Federal status?

    **NO** ☐   **YES** ☐   If requested, attach SF 50 proof.

## APPLICANT CERTIFICATION

**18**   **I certify** that, to the best of my knowledge and belief, all of the information on and attached to this application is true, correct, complete and made in good faith.  **I understand** that false or fraudulent information on or attached to this application may be grounds for not hiring me or firing me after I begin work, and may be punishable by fine or imprisonment.  **I understand** that any information I give may be investigated.

SIGNATURE   *Patrick J. Spalding*

DATE SIGNED   03/17/03

Patrick J. Spalding
308745978

Announcement Number UF168394 CT
Administrative Management Specialist
GS-301-14

## OF 612 Attachment to Item 13 Other Qualifications

Management Concepts Incorporated, Introduction to the Federal
Acquisition Regulations (FAR), January 4-5, 1989, Certificate of Completion

FmHA - National Office, Small Purchase Warrant, January 19, 1989

FmHA - National Office, Contracting Training for Program Personnel,
February 13-17, 1989, Completed

Management Concept Incorporated, Use and Disposal of Personal
Property, February 22-23, 1989, Certificate of Completion

FmHA — National Office Contract Training for Program Personnel, February 1992
Certificate of Completion

Management Concepts, Inc., Federal Contracting, March 6-10, 1989,
Certificate of Completion

Management Concepts Inc., Advanced Simplified Acquisition, June 2, 1997
Certificate of Completion

Management Concepts Inc., Contract Law, May 1992, Certificate of Completion

Management Concepts Inc., Sealed Bidding, October 1992, Certificate of Completion

FmHA - National Office, CPM's Annual Policy Meeting, February 1993, Completed

Management Concepts Inc., Leasing, Cost and Price Analysis, October 1993, Certificate of Completion

FmHA - National Office, CPM's Annual Policy Meeting, June 18-22, 1990,
Completed

Patton Management — Construction Contracts, June 20-24, 1994, Certificate of Completion

FmHA - National Office, CPM's Annual Policy Meeting, April 1994, Completed

Patton Management - Architect/Engineering Services, August 22-26, 1994, Certificate of Completion

Patton Management - Federal Appropriations Law, July 18-20, 1995, Certificate of Completion

RECD - National Office, CPM's Annual Policy Meeting, June 12-14, 1995, Completed

FmHA - Leasing Training, December 9-13, 1991, Lease Warrant Issued

Patrick J. Spalding
308745978

Announcement Number UF168394 CT
Administrative Management Specialist
GS-301-14

FmHA - Arkansas, Unix, Databases, Introduction to Spreadsheets
October 17-21, 1988, Completed

USDA — Real Property Workshop, June 19-22, 1995

Patton Management - Blanket Purchase Agreements, November 29-30, 1993, Certificate of Completion

FmHA — Foundation Information for Real Property, December 7-10, 1993

FmHA — National Office, introduction to SACONs, May 1992, Certificate of completion

FSA - Foundation Information for Real Property and Government Purchase Card, Fall 1998 Completed

FmHA — Introduction to Automated Farm and Home Plans and Disaster Certification, Certificate of Completion, 1997

OPM - Federal Budget Process, January 19-20, 1989, Certificate of Completion

FmHA - National Office, PMS Conference, April 10-14, 1989, Completed

OPM - Basic Position Classification, May 15-26, 1989, Certificate of Completion

OPM - Basic Employee Relations, June 5-9, 1989, Certificate of Completion

OPM - Basic Staffing & Placement, July 24-August 4, 1989,
Certificate of Completion

OPM - Briefing on Whistle-blower Protection Workshop, August 8, 1989 Completed

OPM — EEO for Personnelist March 21-23, 1990, Certificate of Completion

FmHA - Detail to National Office Personnel Division, October 16-20, 1989

Practical Management Inc., Managing the Training Function,
August 22-23, 1989, Certificate of Completion

OPM - Adverse Action & Unacceptable Performance Actions,
September 26-28, 1989, Certificate of Completion

Detail to the National Office - Personnel Division, October16-20, 1989, Completed

Patrick J. Spalding
308745978

OPM - EEO - Its Place in the Federal Government, December 13, 1989
Independent Study Course, Certificate of Completion

OPM - Qualification Analysis Workshop, January 9-11, 1990, Certificate of Completion

OPM - Basic Personnel Management, February 2, 1990, Independent Study
    Course, Certificate of Completion, Subject Matter: Federal Personnel Manual

Detail to the National Office - Employee Relations, February 25 through March 2, 1990

OPM - Basic Labor Relations, March 5-9, 1990, Certificate of Completion

OPM - Developing a Budget for a Unit, Independent Study Course, Completed October, 1990,
Certificate of Completion

FmHA - Fundamentals of Instruction Course - February 1991, Little Rock, AR, Certificate of
Completion

New Horizons Computer Training - Introduction to Access, 2-days spring 1999, Certificate of
Completion

The Regulatory Group, Inc. — Advanced Regulation Drafting, 2 days April 2002, Certificate of
Completion

Dale Carnegie Training – High Impact Presentations – Certificate of Completion – October 2002

Farm Loan Programs, Annual Policy and Training Meeting – USDA, FSA – Presenter and Trainee –
December 2002

Standard Form 50
Rev 7/91
· U.S.Office of Personnel Management
FPM Supp. 296-33. Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

Exception to SF
approved by GSA/IRMS

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| SPALDING, PATRICK J | 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 | 06/01/60 | 01/12/03 |

**FIRST ACTION** | **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 894 | PAY ADJ | | |
| Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| JWM | REG 531.205 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| ZLM | E O 13282 | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | LOAN SPECLST (AGRL) |
| | 90086280    116540 |

| 8 Pay Plan | 9. Occ Code | 10.Grade/Level | 11.Step/Rate | 12. Total Salary | 13 Pay Basis | 16 Pay Plan | 17 Occ Code | 18.Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21 Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 72,851.00 | PA | GS | 1165 | 13 | 04 | 75,112.00 | PA |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |
| 65,349.00 | 7,502.00 | 72,851.00 | .00 | | | 67,377.00 | 7,735.00 | 75,112.00 | .0 | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FARM SERVICE AGENCY |
| | DEP ADMR FARM LOAN PROGRAMS |
| | LOAN MAKING DIVISION |
| | DIRECT LOANS & FUNDS MGMT BR |
| | AG FA030200040000000    PP 01 2003 |

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 – None   3 – 10 Point/Disability   5 – 10 Point/Other   2 – 5 Point.   4 – 10 Point/Compensable   6 – 10 Point/Compensable/30% | 1 | 0 – None   2 – Conditional   1 – Permanent   3 – Indefinite | | YES  X NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| D0  BASIC-STANDARD | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31 Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per |
|---|---|---|---|
| FERS AND FICA | 05/15/83 | F  FULL TIME | Biweekly Pay Period |

**POSITION DATA**

| 34 Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 | 1 – Competitive Service   3 – SES General   2 – Excepted Service   4 – SES Career Reserved | E  E-Exempt   N-Nonexempt | | 0395 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON   DIST OF COLUMBIA   DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

FEDERAL PAY INCREASE DUE TO E.O. 13282 SIGNED 12/31/02.
SALARY INCLUDES A GENERAL INCREASE OF 3.1% ROUNDED AND A LOCALITY
PAYMENT (OR OTHER GEOGRAPHIC ADJUSTMENT) APPLICABLE IN THIS AREA.

| Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| ~~DEP~~ARTMENT OF AGRICULTURE | *Donna D. Beecher* |
| ~~Ag~~ency Code | 48. Personnel Office ID | 49. Approval Date | DONNA D. BEECHER |
| AG FA | 4881 | 12/31/02 | DIRECTOR, OF HUMAN RESOURCES MGMT |

TURN OVER FOR IMPORTANT INFORMATION
3-Part   50-315

Editions Prior to 7/91 Are Not Usable After 6/30.
NSN 7540-01-333-62

1 - Employee Copy - Keep for Future Reference

AG FA030200040000000   PP 01 1*2003*BATCH 48819950 000-00 204-12 AG/FO FA-4881

REPRODUCE LOCALLY. *Include form number and date on all reproductions.*

**AD-2000**
(09-27-00)

United States Department of Agriculture

## Performance Plan Agreement and Appraisal

*· Act Notice: Submission of information is mandatory. Failure to provide information will prohibit data collection required by the Office of Personnel Management.*

| 1. EMPLOYEE'S NAME | 2. RATING PERIOD |
|---|---|
| Patrick Spalding | FROM: 10-01-01          TO:   9-30-02 |

| 3. TITLE/SERIES/GRADE | 4. AGENCY/DIVISION | 5. SOCIAL SECURITY NUMBER |
|---|---|---|
| Senior Loan Office 1165-13 | FSA/DAFLP/LMD/DLFMB | 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 |

### PART I - PERFORMANCE PLAN

6. CRITICAL RESULTS *(Check (✔) a minimum of 2/ maximum of 5 applicable elements.)*

Note:    The narrative statements describe the "Results Achieved" level of performance. Where applicable, quantity, quality, and timeliness are derived directly from appropriate agency regulations, policies, instructions, work plans or other guidelines. If no guidelines exist, further clarification will be provided by the rating official. These elements are to be used by employees and supervisors to develop performance plans. They may be used as is, with further clarification, or up to three new elements may be developed, as appropriate. All employees must have at least one job specific element (see two-level performance appraisal system policy part 10 A (2) (e) (v)).

| | Elements | Results Achieved | Results Not Achieved |
|---|---|---|---|
| [X] | **Element #1  Execution of Duties:** Completed work assignments are performed in a timely manner, assuring a quality of work that meets the needs of the organization. Appropriate work methods are selected for the development of work products. Work products do not require substantive revisions. Assignments are completed in accordance with applicable agency guidelines, including time-frames. **Further clarification, as needed:** | X | |
| [x] | **Element #2  Communications:** Oral and written communications are clear, correct, timely, and presented in an understandable manner. Supervisor and coworkers are informed of issues and problems when necessary. Information and guidance provided is timely and correct. **Further clarification, as needed:** | X | |
| [ ] | **Element #3  Supervision:** Work is assigned in a fair and effective manner. Technical guidance to subordinate staff is given in a timely manner. Performance management is implemented in accordance with procedure. Issues, concerns, or problems are handled promptly and fairly. To the extent possible, staff is properly trained and complies with occupational health and safety programs. Management decisions are supported and implemented within appropriate time-frames. **Further clarification, as needed:** | | |
| [ ] | **Element #4 - Team Leadership:** Routinely leads individuals and team members toward specific goals and accomplishments. Provides encouragement, guidance, and direction as needed. Adjusts style to fit situation. Delegates appropriate authority in an effective manner. Coordinates functions of the team members. Demonstrates a sincere interest in employees' activities, abilities, etc. **Further clarification, as needed.** | | |

Th      partment of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and .      or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

| Elements | Results Achieved | Results Not Achieved |
|---|---|---|
| ☐ **Element #5  Program Management**: Manages program(s), resolving issues and problems within the employee's control. Monitors all aspects of program(s) for quality, effectiveness, and consistency. Program plans and guidance are responsive to objectives and requirements of the Agency. Policy instructions are appropriately issued and are accurate. Evaluates effectiveness of work and adjusts plans accordingly. **Further clarification, as needed:** | | |
| ☒ **Element #6  Special Projects**:  Special projects are regularly completed on time in a competent, accurate, and thorough manner. Completed projects comply with regulations and procedures. Special projects are completed independently, or reflect research and collaboration with others as required.  **Further clarification, as needed:** | | ✗ |
| ☐ **Element #7  Research and Analysis**:  Thoroughly and accurately researches issues in a timely manner, using available reference sources (e.g., USDA manuals, or applicable law or regulations). Makes reasonable recommendations or decisions based on available guidance.  **Further clarification, as needed:** | | |
| ☒ **Element #8  Customer Service**:  Routinely displays courteous and tactful behavior.  Projects a positive and professional image of USDA.  Provides advice that is timely, responsive and accurate. Maintains appropriate rapport with internal and external customers. Develops and establishes working relationships with external organizations as required. Keeps supervisor and/or team leader informed of difficult and/or controversial issues and unique problems. Takes action to effectively solve problems before they have an adverse impact on the organization or other employees.  **Further clarification as needed:** | | ✗ |
| ☐ **Element #9  Equal Opportunity & Civil Rights**: (Mandatory for all supervisors and managers).  Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of working to employ and develop a diverse, yet unified workforce.  **Further clarification, as needed.** | | |
| ☒ **Element #10  Equal Opportunity & Civil Rights**: (Mandatory for all non-supervisory employees).  Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of valuing a diverse, yet unified workforce.  **Further clarification, as needed:** | | ✗ |
| ☐ **Element #11  Resource Management**:  Monitors allocated funds and maintains complete and accurate records of expenditures. Routinely utilizes resources in an efficient and effective manner. Ensures that funds, property and other resources are guarded against waste, loss, unauthorized use, and misappropriation.  **Further clarification, as needed:** | | |

| Elements | Results Achieved | Results Not Achieved |
|---|---|---|
| ☐ **Element #12** <u>Individual Contributions to the Team</u>: Ordinarily displays dependability and reliability. Promotes open communication. Contributes creative ideas and actively participates in team meetings resulting in added value to the team's products and services. When problems arise, explores causes and assists in resolving them. Works with team members to appropriately implement decisions. Is usually open-minded to new ideas and approaches in implementing the team's goals. Willing accepts and acts on constructive criticism. <u>Further clarification, as needed:</u> | | |
| ☐ **Element #13** - | | |
| ☐ **Element #14** - | | |
| ☐ **Element #15** - | | |

## PART II - PROGRESS REVIEWS

Note:   Regular and open communication between supervisors and employees is vitally important in any performance management system, and particularly in a two-tier system where all elements rated are critical elements. Progress reviews should be held quarterly, but no less than semi-annually, and such reviews will be documented in writing.   Date of reviews, initials of employee and rating official and comments must be provided for each review. *(Provide any additional comments as an attachment).*

### DISCUSSION TOPICS FOR USE IN PLANNING PERFORMANCE AND CONDUCTING PROGRESS REVIEWS

- Employee's performance on primary responsibilities/priorities in the past year.
  - ▸ revise performance work plan for the coming year, as necessary
  - ▸ relationship to overall work unit objectives

- Employee's strengths and areas for growth

- Barriers to effective work performance and job satisfaction

- Employee's development *(over the past year; future needs for current job; long-term career goals and developmental needs to achieve them)*

- Possible work process improvements

- Whether employee continues to grow to meet future needs and demands of the changing environment

- Employee's feedback/constructive suggestions for supervisor

  Anything else the employee or supervisor would like to address

**7. RATING OFFICIAL'S COMMENTS**

| | |
|---|---|
| 1st Quarter | |
| 2nd Quarter | |
| 3rd Quarter | |
| 4th Quarter | |

**8. EMPLOYEE'S COMMENTS**

| | |
|---|---|
| 1st Quarter | |
| 2nd Quarter | |
| 3rd Quarter | |
| 4th Quarter | |

| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| Meeting Date | | | 5-14-02 | |
| Employee's Initials | | | 5-14-02 PB | |
| Rating Official's Initials | | | MAH | |

## III - SUMMARY RATING

☒ RESULTS ACHIEVED          ☐ RESULTS NOT ACHIEVED *

*A "Results not Achieved" rating requires explanation. Provide additional comments as an attachment.*

## PART IV - CERTIFICATION

Note:  Employee's signature certifies review and discussion with the Rating Official.  It does not necessarily mean that the employee concurs with the information on this form.

**9.  PERFORMANCE PLAN** *(Sign when plan is established)*

Employee's Signature _____ Date 10-30-01

Print Name of Rating Official
MICHAEL A. HINTON

Signature of Rating Official _____ Date 10-30-01

I have reviewed the standards of conduct and have had any questions answered by my satisfaction. (Employee initial appropriate block below.)
YES ☒     NO ☐

**10.  SUMMARY RATING** *(Sign when rating is completed)*

Employee's Signature _____ Date 10-25-02

Print Name of Rating Official
MICHAEL A. HINTON

Signature of Rating Official _____ Date 10-25-02

Name of Reviewing Official *(required for summary rating of "Results Not Achieved")*     Date

# Exhibit No. 12

Patrick Spalding

Page 1

1

2                  UNITED STATES DISTRICT COURT FOR THE

3                        DISTRICT OF COLUMBIA

4                           CIVIL DIVISION

5    SEDERIS FIELDS                )

6        Plaintiff                 )

7            vs.                   )  Civil Action No.

8    MIKE JOHANNS, SECRETARY,      )  06-0538(HHK)

9    U.S. DEPARTMENT OF            )

10   AGRICULTURE                   )

11       Defendant                 )

12

13

14

15           Deposition of Patrick J. Spalding

16                      Washington, D.C.

17                      March 12, 2007

18

19

20

21   Reported by:  Bonnie L. Russo

22   JOB NO. 179873B

Patrick  Spalding

Page 6

1   A.   Yes.
2   Q.   It's your obligation to answer each
3   question truthfully and fully.  If you are not
4   sure what is being asked of you just let me
5   know and I will repeat the question so we get a
6   clear answer.
7        Are you taking any medication or
8   receiving any medical treatment which would
9   impair your ability to answer questions
10  truthfully and honestly?
11  A.   No, I'm not.
12  Q.   Are you currently employed?
13  A.   Yes, I am.
14  Q.   Who is your employer?
15  A.   USDA Farm Service Agency.
16  Q.   What is your current grade, title
17  and series?
18  A.   I am a GS 301, Grade 14, and the
19  title is administrative specialist.
20  Q.   What is the series number?
21  A.   301.
22  Q.   What do you do in this position?

