# Attachment AA

Douglas Frago

Page 1

1

2              UNITED STATES DISTRICT COURT FOR THE

3                     DISTRICT OF COLUMBIA

4                        CIVIL DIVISION

5    SEDERIS FIELDS                )

6        Plaintiff                 )

7            vs.                   ) Civil Action No.

8    MIKE JOHANNS, SECRETARY,  ) 06-0538(HHK)

9    U.S. DEPARTMENT OF           )

10   AGRICULTURE                   )

11       Defendant                 )

12

13

14

15              Deposition of Douglas W. Frago

16                    Washington, D.C.

17                    March 12, 2007

18

19

20

21   Reported by:  Bonnie L. Russo

22   JOB NO. 179873C

Page 2

```
 1
 2
 3
 4
 5              March 12, 2007
 6              2:05 p.m.
 7
 8
 9   Deposition of Douglas W. Frago held at:
10
11       Law Offices of David A. Branch
12       1825 Connecticut Avenue, N.W.
13       Suite 690
14       Washington, D.C. 20009
15
16
17
18
19
20
21   Pursuant to notice, before Bonnie L. Russo,
22   Notary Public
```

Page 4

```
 1           C O N T E N T S
 2   EXAMINATION OF DOUGLAS W. FRAGO        PAGE
 3   BY MR. BRANCH                5
 4
 5
 6
 7   EXHIBITS
 8   1    Final Interview Schedule
 9   2    Score Sheets
10   3    Merit Promotion Competitive
11        Certificate
12   4    E-Mail dated 7-18-03
13   5    E-Mail dated 7-22-03
14   6    E-Mail dated 7-11-03
15   7    Notification of Personnel Action
16   8    Frago Interview Notes
17
18
19
20
21
22
```

Page 3

```
 1   APPEARANCES:
 2   For the Plaintiff
 3       DAVID A. BRANCH, Esq.
 4       LAW OFFICES OF DAVID A. BRANCH
 5       1825 Connecticut Avenue, N.W.
 6       Suite 690
 7       Washington, D.C. 20009
 8       202-785-2805
 9   For the Defendant
10       JUDi ... KIDWELL, Esq.
11       UNITED STATES ATTORNEY'S OFFICE
12       555 4th Street, N.W.
13       Civil Division
14       Room E4905
15       Washington, D.C. 20530
16       202-514-7250
17
18   Also Present:
19   Nena Hewitt, Esq.
20   UNITED STATES DEPARTMENT OF AGRICULTURE
21   Sederis Fields
22
```

Page 5

```
 1
 2
 3   (Exhibits included with transcript.)
 4
 5
 6
 7           P-R-O-C-E-E-D-I-N-G-S
 8       DOUGLAS W. FRAGO,
 9   being first duly sworn, to tell the truth, the
10       whole truth and nothing but the truth,
11           testified as follows:
12   EXAMINATION BY COUNSEL FOR PLAINTIFF
13       BY MR. BRANCH:
14       Q.   Please state your name.
15       A.   Douglas William Frago.
16       Q.   Good afternoon, Mr. Frago.  My name
17   is David Branch.  My office represents Sederis
18   Fields.  We are here today to take your
19   deposition.  I have some questions for you.
20   It's going to take us some time to get through
21   the questions here so I want to proceed as
22   quickly as possible, though.
```

2 (Pages 2 to 5)

Douglas Frago

Page 6

1    If you need to take a break at any
2  point, let me know. I will be happy to
3  accommodate that request. If you're not sure
4  what's being asked of you, just let me know and
5  I'll repeat or rephrase the question.
6        Are you taking any medication or
7  receiving any treatment which would impair your
8  ability to testify truthfully here today?
9    A.   No.
10   Q.   It's important that you provide a
11 verbal response to each question asked. It's
12 not appropriate to nod your head or to respond
13 in a nonverbal manner.
14        Please allow me to finish the
15 question before you start your answer.
16        Okay. Are you currently employed?
17   A.   No.
18   Q.   Are you retired?
19   A.   Retired.
20   Q.   Okay. And who did you last work
21 for?
22   A.   Department of Agriculture.

Page 7

1    Q.   And when did you retire?
2    A.   December of '05.
3    Q.   What was your last position at
4  Agriculture?
5    A.   Deputy administrator for field
6  operations.
7    Q.   And what was your grade?
8    A.   SES 2 or 3. They switched to a
9  nongraded level, but it was SES.
10   Q.   How long did you work at the
11 Department of Agriculture?
12   A.   Three and a half years this time
13 around.
14   Q.   Had you worked there previously?
15   A.   Yes.
16   Q.   So December of '05 is when you
17 retired from Agriculture?
18   A.   Yes.
19   Q.   So three and a half years since mid
20 2001?
21   A.   2002. April of 2002.
22   Q.   April of 2002 until December, 2005;

Page 8

1  is that correct?
2    A.   Time goes by. Yes.
3    Q.   Okay. So when did you previously
4  work at Agriculture?
5    A.   1990 to 1993.
6    Q.   Any other service at the Department
7  of Agriculture?
8    A.   No. As an employee, no.
9    Q.   How many years in federal service?
10   A.   I think I had 17, 18.
11   Q.   What's your address?
12   A.   1743 North Lake Shore Drive, Louisa,
13 Virginia.
14   Q.   L-O-U-I-S-A?
15   A.   Correct. 23093.
16        MS. KIDWELL: For the record, that
17 information is covered under our stipulation
18 and protective order.
19        BY MR. BRANCH:
20   Q.   Your last position at Agriculture,
21 what were your duties?
22   A.   I was deputy administrator for field

Page 9

1  operations overseeing the activity of 51 states
2  and state directors to possibly 2500 county
3  offices --
4    Q.   And in the --
5    A.   -- state committee members and state
6  offices.
7    Q.   What were your duties as it relates
8  to supervising employees in the D.C. office?
9    A.   I supervised the immediate office of
10 deputy administrator, and, Mr. Branch, it
11 fluctuated whether it was 17 to 22.
12   Q.   17 to 22?
13   A.   People. And I was a direct
14 supervisor of 51 state directors.
15   Q.   How far have you gone in school?
16   A.   I have a bachelor's degree.
17   Q.   From what university or school?
18   A.   University of -- California State
19 University in San Luis Obispo.
20   Q.   California State University --
21   A.   San Luis Obispo.
22   Q.   How do you spell that?

3 (Pages 6 to 9)

Page 10

1    A.   San, S-A-N L-u-i-s.
2    Q.   L-U?
3    A.   L-U-I-S.
4    Q.   Okay.
5    A.   Obispo, O-B-I-S-P-O.
6    Q.   Okay.  What year did you get your
7   degree there?
8    A.   '63. 1963.
9    Q.   Were you involved in the selection
10  of a GS-14 administrative management specialist
11  position in 2003?
12   A.   Yes.
13   Q.   What was your involvement from start
14  to finish from the vacancy announcement until
15  the positions were filled?
16   A.   I and Mr. Chott in my office.
17   Q.   When you say, "Mr. Chott," who are
18  you referring to?
19   A.   John Chott was special assistant.
20   Q.   He was your special assistant?
21   A.   Yes.
22   Q.   What was his title?

Page 11

1    A.   Special.  I believe it was special
2   assistant to deputy administrator for field
3   operations.
4    Q.   Now, was your position a -- was it a
5   political appointment?
6    A.   Political appointment.
7    Q.   Okay.  So you were appointed by
8   President Bush for this position?
9    A.   No.  Technically, I think you're
10  appointed by the administrator which would have
11  been Mr. Little, but you would be cleared
12  through the political process.
13   Q.   Okay.  So Mr. Chott was your
14  specialist assistant?
15   A.   Yes.
16   Q.   When did he become your special
17  assistant?
18   A.   He was there when I was -- he was
19  there when I arrived.
20   Q.   Okay.  And your involvement in this
21  selection for this position?
22   A.   Okay.  When it was determined that

Page 12

1   we were going to upgrade the positions of
2   program positions and administrative positions,
3   plus we were given authority to hire an
4   additional 15 that was going to be in charge of
5   field operations which included the
6   administrative and the program positions.
7    Q.   When you say you were given
8   authority to upgrade the positions, what does
9   that mean?
10   A.   To hire for the position.  Hire the
11  positions.
12   Q.   And so by upgrade you don't mean
13  take an existing position, and raise the level
14  to --
15   A.   No.  Absolutely not.
16   Q.   Okay.  You have to allow me to
17  finish.  You may know where I'm going, but let
18  me get there first.
19       You were not talking about taking an
20  existing position and raising the grade?
21   A.   No.
22   Q.   What's your response?

Page 13

1    A.   No, we were not.
2    Q.   What did you mean by upgrade?
3    A.   Meaning that the levels of
4   responsibilities for two new positions in the
5   administrative area -- actually, three because
6   Mrs. Treese was the assistant in that area or
7   she later -- she became the assistant.
8        We were upgrading the
9   responsibilities of the program people that we
10  had.  We didn't have administrative -- we had
11  program 13s.  But we didn't have the -- any
12  administrative positions that handle the
13  administrative side of the agencies.  It was
14  just kind of fluttered around to everybody.
15   Q.   Okay.  So that determination was
16  made.  What was the next step in the process?
17   A.   Getting approval to hire the three
18  new positions.  Getting the approval to
19  backfill, if it was necessary.  Getting the
20  approval of the agency to hire the 15.
21   Q.   And was that accomplished?
22   A.   Yes.  We were given approval to hire

4 (Pages 10 to 13)

Douglas Frago

Page 14

1  the 15s, the additional 15 and to create three
2  positions.
3    Q.  What were the three positions
4  created?
5    A.  Administrative Specialist II and one
6  program specialist.
7    Q.  What was the next step in the
8  process of filling these positions?
9    A.  Personnel put out the
10  advertisements, the notices. They compiled the
11  best qualified. They sent a list, a certain
12  list with a list of qualified candidates. The
13  secretary then scheduled the interviews.
14    Q.  And what role were you playing in
15  this?
16    A.  I was going to be the deciding
17  official, naturally, because everybody -- at
18  that point, everybody reported to me and I
19  opted to interview the program specialist.
20    Q.  All right. So you say there were
21  three positions: Two administrative management
22  positions and one program specialist position?

Page 15

1    A.  And one assistant to the deputy
2  administrators position.
3    Q.  And that was at the 15 level,
4  correct?
5    A.  That was the 15.
6    Q.  Okay. So for the 14 positions there
7  were three positions?
8    A.  That's correct.
9    Q.  All right. So the last thing you
10  told me was that the -- I think the secretary
11  set up interviews?
12    A.  Yes. She would have been the person
13  to schedule them.
14    Q.  Okay.
15    A.  Once a cert came from personnel.
16    Q.  All right. So what was the next
17  thing that happened after the cert came from
18  personnel?
19    A.  Set up the interviews and selected
20  who was going to be on the interview panel.
21    Q.  Who selected who would be on the
22  interviewing panel?

Page 16

1    A.  I did.
2    Q.  Who did you select for the
3  interviewing panel?
4    A.  Soloman Ramirez, Mr. Chott, myself.
5  Both Mr. Chott and I was in -- we were in
6  communication with the personnel folks because
7  we also wanted to have an EEO advisor there,
8  which we did. And I don't remember his name.
9  I want to say it was Shawn. But I think that's
10  all I know.
11    Q.  Okay. So for the first interview
12  the panel included yourself, Chott and Mr.
13  Ramirez?
14    A.  Yes.
15    Q.  Is that correct?
16    A.  Correct.
17    Q.  What positions were you interviewing
18  for?
19    A.  Two administrative positions and one
20  program position.
21    Q.  So you were interviewing for three
22  different positions?

Page 17

1    A.  Three different positions.
2    Q.  Okay. And what happened next? Did
3  you conduct these interviews?
4    A.  Conducted the interviews. After
5  the -- and I -- again, I can't remember whether
6  it was 14 or 15 people that were interviewed.
7  We had three pages of questions. They were
8  rather generic. There were a couple of
9  questions that were just strictly program
10  related. The vast majority of the others were
11  more generic and if they -- a person was
12  applying for the program position, they
13  responded to all the generic questions plus the
14  program. And the same way with the
15  administrative. That if they were applying for
16  the administrative, then they did not respond
17  to the program questions.
18    Q.  So did you have some applicants
19  applying for both positions?
20    A.  Yes.
21    Q.  How many applicants applied for both
22  positions?

5 (Pages 14 to 17)

Douglas Frago

Page 18

1    A.    I absolutely don't recall.
2    Q.    Okay. So explain to me what
3  happened as part of this interviewing process,
4  this first interviewing process?
5    A.    Held the interview, individual
6  interviews. After it was complete when we
7  interviewed everyone, we sat around the table,
8  Ramirez, Chott and myself. We kept rough
9  notes. I kept my own notes strictly for my own
10  memory. And the first interview the decision
11  was mutually made by all three of us that we
12  would only rank people -- what was the term
13  that we used? I think personnel normally puts
14  terms like high medium and low and we opted
15  just high and medium. My personal view was if
16  we were sent a cert by personnel that everybody
17  met the minimum standard for that cert.
18    Q.    Okay. So what was the result of
19  your first interview, first series of
20  interviews?
21    A.    Again, being there were so many
22  folks that had applied and we interviewed, Mrs.

Page 19

1  Treese was selected almost simultaneous by a
2  panel of -- actually, I think there were a
3  couple SES people, and she was selected and I
4  opted at that point to hold a second round of
5  interviews with a top folks on both -- for both
6  positions. And when I say, "both positions," I
7  mean administrative positions that were the
8  two, and the program position.
9    Q.    Okay. So there was one round of
10  interviews with all the applicants for both
11  positions; is that correct?
12    A.    That is correct.
13    Q.    Then you decided that there would be
14  a second round of interviews for the top
15  applicants or candidates for both positions?
16    A.    That is correct.
17    Q.    And how many people were interviewed
18  for the program positions?
19    A.    Four or five.
20    Q.    And how many people were -- got to
21  the second interview for the administrative
22  position?

Page 20

1    A.    Same thing. Five, I believe. That
2  one I was sure there was five. On the other
3  one I was -- it was -- it just seems it was
4  four or five.
5    Q.    And why did you hold the second
6  round of interviews?
7    A.    Because at that point Mrs. Treese
8  that had been selected for the 15 was going to
9  be the supervisor of these people, whoever was
10  selected, she was going to be the supervisor.
11  I was no longer the supervisor and I thought
12  that she should be a part of the interview
13  process.
14    Q.    Did Mrs. Treese replace someone on
15  the interviewing panel?
16    A.    No. It was a new interviewing
17  panel. It was a -- as far as I was concerned,
18  a new panel.
19    Q.    Who was on the second panel?
20    A.    Mrs. Treese, Mr. Chott and myself.
21    Q.    And those -- you and Mr. Chott were
22  on the first panel, right?

Page 21

1    A.    That is correct.
2    Q.    But Mr. Ramirez was also on the
3  first panel?
4    A.    He was on the first panel.
5    Q.    Why was he not on the second panel?
6    A.    Because I think then at that point
7  my thought was we were now getting down to
8  really the best of the best.
9    Q.    And so why was he not on the second
10  panel?
11    A.    No reason, other than Mrs. Treese
12  was going to be supervising so I added Mrs.
13  Treese.
14    Q.    You also said you had an EEO
15  observer for the first panel?
16    A.    Uh-huh.
17    Q.    Did you have an EEO observer for the
18  second round of interviews?
19    A.    No.
20    Q.    And why not?
21    A.    Again, with consultation with
22  personnel, they said that wasn't necessary.

6 (Pages 18 to 21)

Douglas Frago

Page 22

1    Q.    Well, did personnel tell you that if
2    there was a second interview with the deciding
3    official that you didn't need an EEO observer
4    or if there was a second interviewing panel you
5    didn't need an EEO observer?
6    A.    My recollection is that we didn't
7    need an EEO adviser there.
8    Q.    Okay. All right. So what happened
9    after it was decided that you would have a
10    second round of interviews?
11    A.    They were scheduled.
12    Q.    Okay. And who conducted the --
13    well, strike that.
14    All right. So they were -- when you
15    say, "they were scheduled," do you mean for
16    both positions?
17    A.    Yes.
18    Q.    Interviews were scheduled for both
19    positions?
20    A.    Yes. My recollection is yes.
21    Q.    All right. And so what happened
22    after the interviews were scheduled for both

Page 23

1    positions?
2    A.    As we interviewed or -- and again,
3    as I interviewed, we rank each question one to
4    five.
5    Q.    You rank the response to each
6    question or each question?
7    A.    The response from each question from
8    one to five.
9    Q.    All right. Did you discuss with
10    . Treese or Chott the fact that you all
11    would rank the responses to questions after
12    each interview?
13    A.    It was -- at some point, Mr. Branch,
14    I have to assume that it was discussed because
15    we did it.
16    Q.    I don't want you to make
17    assumptions.
18    A.    Okay.
19    Q.    I mean, do you recall discussing
20    with Treese and Chott that they were to rank
21    each applicant after the interview?
22    A.    Each applicant was to be ranked,

Page 24

1    whether during the interview or after the
2    interview. Each applicant was to be ranked.
3    Q.    And the question is: Did you have
4    that discussion with Chott and Treese before
5    you started the interviews?
6    A.    Yes.
7    Q.    Okay.
8    A.    Because as I look back on my notes,
9    I had done that.
10    Q.    Do you know if the other panel
11    members --
12    A.    I had never seen --
13    Q.    -- did that?
14    A.    I've never seen their notes.
15    Q.    So you recall a discussion -- you
16    believe that there was a discussion with
17    yourself and Chott and Treese where there was
18    an agreement that the applicants would be
19    ranked either before or -- well, during or
20    after their interviews?
21    A.    During or after. Yes, that is
22    correct.