Page 7

1   A.   I provide support to the field
2   offices.
3   Q.   What type of support?
4   A.   Administrative.
5   Q.   What do you mean by administrative?
6   A.   Personnel, budget, workload.
7   Q.   Personnel, budget and workload?
8   A.   Yes.
9   Q.   What do you mean by personnel?  What
10  type of support do you provide to the field
11  offices?
12  A.   They will call in with questions and
13  we will either provide them an answer or we
14  will get them an answer.
15  Q.   Questions such as?
16  A.   Classification, staffing, employer
17  relations issues, conduct issues, what do we do
18  in this case or that case.
19  Q.   What type of budgeting support do
20  you provide?
21  A.   The field will contact us for a
22  need, a special need to buy equipment,

Page 8

1   furniture.  If they need additional personnel
2   we work as a liaison at the budget staff to
3   give them the resources.
4   Q.   So you are not actually doing a
5   budget.  You are just working with the field
6   office to get them the resources that they
7   need?
8   A.   If you are asking me if I provide
9   them a budget?
10  Q.   Yes.
11  A.   No, I do not provide a budget.
12  Q.   You don't prepare a budget, correct?
13  A.   No.
14  Q.   And I think you said that the third
15  thing was workload?
16  A.   Provide workload support.
17  Q.   Yes.  What is that?
18  A.   That's how we measure the work
19  activity in the field.  What needs to get done.
20  What gets done.  We use that to provide
21  staffing.
22  Q.   Who do you report to in your current

Page 9

1   position?
2   A.   Linda Treese.
3   Q.   How long have you been in this
4   position?
5   A.   Three years, three and a half.
6   Q.   Did you start in July of 2003?
7   A.   August of 2003.
8   Q.   How far have you gone in school?
9   A.   College, four years of college.
10  Q.   Do you have a college degree?
11  A.   Yes, I do.
12  Q.   From what school?
13  A.   Purdue University.
14  Q.   What year?
15  A.   1982.
16  Q.   Do you hold any other degrees?
17  A.   No.
18  Q.   What is the area of concentration
19  for your degree?
20  A.   Animal science.
21  Q.   What years did you attend Purdue
22  University?

3 (Pages 6 to 9)

Patrick Spalding

Page 30

1  a different panel?
2      A.    Linda Treese replaced Soloman
3  Ramirez because she had just been recently
4  selected as the supervisor of that section.
5      Q.    Do you recall how many questions
6  were asked of you in the second interview?
7      A.    No, I do not.
8      Q.    How long did the second interview
9  last?
10      A.    I don't recall it being any longer
11  than the first.
12      Q.    Which was how long?
13      A.    I don't recall.  I know they were
14  similar in length.
15      Q.    What happened after the second
16  interview?
17      A.    I received a call.  It was a week, a
18  few days -- between three and five days I got a
19  call from John Chott that said Mr. Frago wanted
20  to speak with me.
21      Q.    Did he tell you why Frago wanted to
22  speak to you?

Page 31

1      A.    No, he did not.
2      Q.    Did you -- did he tell you anything
3  else?
4      A.    No.
5      Q.    Did you speak to Frago?
6      A.    Not at that time.
7      Q.    At some point did you speak to
8  Frago?
9      A.    Yes.
10      Q.    And what happened during that
11  conversation?
12      A.    He asked me if I was still
13  interested in the job.  That they were making
14  me an offer.
15      Q.    And how long was it after the second
16  interview that you got this call?
17      A.    I don't recall exact days.  It was
18  not a week but it was more than three.
19      Q.    What was your response?
20      A.    That I would need to discuss it with
21  my spouse.
22      Q.    Did you eventually get back to him?

Page 32

1      A.    Yes, I did.
2      Q.    What was your response?
3      A.    I accepted the position.
4      Q.    After you were hired did you have to
5  go to any specialized training for the
6  position?
7      A.    Are you asking me did I have to go
8  to specialized training for the position?
9      Q.    Let me clarify that.  Did you go to
10  any training after you received the job?
11      A.    Yes.
12      Q.    What type of training?
13      A.    Resolving official.
14      Q.    What is that?
15      A.    It's an in-house course put on by
16  the Equal Opportunity Civil Rights staff where
17  they train you to be a resolver for the agency.
18      Q.    Why was it necessary for you to go?
19      A.    I was asked to go.  I was told to
20  go.
21      Q.    Had you received resolving official
22  training before?

Page 33

1      A.    No, I have not.
2      Q.    Have you been called upon to serve
3  as a resolving official since your selection
4  for this 14 position?
5      A.    Yes.
6      Q.    On how many occasions?
7      A.    Three, four.  Three or four.
8      Q.    Did you attend any other training?
9      A.    Electronic correspondence training.
10      Q.    What was the purpose of the
11  electronic correspondence training?
12      A.    The department agencies were
13  implementing electronic correspondence tracking
14  system.
15      Q.    Did you attend any other training?
16      A.    No.
17      Q.    Have you received training in
18  personnel, conduct, investigator -- personnel,
19  conduct, investigator training?
20      A.    No.
21      Q.    Prior to your selection for this 14
22  position, administrative 301 series position,

9 (Pages 30 to 33)

Patrick Spalding

Page 38

1    A.    Van pool.
2    Q.    So you were on the van pool when the
3  call actually came in?
4    A.    Correct.
5    Q.    You say it was approximately 5:00?
6    A.    I don't know when the voice mail
7  picked up the call.
8    Q.    And what time do you usually take
9  your van pool?
10    A.    4:00.
11    Q.    And you take it from where to where?
12    A.    From the south building to
13  Fredericksburg.
14    Q.    How long does it take for that trip?
15    A.    Approximately an hour.
16    Q.    So you get on the van at 4.  You
17  were on the van for an hour, it takes you?
18    A.    Approximately.
19    Q.    Did you say Frederick or
20  Fredericksburg?
21    A.    Fredericksburg, Virginia.
22    Q.    So you were on the van an hour and

Page 39

1  then you picked up the message?
2    A.    Yes.
3    Q.    When you got to Fredericksburg?
4    A.    Yes.
5    Q.    What did you do when you picked up
6  the message?
7    A.    I returned a call to John Chott.
8    Q.    Did you call him immediately?
9    A.    After getting the voice mail
10  message?
11    Q.    Yes.
12    A.    No.
13    Q.    What I am trying to figure out did
14  you stop when you got to Fredericksburg and
15  call him at that point or did you wait and call
16  him the next day?
17    A.    I called him a few minutes later.
18    Q.    So sometime after 5:00?
19    A.    Yes.
20    Q.    You don't recall the date that you
21  called him?
22    A.    No, I don't.

Page 40

1    Q.    Did you get an e-mail or anything
2  else from him?
3    A.    No.
4    Q.    So was there any written
5  communication whatsoever?
6    A.    No.
7    Q.    So you had -- you called Chott back
8  after you got to Fredericksburg?
9    A.    Correct.
10    Q.    And that's when you had the
11  conversation with him that you referenced
12  earlier?
13    A.    Yes.
14    Q.    Was that the conversation where he
15  told you that Doug Frago wanted to talk to you?
16    A.    Yes.
17    Q.    And what was your response to that?
18    A.    That Doug Frago wanted to speak to
19  me?
20    Q.    Yes.
21    A.    What was my response?
22    Q.    Yes.  How did you respond to that

Page 41

1  when he said Doug Frago wants to speak to you?
2    A.    I said, well, I'm available to speak
3  now.  He said Doug was on another call.  Could
4  Doug call me back.
5    Q.    Did that happen?
6    A.    Yes, it did.
7    Q.    When did Doug call you back -- Frago
8  call you back?
9    A.    30 to 45 minutes later.
10    Q.    Where were you when he called you
11  back?
12    A.    My apartment, home.
13    Q.    Is that in Fredericksburg?
14    A.    Yes.
15    Q.    So if you got this call, the initial
16  call at 5:00 and Frago calls you back at 30 to
17  45 minutes, is it about 6:00 when he calls you?
18    A.    It's before 6.
19    Q.    Frago calls you at home before 6
20  p.m.?
21    A.    Yes.
22    Q.    How do you know it was before 6

11 (Pages 38 to 41)

Patrick Spalding

Page 22

1   A.   Yes, it was.  That's the city.
2   Q.   So that was sometime between 1986
3   and 1987?
4   A.   Yes.
5   Q.   So that was about 15 years before
6   you applied for your current position?
7   A.   Yes.
8   Q.   So you started as a loan specialist
9   in Washington, D.C. at the Grade 12 level and
10  how long was it before you became a Grade 13?
11  A.   One year.
12  Q.   Your last position before your
13  current position was loan specialist?
14  A.   Yes.
15  Q.   Prior to your current position as a
16  loan -- as a 301 administrative specialist, is
17  that the correct title?
18  A.   Yes.
19  Q.   Had you served at least one year at
20  the Grade 13 level in the 301 series?
21  A.   No.
22  Q.   Prior to your selection at the Grade

Page 23

1   14 level in this administrative position had
2   you served in the 301 series at all?
3   A.   No.
4   Q.   Was that a requirement for the
5   application that you serve at least one year at
6   the lower grade level, next lower grade level?
7   A.   I can't answer that question.
8   Q.   Did you interview for your current
9   position?
10  A.   Yes.
11  Q.   Who did you interview with?
12  A.   Doug Frago, John Chott, Soloman
13  Ramirez and Linda Treese.
14  Q.   How many interviews did you have?
15  A.   Two.
16  Q.   Was there a panel for the first
17  interview?
18  A.   I don't know.
19  Q.   You don't know if there was a panel?
20  A.   I don't understand your question.
21  Q.   Was there an interviewing panel?
22  A.   Yes, there was an interviewing

Page 24

1   panel, yes.
2   Q.   Who was on the interviewing panel
3   for the first interview?
4   A.   Doug Frago, John Chott and Soloman
5   Ramirez.
6   Q.   And who was on the second panel?
7   A.   Doug Frago, John Chott, Linda
8   Treese.
9   Q.   Prior to interviewing for the --
10  with the first panel did you know any of the
11  panel members?
12  A.   No.
13  Q.   You didn't know Doug Frago?
14  A.   No.
15  Q.   Or John Chott?
16  A.   No.
17  Q.   Or Ramirez?
18  A.   No.
19  Q.   Did you work in any section
20  affiliated with any of these individuals?
21  A.   No.
22  Q.   Prior to interviewing for the second

Page 25

1   interview did you know Linda Treese?
2   A.   No.
3   Q.   I would like for you to walk me
4   through your application process; everything
5   that happened from the time you submitted your
6   application until you were informed that you
7   were selected for the application?
8   A.   I read the vacancy announcement on
9   the Internet.  I pulled my application
10  information together, provided responses on the
11  Internet to the questions.
12  Q.   Let me stop you there one second.
13  When you learned that there was a vacancy
14  announcement what was the section that you were
15  working in at the time?
16  A.   Farm loan programs, direct loan
17  making.
18  Q.   Farm loan programs?
19  A.   Direct loan making.
20  Q.   Direct loan making?
21  A.   Yes.
22  Q.   And where is that office located?

7 (Pages 22 to 25)

Patrick Spalding

Page 14

1    A.    Cass County.  C-A-S-S.
2    Q.    How long were you the county
3 supervisor at Cass County?
4    A.    Approximately two years.
5    Q.    What was your next position?
6    A.    I was administrative officer
7 trainee.
8    Q.    Where did you work as an
9 administrative officer trainee?
10    A.    Little Rock, Arkansas.
11    Q.    How long were you in that position?
12    A.    Two -- approximately two and a half
13 years.
14    Q.    You were an administrative officer
15 trainee for two and a half years?
16    A.    Let me correct that.  It was two.
17 Two years.
18    Q.    Two years?
19    A.    Two years.
20    Q.    So you were an administrative
21 officer trainee?
22    A.    Uh-huh.

Page 15

1    Q.    For two years?
2    A.    Yes, sir.
3    Q.    And in Little Rock, Arkansas?
4    A.    Yes.
5    Q.    What was your grade there?
6    A.    GS-11.
7    Q.    What was your next position?
8    A.    Administrator officer.
9    Q.    And where was that work location?
10    A.    Amhurst, Massachusetts.
11    Q.    What was your grade?
12    A.    GS-12.
13    Q.    How long were you in that position?
14    A.    11 months.
15    Q.    What was your next position?
16    A.    Contracting officer.
17    Q.    And let me just -- for the
18 administrative officer position you held for 11
19 months, what period of time was that?
20    A.    May 1991 through March 1992.
21    Q.    May of '91 until March of '92?
22    A.    I believe that's correct.

Page 16

1    Q.    And your grade was a 12?
2    A.    Yes.
3    Q.    And where did you work after that?
4    A.    St. Paul, Minnesota.
5    Q.    What was your position?
6    A.    Contracting officer.
7    Q.    What was your grade?
8    A.    11.
9    Q.    So how did you come to leave a Grade
10 12 position to accept a Grade 11?
11    A.    Applied for the job and asked for a
12 transfer and a voluntary change of lower grade.
13    Q.    Why did you do that?
14    A.    Personal reasons.
15    Q.    What personal reasons?
16    A.    My wife and I didn't like the east
17 coast.  We are mid westerners.  I am a mid
18 westerner.  Closer to home.
19    Q.    You are on the east coast now?
20    A.    Yes, sir, I am.
21    Q.    So you asked for a lower graded
22 position and you accepted a position in St.

Page 17

1 Paul, Minnesota?
2    A.    Yes.
3    Q.    And how long were you in this
4 position?
5    A.    Eight years.
6    Q.    This was a -- was it a loan
7 specialist position?  I'm sorry what was the
8 title?
9    A.    Contract specialist.
10    Q.    Contract specialist.  What was the
11 series for that position?
12    A.    1102.
13    Q.    When you were an administrative
14 officer for 11 months what was the series for
15 that position?
16    A.    341.
17    Q.    Now, what was the next position
18 after the contract specialist position?
19    A.    Loan specialist.
20    Q.    Where was that position?
21    A.    Washington, D.C.
22    Q.    What was your grade?

5 (Pages 14 to 17)

Patrick Spalding

Page 46

1    A.    Yes.
2    Q.    Just wanted to be clear on that.
3          MR. NAGEL:  Okay.  I think that's
4    it.  Thank you for your time.
5          (Whereupon, the proceeding was
6    concluded at 12:52 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 48

1          CERTIFICATE OF NOTARY PUBLIC
2          I, Bonnie L. Russo, the officer before
3    whom the foregoing deposition was taken, do
4    hereby certify that the witness whose testimony
5    appears in the foregoing deposition was duly
6    sworn by me; that the testimony of said witness
7    was taken by me in shorthand and thereafter
8    reduced to computerized transcription under my
9    direction; that said deposition is a true
10   record of the testimony given by said witness;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this deposition was taken; and further,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of the action.
18   _____
19          Notary Public in and for
20          the District of Columbia
21   My Commission expires:  May 14, 2010
22

Page 47

1          ACKNOWLEDGMENT OF DEPONENT
2    I, PATRICK J. SPALDING, do hereby acknowledge I
3    have read and examined the foregoing pages of
4    testimony, and the same is a true, correct and
5    complete transcription of the testimony given
6    by me, and any changes or corrections, if any,
7    appear in the attached errata sheet signed by
8    me. _____
9    _____    _____
10   Date        PATRICK J. SPALDING
11
12
13
14
15
16
17
18                                    ·
19
20
21
22

Page 49

1    Ms. Judith Kidwell
     U.S. Attorney's Office
2    555 4th Street, NW
     Civil Division
3    Room E4905
     Washington, DC 20530
4
5
6
     IN RE:  Fields vs. Mike Johanns
7
8
     Dear Ms. Kidwell,
9
     Enclosed please find your copy of the
10   deposition of PATRICK J. SPALDING along with
     the original signature page.  As agreed, you
11   will be responsible for contacting the witness
     regarding reading and signing the transcript.
12
     Within 30 days of receipt, please forward
13   errata sheet and original signature page signed
     to opposing counsel.
14
     If you would like to change this procedure or
15   if you have any questions, please do not
     hesitate to call.
16
     Thank you.
17
     Yours,
18
19
20
     Bonnie L. Russo
21   Reporter/Notary
22

13 (Pages 46 to 49)

Patrick  Spalding

## A

**ability** 6:9
**accept** 16:10
  44:11,12
**accepted** 16:22
  32:3 45:4,22
**accommodate**
  5:16
**acknowledge**
  47:2
**ACKNOWLE...**
  47:1
**action** 1:7
  48:12,17
**activity** 8:19
**additional** 8:1
  35:14
**administrative**
  6:19 7:4,5
  14:6,9,14,20
  15:18 17:13
  22:16 23:1
  33:22 34:6,8
**administrator**
  15:8 26:5
**affiliated** 24:20
**agencies** 33:12
**agency** 6:15
  32:17
**agreed** 49:10
**AGRICULTU...**
  1:10 3:21
**algebra** 10:22
**alternated** 28:4
**Amhurst** 15:10
  34:10,13
**animal** 9:20
  10:15,18,20
  10:21 11:1,2
**announceme...**
  25:8,14 27:1
**answer** 6:2,6,9
  7:13,14 23:7
**apart** 13:20
**apartment**
  41:12