Page 25

1    Q.    What was the next step in the
2    process?
3    A.    Well, after the interviews were
4    complete I remember sitting around the table
5    with -- at that point with their -- the resumes
6    and we then -- we looked at the resumes. I
7    remember that was the first time that I looked
8    at the resumes.
9    Q.    So after all the interviews were
10    done?
11    A.    Yes.
12    Q.    For both positions?
13    A.    Yes.
14    Q.    Okay. I just want to be sure I
15    understand that.
16    A.    Uh-huh.
17    Q.    Understand this.
18    When you scheduled the interviews
19    did you schedule the -- all of the interviews
20    at the same time or over a period of days?
21    A.    Okay. It would be over a period of
22    days the interviews took place. They weren't

7 (Pages 22 to 25)

Douglas Frago

Page 26

1  at the same time because everybody wasn't in
2  one given room.
3      Q.    Okay.  Well, thank you for
4  clarifying that for me.  I didn't mean to
5  suggest everybody did it at the same time,
6  but -- so for -- was that true for both
7  positions that you schedule all the interviews
8  over a period of days?
9      A.    Uh-huh.
10     Q.    Is that yes?
11     A.    Yes.
12     Q.    At what point in the selection
13  process was there this discussion between
14  yourself and Treese and Chott?
15     A.    After the interview process.  After
16  we finished interviewing all the candidates.
17     Q.    After the last candidate was
18  interviewed for both positions?
19     A.    Yes.  I do not recall having
20  specific interviews after each candidate.
21     Q.    And you believe that there were five
22  applicants for the administrative series

Page 27

1  position and four to five applicants for the
2  program position?
3      A.    Yes.
4      Q.    And is it your testimony that after
5  nine to ten interviews, that's when you had
6  this discussion of who would be selected?
7      A.    That is correct.
8      Q.    Okay.
9      A.    That is my recollection.
10     Q.    All right.  And so tell me what
11  happened at the -- during this discussion phase
12  after everyone was selected?
13     A.    Discussion phase, I know we
14  discussed our feelings of what were the strong
15  points on the different responses to the
16  questions, and as I said, that is the first
17  that -- that's the first time I remember
18  looking at the resumes.  I then looked at the
19  resumes again later when I finally made the
20  decision on who was going to be offered the
21  position.
22         Now, I do know a grid was made.  I

Page 28

1  didn't make the grid, but at that point I can
2  remember saying, you know, for question number
3  one it was Fields had or whatever the
4  questions -- these were her numbers per the
5  four questions and the same thing with the
6  other candidates.  And then it was added up and
7  I believe then divided.
8      Q.    And did that occur for all nine
9  applicants, nine to ten applicants?
10     A.    As I remember, yes.
11     Q.    When was the grid made?  Was it
12  during this discussion after the candidates?
13     A.    It just seems to me it was made
14  during the discussion when we were ready to
15  give our ratings.
16     Q.    Who made the grid?
17     A.    I am not sure if it was Mr. Chott or
18  Mrs. Treese.  I have seen a copy of it but I
19  don't know their handwriting.  I just don't
20  know.  I know I didn't.
21     Q.    You did not?
22     A.    I know I didn't.

Page 29

1      Q.    Okay.
2      A.    I mean, I can't even read my own
3  handwriting.
4      Q.    And so what happened after a --
5  after you had this discussion?
6      A.    Well, then there was a discussion on
7  who came out on top and in my recollection
8  Nagel came out on top on both program and
9  administrative.  And it just seemed to me the
10  next was Ms. Cronin on the program side.  On
11  the administrative side it was Nagel, Spalding,
12  Peters or Peterson.  Peters, I think.  And
13  there is some discussion on the next two
14  between Freeman and Fields.
15         On my notes I had Freeman ahead of
16  Fields.  On the composite, I think -- I thought
17  it was the other way around.  But they were
18  all -- you know, they were relatively close on
19  the bottom side.
20     Q.    Okay.  So was a decision made after
21  this grid was prepared?
22     A.    No.  No.  Because I still sat --

8 (Pages 26 to 29)

Douglas Frago

Page 30

1  after they left I had all the recommendations
2  and I still sat and went through the resumes
3  several more times. And I would -- I cannot
4  tell you -- I cannot recall whether the
5  decision was made at the end of the day that
6  day of the last interview or whether it was the
7  following day. Personnel may be able to tell
8  you that because whenever the cert was sent to
9  personnel. Or the selection. I don't --
10  excuse me with terminology. Whatever the --
11  the register was sent back.
12      Q.   Was a decision made before the
13  certificate was sent to personnel?
14      A.   Well, of course. It would have to
15  be made before because you have to inform
16  personnel on who was selected.
17      Q.   So after the last interview, how
18  long did it take you before a decision was
19  made?
20      A.   Mr. Branch, I cannot sit here in
21  good conscience tell you that it was two hours
22  or it was the end of the day or the next day.

Page 31

1  I just absolutely do not recall.
2      Q.   Okay. So you don't recall how long
3  it took to make it?
4      A.   I do not recall whether it was a day
5  of two, but it wasn't many days. I mean, it
6  wouldn't have been a long period. It could
7  have been that same day or the next day.
8      Q.   And do you recall how long this
9  discussion took place between yourself and
10  ...ott and Treese?
11      A.   A couple of hours.
12      Q.   At least a couple of hours?
13      A.   At least a couple of hours. Nothing
14  happened faster than that.
15      Q.   And you said after you had this
16  discussion, then you looked at the resumes
17  again?
18      A.   Uh-huh.
19      Q.   Okay. And how long after you had
20  this discussion with Chott and Treese was it
21  that you made a decision?
22      A.   I just don't know the timing again.

Page 32

1  In the meantime -- in between of having all
2  these interviews, you know, the operation of
3  the department went on in the agency so that's
4  why I don't want to say it was at the end of
5  that day or the next day. But it was in a
6  short period of time.
7      Q.   Okay.
8      A.   By short period I mean in a matter
9  of days. I just can't -- I cannot tell you. I
10  cannot remember whether it was on the 8th,
11  10th, 12th, 15th. I can't remember that.
12      Q.   All right. What was the next step
13  in the process?
14      A.   The information was sent to
15  personnel.
16      Q.   No, before the information being
17  sent to personnel you said that there was a
18  discussion with yourself and the other panel
19  members.
20      A.   Uh-huh.
21      Q.   And then you looked at the resumes
22  once again?

Page 33

1      A.   And then --
2      Q.   And then what was the next step in
3  the process after that?
4      A.   I made that decision and circled the
5  name of who was offered the position.
6      Q.   Okay. So you made a decision on who
7  would be selected?
8      A.   Uh-huh.
9      Q.   For which positions?
10      A.   All three positions.
11      Q.   Did you make that decision at the
12  same time? You decided at the same time that
13  all three positions -- who would be selected
14  for all three positions?
15      A.   That, I am almost positive that's
16  what I would have done. I would not have let
17  them sit.
18      Q.   Okay. Who did you select for these
19  different positions?
20      A.   Administrative was Nagel and
21  Spalding, and program was Cronin.
22      Q.   Why did you select Cronin for the

9 (Pages 30 to 33)

Douglas Frago

Page 34

1    program position?
2        A.    Because she was next in line.  Now,
3    what I absolutely -- again, I am hoping that if
4    you have already talked to Mr. Chott, I am
5    hoping he will recall, but I can't recall on --
6    at what point -- this is what I can't recall.
7    At what point Mr. Nagel was asked whether he
8    wanted to take the program position or the
9    administrative position.  But I recall that
10   that was given an option because he was top on
11   both.  He was far superior on both program and
12   administrative positions.
13       Q.    So you believe Nagel was given the
14   option of taking either the program or the
15   administrative job?
16       A.    Ultimately, which that he wanted to
17   be considered for and which he took.  That's
18   just -- that's in my mind.  I tend to believe
19   that that's what happened.  Because I know he
20   was -- he came out on top on both.  He applied
21   for and was certified for both and came out on
22   top on both in the scoring of both.

Page 35

1        Q.    And I think you testified previously
2    you hope that Chott would be able to answer
3    that?
4        A.    What I am saying is if Mr. Chott is
5    going to be interviewed I will hope that he
6    would remember exactly how that process
7    occurred.  I just don't recall exactly how that
8    occurred.
9        Q.    Well, let me ask you this:  Did you
10   talk to Nagel and tell him he could select
11   either the program or the administrative
12   position?
13       A.    I don't recall talking to Mr. Nagel.
14   I know that was the discussion between Treese
15   and Chott and I when Nagel ended up being top
16   on both that he would be given that option to
17   choose.  Because he was the top of both.
18       Q.    So there was a discussion between
19   yourself and Treese and Chott --
20       A.    Yes.
21       Q.    -- that because Nagel was at the top
22   of both for both positions he would be given

Page 36

1    the option; is that correct?
2        A.    That's what I recall.
3        Q.    Okay.  Can you explain to me what
4    was said in that discussion, as much of it as
5    you can recall?
6        A.    No.  Just that that's -- that we
7    were in a dilemma that he happened to be the
8    top on both positions.
9        Q.    Now, did this discussion between
10   yourself and Chott and Treese, did it happen
11   before all of the applicants were interviewed
12   or after all of --
13       A.    Of course not.
14       Q.    Allow me to finish.
15            Or after all the applicants were
16   interviewed?
17       A.    It was after everyone was
18   interviewed, after everyone was scored and then
19   the realization that the same person came out
20   on top on both cases.
21            And I apologize, Mr. Branch, if I --
22   I interrupt.

Page 37

1        Q.    No.  That's -- we're fine there.
2        A.    Just everything is here.
3        Q.    All right.  So Nagel was given the
4    option of taking the administrative position or
5    the program position?
6        A.    That's what I recall.
7        Q.    Were you informed which position he
8    accepted or he decided to accept?
9        A.    The administrative, yes.
10       Q.    And who told you that?
11       A.    I believe it was one or the other
12   two told me that.  By the other two I mean Mrs.
13   Treese or Mr. Chott.
14       Q.    So at some point you had this
15   discussion of the applicants and a ranking or
16   rating of the applicants and it was determined
17   that Nagel came out on top?
18       A.    In both positions.
19       Q.    Did you stop this discussion process
20   and someone went and called Nagel or what
21   happened after that that you learned that Nagel
22   was going to accept the administrative

10 (Pages 34 to 37)

Douglas Frago

Page 38

1    position?

2    A.   I am just not sure what the process

3    was, whether it came back to me before -- and

4    again, I don't even know if it was in writing

5    or verbal, but that came back to me that he

6    wanted to be considered for the administrative.

7    And then I made the decision.

8    Q.   So it was only after Nagel indicated

9    that he wanted to be considered for the

10   administrative position that you made the

11   selection of Nagel?

12   A.   Uh-huh.

13   Q.   Is that yes?

14   A.   That's yes.

15   Q.   Okay.

16   A.   And he scored the highest in the

17   administrative interviews of all the

18   candidates.

19   Q.   All right. So Nagel was selected

20   for the administrative position and Cronin was

21   selected for the program position.

22   A.   Program position.

Page 39

1    Q.   And who was selected for the other

2    administrative position?

3    A.   Pat Spalding.

4    Q.   Okay. Were you involved in the

5    selection of Spalding for this second

6    administrative position?

7    A.   Yes.

8    Q.   Okay. Can you tell me what

9    happened?

10   A.   I made that selection based on the

11   scoring, the interviews and the resumes, the

12   back up.

13   Q.   So you made the selection on your

14   own?

15   A.   I made all the selections on my own.

16   Q.   Was it based on the score that he

17   received?

18   A.   Uh-huh. The score that he received,

19   and as I said, that I also reviewed all the

20   resumes even after they were reviewed with

21   the --

22   Q.   And for all -- for the other folks

Page 40

1    who were selected for these three positions,

2    for all the people that were selected, is it

3    your contention that you selected the

4    individuals who had the highest scores?

5    A.   Uh-huh.

6    Q.   Is that yes?

7    A.   Yes.

8         And I will say that they definitely

9    had the highest scores on my sheets.

10   Q.   What about for the overall panel?

11   A.   They were the highest scores, as I

12   remember also, on the overall panel.

13   Q.   At what point in the process did

14   Patrick -- did Pat Spalding accept the

15   position?

16   A.   Mr. Branch, I believe -- and I am

17   not a personnel person -- but I believe that

18   once the deciding official makes a selection

19   that went to personnel, then personnel does the

20   official informing. And I think at that point

21   they can still reject -- they can accept it or

22   reject it.

Page 41

1    Q.   Did you speak to Mr. Spalding?

2    A.   Only during the interview process.

3    Q.   Only during the interviewing

4    process?

5    A.   Yes.

6    Q.   Did you speak to him after the

7    interviewing process?

8    A.   No.

9    Q.   Did you actually call Mr. Spalding

10   and ask him if he would accept a position?

11   A.   I don't recall if I did. I don't

12   believe I called anyone.

13   Q.   Did you ask John Chott to call Mr.

14   Spalding to see if he would accept a position?

15   A.   I may have asked John Chott to call

16   the candidates but -- because I want to say

17   that I think it was John Chott that went and

18   talked to Mrs. Fields. And that was -- we had

19   several people in our office that had applied

20   for these positions and we felt -- and I

21   would -- I agreed with it. We felt for the

22   continuity within the office.

11 (Pages 38 to 41)

Douglas Frago

Page 42

1    Q.   Why did you have John Chott
2  contacting people who were not selected or the
3  people who were selected when you were the
4  deciding official?
5    A.   I delegated that down to him.  There
6  was --
7    Q.   Okay.
8    A.   We worked closely together.
9    Q.   So if Mr. Spalding's memory is that
10  you actually called him and offered the job to
11  him would you dispute that?
12    A.   No, I wouldn't dispute that at all
13  because -- again, let me -- Mr. Branch, let me
14  think here.
15       I don't remember.  What I don't
16  remember is whether the search went over first
17  to personnel and they did the notification and
18  then I called the candidates, the successful
19  candidates.  I tend to think that that's how I
20  would have done it, is -- that's how I did it
21  with the state directors.  I didn't select them
22  but I was the person to notify the state

Page 43

1  directors that they had been selected.
2       So at some point a conversation did
3  occur with Linda Cronin, with Linda Treese,
4  with Mr. Spalding and Mr. Nagel, at some point.
5  It wouldn't have been until after the search
6  had been sent to personnel.
7    Q.   Did you speak to Mrs. Fields to tell
8  her she had not been selected?
9    A.   No.  I think Mr. Chott is the one
10  that talked to Mrs. Fields and -- because I had
11  talked to Rodge Singh that was also a
12  candidate.  And they were the two that were in
13  our office.
14    Q.   You talked to -- what's the other
15  person's niece name?
16    A.   Rodge Singh.
17    Q.   How do you spell the last name?
18    A.   S-I-N-G-H, I believe.
19       Anyone qualified in our office
20  applied for the positions.  They all didn't
21  make the interviews.
22    Q.   So after you considered the

Page 44

1  applications and you made the final decisions,
2  did you do anything else in the selection
3  process?
4    A.   Other than have the secretary send
5  it to personnel.
6    Q.   And what did the secretary send to
7  personnel?
8    A.   I believe it's called the selection
9  cert.  Again, I don't know the terminology.  I
10  only -- my times there I only had -- this is
11  the only time I hired anybody.
12    Q.   Mr. Frago, were you aware of the
13  positions held by Spalding and Nagel before
14  their selection for this administrative
15  position?
16    A.   I knew the position that Nagel held
17  because he was in our office.  Spalding, he
18  worked for the deputy administrator for farm
19  programs.
20    Q.   And this administrative series
21  position, it was in the 301 series; is that
22  correct?

Page 45

1    A.   That's what I told them.
2    Q.   Is it true that neither Spalding nor
3  Nagel actually held a 301 series position at
4  the time they were selected for this job?
5    A.   I have no idea.  I mean, that's one
6  thing I don't remember focusing in.  If they
7  were on the cert, then personnel certified them
8  to be interviewed for that position.
9    Q.   Now, was Mr. Nagel interviewed for
10  both the administrative and program positions?
11    A.   Yes.
12    Q.   Did he have separate interviews for
13  both of those positions?
14    A.   No, he did not.  As I recall, he had
15  one interview on the first round.  One
16  interview like everyone.
17    Q.   One interview, I'm sorry, on the
18  first round?
19    A.   Then on the second, the same thing.
20    Q.   One interview on the second round?
21    A.   Same thing.
22    Q.   And so why was he not interviewed

12 (Pages 42 to 45)

Douglas Frago

Page 46

1   twice --
2      A.   The way the questions were --
3      Q.   Allow me to finish.
4          Why was he not interviewed twice for
5   the second position?
6      A.   The way the questions were set up,
7   the three pages, it included generic questions
8   and then it had questions that were
9   specifically program related. To the program
10  related questions, the administrative person
11  did not have to respond to those or the vice
12  versa.
13     Q.   And what about the second interview?
14     A.   The second interview it was the same
15  four questions for everybody.
16     Q.   Okay. And why was Mr. Nagel not
17  interviewed separately for the second
18  interview?
19     A.   Because they were the same
20  questions.
21     Q.   Were any of the questions position
22  specific?

Page 47

1      A.   On the second interview it didn't
2   appear to me to be.
3          Can I look?
4      Q.   Certainly. That's what I'm going to
5   show you.
6          Do you have it there with you?
7      A.   I have my copies. The first four
8   questions, yes. First one is interest of your
9   strength as an employee.
10     MS. KIDWELL:  Objection.
11     BY MR. BRANCH:
12     Q.   Can you read the first question?
13     MS. KIDWELL:  Mr. Branch, can we
14  identify this for the record?
15     BY MR. BRANCH:
16     Q.   What are you reading from, sir?
17     A.   I'm reading the interview questions
18  for the GS0114 specialist farm programs, farm
19  loan and administrative functions.
20     Q.   Okay. Are you reading from your
21  notes?
22     A.   I'm reading the questions.

Page 48

1      Q.   The questions from your notes?
2      A.   Yes.
3      Q.   Can you turn to your notes for Ken
4   Nagel?
5      A.   Okay.
6      Q.   Are you there?
7      A.   I am there.
8      Q.   Can you read the first question?
9      A.   "We are interested in your strength
10  as an employee. What do you bring to this
11  position, knowledge, skills and ability?"
12     Q.   What position was that question
13  referring to?
14     A.   Both. Because on my notes you can
15  see on the left-hand side I have administrative
16  and on the right-hand side I have program.
17     Q.   Well, the question doesn't say,
18  "What do you bring to these positions," does
19  it?
20     A.   No.
21     Q.   It says "this position." It
22  identifies a singular position, correct?

Page 49

1      A.   That's what -- when you read the
2   question that's what it would imply, but it was
3   for both.
4      Q.   Well, why did you --
5      A.   The intent was for both.
6      Q.   When you say, "the intent was for
7   both," what's the basis for your belief that
8   the intent was for both?
9      A.   Because in my notes I have
10  administrative on one side, I have program on
11  the other. And in this case, Mr. Nagel's
12  responses he talks about --
13     Q.   We'll get to his responses in a
14  minute.
15     A.   Sure.
16     Q.   But was there a discussion with the
17  panel members that they would rate Mr. Nagel on
18  both the administrative and the program
19  position on this single interview sheet?
20     A.   I would have to -- I don't want to
21  assume. I would say yes because that's what I
22  did.

13 (Pages 46 to 49)

Douglas Frago

Page 50

1    Q.   Do you know if the other folks --
2    allow me to finish -- do you know if the folks
3    who -- other folks who were on the interviewing
4    panel rated or ranked Mr. Nagel for both
5    positions on this single interview sheet?
6    A.   I don't know if they did.  I have to
7    assume they did.  That's what I did.
8    Q.   Was there any discussion with the
9    other panel members that they would rate Mr.
10   Nagel on both positions on this single
11   interview sheet?
12   A.   I believe there was.
13   Q.   When did that discussion take place?
14   A.   Before Mr. Nagel or anyone that was
15   being interviewed for two positions when Mr.
16   Nagel came in.
17   Q.   Okay.  So you believe before Mr.
18   Nagel or for anyone who interviewed for two
19   positions came in, there was a discussion that
20   those individuals were to be rated on both the
21   program and the administrative position?
22   A.   That is -- yes, that's what I

Page 51

1    believe.
2    Q.   Was Mr. Nagel told at the time of
3    his interview that he was interviewing for both
4    the administrative and the program specialist
5    positions?
6    A.   I believe he was.
7    Q.   Who told him that?
8    A.   He would have been told the period
9    he walked in.  It called have been me.  I would
10   assume it would be me.  It could have been Mrs.
11   Treese or it could have been Mr. Chott.
12   Q.   Do you recall?
13   A.   No, I do not recall.
14   Q.   Let me show you --
15       (Deposition Exhibit No. 1 was marked
16   for identification.)
17       BY MR. BRANCH:
18   Q.   Do you recall when folks were
19   actually interviewed?  Do you recall when folks
20   were actually interviewed for the position?
21   A.   How specific do you -- do I recall
22   what day?