**appear** 47:7
**APPEARANC...**
  3:1
**appears** 48:5
**application**
  23:5 25:4,6,7
  25:9 27:2
**applications**
  28:9
**applied** 16:11
  22:6
**apply** 27:10,11
**applying** 26:3
**appropriate**
  5:19 50:6
**approximately**
  13:14 14:4,12
  26:13 37:14
  38:5,15,18
  42:5,22 45:16
**area** 9:18
**areas** 11:4
**Arkansas**
  14:10 15:3
  34:10 35:2
**arrival** 37:19
**arrived** 37:17
**asked** 6:4
  16:11,21
  27:22 28:3
  29:12 30:6
  31:12 32:19
**asking** 8:8 32:7
  44:12
**assistant** 11:16
  11:17 12:15
  20:22 21:8
**attach** 50:6
**attached** 47:7
**attend** 9:21
  33:8,15
**attended** 10:5
  10:9
**attorney** 48:15
**Attorney's** 3:12
  49:1

**August** 9:7
**authorize** 50:6
**available** 41:2
**Avenue** 2:12
  3:5

## B

**back** 31:22
  40:7 41:4,7,8
  41:11,16
  44:18
**background**
  28:1 29:13
**based** 10:21
**Basic** 10:20
**believe** 15:22
  36:6,13
**best** 36:6,7
  44:22
**blocks** 26:13
**Bonnie** 1:21
  2:21 48:2
  49:20
**Branch** 2:11
  3:3,4 4:3 5:7
  5:11 35:12
**break** 5:14
  35:10
**breeding** 11:2
**budget** 7:6,7
  8:2,5,9,11,12
**budgeting** 7:19
**building** 26:1,6
  26:7,8,14
  38:12
**buy** 7:22

## C

**C** 4:1
**call** 7:12 27:5
  28:12 30:17
  30:19 31:16
  35:22 36:4,15
  36:22 37:4
  38:3,7 39:7,8
  39:15,15 41:3
  41:4,7,8,15

  41:16 42:4,11
  43:5 44:7,18
  44:20 49:15
**called** 27:6
  28:14 33:2
  36:19 37:22
  39:17,21 40:7
  41:10 42:7,8
  42:13,14
  45:21
**calls** 41:16,17
  41:19 44:17
  44:17
**candidates**
  35:6
**CAPTION** 50:1
**captioned** 50:3
**case** 7:18,18
  50:1
**Cass** 12:10
  14:1,3 21:14
  21:16,20
**cell** 36:19,22
**Certificate** 48:1
  50:6
**certify** 48:4
**chance** 42:17
**change** 16:12
  49:14 50:7
**changes** 47:6
  50:4
**chemistry**
  10:22
**Chott** 23:12
  24:4,7,15
  30:19 35:17
  35:22 36:4,16
  37:3 39:7
  40:7 42:4
  44:6,7,17
**city** 22:1 37:20
**Civil** 1:4,7 3:14
  32:16 49:2
**clarify** 32:9
**Classification**
  7:16

**clear** 6:6 44:16
  46:2
**Closer** 16:18
**coast** 16:17,19
**college** 9:9,9
  9:10 11:11
**Columbia** 1:3
  48:20
**come** 16:9
  19:15
**Commission**
  48:21
**communicati...**
  40:5
**complete**
  10:18 47:5
**computerized**
  48:8
**concentration**
  9:18
**concluded**
  46:6
**conduct** 7:17
  33:18,19
**Connecticut**
  2:12 3:5
**contact** 7:21
**contacting**
  49:11
**contract** 17:9
  17:10,18
**Contracting**
  15:16 16:6
**conversation**
  31:11 40:11
  40:14 43:4,15
  43:20 45:2
**copy** 49:9
**correct** 8:12
  14:16 15:22
  22:17 34:14
  35:19 38:4
  40:9 44:11
  45:8,14 47:4
**corrections**
  47:6

Patrick Spalding

31:10 43:3
45:1
**happy** 5:16
**head** 5:19
36:10
**held** 2:9 11:14
15:18
**hereto** 48:16
**hesitate** 49:15
**HEWITT** 3:20
**high** 10:2
**Hinton** 20:7
**hired** 32:4
**hold** 9:16 10:11
**home** 16:18
36:17,18 37:9
37:11 41:12
41:19
**honestly** 6:10
**hour** 38:15,17
38:22
**husbandry**
10:21

**I**

**immediately**
39:8
**impair** 6:9
**implementing**
33:13
**important** 5:17
**incorrect** 36:20
**Indiana** 11:20
12:11
**indicated** 50:5
**individuals**
24:20
**information**
25:10
**informed** 25:6
**initial** 41:15
44:7
**interested**
31:13 48:16
**Internet** 25:9
25:11 27:3

**interview** 23:8
23:11,17 24:3
25:1 26:20
27:5,9,14,18
27:21 28:2,7
28:13,17,18
28:20 29:1,4
29:5,6,11,14
29:17,20 30:6
30:8,16 31:16
35:16 36:3
**interviewing**
23:21,22 24:2
24:9,22 26:16
**interviews**
23:14 28:9
**investigator**
33:18,19
**in-house** 32:15
**issues** 7:17,17
34:5

**J**

**J** 1:15 2:9 4:2
5:2,9 47:2,10
49:10 50:2,19
**job** 1:22 16:11
31:13 32:10
43:11 45:14
**Johanns** 1:8
49:6 50:1
**John** 23:12
24:4,7,15
30:19 35:22
36:4,16 37:3
39:7 42:4
**Judith** 3:11
49:1
**July** 9:6

**K**

**Kidwell** 3:11
49:1,8
**know** 5:15 6:5
23:18,19
24:10,13 25:1
26:16 30:13

37:15 38:6
41:22 43:22
**knowledge**
36:6,8

**L**

**L** 1:21 2:21
48:2 49:20
**Law** 2:11 3:4
**learned** 25:13
**leave** 16:9
**left** 18:10,18
19:2 36:21
37:1 42:7,8
**length** 30:14
**let's** 35:10 45:6
**level** 12:16,18
13:12 18:7,15
19:18,19,20
22:9,20 23:1
23:6,6
**liaison** 8:2
**Linda** 9:2 23:13
24:7 25:1
30:2
**little** 14:10 15:3
21:21 34:10
**live** 11:1
**living** 42:5
**loan** 17:6,19
18:6,19 19:21
20:8,15,18,20
21:3,4 22:8
22:13,16
25:16,16,18
25:19,20
**located** 25:22
**location** 11:19
15:9 34:9
**Logan's** 21:22
**long** 5:13 9:3
11:6 12:5
13:3,8,17
14:2,11 15:13
17:3 20:8,15
21:19 22:10
29:14 30:8,12

31:15 38:14
**longer** 30:10
**lot** 37:17
**lower** 16:12,21
18:14 23:6,6

**M**

**mail** 36:21 37:1
37:2,7 38:6
39:9
**making** 25:17
25:19,20
31:13
**March** 1:17 2:5
15:20,21
34:15 50:2
**Massachuse...**
15:10 34:11
34:13 35:3
**math** 34:22
**matter** 50:3
**matters** 34:1
**mean** 7:5,9
**measure** 8:18
**medical** 6:8
**medication** 6:7
**members**
24:11 28:5
**merit** 18:8
**message** 37:8
37:13,16 39:1
39:6,10 42:7
42:9
**met** 26:19
**microbiology**
10:22
**mid** 16:17,17
**Mike** 1:8 20:7
49:6
**Minnesota**
16:4 17:1
18:10 19:17
**minute** 45:17
**minutes** 39:17
41:9,17 42:6
**missed** 19:5
42:11

**Monday** 43:8
**months** 15:14
15:19 17:14
34:17,18

**N**

**N** 4:1,1
**NAGEL** 35:9
46:3
**name** 5:8,10
50:5
**narrowed**
28:21 29:7
**necessary**
32:18
**need** 5:14 7:22
7:22 8:1,7
31:20 43:12
43:18 44:19
**needs** 8:19
**neither** 48:11
**NENA** 3:20
**nod** 5:19
**nodding** 36:10
**normal** 37:18
**Notary** 2:22
48:1,19
**noted** 50:4
**notice** 2:21
**number** 6:20
29:8 36:5
**nutrition** 11:3
**NW** 49:2
**N.W** 2:12 3:5
3:13

**O**

**O** 4:1
**oath** 5:22
**obligation** 6:2
**obtain** 13:3,8
18:5
**obtained** 13:1
**occasions** 33:6
**offer** 31:14
**offered** 43:6,11
45:7,13

| | | | | |
|---|---|---|---|---|
| 49:20 | shuttle 37:20 | 18:10,18 19:2 | talk 40:15 | 14:15,21 34:7 |
| **S** | signature | 19:8,17 | talking 19:8 | training 32:5,8 |
| **S** 4:1 | 49:10,13 | staff 8:2 18:19 | tell 5:3 29:22 | 32:10,12,22 |
| scheduled | 50:18 | 32:16 | 30:21 31:2 | 33:8,9,11,15 |
| 28:17 | signed 47:7 | staffing 7:16 | 44:19 | 33:17,19 |
| school 9:8,12 | 49:13 50:5 | 8:21 | ten 34:17,17 | transcript |
| 10:3 | signing 49:11 | start 9:6 11:9 | testified 5:5 | 49:11 50:3,7 |
| schools 10:12 | similar 30:14 | started 11:12 | testimony | transcription |
| science 9:20 | sir 11:13 15:2 | 13:15 22:8 | 26:15 35:16 | 47:5 48:8 |
| 10:15,19,20 | 16:20 18:16 | 29:9 | 47:4,5 48:4,6 | transfer 16:12 |
| sciences 11:1 | 20:14 27:15 | state 5:8 | 48:10 | treatment 6:8 |
| second 24:6,22 | Soloman 23:12 | STATES 1:2 | Thank 46:4 | Treese 9:2 |
| 25:12 28:12 | 24:4 30:2 | 3:12,21 | 49:16 | 23:13 24:8 |
| 28:19 29:3,5 | sorry 17:7 | stock 11:1 | thing 8:15 | 25:1 30:2 |
| 29:6,10,14,20 | 36:20 | stop 25:12 | 27:13 | 35:17 |
| 30:6,8,15 | sounds 35:1 | 39:14 | think 5:13 8:14 | trip 38:14 |
| 31:15 35:16 | south 26:5,8 | Street 3:13 | 27:13 46:3 | true 47:4 48:9 |
| 36:3 45:11 | 26:14 38:12 | 49:2 | third 8:14 | truth 5:3,4,4 |
| secretary 1:8 | Spalding 1:15 | submitted 25:5 | thought 19:1 | truthfully 6:3 |
| 28:15 | 2:9 4:2 5:2,9 | 27:4 | 21:7 | 6:10 |
| section 24:19 | 5:10 35:13 | Suite 2:13 3:6 | three 9:5,5 | trying 39:13 |
| 25:14 30:4 | 47:2,10 49:10 | supervisor | 13:19 20:10 | two 12:6 13:14 |
| Sederis 1:5 | 50:2,19 | 11:16,17 12:8 | 20:10 30:18 | 14:4,12,12,15 |
| 3:22 5:11 | speak 30:20,22 | 12:16,17 | 31:18 33:7,7 | 14:16,17,18 |
| selected 18:8 | 31:5,7 40:18 | 13:12,21 14:3 | 36:7,7,9 | 14:19 15:1 |
| 25:7 30:4 | 41:1,2 42:15 | 20:5 21:1,1,6 | time 15:19 | 21:21 23:15 |
| selection 22:22 | 42:16,17 | 21:8,11,13,16 | 21:15 25:5,15 | 26:13 28:10 |
| 33:3,21 | 43:12,19 44:3 | 21:19,20 30:4 | 26:19 29:15 | 34:6 45:10 |
| separate 26:14 | 44:19 | support 7:1,3 | 31:6 37:19 | type 7:3,10,19 |
| series 6:17,20 | speaks 44:18 | 7:10,19 8:16 | 38:8 42:3,5 | 10:14,17 |
| 17:11,14 18:2 | special 7:22 | supposed 37:4 | 46:4 | 32:12 |
| 22:20 23:2 | specialist 6:19 | sure 6:4 10:16 | times 21:17 | |
| 27:22 33:22 | 17:7,9,10,18 | sworn 5:3 48:6 | title 6:16,19 | **U** |
| 34:7,8 35:6 | 17:19 18:6 | system 33:14 | 17:8 21:2,4,5 | Uh-huh 14:22 |
| serve 18:14,20 | 19:22 20:9,15 | S-O-U-T-H 26:9 | 22:17 | understand |
| 19:18 20:8 | 20:18,21 21:3 | | today 5:12,13 | 5:21 23:20 |
| 23:5 33:2 | 21:5 22:8,13 | **T** | told 19:1,10 | 35:15 43:16 |
| served 19:6 | 22:16 | T 4:1,1 | 28:6,19,22 | 45:9 |
| 22:19 23:2 | specialized | take 5:12,14 | 29:1,7,19 | UNITED 1:2 |
| Service 6:15 | 32:5,8 | 11:4 13:3,8 | 32:19 35:5 | 3:12,21 |
| sheet 47:7 | specific 21:17 | 35:9 38:8,11 | 40:15 43:21 | universities |
| 49:13 50:1,4 | spoke 44:6,8 | 38:14 | 45:4,21 | 10:12 |
| 50:6 | 44:10 45:2,10 | taken 35:11 | touch 28:10 | university 9:13 |
| short 35:10,11 | 45:20,20 | 48:3,7,13 | tracking 33:13 | 9:22 10:6,8,9 |
| shorthand 48:7 | spouse 31:21 | 50:3 | train 32:17 | USDA 6:15 |
| | St 16:4,22 | takes 38:17 | trainee 14:7,9 | 11:7,9,12,15 |
| | | 42:3 | | 13:15,17 |

# Exhibit No. 13

SFO FIELDS JR
9308 Locksley Road
Fort Washington, Maryland 20744
E-mail: Shfieldsjr@aol.com

Home Phone: (301) 839-6223    Office Phone: (202) 720-7552

**Social Security Number:**
**Country of Citizenship:**        *United States of America*
**Veteran's Preference:**          *No*
**Highest Grade:**                 *GS-0301-13*
**Contact Current Supervisor:**    *Yes*

RECEIVED
FH8344
3I063B

**VACANCY INFORMATION:**    *Administrative Management Specialist, GS-0301-14, UF168394 CT*

**PROFILE:**    *My work experience consists of twenty-five years of Federal Services with an emphasis on Personnel, Civil Rights (CR), administrative and financial management, and FSA/USDA Program operations. Expertise includes Equal Employment Opportunity, Affirmative Employment, Conflict Resolution (Certified Mediator in Federal Workplace Dispute), Human Resources Management, and Personnel Misconduct Investigator.*

**WORK EXPERIENCE:**

**Deputy Administrator for Field Operations**        *01/21/1999 - Present*
U.S. Department of Agriculture, Farm Service Agency    *40 Hours per Week*
1400 Independence Avenue, S.W.                         *Grade Level: GS-0301-13*
Washington, D.C.  20250-0541                           *Supervisor: Douglas W. Frago, (202) 690-2807*

*Program Coordination Specialist (GS-301-13): Serves as liaison between Headquarters, Deputy Administrator for Field Operations (DAFO) and State and county offices on administrative issues related to Human Resources, Equal Employment Opportunity (EEO), Civil Rights (CR), Alternative Dispute Resolution (Mediation) and the Consent Decree Budget.*

- *Coordinate and prepare semiannual and annual budget reports of expenditures used from the State and county offices, to implement the court ordered Consent Decree (Pigford vs. Veneman).*
- *Represent DAFO on several Committees. Serve as a member of the FSA National Advisory Council to make recommendations to the Administrator on Civil Rights procedures and policies. Serve on the FSA Awards Review Committee to ensure awards are distributed fairly. Represent DAFO on the Disability Awareness Program Committee to implement hiring of disabled employees in the Federal Government as mandated by Executive Order 13163. Also, attend other ad hoc meetings to represent DAFO in evaluating the effectiveness of organization programs and operations.*
- *Coordinate CR training for SEDs, State and County FSA Committees and field office employees. Serve as liaison between the office of CR and the State and county offices providing advice and guidance concerning regulations, policy and procedure including Departmental, OPM, and EEO laws and regulations such as 29 Code of Federal Regulation Part 1614 (Federal Sector Equal Employment Opportunity).*
- *Serve as an Agency Resolving Official to resolve conflicts and controversies regarding EEO complaints and Personnel grievances filed by employees under DAFO's jurisdiction. Review administrative, EEO, and Personnel decisions and appellate decisions.*
- *Conduct "Misconduct Personnel Investigations" of alleged prohibited personnel practices, OIG complaints, and fact finding. Take sworn affidavits or statements from witnesses and management officials. Write technical reports of findings and make recommendations to DAFO and other appropriate Management officials.*
- *Facilitate the placement of Student Summer Interns and the Co-op Student Career Experience Program (SCEP) in the State and county offices. Last year assisted in the selection process for hiring four DAFO employees.*
- *Serve on Human Resource Division (HRD) Recommending Panel for the "Executive Potential Program." The past four years served on the ad hoc committee to select candidates for the FSA Administrator's and Secretary's Awards.*
- *Analyze the Affirmative Employment Program (AEP) to identify under represented areas and provide instruction and policy guidance to State and county FSA offices to diversify the workforce. Prepare impact analysis reports and make recommendations to management.*
- *Plan and coordinate outreach initiatives with State and county offices by disseminating FSA information at recruitment workshops and display FSA exhibits and the annual NAACP Convention and the Small Farm Week. Represent the Agency and make presentations regarding FSA accomplishments, and policy related to program operations.*
- *Develops DAFO's segment of the agency wide Administrator's Performance Report Card and Accomplishments. Respond to incoming mail and write notices and handbooks. Develop and coordinate DAFO's annual and semiannual accomplishment reports. Prepare briefing books for management regarding personnel, EEO, OIG reports and the Consent Decree utilizing current laws, policy and procedures. Review Agency's handbooks, directives and notices for compliance with laws, regulations related to civil rights performance, personnel and budget.*
-