Page 52

1    Q.   Yes.
2    A.   No, I don't recall what day.
3    Q.   I'm showing you what's been marked
4    as something taken from the report of
5    investigation.  It says, "Final Interview
6    Schedule."  It has July -- well, first, it
7    says, "Final Interview Schedule 3092 S," what
8    does that mean?
9    A.   That's the office number.
10   Q.   Is that a room?
11   A.   Yes.
12   Q.   Okay.  Is that where the interviews
13   took place?
14   A.   If that was the -- if that's my
15   office number, then yes.
16       Yeah, that would be our office
17   number.  But it could be the secretary outer
18   office.  It could be my office.
19   Q.   And there is a schedule that starts
20   with Wednesday, July 16?
21   A.   Yes.
22   Q.   Are you referring to some other

Page 53

1    document?
2    A.   No.  I was trying to see that this
3    is an old book from when I was working and I
4    have an old card there and I can probably tell
5    you what my office number was.
6    Q.   Oh, okay.
7    A.   3094.  My office is 3094.  3092 is
8    the secretary's reception room.
9    Q.   Okay.  So there's -- on this
10   schedule there is Wednesday, July 16; Thursday,
11   July 17; Monday, July 21?
12   A.   Uh-huh.
13   Q.   Do you see that?
14   A.   Yep.
15   Q.   Ad there is -- there are times to
16   the left and then on the right there is
17   handwritten note of unknown Applicant F,
18   Selectee Applicant H?
19   A.   Yes.
20   Q.   Okay.  Do you know what these names
21   refer to?
22   A.   People that were being interviewed.

14 (Pages 50 to 53)

Douglas Frago

Page 54

1     Q.   Were these folks being interviewed
2   for both positions or just for the
3   administrative?
4          MS. KIDWELL: Mr. Branch, I'm going
5   to object. I don't see any names on Exhibit 1
6   that I have a copy of.
7          MR. BRANCH: He said these -- the
8   unknowns selectee applicant refers to folks who
9   were being interviewed.
10         THE WITNESS: That's -- I would
11  assume that's what they mean.
12         BY MR. BRANCH:
13    Q.   Does this refresh your memory on
14  when people were interviewed for these
15  positions?
16    A.   What it does -- tells me on
17  Wednesday, 16th, that there was probably four
18  interviews. And on Thursday, July 17th, there
19  were three interviews, and Monday, July 21st,
20  there was one interview. So I assume this is
21  when they were interviewed.
22    Q.   Okay. On July 21st, that interview

Page 55

1   was for the complainant, and that would be Mrs.
2   Fields?
3     A.   Yes.
4          (Deposition Exhibit No. 2 was marked
5   for identification.)
6          BY MR. BRANCH:
7     Q.   I am showing what's been marked as
8   your Deposition Exhibit No. 2.
9          Can you identify this, please?
10    A.   This looks like a grid that either
11  Mr. Chott or Mrs. Treese made and lists the
12  numbers that we gave people.
13    Q.   Okay. And on the second page of
14  this document there are four columns across the
15  top, one, two, three, and four. Do you see
16  those?
17    A.   Uh-huh.
18    Q.   Underneath those there are initials.
19  Do you know who those initials refer to?
20    A.   John, Doug and Linda.
21    Q.   Okay. And along the left side there
22  are four names. Can you read those names?

Page 56

1     A.   Pat, Gene, Bruce and Sedaris.
2     Q.   And who are those folks?
3     A.   They were interviewed.
4     Q.   Were they applicants for the
5   administrative series position?
6     A.   Yes, they were applicants for the
7   administrative position.
8     Q.   Were they also applicants for the
9   program position?
10    A.   No.
11    Q.   Let's turn to the second page. The
12  names along the left-hand column?
13    A.   Uh-huh.
14    Q.   Can you read those names?
15    A.   Linda, Jan, Ken and Chuck.
16    Q.   And who are those folks?
17    A.   They were interviewed also.
18    Q.   And they were applicants for which
19  position?
20    A.   Linda, Jan and Chuck were for the
21  program, and Nagel was for both.
22    Q.   Linda, Jan and Chuck, they were for

Page 57

1   the program position. And you're saying Ken
2   was for both positions?
3     A.   Uh-huh.
4     Q.   Why isn't Ken's name on the first
5   page?
6     A.   I have no idea.
7     Q.   And the initials across the top for
8   four columns, looks like J, D and L?
9     A.   That's correct.
10    Q.   What do they represent?
11    A.   John, Doug and Linda.
12    Q.   Now, were these grids prepared at
13  the same time?
14    A.   I don't -- I did not prepare the
15  grids. The grids were prepared when we were
16  sitting at the table. I remember the --
17    Q.   That was after everyone was
18  interviewed?
19    A.   Yes.
20    Q.   Okay. So it appears that from
21  Exhibit No. 1 that Mrs. Fields was interviewed
22  on Monday, July 21?

15 (Pages 54 to 57)

Page 58

1    A.    Uh-huh.
2    Q.    Is that correct?
3    A.    Correct.
4        (Deposition Exhibit No. 3 was marked
5    for identification.)
6        BY MR. BRANCH:
7    Q.    Can you identify this document?
8    A.    This is the certificate that I
9    believe goes back to the personnel. Let me
10    read it.
11        Yes. Okay.
12    Q.    And it's a two-page document?
13    A.    Correct.
14    Q.    And what is the second page of this
15    document?
16    A.    Well, it looks like this document is
17    a promotion noncompetitive certification.
18    Q.    The second page of the document?
19    A.    That's what the title is.
20    Q.    Okay. And is that your signature at
21    the bottom of the second page?
22    A.    That's my signature.

Page 59

1    Q.    And what's the date of this
2    document?
3    A.    Issue date is 28th and the sign date
4    is July 21st.
5    Q.    So did you sign this on July 21st,
6    2003?
7    A.    Boy, is that my -- are those my
8    numbers?
9        Mr. Branch, I signed it. That's my
10    signature.
11    Q.    And what about the numbers there,
12    the date, the numbers with the date?
13    A.    It looks like they are my numbers,
14    too.
15    Q.    Okay. And can you explain to me
16    what this first page is?
17    A.    I have to read it. I have only --
18    I've seen is this once when I signed it.
19    Q.    Is that your signature at the
20    bottom?
21    A.    That's my signature.
22    Q.    It's cut off, but is that your

Page 60

1    signature?
2    A.    That's my signature. And the NS and
3    Ss are mine. All this other -- the material
4    written on the right-hand side is not mine and
5    the selection on the left-hand side is not
6    added, but the NS, and the Ss are mine.
7    Q.    And what about the Y --
8    A.    Yes.
9    Q.    -- and the no?
10    A.    Those are mine, also.
11    Q.    Okay. So did you complete this
12    form?
13    A.    I completed those interview yes and
14    no and action SD or NS.
15    Q.    Okay. This is --
16    A.    This would be -- excuse me -- under
17    the advisement because I would have never seen
18    one of these forms in my life before this
19    interview process.
20    Q.    Okay. So I believe you told me
21    previously that you interviewed five people for
22    the two administrative management specialist

Page 61

1    positions?
2    A.    I don't know how many of the 14 were
3    the administrative. I don't recall that. I
4    mean, do you have that there?
5    Q.    No. I'm just asking you for -- did
6    you interview five people for the
7    administrative or at least a second interview
8    for the administrative position?
9    A.    Second interview there were five,
10    yes.
11    Q.    Okay. What does this reflect? Is
12    this all the interviews for the administrative
13    position?
14    A.    That would be my assumption. Let me
15    read it.
16        God, I hate to make assumptions.
17    This is the form that was sent back to
18    personnel. And it looks like to me that
19    everybody is on that list.
20        Is there 13 there or 14?
21    Q.    You'll have to tell me.
22    A.    13. We didn't interview 13 for each

16 (Pages 58 to 61)

Douglas Frago

Page 62

1  one. So I -- my assumption is that is the
2  total number of people interviewed.
3      Q.    And I believe your prior testimony
4  was that you believe that after all the
5  interviews and you had this discussion with
6  Treese and Chott, that the selections were made
7  for all three positions?
8      A.    After all the interviews, after the
9  discussion, yes.
10     Q.    Okay. And the final -- Mrs. -- was
11 Mrs. Fields the last person to be interviewed?
12     A.    It would appear on this one, yes.
13     Q.    Do you recall if she was the last
14 person to be interviewed or not?
15     A.    I recall because what sticks in my
16 mind -- and as I am thinking it -- before
17 coming here today, there just seemed to me that
18 there was a difficulty that Mrs. Fields was not
19 available for the Wednesday and Thursday. That
20 just sticks in my mind. I won't swear on a
21 Bible. Excuse me. I won't swear on a Bible on
22 that, but it sticks in my mind that there was

Page 63

1  difficulty with the secretary scheduling Mrs.
2  Fields.
3      Q.    Was it because she was on travel?
4      A.    There was some reason.
5      Q.    And is it your testimony that no
6  decisions were made on the selections until
7  Mrs. Fields was selected?
8      A.    Until she was interviewed.
9      Q.    Until she was interviewed?
10     A.    Absolutely.
11     Q.    Okay.
12     A.    And I know that we are writing all
13 this down, but Mrs. Fields did react there.
14 Did I remember correctly?
15     Q.    Wait. Well, now, hold on. I'm just
16 asking you questions, sir.
17     A.    Okay. Sorry.
18     Q.    If you can just answer.
19         (Deposition Exhibit No. 4 was marked
20 for identification.)
21         BY MR. BRANCH:
22     Q.    I am showing you what is marked as

Page 64

1  Deposition Exhibit No. 4.
2          Have you seen that document prior to
3  today's date? There is an e-mail address there
4  that says Doug Frago USDA?
5      A.    Yes.
6      Q.    Is that your e-mail address?
7      A.    Yes.
8      Q.    Okay.
9      A.    Why am I hesitant? The assumption
10 is, of course, it is.
11     Q.    Okay.
12     A.    It's there and it went through and
13 it didn't bounce back.
14     Q.    All right. And what's the date of
15 this e-mail?
16     A.    July 18th.
17     Q.    Of what year?
18     A.    '03.
19     Q.    And was that before or after Mrs.
20 Fields was interviewed for the position?
21     A.    Well, she wasn't interviewed for
22 this position.

Page 65

1      Q.    Was that before or after. Was July
2  18th before or after Mrs. Fields was
3  interviewed?
4      A.    July 18th is the Friday. It is
5  before Mrs. Fields is interviewed.
6      Q.    And what is this -- what is the
7  subject of this letter or subject of this
8  e-mail?
9      A.    That Doug has chosen Linda Cronin
10 for -- subject, his selection.
11     Q.    Okay. And what is the contents, if
12 you can read the contents of this e-mail?
13     A.    That "Doug has chosen Linda Cronin
14 for the program specialist position."
15     Q.    So this e-mail seems to suggest that
16 Doug -- and that would be you, correct?
17     A.    Uh-huh.
18     Q.    Doug Frago has chosen Linda Cronin
19 for the program specialist position and it's
20 dated July 18th, 2003?
21     A.    That's what it says there.
22     Q.    Okay. And I believe your prior

17 (Pages 62 to 65)

Page 66

1  testimony was that Linda Cronin was not
2  selected until Mrs. Fields was interviewed?
3     A.   That's what I recalled.  But this
4  would tell me that Mr. Chott sent this out
5  before we finished the administrative
6  interviews.
7     Q.   Before you --
8     A.   So I stand corrected.
9     Q.   Okay.  So Mr. Chott sent this e-mail
10  out -- July 18th, 2003 e-mail out before the
11  interviews were completed?
12     A.   Before the administrative interviews
13  were completed.
14     Q.   Okay.  Now, I believe you testified
15  previously that after all the interviews since
16  Ken Nagel ranked the highest in both the
17  administrative and the program interviews, that
18  he was given the option of selecting the
19  program position or the administrative
20  position?
21     A.   That's what I recall.  The timing
22  may be off, but that's what I recall.

Page 67

1     Q.   Okay.
2     A.   My timing may not be on, but that's
3  what I recall.
4     Q.   So how can it be that Nagel was
5  given the option of accepting the
6  administrative or the program position and that
7  position was announced that it had been filled
8  on July 18th and Mrs. Fields was not even
9  interviewed until July 21?
10     A.   Then it would tell me that the
11  interviews of all the program applicants had
12  already been completed and it tells me that
13  maybe what it was is that Ken opted to only be
14  considered for the administrative.  And
15  therefore that relieved the selection -- the
16  timing I'm just -- Mr. Branch, I can't remember
17  the timing if I can't remember the timing.
18     I just know that what I have told
19  you as far as Ken was the top on both, and you
20  know, if John sent this out on the 18th, on the
21  Friday after, it would then tell me that the
22  decision for the program position had been made

Page 68

1  before the administrative position.
2     Q.   All right.  So now let's get this
3  clear.  When did you make a decision on the
4  program position?
5     A.   Looking at that would tell me it
6  would have been on Thursday or Friday.  The
7  timing there is 4:56 p.m..
8     Q.   So you believe you made a decision
9  on the program position before --
10     A.   I believe I --
11     Q.   -- before Friday at 4:56 p.m.?
12     A.   What I told you is I believe that I
13  made the decision after all people were
14  interviewed.
15     Q.   Okay.  And which --
16     A.   I evidently recalled incorrectly.
17     Q.   So now you're changing your
18  testimony?
19     A.   Am I to assume that this is a fact?
20     Q.   Well, I can't answer the question
21  for you.
22     A.   And I can't either.  So I can't

Page 69

1  answer that.  That, I can't -- I can't answer
2  that question because if that went out, that
3  would tell me -- if this is, in fact, an e-mail
4  that went out, then Mr. Chott is informing the
5  staff that Ms. Cronin has been selected as the
6  program specialist.  And that is on the -- July
7  18th.  Which is the day after the Thursday.
8     Q.   So is it your belief that Nagel
9  declined the position of program specialist
10  before the final -- before the interview
11  process was even completed for the
12  administrative position?
13     A.   That would appear to me that that
14  would tell us.
15     Q.   Did John Chott tell you that Nagel
16  had declined the position before the
17  interviewing process was completed for the
18  administrative position?
19     A.   That, I don't recall.  I recall that
20  Mr. Nagel came out top on all of them.  That, I
21  just recall.  Because that's what my notes
22  have.

18 (Pages 66 to 69)

Douglas Frago

Page 70

1    Q.    Was Mr. Nagel a preselection for
2    this administrative position?
3    A.    Absolutely not.
4    Q.    Well, that's what it seems like from
5    these documents?
6        MS. KIDWELL: Objection.
7    Argumentative.
8        THE WITNESS: Absolutely not.
9    BY MR. BRANCH:
10    Q.    It appears that a decision had
11    already been made to select Mr. Nagel.
12    Wouldn't that be an explanation for this?
13        MS. KIDWELL: Objection.
14    Argumentative, improper foundation.
15        THE WITNESS: No, Mr. Branch. No,
16    it would not be. There was no preselection.
17    The best candidates were selected after the
18    interview process.
19    BY MR. BRANCH:
20    Q.    But as I understand your prior
21    testimony, Mr. Nagel declined the position of
22    program specialist?

Page 71

1    A.    No, I did not say he declined.
2    Q.    He was given the option of -- allow
3    me to finish.
4    A.    I believe he was given the option,
5    yes.
6    Q.    Okay.  He was -- your testimony, I
7    believe, was that he was given the option of
8    accepting the program or the administrative
9    position and he decided to accept the
10    administrative position?
11    A.    And again, this is recalling four
12    years later is giving the option or wanting to
13    be considered for -- I don't know the
14    correct -- I don't know what terminology was
15    used. It's four years ago.
16        MR. BRANCH: Let's take a short
17    break here.
18        (A short recess was taken.)
19    BY MR. BRANCH:
20    Q.    Mr. Frago, for the individuals who
21    were recommended for selection for the two
22    administrative positions, did they agree to

Page 72

1    accept the positions before you sent the
2    certificate to personnel?
3    A.    Not that I recall.
4    Q.    So can you explain to me why you
5    would send a certificate to personnel before
6    the positions were accepted?
7    A.    My understanding -- personnel -- as
8    far as I understand, personnel is the one that
9    makes the offer.  Personnel is the one that
10    does that.
11    Q.    So what did you understand your role
12    when you completed this?
13    A.    That as selecting official telling
14    personnel who the choice was for the position.
15    Q.    Okay.  For the second page of -- I
16    think this is Exhibit No. 3, I guess it's the
17    first page of Exhibit NO. 3.  The second page
18    may be a continuation of that first page.
19    A.    I have come to the same conclusion.
20    Q.    So there are two names, two items
21    listed here with selecting one and selecting
22    two.

Page 73

1        Do you see those two items?
2    A.    Uh-huh.
3    Q.    Is that a yes?
4    A.    Yes.
5    Q.    And this page -- this document is
6    dated July 21st, 2003?
7    A.    Yes.
8    Q.    Had Mr. Spalding or Mr. Nagel
9    accepted the position when you sent this merit
10    promotion competitive certificate to personnel?
11    A.    I don't recall.
12    Q.    Had you spoken with either one of
13    them to offer the position to them?
14    A.    I don't believe I had.
15    Q.    Did you speak to either Mr. Nagel or
16    Mr. Spalding after you completed this to offer
17    the position to them?
18    A.    At the point that personnel would
19    have said I can do that that's what I would
20    have done.
21    Q.    Do you recall how long it was after
22    you sent this to personnel before personnel

19 (Pages 70 to 73)

Page 74

1  said to you, you can offer these folks a job?
2      A.   No, I do not.
3      Q.   Was it within --
4      A.   I think this must be Carol Taylor's
5  signature.
6      Q.   Was it within a week or a month?
7      A.   Do not know.  No.  It would have
8  been soon after.
9      Q.   What do you mean by soon after?
10  Less than a week, less then a month?
11      A.   I would assume a couple -- here I
12  go.  In a couple of days.
13      Q.   And so --
14      A.   If not that day.
15      Q.   Okay.  And --
16      A.   I don't recall.
17      Q.   Okay.  And after personnel told you
18  it was okay to offer the position to them what
19  did you do?  Did you contact these folks?
20      A.   At some point I talked with Nagel,
21  Cronin and Spalding as I talked with Linda
22  Treese.