*Sederis Fields,*

**Office of Civil Rights**                                    *05/97 - 01/21/99*
*U.S. Department of Agriculture, Farm Service Agency*       *40 Hours per Week*
*1400 Independence Avenue, S.W.*                            *Grade Level: GS-0260-13*
*Washington, D. C. 20250*                                   *Supervisor: Willie D. Cook*

**Equal Employment Specialist** *(GS-260-13): Served as Team Leader on Equal Employment Opportunity (EEO) and Civil Rights (CR) Management Reviews, Program Manager for the 1890 Program, Coordinator for Hispanic Association of Colleges and Universities, (HACU) and served as an EEO Fact-finding Investigator.*

- *Conducted EEO&CR State Management Reviews, to evaluate the effectiveness of EEO and CR Compliance Program the county and State offices. Made recommendations for corrective action upon completion. Analyzed corrective action plans submitted by State Executive Director. The review team ensured the following:*

    - *FSA's program delivery and services are in compliance with applicable EEO/CR laws and regulations.*
    - *All USDA Service Centers are accessible to persons with disabilities.*
    - *Enhancement of the Outreach Program and service delivery to women, minorities and persons with disabilities by establishing partnerships with community-based organizations.*
    - *Utilized the 1890, 1994, 1862 land grant Institutions, and HACU to increase diversity in the workforce.*
    - *Develop "Outreach Plan" with measurable goals and objectives.*

- *Served as Program Manager for the USDA/1890 National Scholars Program for the Agency:*

    - *Recruited outstanding minority students who commit to careers within FSA.*
    - *Interacted with 1890 Universities to carry out the Agency programs and objectives.*
    - *Facilitated the placement of students in FSA positions in Headquarters, State, and Field offices.*
    - *Represented the Agency at conferences, workshops, meetings and other activities to support the USDA/1890 Scholars Program.*
    - *Served as a member of the Executive Team of the USDA 1890 Taskforce for the Mission Areas, provided progress and status reports.*

- *Coordinated the Hispanic Association of Colleges and Universities (HACU) Program to increase employment opportunities for Hispanic Americans:*

    - *Participated in the summer internship program to recruit students for summer employment.*
    - *Worked closely with FSA managers to place students Nationwide in offices with under representation of minority employees.*
    - *Coordinated the new fall semester program implemented.*
    - *Carried day-to-day activities with the students and supervisors.*

- *Prepared budget reports in support of the 1890 Institutions and HACU. Responded to Congressional correspondence, and prepared the Annual Performance Plan and Historical Black Colleges and Universities (HBCU) reports concerning these programs.*

- *Program Outreach Delivery Program.*
    - *Provided "Simple Justice" videos to all Headquarters, State and Field offices.*
    - *Developed tracking system to ensure that all FSA employees reviewed the "Simple Justice" videos tapes provided by the Department.*
    - *Provided all FSA offices with required Civil Rights materials including recent Departmental notices.*
    - *Prepared memoranda to all FSA employees informing them to review recent CR notices and materials.*
    - *Prepared memoranda to all Managers providing them with instructions concerning recent Departmental Civil Right mandates.*

- *Responded to EEO complainants, interrogators, investigative memorandum and OIG complaints.*

Sederis Fields,

**Office of Civil Rights**                                    05/97 - 08/90
*U.S. Department of Agriculture, Farm Service Agency*         *40 Hours per Week*
*1400 Independence Avenue, S.W.*                              *Grade Level: GS-260-12*
*Washington, D.C. 20250*                                     *Supervisor: Willie D. Cook*

**Equal Employment Specialist:** *Served as National Special Emphasis Program (SEP) Manager and Federal Women's
Program (FWP) Manager.*

- *Provided technical guidance to State Offices FWP and SEP Managers. Planned, developed, and coordinated SEP
  annual Accomplishments Report and Work Plan from all 51 State offices. Developed SEP segments of agency wide
  AEP. Made recommendations to management officials concerning the programs possible improvement.
  Immediately responded to inquiries concerning Civil Rights and equal opportunities for women and minorities.
  Provided advice and assistance to employees requesting information on EEO&CR programs on a continual basis.*

- *Served as Team Leader to on EEO&CR State Management Reviews which were conducted to ensure State and
  county offices are in compliance with regulations. Made recommendations for corrective action upon completion.
  Analyzed corrective action plans submitted by State Executive Director.*

- *Developed Agency's Affirmative Employment Plans (AEP), Civil Rights Implementation Plans (CRIP), and prepared
  the Specials Emphasis Program Manager accomplishment reports.*

- *Reviewed and conducted Civil Rights impact analysis of agency Federally Assisted and Conducted Programs.*

- *Established a new Civil Rights Advisory Council. Provided training and technical guidance. Served as Ex-officio
  member. Maintained contact with nationwide FSA advisory committees.*

- *Represented FSA at SEP conferences/seminars, to obtain knowledge in providing methods to increase employment
  opportunities for women, minorities, and persons with disabilities. Conferences included the Hispanic Employment
  Program annual briefing; Federally Employed Women annual conferences; Strategies for Historically Black Colleges
  and Universities; Blacks in Government; League of United Latin American Citizen (LULAC) National Convention.
  Required putting knowledge of laws and regulations into practice.*

- *Coordinated Special Emphasis observances such as Black History, Women's History, Asian American/Pacific
  Islander, Hispanic Heritage, and American-Indian Heritage months. Encouraged employees to participate to help
  value cultural differences and understand the need for workforce diversity.*

- *Independently wrote Administrator's Memorandas, FSA's National Notices and informational material to inform FSA
  employees of upcoming SEP activities, Prevention of Sexual Harassment, scholarships, and award opportunities.
  Developed and wrote amendments to FSA Handbooks 19-PM (Equal Employment Opportunity Programs) and
  18-AO (Civil Rights Compliance Programs). Additionally, wrote EEQ policy statements.*

## EDUCATION

*George Mason University, Fairfax, Virginia*
  *(56 hours) Federal Workplace Mediation, May 2000*

*Howard University, Washington, D.C.*
  *B.S. Business Management*

## CERTIFICATIONS AND LICENSES

Certified Federal Workplace Mediator        *George Mason University*              05/22/00
Certified Personnel Recruiter               *FSA/Human Resource Division*          06/26/99
Personnel Misconduct Investigator           *Office of Inspector General (OIG/OP)* 03/11/93

**Reference will be provided upon request.**

162   -3-

| COURSE TITLES | DATE | SCHOOL OR LOCATION | HOURS |
|---|---|---|---|
| FEDERAL DISPUTE RESOLUTION TRAINING (FDR) | August 18-22, 2002<br>August 20-24, 2000<br>August 22-26, 1999 | FDR Conference, Inc.<br>Washington, D.C.  20036 | 32<br>32<br>32 |
| ADVANCE MEDIATION & CONFLICT MANAGEMENT SKILLS | August 7-9, 2001 | Justice Center of Atlanta, Inc.<br>Washington, DC | 20 |
| NATIONAL MEDIATOR TRAINING | Sept. 11-13, 2001 | USDA Conflict Prevention and Resolution Center, Arlington, VA | 24 |
| EXAMINING CONFLICTS IN EMPLOYMENT LAWS | Aug. 31 - Sept. 3, 1999 | Equal Employment Opportunity Commission (EEOC), NJ | 30 |
| EEO MEDIATION "RESOLVING OFFICIAL" TRAINING | February 16-18, 1999 | Office of Civil Rights, FSA<br>Washington,  D.C. | 24 |
| USDA CUSTOMER SERVICE TRAINING | March 29- April 1,1999 | FSA, Washington, D.C. | 24 |
| AGRICULTURE OUTLOOK FORUM 1999 | February 22-23, 1999 | USDA, Washington, D.C. | 16 |
| RECRUITER CERTIFICATION TRAINING | June 23-26, 1998 | FSA HRD/Training Branch<br>Washington, D.C. 20037 | 30 |
| FEDERALLY EMPLOYED WOMEN MANAGEMENT TRAINING | March 13-14, 1997 | University of Maryland<br>College Park, MD  20741-1610 | 16 |
| ALTERNATIVE DISPUTES RESOLUTION (ADR) | March 4-5, 1997 | Rushford & Associates<br>Denver, Colorado | 16 |
| EQUAL EMPLOYMENT & CIVIL RIGHTS TRAINING (MODULES 3,7,8) | January 30-31, 1997<br>1998, 1999, 2000 | FSA, CR&SBUS<br>Washington, D.C. | 24 |
| HIGH IMPACT PRESENTATION | April 18-19, 1996 | Dale Carnegie Center of Excellence<br>Rockville, MD  20852 | 16 |
| FEDERAL WOMEN'S PROGRAM MANAGERS TRAINING | February 21-24, 1995 | Office of Personnel Management (OPM), Washington, D.C. | 24 |
| TRAIN THE TRAINER WORKSHOP | November 7-9, 1994 | USDA/Graduate School | 24 |
| CAREER DEVELOPMENT SEMINAR FOR MID-LEVEL AND SENIOR-LEVEL WOMEN | September 11-15, 1994 | Annapolis, Maryland | 40 |
| FEDERALLY EMPLOYED WOMEN (FEW) ANNUAL NATIONAL TRAINING (EEO & OPM TRAINING) | July 1997, 1996, 1995<br>1994, 1993, 1992 | FEW 1400 Eye Street, NW<br>Suite 425,Washington, D.C. 20005 | |
| ROLE OF THE SPECIAL EMPHASIS PROGRAM MANAGER (STAFFING AND RECRUITMENT) | July 26-27, 1993 | Rushford & Associates,<br>Denver CO | 16 |
| FREEDOM OF INFORMATION ACT TRAINING | July 8, 1993 | USDA/Office of Advocacy and Enterprise (OAE),Wash. D.C. | 7 |
| OIG/OP INVESTIGATOR'S TRAINING (EMPLOYEE MISCONDUCTS) | March 8-11, 1993 | Office of Inspector General (OIG)<br>Office of Personnel, Annapolis, MD | 32 |
| EEO COUNSELOR'S TRAINING | Sept. 28-Oct. 2, 1992 | Casper, Wyoming | 40 |
| PROBLEM SOLVING AND DECISION MAKING (KEPNER-TREGOE) | August 11-14, 1992 | ASCS Training Branch<br>Washington, D.C. | 23 |
| FEDERAL WOMEN'S PROG. MANAGERS TRAINING | Sept. 24-26, 1991 | USDA/OAE, Williamsburg, VA | 30 |
| EQUAL EMPLOYMENT OPPORTUNITY COUNSELING | August 25-28, 1992 | OPM Washington, D.C. | 32 |
| ADVISORY COMMITTEE MEMBER | September 1996<br>January 1990 | Systems Service and Training<br>Washington, D.C. | 24 |
| EMPLOYEE RELATIONS | February 1979 | OPM, Washington, D.C. | 30 |

JOB-RELATED HONORS, AWARDS, MEMBERSHIPS ETC. SEDERIS FIELDS

| HONORS AND RECOGNITIONS | DATE |
|---|---|
| Performance Award (QSI) – DAFO | 2002 |
| Performance Awards (Cash) 2001 - DAFO | 2001 |
| Extra Effort Cash Award (Consent Decree)- DAFO | 2000 |
| Outstanding Performance Award (QSI) – EDSO – 1999 | 1999 |
| Outstanding Performance Award – Office of Civil Rights – 1998, 1997 & 1996 | 1998, 1997 & 1996 |
| Special Act Cash Award – Office of Civil Rights – 1998 | 1998 |
| Certificate of Merit and Cash Award – Office of Civil Rights -- 1994, 1992 | 1994 & 1992 |
| Certificate of Merit and Cash Award -- Southeast Area (DASCO) – 2/89 | 2/89 |
| Certificate of Appreciate and Cash Award (Suggestion Adoption) -- Administrator | 01/89 |
| Certificate of Merit and Cash Award –Tobacco and Peanuts Division -- 06/85 | 06/85 |
| Certificate of Appreciate from the Administrator (for individual sacrifice and professional dedication in meeting various demands and constraints of a court ordered Consent Decree progress.) | September 2000 |
| Achievement Award (Federal Women's Program Manager) | July 1998 |
| Certificate of Appreciate from the Secretary of Agriculture (Contribution to Federal Women's Program Manager's (FWPM) Council) | September 1997 |
| Certificate of Appreciate, from the Administrator, FSA (Contribution for implementation of FSA/FAS Mentoring Program) | December 10, 1996 |
| Certificate and letter from the Secretary of Agriculture for Volunteer Work at Van Ness Elementary School | March 22, 1996 |
| Certificate of Appreciation (Contribution in planning the 1996 Women's History Month Activities) | March 4, 1996 |
| Certificate of Appreciation (Outstanding contribution to FWPM Council) | September 1995 March 1995 |
| Certificate of Appreciation (Contribution to the Team USDA Center of Excellence in San Juan Puerto Rico) | September 1995 |
| Certificate of Appreciation (Coordination of the first interagency Career Development Seminar for Women) | June 23, 1995 |
| Certificate of Appreciation (Plan and coordinated USDA FWPM Job Fair) | October 4, 1994 |
| Certificate of Appreciation For excellent contributions to the Department's Hispanic Emphasis Program. | September 15, 1994 |
| Certificate of Appreciation Campaign Federal Campaign (CFC), Team Captain for Administrator's Staff | December 1993 |
| Letters of Appreciation from Office of Civil Rights Enforcement (OCRE) (for leadership in Special Emphasis Programs) | June 1, 1994 February 7, 1994 November 24, 1993 June 25, 1993 |
| Certificate of Appreciation from Administrator (for leadership in 1992 Special Emphasis Programs) | March 1992 |
| Achievement Award Women's Action Taskforce (WAT) | August 26, 1992, Aug. 1993 August 1995, Sept. 1996 |
| Certificate of Appreciation CFC Keyworker | November 1992 |
| Certificate of Appreciation, Saving Bond Campaign | July 1991 |
| Certificate of Appreciation, Volunteer Work at Largo High School | May 1991 |

| MEMBERSHIPS IN PROFESSIONAL ORGANIZATIONS -SEDERIS FIELDS | |
|---|---|
| *Federal Woman Program Manager's Council (FWPM)*<br>*Chaired, Information Resource Committee*<br>*Chaired, Affirmative Employment Committee* | *1992 to 1998* |
| *DA Child Care Foundation (Vice Chairperson)* | *1995 to Present* |
| *Women's Action Taskforce (WAT), USDA – (Vice President)* | *1987 to present* |
| *Federally Employed Women (FEW), Inc.* | *Lifetime Member* |
| *FSA Civil Rights Advisory Council (Ex-officio member)* | *1990 to 1998* |
| *Toastmaster (Speech Club)* | *1983 - 1999* |
| *The Forum on Blacks in Agriculture, USDA* | *1992 - 1998* |
| *Missionary Work in Ghana. Africa (December 15-29, 2002)* | *12/15-29/02* |
| *Citizen Advisory Committee for Prince Georges County, MD* | *2002-Present* |
| *Hispanic American Culture Effort (HACE)* | *1992- 1998* |
| PUBLIC SPEAKING | |
| *Represented the Agency at 92nd Annual NAACP Convention, New Orleans, LA*<br>*Represented the Agency at 93rd Annual NAACP Convention, Houston, TX* | *July 9-12, 2001*<br>*July 2002* |
| *Made Presentation at Small Farms Week regarding FSA programs, NC A&T University*<br>*Represented the Agency - Women in Agriculture Symposium, Small Farms Week, N.C.* | *March 27, 2001*<br>*March 2002* |
| *Presentation regarding Civil Rights and EEO laws and regulations (substituted for Director*<br>*of Civil Rights). Addressed CRAT recommendations concerning recruitment.* | *June 23, 1998* |
| *Conducted a Workshop on Sexual Harassment in the Workplace - Appleton, Wisconsin* | *March 22, 1995* |
| *Several presentations on Affirmative Action* | *January 1997*<br>*October 1996*<br>*March 1996* |
| *Presented scholarships at USDA Women's Equality Day Awards Program (Chair*<br>*Scholarship Subcommittee)* | *August 26, 1995*<br>*August 26, 1994* |
| *Made closing remarks at USDA Women's Equality Day Awards Program (the Secretary of*<br>*Agriculture guest speaker)* | *August 26, 1993* |
| *Presentation at Awards Program for Person with Disabilities in Agriculture (APDA) on*<br>*behalf of Women Action Taskforce.* | *October 26, 1992* |
| *USDA/ASCS Women's History Month Program - Gave Invocation* | *March 25, 1992* |