Page 75

1      Q.   And what did you tell these --
2  Nagel, Spalding and Cronin?
3      A.   That they were my selection for the
4  position.
5      Q.   And you don't know if that was
6  before or after you spoke to personnel?
7      A.   I wouldn't have spoke directly to
8  personnel.  This would have gone over and they
9  would have communicated back.
10      Q.        ,.  Or after someone spoke --
11  someone from personnel spoke to you and
12  communicated back to you?
13      A.   That that was a process.
14      Q.   Do you know when that -- when it
15  occurred that you talked to these?
16      A.   No, I do not.
17      Q.   Cronin, Nagel or Spalding?
18      A.   No, I do not.
19      Q.   Did you talk to those three
20  individuals on the same day?
21      A.   I do not recall.
22          (Deposition Exhibit No. 5 was marked

Page 76

1  .for identification.)
2          BY MR. BRANCH:
3      Q.   Showing you what has been marked as
4  Deposition Exhibit No. 5.
5          Can you identify this document?
6      A.   The document is an e-mail from John
7  Chott, July 22nd, '03.  Subject was selection.
8  It says, "Doug has asked that all of you be
9  notified that he is has selected Ken Nagel and
10  Pat Spalding of FLP for the two administrative
11  positions."
12          MS. KIDWELL:  Mr. Branch, just for
13  the record, agency counsel -- neither agency
14  counsel or I have seen Exhibits 4 and 5 prior
15  to this deposition.
16          MR. BRANCH:  Mrs. Fields, you can
17  see that there is a date here at the bottom.
18  I'm not sure the source of the date, but we
19  just received these documents today.  So the
20  first time I have seen them is today.
21          I think they probably would have
22  been responsive to the discovery request that

Page 77

1  we -- when we asked for all the documents
2  related to the filling of these positions.  So
3  I'm concerned that the agency hasn't adequately
4  checked the electronic mails to produce these
5  documents, or produce these e-mails.
6          MS. KIDWELL:  Mr. Branch, for the
7  record, I think that these documents are
8  also -- should have been responsive to the
9  discovery which we propounded to the plaintiff.
10          MR. BRANCH:  And what I'm telling
11  you I just received it today so you're getting
12  it the same day that I'm receiving it.  But the
13  agency should have checked its records, it
14  should have produced these documents
15  previously?
16          MS. KIDWELL:  If the documents were
17  available..  We're talking over four years ago.
18          BY MR. BRANCH:
19      Q.   Did you authorize John Chott to
20  advise the staff that Ken Nagel and Pat
21  Spalding have been selected for the two
22  administrative positions?

20 (Pages 74 to 77)

Douglas Frago

Page 78

1    A.   He did. I assume I did.

2    Q.   I understand that Mrs. Fields was

3  interviewed on the afternoon of the 21st, of

4  July 21st, and then there was some discussion

5  with the panel members. There was a ranking or

6  rating of the candidates and then this e-mail

7  which is dated the following day indicates that

8  Ken Nagel and Pat Spalding were selected for

9  the administrative positions. Is that your

10  memory of how things happened?

11    A.   Yes.

12    Q.   Do you recall talking to Ken Nagel

13  on the evening of July 21st at 6:00 and Mr.

14  Nagel -- I'm sorry.

15         Do you recall talking to Pat

16  Spalding on the evening of July 21st at 6:00

17  p.m. and Mr. Spalding telling you that he could

18  not accept the position until he spoke with his

19  wife?

20    A.   I don't recall that.

21    Q.   And on July 21st you submitted to

22  your personnel department this merit promotion

Page 79

1  competitive certificate where you indicated

2  that the selectee was -- that two individuals

3  have been selected from the applicants?

4    A.   Correct. Yes, I see that.

5    Q.   Okay. How could it be that the

6  selections were made for these two individuals

7  when Mr. Spalding didn't agree to accept the

8  position until the 22nd of July?

9    MS. KIDWELL: Objection. Improper

10  .uundation.

11    THE WITNESS: My understanding --

12  not my understanding. The selection process is

13  once people are selected it goes -- it's sent

14  to personnel. Whether a person accepts the

15  position or doesn't accept the position is

16  irrelevant.

17    BY MR. BRANCH:

18    Q.   Mr. Frago, do you know what the

19  difference is between a -- between the 301

20  administrative position at the 14 level and the

21  program specialist position 1145 at the 14

22  level?

Page 80

1    A.   I am not a expert on different

2  classifications, program is one. Personnel is

3  the other. I mean --

4    Q.   I understand Mr. Nagel was the

5  highest rated person for the program specialist

6  position which was -- which is an 1145

7  position?

8    A.   Okay.

9    Q.   But he was not selected for the

10  program specialist position at the 14 level

11  even though he was already in the 1145 series.

12  Do you know why that occurred?

13    A.   Repeat it again.

14    Q.   Mr. Nagel was in the 1145 series at

15  a grade 13 level. He applied for a grade 14

16  position in the 1145 series but he was not

17  selected for that position. And I am asking

18  you, do you have an explanation of why, if he

19  was already in the 1145 series at the 13 level,

20  he was not selected for the grade 14 position

21  in the 1145 series?

22    A.   According to my notes, he was -- he

Page 81

1  scored the highest in the administrative

2  position.

3    Q.   Okay. But why was -- if he was

4  already in the 1145 series, why wasn't he

5  selected for the 1145 series at the grade 14

6  level?

7    A.   I don't know if it would make any

8  difference.

9    Q.   What do you mean it wouldn't make

10  any difference?

11    A.   Because he qualified for either one

12  of the two.

13    Q.   Well, it would mean that someone

14  other than Mr. Nagel would have to be selected

15  for the administrative series position,

16  wouldn't it?

17    A.   That, I don't know. It would assume

18  to me, then, Mr. Peters -- taking your line of

19  thought, then Mr. Peters would be the next

20  selectee.

21    Q.   And who is Mr. Peters?

22    A.   He was number three in the

21 (Pages 78 to 81)

Page 82

1  administrative.
2      Q.   Was Mr. Peters already in the 301
3  series?
4      A.   I have no idea. I have no idea. I
5  have no idea what series they were in.
6          (Deposition Exhibit No. 6 was marked
7  for identification.)
8      Q.   I believe your prior testimony was
9  that you believe that it was HR approved the
10 process of not having an EEO observer on the
11 second interview panel?
12     A.   Repeat that again. I don't think
13 that's what I said.
14     Q.   Why did you not have an EEO observer
15 on the second panel?
16     A.   What did you just say? I'm sorry.
17     Q.   Well, let me just rephrase the
18 question.
19         Why did you not have an EEO observer
20 on the second panel?
21     A.   We just didn't, but we asked Carolyn
22 Taylor if we had to and she indicated no, that

Page 83

1  it was not necessary.
2      Q.   Okay. Can you read this first
3  sentence of this e-mail?
4      A.   "The EEO representatives are
5  required only for panel interview process. If
6  you're doing a second interview which is
7  usually with a selecting official or
8  representative, you do not need an EEO
9  present."
10     Q.   Was the second interview a panel
11 interview? Was the second interview for the
12 administrative specialist position a second --
13 a panel interview?
14     A.   The second interview was Mr. Chott
15 and I and Mrs. Treese because she had just been
16 selected and was going to serve.
17     Q.   Was that a panel?
18     A.   I don't think it was -- I don't
19 remember referring to it as a panel.
20     Q.   Well, what's your under --
21     A.   The first one was a panel.
22     Q.   Why -- how did the first one differ

Page 84

1  from the second?
2      A.   I wanted Mrs. Treese to have some
3  input because she was going to be the
4  supervisor of the these positions.
5      Q.   Okay. Then you misunderstood my
6  question.
7          Why was the first interview that
8  included three people consist -- considered a
9  panel and the second interview that included
10 three interviewers not considered a panel?
11         MS. KIDWELL: Objection. Improper
12 foundation.
13         THE WITNESS: It just wasn't
14 referred to as a panel.
15         BY MR. BRANCH:
16     Q.   What was it referred to as?
17     A.   We were having a second interview
18 and I wanted Mrs. Treese to be present.
19     Q.   And the second part of this first
20 sentence says that if you're doing a second
21 interview, which is usually with the selecting
22 official or representative, you do not need EEO

Page 85

1  present.
2          Was the second interview with the
3  selecting official alone?
4      A.   No.
5      Q.   Was the second interview with the
6  selecting official or the selecting official's
7  representative alone?
8      A.   No.
9      Q.   Have you seen this e-mail prior to
10 today's date?
11     A.   No.
12     Q.   What's your understanding of this
13 first sentence, the first two sentences here?
14     A.   That in the initial panel we need
15 you to have an EEO representative and the
16 second one we did not. The second --
17     Q.   The second what?
18     A.   Interview we did not.
19     Q.   Well, doesn't this seem to say that
20 if you're doing a second interview, which is
21 usually with the selecting official or
22 representative, you do not need EEO present?

22 (Pages 82 to 85)

Douglas Frago

1    MS. KIDWELL: Objection. Asked and
2  answered.
3    THE WITNESS: I think I already
4  answered that.
5    BY MR. BRANCH:
6    Q.  And the EEO representative is
7  required only for panel interview process?
8    A.  That's what it says.
9    Q.  Okay.  Do you know if there was any
10 follow-up to seek clarity on whether the three
11 individuals who conducted the second interviews
12 were considered a panel?
13   A.  I have no idea.  Mr. Chott sent this
14 one.
15   Q.  Mr. Frago, are you aware of any
16 occasion where John Chott has made racist
17 comments?
18   A.  No.
19   Q.  Has he made any racist comments in
20 your presence?
21   A.  No.
22   Q.  Have you been told that he made

1  racist comments at any occasion?
2    A.  No.
3    Q.  Wasn't it true that John Chott
4  referred to an African-American employee as a
5  fat afro black lady or something along those
6  lines?
7    A.  Never heard that.
8    Q.  Are you aware of any EEO complaints
9  being filed against Chott?
10   A.  No.
11   Q.  Have you sat on any other panels
12 other than the panels that you sat on for this
13 position?
14   A.  No.
15   Q.  Were there other EEO complaints
16 filed against your agency or you department
17 while you were the supervisor?
18   MS. KIDWELL: Objection.  Improper
19 foundation.
20   THE WITNESS: My department, no.
21   (Deposition Exhibit No. 7 was marked
22 for identification.)

1    BY MR. BRANCH:
2    Q.  I am showing you what has been
3  marked as Deposition Exhibit No. 7.
4    Can you identify this, please?
5    You may not be able to identify it
6  from the first page since the name is redacted.
7    A.  I don't.
8    Q.  If you will look at the last --
9    A.  Personnel action?
10   Q.  Yeah.  If you will look at the last
11 page, do you see your name on this document?
12   A.  Uh-huh.
13   Q.  And you're listed as the rating
14 official?
15   A.  Uh-huh.
16   Q.  I'm going to represent to you that
17 this is the evaluation for Mr. Nagel for the
18 period ending September 30th, 2002.
19   A.  Uh-huh.
20   Q.  If you will turn to the second page
21 of this document, second page, Page 2.
22   A.  This is Page 2.

1    Q.  Okay.  The second page of the
2  document under title, series and grade program
3  coordination specialist GS 301 13/04?
4    A.  Uh-huh.
5    Q.  Do you see that?
6    A.  Yes.
7    Q.  Was Mr. Nagel in a 301 series
8  position for the year ending 2002?
9    A.  I have no idea.
10   Q.  Okay.  But you signed this document?
11   A.  I signed the rating.  I didn't --
12 yes, I signed the rating, yes.
13   Q.  Do you know why his performance plan
14 agreement and appraisal would indicate that he
15 was in a 301 series position?
16   A.  I have no idea.
17   MS. KIDWELL: For the record, Mr.
18 Nagel's name does not appear anywhere on
19 Exhibit 7.
20   MR. BRANCH: Yeah.  The names have
21 been -- the name has been redacted.
22   BY MR. BRANCH:

23 (Pages 86 to 89)

Douglas Frago

1    Q.   Turn, if you will, to --
2         (Deposition Exhibit No. 8 was marked
3    for identification.)
4         BY MR. BRANCH:
5    Q.   Can you identify these?
6    A.   These are my notes.
7    Q.   If you will turn to the first page,
8    these are your interview notes?
9    A.   Yes.
10   Q.   Okay.  And do you see Mrs. -- the
11   first individual interview, do you have
12   Sederis?
13   A.   Yes.
14   Q.   Is that Mrs. Fields?
15   A.   That is correct.
16   Q.   There is no date on this document,
17   correct?
18   A.   That is correct.
19   Q.   And why isn't there a date on the
20   document?
21   A.   Because these were my working notes
22   to help me recall.  They were -- that's what

1    they were.
2    Q.   And there is a number to the left of
3    each of the four questions?
4    A.   Correct.
5    Q.   Did you make those numbers?
6    A.   That is correct.
7    Q.   Was there a discussion between you
8    and the other panel members on what scores or
9    what answers would receive particular scores in
10   response to these questions?
11   A.   No.
12   Q.   So how did the panel members know
13   what was a good score or what was a good
14   answer?
15   A.   Each individual has that subjective.
16   Q.   Can you read Mrs. -- read your notes
17   in response to question number one for Mrs.
18   Field?
19   A.   Sure.
20        My notes.
21   Q.   Yes.  Read them, please.
22   A.   "20 years experience, identifies

1    problems, extensive work" -- "extensive working
2    with the counties, research mediation," I'm not
3    sure what my next word is there.  "Good
4    listener."  And I put "narrow" on the side.
5    Q.   What does narrow mean?
6    A.   As I remember, it was related to the
7    20 years experience because I felt the comments
8    were very narrowly focused on her expertise as
9    civil rights EEO.
10   Q.   And did you originally give her 2
11   and cross it out and change it to the a 3?
12   A.   Yes, I did.
13   Q.   Did you give her -- originally give
14   her 2s for all of her scores?
15   A.   I don't recall whether I crossed a 2
16   out.  If I rated 2 and then scratched it out
17   and put the 3 and then went on to question
18   number 2.
19   Q.   Now, did you make your decision on
20   the selection of Spalding and Nagel based only
21   on their interviews?
22   A.   No.  No.  I said that we went

1    through this second process and then looked at
2    the resumes.
3    Q.   Were the applicants given any credit
4    for the information contained in the resumes?
5    A.   Oh, sure, yes.
6    Q.   Where was that?
7    A.   That was when I was making the final
8    decision.
9    Q.   Did you give them any numerical
10   score for the information contained in the
11   resumes?
12   A.   No.
13   Q.   Can you read the notes that you made
14   in response to question 2 for Mrs. Fields?  Can
15   you read your handwriting?
16   A.   Yeah, I will get to it.  I'm reading
17   the question first.
18        Mrs. Sederis's first comment was so
19   many.  She indicated there were so many
20   accomplishments.  I am not sure the amount of
21   harassment investigations.
22   Q.   Is that sexual harassment?

24 (Pages 90 to 93)

Douglas Frago

Page 94

1    A.    Could be.
2    Q.    Okay.  What else?
3    A.    Deals with civil rights.  SCS.  She
4  was certified as a mediator.
5    Q.    Where are you reading?
6    A.    Number 2.
7    Q.    Okay.  What's the second line, the
8  first sentence on the second line?
9    A.    "Misunderstanding of program."
10    Q.    What does that mean?
11    A.    I believe in the response to the
12  question there must have been something that
13  Sederis had said that indicated that I wrote
14  misunderstanding of program.
15    Q.    Who are you referring to?
16    A.    Sederis.
17    Q.    That she had a misunderstanding of
18  some program?
19    A.    Uh-huh.
20    Q.    What program?
21    A.    I don't recall.
22    Q.    Okay.  What's your -- can you read

Page 95

1  anything else from that response?
2    A.    No.
3    Q.    Can you read your notes from the
4  third -- her third -- response to the third
5  question?
6    A.    "Describe yourself in terms of your
7  ability to work as a member of the team and
8  what do you believe makes successful chain,
9  respect others opinion.  Dependable, panel
10  participant, never says no or never say no,
11  likes various committees."
12    Q.    And what was -- can you read your
13  notes for question 4?
14    A.    It was "Tell me about a major
15  problem you recently handled.  What issues were
16  presented?  Were you successful in resolving
17  it?  Please be specific as possible."
18        And the response was a short notice
19  on award that she was asked to do some logistic
20  responsibilities, make reservation, hotel, work
21  at hotel, time, et cetera, many problems.  She
22  worked on the Christmas party at the last

Page 96

1  moment.  She did the investigation in Georgia.
2  I am not sure why I have a question mark on
3  that computer hard line drive.  I didn't know
4  what -- didn't come out clear to me.  I have no
5  idea what that refers to.  And then she puts
6  likes to follow through.
7    Q.    What is this comment "can't chew"?
8  What's that?
9    A.    It's related to the hard drive on
10  the computer.  Went down.  And I'm not sure.
11  That's not can't.  I don't know what that
12  means.
13    Q.    And what's the last thing?
14    A.    Christmas party.  I wrote that twice
15  in the middle because I remember Sederis -- one
16  of the accomplishments -- well, one of her
17  successful resolution of a major problem and I
18  rated her low because there were so many other
19  things that seemed to be more important than
20  Christmas parties or award ceremonies.
21    Q.    Okay.  And let's look at your notes
22  for Pat Spalding.  Under question number 1 it

Page 97

1  looks like the word "John" is written to the
2  left.  What is that?
3    A.    Yeah.  He asked that question.  John
4  asked that question.  Linda asked the second
5  question.  Doug asked the third question.
6    Q.    Oh, okay.
7    A.    We all asked the same question.
8    Q.    All right.  Can you read your notes
9  there?
10    A.    Sure.  First one?
11    Q.    Yes.
12    A.    "Knowledge of FSA and FMHA, positive
13  attitude."  I put good body language,
14  communication, administrative background and
15  contracting.  I'm not sure what that word is,
16  but he worked between MSD which is management
17  service department and the field.
18    Q.    It looks like disconnect?
19    A.    Could be.  Disconnect between MSD
20  and the field.  Budgeting, funding, some
21  personnel and the work with OPM.
22    Q.    Now, this position was an

25 (Pages 94 to 97)

Douglas Frago

Page 98

1  administrative management position, correct?
2    A.  Uh-huh.
3    Q.  And most of the work would be
4  personnel; is that correct?
5    A.  No.
6    Q.  Most of the work would be in what
7  area?
8    A.  Contracting, budgeting, funding,
9  office consolidations.
10    Q.  Okay.  What's your -- can you read
11  your notes for the second question?
12    A.  "In your accomplishments describe in
13  detail two or three accomplishments.
14  Reorganization of office closures, employment
15  movement," employees had to be moved from one
16  office to another.  Many reorganization or
17  organization of a state office.  And the horse
18  breeding regulation was a major issue in the
19  farm home -- farm loan program with Mrs.
20  Cooksey and he indicated that he wrote the
21  regulations and worked on the regulations for
22  the Horse Breeders Association regulations.