Standard Form 50-B
Rev 7/91
U.S. Office of Personnel Management
FPM Supp 296-33, Subch. 4

Exception to SF 50-I
approved by GSA/IRMS 2-8

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| FIELDS, SEDERIS W | | 03/11/55 | 01/12/03 |

| ST ACTION | | SECOND ACTION | |
|---|---|---|---|
| de | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| F | PAY ADJ | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| QWM | REG 531.205 | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| ZLM | E O  13282 | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | PROG COORD SPECLST |
| | 00031208   030170 |

| 8 Pay Plan | 7 Occ Code | 10.Grade/Level | 11.Step/Rate | 12. Total Salary | 13 Pay Basis | 16 Pay Plan | 17 Occ Code | 18.Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21 Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 79,473.00 | PA | GS | 0301 | 13 | 07 | 81,941.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 71,289.00 | 8,184.00 | 79,473.00 | .00 | 73,503.00 | 8,438.00 | 81,941.00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | FARM SERVICE AGENCY |
| | DEP ADM FOR FIELD OPERS |
| | FIELD OPERS STAFF |
| | |
| | AG FA0502000000000000    PP 01 2003 |

### EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 1 | 1—None    3—10 Point/Disability    5—10 Point/Other    2—5 Point    4—10 Point/Compensable    6—10 Point/Compensable/30% | 1 | 0—None    2—Conditional    1—Permanent    3—Indefinite | YES  [X] NO |

| REGI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| BASIC-STANDARD-1X FAMILY | 9    NOT APPLICABLE | 0 |

| rement Plan | 31 Service Comp Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| CS | 01/02/78 | F    FULL TIME | |

### TION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1    1—Competitive Service    3—SES General    2—Excepted Service    4—SES Career Reserved | E    E—Exempt    N—Nonexempt | | 0395 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON    DIST OF COLUMBIA    DC |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

EDERAL PAY INCREASE DUE TO E.O. 13282 SIGNED 12/31/02.
ALARY INCLUDES A GENERAL INCREASE OF 3.1% ROUNDED AND A LOCALITY
AYMENT (OR OTHER GEOGRAPHIC ADJUSTMENT) APPLICABLE IN THIS AREA.

| mploying Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| RTMENT OF AGRICULTURE | *Florea M. Beecher* |
| cy Code    48. Personnel Office ID    49. Approval Date | DONNA D. BEECHER |
| AG FA    4881    12/31/02 | DIRECTOR, OF HUMAN RESOURCES MGMT |

TURN OVER FOR IMPORTANT INFORMATION
3-Part    50-315

Editions Prior to 7/91 Are Not Usable After 6/30/9
NSN 7540-01-333-623

1 – Employee Copy – Keep for Future Reference

1660

REPRODUCE LOCALLY. *Include form number and date on all reproductions.*

| AD-2000<br>(09-27-00) | United States Department of Agriculture |
| --- | --- |

## Performance Plan Agreement and Appraisal

*Privacy Act Notice: Submission of information is mandatory.  Failure to provide information will prohibit data collection required by the Office of Personnel Management.*

| 1.  EMPLOYEE'S NAME<br>FIELDS, SEDERIS | 2.  RATING PERIOD<br>FROM: 10/01/01          TO:   09/30, 02 |
| --- | --- |

| 3.  TITLE/SERIES/GRADE<br>PROG COOR SPECIALIST GS-0301-13 | 4.  AGENCY/DIVISION<br>FSA/EDSO | 5.  SOCIAL SECURITY NUMBER |
| --- | --- | --- |

## PART I - PERFORMANCE PLAN

6.  CRITICAL RESULTS *(Check (✓) a minimum of 2/ maximum of 5 applicable elements.)*

Note:   The narrative statements describe the "Results Achieved" level of performance. Where applicable, quantity, quality, and timeliness are derived directly from appropriate agency regulations, policies, instructions, work plans or other guidelines. If no guidelines exist, further clarification will be provided by the rating official. These elements are to be used by employees and supervisors to develop performance plans. They may be used as is, with further clarification, or up to three new elements may be developed, as appropriate. All employees must have at least one job specific element (see two-level performance appraisal system policy part 10 A (2) (e) (v)).

| Elements | Results Achieved | Results Not Achieved |
| --- | --- | --- |
| [X]   **Element #1**  Execution of Duties:  Completed work assignments are performed in a timely manner, assuring a quality of work that meets the needs of the organization.  Appropriate work methods are selected for the development of work products. Work products do not require substantive revisions.  Assignments are completed in accordance with applicable agency guidelines, including timeframes. **Further clarification, as needed:** | ✓ | |
| [X]   **Element #2**  Communications:  Oral and written communications are clear, correct, timely, and presented in an understandable manner. Supervisor and coworkers are informed of issues and problems when necessary. Information and guidance provided is timely and correct.  **Further clarification, as needed:** | ✓ | |
| [ ]   **Element #3**  Supervision:  Work is assigned in a fair and effective manner. Technical guidance to subordinate staff is given in a timely manner. Performance management is implemented in accordance with procedure. Issues, concerns, or problems are handled promptly and fairly. To the extent possible, staff is properly trained and complies with occupational health and safety programs. Management decisions are supported and implemented within appropriate time-frames. **Further clarification, as needed:** | ✓ | |
| [ ]   **Element #4 -** Team Leadership:  Routinely leads individuals and team members toward specific goals and accomplishments.  Provides encouragement, guidance, and direction as needed. Adjusts style to fit situation. Delegates appropriate authority in an effective manner. Coordinates functions of the team members. Demonstrates a sincere interest in employees' activities, abilities, etc. **Further clarification, as needed:** | ✓ | |

Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, ... al or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) -720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD).  USDA is an equal opportunity provider and employer.

167

AD-2000 (09-27-00)

Page 2 of 4 4

| | Elements | Results Achieved | Results Not Achieved |
|---|---|---|---|
| ☐ | **Element #5  Program Management:**  Manages program(s), resolving issues and problems within the employee's control.  Monitors all aspects of program(s) for quality, effectiveness, and consistency. Program plans and guidance are responsive to objectives and requirements of the Agency.  Policy instructions are appropriately issued and are accurate. Evaluates effectiveness of work and adjusts plans accordingly.  **Further clarification, as needed:** | ✓ | |
| ☒ | **Element #6  Special Projects:**   Special projects are regularly completed on time in a competent, accurate, and thorough manner. Completed projects comply with regulations and procedures. Special projects are completed independently, or reflect research and collaboration with others as required.  **Further clarification, as needed:** | ✓ | |
| ☐ | **Element #7  Research and Analysis:**  Thoroughly and accurately researches issues in a timely manner, using available reference sources (e.g., USDA manuals, or applicable law or regulations. Makes reasonable recommendations or decisions based on available guidance.  **Further clarification, as needed:** | ✓ | |
| ☒ | **Element #8  Customer Service:**  Routinely displays courteous and tactful behavior. Projects a positive and professional image of USDA.  Provides advice that is timely, responsive and accurate. Maintains appropriate rapport with internal and external customers. Develops and establishes working relationships with external organizations as required. Keeps supervisor and/or team leader informed of difficult and/or controversial issues and unique problems. Takes action to effectively solve problems before they have an adverse impact on the organization or other employees.  **Further clarification as needed:** | ✓ | |
| ☐ | **Element #9  Equal Opportunity & Civil Rights:** (Mandatory for all supervisors and managers).  Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of working to employ and develop a diverse, yet unified workforce.  **Further clarification, as needed.** | ✓ | |
| ☒ | **Element #10  Equal Opportunity & Civil Rights:** (Mandatory for all non-supervisory employees).  Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of valuing a diverse, yet unified workforce.  **Further clarification, as needed:** | ✓ | |
| ☐ | **Element #11  Resource Management:**  Monitors allocated funds and maintains complete and accurate records of expenditures. Routinely utilizes resources in an efficient and effective manner. Ensures that funds, property and other resources are guarded against waste, loss, unauthorized use, and misappropriation.  **Further clarification, as needed:** | ✓ | |

AD-2000 (09-27-00)                                                                    Page 3 of 4 4

| Elements | Results Achieved | Results Not Achieved |
|---|---|---|
| ☐ **Element #12  Individual Contributions to the Team:** Ordinarily displays dependability and reliability. Promotes open communication. Contributes creative ideas and actively participates in team meetings resulting in added value to the team's products and services. When problems arise, explores causes and assists in resolving them. Works with team members to appropriately implement decisions. Is usually open-minded to new ideas and approaches in implementing the team's goals. Willing accepts and acts on constructive criticism. **Further clarification, as needed:** | ✓ | |
| ☐ Element #13 - | | |
| ☐ Element #14 - | | |
| ☐ Element #15 - | | |

**PART II - PROGRESS REVIEWS**

Regular and open communication between supervisors and employees is vitally important in any performance management system, and particularly in a two-tier system where all elements rated are critical elements. Progress reviews should be held quarterly, but no less than semi-annually, and such reviews will br documented in writing.    Date of reviews, initials of employee and rating official and comments must be provided for each review. *(Provide any additional nments as an attachment).*

### DISCUSSION TOPICS FOR USE IN PLANNING PERFORMANCE AND CONDUCTING PROGRESS REVIEWS

• Employee's performance on primary responsibilities/priorities in the past year.

 ► revise performance work plan for the coming year, as necessary

 ► relationship to overall work unit objectives

• Employee's strengths and areas for growth

• Barriers to effective work performance and job satisfaction

• Employee's development *(over the past year; future needs for current job; long-term career goals and developmental needs to achieve them)*

• Possible work process improvements

• Whether employee continues to grow to meet future needs and demands of the changing environment

• Employee's feedback/constructive suggestions for supervisor

  nything else the employee or supervisor would like to address

# Exhibit No. 14

| Name | Title | Start Date | End Date | Hours | Address 1 | State |
|---|---|---|---|---|---|---|
| Fields, Sederis W | Disability Employment Awarenes | 3/15/2005 | 3/15/2005 | 0 | NAACP | MD |
| Fields, Sederis W | NAACP Conference | 7/10/2004 | 7/15/2004 | 40 | AMERICAN UNIVERSITY, OFFICE OF SPEC. EDC | DC |
| Fields, Sederis W | Current Issues Facing Fed. Employment Progra | 11/14/2003 | 11/14/2003 | 8 | NAACP | MD |
| Fields, Sederis W | NAACP 94th Annual Convention | 7/14/2003 | 7/17/2003 | 32 | NAACP | MD |
| Fields, Sederis W | Federal Communication Skills | 6/16/2003 | 6/16/2003 | 8 | 6172 OXON HILL ROAD | MD |
| Fields, Sederis W | 2002 Annual Computer Security | 5/30/2003 | 5/30/2003 | 0 | | |
| Fields, Sederis W | Ability to Communicate in Writing | 5/27/2003 | 5/27/2003 | 8 | 600 MARYLAND AVENUE, SW | DC |
| Fields, Sederis W | Federal Dispute Resolution Training | 8/20/2002 | 8/23/2002 | 32 | FEDERAL DISPUTE RESOLUTION CONFEREN | DC |
| Fields, Sederis W | NAACP Training Conference | 7/8/2002 | 7/11/2002 | 32 | NAACP | MD |
| Fields, Sederis W | EEOC Technical Assistance Program Seminar | 8/28/2001 | 8/31/2001 | 32 | 21 SOUTH 5TH STREET, 4TH FLOOR | PA |
| Fields, Sederis W | Advance Mediation | 8/7/2001 | 8/9/2001 | 27 | 976 EDGEWOOD AVENUE, NE | GA |
| Fields, Sederis W | THE FEDERAL DISPUTE RESOLUTION TRAIN | 8/20/2000 | 8/24/2000 | 32 | 1100 CONNECTICUT AVENUE,NW, STE 900 | DC |
| Fields, Sederis W | PREVENTION OF SEXUAL HARASSMENT | 3/16/2000 | 3/16/2000 | 1 | 1400 INDEPENDENCE AVE, SW STOP 0574 | DC |
| Fields, Sederis W | FEDERAL WORKPLACE MEDIATION | 1/29/2000 | 5/18/2000 | 52 | Georgia Mason University, Fairfax, VA | VA |
| Fields, Sederis W | Examining Conflicts in Employment Laws | 8/31/1999 | 9/3/1999 | 32 | 21 SOUTH FIFTH STREET, STE. 400 | PA |
| Fields, Sederis W | FEDERAL DISPUTE RESOLUTION SKILLS | 8/22/1999 | 8/26/1999 | 32 | 1100 CONNECTICUT AVENUE, SW | DC |
| Fields, Sederis W | AGRICULTURAL OUTLOOK FORUM 1999 | 2/22/1999 | 2/23/1999 | 16 | 600 MARYLAND AVE SW | DC |
| Fields, Sederis W | USDA/1890 TASK FORCE CONFNERENCE | 9/28/1998 | 9/30/1998 | 24 | P.O. BOX 4079          1 | TX |
| Fields, Sederis W | USDA/1890 TASK FORCE CONFERENCE | 5/18/1998 | 5/20/1998 | 24 | SUITE 201, HUME HALL | |
| Fields, Sederis W | GROUPWISE 5 DIFFERENCES | 4/14/1998 | 4/14/1998 | 3 | 1400 INDEPENDENCE AVE. | DC |
| Fields, Sederis W | WINDOWS 95 | 4/14/1998 | 4/14/1998 | 3 | 1400 INDEPENDENCE AVE. SW | DC |
| Fields, Sederis W | INTRODUCTION TO CIVIL RIGHTS | 1/22/1998 | 1/22/1998 | 4 | 1400 INDEPENDENCE AVENUE, SW | |
| Fields, Sederis W | 1997 FEDERAL EMPLOYED WOMEN'S (FEW) 2 | 7/7/1997 | 7/11/1997 | 40 | 1611 CONNECTICUT AVE., NW | |
| Fields, Sederis W | FEW DC METRO REGIONAL TRAINING PROGF | 3/13/1997 | 3/14/1997 | 16 | P.O. BOX 2363 | |
| Fields, Sederis W | ALTERNATIVE DISPUTE RESOLUTION: AN IN | 3/4/1997 | 3/5/1997 | 16 | 615 SOUTH XENON COURT | |
| Fields, Sederis W | EEO & CR MODULE 7:  SPECIAL EMPHASIS PF | 1/31/1997 | 1/31/1997 | 2 | P.O. BOX 2415, STOP 0574 | |
| Fields, Sederis W | EEO & CR MODULE 8:  EEO ADVISORY COMM | 1/31/1997 | 1/31/1997 | 2 | P.O. BOX 2415, STOP 0574 | |
| Fields, Sederis W | EEO & CR MODULE 3:  SEXUAL HARASSMENT | 1/30/1997 | 1/30/1997 | 5 | P.O. BOX 2415, STOP 0574 | |
| Fields, Sederis W | 1996 ANNUAL ETHICS TRAINING | 10/17/1996 | 10/17/1996 | 1 | 14TH & INDEPENDENCE AVENUE | |
| Fields, Sederis W | FEW 27TH NATIONAL TRAINING | 7/14/1996 | 7/19/1996 | 48 | 7152 SW 47TH STREET | |
| Fields, Sederis W | HIGH IMPACT PRESENTATIONS | 4/18/1996 | 4/19/1996 | 16 | 6000 EXECUTIVE BLVD., 6TH FLOOR | |
| Fields, Sederis W | MENTORING PROGRAM ORIENTATION (MENT | 4/16/1996 | 4/17/1996 | 4 | P.O. BOX 2415, STOP 0574 | |
| Fields, Sederis W | FEW DC METRO REGIONAL TRAINING PROGF | 3/7/1996 | 3/8/1996 | 16 | P.O. BOX 35 | |