Page 99

1    Q.  Okay.  And what was his response to
2  the third question?
3    A.  "Describe yourself in terms of your
4  ability to work as a member of a team.  What do
5  you believe makes a successful team?  He's a
6  team player.  Personalize, must lead well or be
7  a leader, communications, goals being" -- "set
8  goals."
9    Q.  And what was his response to
10  question 4?
11    A.  "Tell me about your major problem
12  you recently handled.  What issues were
13  present?  Were you successful in resolving it?
14  Please be specific."  MT stands for Montana.
15  Walton stands for a major issue of an eviction
16  in Montana of some landowners and he was --
17  worked closely on the Walton program and the
18  ultimate -- that the Waltons complied with the
19  eviction.  The other was office ceilings.  That
20  he worked on office ceilings in the farm loan
21  program sections.
22    Q.  Turn, if you will, to section -- to

Page 100

1  the next page, Ken Nagel.
2    A.  Uh-huh.
3    Q.  You dated this document, correct?
4    A.  Uh-huh.
5    Q.  Is that a yes?
6    A.  Yes.
7    Q.  Can you read your notes under
8  question 1?
9    A.  "Strong FSA background.  CD
10  management of people, CECD account executive
11  director, management of people.  Worked with
12  the state White House.  Liaison" -- but I can't
13  remember what the other heading was.  For the
14  state committees.  He worked with FAC, F-A-C,
15  which is -- what does FAC stand for?  The
16  National FAC.  It's the organization between
17  FSA.
18    Q.  If you can just read what you wrote,
19  that would be fine?
20    A.  Okay.  "Speaking engagements and the
21  farm loan liaison for the field operations."
22    Q.  And his answer was in response to

Page 101

1  his application for which position?
2    A.  Both.  Because you can see that he
3  is referring to the CED program positions and
4  working in the county and state office and the
5  administrative side would be the management of
6  people, the White House contacts and the
7  National FAC.
8    Q.  Now, on this page you included on
9  the left side it looks like ADM, is that
10  administrative?
11    A.  Administrative.
12    Q.  And on the right is program?
13    A.  Program.
14    Q.  Do you know why the other panel
15  members did not score Mr. Nagel for the
16  administrative and program separately?
17    A.  I think I already mentioned that,
18  that I don't know what they did.  I didn't see
19  their papers.
20    Q.  Okay.  What's your -- what was the
21  response to question 2 indicated in your notes?
22    A.  Okay.  "We're interested in your

26 (Pages 98 to 101)

Douglas Frago

Page 102

1 accomplishments, which you enjoy doing and
2 doing well. Worked with state committees. 235
3 appointments, successful task when the
4 administrative change occurred all state
5 committees had to be replaced. Working with
6 state SEDs the consent decree which was part of
7 farm loan consent decree," and the last refers
8 to working in Puerto Rico after the hurricane.
9 And the clearing of -- there were thousands of
10 cases.
11    Q.  Okay. What was your -- what do your
12 notes indicate in response to question 3?
13    A.  Well, I'm sure what I am writing is
14 ability as a team player, more than one person
15 on a team, and work together.
16    Q.  What do your notes indicate in
17 response to question 4?
18    A.  Major accomplishments, but he said
19 he took over the county committee systems and
20 the regulation writing, the denominations and
21 balloting for county committees.
22    Q.  Are you able to read the rest?

Page 103

1    A.  Information known as -- he also
2 worked on notices. Regulations. Agency
3 department regulations.
4    Q.  Now -- okay. Thank you.
5       Mr. Frago, I understand that during
6 the period when you were the supervisor in the
7 office that a number of positions were filled.
8 There was a position supervisor field
9 operations filled by Linda Treese; is that
10 correct?
11    A.  Correct.
12    Q.  She's a Caucasian female?
13    A.  Correct.
14    Q.  There's an administrative management
15 specialist position filled by Ken Nagel, he was
16 a Caucasian male?
17    A.  That is correct.
18    Q.  There was an administrative
19 management specialist position filled by Pat
20 Spalding and he is a white male; is that
21 correct?
22    A.  Correct.

Page 104

1    Q.  There is an agriculture program
2 specialist position at the 14 level filled by
3 Linda Cronin. She's Caucasian; is that
4 correct?
5    A.  That's correct.
6    Q.  And there is an agricultural
7 specialist -- program specialist position at
8 the 13 level filled by Rick Pinkston; is that
9 correct?
10    A.  That's correct.
11    Q.  And he's a white male, Caucasian
12 male?
13    A.  Correct.
14    Q.  There is an agricultural program
15 specialist position at the 13 level filled by
16 Arlene Moncollier. She's a Caucasian female?
17    A.  That's correct.
18    Q.  Is that correct?
19       There was a GS-14 filled by Jay
20 Mettinger. He was reassigned?
21    A.  He was reassigned.
22    Q.  Okay. He's a Caucasian male?

Page 105

1    A.  Correct.
2    Q.  All right. And all of this occurred
3 during the period when you were the -- in your
4 position?
5    A.  That's correct.
6    Q.  And there was a GS-12 position
7 filled by Deborah Johnson, a Caucasian female;
8 is that correct?
9    A.  She and Zena were there before I was
10 there.
11    Q.  Is that correct?
12    A.  What's the dates? What I am saying
13 is --
14    Q.  October 2005.
15    A.  Okay.
16    Q.  Is that correct?
17    A.  Yes.
18    Q.  All right. So it appears that there
19 were at least eight positions, fairly high
20 level at the 13 level or above that were filled
21 with Caucasians while you were the supervisor
22 of the office?

27 (Pages 102 to 105)

Page 106

1    A.   Why isn't Zena Riley on there?
2    Q.   I'm just asking you about these
3    eight positions.
4    A.   Yes.
5    Q.   Okay.  All right.
6         MR. BRANCH:  No additional questions
7    at this time.
8         BY MS. KIDWELL:
9    Q.   Mr. Frago, I just have a couple
10   questions.  With respect to the list that Mr.
11   Branch just read off to you, did you conduct
12   interviews for every one of those positions and
13   select every one of those individuals?
14   A.   No.
15   Q.   I'm sorry?
16   A.   No, I was not the selecting
17   official.
18   Q.   And are you married, Mr. Frago?
19   A.   Yes, I am.
20   Q.   Do you have any children?
21   A.   Four.
22   Q.   What are the -- what is the gender

Page 107

1    of your children?
2    A.   Two males and two females.
3    Q.   And what is the race or color of
4    your children?
5         MR. BRANCH:  Objection.  Relevance.
6         THE WITNESS:  Male African-American
7    son, male Hispanic-American son, and two girls,
8    one northern European and the other girl
9    combination of a lot of things.
10        BY MS. KIDWELL:
11   Q.   Mr. Frago, in response to one of Mr.
12   Branches's questions concerning EEO's
13   complaints against the department, were you
14   referring to the department -- United States
15   Department of Agriculture or were you referring
16   to your individual section or department?
17   A.   If I -- if we're referring to the
18   question that Mr. Branch asked has there been a
19   complaint against my department, I took it
20   meaning the deputy administrator for field
21   operations, my department.  No, there was not.
22        MS. KIDWELL:  I think that's all the

Page 108

1    questions I have, Mr. Branch.
2         MR. BRANCH:  Okay.  Thank you for
3    your time here today, Mr. Frago.  The court
4    reporter is going to prepare a transcript of
5    your proceedings here today if you want to
6    review the copy before it comes -- becomes
7    final, you need to indicate that on the record.
8         MS. KIDWELL:  Yes, we do.
9         THE WITNESS:  Yes, I do.
10        MR. BRANCH:  Okay.  Thank you for
11   your time.
12        (Whereupon, the proceeding was
13   concluded at 4:12 p.m.)
14
15
16
17
18
19
20
21
22

Page 109

1         ACKNOWLEDGMENT OF DEPONENT
2    I, DOUGLAS W. FRAGO, do hereby acknowledge I
3    have read and examined the foregoing pages of
4    testimony, and the same is a true, correct and
5    complete transcription of the testimony given
6    by me, and any changes or corrections, if any,
7    appear in the attached errata sheet signed by
8    me.
9    _____    _____
10   Date               DOUGLAS W. FRAGO
11
12
13
14
15
16
17
18
19
20
21
22

28 (Pages 106 to 109)

Douglas Frago

Page 110

1    CERTIFICATE OF NOTARY PUBLIC
2        I, Bonnie L. Russo, the officer before
3    whom the foregoing deposition was taken, do
4    hereby certify that the witness whose testimony
5    appears in the foregoing deposition was duly
6    sworn by me; that the testimony of said witness
7    was taken by me in shorthand and thereafter
8    reduced to computerized transcription under my
9    direction; that said deposition is a true
10   record of the testimony given by said witness;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this deposition was taken; and further,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of the action.
18   _____
19           Notary Public in and for
20           the District of Columbia
21   My Commission expires:  May 14, 2010
22

Page 112

1    DEPOSITION ERRATA SHEET
     CASE CAPTION: Fields vs. Johanns
2    DEPONENT: Douglas W. Frago
     DEPOSITION DATE: March 12, 2007
3        I have read the entire transcript of my
     Deposition taken in the captioned matter or the
4    same has been read to me. I request that the
     changes noted on the following errata sheet be
5    entered upon the record for the reasons
     indicated. I have signed my name to the Errata
6    Sheet and the appropriate Certificate and
     authorize you to attach both to the original
7    transcript.
     PAGE/LINE    CHANGE        REASON
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
     SIGNATURE_____DATE_____
19   DOUGLAS W. FRAGO
20
21
22

Page 111

1    Ms. Judith Kidwell
     US Attorneys Office
2    555 4th Street, NW
     Civil Division
3    Room E4905
     Washington, DC 20530
4
5
6
     IN RE:  Fields vs. Johanns
7
8
     Dear Ms. Kidwell:
9
     Enclosed please find your copy of the
10   deposition of DOUGLAS W. FRAGO along with the
     original signature page. As agreed, you will
11   be responsible for contacting the witness
     regarding reading and signing the transcript.
12
     Within 30 days of receipt, please forward
13   errata sheet and original signature page signed
     to opposing counsel.
14
     If you would like to change this procedure or
15   if you have any questions, please do not
     hesitate to call.
16
     Thank you.
17
     Yours,
18
19
20
     Bonnie L. Russo
21   Reporter/Notary
22

29 (Pages 110 to 112)

Douglas  Frago

| | | | | |
|---|---|---|---|---|
| **A** | 77:3 | **African-Ame...** | 62:12 69:13 | **Argumentative** |
| ability 6:8 | **ADM** 101:9 | 87:4 107:6 | 89:18 109:7 | 70:7,14 |
| 48:11 95:7 | **administrative** | afro 87:5 | **APPEARANC...** | **Arlene** 104:16 |
| 99:4 102:14 | 10:10 12:2,6 | **afternoon** 5:16 | 3:1 | **arrived** 11:19 |
| able 30:7 35:2 | 13:5,10,12,13 | 78:3 | **appears** 57:20 | **asked** 6:4,11 |
| 88:5 102:22 | 14:5,21 16:19 | agencies 13:13 | 70:10 105:18 | 34:7 41:15 |
| **absolutely** | 17:15,16 19:7 | agency 13:20 | 110:5 | 76:8 77:1 |
| 12:15 18:1 | 19:21 26:22 | 32:3 76:13,13 | **applicant** | 82:21 86:1 |
| 31:1 34:3 | 29:9,11 33:20 | 77:3,13 87:16 | 23:21,22 24:2 | 95:19 97:3,4 |
| 63:10 70:3,8 | 34:9,12,15 | 103:2 | 53:17,18 54:8 | 97:4,5,7 |
| accept 37:8,22 | 35:11 37:4,9 | ago 71:15 | **applicants** | 107:18 |
| 40:14,21 | 37:22 38:6,10 | 77:17 | 17:18,21 | **asking** 61:5 |
| 41:10,14 71:9 | 38:17,20 39:2 | agree 71:22 | 19:10,15 | 63:16 80:17 |
| 72:1 78:18 | 39:6 44:14,20 | 79:7 | 24:18 26:22 | 106:2 |
| 79:7,15 | 45:10 46:10 | agreed 41:21 | 27:1 28:9,9 | **assistant** 10:19 |
| accepted 37:8 | 47:19 48:15 | 111:10 | 36:11,15 | 10:20 11:2,14 |
| 72:6 73:9 | 49:10,18 | **agreement** | 37:15,16 56:4 | 11:17 13:6,7 |
| **accepting** 67:5 | 50:21 51:4 | 24:18 89:14 | 56:6,8,18 | 15:1 |
| 71:8 | 54:3 56:5,7 | **agricultural** | 67:11 79:3 | **Association** |
| accepts 79:14 | 60:22 61:3,7 | 104:6,14 | 93:3 | 98:22 |
| **accommodate** | 61:8,12 66:5 | **agriculture** | **application** | assume 23:14 |
| 6:3 | 66:12,17,19 | 1:10 3:20 | 101:1 | 49:21 50:7 |
| **accomplished** | 67:6,14 68:1 | 6:22 7:4,11 | **applications** | 51:10 54:11 |
| 13:21 | 69:12,18 70:2 | 7:17 8:4,7,20 | 44:1 | 54:20 68:19 |
| **accomplish...** | 71:8,10,22 | 104:1 107:15 | applied 17:21 | 74:11 78:1 |
| 93:20 96:16 | 76:10 77:22 | ahead 29:15 | 18:22 34:20 | 81:17 |
| 98:12,13 | 78:9 79:20 | allow 6:14 | 41:19 43:20 | **assumption** |
| 102:1,18 | 81:1,15 82:1 | 12:16 36:14 | 80:15 | 61:14 62:1 |
| account | 83:12 97:14 | 46:3 50:2 | **applying** 17:12 | 64:9 |
| 100:10 | 98:1 101:5,10 | 71:2 | 17:15,19 | **assumptions** |
| **acknowledge** | 101:11,16 | amount 93:20 | **appointed** 11:7 | 23:17 61:16 |
| 109:2 | 102:4 103:14 | **announced** | 11:10 | attach 112:6 |
| **ACKNOWLE...** | 103:18 | 67:7 | **appointment** | attached 109:7 |
| 109:1 | **administrator** | **announceme...** | 11:5,6 | attitude 97:13 |
| action 1:7 4:15 | 7:5 8:22 9:10 | 10:14 | **appointments** | **attorney** |
| 60:14 88:9 | 11:2,10 44:18 | answer 6:15 | 102:3 | 110:15 |
| 110:12,17 | 107:20 | 35:2 63:18 | **appraisal** | **Attorneys** |
| activity 9:1 | **administrators** | 68:20 69:1,1 | 89:14 | 111:1 |
| **Ad** 53:15 | 15:2 | 91:14 100:22 | **appropriate** | **ATTORNEY'S** |
| added 21:12 | **advertiseme...** | answered 86:2 | 6:12 112:6 | 3:11 |
| 28:6 60:6 | 14:10 | 86:4 | **approval** 13:17 | authority 12:3 |
| **additional** 12:4 | advise 77:20 | answers 91:9 | 13:18,20,22 | 12:8 |
| 14:1 106:6 | **advisement** | anybody 44:11 | approved 82:9 | **authorize** |
| address 8:11 | 60:17 | **apologize** | **April** 7:21,22 | 77:19 112:6 |
| 64:3,6 | adviser 22:7 | 36:21 | area 13:5,6 | available 62:19 |
| **adequately** | advisor 16:7 | appear 47:2 | 98:7 | 77:17 |

Douglas Frago

Page 114

**Avenue** 2:12
3:5
**award** 95:19
96:20
**aware** 44:12
86:15 87:8

**B**
**bachelor's**
9:16
**back** 24:8
30:11 38:3,5
39:12 58:9
61:17 64:13
75:9,12
**backfill** 13:19
**background**
97:14 100:9
**balloting**
102:21
**based** 39:10,16
92:20
**basis** 49:7
**belief** 49:7 69:8
**believe** 11:1
20:1 24:16
26:21 28:7
34:13,18
37:11 40:16
40:17 41:12
43:18 44:8
50:12,17 51:1
51:6 58:9
60:20 62:3,4
65:22 66:14
68:8,10,12
71:4,7 73:14
82:8,9 94:11
95:8 99:5
**best** 14:11 21:8
21:8 70:17
**Bible** 62:21,21
**black** 87:5
**body** 97:13
**Bonnie** 1:21
2:21 110:2
111:20

**book** 53:3
**bottom** 29:19
58:21 59:20
76:17
**bounce** 64:13
**Boy** 59:7
**Branch** 2:11
3:3,4 4:3 5:13
5:17 8:19
9:10 23:13
30:20 36:21
40:16 42:13
47:11,13,15
51:17 54:4,7
54:12 55:6
58:6 59:9
63:21 67:16
70:9,15,19
71:16,19 76:2
76:12,16 77:6
77:10,18
79:17 84:15
86:5 88:1
89:20,22 90:4
106:6,11
107:5,18
108:1,2,10
**Branches's**
107:12
**break** 6:1 71:17
**Breeders** 98:22
**breeding** 98:18
**bring** 48:10,18
**Bruce** 56:1
**budgeting**
97:20 98:8
**Bush** 11:8

**C**
**C** 4:1
**California** 9:18
9:20
**call** 41:9,13,15
111:15
**called** 37:20
41:12 42:10
42:18 44:8

51:9
**candidate**
26:17,20
43:12
**candidates**
14:12 19:15
26:16 28:6,12
38:18 41:16
42:18,19
70:17 78:6
**CAPTION**
112:1
**captioned**
112:3
**card** 53:4
**Carol** 74:4
**Carolyn** 82:21
**case** 49:11
112:1
**cases** 36:20
102:10
**Caucasian**
103:12,16
104:3,11,16
104:22 105:7
**Caucasians**
105:21
**CD** 100:9
**CECD** 100:10
**CED** 101:3
**ceilings** 99:19
99:20
**ceremonies**
96:20
**cert** 15:15,17
18:16,17 30:8
44:9 45:7
**certain** 14:11
**Certainly** 47:4
**certificate** 4:11
30:13 58:8
72:2,5 73:10
79:1 110:1
112:6
**certification**
58:17

**certified** 34:21
45:7 94:4
**certify** 110:4
**cetera** 95:21
**chain** 95:8
**change** 92:11
102:4 111:14
112:7
**changes** 109:6
112:4
**changing**
68:17
**charge** 12:4
**checked** 77:4
77:13
**chew** 96:7
**children**
106:20 107:1
107:4
**choice** 72:14
**choose** 35:17
**chosen** 65:9,13
65:18
**Chott** 10:16,17
10:19 11:13
16:4,5,12
18:8 20:20,21
23:10,20 24:4
24:17 26:14
28:17 31:10
31:20 34:4
35:2,4,15,19
36:10 37:13
41:13,15,17
42:1 43:9
51:11 55:11
62:6 66:4,9
69:4,15 76:7
77:19 83:14
86:13,16 87:3
87:9
**Christmas**
95:22 96:14
96:20
**Chuck** 56:15
56:20,22