2

| Name | Course | Date | Date | Number | Location |
|---|---|---|---|---|---|
| Fields,Sederis W | BASIC RESUME WRITING | 2/27/1996 | 2/27/1996 | 2 | P.O. BOX 2415, AG CODE 0574 |
| Fields,Sederis W | BUSINESS LAW, University of Maryland | 1/27/1996 | 3/14/1996 | 30 | UNIVERSITY BLVD. AT ALDELPHI RD. |
| Fields,Sederis W | 1995 ANNUAL ETHICS TRAINING | 12/7/1995 | 12/7/1995 | 1 | 14TH & INDEPENDENCE AVE., SW |
| Fields,Sederis W | FEDERALLY EMPLOYED WOMEN 25TH NATIO | 7/19/1995 | 7/21/1995 | 24 | P.O. BOX 45157 |
| Fields,Sederis W | LULAC NATIONAL CONVENTION | 6/25/1995 | 6/29/1995 | 40 | 221 NORTH KANSAS ST., STE. #221 |
| Fields,Sederis W | FEDERAL WOMEN'S PROGRAM MANAGERS T | 2/21/1995 | 2/24/1995 | 32 | 14TH & INDEPENDENCE AVE SW #40-W |
| Fields,Sederis W | HIV/AIDS EDUCATION TRAINING PROGRAM | 12/21/1994 | 12/21/1994 | 2 | P.O. BOX 2415 |
| Fields,Sederis W | TRAIN-THE-TRAINER WORKSHOP | 11/7/1994 | 11/9/1994 | 18 | 600 MARYLAND AVE., SW RM 106 |
| Fields,Sederis W | CAREER DEVELOPMENT SEMINAR FOR MID-L | 9/11/1994 | 9/16/1994 | 40 | 14TH & INDEPENDENCE AVE SW #1336 |
| Fields,Sederis W | INTRODUCTION TO LAN | 8/9/1994 | 8/9/1994 | 3 | P.O. BOX 2415 |
| Fields,Sederis W | INTRO TO WINDOWS AND LAN | 8/8/1994 | 8/9/1994 | 9 | P.O. BOX 2415 |
| Fields,Sederis W | 16TH ANNUAL NATIONAL TRAINING CONFERE | 8/1/1994 | 8/5/1994 | 40 | 1820 11TH STREET, NW |
| Fields,Sederis W | FEDERALLY EMPLOYED WOMEN 25TH NATIO | 7/18/1994 | 7/22/1994 | 46 | P.O. BOX 327 |
| Fields,Sederis W | LEAGUE OF UNITED NATIONAL LATIN AMERIC | 6/25/1994 | 6/30/1994 | 40 | 1600 DESERT INN RD., STE. 207A |
| Fields,Sederis W | COOPERATIVE EDUCATION, U. of MD | 4/23/1994 | 8/6/1994 | 60 | U. MD, UNIVERSITY BLVD. AT ADELPHI ROAD |
| Fields,Sederis W | BUSINESS LAW, University of Maryland | 3/21/1994 | 5/11/1994 | 30 | U. MD, UNIVERSITY BLVD. AT ALDEPHI ROAD |
| Fields,Sederis W | THE PREVENTION OF SEXUAL HARASSMENT | 3/9/1994 | 3/9/1994 | 3 | 14TH & INDEPENDENCE AVE., SW |
| Fields,Sederis W | TECHNICAL WRITING (ENGL 393) 4281, Unive | 10/28/1993 | 12/21/1993 | 30 | U. MD, UNIVERSITY BLVD. AT ADELPHI RD. |
| Fields,Sederis W | WORK PRODUCTIVITY, University of MD | 9/7/1993 | 10/27/1993 | 40 | U. MD, UNIV. BLVD. AT ADELPHI ROAD |
| Fields,Sederis W | PREVENTION OF SEXUAL HARASSMENT | 8/31/1993 | 8/31/1993 | 2 | P.O. BOX 2415 |
| Fields,Sederis W | FEDERALLY EMPLOYED WOMEN'S (FEW) 24T | 7/26/1993 | 7/31/1993 | 40 | 5130 E. CHARLESTON BLVD STE 5-68 |
| Fields,Sederis W | EEO ACCESS SYSTEM | 6/28/1993 | 6/28/1993 | 3 | 14TH & INDEPENDENCE AVE RM #1364 |
| Fields,Sederis W | COMPUTER SECURITY | 4/23/1993 | 4/23/1993 | 1 | P.O. BOX 2415, RM 4968-S |
| Fields,Sederis W | OIG/OP INVESTIGATOR TRAINING | 3/8/1993 | 3/11/1993 | 32 | 14TH & INDEPENDENCE AVE SW #18-W |
| Fields,Sederis W | BUSINESS ENGLISH, Howard University | 1/30/1993 | 5/15/1993 | 30 | Howard Univeristy, 2400 "6" STREET, NW |
| Fields,Sederis W | Business Principles & Management, | 1/30/1993 | 5/15/1993 | 30 | Howard University, 2400 "6" STREET, NW |
| Fields,Sederis W | SOCIOLOGY 101, PG Community College | 1/25/1993 | 5/17/1993 | 48 | PG Comm College, Largo, MD |
| Fields,Sederis W | CA - SUPERPROJECT VERSION 2.0 - CONCEP | 10/19/1992 | 10/23/1992 | 18 | 1331 PENNSYLVANIA AVE., NW #1301 |
| Fields,Sederis W | TIME MANAGEMENT SEMINAR | 10/1/1992 | 10/1/1992 | 4 | P.O. BOX 25727 |
| Fields,Sederis W | ANNUAL EEO COUNSELOR TRAINING | 9/28/1992 | 10/2/1992 | 40 | P.O. BOX 2415 |
| Fields,Sederis W | SPEECH 101, PG Community College | 9/14/1992 | 12/21/1992 | 45 | PG Comm. College, 301 LARGO ROAD |
| Fields,Sederis W | ENGLISH 101, PG Community College | 9/9/1992 | 12/16/1992 | 30 | PG Comm. College, 301 LARGO ROAD |
| Fields,Sederis W | BASIC EEO COUNSELING | 8/25/1992 | 8/25/1992 | 32 | P.O. BOX 7230 |
| Fields,Sederis W | KEPNER-TREGOE: PROBLEM SOLVING AND I | 8/11/1992 | 8/14/1992 | 23 | P.O. BOX 2415, RM 4968-S |

3

| | | Beginning | Ending | | |
|---|---|---|---|---|---|
| Fields,Sederis W | FEW TRAINING/CONFERENCE | 7/20/1992 | 7/24/1992 | 40 | P.O. BOX 62142 |
| Fields,Sederis W | RECORDS MANAGEMENT | 4/15/1992 | 4/15/1992 | 2 | P.O. BOX 2415, RM 4968-S |
| Fields,Sederis W | LOTUS 1-2-3 CONCEPTS AND BASIC USES (RI | 5/15/1991 | 5/15/1991 | 6 | 1313 PENNSYLVANIA AVE, NW, #1301 |
| Fields,Sederis W | ADVANCED WORDPERFECT 5.1 | 5/6/1991 | 5/8/1991 | 14 | 1331 PENNSYLVANIA AVE, NW, #1301 |
| Fields,Sederis W | TEAM BUILDING | 4/10/1991 | 4/12/1991 | 20 | 3315 13 SIR THOMAS DRIVE |
| Fields,Sederis W | PROFESSIONAL DEVELOPMENT FOR SECRE | 3/5/1991 | 3/7/1991 | 24 | 6308 CROSSWOODS CIRCLE |
| Fields,Sederis W | INTRODUCTION TO WORDPERFECT 5.1 | 12/11/1990 | 12/14/1990 | 14 | P.O. BOX 2415 |
| Fields,Sederis W | PROOFREADING, EDITING & WRITING SKILLS | 12/6/1990 | 12/6/1990 | 8 | 6901 W 63RD ST, P.O. BOX 2949 |
| Fields,Sederis W | INTRODUCTION TO MS-DOS | 12/5/1990 | 12/5/1990 | 6 | 105 W BROAD ST, STE 400 |
| Fields,Sederis W | PROFESSIONAL PROOFREADING, EDITING & | 7/20/1990 | 7/20/1990 | 8 | 6901 WEST 63RD ST., PO BOX 2949 |
| Fields,Sederis W | ADMINISTRATIVE CONTACT TRAINING | 6/7/1990 | 6/8/1990 | 16 | P.O. BOX 2415 |
| Fields,Sederis W | EFFECTIVE REPORTS, PROPOSALS AND MEM | 3/5/1990 | 3/6/1990 | 16 | 303 WYMAN STREET |
| Fields,Sederis W | EEO ADVISORY COMMITTEE MEMBER TRAINI | 1/31/1990 | 2/2/1990 | 24 | P.O. BOX 9543 |
| Fields,Sederis W | VOICE AND DICTION | 6/2/1989 | 6/28/1989 | 36 | 600 MARYLAND AVENUE, SW RM. 106 |
| Fields,Sederis W | HOW TO COMMUNICATE WITH POWER AND C | 11/4/1988 | 11/4/1988 | 8 | 6901 W. 63RD ST., P.O. BOX 2949 |
| Fields,Sederis W | ALL-IN-1 CLERICAL | 5/19/1986 | 5/20/1986 | 16 | 8301 PROFESSIONAL PLACE |

Name of Colleges Attended:
University of Maryland
Howard University
P.G. Community College
George Mason University
American University
ADR (Mediation), 226



# UNIVERSITY OF MARYLAND UNIVERSITY COLLEGE
### UNDERGRADUATE ENROLLMENT SERVICES

14 September 1993

Ms. Sederis W. Fields
9308 Locksley Rd
Ft Washington, MD    20744

Dear Ms. Fields:

We are pleased to notify you of your admission to University of Maryland University College as an undergraduate student.

You have been classified as an in-state resident for tuition purposes.  Your admission is in effect for one full year (12 months).  If you do not register with University College within this time, your admission status will be terminated and a new application fee will be required for subsequent semesters.  Your name will automatically be added to the list of those who receive the current Undergraduate Schedule of Classes.

If you submitted a registration with your admission application, you will receive your student identification card with your registration confirmation.  Otherwise, your card is enclosed.  This card, required for library services, also permits you to register in future semesters; it must be validated each semester when you register.  For your convenience and to be assured of your preferred course(s), we recommend that you register by mail or phone.

You are required to have all of your official transcripts sent to us directly from the issuing institution during your first semester of attendance at University College.  After all of your transcripts have arrived you may call 301-985-7248 for verification.

University College undergraduate advisors are available to help you in planning your academic program.  You should meet with an advisor within your first semester at University College.  Please call 301-985-7288 for information on advising hours.

For over 45 years, University College has been providing programs and services especially designed for adult, part-time students.  You are joining over 14,000 other students who enroll in programs each semester at more than 30 locations throughout the State.  We welcome you and look forward to serving you in the future.

Sincerely,

*Gary Thornhill*

Gary A. Thornhill
Director
Undergraduate Enrollment Services

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

# Certificate

*in*

# Federal Workplace Mediation

*Awarded this 22nd Day of May, 2000 to*

## Severis W. Fields

*upon the completion of the course of training and the
requirements established by the Board of Directors and the Education
Committee of the Northern Virginia Mediation Service
at the Institute for Conflict Analysis & Resolution,
George Mason University,
Fairfax, Virginia.*

*Robert W. Scott*

Robert W. Scott, J.D., M.S., Executive Director





*Justice Center of Atlanta, Inc.*

*Sederis Fields*

has completed 20 hours of training in
ADVANCED MEDIATION AND CONFLICT MANAGEMENT SKILLS
conducted by the JUSTICE CENTER OF ATLANTA, INC.

Thomas G. Prince
Director of Training

August 9, 2001

Randall F. Dobbs
Executive Director

# Northern Virginia Mediation Service

## *CERTIFICATE OF COMPLETION*

This Certifies That

*Sederis Fields*

Successfully Completed 20 Hours of Training in
*Professional Mediation Skills and Process*
Conducted by Ervin Mast and Susan Shearouse
February 3-5, 2000
for the Northern Virginia Mediation Service of
Fairfax, Virginia

Ervin Mast

Susan Shearouse

# Certificate of Attendance

**U.S. Department of Agriculture**
**Conflict Prevention and Resolution Center**
**National Mediator Training Conference**

This is to certify that

## Sederis Fields

has successfully completed the selected workshops and seminars provided at the Second USDA National Mediator Training Conference



Jeffrey A. Knishkowy, Director

September 11-13, 2001

Date



Rushford & Associates
Denver, Colorado

# Certificate of Training

This is to certify that

*Sederis Fields*

has satisfactorily completed 16 hours of training in

*Alternative Dispute Resolution*

_____
Instructor

_____
Coordinator

**_Denver, Colorado_**
Location

**_March 4-5, 1997_**
Date



# Certificate of Attendance

This is to certify that the below signed attendee has successfully attended and completed the selected workshops and seminars provided at the Fifteenth Annual Federal Dispute Resolution Conference

## Federal Dispute Resolution Conference XV

August 20 - 24, 2000
Anaheim, California

*Sedric Sielly*
Signature of FDR XV Attendee

*A. Jerry Shaw*
G. Jerry Shaw, Chairman

Date: *August 24, 2000*

Participating Agencies:

• EEOC • FLRA • FMCS • GAO • HHS • MSPB • NASA • NAVY • OPM • OSC • USDA • USPS • VA • ATF • CUSTOMS • Smithsonian Institution • National Endowment for the Arts • International Broadcasting Bureau •

FDR Conference, Inc. ✧ 1100 Connecticut Avenue, NW, Suite 900 ✧ Washington, DC 20036



# Rushford & Associates
## Denver, Colorado

## Certificate of Training

This is to certify that

**Sederis   Fields**

has satisfactorily completed 16 hours of training in

**Role of the Special Emphasis Program Manager**

_Carroll A. Rushford_
**Instructor**

_____
**Coordinator**

<u>Las Vegas, Nevada</u>
**Location**

<u>July 26-27, 1993</u>
**Date**



# United States
## Department of Agriculture

# Certificate of Training

This is to certify that

## SEDERIS FIELDS

has satisfactorily completed

*The USDA Federal Women's Program Management Council Training and Planning Conference*

*September 24-26, 1991*



*Jo Ann C. Jenkins, Director*
*Office of Advocacy and Enterprise*

Date

United States
Department of Agriculture

# Certificate of Appreciation

Awarded to

## *Sederis Fields*

**For your valuable support and willingness in serving as a Chairperson for the Federal Women's Program Manager's Council.**

Secretary of Agriculture



FEDERAL WOMEN'S PROGRAM

Date  :  September 1997

# United States
## Department of Agriculture

# Certificate of Appreciation

### Awarded to

## Sederis Fields

### Farm Service Agency

*In recognition of your noteworthy contribution in the implementation of the first FSA, FAS, and RMA National Office Mentoring Program and your services related to the activites on the Program Committee. Congratulations, and best wishes in your future endeavors!*

Grant Buntrock

_____
Grant Buntrock, Administrator

Date    December 10, 1996

United States
Department of Agriculture

# Certificate of Appreciation

Awarded to

## SEDERIS FIELDS

In recognition of your noteworthy coordination of the first interagency
1995 Career Development Seminar for
Senior and Mid-Level Women in Annapolis, Maryland.
June 18-23, 1995

*Grant Buntrock*

Grant Buntrock, Acting Administrator
Consolidated Farm Service Agency

Date   JUNE 23, 1995

# Exhibit No. 15

**Operating Manual**

# Qualification Standards for General Schedule Positions

## Group Coverage Qualifications Standards for

# Administrative and Management Positions

*The text below is extracted verbatim from Section IV-A (pp.13-17) of the **Operating Manual for Qualification Standards for General Schedule Positions** [MANUAL], but contains minor edits to conform to web-page requirements.*

This qualification standard covers positions in the General Schedule that involve the performance of two-grade interval administrative and management work. It contains common patterns of creditable experience and education to be used in making qualifications determinations. Related individual occupational requirements are contained in Section IV-B of the [MANUAL]. Section V of the same manual identifies the occupations that have test requirements. This same information is available through the index of this Web page.

A list of the occupational series covered by this standard is provided below.

This standard may also be used for two-grade interval positions other than those listed if the education and experience pattern is determined to be appropriate.

## EDUCATION AND EXPERIENCE REQUIREMENTS

The following table shows the amounts of education and/or experience required to qualify for positions covered by this standard.

| GRADE | EDUCATION | EXPERIENCE | |
|---|---|---|---|
| | | GENERAL | SPECIALIZED |
| GS-5 | 4-year course of study leading to a bachelor's degree | 3 years, 1 year of which was equivalent to at least GS-4 | None |
| GS-7 | 1 full year of graduate level education<br>*or*<br>superior academic achievement | None | 1 year equivalent to at least GS-5 |
| GS-9 | master's or equivalent graduate degree<br>*or*<br>2 full years of progressively higher level graduate education leading to such a degree<br>*or*<br>LL.B. or J.D., if related | None | 1 year equivalent to at least GS-7 |
| GS-11 | Ph.D. or equivalent doctoral degree<br>*or*<br>3 full years of progressively higher level graduate education leading to such a degree<br>*or*<br>LL.M., if related | None | 1 year equivalent to at least GS-9 |
| GS-12 and above | None | None | 1 year equivalent to at least next lower grade level |

Equivalent combinations of education and experience are qualifying for all grade levels for which both education and experience are acceptable.



Some of the occupational series covered by this standard include both one- and two-grade interval work. The qualification requirements described in this standard apply only to those positions that typically follow a two-grade interval pattern. While the levels of experience shown for most positions covered by this standard follow the grade level progression pattern outlined in the table, users of the standard should refer to **E.3.*(p)*** in the "General Policies and Instructions" (Section II of the [MANUAL]) for guidance on crediting experience for positions with different lines of progression.

*Undergraduate Education:* Successful completion of a full 4-year course of study in *any field* leading to a bachelor's degree, in an accredited college or university, meets the GS-5 level requirements for many positions covered by this standard. Others have individual occupational requirements in Section IV-B that specify that applicants must, in general, (1) have specific course work that meets the requirements for a major in a *particular field(s)*, or (2) have at least 24 semester hours of course work in the field(s) identified. Course work in fields closely related to those specified may be accepted if it clearly provides applicants with the background of knowledge and skills necessary for successful job performance. One year of full-time undergraduate study is defined as 30 semester hours or 45 quarter hours.

*Superior Academic Achievement:* The superior academic achievement provision is applicable to all occupations covered by this standard. See the "General Policies and Instructions" for specific guidance on applying the superior academic achievement provision.

*Graduate Education:* Education at the graduate level in an accredited college or university in the amounts shown in the table meets the requirements for positions at GS-7 through GS-11. Such education must demonstrate the knowledge, skills, and abilities necessary to do the work.