**circled** 33:4
**civil** 1:4,7 3:13
92:9 94:3
111:2
**clarifying** 26:4
**clarity** 86:10
**classifications**
80:2
**clear** 68:3 96:4
**cleared** 11:11
**clearing** 102:9
**close** 29:18
**closely** 42:8
99:17
**closures** 98:14
**color** 107:3
**Columbia** 1:3
110:20
**column** 56:12
**columns** 55:14
57:8
**combination**
107:9
**come** 72:19
96:4
**comes** 108:6
**coming** 62:17
**comment**
93:18 96:7
**comments**
86:17,19 87:1
92:7
**Commission**
110:21
**committee** 9:5
102:19
**committees**
95:11 100:14
102:2,5,21
**communicated**
75:9,12
**communicati...**
16:6 97:14
**communicati...**
99:7
**competitive**

Douglas Frago

Page 115

4:10 73:10
79:1
compiled
14:10
complainant
55:1
complaint
107:19
complaints
87:8,15
107:13
complete 18:6
25:4 60:11
109:5
completed
60:13 66:11
66:13 67:12
69:11,17
72:12 73:16
complied
99:18
composite
29:16
computer 96:3
96:10
computerized
110:8
concerned
20:17 77:3
concerning
107:12
concluded
108:13
conclusion
72:19
conduct 17:3
106:11
conducted
17:4 22:12
86:11
Connecticut
2:12 3:5
conscience
30:21
consent 102:6
102:7

considered
34:17 38:6,9
43:22 67:14
71:13 84:8,10
86:12
consist 84:8
consolidations
98:9
consultation
21:21
contact 74:19
contacting
42:2 111:11
contacts 101:6
contained 93:4
93:10
contention
40:3
contents 65:11
65:12
continuation
72:18
continuity
41:22
contracting
97:15 98:8
conversation
43:2
Cooksey 98:20
coordination
89:3
copies 47:7
copy 28:18
54:6 108:6
111:9
correct 8:1,15
15:4,8 16:15
16:16 19:11
19:12,16 21:1
24:22 27:7
36:1 44:22
48:22 57:9
58:2,3,13
65:16 71:14
79:4 90:15,17
90:18 91:4,6

98:1,4 100:3
103:10,11,13
103:17,21,22
104:4,5,9,10
104:13,17,18
105:1,5,8,11
105:16 109:4
corrected 66:8
corrections
109:6
correctly 63:14
counsel 5:12
76:13,14
110:11,15
111:13
counties 92:2
county 9:2
101:4 102:19
102:21
couple 17:8
19:3 31:11,12
31:13 74:11
74:12 106:9
course 30:14
36:13 64:10
court 1:2 108:3
covered 8:17
create 14:1
created 14:4
credit 93:3
Cronin 29:10
33:21,22
38:20 43:3
65:9,13,18
66:1 69:5
74:21 75:2,17
104:3
cross 92:11
crossed 92:15
currently 6:16
cut 59:22

---D---
D 57:8
date 59:1,3,3
59:12,12 64:3
64:14 76:17

76:18 85:10
90:16,19
109:10 112:2
112:18
dated 4:12,13
4:14 65:20
73:6 78:7
100:3
dates 105:12
David 2:11 3:3
3:4 5:17
day 30:5,6,7,22
30:22 31:4,7
31:7 32:5,5
51:22 52:2
69:7 74:14
75:20 77:12
78:7
days 25:20,22
26:8 31:5
32:9 74:12
111:12
DC 111:3
Deals 94:3
Dear 111:8
Deborah 105:7
December 7:2
7:16,22
decided 19:13
22:9 33:12
37:8 71:9
deciding 14:16
22:2 40:18
42:4
decision 18:10
27:20 29:20
30:5,12,18
31:21 33:4,6
33:11 38:7
67:22 68:3,8
68:13 70:10
92:19 93:8
decisions 44:1
63:6
declined 69:9
69:16 70:21

71:1
decree 102:6,7
Defendant 1:11
3:9
definitely 40:8
degree 9:16
10:7
delegated 42:5
denominatio...
102:20
department 1:9
3:20 6:22
7:11 8:6 32:3
78:22 87:16
87:20 97:17
103:3 107:13
107:14,15,16
107:19,21
Dependable
95:9
DEPONENT
109:1 112:2
deposition
1:15 2:9 5:19
51:15 55:4,8
58:4 63:19
64:1 75:22
76:4,15 82:6
87:21 88:3
90:2 110:3,5
110:9,13
111:10 112:1
112:2,3
deputy 7:5 8:22
9:10 11:2
15:1 44:18
107:20
describe 95:6
98:12 99:3
detail 98:13
determination
13:15
determined
11:22 37:16
differ 83:22
difference

Douglas Frago

Page 116

| | | | | |
|---|---|---|---|---|
| **different** 16:22 17:1 27:15 33:19 80:1 | 88:11,21 89:2 89:10 90:16 90:20 100:3 | **employee** 8:8 47:9 48:10 87:4 110:14 | 63:19 64:1 72:16,17 75:22 76:4 | 102:7 **faster** 31:14 **fat** 87:5 |
| **difficulty** 62:18 63:1 | **documents** 70:5 76:19 | **employees** 9:8 98:15 | 82:6 87:21 88:3 89:19 | **federal** 8:9 **feelings** 27:14 |
| **dilemma** 36:7 | 77:1,5,7,14 77:16 | **employment** 98:14 | 90:2 **Exhibits** 4:7 | **felt** 41:20,21 92:7 |
| **direct** 9:13 **direction** 110:9 | **doing** 83:6 84:20 85:20 | **Enclosed** 111:9 | 5:3 76:14 **existing** 12:13 | **female** 103:12 104:16 105:7 |
| **directly** 75:7 **director** 100:11 | 102:1,2 **Doug** 55:20 | **ended** 35:15 **engagements** | 12:20 **experience** | **females** 107:2 **field** 7:5 8:22 |
| **directors** 9:2 9:14 42:21 | 57:11 64:4 65:9,13,16,18 | 100:20 **enjoy** 102:1 | 91:22 92:7 **expert** 80:1 | 11:2 12:5 91:18 97:17 |
| 43:1 **disconnect** | 76:8 97:5 **Douglas** 1:15 | **entered** 112:5 **entire** 112:3 | **expertise** 92:8 **expires** 110:21 | 97:20 100:21 103:8 107:20 |
| 97:18,19 **discovery** | 2:9 4:2 5:8,15 109:2,10 | **errata** 109:7 111:13 112:1 | **explain** 18:2 36:3 59:15 | **Fields** 1:5 3:21 5:18 28:3 |
| 76:22 77:9 **discuss** 23:9 | 111:10 112:2 112:19 | 112:4,5 **Esq** 3:3,10,19 | 72:4 **explanation** | 29:14,16 41:18 43:7,10 |
| **discussed** 23:14 27:14 | **drive** 8:12 96:3 96:9 | et 95:21 **European** | 70:12 80:18 **extensive** 92:1 | 55:2 57:21 62:11,18 63:2 |
| **discussing** 23:19 | **duly** 5:9 110:5 **duties** 8:21 9:7 | 107:8 **evaluation** | 92:1 **e-mail** 4:12,13 | 63:7,13 64:20 65:2,5 66:2 |
| **discussion** 24:4,15,16 | **D.C** 1:16 2:14 3:7,15 9:8 | 88:17 **evening** 78:13 | 4:14 64:3,6 64:15 65:8,12 | 67:8 76:16 78:2 90:14 |
| 26:13 27:6,11 27:13 28:12 | — E — | 78:16 **everybody** | 65:15 66:9,10 69:3 76:6 | 93:14 111:6 112:1 |
| 28:14 29:5,6 29:13 31:9,16 | **E** 4:1 **EEO** 16:7 21:14 | 13:14 14:17 14:18 18:16 | 78:6 83:3 85:9 | **filed** 87:9,16 **filled** 10:15 |
| 31:20 32:18 35:14,18 36:4 | 21:17 22:3,5 22:7 82:10,14 | 26:1,5 46:15 61:19 | **e-mails** 77:5 **E4905** 3:14 | 67:7 103:7,9 103:15,19 |
| 36:9 37:15,19 49:16 50:8,13 | 82:19 83:4,8 84:22 85:15 | **eviction** 99:15 99:19 | 111:3 | 104:2,8,15,19 105:7,20 |
| 50:19 62:5,9 78:4 91:7 | 85:22 86:6 87:8,15 92:9 | **evidently** 68:16 **exactly** 35:6,7 | — F — | **filling** 14:8 77:2 **final** 4:8 44:1 |
| **dispute** 42:11 42:12 | **EEO's** 107:12 **eight** 105:19 | **EXAMINATION** 4:2 5:12 | **F** 53:17 **FAC** 100:14,15 | 52:5,7 62:10 69:10 93:7 |
| **District** 1:2,3 110:20 | 106:3 **either** 24:19 | **examined** 109:3 | 100:16 101:7 **fact** 23:10 | 108:7 **finally** 27:19 |
| **divided** 28:7 **Division** 1:4 | 34:14 35:11 55:10 68:22 | **excuse** 30:10 60:16 62:21 | 68:19 69:3 **fairly** 105:19 | **financially** 110:16 |
| 3:13 111:2 **document** 53:1 | 73:12,15 81:11 | **executive** 100:10 | **far** 9:15 20:17 34:11 67:19 | **find** 111:9 **fine** 37:1 |
| 55:14 58:7,12 58:15,16,18 | **electronic** 77:4 **employed** 6:16 | **Exhibit** 51:15 54:5 55:4,8 | 72:8 **farm** 44:18 | 100:19 **finish** 6:14 |
| 59:2 64:2 73:5 76:5,6 | 110:12,15 | 57:21 58:4 | 47:18,18 98:19,19 99:20 100:21 | 10:14 12:17 |

Douglas  Frago

| | | | | |
|---|---|---|---|---|
| 36:14 46:3 | form 60:12 | 77:11 | guess 72:16 | Hispanic-Am... |
| 50:2 71:3 | 61:17 | girl 107:8 | | 107:7 |
| finished 26:16 | forms 60:18 | girls 107:7 | **H** | hold 19:4 20:5 |
| 66:5 | forward 111:12 | give 28:15 | H 53:18 | 63:15 |
| first 5:9 12:18 | foundation | 92:10,13,13 | half 7:12,19 | home 98:19 |
| 16:11 18:4,10 | 70:14 79:10 | 93:9 | handle 13:12 | hope 35:2,5 |
| 18:19,19 | 84:12 87:19 | given 12:3,7 | handled 95:15 | hoping 34:3,5 |
| 20:22 21:3,4 | four 19:19 20:4 | 13:22 26:2 | 99:12 | horse 98:17,22 |
| 21:15 25:7 | 27:1 28:5 | 34:10,13 | handwriting | hotel 95:20,21 |
| 27:16,17 | 46:15 47:7 | 35:16,22 37:3 | 28:19 29:3 | hours 30:21 |
| 42:16 45:15 | 54:17 55:14 | 66:18 67:5 | 93:15 | 31:11,12,13 |
| 45:18 47:7,8 | 55:15,22 57:8 | 71:2,4,7 93:3 | handwritten | House 100:12 |
| 47:12 48:8 | 71:11,15 | 109:5 110:10 | 53:17 | 101:6 |
| 52:6 57:4 | 77:17 91:3 | giving 71:12 | happen 36:10 | HR 82:9 |
| 59:16 72:17 | 106:21 | go 74:12 | happened | hurricane |
| 72:18 76:20 | Frago 1:15 2:9 | goals 99:7,8 | 15:17 17:2 | 102:8 |
| 83:2,21,22 | 4:2,16 5:8,15 | God 61:16 | 18:3 22:8,21 | |
| 84:7,19 85:13 | 5:16 44:12 | goes 8:2 58:9 | 27:11 29:4 | **I** |
| 85:13 88:6 | 64:4 65:18 | 79:13 | 31:14 34:19 | idea 45:5 57:6 |
| 90:7,11 93:17 | 71:20 79:18 | going 5:20 | 36:7 37:21 | 82:4,4,5 |
| 93:18 94:8 | 86:15 103:5 | 12:1,4,17 | 39:9 78:10 | 86:13 89:9,16 |
| 97:10 | 106:9,18 | 14:16 15:20 | happy 6:2 | 96:5 |
| five 19:19 20:1 | 107:11 108:3 | 20:8,10 21:12 | harassment | identification |
| 20:2,4 23:4,8 | 109:2,10 | 27:20 35:5 | 93:21,22 | 51:16 55:5 |
| 26:21 27:1 | 111:10 112:2 | 37:22 47:4 | hard 96:3,9 | 58:5 63:20 |
| 60:21 61:6,9 | 112:19 | 54:4 83:16 | hate 61:16 | 76:1 82:7 |
| FLP 76:10 | Freeman 29:14 | 84:3 88:16 | head 6:12 | 87:22 90:3 |
| fluctuated 9:11 | 29:15 | 108:4 | heading | identifies |
| fluttered 13:14 | Friday 65:4 | good 5:16 | 100:13 | 48:22 91:22 |
| FMHA 97:12 | 67:21 68:6,11 | 30:21 91:13 | heard 87:7 | identify 47:14 |
| focused 92:8 | FSA 97:12 | 91:13 92:3 | held 2:9 18:5 | 55:9 58:7 |
| focusing 45:6 | 100:9,17 | 97:13 | 44:13,16 45:3 | 76:5 88:4,5 |
| folks 16:6 | functions | grade 7:7 | help 90:22 | 90:5 |
| 18:22 19:5 | 47:19 | 12:20 80:15 | hereto 110:16 | II 14:5 |
| 39:22 50:1,2 | funding 97:20 | 80:15,20 81:5 | hesitant 64:9 | immediate 9:9 |
| 50:3 51:18,19 | 98:8 | 89:2 | hesitate 111:15 | impair 6:7 |
| 54:1,8 56:2 | further 110:13 | grid 27:22 28:1 | Hewitt 3:19 | imply 49:2 |
| 56:16 74:1,19 | F-A-C 100:14 | 28:11,16 | high 18:14,15 | important 6:10 |
| follow 96:6 | | 29:21 55:10 | 105:19 | 96:19 |
| following 30:7 | **G** | grids 57:12,15 | highest 38:16 | improper 70:14 |
| 78:7 112:4 | gender 106:22 | 57:15 | 40:4,9,11 | 79:9 84:11 |
| follows 5:11 | Gene 56:1 | GS 89:3 | 66:16 80:5 | 87:18 |
| follow-up | generic 17:8 | GS-12 105:6 | 81:1 | included 5:3 |
| 86:10 | 17:11,13 46:7 | GS-14 10:10 | hire 12:3,10,10 | 12:5 16:12 |
| foregoing | Georgia 96:1 | 104:19 | 13:17,20,22 | 46:7 84:8,9 |
| 109:3 110:3,5 | getting 13:17 | GS0114 47:18 | hired 44:11 | 101:8 |
| | 13:18,19 21:7 | | | |

Douglas Frago

Page 118

incorrectly 68:16
indicate 89:14 102:12,16 108:7
indicated 38:8 79:1 82:22 93:19 94:13 98:20 101:21 112:5
indicates 78:7
individual 18:5 90:11 91:15 107:16
individuals 40:4 50:20 71:20 75:20 79:2,6 86:11 106:13
inform 30:15
information 8:17 32:14,16 93:4,10 103:1
informed 37:7
informing 40:20 69:4
initial 85:14
initials 55:18 55:19 57:7
input 84:3
intent 49:5,6,8
interest 47:8
interested 48:9 101:22 110:16
interrupt 36:22
interview 4:8 4:16 14:19 15:20 16:11 18:5,10,19 19:21 20:12 22:2 23:12,21 24:1,2 26:15 30:6,17 41:2 45:15,16,17 45:20 46:13

46:14,18 47:1 47:17 49:19 50:5,11 51:3 52:5,7 54:20 54:22 60:13 60:19 61:6,7 61:9,22 69:10 70:18 82:11 83:5,6,10,11 83:11,13,14 84:7,9,17,21 85:2,5,18,20 86:7 90:8,11
interviewed 17:6 18:7,22 19:17 23:2,3 26:18 35:5 36:11,16,18 45:8,9,22 46:4,17 50:15 50:18 51:19 51:20 53:22 54:1,9,14,21 56:3,17 57:18 57:21 60:21 62:2,11,14 63:8,9 64:20 64:21 65:3,5 66:2 67:9 68:14 78:3
interviewers 84:10
interviewing 15:22 16:3,17 16:21 18:3,4 20:15,16 22:4 26:16 41:3,7 50:3 51:3 69:17
interviews 14:13 15:11 15:19 17:3,4 18:6,20 19:5 19:10,14 20:6 21:18 22:10 22:18,22 24:5

24:20 25:3,9 25:18,19,22 26:7,20 27:5 32:2 38:17 39:11 43:21 45:12 52:12 54:18,19 61:12 62:5,8 66:6,11,12,15 66:17 67:11 86:11 92:21 106:12
investigation 52:5 96:1
investigations 93:21
involved 10:9 39:4
involvement 10:13 11:20
irrelevant 79:16
issue 59:3 98:18 99:15
issues 95:15 99:12
items 72:20 73:1

——— J ———
J 57:8
Jan 56:15,20 56:22
Jay 104:19
job 1:22 34:15 42:10 45:4 74:1
Johanns 1:8 111:6 112:1
John 10:19 41:13,15,17 42:1 55:20 57:11 67:20 69:15 76:6 77:19 86:16 87:3 97:1,3

Johnson 105:7
Judith 3:10 111:1
July 52:6,20 53:10,11,11 54:18,19,22 57:22 59:4,5 64:16 65:1,4 65:20 66:10 67:8,9 69:6 73:6 76:7 78:4,13,16,21 79:8

——— K ———
Ken 48:3 56:15 57:1 66:16 67:13,19 76:9 77:20 78:8,12 100:1 103:15
Ken's 57:4
kept 18:8,9
Kidwell 3:10 8:16 47:10,13 54:4 70:6,13 76:12 77:6,16 79:9 84:11 86:1 87:18 89:17 106:8 107:10,22 108:8 111:1,8
kind 13:14
knew 44:16
know 6:2,4 12:17 16:10 24:10 27:13 27:22 28:2,19 28:20,20,22 29:18 31:22 32:2 34:19 35:14 38:4 44:9 50:1,2,6 53:20 55:19 61:2 63:12 67:18,20 71:13,14 74:7 75:5,14 79:18

80:12 81:7,17 86:9 89:13 91:12 96:3,11 101:14,18
knowledge 48:11 97:12
known 103:1

——— L ———
L 1:21 2:21 57:8 110:2 111:20
lady 87:5
Lake 8:12
landowners 99:16
language 97:13
Law 2:11 3:4
lead 99:6
leader 99:7
learned 37:21
left 30:1 53:16 55:21 91:2 97:2 101:9
left-hand 48:15 56:12 60:5
letter 65:7
let's 56:11 68:2 71:16 96:21
level 7:9 12:13 15:3 79:20,22 80:10,15,19 81:6 104:2,8 104:15 105:20,20
levels 13:3
liaison 100:12 100:21
life 60:18
likes 95:11 96:6
Linda 43:3,3 55:20 56:15 56:20,22 57:11 65:9,13 65:18 66:1