One year of full-time graduate education is considered to be the number of credit hours that the school attended has determined to represent 1 year of full-time study. If that information cannot be obtained from the school, 18 semester hours should be considered as satisfying the 1 year of full-time study requirement.

Part-time graduate education is creditable in accordance with its relationship to a year of full-time study at the school attended.

For certain positions covered by this standard, the work may be recognized as sufficiently technical or specialized that graduate study alone may not provide the knowledge and skills needed to perform the work. In such cases, agencies may use selective factors to screen out applicants without actual work experience.

*General Experience:* For positions for which individual occupational requirements do not specify otherwise, general experience is 3 years of progressively responsible experience, 1 year of which was equivalent to at least GS-4, that demonstrates the ability to:

1. Analyze problems to identify significant factors, gather pertinent data, and recognize solutions;
2. Plan and organize work; and
3. Communicate effectively orally and in writing.

Such experience may have been gained in administrative, professional, technical, investigative, or other responsible work. Experience in substantive and relevant secretarial, clerical, or other responsible work may be qualifying as long as it provided evidence of the knowledge, skills, and abilities (KSA's) necessary to perform the duties of the position to be filled. Experience of a general clerical nature (typing, filing, routine procedural processing, maintaining records, or other nonspecialized tasks) is not creditable. Trades or crafts experience appropriate to the position to be filled may be creditable for some positions.

For some occupations or positions, applicants must have had work experience that demonstrated KSA's in addition to those identified above. Positions with more specific general experience requirements than those described here are shown in the appropriate individual occupational requirements.

*Specialized Experience:* Experience that equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position, and that is typically in or related to the work of the position to be filled. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization. Applicants who have the 1 year of appropriate specialized experience, as indicated in the table, are not required by this standard to have general experience, education above the high school level, or any additional specialized experience to meet the minimum qualification requirements.

*Combining Education and Experience:* Combinations of successfully completed post-high school education and experience may be used to meet total qualification requirements for the grade levels specified in the table, and may be computed by first determining the applicant's total qualifying experience as a percentage of the experience required for the grade level; then determining the applicant's education as a percentage of the education required for the grade level; and then adding the two percentages. The total percentages must equal at least 100 percent to qualify an applicant for that grade level. Only graduate education in excess of the amount required for the next lower grade level may be used to qualify applicants for positions at grades GS-9 and GS-11. (When crediting education that requires specific course work, prorate the number of hours of related courses required as a proportion of the total education to be used.)

The following are examples of how education and experience may be combined. They are examples only, and are not all-inclusive.

- The position to be filled is a Quality Assurance Specialist, GS-1910-5. An applicant has 2 years of general experience and 45 semester hours of college that included 9 semester hours in related course work as described in the individual occupational requirements in Section IV-B. The applicant meets 67 percent of the required experience and 38 percent of the required education. Therefore, the applicant exceeds 100 percent of the total requirement and is qualified for the position.
- The position to be filled is a Management Analyst, GS-343-9. An applicant has 6 months of specialized experience equivalent to GS-7 and 1 year of graduate level education. The applicant meets 50 percent of the required experience but none of the required education, since he or she does not have any graduate study beyond that which is required for GS-7. Therefore, the applicant meets only 50 percent of the total requirement and is not qualified for the position. (The applicant's first year of graduate study is not qualifying for GS-9.)
- The position to be filled is a Music Specialist, GS-1051-11. An applicant has 9 months of specialized experience equivalent to GS-9 and 2 1/2 years of creditable graduate level education in music. The applicant meets 75 percent of the required experience and 50 percent of the required education, i.e., the applicant has 1/2 year of graduate study beyond that required for GS-9. Therefore, the applicant exceeds the total requirement and is qualified for the position. (The applicant's first 2 years of graduate study are not qualifying for GS-11.)

## USING SELECTIVE FACTORS FOR POSITIONS COVERED BY THIS STANDARD

Selective factors must represent knowledge, skills, or abilities that are essential for successful job performance and cannot reasonably be acquired on the job during the period of orientation/training customary for the position being filled. For example, while the individual occupational requirements for Recreation Specialist provide for applicants to meet minimum qualifications on the basis of education or experience in any one of a number of recreational fields, a requirement for knowledge of therapeutic recreation may be needed to perform the duties of a position providing recreation services to persons with physical disabilities. If that is the case, such knowledge could be justified as a selective factor in filling the position.

## OCCUPATIONAL COVERAGE

A list of the occupational series covered by this qualification standard is provided below. The occupational series marked with an asterisk have individual occupational requirements in Section IV-B of the **Operating Manual for Qualification Standards for General Schedule Positions**. Refer to the Index for links.

GS-301 Miscellaneous Administration and Program
GS-1145 Agricultural Program Specialist*
GS-1146 Agricultural Marketing*
GS-1147 Agricultural Market Reporting
GS-1150 Industrial Specialist*

# Exhibit No. 16

# Exhibit No. 17

**Exhibit No. 18**

EXHIBIT NO. 1

FINAL INTERVIEW SCHEDULE
3092-S

WEDNESDAY, JULY 16

11:00 --     Unknown
11:15 --     Applicant F
11:30 --     Selectee #1
11:45 --     Applicant H

THURSDAY, JULY 17

1:00 --     Selectee #2
1:15 --     Applicant L
1:30 --     Applicant G

MONDAY, JULY 21

1:00 --     Complainant

4/15

**Exhibit No. 19**





# Exhibit No. 20

EXHIBIT NO. 3

3 12-07 BH

**U.S. DEPARTMENT OF AGRICULTURE**
**FARM SERVICE AGENCY**

**Merit Promotion Competitive Certificate**
**Vacancy Identification Number UFI68394CT**
**ISSUE DATE: April 28, 2003**

| | |
|---|---|
| **Position Title** | Administrative Management Specialist  (Two Positions) |
| **Series and Grade:** | GS-301-14 |
| **Organization:** | FSA, Deputy Administrator for Field Operations |
| | Field Operations Staff |
| **Location:** | Washington, DC |

The Selecting Official will review the promotion certificate and make a selection in accordance with the Merit Promotion Plan, utilizing interview procedures described in PM Notice 2334. The candidates listed below were evaluated under Merit Promotion Program procedures and were found to be the best qualified for this position. Every precaution should be taken to observe and maintain the strict confidential nature of these documents.  Please indicate the action taken for each name by marking "S" for selected or "D" for Declined or "NS" for not selected and return the certificate to the Human Resources Division by July 27, 2003.

The candidates' applications (OF-612, Resume, etc.), performance appraisals, awards and any other relevant information are attached for your review and consideration.  **If one candidate on this certificate is interviewed, then all candidates must be interviewed.**

| Name | Interviewed (Yes-No) | Action (S-D-NS) | |
|---|---|---|---|
| | Y | NS | R, Amer. Indian |
| Withdrew | N | | |
| | Y | NS | White/F |
| withdrew | No | | |
| | Y | NS | White/F |
| Complainant | Y | NS | Black/F |
| | Y | NS | White/Male |
| Selectee #1 | Y  White/Male | S | interview # 7/27/0 |
| | Y | NS | White/M |
| | Y | NS | White/M |
| | Y | NS | Asian/Pacific Islander |
| | Y | NS | Male/White |
| Selectee #2 | Y | S | White/Male interview # |

| NAME OF SELECTING OFFICIAL | |
|---|---|
| Douglas W. Frago | **Deputy Administrator for Field Operations** |
| SIGNATURE | DATE |

137

# U. S. DEPARTMENT OF AGRICULTURE
## FARM SERVICE AGENCY

### Merit Promotion Noncompetitive Certificate
### Vacancy Identification Number UF168394CT
### ISSUE DATE: April 28, 2003



| | |
|---|---|
| Position Title: | Administrative Management Specialist (Two Positions) |
| Series and Grade: | GS-301-14 |
| Organization: | FSA, Deputy Administrator for Field Operations |
| | Field Operations Staff |
| Location: | Washington, DC |

The candidates listed below were evaluated under noncompetitive Merit Promotion procedures and were found to be qualified for this position. The Selecting Official will review the promotion certificate and make a selection in accordance with the Merit Promotion Plan, utilizing interview procedures described in PM Notice 2334. Every precaution should be taken to observe and maintain the strict confidential nature of these documents. Any candidate on the list may be selected. Please indicate the action taken for each name by marking "S" for selected or "D" for declined or "NS" for not selected and return the certificate to the Human Resources Division by July 27, 2003 .

The candidates' application (OF-612, Resume, etc.), performance appraisals, awards and any other relevant information are attached for your review and consideration.   In accordance with PM Notice 2334, all candidates on the noncompetitive certificate must be interviewed, if a selection is made from this certificate.

| Name | Interviewed (Yes - No) | Action (S -D – NS) |
|---|---|---|
| | Y | NS |
| | Y | NS |

| NAME OF SELECTING OFFICIAL | TITLE |
|---|---|
| Douglas W. Frago | Deputy Administrator for Field Operations |
| SIGNATURE | DATE |
| | 07-21 -03 |

138

# Exhibit No. 21

## Fields, Sederis - Washington, DC

EXHIBIT NO. 4
Frago
3-12-07

From:       John Chott [John Chott@wdc.usda.gov]

Sent:       Friday, July 18, 2003 4:56 PM

To:         Moncalieri, Arleen - Washington, DC; Elliott, Brenda - Washington, DC; 'Caleb
            Jones.DCN004PO1.DC'; Douglas, Cecile - Washington, DC; Cronin, Linda - Richmond, VA;
            Johnson, Deborah - Washington, DC; 'Doug Frago-USDA.GW.8930A'; Edwards, Sharon -
            Washington, DC; 'James.Meidinger@usda.gov'; Chott, John - Washington, DC; 'Kathy
            Lindquist.DCN004PO1.DC'; 'Kenneth Nagel'; Treese, Linda - Washington, DC; 'Mary
            Hinkle.DCN004PO1.DC'; Spalding, Patrick - Washington, DC; Singh, Ragh - Washington, DC;
            Pinkston, Rick - Washington, DC; Fields, Sederis - Washington, DC; Bryant, Star - Washington, DC;
            Riley, Zina - Washington, DC

Subject:    Selection

This is to inform the staff that Doug has chosen Linda Cronin for the Program Specialist position.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone: 202-690-2807
Fax: 202-690-3309

# Exhibit No. 22

## Fields, Sederis - Washington, DC

Frago

EXHIBIT NO. 5

3 12-07  BK

**From:**  John Chott [John Chott@wdc.usda.gov]

**Sent:**  Tuesday, July 22, 2003 10:23 AM

**To:**  Moncalieri, Arleen - Washington, DC; Elliott, Brenda - Washington, DC; Caleb Jones.DCN004PO1.DC; Douglas, Cecile - Washington, DC; Cronin, Linda - Washington, DC; Johnson, Deborah - Washington, DC; Doug Frago-USDA.GW.8930A; Edwards, Sharon - Washington, DC; James.Meidinger@usda.gov; Chott, John - Washington, DC; Kathy Lindquist.DCN004PO1.DC; Kenneth Nagel; Treese, Linda - Washington, DC; Mary Hinkle.DCN004PO1.DC; Spalding, Patrick - Washington, DC; Singh, Ragh - Washington, DC; Pinkston, Rick - Washington, DC; Fields, Sederis - Washington, DC; Bryant, Star - Washington, DC; Riley, Zina - Washington, DC

**Subject:** Selections

Doug has asked that all of you be notified that he has selected Ken Nagel and Pat Spalding of FLP for the two Administrative positions.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

# Exhibit No. 23

## John Chott - Re: Second selection from GS-14 Ag Program Cert

**From:**     Carolyn Taylor
**To:**       John Chott
**Date:**     7/11/03 11:41 AM
**Subject:**  Re: Second selection from GS-14 Ag Program Cert

The EEO representative is required only for "panel interview" process.  If you are doing a second interview, which is usually with the selecting official or representative, you do not need EEO present.

>>> John Chott 07/11/03 11:30AM >>>
We interviewed for the non-supervisory 14s even though we did not have to; however, we did reduce the numbers to HIGH and MEDIUM.  We would like a short final inteview with the HIGHS.  Do we need an EEO person.  I though not since you do not need one for interviewing the highs after you get the list from the panel.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 11:18AM >>>
You can FAX me the certificate once you have acceptance and send everything back by mail.    You can send me a copy of the interview panel sheet but the selecting official should keep a copy with any other documents you have in the selection process which are your files.

>>> John Chott 07/11/03 10:24AM >>>
Thanks, we are not sure yet.  By the way, we have offered the 15 to someone who will let us know this afternoon.  The cert deadline is tomorrow.  May I fax the certs to you this afternoon or will sending them by internal mail be ok.  They are dated before the 12th.  Also do you want the panel rating sheet?

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 10:16AM >>>
That's fine, you will need to submit another SF52 for your second selection for Agrl Prog Speclst.

>>> John Chott 07/11/03 09:42AM >>>
The Admini Specialist --we already are selecting two.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 08:39AM >>>

     Yes, if the announcement does not state two or more positions, and the Agrl Prog Speclst announcement did not,  then you are to notify the Union of the circumstances and that you would like to make two selections.     This is not changing your selections (2) for the Agrl Mgmt Speclst announcement?

                                                                   >>> John Chott 07/10/03 06:19PM >>>
We may want to select a second person from the cert, but, unlike the Admin Specialist, we did advertise for two.  If I recall, we must ask the union.  Is that correct?

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

**Exhibit No. 24**

**Exhibit No. 25**



| | Linda | Jan | Ken | Chuck |
|---|---|---|---|---|
| 1 pt | 5 5 4 | 3 3 3 | 4 5 5 | 3 3 4 |
| | 14 | 9 | 14 | 10 |
| 2 pt | 5 3 5 | 3 3 2 | 3 4 4 | 3 4 5 |
| | 13 | 66 | 12 | 12 |
| 3 pt | 5 3 4 | 3 4 3 | 5 3 5 | 4 3 4 |
| | 12 | 10 | 13 | 11 |
| 4 pt | 4 3 5 | 4 3 3 | 5 4 5 | 5 4 4 |
| | 12 | 10 | 14 | 13 |

# Exhibit No. 26

## John Chott - Re: Second selection from GS-14 Ag Program Cert

**From:**     Carolyn Taylor
**To:**       John Chott
**Date:**     7/11/03 11:41 AM
**Subject:**  Re: Second selection from GS-14 Ag Program Cert

The EEO representative is required only for "panel interview" process.  If you are doing a second interview, which is usually with the selecting official or representative, you do not need EEO present.

>>> John Chott 07/11/03 11:30AM >>>
We interviewed for the non-supervisory 14s even though we did not have to; however, we did reduce the numbers to HIGH and MEDIUM.  We would like a short final inteview with the HIGHS.  Do we need an EEO person.  I though not since you do not need one for interviewing the highs after you get the list from the panel.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 11:18AM >>>
You can FAX me the certificate once you have acceptance and send everything back by mail.     You can send me a copy of the interview panel sheet but the selecting offical should keep a copy with any other documents you have in the selection process which are your files.

>>> John Chott 07/11/03 10:24AM >>>
Thanks, we are not sure yet.  By the way, we have offered the 15 to someone who will let us know this afternoon.  The cert deadline is tomorrow.  May I fax the certs to you this afternoon or will sending them by internal mail be ok.  They are dated before the 12th.  Also do you want the panel rating sheet?

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 10:16AM >>>
That's fine, you will need to submit another SF52 for your second selection for Agrl Prog Speclst.

>>> John Chott 07/11/03 09:42AM >>>
The Admini Specialist --we already are selecting two.

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

>>> Carolyn Taylor 07/11/03 08:39AM >>>

    Yes, if the announcement does not state two or more positions, and the Agrl Prog Speclst announcement did not,  then you are to notify the Union of
            the circumstances and that you would like to make two selections.     This is not changing your selections (2) for the Agrl Mgmt
                        Speclst announcement?

                                        >>> John Chott 07/10/03 06:19PM >>>
We may want to select a second person from the cert, but, unlike the Admin Specialist, we did advertise for two.  If I recall, we must ask the union.  Is that correct?