74:21 97:4
103:9 104:3
**line** 34:2 81:18
94:7,8 96:3
**lines** 87:6
**list** 14:11,12,12
61:19 106:10
**listed** 72:21
88:13
**listener** 92:4
**lists** 55:11
**Little** 11:11
**loan** 47:19
98:19 99:20
100:21 102:7
**logistic** 95:19
**long** 7:10 30:18
31:2,6,8,19
73:21
**longer** 20:11
**look** 24:8 47:3
88:8,10 96:21
**looked** 25:6,7
27:18 31:16
32:21 93:1
**looking** 27:18
68:5
**looks** 55:10
57:8 58:16
59:13 61:18
97:1,18 101:9
**lot** 107:9
**Louisa** 8:12
**low** 18:14
96:18
**Luis** 9:19,21
**L-O-U-I-S-A**
8:14
**L-U** 10:2
**L-u-i-s** 10:1,3

**M**

**mails** 77:4
**major** 95:14
96:17 98:18
99:11,15
102:18

**majority** 17:10
**making** 93:7
**male** 103:16,20
104:11,12,22
107:6,7
**males** 107:2
**management**
10:10 14:21
60:22 97:16
98:1 100:10
100:11 101:5
103:14,19
**manner** 6:13
**March** 1:17 2:5
112:2
**mark** 96:2
**marked** 51:15
52:3 55:4,7
58:4 63:19,22
75:22 76:3
82:6 87:21
88:3 90:2
**married** 106:18
**material** 60:3
**matter** 32:8
112:3
**mean** 12:9,12
13:2 19:7
22:15 23:19
26:4 29:2
31:5 32:8
37:12 45:5
52:8 54:11
61:4 74:9
80:3 81:9,13
92:5 94:10
**meaning** 13:3
107:20
**means** 96:12
**mediation** 92:2
**mediator** 94:4
**medication** 6:6
**medium** 18:14
18:15
**member** 95:7
99:4

**members** 9:5
24:11 32:19
49:17 50:9
78:5 91:8,12
101:15
**memory** 18:10
42:9 54:13
78:10
**mentioned**
101:17
**merit** 4:10 73:9
78:22
**met** 18:17
**Mettinger**
104:20
**mid** 7:19
**middle** 96:15
**MIKE** 1:8
**mind** 34:18
62:16,20,22
**mine** 60:3,4,6
60:10
**minimum**
18:17
**minute** 49:14
**misundersta...**
94:9,14,17
**misundersto...**
84:5
**moment** 96:1
**Moncollier**
104:16
**Monday** 53:11
54:19 57:22
**Montana** 99:14
99:16
**month** 74:6,10
**moved** 98:15
**movement**
98:15
**MSD** 97:16,19
**MT** 99:14
**mutually** 18:11

**N**

**N** 4:1,1

**Nagel** 29:8,11
33:20 34:7,13
35:10,13,15
35:21 37:3,17
37:20,21 38:8
38:11,19 43:4
44:13,16 45:3
45:9 46:16
48:4 49:17
50:4,10,14,16
50:18 51:2
56:21 66:16
67:4 69:8,15
69:20 70:1,11
70:21 73:8,15
74:20 75:2,17
76:9 77:20
78:8,12,14
80:4,14 81:14
88:17 89:7
92:20 100:1
101:15
103:15
**Nagel's** 49:11
89:18
**name** 5:14,16
16:8 33:5
43:15,17 57:4
88:6,11 89:18
89:21 112:5
**names** 53:20
54:5 55:22,22
56:12,14
72:20 89:20
**narrow** 92:4,5
**narrowly** 92:8
**National**
100:16 101:7
**naturally** 14:17
**necessary**
13:19 21:22
83:1
**need** 6:1 22:3,5
22:7 83:8
84:22 85:14
85:22 108:7

**neither** 45:2
76:13 110:11
**Nena** 3:19
**never** 24:12,14
60:17 87:7
95:10,10
**new** 13:4,18
20:16,18
**niece** 43:15
**nine** 27:5 28:8
28:9
**nod** 6:12
**noncompetit...**
58:17
**nongraded** 7:9
**nonverbal** 6:13
**normally** 18:13
**North** 8:12
**northern** 107:8
**Notary** 2:22
110:1,19
**note** 53:17
**noted** 112:4
**notes** 4:16 18:9
18:9 24:8,14
29:15 47:21
48:1,3,14
49:9 69:21
80:22 90:6,8
90:21 91:16
91:20 93:13
95:3,13 96:21
97:8 98:11
100:7 101:21
102:12,16
**notice** 2:21
95:18
**notices** 14:10
103:2
**notification**
4:15 42:17
**notified** 76:9
**notify** 42:22
**NS** 60:2,6,14
**number** 28:2
52:9,15,17

Douglas Frago

Page 120

| | | | | |
|---|---|---|---|---|
| 53:5 62:2<br>81:22 91:2,17<br>92:18 94:6<br>96:22 103:7<br>**numbers** 28:4<br>55:12 59:8,11<br>59:12,13 91:5<br>**numerical** 93:9<br>**NW** 111:2<br>**N.W** 2:12 3:5<br>3:12<br><br>**O**<br>**O** 4:1<br>**Obispo** 9:19,21<br>10:5<br>**object** 54:5<br>**Objection**<br>47:10 70:6,13<br>79:9 84:11<br>86:1 87:18<br>107:5<br>**observer** 21:15<br>21:17 22:3,5<br>82:10,14,19<br>**occasion** 86:16<br>87:1<br>**occur** 28:8<br>43:3<br>**occurred** 35:7<br>35:8 75:15<br>80:12 102:4<br>105:2<br>**October**<br>105:14<br>**offer** 72:9<br>73:13,16 74:1<br>74:18<br>**offered** 27:20<br>33:5 42:10<br>**office** 3:11 5:17<br>9:8,9 10:16<br>41:19,22<br>43:13,19<br>44:17 52:9,15<br>52:16,18,18<br>53:5,7 98:9 | 98:14,16,17<br>99:19,20<br>101:4 103:7<br>105:22 111:1<br>**officer** 110:2<br>**offices** 2:11 3:4<br>9:3,6<br>**official** 14:17<br>22:3 40:18,20<br>42:4 72:13<br>83:7 84:22<br>85:3,6,21<br>88:14 106:17<br>**official's** 85:6<br>**Oh** 53:6 93:5<br>97:6<br>**okay** 6:16,20<br>8:3 10:4,6<br>11:7,13,20,22<br>12:16 13:15<br>15:6,14 16:11<br>17:2 18:2,18<br>19:9 22:8,12<br>23:18 24:7<br>25:14,21 26:3<br>27:8 29:1,20<br>31:2,19 32:7<br>33:6,18 36:3<br>38:15 39:4,8<br>42:7 46:16<br>47:20 48:5<br>50:17 52:12<br>53:6,9,20<br>54:22 55:13<br>55:21 57:20<br>58:11,20<br>59:15 60:11<br>60:15,20<br>61:11 62:10<br>63:11,17 64:8<br>64:11 65:11<br>65:22 66:9,14<br>67:1 68:15<br>71:6 72:15<br>74:15,17,18<br>75:10 79:5 | 80:8 81:3<br>83:2 84:5<br>86:9 89:1,10<br>90:10 94:2,7<br>94:22 96:21<br>97:6 98:10<br>99:1 100:20<br>101:20,22<br>102:11 103:4<br>104:22<br>105:15 106:5<br>108:2,10<br>**old** 53:3,4<br>**once** 15:15<br>32:22 40:18<br>59:18 79:13<br>**operation** 32:2<br>**operations** 7:6<br>9:1 11:3 12:5<br>100:21 103:9<br>107:21<br>**opinion** 95:9<br>**OPM** 97:21<br>**opposing**<br>111:13<br>**opted** 14:19<br>18:14 19:4<br>67:13<br>**option** 34:10<br>34:14 35:16<br>36:1 37:4<br>66:18 67:5<br>71:2,4,7,12<br>**order** 8:18<br>**organization**<br>98:17 100:16<br>**original** 111:10<br>111:13 112:6<br>**originally**<br>92:10,13<br>**outcome**<br>110:17<br>**outer** 52:17<br>**overall** 40:10<br>40:12<br>**overseeing** 9: i | **O-B-I-S-P-O**<br>10:5<br><br>**P**<br>**page** 4:2 55:13<br>56:11 57:5<br>58:14,18,21<br>59:16 72:15<br>72:17,17,18<br>73:5 88:6,11<br>88:20,21,21<br>88:22 89:1<br>90:7 100:1<br>101:8 111:10<br>111:13<br>**pages** 17:7<br>46:7 109:3<br>**PAGE/LINE**<br>112:7<br>**panel** 15:20,22<br>16:3,12 19:2<br>20:15,17,18<br>20:19,22 21:3<br>21:4,5,10,15<br>22:4 24:10<br>32:18 40:10<br>40:12 49:17<br>50:4,9 78:5<br>82:11,15,20<br>83:5,10,13,17<br>83:19,21 84:9<br>84:10,14<br>85:14 86:7,12<br>91:8,12 95:9<br>101:14<br>**panels** 87:11<br>87:12<br>**papers** 101:19<br>**part** 18:3 20:12<br>84:19 102:6<br>**participant**<br>95:10<br>**particular** 91:9<br>**parties** 96:20<br>110:12,15<br>**party** 95:22<br>96:14 | **Pat** 39:3 40:14<br>56:1 76:10<br>77:20 78:8,15<br>96:22 103:19<br>**Patrick** 40:14<br>**people** 9:13<br>13:9 17:6<br>18:12 19:3,17<br>19:20 20:9<br>40:2 41:19<br>42:2,3 53:22<br>54:14 55:12<br>60:21 61:6<br>62:2 68:13<br>79:13 84:8<br>100:10,11<br>101:6<br>**performance**<br>89:13<br>**period** 25:20<br>25:21 26:8<br>31:6 32:6,8<br>51:8 88:18<br>103:6 105:3<br>**person** 15:12<br>17:11 36:19<br>40:17 42:22<br>46:10 62:11<br>62:14 79:14<br>80:5 102:14<br>**personal** 18:15<br>**Personalize**<br>99:6<br>**personnel** 4:15<br>14:9 15:15,18<br>16:6 18:13,16<br>21:22 22:1<br>30:7,9,13,16<br>32:15,17<br>40:17,19,19<br>42:17 43:6<br>44:5,7 45:7<br>58:9 61:18<br>72:2,5,7,8,9<br>72:14 73:10<br>73:18,22,22 |

Douglas Frago

74:17 75:6,8
75:11 78:22
79:14 80:2
88:9 97:21
98:4
**person's** 43:15
**Peters** 29:12
29:12 81:18
81:19,21 82:2
**Peterson** 29:12
**phase** 27:11,13
**Pinkston** 104:8
**place** 25:22
31:9 50:13
52:13
**plaintiff** 1:6 3:2
5:12 77:9
**plan** 89:13
**player** 99:6
102:14
**playing** 14:14
**please** 5:14
6:14 55:9
88:4 91:21
95:17 99:14
111:9,12,15
**plus** 12:3 17:13
**point** 6:2 14:18
19:4 20:7
21:6 23:13
25:5 26:12
28:1 34:6,7
37:14 40:13
40:20 43:2,4
73:18 74:20
**points** 27:15
**political** 11:5,6
11:12
**positions**
10:15 12:1,2
12:2,6,8,11
13:4,12,18
14:2,3,8,21
14:22 15:6,7
16:17,19,22
17:1,19,22

19:6,6,7,11
19:15,18
22:16,19 23:1
25:12 26:7,18
33:9,10,13,14
33:19 34:12
35:22 36:8
37:18 40:1
41:20 43:20
44:13 45:10
45:13 48:18
50:5,10,15,19
51:5 54:2,15
57:2 61:1
62:7 71:22
72:1,6 76:11
77:2,22 78:9
84:4 101:3
103:7 105:19
106:3,12
**positive** 33:15
97:12
**possible** 5:22
95:17
**possibly** 9:2
**prepare** 57:14
108:4
**prepared** 29:21
57:12,15
**preselection**
70:1,16
**presence**
86:20
**present** 3:18
83:9 84:18
85:1,22 99:13
**presented**
95:16
**President** 11:8
**previously**
7:14 8:3 35:1
60:21 66:15
77:15
**prior** 62:3 64:2
65:22 70:20
76:14 82:8

85:9
**probably** 53:4
54:17 76:21
**problem** 95:15
96:17 99:11
**problems** 92:1
95:21
**procedure**
111:14
**proceed** 5:21
**proceeding**
108:12
**proceedings**
108:5
**process** 11:12
13:16 14:8
18:3,4 20:13
25:2 26:13,15
32:13 33:3
35:6 37:19
38:2 40:13
41:2,4,7 44:3
60:19 69:11
69:17 70:18
75:13 79:12
82:10 83:5
86:7 93:1
**produce** 77:4,5
**produced**
77:14
**program** 12:2,6
13:9,11 14:6
14:19,22
16:20 17:9,12
17:14,17 19:8
19:18 27:2
29:8,10 33:21
34:1,8,11,14
35:11 37:5
38:21,22
45:10 46:9,9
48:16 49:10
49:18 50:21
51:4 56:9,21
57:1 65:14,19
66:17,19 67:6

67:11,22 68:4
68:9 69:6,9
70:22 71:8
79:21 80:2,5
80:10 89:2
94:9,14,18,20
98:19 99:17
99:21 101:3
101:12,13,16
104:1,7,14
**programs**
44:19 47:18
**promotion** 4:10
58:17 73:10
78:22
**propounded**
77:9
**protective** 8:18
**provide** 6:10
**Public** 2:22
110:1,19
**Puerto** 102:8
**Pursuant** 2:21
**put** 14:9 92:4
92:17 97:13
**puts** 18:13 96:5
**P-R-O-C-E-E-...**
5:7
**p.m** 2:6 68:7,11
78:17 108:13

**Q**

**qualified** 14:11
14:12 43:19
81:11
**question** 6:5
6:11,15 23:3
23:6,6,7 24:3
28:2 47:12
48:8,12,17
49:2 68:20
69:2 82:18
84:6 91:17
92:17 93:14
93:17 94:12
95:5,13 96:2
96:22 97:3,4

97:5,5,7
98:11 99:2,10
100:8 101:21
102:12,17
107:18
**questions** 5:19
5:21 17:7,9
17:13,17
23:11 27:16
28:4,5 46:2,6
46:7,8,10,15
46:20,21 47:8
47:17,22 48:1
63:16 91:3,10
106:6,10
107:12 108:1
111:15
**quickly** 5:22

**R**

**race** 107:3
**racist** 86:16,19
87:1
**raise** 12:13
**raising** 12:20
**Ramirez** 16:4
16:13 18:8
21:2
**rank** 18:12 23:3
23:5,11,20
**ranked** 23:22
24:2,19 50:4
66:16
**ranking** 37:15
78:5
**rate** 49:17 50:9
**rated** 50:4,20
80:5 92:16
96:18
**rating** 37:16
78:6 88:13
89:11,12
**ratings** 28:15
**react** 63:13
**read** 29:2 47:12
48:8 49:1
55:22 56:14

Douglas Frago

Page 122

| | | | | |
|---|---|---|---|---|
| 58:10 59:17 | **receive** 91:9 | **related** 17:10 | **required** 83:5 | 39:20 |
| 61:15 65:12 | **received** 39:17 | 46:9,10 77:2 | 86:7 | **Rick** 104:8 |
| 83:2 91:16,16 | 39:18 76:19 | 92:6 96:9 | **research** 92:2 | **Rico** 102:8 |
| 91:21 93:13 | 77:11 | 110:11 | **reservation** | **right** 14:20 |
| 93:15 94:22 | **receiving** 6:7 | **relates** 9:7 | 95:20 | 15:9,16 20:22 |
| 95:3,12 97:8 | 77:12 | **relative** 110:14 | **resolution** | 22:8,14,21 |
| 98:10 100:7 | **reception** 53:8 | **relatively** 29:18 | 96:17 | 23:9 27:10 |
| 100:18 | **recess** 71:18 | **Relevance** | **resolving** | 32:12 37:3 |
| 102:22 | **recollection** | 107:5 | 95:16 99:13 | 38:19 53:16 |
| 106:11 109:3 | 22:6,20 27:9 | **relieved** 67:15 | **respect** 95:9 | 64:14 68:2 |
| 112:3,4 | 29:7 | **remember** 16:8 | 106:10 | 97:8 101:12 |
| **reading** 47:16 | **recommenda...** | 17:5 25:4,7 | **respond** 6:12 | 105:2,18 |
| 47:17,20,22 | 30:1 | 27:17 28:2,10 | 17:16 46:11 | 106:5 |
| 93:16 94:5 | **recommended** | 32:10,11 35:6 | **responded** | **rights** 92:9 |
| 111:11 | 71:21 | 40:12 42:15 | 17:13 | 94:3 |
| **ready** 28:14 | **record** 8:16 | 42:16 45:6 | **response** 6:11 | **right-hand** |
| **realization** | 47:14 76:13 | 57:16 63:14 | 12:22 23:5,7 | 48:16 60:4 |
| 36:19 | 77:7 89:17 | 67:16,17 | 91:10,17 | **Riley** 106:1 |
| **really** 21:8 | 108:7 110:10 | 83:19 92:6 | 93:14 94:11 | **Rodge** 43:11 |
| **reason** 21:11 | 112:5 | 96:15 100:13 | 95:1,4,18 | 43:16 |
| 63:4 112:7 | **records** 77:13 | **reorganization** | 99:1,9 100:22 | **role** 14:14 |
| **reasons** 112:5 | **redacted** 88:6 | 98:14,16 | 101:21 | 72:11 |
| **reassigned** | 89:21 | **repeat** 6:5 | 102:12,17 | **room** 3:14 26:2 |
| 104:20,21 | **reduced** 110:8 | 80:13 82:12 | 107:11 | 52:10 53:8 |
| **recall** 18:1 | **refer** 53:21 | **rephrase** 6:5 | **responses** | 111:3 |
| 23:19 24:15 | 55:19 | 82:17 | 23:11 27:15 | **rough** 18:8 |
| 26:19 30:4 | **referred** 84:14 | **replace** 20:14 | 49:12,13 | **round** 19:4,9 |
| 31:1,2,4,8 | 84:16 87:4 | **replaced** 102:5 | **responsibiliti...** | 19:14 20:6 |
| 34:5,5,6,9 | **referring** 10:18 | **report** 52:4 | 13:4,9 95:20 | 21:18 22:10 |
| 35:7,13 36:2 | 48:13 52:22 | **reported** 1:21 | **responsible** | 45:15,18,20 |
| 36:5 37:6 | 83:19 94:15 | 14:18 | 111:11 | **Russo** 1:21 |
| 41:11 45:14 | 101:3 107:14 | **reporter** 108:4 | **responsive** | 2:21 110:2 |
| 51:12,13,18 | 107:15,17 | **Reporter/Not...** | 76:22 77:8 | 111:20 |
| 51:19,21 52:2 | **refers** 54:8 | 111:21 | **rest** 102:22 | |
| 61:3 62:13,15 | 96:5 102:7 | **represent** | **result** 18:18 | |
| 66:21,22 67:3 | **reflect** 61:11 | 57:10 88:16 | **resumes** 25:5 | **S** |
| 69:19,19,21 | **refresh** 54:13 | **representative** | 25:6,8 27:18 | **S** 4:1 52:7 |
| 72:3 73:11,21 | **regarding** | 83:8 84:22 | 27:19 30:2 | **San** 9:19,21 |
| 74:16 75:21 | 111:11 | 85:7,15,22 | 31:16 32:21 | 10:1 |
| 78:12,15,20 | **register** 30:11 | 86:6 | 39:11,20 93:2 | **sat** 18:7 29:22 |
| 90:22 92:15 | **regulation** | **representati...** | 93:4,11 | 30:2 87:11,12 |
| 94:21 | 98:18 102:20 | 83:4 | **retire** 7:1 | **saying** 28:2 |
| **recalled** 66:3 | **regulations** | **represents** | **retired** 6:18,19 | 35:4 57:1 |
| 68:16 | 98:21,21,22 | 5:17 | 7:17 | 105:12 |
| **recalling** 71:11 | 103:2,3 | **request** 6:3 | **review** 108:6 | **says** 48:21 |
| **receipt** 111:12 | **reject** 40:21,22 | 76:22 112:4 | **reviewed** 39:19 | 52:5,7 64:4 |
| | | | | 65:21 76:8 |
| | | | | 84:20 86:8 |