John W. Chott, Jr.
Assistant to the Deputy Administrator for Field Operations
Phone:  202-690-2807
Fax:  202-690-3309

| Vacancy Announcement | Selectees | Minorities Interviewed | Job Series of Selectees | Opening/ Closing Dates | Doug Frago Deposition |
|---|---|---|---|---|---|
| Supervisory Field Operations GS-301-15 | Linda Treese, **Caucasian Female** (Selected | D. Adams, African American; S. Bryant, African American; J. Comas, Hispanic | GS-0560-15 | February 24, 2003 March 17, 2003 | Pg.103 lines 5-13 |
| Adm. Management Specialist GS-301-14 | Ken Nagel, **Caucasian Male** (Promoted) | J. Comas, Hispanic; S. Fields, African American; R. Singh, Asian | GS-1145-13 | February 24, 2003 March 17, 2003 | Pg. 103 lines 14-17 |
| Adm. Management Specialist GS-301-14 | Pat Spalding, **Caucasian Male** (Promoted) | J. Comas, Hispanic; S. Fields, African American; R. Singh, Asian; Unknown | GS-1165-13 | February 24, 2003 March 17, 2003 | Pg. 103 lines 18-22 |
| Agricultural Program Specialist, GS 1145-14 | Linda Cronin, **Caucasian Female** (Promoted) | J. Comas, Hispanic; R. Singh, Asian; Unknown | GS-1145-13 | February 24, 2003 March 17, 2003 | Pg.104 lines 1-5 |
| Agricultural Program Specialist, GS-1145-13, | Rick Pinkston, **Caucasian Male** (Reinstated) Previously work for Frago | P. Miller, African American; Unknown | GS-1145-13 | October 6, 2003 October 27, 2003 | ~ Pg.104 lines 6-13 |
| Agricultural Program Specialist, GS-1145-13 | Arlene Moncalier, **Caucasian Female** (Selected) | P. Miller, African American; Unknown | GS-1145-13 | October 6, 2003 October 27, 2003 | Pg.104 lines 14-17 |
| GS-301-14 | J. Meidinger, **Caucasian Male** (Reassigned) | CED from South Dakota hired for BUD Division, later detailed to DAFO than hired permanently. | GS-0560-14 Reassigned to GS-301-14 | April 2005 | Pg.104 lines 19-22 AND Pg. 105 lines 1-3 |
| GS-0343-12 GS-301-15 GS-301-15 GS-1145-14 GS-X343-12 GS-1145-13 | Debra Johnson, **Caucasian Female** (Selected) John Truluck, **Caucasian Male** Stephen Newton, **Caucasian Male** Trina Brake, **Caucasian Female** Mary T. Jeerdsma, Caucasian Female Cindy Foister, **Caucasian Female** | Hired in 2002 as a GS-343-9. (Previously GS-7, Secretary) Former Director of Tobacco Transferred from Georgia Promoted to GS-14 Replaced Linda Cronin Transferred Selected Feb 2008 | GS-13 GS-15 GS-15 GS-15 GS-14 GS-12 GS-13 | October 2005 12/11/06 2006 Mar. 2007 | Pg.105 lines 6-17 |

**Caucasian (GS-13 and above) hired from 2003 to present – Total 13 (no minorities).**

**Exhibit 1, Frago Deposition page 105 lines 18-2 and page 106 lines 2-4. Mr. Frago admitted that there were at least eight positions, fairly high level at the GS-13 or above that were filled with Caucasians while he was the supervisor of the office.**

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4    ------------------------------------x

5    SEDERIS FIELDS,                    )

6              Plaintiff        ) Civil Action:

                                 06-0538 (HHK)

7         V.                     )

8    MIKE JOHANNS, SECRETARY, U.S.       )

     DEPARTMENT OF AGRICULTURE,

9                               )

10             Defendants        Pages 1-84

     ------------------------------------x

11

12              **COPY**

13

14        DEPOSITION OF LINDA TRESE

15        Tuesday, March 6, 2007

16          Washington, DC

17

18

19

20   Reported by:  Sherry L. Brooks

21   Job No. 179740

**Linda Trese**

Page 31

1          (Exhibit Number 1 was marked for

2   identification and was attached to the deposition.)

3          BY MR. BRANCH:

4     Q.   I'm showing you what's been marked as your

5   Deposition Exhibit Number 1.  Take a look at this,

6   please.  Can you identify this document?

7     A.   The documents are the grids that were used

8   after the interview process for the vacancies and

9   they're in my handwriting.  They're pencil documents.

10     Q.   Pencil documents?

11     A.   Pencil or pen.

12     Q.   And these are the second and third pages

13   of this document?

14     A.   The second and third pages.  Help me

15   understand your question.

16     Q.   There are three pages to this document.

17   There's a cover sheet and then there's two pages,

18   which appear to be grids.

19     A.   Yes.  I'm sorry.  The three pages you set

20   in front of me, the last two are grids.

21     Q.   Okay.  Now, on the first page of the grid,

**Linda Trese**

1    there are names listed on the left-hand column.   What

2    are those names?

3        A.    On the second page --

4        Q.    First page of the grid, there are names

5    listed on the left-hand column.   What are those

6    names?

7        A.    Pat for Patrick Spaulding, Jean for Jean

8    Freeman, Bruce for Bruce Peters, Sederis for Sederis

9    Fields.

10       Q.    And along the top section at the top of

11   the document, there are initials in those four

12   columns.   Do you know what those initials are?

13       A.    Yes.

14       Q.    And what are the initials?

15       A.    The initials are J. for John Chott, D. for

16   Doug Frago, L. for Linda Trese.

17       Q.    Now, on the second grid sheet, do you see

18   names on the left-hand column?

19       A.    Yes, I do.

20       Q.    What are those names?

21       A.    The names on the left-hand column are

**Linda Trese**

Page 33

1    Linda for Linda Cronin, J. for I can't recall.  I

2    don't know who that is; Ken for Ken Nagle; and Chuck

3    I believe for Chuck Ropp.

4        Q.   And there are four columns along the top

5    of this document with initials beneath those columns.

6    What are those initials?

7        A.   The four columns under each column,

8    there's initials J. for John Chott, D. for Doug

9    Frago, L. for Linda Trese.

10       Q.   Now, you previously testified that you

11   only interviewed for the 301 series.  What is this

12   second page?  What does this represent?

13       A.   When I testified earlier, I couldn't

14   remember if I sat in for the 1145 because I've been

15   so focused on the administrative positions because I

16   knew I was coming for this deposition.  I thought I

17   remembered interviewing Linda Cronin.  I guess I was

18   thinking Ken was on that, so the final page I was

19   incorrect in when I said that I did sit in on the

20   interviews for the 1145 program specialist.

21            And this third page of the three pages you

**Linda Trese**

Page 34

1   gave me is the grid for that interview process.

2       Q.    So the third page is the grid for the 1145

3   interview process; is that correct?

4       A.    Yes.  That's what it would have been for.

5   I believe that Ken Nagle and I didn't know if any of

6   the others applied for the 301, but I know he did

7   because he was considered on the 301 and must have

8   moved on after both of those earlier interview sets.

9       Q.    And on the first page of this grid, what

10  does this represent?

11      A.    The first page with Pat, Jean, Bruce, and

12  Sederis is the interview process for the 301 -- two

13  301 vacancies.

14      Q.    And Ken Nagle's name is not on the first

15  page for the interviewing process for the 301

16  position; is that correct?

17      A.    Yes.  That's correct.  Ken Nagle's name is

18  not on the first page.  It's on the second.

19      Q.    Did Ken Nagel interview for the 301

20  position?

21      A.    The four questions that were asked of

# Exhibit No. 27





**Department: Department Of Agriculture**
**Agency: Farm Service Agency**
**Job Announcement Number:**
**UK168604WDC-KAM**

| Overview | Duties | Qualifications & Evaluations | Benefits & Other Info | How to Apply |

◄ Back to Search Results

# AGRICULTURAL PROGRAM SPECIALIST, GS-1145-13

**QUALIFICATIONS REQUIRED:**
Applicants must meet all qualification requirements by Friday, January 18, 2008.  If you have questions about the position requirements, which the U.S. Office of Personnel Management (OPM) sets, you may review them in greater depth in OPM's Qualifications Standards Handbook of General Schedule Positions. It is available for your review on OPM's website.

**QUALIFICATION REQUIREMENTS:**  You must possess one year of specialized experience equivalent to the next lower grade level in the Federal service.  Experience that equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position, and that is typically in or related to the work of the position to be filled.

**SPECIALIZED EXPERIENCE AT THE GS-13 LEVEL:**  One full-time year (12 months) of specialized work experience in the agricultural field equivalent to the GS-12 grade level in the Federal service. Experience that involved work in directing, developing, reviewing, administering and coordinating programs which demonstrate knowledge of the laws and regulations governing agricultural stabilization and conservation programs and of the particular application of national policies and objectives at the State level; understanding of farming practices and customs in the United States, and of the economic needs of farm communities at the State level; knowledge of current State and Federal agricultural trends; and ability to establish and maintain effective relationships with representatives of public and private organizations, farmers' associations, and others, and to interpret regulations, programs and policies affecting them.

**THE SUBSTITUTION OF EDUCATION IS NOT QUALIFYING FOR THE GS-13 LEVEL.**

**BACKGROUND INVESTIGATION AND FINGERPRINT CHECK:** Selection and retention in this position is contingent on a successfully adjudicated FBI National Criminal History Check (fingerprint check) and a background investigation. Prior to employment, you may be required to complete an OF-306, Declaration of Federal Employment and other paperwork. The information collected on this form is used to determine suitability for Federal employment.  You will also be required to sign and certify the accuracy of all information in your application/resume. You must answer all questions truthfully and completely. A false statement on any part of the declaration or other forms may be grounds for not hiring you or for firing you after you begin work.

**HOW YOU WILL BE EVALUATED:**                                                          Top ▲
**BASIS OF RATING:** All applicants are rated on the extent and quality of experience, education, and training relevant to the duties of the position. An automated scoring system, based on the on-line application process is

used. Before any certificate can be issued to the selecting official, the resume is reviewed by an HR Specialist to ensure that (a) minimum qualification requirements are met and (b) the resume supports the answers provided to the job-specific questions. Your answers will be verified against information provided in your online resume and application. Be sure that your resume clearly supports your responses to all the questions addressing experience and education relevant to this position.

← Back to Search Results

 APPLY ONLINE       PRINT PREVIEW       EMAIL A FRIEND

 **Send Mail**

**Send Mail to:**
Farm Service Agency
Please do not send mail
Apply On-Line
Thank You, MO 00000
USA

 **Questions?**

**For questions about this job:**
FARM SERVICE AGENCY
Phone: (816)926-6781
Email: Exam1@kcc.usda.gov

**USAJOBS Control Number:** 1102305

EEO Policy Statement | Reasonable Accommodation Policy Statement | Veterans Information
Legal and Regulatory Guidance

Home | Search Jobs | My USAJOBS | Information Center | Veterans | Forms | Employer Services
FAQS | Privacy Policy | Help | Site Map
Contact Us | Privacy Act and Public Burden Information

This is a United States Office of Personnel Management website. USAJOBS is the Federal Government's
official one-stop source for Federal jobs and employment information.

  

Administrative Management Specialist
GS-301-14
Deputy Administrator for Field Operations
Field Operations Staff


A.    INTRODUCTION

This position is located on the Field Operations Staff of the Deputy Administrator for
Field Operations (DAFO) which was established to provide oversight and guidance to
State and county offices of the Farm Service Agency (FSA) in order to improve program
delivery and customer service. The incumbent represents DAFO by providing instruction
and policy guidance to State and county FSA offices related to administrative and
management issues including, but not limited to, those related to budget, workload
analysis and reporting, personnel, fiscal management, and administrative services. The
incumbent also participates fully in the development, implementation and evaluation of
nationwide policies and programs pertaining to all aspects of the operation and
management of State and county FSA offices and represents DAFO in meetings with top
Agency and Departmental officials on matters related to State and county office
management, operating policies and overall program delivery. This is the full
performance level of this position.


B.    MAJOR DUTIES AND RESPONSIBILITIES

Represents DAFO by providing instruction and policy guidance to State and county FSA
offices in all areas related to budget, workload analysis and reporting, personnel, fiscal
management, and administrative services. Such programs impact Agency commodity
production, commodity loan, conservation, environmental quality and emergency
assistance programs, administrative operations of State and county FSA offices and
operations of other agencies whose programs interrelate with those of FSA.
Administrative management issues are nationwide in scope, characterized by rapid
change, and of critical importance to the operations of the Agency and to the provision of
program services to Agency clientele. The incumbent applies knowledge of Agency
programs and applicable administrative management policies, procedures and
requirements in providing authoritative advice and direction to State and county office
officials and, as appropriate, serves as liaison between FSA State and county offices and
representatives of other agencies.

Represents DAFO in working with headquarters administrative management officials,
State Executive Directors (SED), other State office officials and representatives of other
agencies to develop and implement policies and procedures to assure the effective,
efficient implementation of State and county FSA offices. Participates fully in the
development of Agency and inter-Agency plans and initiatives for resource sharing and
common administrative policies and systems. Provides overall coordination and
representation on the implementation and assessment of new and revised policies and

132

initiatives in FSA county offices. Initiates actions to assure that the implementation of administrative management initiatives appropriately complements and furthers program delivery objectives, that fiscal and human resources are used efficiently, and that Agency needs are met on a nationwide basis.

Provides liaison between headquarters management officials and State and county office personnel on matters related to the implementation, application and evaluation of administrative policies and procedures. Represents DAFO and the Agency in dealings with Rural Development and Natural Resource Conservation Service personnel in Service Centers involving common administrative policies and the sharing of administrative resources. Represents DAFO in working with SEDs to ensure that service center personnel are properly trained in applicable administrative management policies and procedures so as to provide efficiency and economy of administrative operations as well as effective delivery of Agency farm programs and services.

Participates fully with Agency program officials in the development, implementation and review of program policies, procedures and regulations. ████████████████████ ███████████████ requirements, recommends new or revised procedures related to administrative management programs and functions to enhance operational effectiveness of State and county FSA offices and to resolve problems in the field affecting program operations or the provision of program services. Represents DAFO in authoring and/or approving correspondence, directives, notices, or other policy issuances related to program and administrative operations in the field.

Establishes and maintains effective working relationships with employees and officials at all levels of the Agency, with employee associations, and with representatives of other agencies, departments and non-government interests. Represents DAFO in working with division and office directors, including SEDs, State FSA Committees, County Executive Directors and County FSA Committees, to coordinate activities and to resolve questions and situations that arise. Presents DAFO's position on issues affecting the implementation of administrative management initiatives, conducts negotiations to resolve conflicts and controversies, and initiates necessary action to assure understanding and acceptance of DAFO policies and objectives.

Represents DAFO in carrying out special assignments, including those dealing with confidential issues. Participates with and represents DAFO in developing, implementing and interpreting overall programs and policies related to the management of State and county FSA offices. Conducts evaluations of management issues and develops recommendations for management improvements applicable to individual or multiple offices. Speaks for DAFO in providing policy direction to individual State and county FSA offices or on a nationwide basis as appropriate.

Supervises assigned clerical support staff. As assigned, provides general direction or policy advice to lower graded specialists on DAFO's Field Operations Staff who work with specific farm programs and related operations.

Page 2 of 5

133

C.    EVALUATION FACTORS

    1.    Knowledge Required by the Position

Thorough knowledge of Agency administrative management olicies and procedures and program operations carried out through State and county FSA offices and employees to participate with and represent DAFO on issues related to the implementation of management initiatives affecting State and county office operations.

Knowledge of broad principles and practices related to budget, personnel, administrative services, financial management and similar issues to represent DAFO and FSA in dealings with other agencies to establish and maintain common administrative policies.

Thorough knowledge of the policies and goals of the Agency and DAFO as applied to State and county office operations.

Thorough knowledge of analytical processes and techniques to evaluate the effectiveness and efficiency of field operations and to determine and initiate appropriate policy revisions.

Skill in dealing effectively with individuals and groups both inside and outside of the Agency to represent and speak for DAFO, including making commitments involving utilization of resources to carry out administrative management and related program policy objectives.

    2.    Supervisory Controls

The incumbent works under the general policy direction of DAFO and is authorized to represent and speak for DAFO on major issues affecting State and county office operations and resource utilization. Determinations and recommendations made by the incumbent are reviewed for broad policy implications, but are typically accepted without significant change.

    3.    Guidelines

Although specific policies and procedures exist for the administration of Agency programs, the incumbent operates primarily under administrative guidelines related to broad DAFO, Agency and inter-Agency initiatives. The incumbent uses significant judgment and discretion in determining the intent and applicability of established policies; in providing authoritative policy interpretation to others; and in developing, recommending and/or initiating policies and policy revisions affecting State and county operations on a nationwide basis. Guidelines developed by the employee (i.e., with regard to resource management and

utilization, program delivery systems and the impact of administrative decisions on program operations) have a direct impact on overall program operations and the manner in which customer needs are met.

4.  Complexity

Work performed by the incumbent requires thorough and ongoing analysis of interrelated issues affecting the impact of administrative management initiatives on program and administrative operations and program delivery in State and county FSA offices. Decisions are impacted by conflicting program and management objectives such as accomplishment of program mandates and improvement of program delivery while reducing staffing and expenditures. The incumbent must ensure that actions are taken or recommendations made that appropriately address and reconcile conflicting requirements.

5.  Scope and Effect

The purpose of the work is to provide broad policy interpretation and direction on the application of administrative management initiatives to State and county office operations. The work also involves evaluating operations and policies to promote optimum efficiency, economy and effectiveness. The work affects program and administrative activities on a nationwide basis carried out through the operations of over 2,000 individual offices as well as the recipients of farm program services and benefits. Actions may also affect policies and operations of other agencies where common administrative policies have been established.

6.  Personal Contacts and

7.  Purpose of Contacts

Contacts are maintained with employees and officials at all levels of the Agency and with representatives of employee associations, other agencies, departments and non-government interests. Most contacts are not routine and involve determining roles as well as assessing issues and authorities.

The purpose of the work is to provide authoritative direction, decisions and policy guidance. Duties often involve taking or directing actions which are highly controversial, which may conflict with objectives of other agencies, and which meet with hostility or lack of cooperation in the field. In order to resolve problems related to policy interpretation or program delivery, the incumbent must often take or oversee actions which involve a high degree of persuasion and negotiation to achieve acceptable results.

Page 4 of 5

135

8.    Physical Demands

The work is primarily sedentary.

9.    <u>Work Environment</u>

The work is typically performed in an office setting.

136