Douglas Frago

95:10
schedule 4:8
  15:13 25:19
  26:7 52:6,7
  52:19 53:10
scheduled
  14:13 22:11
  22:15,18,22
  25:18
scheduling
  63:1
school 9:15,17
score 4:9 39:16
  39:18 91:13
  93:10 101:15
scored 36:18
  38:16 81:1
scores 40:4,9
  40:11 91:8,9
  92:14
scoring 34:22
  39:11
scratched
  92:16
SCS 94:3
SD 60:14
search 42:16
  43:5
second 19:4,14
  19:21 20:5,19
  21:5,9,18
  22:2,4,10
  39:5 45:19,20
  46:5,13,14,17
  47:1 55:13
  56:11 58:14
  58:18,21 61:7
  61:9 72:15,17
  82:11,15,20
  83:6,10,11,12
  83:14 84:1,9
  84:17,19,20
  85:2,5,16,16
  85:17,20
  86:11 88:20
  88:21 89:1

93:1 94:7,8
  97:4 98:11
secretary 1:8
  14:13 15:10
  44:4,6 52:17
  63:1
secretary's
  53:8
section 99:22
  107:16
sections 99:21
Sedaris 56:1
Sederis 1:5
  3:21 5:17
  90:12 94:13
  94:16 96:15
Sederis's
  93:18
SEDs 102:6
see 41:14
  48:15 53:2,13
  54:5 55:15
  73:1 76:17
  79:4 88:11
  89:5 90:10
  101:2,18
seek 86:10
seen 24:12,14
  28:18 59:18
  60:17 64:2
  76:14,20 85:9
select 16:2
  33:18,22
  35:10 42:21
  70:11 106:13
selected 15:19
  15:21 19:1,3
  20:8,10 27:6
  27:12 30:16
  33:7,13 38:19
  38:21 39:1
  40:1,2,3 42:2
  42:3 43:1,8
  45:4 63:7
  66:2 69:5
  70:17 76:9

77:21 78:8
  79:3,13 80:9
  80:17,20 81:5
  81:14 83:16
selectee 53:18
  54:8 79:2
  81:20
selecting 66:18
  72:13,21,21
  83:7 84:21
  85:3,6,6,21
  106:16
selection 10:9
  11:21 26:12
  30:9 38:11
  39:5,10,13
  40:18 44:2,8
  44:14 60:5
  65:10 67:15
  71:21 75:3
  76:7 79:12
  92:20
selections
  39:15 62:6
  63:6 79:6
send 44:4,6
  72:5
sent 14:11
  18:16 30:8,11
  30:13 32:14
  32:17 43:6
  61:17 66:4,9
  67:20 72:1
  73:9,22 79:13
  86:13
sentence 83:3
  84:20 85:13
  94:8
sentences
  85:13
separate 45:12
separately
  46:17 101:16
September
  88:18
series 18:19

26:22 44:20
  44:21 45:3
  56:5 80:11,14
  80:16,19,21
  81:4,5,15
  82:3,5 89:2,7
  89:15
serve 83:16
service 8:6,9
  97:17
SES 7:8,9 19:3
set 15:11,19
  46:6 99:7
sexual 93:22
Shawn 16:9
sheet 49:19
  50:5,11 109:7
  111:13 112:1
  112:4,6
sheets 4:9 40:9
Shore 8:12
short 32:6,8
  71:16,18
  95:18
shorthand
  110:7
show 47:5
  51:14
showing 52:3
  55:7 63:22
  76:3 88:2
side 13:13
  29:10,11,19
  48:15,16
  49:10 55:21
  60:4,5 92:4
  101:5,9
sign 59:3,5
signature
  58:20,22
  59:10,19,21
  60:1,2 74:5
  111:10,13
  112:18
signed 59:9,18
  89:10,11,12

109:7 111:13
  112:5
signing 111:11
simultaneous
  19:1
Singh 43:11,16
single 49:19
  50:5,10
singular 48:22
sir 47:16 63:16
sit 30:20 33:17
sitting 25:4
  57:16
skills 48:11
Soloman 16:4
son 107:7,7
soon 74:8,9
sorry 45:17
  63:17 78:14
  82:16 106:15
source 76:18
Spalding 29:11
  33:21 39:3,5
  40:14 41:1,9
  41:14 43:4
  44:13,17 45:2
  73:8,16 74:21
  75:2,17 76:10
  77:21 78:8,16
  78:17 79:7
  92:20 96:22
  103:20
Spalding's
  42:9
speak 41:1,6
  43:7 73:15
Speaking
  100:20
special 10:19
  10:20 11:1,1
  11:16
specialist
  10:10 11:14
  14:5,6,19,22
  47:18 51:4
  60:22 65:14

Douglas Frago

Page 124

| | | **T** | 42:19 | **three** 7:12,19 |
|---|---|---|---|---|
| 65:19 69:6,9 | 111:2 | | **term** 18:12 | 13:5,17 14:1 |
| 70:22 79:21 | **strength** 47:9 | **T** 4:1,1 | **terminology** | 14:3,21 15:7 |
| 80:5,10 83:12 | 48:9 | **table** 18:7 25:4 | 30:10 44:9 | 16:21 17:1,7 |
| 89:3 103:15 | **strictly** 17:9 | 57:16 | 71:14 | 18:11 33:10 |
| 103:19 104:2 | 18:9 | **take** 5:18,20 | **terms** 18:14 | 33:13,14 40:1 |
| 104:7,7,15 | **strike** 22:13 | 6:1 12:13 | 95:6 99:3 | 46:7 54:19 |
| **specific** 26:20 | **strong** 27:14 | 30:18 34:8 | **testified** 5:11 | 55:15 62:7 |
| 46:22 51:21 | 100:9 | 50:13 71:16 | 35:1 66:14 | 75:19 81:22 |
| 95:17 99:14 | **subject** 65:7,7 | **taken** 52:4 | **testify** 6:8 | 84:8,10 86:10 |
| **specifically** | 65:10 76:7 | 71:18 110:3,7 | **testimony** 27:4 | 98:13 |
| 46:9 | **subjective** | 110:13 112:3 | 62:3 63:5 | **Thursday** |
| **spell** 9:22 | 91:15 | **talk** 35:10 | 66:1 68:18 | 53:10 54:18 |
| 43:17 | **submitted** | 75:19 | 70:21 71:6 | 62:19 68:6 |
| **spoke** 75:6,7 | 78:21 | **talked** 34:4 | 82:8 109:4,5 | 69:7 |
| 75:10,11 | **successful** | 41:18 43:10 | 110:4,6,10 | **time** 5:20 7:12 |
| 78:18 | 42:18 95:8,16 | 43:11,14 | **thank** 26:3 | 8:2 25:7,20 |
| **spoken** 73:12 | 96:17 99:5,13 | 74:20,21 | 103:4 108:2 | 26:1,5 27:17 |
| **Ss** 60:3,6 | 102:3 | 75:15 | 108:10 | 32:6 33:12,12 |
| **staff** 69:5 77:20 | **suggest** 26:5 | **talking** 12:19 | 111:16 | 44:11 45:4 |
| **stand** 66:8 | 65:15 | 35:13 77:17 | **thing** 15:9,17 | 51:2 57:13 |
| 100:15 | **Suite** 2:13 3:6 | 78:12,15 | 20:1 28:5 | 76:20 95:21 |
| **standard** 18:17 | **superior** 34:11 | **talks** 49:12 | 45:6,19,21 | 106:7 108:3 |
| **stands** 99:14 | **supervised** 9:9 | **task** 102:3 | 96:13 | 108:11 |
| 99:15 | **supervising** | **Taylor** 82:22 | **things** 78:10 | **times** 30:3 |
| **start** 6:15 | 9:8 21:12 | **Taylor's** 74:4 | 96:19 107:9 | 44:10 53:15 |
| 10:13 | **supervisor** | **team** 95:7 99:4 | **think** 8:10 11:9 | **timing** 31:22 |
| **started** 24:5 | 9:14 20:9,10 | 99:5,6 102:14 | 15:10 16:9 | 66:21 67:2,16 |
| **starts** 52:19 | 20:11 84:4 | 102:15 | 18:13 19:2 | 67:17,17 68:7 |
| **state** 5:14 9:2,5 | 87:17 103:6,8 | **Technically** | 21:6 29:12,16 | **title** 10:22 |
| 9:5,14,18,20 | 105:21 | 11:9 | 35:1 40:20 | 58:19 89:2 |
| 42:21,22 | **sure** 6:3 20:2 | **tell** 5:9 22:1 | 41:17 42:14 | **today** 5:18 6:8 |
| 98:17 100:12 | 25:14 28:17 | 27:10 30:4,7 | 42:19 43:9 | 62:17 76:19 |
| 100:14 101:4 | 38:2 49:15 | 30:21 32:9 | 72:16 74:4 | 76:20 77:11 |
| 102:2,4,6 | 76:18 91:19 | 35:10 39:8 | 76:21 77:7 | 108:3,5 |
| **states** 1:2 3:11 | 92:3 93:5,20 | 43:7 53:4 | 82:12 83:18 | **today's** 64:3 |
| 3:20 9:1 | 96:2,10 97:10 | 61:21 66:4 | 86:3 101:17 | 85:10 |
| 107:14 | 97:15 102:13 | 67:10,21 68:5 | 107:22 | **told** 15:10 |
| **step** 13:16 14:7 | **swear** 62:20,21 | 69:3,14,15 | **thinking** 62:16 | 37:10,12 45:1 |
| 25:1 32:12 | **switched** 7:8 | 75:1 95:14 | **third** 95:4,4,4 | 51:2,7,8 |
| 33:2 | **sworn** 5:9 | 99:11 | 97:5 99:2 | 60:20 67:18 |
| **sticks** 62:15,20 | 110:6 | **telling** 72:13 | **thought** 20:11 | 68:12 74:17 |
| 62:22 | **systems** | 77:10 78:17 | 21:7 29:16 | 86:22 |
| **stipulation** | 102:19 | **tells** 54:16 | 81:19 | **top** 19:5,14 |
| 8:17 | **S-A-N** 10:1 | 67:12 | **thousands** | 29:7,8 34:10 |
| **stop** 37:19 | **S-I-N-G-H** | **ten** 27:5 28:9 | 102:9 | 34:20,22 |
| **Street** 3:12 | 43:18 | **tend** 34:18 | | |

Douglas Frago

35:15,17,21
36:8,20 37:17
55:15 57:7
67:19 69:20
**total** 62:2
**transcript** 5:3
108:4 111:11
112:3,7
**transcription**
109:5 110:8
**travel** 63:3
**treatment** 6:7
**Treese** 13:6
19:1 20:7,14
20:20 21:11
21:13 23:10
23:20 24:4,17
26:14 28:18
31:10,20
35:14,19
36:10 37:13
43:3 51:11
55:11 62:6
74:22 83:15
84:2,18 103:9
**true** 26:6 45:2
87:3 109:4
110:9
**truth** 5:9,10,10
**truthfully** 6:8
**trying** 53:2
**turn** 48:3 56:11
88:20 90:1,7
99:22
**twice** 46:1,4
96:14
**two** 13:4 14:21
16:19 19:8
29:13 30:21
31:5 37:12,12
43:12 50:15
50:18 55:15
60:22 71:21
72:20,20,22
73:1 76:10
77:21 79:2,6

81:12 85:13
98:13 107:2,2
107:7
**two-page**
58:12

**U**

**Uh-huh** 21:16
25:16 26:9
31:18 32:20
33:8 38:12
39:18 40:5
53:12 55:17
56:13 57:3
58:1 65:17
73:2 88:12,15
88:19 89:4
94:19 98:2
100:2,4
**ultimate** 99:18
**Ultimately**
34:16
**Underneath**
55:18
**understand**
25:15,17
70:20 72:8,11
78:2 80:4
103:5
**understanding**
72:7 79:11,11
85:12
**United** 1:2 3:11
3:20 107:14
**university** 9:17
9:18,19,20
**unknown**
53:17
**unknowns**
54:8
**upgrade** 12:1,8
12:12 13:2
**upgrading** 13:8
**USDA** 64:4
**usually** 83:7
84:21 85:21

**U.S** 1:9

**V**

**vacancy** 10:14
**various** 95:11
**vast** 17:10
**verbal** 6:11
38:5
**versa** 46:12
**vice** 46:11
**view** 18:15
**Virginia** 8:13
**vs** 1:7 111:6
112:1

**W**

**W** 1:15 2:9 4:2
5:8 109:2,10
111:10 112:2
112:19
**Wait** 63:15
**walked** 51:9
**Walton** 99:15
99:17
**Waltons** 99:18
**want** 5:21 16:9
23:16 25:14
32:4 41:16
49:20 108:5
**wanted** 16:7
34:8,16 38:6
38:9 84:2,18
**wanting** 71:12
**Washington**
1:16 2:14 3:7
3:15 111:3
**wasn't** 21:22
26:1 31:5
64:21 81:4
84:13 87:3
**way** 17:14
29:17 46:2,6
**Wednesday**
52:20 53:10
54:17 62:19
**week** 74:6,10
**went** 30:2 32:3

37:20 40:19
41:17 42:16
64:12 69:2,4
92:17,22
96:10
**weren't** 25:22
**We'll** 49:13
**we're** 37:1
77:17 101:22
107:17
**white** 100:12
101:6 103:20
104:11
**wife** 78:19
**William** 5:15
**witness** 54:10
70:8,15 79:11
84:13 86:3
87:20 107:6
108:9 110:4,6
110:10
111:11
**word** 92:3 97:1
97:15
**work** 6:20 7:10
8:4 92:1 95:7
95:20 97:21
98:3,6 99:4
102:15
**worked** 7:14
42:8 44:18
95:22 97:16
98:21 99:17
99:20 100:11
100:14 102:2
103:2
**working** 53:3
90:21 92:1
101:4 102:5,8
**wouldn't** 31:6
42:12 43:5
70:12 75:7
81:9,16
**writing** 38:4
63:12 102:13
102:20

**written** 60:4
97:1
**wrote** 94:13
96:14 98:20
100:18

**Y**

**Y** 60:7
**Yeah** 52:16
88:10 89:20
93:16 97:3
**year** 10:6 64:17
89:8
**years** 7:12,19
8:9 71:12,15
77:17 91:22
92:7
**Yep** 53:14

**Z**

**Zena** 105:9
106:1

**0**

**03** 64:18 76:7
**05** 7:2,16
**06-0538(HHK)**
1:8

**1**

**1** 4:8 51:15
54:5 57:21
96:22 100:8
**10th** 32:11
**1145** 79:21
80:6,11,14,16
80:19,21 81:4
81:5
**12** 1:17 2:5
112:2
**12th** 32:11
**13** 61:20,22,22
80:15,19
104:8,15
105:20
**13s** 13:11
**13/04** 89:3

Douglas  Frago

Page 126

| | | | | |
|---|---|---|---|---|
| **14** 15:6 17:6 61:2,20 79:20 79:21 80:10 80:15,20 81:5 104:2 110:21 | **2010** 110:21 **202-514-7250** 3:16 **202-785-2805** 3:8 | **6** | | |
| **15** 12:4 13:20 14:1 15:3,5 17:6 20:8 | **20530** 3:15 111:3 | **6** 4:14 82:6 **6:00** 78:13,16 **63** 10:8 **690** 2:13 3:6 | | |
| **15s** 14:1 **15th** 32:11 **16** 52:20 53:10 **16th** 54:17 | **21** 53:11 57:22 67:9 **21st** 54:19,22 59:4,5 73:6 78:3,4,13,16 78:21 | **7** | | |
| **17** 8:10 9:11,12 53:11 **17th** 54:18 **1743** 8:12 **179873C** 1:22 | **22** 9:11,12 **22nd** 76:7 79:8 **23093** 8:15 **235** 102:2 **2500** 9:2 **28th** 59:3 | **7** 4:15 87:21 88:3 89:19 **7-11-03** 4:14 **7-18-03** 4:12 **7-22-03** 4:13 | | |
| **18** 8:10 **18th** 64:16 65:2 65:4,20 66:10 67:8,20 69:7 | **3** | **8** | | |
| **1825** 2:12 3:5 **1963** 10:8 **1990** 8:5 **1993** 8:5 | **3** 4:10 7:8 58:4 72:16,17 92:11,17 102:12 **30** 111:12 **30th** 88:18 | **8** 4:16 90:2 **8th** 32:10 | | |
| **2** | **301** 44:21 45:3 79:19 82:2 89:3,7,15 **3092** 52:7 53:7 **3094** 53:7,7 | | | |
| **2** 4:9 7:8 55:4,8 88:21,22 92:10,15,16 92:18 93:14 94:6 101:21 | **4** | | | |
| **2s** 92:14 **2:05** 2:6 **20** 91:22 92:7 **20009** 2:14 3:7 **2001** 7:20 | **4** 4:12 63:19 64:1 76:14 95:13 99:10 102:17 **4th** 3:12 111:2 **4:12** 108:13 **4:56** 68:7,11 | | | |
| **2002** 7:21,21 7:22 88:18 89:8 **2003** 10:11 59:6 65:20 66:10 73:6 | **5** | | | |
| **2005** 7:22 105:14 **2007** 1:17 2:5 112:2 | **5** 4:3,13 75:22 76:4,14 **51** 9:1,14 **555** 3:12 111:2 | | | |